# TAB A

DocuSign Envelope ID: 9F0FB66F-FF27-430D-B72D-9A93FF460456

Scott R. Hatch, Bar No. 241563
  shatch@calljensen.com
Joshua G. Simon, Bar No. 264714
  jsimon@calljensen.com
Rebecca I Makitalo, Bar No. 330258
  rmakitalo@calljensen.com
CALL & JENSEN
A Professional Corporation
610 Newport Center Drive, Suite 700
Newport Beach, CA  92660
Tel:    (949) 717-3000

Attorneys for Defendants, Össur Americas, Inc. and Össur hf

## UNITED STATES DISTRICT COURT

## CENTRAL OF CALIFORNIA

| | |
|---|---|
| WAYNE CALCO, an individual, | Case No.  8:22-cv-01971 JWH (KESx) |
| Plaintiff, | **DECLARATION OF TATJANA LATINOVIC IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| vs. | |
| ÖSSUR AMERICAS, INC., a California corporation; Össur hf, an Icelandic company; and DOES 1 through 10, inclusive, | Date:  July 11, 2024<br>Time:  10:00 a.m.<br>Place:  Courtroom 9D |
| Defendants. | |
| | Complaint Filed:   October 26, 2022<br>Trial Date:          October 21, 2024 |

DocuSign Envelope ID: 9F0FB66F-FF27-430D-B72D-9A93FF460456

I, Tatjana Latinovic, declare as follows:

1.    I have personal knowledge of the facts in this declaration, and if called to testify concerning them, I could do so competently.

2.    I am employed by Össur Iceland ehf as its Vice President of Intellectual Property.

3.    Össur is as a global leader in orthopedics and is particularly known for its expertise in the development, manufacturing, and distribution of prosthetic limbs, braces, and orthopedic support products.

4.    In my role as Vice President of Intellectual property, I am familiar with Össur's policies, records, and databases pertaining to its intellectual property portfolio, including in particular its patents, patent applications, and related and underlying documentation as maintained in Össur's patent management software, Patricia. I am the person primarily responsible for maintaining such records and databases in the ordinary course of Össur's business. Among other functions, Patricia stores all patent applications and patents, including all drawings and written evidence provided by prospective inventors, including Mr. Calco. All evidence of inventorship, including drawings, provided by Mr. Calco were uploaded to Patricia. Also stored in Patricia are patent prosecution histories, including office actions and response to office actions in connection with patent applications. I am also the primary point of contact at Össur for Össur's outside patent counsel and am familiar with Össur's prosecution histories. Product development information including the completion of various "Gates" is governed by the Product Lifecycle Management Procedure and is tracked in Össur's databases as well. I am familiar with the procedure and have access to these databases.

5.    One of Össur's best-selling clinical cervical collars on the market is the Miami J cervical collar, which has been sold since 1991, is covered by a number of US and international patents, and is clinically proven to provide comfortable immobilization of the neck pre and post-surgery, or after injury.

DocuSign Envelope ID: 9F0FB66F-FF27-430D-B72D-9A93FF460456

6.    Wayne Calco ("Calco") was a named inventor on patents for other adjustable cervical collars of Össur's competitors, including US 7,674,234 Patent ("'234 Patent") and US 9,132,027 ("'027 Patent").

7.    Calco and Össur entered into a Services Agreement on October 29, 2015. At the time the Services Agreement was entered into, and all times relevant to this case, Össur harbored an intent to be bound by the terms of the Services Agreement. While Duane Romo spearheaded negotiations of the Services Agreement with Mr. Calco, I was part of the team that reviewed the Services Agreement for Össur and made changes to the draft Services Agreement, including the key provisions governing the payment of a Future Royalty to MR. Calco. Not only that, as I testified in my deposition:

> I provided the template for the service agreement which is the standard template that Ossur uses when working with consultants.· I met Mr. Calco, and I believe I was involved in editing the agreement and adding to the agreement exhibits that were negotiations with Mr. Calco.

(Latinovic Depo. at 12:18–20.) I was part of many internal discussion at Össur about the purposes and goals of the Services Agreement and the language that would protect Össur given that we were agreeing to pay Mr. Calco upfront for alleged ideas he would not disclose until the Agreement was signed. In particular, this is why his compensation was structured in the way it was: to compensate Calco upfront for allowing Össur to learn of his ideas and to compensate Mr. Calco with a royalty if his ideas turned out to be (1) truly original and patented and (2) of market value to Össur. This is also why I insisted that Össur be given full and sole discretion with respect to the pursuit of patent claims and product manufacturing because Össur was flying blind with respect to Calco's ideas before the Agreement was signed, and Össur did not want to be stuck having to prosecute claims for ideas that were not patentable after full consideration of the prior art or that were of no market value to Össur. Össur had every intention of patenting Mr. Calco's ideas should they have proven patentable over prior art and of market value to Össur as such patent protection would have been of benefit to Össur. In

DocuSign Envelope ID: 9F0FB66F-FF27-430D-B72D-9A93FF460456

other words, because Calco's ideas were hidden from Össur's view before the Services Agreement was executed, the Services Agreement was designed to compensate Calco upfront for allowing Össur to peer into his paper bag of ideas, compensate Calco if his ideas turned out to be of market value to Össur at the time, and also protect Össur if it decided not to bring Calco's ideas to market.

8.    Attached hereto as **Exhibit 1** is a true and correct copy of the Services Agreement.

9.    On November 24, 2015, I received an email from Calco with formal submission drawings dated August 28, 2015 for the purpose of proving his conception of the sternum adjustment concept before the Services Agreement was signed on which Calco wrote, "Sternum pad adjusts with ball joint and high-angle screw-style shaft concept," "Finger turns dial left or right to raise or lower pad," "Ball joint allows pad to lay flat on differing anatomies," and "Confidential for Ossur patent. Wayne Calco designer 8/28/2015." Attached hereto as **Exhibit 2** is a true and correct copy of Calco's November 24, 2015 email.

10.    On January 26, 2016, I received an email from Calco with a drawing dated December 4, 2015 reflecting his purported Repeatable Fit Tabs concept, and I received no other earlier drawing of that concept. In the same email, Calco included proof of concept drawing of his height adjustment concept on which Calco wrote "Chin-support-adjustment concept. Wayne Calco designer 8/28/2015."  Attached hereto as **Exhibit 3** is a true and correct copy of the January 26, 2016 email.

11.    On February 25, 2016, Össur filed a provisional application for an adjustable cervical collar, which included both of Calco's concepts for Sternum Adjustment and his drawings for his Repeatable Fit Tabs concept. This was the start of the Calco Patent Family that Össur designated as P2810 internally in its patent management software, Patricia. Attached hereto as **Exhibit 4** is a true and correct copy of the February 25, 2016 provisional application.

DocuSign Envelope ID: 9F0FB66F-FF27-430D-B72D-9A93FF460456

12.    The adjustable cervical collar product that Calco worked on during his consultancy did not complete Gate 2.1 given that a manufacturer was never selected, and the product was never registered with the FDA.

13.    Although no Össur product "based on concepts that [Calco] created prior to entering into Service Agreement as evidenced by written records" was developed, Össur filed a non-provisional patent application for Calco's concepts on February 24, 2017, which issued as Patent No. US 10,512,559 ("'559 Patent"). The '559 Patent lists Calco as the first named co-inventor because of its inclusion of Calco's pre-Services Agreement Opposite Racks concept. Attached hereto as **Exhibit 5** is a true and correct copy of the '559 Patent.

14.    On March 6, 2017, I received an email from Calco expressing concern about a "disturbing development" and that he was "confused why [Össur] want[s] to patent my designs that you have no intention of producing." Mr. Calco attached to his email the '559 Patent application, including the formal drawings, specification, and patent claims that did not have claims for his Sternum Adjustment or Repeatable Fit Tabs concepts. Attached hereto as **Exhibit 6** is a true and correct copy of the March 6, 2017 email along with its attachments.

15.    On November 18, 2019, Össur also filed a continuation for the '559 Patent with Application No. 16/686,582, including claims for Calco's pre-Services Agreement Sternum Adjustment concept. A patent issued on the allowed claims for the continuation on October 25, 2022 and issued as US 11,478,374 ("'374 Patent"). The '374 Patent also lists Calco as the first named co-inventor. Attached hereto as **Exhibit 7** is a true and correct copy of the '374 Patent.

16.    The Calco Patent Family (P2810) includes the '559 and '374 Patents, European patent EP3419570 (validated in France, Germany and United Kingdom), and US pending application 17/950,839. As with the Calco Patent Family (P2810), Össur generally seeks broad patent protection even if Össur decides not to manufacture, distribute, or sell products protected by its patents. Mr. Calco and his purported expert

DocuSign Envelope ID: 9F0FB66F-FF27-430D-B72D-9A93FF460456

have attempted to misconstrue this statement that I have made in my declaration that "Össur generally seeks broad patent protection even if Össur decides not to manufacture, distribute, or sell products protected by its patents." I make this statement as an explanation as to why Össur sought patent protection for Calco's cervical collar although it had no intention of manufacturing it. Mr. Calco and his expert, however, take my statement out of context to suggest that Össur seeks the broadest claims possible when prosecuting patent claims without regard to prior art and prosecution history. That is not Össur's policy, and the prosecution of the claims in the patents in the Calco patent family was not a departure from any Össur policy.

17. No patent in the Calco Patent Family (P2810) covers a product that has been manufactured, distributed, or sold by Össur. Nor has any product covered by Calco Patent Family (P2810) ever completed Gate 2.1: no manufacturer has ever been selected and no FDA registration has ever been obtained for any such product. Gate 2.1 is decision point in the Product development and life cycle process that occurs at a stage transitions of a process where the completion and outcomes of stage activities are reviewed. Calco's design did not meet the criteria for the project to pass Gate 2.1 and did not move to product acceptance stage.

18. The Services Agreement with Calco terminated on January 31, 2017.

19. After Calco's concepts were determined by Össur to be unworkable and potentially infringing of Calco's other patents of Össur's competitors, Össur initiated an entirely fresh and distinct product design of an adjustable cervical collar with the assistance of Össur Mechanical Engineer, Henry Hsu. Mr. Hsu conceived of the Miami J Select's Sternal-Relief Dial after Calco's consultancy. Specifically, Henry Hsu conceived of the Sternal-Relief Dial on February 16, 2017. Attached hereto as **Exhibit 8** is a true and correct copy of the February 16, 2017 email I received from Henry Hsu with his conception of the Sternal-Relief Dial.

20. Össur filed the application for the Miami J Select on September 6, 2017, Application No. 15/696,885 (the "885 Application"), Publication No. US 2018/0078400

- 6 -

DECLARATION OF TATJANA LATINOVIC IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

DocuSign Envelope ID: 9F0FB66F-FF27-430D-B72D-9A93FF460456

A1, which was published on March 22, 2018, and a patent issued for the allowed claims on September 27, 2022, US 11,452,633 (the "'633 Patent"). The '885 Application did not name Calco as an inventor. That is because the '885 Application does not include "claims based on concepts that [Calco] created prior to entering into Service Agreement as evidenced by written records." Attached hereto as **Exhibit 9** is a true and correct copy of the '885 Application.

21.     Although the '885 Application describes and shows embodiments of "tabs," they are just a hook and loop connection, not much different from the old Miami J, and nothing close to Calco's underdeveloped Repeatable Fit Tabs concept that require a locking mechanism on the collar.

22.     Claim 18 of the '885 Application covered the Sternal-Relief Dial but was subsequently withdrawn by Össur in October of 2020 when new claims were filed.

23.     The Miami J Select ultimately resulted in a family of patents designated by Össur as P2835 in its patent management software, Patricia, including the '633 Patent and US 10,945,872 ("'872 Patent"). The Miami J Select Patent Family (P2835), which also includes pending European patent application published under EP3515378 and granted patent in China CN109803615, does not include "claims based on concepts that [Calco] created prior to entering into Service Agreement as evidenced by written records." Attached hereto as **Exhibit 10 and Exhibit 11** are true and correct copies of the '633 Patent and '872 Patent, respectively.

24.     Attached as **Exhibit 12** is a true and correct copy of the Instructions for Use for the Miami J Select, which is publicly available at the following link: https://media.ossur.com/ossur-dam/image/upload/pi-documents-global/Miami_J_Select_1363_001_8.pdf

25.     Attached as **Exhibit 13** is a true and correct copy of the Patient Guide for the Miami J Select, which is publicly available at the following link: https://media.ossur.com/ossur-dam/image/upload/product-documents-global/Miami_J_Select_us_en_PN60203.pdf

DECLARATION OF TATJANA LATINOVIC IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

DocuSign Envelope ID: 9F0FB66F-FF27-430D-B72D-9A93FF460456

26.     The Clinician Fitting Tutorial for the Miami J Select is publicly available online at https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select#specificationContentAnchor. Attached as **Exhibit 14** is a true and correct copy of two screen shots taken of the Miami J Select in the video at 4:23-4:30 and rotated 90 degrees clockwise as the video is of a Miami J Select fitted on a dummy lying horizontally. The first screen shot shows the Sternal-Relief Dial in the vertical position. The second screen shot shows the Sternal-Relief Dial in the horizontal position. Red outlined boxes were added to highlight the location of the Sternal-Relief Dial in each screenshot.

27.     On February 24, 2017, Össur's IP Administrator sent an email to Mr. Calco at my direction (and copied me) that attached the final draft for the '559 application, including the formal drawings, specification, and patent claims, along with a declaration for Mr. Calco's signature. The application included Mr. Calco's formal drawings but did not include claims for either his concepts for Repeatable Fit Tabs or Sternum Adjustment. Attached as **Exhibit 15** is a true and correct copy of that February 24, 2017 email and its attachments.

28.     Mr. Calco responded that very same date on February 24, 2017 indicating that he could not respond but that he had questions and that his attorney was involved. Attached as **Exhibit 16** is a true and correct copy of Mr. Calco's February 24, 2017 email to Össur.

29.     On February 17, 2022, during the prosecution of the '374 patent, the patent examiner issued a non-final rejection regarding certain claims, including Claim 1. Attached as **Exhibit 17** is a true and correct copy of the Office Action issuing the non-final rejection of the claims. Among other things, the examiner noted that the terms "adjustment mechanism" and "locking mechanism" invoked a 112(f) means-plus-function limitation. (Ex. 17, at p. 4.) The Examiner stated in no uncertain terms:

> This application includes one or more claim limitations that do
> not use the word "means," but are nonetheless being interpreted

DocuSign Envelope ID: 9F0FB66F-FF27-430D-B72D-9A93FF460456

under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, because the claim limitation(s) uses a generic placeholder that is coupled with functional language without reciting sufficient structure to perform the recited function and the generic placeholder is not preceded by a structural modifier. Such claim limitation(s) is/are: **an adjustment mechanism** as set forth in claims 1-6, 13-14 and 19-20; a locking mechanism as set forth in claims 7 and 16.

Because this/these claim limitation(s) is/are being interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, it/they is/are being interpreted to cover the corresponding structure described in the specification as performing the claimed function, and equivalents thereof.

(Ex. 17 at p. 4.)

30.    Given the Examiner's interpretation of "adjustment mechanism" as a means-plus-function limitation under 35 U.S.C. 112(f), on May 20, 2022, Össur amended Claim 1 by reciting sufficient structure to perform the claimed function: namely, the allowable subject matter according to the USPTO—"wherein the sternum pad is mounted to a ball joint and the adjustment mechanism has an adjustment dial and an extension element arranged for adjustably extending relative to the lower support." Reciting this structure not only allowed Claim 1 to issue, but also it is based on Mr. Calco's 8/8/2015 Drawing. Attached as **Exhibit 18** is a true and correct copy of the relevant portion of Össur's May 20, 2022 Reply to Office Action including its arguments and amendments to Claim 1 (among others) in light of the Patent Examiner's February 17, 2022 non-final rejection of Claim 1.

31.    There is no ball joint in the Miami J Select.

/ / /

/ / /

DECLARATION OF TATJANA LATINOVIC IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

DocuSign Envelope ID: 9F0FB66F-FF27-430D-B72D-9A93FF460456

1    I declare under penalty of perjury under the laws of the United States that the
2    foregoing is true. This declaration was signed on June 3, 2024 at Reykjavik, Iceland.

3
4    Signed: 
5    Tatjana Latinovic
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 10 -
DECLARATION OF TATJANA LATINOVIC IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

# EXHIBIT 1

**SERVICES AGREEMENT**

This Services Agreement (the "Agreement"), dated the 29th day of October, 2015, (the "Effective Date"), is between Össur Americas, Inc., a California Corporation with a principal place of business at 27051 Towne Centre Drive, Foothill Ranch, CA 92610 (the "Company"), and Wayne Calco, located at 1108.5 West Center Street, Anaheim, CA 92805 ("Consultant").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Company and Consultant ("Party" or collectively, the "Parties"), intending to be legally bound, hereby agree as follows:

1.    **Engagement.** Company engages Consultant to provide the services described in the Development Plan attached as Exhibit 1 (the "Services") and such additional services as the Parties may mutually agree upon from time to time. All of the services shall be provided by Consultant and no one else other than vendors utilized by Consultant in the regular course of his business, including, but not limited to, a rendering expert.  Development Plan framework shall follow the framework of Össur's New Product Development and Design & Development Processes, as laid out in Exhibits 3 and 4. The Development Plan shall define the obligations and undertakings of the Parties with respect to the work to be undertaken.

2.    **Work Records.** Consultant shall, on a form substantially similar to that in the attached Exhibit 2 ("Monthly Report"), keep a written record describing the Services provided for the Company. A copy of each Monthly Report shall be given to Company within five (5) business days following the end of each month.

3.    **Compensation.** As compensation for all of the Services provided by Consultant, Company agrees to pay Consultant as set forth in the attached Exhibit 3. Company and Consultant agree that they have negotiated the consulting fee in good faith, based upon the fair market value of the Services to be provided.  Consultant acknowledges and agrees that Company shall be under no obligation to pay for Services unless and until Consultant submits a Monthly Invoice as set forth in Section 2.

4.    **Term.** The term of this Agreement will commence on the Execution Date and continue until the 31st of January, 2017 (the "Term") unless terminated earlier as provided herein.  The Term may be extended upon mutual written agreement by the Parties at least thirty (30) days before expiration.

5.    **Expenses.** Consultant shall be solely responsible for all expenses it incurs in rendering the Services, including without limitation: health benefits; disability insurance; pension benefits; life insurance; membership fees and dues in professional societies and organizations and all applicable taxes. Notwithstanding the previous sentence, Company will reimburse Consultant's reasonable travel expenses incurred in connection with the Services, and which have been substantiated by receipts sent to avap@ossur.com, as follows:

(a)  *Air fare* – Company will reimburse Consultant for coach-class tickets to/from locations Consultant must visit in order to provide the Services. Consultant acknowledges and agrees that it will complete all airfare arrangements at least ten (10) business days before the travel date.

(b)  *Hotel* – Company will reimburse Consultant up to $200 per night in connection with Consultant's hotel costs. Consultant can seek authorization from Company to stay at a hotel that costs more than $200 per night if suitable accommodations cannot be found for $200 per night or less in the area where Consultant is staying. If such authorization is granted, Company will reimburse those hotel costs; if Company does not grant such authorization, Consultant will be responsible for the difference between $200 per night and the rate charged by the hotel if Consultant still elects to stay at the more-than-$200/night hotel.

(c)  *Meals* – Company will reimburse Consultant's reasonable meal expenses when Consultant travels for Company-related tasks; Consultant acknowledges that Company exercises sole discretion in determining what constitutes reasonable food expenses and that its decision in that regard will be binding on Consultant.

(d)  *Taxi/Rental Car* – Company will reimburse Consultant's taxi or reasonable rental car expenses. Consultant acknowledges that Company exercises sole discretion in determining what constitutes reasonable rental car expenses and that its decision in that regard will be binding on Consultant.

(e)  International travel shall be business class and only if reasonably necessary to fulfill the terms of this Agreement.

OSS 000001

6.  **Exclusive Services.** Consultant represents and warrants that he is not a party to any contract or agreement with a third party that contains a non-competition obligation or similar provision that would prevent Consultant from entering into this Agreement or rendering the Services. During the Term of this Agreement, Consultant will not directly or indirectly, for compensation or without compensation, engage in or provide consulting services to anyone other than Company with respect to an orthopedic collar. The restrictions set forth in this Section are considered by the Parties to be reasonable for the purpose of protecting the business of Company and its subsidiaries. If any such restriction is found by any court of competent jurisdiction to be unenforceable, this Section shall be interpreted to extend for the maximum period of time, range of activities or geographic area enforceable by law.

7.  **Confidential Information.**

(a)  The term "Confidential Information" means, collectively and individually, any information, documents, data, or materials of a Party and its affiliates (the "Disclosing Party") of any type or kind (including, without limitation, developments, technical data, specifications, designs, ideas, product plans, test information, research and development, personal information, financial information, customer lists, business methods and operations, and marketing programs), whether in paper, electronic, digital, pictorial, ephemeral, visual, audible, or tangible or intangible form, which are proprietary to the Disclosing Party or any of its affiliates and indicated to be confidential or which, by the nature of the information or the circumstances of their existence or disclosure, the other Party and its Affiliates (the "Receiving Party") would reasonably be considered confidential.  The term "Confidential Information" shall include this Agreement and all of its provisions, terms and conditions.

(b)  The term "Confidential Information" shall not include confidential information which is: (i) in the public domain at the Effective Date or at the time it is disclosed to or obtained by the Receiving Party under this Agreement; (ii) approved for release by the Disclosing Party in writing, (iii) any information known by the Receiving Party at the time such information is disclosed to the Receiving Party unless such knowledge or disclosure is the result of a direct or indirect violation of an obligation of confidentiality owed to the Disclosing Party or any of its associates or under any applicable Law or (iv)  is independently developed by the Receiving Party or any of its associates without use of or reference to any such Confidential Information.

(c)  The Receiving Party hereby agrees to receive all Confidential Information of the Disclosing Party in strict confidence and that it will not at any time, directly or indirectly, disclose, distribute, publish, divulge, reveal or communicate to any Third Party any of the Disclosing Party's Confidential Information, or use, pursue or exploit any such Confidential Information for his own benefit or for the benefit of others other than for the purposes as contemplated by this Agreement. The Recipient shall disclose Confidential Information only to those of its vendors who have a need to know such information for the purposes contemplated by this Agreement and shall cause its vendors to comply with the confidentiality provisions of this Agreement. The Receiving Party shall take the same precautions to protect the confidentiality of the Disclosing Party's Confidential Information as the Receiving Party takes for its own Confidential Information, but no less than reasonable precautions.

(d)  The Parties agree that Confidential Information of the Disclosing Party may be used and/or disclosed by the Receiving Party, in addition to any use and disclosure permitted by this Agreement or pursuant to any provision or agreement in this Agreement, only if and to the extent permitted as follows:

i.  Confidential Information of the Disclosing Party may be used by the Receiving Party or disclosed by the Receiving Party to any of its Associates only to the extent that such use or disclosure is necessary for performing the Receiving Party's obligations under this Agreement, and if any such Associate agrees in writing to be legally bound by and comply with the provisions of this Section 7; and

ii.  the Receiving Party may disclose any Confidential Information of the Disclosing Party to the extent that such disclosure is required under any applicable Law or the order of any court of competent jurisdiction if (i) the Receiving Party has given the Disclosing Party prior notice of such requirement and such required disclosure, (ii) the Disclosing Party has had sufficient opportunity after such prior notice to take any legal steps, with the Receiving Party's assistance, to prevent or limit the disclosure of such Confidential Information, and (iii) the Disclosing Party has not been successful in preventing or limiting the disclosure or has obtained a protective order regarding the Disclosing Party's Confidential Information required to be disclosed.

Page 2 of 14

OSS 000002

(e)  The Parties agree that damages alone will be an insufficient remedy for violations of the terms of this Section 7, and that the Disclosing Party would suffer irreparable damage as a result of a violation. Accordingly, the Disclosing Party shall be entitled, in the event of a breach or threatened breach of this Section 7, to obtain injunctive relief to enforce its provisions. Injunctive relief shall be in addition to any and all other rights or remedies available to the Disclosing Party, including, but not limited to, damages or other relief or remedies for such violation. Assertion or the failure to assert injunctive relief shall not constitute a waiver of any such other rights or remedies. In the event it is necessary for the Disclosing Party to institute legal proceedings to enforce this Section 7, the prevailing Party will be entitled to recover attorneys' fees and costs incurred in any such proceedings.

**8.  Originality – Non-Infringement of Contributions.** All works prepared, created or furnished by Consultant in connection with the Services provided under this Agreement, or to which Consultant has contributed or contributes in connection with Services provided under this Agreement, regardless of medium and whether consisting of information, software, developments, inventions, know-how, or other information or material that may be protected under any form of intellectual property law (collectively, "Works"), and all rights under such intellectual property laws (collectively, "Intellectual Property Rights") have been and shall be original and do not and shall not infringe or violate the rights of any other person or entity under any laws, including but not limited to any copyright, trademark, trade secret and/or patent laws, anywhere in the world.  The Company shall pay all patent costs as well as the cost of patent searches. The parties shall work together to reasonably resolve any issues that may arise as a result of a patent search with regard to establishing the Works and Intellectual Property Rights in compliance with this Agreement.

**9.  Company Work and Rights in Adaptations.** All documents, materials, products, therapies, data, drawings, designs, analyses, graphs, reports. tooling, physical property, computer programs, ideas, methods, discoveries, improvements, concepts, ideas, and other forms of tangible expression, inventions or developments, in any media now or hereafter produced, created, or conceived by Consultant in connection with the Services provided under this Agreement, or which are otherwise the results or proceeds of the Services performed under this Agreement, shall at all times be and remain the exclusive property of Company and its affiliates, including but not limited to Össur hf. ("Affiliates"). All rights therein of any kind or nature, including but not limited to Intellectual Property Rights, however denominated, shall vest, from inception, in Company and its Affiliates ("Company Work") and shall constitute a "work made for hire" and Company Confidential Information for the purposes of this Agreement. The fact that Consultant encodes, adapts or otherwise uses such Company Work in connection with the Services provided under this Agreement shall not give rise to any right, claim, or entitlement by Consultant that it/it is a co-author, co-developer or otherwise has any ownership or other right in such Company work, other than to use it in the manner contemplated under this Agreement. All right, title and interest in and to any intellectual property developed by Consultant for the Company pursuant to this Agreement ("Subject Intellectual Property") shall be owned by Company and/or its Affiliates as determined by Company in its sole discretion, and Consultant agrees that by execution of this Agreement Consultant hereby assigns and transfers to Company all such right, title and interest to Subject Intellectual Property as of and from the Effective Date. Upon the request of the Company, Consultant shall promptly take such further actions, including execution and delivery of all appropriate instruments of conveyance, as may be necessary to assist the Company to prosecute, register, perfect, record or enforce its rights in any Subject Intellectual Property. In the event the Company is unable, after reasonable effort, to obtain Consultant's signature on any such documents, Consultant hereby irrevocably designates and appoints Company as Consultant's agent and attorney-in-fact, to act for and on Consultant's behalf solely to execute and file any such application or other document and do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights or other intellectual property protected related to the Subject Intellectual Property with the same legal force and effect as if Consultant had executed them. Consultant agrees that this power of attorney is coupled with an interest.

**10.  No Conflicting Obligations.** Consultant hereby certifies that the performance of all of the terms of this Agreement and the Services will not breach or conflict with any agreement to keep confidential the proprietary information of another entity.

**11.  No Improper Use of Materials.** Consultant agrees not to bring to Company or to use in the performance of the Services any materials or documents (i) of a present of former employer or employee, or (ii) obtained by consultant under an obligation of confidentiality imposed by reason of another of their contracting relationships, unless such materials or documents are generally available to the public or they have authorization for the possession and unrestricted use of such materials. Consultant acknowledges that it shall not breach any obligation of confidentiality vis-à-vis other persons or entities to which it has an obligation of confidentiality, and agrees to fulfill all such obligations during the Term.

**12.  Independent Contractor.** None of the provisions of this Agreement are intended to create and none shall be deemed or construed to create any relationship between the Parties, other than that of independent contractor. The Parties are independent entities contracting with each other solely for the purpose of effectuating the provisions of this Agreement. This Agreement is not

OSS 000003

intended, and shall not be construed, to create a venture, partnership, association, trustee-beneficiary relationship, principal-agent relationship, or fiduciary relationship between the Parties.

13. **Indemnification**.

(a) **Indemnity by Consultant.** Consultant agrees to indemnify, defend and hold Company, all successors, assigns, directors, shareholders, members, officers, employees, agents and representatives of each (the "Ossur Indemnitees") harmless from all damages, liability, claims, losses, awards, judgments, settlements, expenses and costs (including reasonable attorneys' fees and costs of defense), against any actions, suits, litigation, claims, demands, arbitration or proceeding, and any threats thereof (whether or not brought by a Third Party), resulting from, arising out of, or in connection with any (a) breach of any representation or warranty of Consultant set forth in this Agreement, (b) any breach of any covenant or agreement of Consultant set forth in this Agreement, (c) any negligence or willful misconduct of Consultant or its directors, officers, or employees, to the extent relating to the Services or the performance of Consultant's obligations under this Agreement], and (d) any assertion, claim or allegation of any infringement of any patents or any other Intellectual Property Rights of any Third Party in connection with the Services or the promotion, marketing, distribution, licensing, or use of the Services.

(b) **Indemnification Procedures.**

i. Promptly after Company obtains knowledge of the potential existence or commencement claim by a Third Party that may give rise to an indemnification claim in respect of which Company is or may be entitled to indemnification under this Agreement ("Claim"), Company will promptly notify Consultant of such Claim in writing; provided, however, that any failure to give such notice will not waive any rights of Company except to the extent that the rights of Consultant are actually prejudiced thereby. Consultant will assume the defense and settlement of such Claim with counsel reasonably satisfactory to Company at Consultant's sole risk and expense; provided, however, that Company (A) will be permitted to join in the defense and settlement of such Claim and to employ counsel at its own expense; (B) will reasonably cooperate with Consultant in the defense and any settlement of such Claim; and (C) will have the right to pay or settle such Claim at any time in which event Company will be deemed to have waived any right to indemnification therefor by Consultant. Consultant may settle any Claim without Company's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

ii. If Consultant fails to assume the defense of such Claim or, having assumed the defense and settlement of such Claim, fails reasonably to contest such Claim in good faith, Company, without waiving its right to indemnification, may assume the defense and settlement of such Claim; provided, however, that Consultant (A) may join in the defense and settlement of such Claim and employ counsel at its own expense and (B) will cooperate with Company in the defense and settlement of such Claim. Company may settle such Claim without Consultant's written consent unless such settlement (x) does not include a release of all covered Claims pending against Consultant; (y) contains an admission of liability or wrongdoing by Consultant; or (z) imposes any obligations upon Consultant other than an obligation to stop using any infringing items. Consultant will be liable to Company for all costs and expenses incurred in connection with the defense and settlement of any Claim pursuant to this Section 14.

iii. Upon a determination of liability in respect of this Section 14, Consultant will pay Company the amount so determined within thirty (30) business days after the date of such determination. If there should be a dispute as to the amount or manner of determination of any indemnity obligation owed under this Agreement, Consultant will nevertheless pay when due such portion, if any, of the obligation as will not be subject to dispute. Upon the payment in full of any claim, either by setoff or otherwise, the Party or entity making payment will be subrogated to the rights of Company against any person, firm, corporation or other entity with respect to the subject matter of such claim.

14. **Notices.** All notices, requests, demands, approvals, consents, waivers, and other communications required or permitted to be given under this Agreement (a "Notice") shall be in writing and shall be (a) delivered personally, (b) mailed by first-class, registered, or certified mail, return receipt requested, postage prepaid, (c) sent by next-day or overnight mail or delivery, or (d) sent by e-mail transmission, provided that the original copy is also sent by methods (b) or (c) set forth above in this Section.

If to Consultant:                                    If to Össur:

Page 4 of 14

OSS 000004

Mr. Wayne Calco
1108.5 West Center Street
Anaheim, CA 92805
calco.wayne@me.com

Össur Americas, Inc.
27051 Towne Centre Drive
Foothill Ranch, CA 92610
Attn: Duane Romo
dromo@ossur.com

or, in each case, at such other address as may be specified in a Notice to the other Party. Any Notice shall be deemed effective and given upon delivery (or refusal to accept delivery).

**15. Compliance.** All of the Services in this Agreement shall be provided in compliance with all applicable federal, State, and local laws, rules and regulations, and all policies and procedures of the Company.

**16. Termination for Cause.** This Agreement may be terminated by either Party for cause immediately upon notice to the other Party in the event of any of the following:

(a) a Party's breach of any term, representation, warranty, covenant or condition of this Agreement, *provided however*, that if the breach is capable of being cured, the breaching Party fails to cure that breach to the reasonable satisfaction of the non-breaching Party within thirty (30) days of written notice from the non-breaching Party setting forth the specific nature of such breach (the failure of Consultant to keep and timely provide Company the written records required by Section 2 shall constitute a breach incapable of being cured);

(b) a Party's corporate dissolution;

(c) a Party's indictment or conviction of any criminal offense involving dishonesty or breach of trust, or any felony, or which would result in the other Party being adversely affected by a continued relationship.

**17. Termination without Cause.** This Agreement may be terminated by either Party without cause upon thirty (30) days prior notice to the other Party.   Whether or not this Agreement is terminated for any reason, royalties shall continue for the life of the patent.

**18. Miscellaneous.**

(a) **Cooperation.** The Parties agree to cooperate with each other to carry out the purpose and intent of this Agreement.

(b) **Captions.** The captions used herein as headings of various sections are for convenience only and are not to be construed to be part of this Agreement or to be used in determining or construing the intent or context of this Agreement.

(c) **Interpretation.** The Parties agree that this Agreement is the product of all their efforts, and that it should not be interpreted in favor of any one Party merely because of such Party's efforts in preparing it. The Parties acknowledge that each has had an opportunity to have its counsel review and revise this Agreement and that any rule of law or legal decision that would require interpretation of any claimed ambiguity against the Party drafting it shall have no application to this Agreement and is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effectuate the intent of the Parties.

(d) **Entire Agreement: Amendment.** This Agreement contains the entire agreement of the Parties with respect to the subject matter hereof and supersedes any other existing agreements, representations or promises exchanged by the Parties with respect to the same subject matter, whether verbal or written. This Agreement may not be modified except through a writing that is signed by all the Parties.

(e) **Survival.** The provisions of Sections 7 "Confidential Information", 9 "Company Work and Rights in Adaptations" and 14 "Indemnification" shall survive beyond the expiration or termination of this Agreement.

(f) **Applicable Law: Jurisdiction.** The execution, interpretation, and performance of this Agreement shall be governed by the internal laws and judicial decisions of the State of California, without regard to conflict of laws principles. Each of

OSS 000005

the parties (a) consents to submit itself to the personal jurisdiction with venue in Orange County, State of California with respect to actions or proceedings arising out of or relating to this Agreement, (b) agrees that all claims in respect of such actions or proceedings may be heard and determined only in any such court, (c) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (d) agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court or forum, except to enforce a judgment obtained in a court described in clause (a) above. Each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other party with respect thereto.

(g) **Binding Effect: No Assignment.** This Agreement is binding upon and inures to the benefit of the Parties, their respective heirs, executors, administrators, successors and assigns. Consultant may not assign this Agreement or subcontract any of its obligations without the prior written consent of Company.

(h) **Waiver of Breach.** The failure of a Party to insist upon strict adherence to any term of this Agreement on any occasion is not considered a waiver of said term, nor does it deprive such Party of the right thereafter to enforce said term or any other term of this Agreement.

(i) **Severability.** If any provision of this Agreement is found to be invalid or illegal for any reason whatsoever, then notwithstanding such invalidity or illegality, the remaining terms and provisions of this Agreement will remain in full force and effect in the same manner as if the invalid or illegal provisions had not been contained herein. However, if the resulting change in this Agreement materially affects the intent or purposes of the Parties in first entering into this Agreement or otherwise has a material adverse effect on either Consultant or Company, then such affected party may terminate this Agreement upon thirty (30) days advance written notice to the other. During this notice period, if the other Party chooses to mitigate the damage of the change so that the change is no longer material, the cause for termination will be deemed cured.

(j) **Counterparts: Facsimile Signatures.** This Agreement may be executed in multiple counterparts and so executed will constitute one agreement, binding on all Parties, even though all Parties are not signatories to the original or same counterpart. Any counterpart of this Agreement will for all purposes be deemed a fully executed instrument. Facsimile signatures shall be as effective as original signatures.

**IN WITNESS WHEREOF,** the Parties have executed this Services Agreement as of the date first above written.

ÖSSUR AMERICAS, INC.                    WAYNE CALCO

By: _____          By: _____
Duane Romo

Director Functional Healing

OSS 000006

**EXHIBIT 1**

**SERVICES TO BE PROVIDED BY CONSULTANT**

Consultant shall perform design services related to Adjustable Cervical Collar project. The services will be provided within the framework of the following Development Plan:



Adjustable Collar Consultancy Development Plan and Deliverables

| Start | Due | Description | RACI | Status | Comments |
|---|---|---|---|---|---|
| | | **Product Input** | | | |
| | | Intended Use and Classification | C | | WC Advisement |
| | | Meet with key stakeholders (internal, external) | C | | WC Advisement |
| | | Meet with IP team | C | | WC Advisement |
| | | Product Requirements | R | | WC Responsible |
| | | Medical Necessity | C | | WC Advisement |
| | | Hazard Analysis | C | | WC Advisement |
| | | Essential Requirements | C | | WC Advisement |
| | | Risk Management Plan | C | | WC Advisement |
| | | Validation Plan | C | | WC Advisement |
| | 13-Nov-2015 | **Product Inputs Review** | C | | WC Advisement |
| | | | | | |
| | | **Project Input** | | | |
| | | Project Plan | C | | WC Advisement |
| | 1-Dec-2015 | **Project Inputs Review** | C | | WC Advisement |
| | | | | | |
| | | **Gate 2** | | | |
| | | Gate 2 PPT Preparation | C | | WC Advisement |
| | 8-Dec-2015 | **Gate 2 Review / Pass** | C | | WC Advisement |
| | | | | | |
| | | **Technical Input** | | | |
| | | Technical Requirements | R | | WC Responsible |
| | | Verification Plan | R | | WC Responsible |
| | 22-Dec-2015 | **Technical Inputs Review** | C | | WC Advisement |
| | | | | | |
| | | **Product Implementation Review** | | | |
| | 21-Mar-2016 | PROTOTYPE 1 Design | A | | WC Accountable |
| | | Meet with key stakeholders (internal, external) | R | | WC Responsible |
| | | Verify current / new requirements | A | | WC Accountable |

Page **7** of 14

OSS 000007



| Date | Task | RACI | Role |
|---|---|---|---|
| 5-May-2016 | PROTOTYPE 2 Design | A | WC Accountable |
| | Meet with key stakeholders (internal, external) | R | WC Responsible |
| | Verify new requirements | A | WC Accountable |
| 7-Jul-2016 | PROTOTYPE 3 Design | A | WC Accountable |
| | Meet with key stakeholders (internal, external) | R | WC Responsible |
| | Verify final design with stakeholders | A | WC Accountable |
| | Design Specifications - Drawings | C | WC Advisement |
| | Design Overview | R | WC Responsible |
| | DFMECA | C | WC Advisement |
| | IFU Draft | R | WC Responsible |
| | IP – Submit applications for IP | C | WC Advisement |
| **7-Jul-2016** | **Design Implementation Review** | C | WC Advisement |
| | | | |
| | **Production and Process Design Review** | | |
| | Production cost | C | WC Advisement |
| | Production specifications | I | WC Reviewer |
| **7-Jul-2016** | **Production & Process Design Review** | I | WC Reviewer |
| | | | |
| | **Gate 2.1** | | |
| | Presentation Prep | C | WC Advisement |
| **14-Jul-2016** | **Gate 2.1 Review attendance / Pass** | C | WC Advisement |
| | | | |
| | **Gate 2.3** | | |
| 4-Aug-2016 | Draft work instructions | I | WC Reviewer |
| | | | |
| | **Process Setup and Sample Run Review** | | |
| | PFMECA | I | WC Reviewer |
| | Sample Run Set-up | C | WC Reviewer |
| 13-Oct-2016 | Sample Run Approval | I | WC Reviewer |
| **13-Oct-2016** | **Process Setup and Sample Run Review** | C | WC Advisement |
| | | | |
| | **Gate 3** | | |
| | Design Freeze - Finalize All Specifications | C | WC Advisement |
| **20-Oct-2016** | **Gate 3 Review attendance / Pass** | C | WC Advisement |
| | | | |
| | **Gate 3.1** | | |
| 17-Nov-2016 | Technical Presentation review | C | WC Advisement |
| | | | |
| | **ISQ** | | |
| 16-Jan-2017 | Review PFMECA | I | WC Reviewer |
| | | | |
| | **Validation** | | |
| | Hazard Analysis review | C | WC Advisement |
| | Risk Management Report review | C | WC Advisement |
| | Validation Report | C | WC Advisement |
| | Clinical Evaluation | C | WC Advisement |

OSS 000008



| 16-Jan-2017 | Validation Review | C | WC Advisement |
|---|---|---|---|
| | **Gate 4** | | |
| | Gate 4 Presentation Prep | C | WC Advisement |
| 16-Jan-2017 | Gate 4 Review attendance / Pass | C | WC Advisement |

| RACI |
|---|
| RESPONSIBLE -Owns the task |
| ACCOUNTABLE - sign off/approval of "R" tasks |
| CONSULTED/CONTRIBUTOR - Has information or capability necessary to complete work |
| *INFORMED - to be notified of results for review* |

OSS 000009

**EXHIBIT 2**

**CONSULTANT'S TIME REPORT**

Period: _____

Services rendered pursuant to the Services Agreement between Össur Americas and Wayne Calco:

Detailed description of the work performed:

| DESCRIPTION OF SERVICES | HOURS | AMOUNT |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

Costs incurred:

| DESCRIPTION OF COSTS | AMOUNT |
|---|---|
| | |
| | |
| | |
| | |

OSS 000010

**EXHIBIT 3**

**COMPENSATION**

Company agrees to pay Consultant as follows:

Consultancy Fees. One hundred fifty thousand dollars ($150,000.00) to be invoiced at monthly intervals, ten thousand dollars ($10,000.00) per month. If the projects completes early, unpaid balance will be due at that time. For the avoidance of doubt, if this Agreement is terminated prior to full completion of the Services, as determined by Company in its sole discretion, Consultant shall not be entitled to the remaining unpaid balance and shall only be compensated for work completed during the month of termination on a prorated basis as determined by Company in its sole discretion.

Royalty Payments:

**Advanced Royalty Payment ("Advanced Royalty Payment").** At the time of execution of this Agreement, Company shall pay to Consultant thirty thousand dollars ($30,000.00) as an advanced royalty payment. Company shall pay Consultant an additional Advanced Royalty Payment of twenty thousand dollars ($20,000.00) upon successful completion of Gate 2.1. Each Advanced Royalty Payment detailed in this Paragraph shall be deducted from future Royalty Payments (defined below). In case no future Royalty Payments are due to Consultant (for the lack of Patented Products), Consultant will not be obliged to pay the Advance Royalty Payment back.

**Future Royalty Payments.** Company shall pay Consultant a royalty ("Royalty") based on sales made by Company of patented products, designs or processes ("Patented Products") that are protected and covered by valid issued claims contained in patents owned or controlled by Company that name Consultant as an inventor or co-inventor ("Patents") and that are based on the concepts that Consultant has created prior to entering into Service Agreement as evidenced by written records (excluding all ideas, inventions and concepts created on or after the Consultant entered into the Service Agreement). The Royalty based on sales of Patented Products shall be four percent (4%) of the Net Selling Price of such Patented Products with regard to sales of such Patented Products actually made by Company to its customers. "Net Selling Price" is revenue received by Company from the sale by Company of the Products to its customers, less returns, discounts, allowances, chargeback, freight, insurance, duty, V.A.T., other taxes, tariffs and other similar deductions. In the event a Patented Product is covered by more than one Patent, then only a Royalty corresponding to that which Company would be obligated to pay to Consultant if the Patented Product was covered by a single Patent shall be paid to Consultant by Company based on sales of such Patented Product. Nothing in this Agreement or this Paragraph shall be interpreted in a manner obligating Company to make, use, sell or import in or into the U.S. or other country or region of the world any Patented Products, and any such making, using, selling and importing shall be carried out solely at the discretion of Company. Company shall have full and sole discretionary authority with regard to patenting or seeking patents with regard to any Subject Intellectual Property anywhere in the World and/or, if patenting has been initiated, dropping the pursuit of any pending patent, or, if a patent has been granted, dropping the maintenance or defense of any granted patent, related to Subject Intellectual Property.  Company shall be solely responsible for all patent and patent related expenses.

**Royalty Payments Reporting**

**a.** Company shall provide Consultant with quarterly reports of sales volumes of Patented Products for which Royalties are payable to Consultant, which reports shall accompany Royalty payments paid by Company to Consultant. Company will provide all such reports and payments to Consultant within thirty (30) days following the end of each quarter beginning from the Effective Date, if a Royalty payment is due to Consultant for sales or uses made during any such year. If no Patented Product sales occurred following the Effective Date or during such year or since a last annual report was submitted to Consultant with a Royalty payment, no report shall be furnished to Consultant until such sales occur, whereupon Company shall provide Consultant with a quarterly report and any Royalty payment that may be due Consultant within thirty (30) days following the end of the next year following the first of such sales or uses.
**b.** The right of Consultant provided with regard to Royalties and reports shall be personal to Consultant and shall not be assigned, hypothecated, pledged, securitized, sold, collateralized, transferred, mortgaged, or given over to another party or entity in any manner. The following transfers shall be exempt from this restriction: (i) transfer to or for the benefit of a Consultant's immediate family through gift, bequest, or inheritance; and (ii) transfers to a trust, family limited partnership, or other entity created for the benefit of the Consultant or a member of his immediate family.  Upon the death of Consultant, Company shall pay Consultant's estate, executor or representative the Royalty arising from sales of Patented Products completed by Company following the date of

OSS 000011

death, for so long as the Patents claiming such Patented Products remain in full force and effect in the respective territory where the sales of Patented Products are made on which the Royalty is based. Company also shall report to and pay Consultant's estate, executor or representative any Royalty due Consultant for sales of Patented Products that were completed by Company that occurred before the date of Consultant's death.

OSS 000012

**EXHIBIT 4**

ÖSSUR'S NEW PRODUCT DEVELOPMENT PROCESS

OSS 000013



# Product development and life cycle process

Ossur Process

*Life Without Limitations*

## 1. Purpose

Describe the work procedure for New Product Development and through the product life cycle.

## 2. Scope

The process applies to all employees working in product development, in R&D, S&M and M&O. It applies to all New Product Development projects including new product lines, product line extension and new product version.

## 3. Responsibility

Vice President of Research and Development, Project Management Office, Director Engineering, Director Product Management, Director of Manufacturing Engineering and Sourcing. See also the organization chart:
https://plaza.ossur.com/company/orgcharts/Pages/Home.aspx

## 4. Definitions

N/A

## 5. Description

The 'Product Development and Life Cycle Process' consist of seven main phases, and five sub phases. Each phase ends with a gate meeting, whereas the project sub-phases end with a gate meeting or a formal milestone closure.

**Gate meetings:**
At gate meetings completion of phase objectives is reviewed and approved.
- Gate approvers and required participants need to be represented at the meeting
- A presentation is delivered.
- Gate checklists are completed prior to the meeting and reviewed at the meeting. If this requires preparatory meetings the project manager should hold these with relevant parties.
- The project manager seeks approval of the gate from the gate approvers at the meeting. The approval is documented through electronic approval at the project site on Plaza.

**Formal Milestone Closure:**
When a sub gate ends with a Milestone Closure the completion of the phase objective is formalized and documented through completion of the checklists. The checklists need to be approved by the approvers appointed in the Gate Approver List. The Project Manager seeks approval through electronic approval at the project site on Plaza. It is up to the project manager to call a formal approval meeting if needed.

All product development projects are initiated in PROJECTS, project database on Plaza. Forms and documents related to the gate process are stored in Plaza: https://plaza.ossur.com/work@ossur/Forms/Pages/default.aspx
**Notice:** Some forms are required in more than one Gate in the process. If there is no additional information the one used in a previous Gate is valid. The process for Control of Documents and Records is in the Quality Manual on Plaza and all documents in R&D department shall be stored accordingly.
Further description of the design process is shown in the flow chart below:

OSSUR CONFIDENTIALITY NOTICE: This document contains information that is confidential and proprietary to Ossur. Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without the prior written consent of Ossur.

OSS 000014





OSS 000015

EXHIBIT 5

ÖSSUR'S DESIGN & DEVELOPMENT PROCESS

OSS 000016

## Design & Development Process



*Life Without Limitations*

## 1  Purpose

This process, and its associated controls, describes the framework in which design and development activities related to medical device and supporting systems design are to be performed. Together with additional processes herein referred to, this process aims at fulfilling requirements of ISO13485, FDA 21CFR820, and EN 62366, as well as to ensure that all medical devices related design activities are properly controlled.

## 2  Scope

This document specifies a process for defining, planning, implementing, verifying and validating product development work associated both with the creation of new products and changes performed on existing ones. This process applies to all stages of the life-cycle of the product, including both the overall activities from an approved product idea (in the context of QM 1664 Product Development and Life Cycle Process), or an approved product change request (in the context of QM 1692 Product CAPA), as well as activities within a single development iteration, or module development, that is done as part of product development work or in isolation.

This process does not describe risk management activities, but makes references to QM 1673 which shall be considered simultaneously for all activities herein described.
This process does not describe design transfer activities, but the Design Transfer Process shall be considered simultaneously for all activities herein described.
This process does not explicitly describe detailed aspects of each of its activity, but makes references to specific Work Instructions or Standard Operating Procedures to provide additional guidance in its execution.

## 3  Responsibilities

This process is owned by the Executive VP of R&D, who is responsible for ensuring its maintenance and control its effectiveness.

This process is to be reviewed and approved by the Executive VP of R&D, the Executive VP of M&O and the Management Representative.

Product Technical Leads are responsible, for the products group they manage, to ensure that this process and its output are fulfilled during new product development or product change work;

Product Lead Designers have the responsibility for implementing this process in the projects they are leading and making sure that Product Designers are following the process in daily work execution.

Product Designers are responsible for using this process in the execution of their daily tasks and delivering the process outputs herein defined.

Document ID: QM4267 – Official Version: 2.0 -  Date Approved: 2014-04-14
OSSUR CONFIDENTIALITY NOTICE: This document contains information that is confidential and proprietary to Össur. Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without the prior written consent of Össur.

OSS 000017



# Design & Development Process

*Life Without Limitations*

## 4    Definitions

**Alpha Testing**

At Össur, **Alpha Testing** is human-based testing aimed at supporting product development and design improvements. **Alpha Testing** is performed on released prototypes. End points of **Alpha Testing** are directed towards verification of the design implementation capacity to fulfill the product technical requirements.

**Beta Testing**

At Össur, **Beta Testing** is human-based testing carried on products with a frozen design and issued from normal production. Beta testing is aimed at testing the product as a whole, and not only specific design aspects. End points of **Beta Testing** are therefore directed at validating the product intended uses, its medical indications and clinical benefits.

**Design History File**

**Design History File** (DHF) means a compilation of records which describes the design history of a finished device.
In the Össur Quality System, the **Design History File** is part of the Technical File.

**Design Inputs**

The physical and performance requirements of a device that are used as a basis for device design.

**Design Outputs**

The results of a design effort at each design phase and at the end of the total design effort. The finished **Design Output** is the basis for the **Device Master Record**. The total finished design output consists of the device, its packaging and labelling, and the **Device Master Record**.

**Design Review**

A **Design Review** means a documented, comprehensive, systematic examination of a design to evaluate the adequacy of the design requirements, to evaluate the capability of the design to meet these requirements, and to identify problems. Refer to Form 1411 for the Standard Operating Procedures associated with execution of formal **Design Review**.

**Design Transfer**

**Design Transfer** is the process in which the device design is translated into production, distribution, and installation specifications.

**Design Overview (document)**

Collection of descriptive materials which define and characterize the design. Examples include block diagrams, flow charts, software high-level code, and system or subsystem design specifications.

**Device Master Record**

**Device Master Record** (DMR) means a compilation of records containing the procedures and specifications for a finished device.
In the Össur Quality System, the **Device Master Record** is part of the Technical File.

Document ID: QM4267 - Official Version: 2.0 - Date Approved: 2014-04-14
ÖSSUR CONFIDENTIALITY NOTICE: This document contains information that is confidential and proprietary to Össur. Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without the prior written consent of Össur.

OSS 000018

# Design & Development Process



Life Without Limitations'

**Iteration**
A design effort leading to a prototype. **Iterations** can have different scope depending on the level at which they are used. For example, **Iterations** can be used at the product level in order to manage iterative development or the design implementation level to refine design solutions.

**Modular Product**
A **Modular Product** is a product whose subsystems are composed of a number of modules, which are defined according to the system architecture documentation. Products that include software shall always be considered as **Modular Products** as it is required that programmable electronic subsystems are identified as separate modules to be able to evaluate its contribution to basic safety and essential performance.

**Module**
A **Module** is an entity created by the logical, functional or physical partitioning of a device or system.

**Product**
In the context of this procedure, **Product** means component, module or device or any deliverable associated with execution of the process herein defined.

**Product Stakeholders**
The product stakeholders are the individual directly responsible for defining and monitoring the product capacity to fulfill its intended use, identified user needs and medical devices regulatory/quality requirements. In the context of this process, this group is defined as:
- Product Lead Designer;
- Medical Director;
- Global Product Manager;
- Project Manager;
- Manufacturing & Operations Representative;
- Regulatory Affairs Representative.

**Production Specifications**
**Production Specifications** are a set of controlled documents that defines all knowledge critical to device quality and performance and ensure that manufactured devices are repeatedly and reliably produced within product and process capabilities.

**Project**
An individual or collaborative work effort that is carefully planned and designed to achieve a particular goal. A **Project** describes the general organization of the work effort directed at generating the product.

**Project Stakeholders**
The Project Stakeholders are the individual directly responsible for defining and monitoring that the project in which the design work is performed is properly implemented and provided with adequate resources. In the context of this process, this group is defined as:
- Project Manager;
- Technical Product Lead(s) for the product group(s) to which the design work is attached.

Document ID: QM4267 - Official Version: 2.0 - Date Approved: 2014-04-14

ÖSSUR CONFIDENTIALITY NOTICE: This document contains information that is confidential and proprietary to Össur. Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without the prior written consent of Össur.

OSS 000019

## Design & Development Process



*Life Without Limitations*

**Prototype**
Output of an implementation stage that is to be submitted to verification activities.

**Release**
A **Prototype** that succeeded in **Verification** activities. A **Released Prototype** is able to sustain validation activities.

**Requirement(s)**
A **Requirement** is an objective that must be met. Unless required by the scope of the product to which it is associated, the **Requirement(s)** shall leave design and implementation details to the developers.

**Specification**
Any requirement with which a product, process, service or other activity must conform.
From a design and development standpoint, a **Specification** document is an output to the design and verification activities that defines a performance level based on a verified requirement or describes how something is supposed to be done.

**Technical Stakeholders**
The Technical stakeholders are the individual directly responsible for defining and monitoring that the product design and implementation fulfill state-of-the-art design rules, as well as quality standards, both internal and external. In the context of this process, this group is defined as:
- Product Lead Designer;
- Product Designer(s) associated with the specific design item(s);
- Manufacturing Engineer(s);
- Production Process Owner(s);
- Technical Platform Lead associated with the engineering field(s) of the Product.

**Verification**
Confirmation by examination and provision of objective evidence that specified requirements have been fulfilled.

**Validation**
Confirmation by examination and provision of objective evidence that the particular requirements for a specific intended use can be consistently fulfilled. More specifically, Product or Design **Validation** means establishing by objective evidence that device specifications conform with user needs and intended use(s).

Document ID: QM4267 - Official Version: 2.0 - Date Approved: 2014-04-14
ÖSSUR CONFIDENTIALITY NOTICE: This document contains information that is confidential and proprietary to Össur. Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without the prior written consent of Össur.

OSS 000020

# Design & Development Process



Life Without Limitations®

## 5    Process Description



**Figure 1 - Development Process Flowchart**

Document ID: QM4267 - Official Version: 2.0 - Date Approved: 2014-04-14

ÖSSUR CONFIDENTIALITY NOTICE: This document contains information that is confidential and proprietary to Össur. Neither this document nor the
information therein may be reproduced, used or distributed to or for the benefit of any third party without the prior written consent of Össur.

OSS 000021

# Design & Development Process



**Table 1 - Detailed Step by Step Process Overview**

| Process Reference | Description |
|---|---|
| A | **Process Entry Point**<br><br>Design Process is entered through multiple processes that are all calling for a new product design or change to an existing product design. Entry in the design process requires formal approval of the product change request or new product idea in the originating process. Following approval of the new product idea or product change idea, roles and resources shall be defined and associated with the project. |
| B | **Product Inputs Definition Activity**<br><br>This activity is concerned with the formal definition of the product creation, or change, at the high level and for all stakeholders involved in the product type being herein addressed.<br><br>Product inputs shall be defined based on the guidance provided in the document templates associated with the documents listed below, as well as product regulatory landscape and Össur internal quality standards.<br><br>Alternate source of information are to be considered when defining product inputs, such as existing similar products, customer feedback, complaints databases, publicly available data from National Competent Authorities and international standards applicable to the type of product being considered.<br><br>Output documents must be reviewed and approved following the documentation control structure and rules.<br><br>Modification of previously approved Product Inputs shall be performed as per the Change Control Process.<br><br>**Outputs (Create or Modify)**<br><br>Product / Design Criteria Document (Form 9);<br><br>Intended Use Document (Form 715);<br><br>Medical Necessity & Benefits Analysis (Form 345);<br><br>Validation Plan (considering requirements of QM1686);<br><br>Hazard Analysis (see QM1673). |
| C | **Product Inputs Review & Approval**<br><br>**Review**<br><br>Product inputs must be reviewed for adequacy and completeness by reviewers, following formal review standard operating procedures defined in Form 1411.<br><br>Failure to reach consensus between approvers shall be resolved by the modification of the Product Inputs Definition until agreement is reached by all stakeholders.<br><br>Evolution of the Product Inputs and the rationale for their evolution shall be documented as part of the review process output.<br><br>**Approval**<br><br>Scope of the approval requires all **Product Stakeholders** to agree on the scope and definition of the inputs to be addressed, as well as their intended use, as per described in |

Document ID: QM4267 - Official Version: 2.0 - Date Approved: 2014-04-14

ÖSSUR CONFIDENTIALITY NOTICE: This document contains information that is confidential and proprietary to Össur. Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without the prior written consent of Össur.

OSS 000022

# Design & Development Process



Life Without Limitations®

| | the activities output documents. |
|---|---|
| | Approval shall minimally include all **Product Stakeholders** as defined for the development project. |
| | ***Outputs (Create)*** |
| | Product Inputs Review Activity Report (as per Form 1411). |
| **D** | ***Product Design & Development Planning Activities*** |
| | A plan that describes design and development activities, their objectives and milestones, as well as define the responsibilities for implementation shall be established and maintained as it evolves through time. |
| | The plan shall formally identify the individuals responsible for the execution of the review and approval tasks associated with the Document Control Procedure, as well as the formal review and approval activities herein defined and further detailed in Form 1411. |
| | The plan shall also formally identify the individuals to be notified when changes are executed in the context of the development activities following the Change Control Process. |
| | Design and development planning documents shall be reviewed and approved following the Documentation Control Procedure structure and rules. |
| | Modification of previously approved Product Development Plan shall be performed as per the Change Control Process. |
| | ***Outputs (Create or Modify)*** |
| | Product Design & Development Plan Document(s); |
| | Product Risk Management Plan (as per QM1673). |
| **E** | ***Planning Review & Approval*** |
| | ***Review*** |
| | Design and development planning shall be reviewed for feasibility, adequacy of content and availability of resources by reviewers, following formal review standard operating procedures defined in Form 1411. |
| | Failure to reach consensus between approvers shall be resolved by the modification of the design and development plan until agreement is reached between all stakeholders. |
| | Evolution of the design and development plan and the rationale for its evolution shall be documented as part of the review process output. |
| | ***Approval*** |
| | Scope of the approval requires all **Product Stakeholders** and **Project Stakeholders** to agree on design and development plan content in its whole, as per documented in the output documents associated with the product design and development planning activities output listed above. |
| | Approval shall minimally include all **Product Stakeholders** and **Project Stakeholders** as defined for the development project. |
| | ***Outputs (Create)*** |

OSSUR CONFIDENTIALITY NOTICE: This document contains information that is confidential and proprietary to Össur. Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without the prior written consent of Össur.

OSS 000023

## Design & Development Process



| | |
|---|---|
| | Product Development Planning Review Activity Report (as per Form 1411). |
| **F** | ***Technical Inputs Definition Activities***<br><br>This activity is concerned with the formal definition of the technical inputs required in order to implement the product creation or change described by the Product Inputs previously established.<br><br>These activities shall create a comprehensive set of design input requirements, at an engineering level of detail, that are establishing what the design is expected to do in order to fulfill the product intended use and requirements.<br><br>Technical Inputs documents shall be reviewed and approved following the Documentation Control Procedure structure and rules.<br><br>Modification of previously approved technical inputs documents shall be performed as per the Change Control Process.<br><br>***Outputs (Create or Modify)***<br><br>Product Verification Plan;<br><br>Product Technical Requirements Document;<br><br>Additionally, for Modular Products:<br><br>Product System Architecture Document;<br><br>Product Module(s) Technical Requirements Document(s). |
| **G** | ***Technical Inputs Definition Review & Approval***<br><br>***Review***<br><br>Technical inputs shall be reviewed for feasibility, adequacy of scope and definition, as well as completeness.<br><br>Technical Inputs coverage shall be reviewed to ensure the design implementation capacity to fulfill the product intended use defined by the Product Inputs.<br><br>All technical inputs must be reviewed to ensure that they can be quantitatively measured through a formal and repeatable test, as per mapped in the Verification Plan document.<br><br>Failure to reach consensus between approvers shall be resolved by the modification of the technical inputs content until agreement is reached between all stakeholders.<br><br>Evolution of the technical inputs definition and the rationale for their evolution shall be documented as part of the review process output.<br><br>***Approval***<br><br>Scope of the approval requires all **Technical Stakeholders** to agree on technical inputs set in its whole, as per documented in the output documents associated with the product technical inputs definition activities listed above.<br><br>Technical Inputs documents shall be approved by the **Technical Stakeholders**.<br><br>***Outputs (Create)***<br><br>Technical Inputs Review Activity Report (as per Form 1411). |

Document ID: QM4267 – Official Version: 2.0 – Date Approved: 2014-04-14

OSSUR CONFIDENTIALITY NOTICE: This document contains information that is confidential and proprietary to Ossur. Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without the prior written consent of Ossur.

OSS 000024

# Design & Development Process



Life Without Limitations®

| H | **Product Implementation Activities** |
|---|---|
| | Product implementation activities are concerned with the realization of the product or product change previously defined by the Product Inputs and Technical Inputs. |
| | Specific work processes are associated with each technical field included in the product or product change scope. The following procedures shall be used to support the specific requirements of the product implementation activities relating to each technical field: |
| | Software: QM4275 shall be implemented when performing software product creation or change; |
| | Electronics: QM4274 shall be implemented when performing electronics product creation or change; |
| | Mechanical: QM1697 shall be implemented when performing mechanical product creation or change. |
| | Products characterized by extensive coupling between different technical fields or **Modular Products** shall establish the nature and constraints associated with the coupling through the mechanisms defined in this process, where stakeholders from each technical field are to be involved in the definition, review and approval activities. |
| | Output documents must be reviewed and approved following the Documentation Control Procedure structure and rules or through the specific guidelines defined for each technical field listed above. |
| | Approval shall minimally include all **Technical Stakeholders** as defined for the development activities. |
| | Modification of previously approved output documents resulting from the product implementation activities shall be performed as per the Change Control Process. |
| | **Outputs (Create or Modify)** |
| | Design Overview Document(s); |
| | Models used to support design activities and their documentation (e.g., CAD, FEA, Simulations, etc.) (Following their respective processes); |
| | Test Case Specifications Document(s); |
| | Production Specifications Document(s) (as per Design Transfer Procedure); |
| | Risk Analysis Report (as per QM1673); |
| | Product Prototypes. |
| I | **Product Verification Activities** |
| | Product verification activities shall be performed based on the Verification Plan previously defined and approved, as well as Test Case Specifications previously defined and approved. |
| | Design verification shall provide objective evidence that the design outputs are meeting the design inputs through execution of tests, inspections or reviews, and analyses. |
| | Whenever applicable and reasonably practical, verification activities shall rely on established test methods or standards that have been documented for adequacy in the context in which the test methods are used. |

Document ID: QM4267 - Official Version: 2.0 - Date Approved: 2014-04-14

ÓSSUR CONFIDENTIALITY NOTICE: This document contains information that is confidential and proprietary to Óssur. Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without the prior written consent of Óssur.

OSS 000025

## Design & Development Process



Life Without Limitations®

| | |
|---|---|
| | Whenever verification activities require the use of human test subjects, framework defined in QM1686 – Clinical Testing shall be used. |
| | Output of the verification activities shall include a traceability matrix that directly establishes the relationship of outputs to inputs. |
| | Verification activities output documents shall be reviewed and approved following the Documentation Control Procedure structure and rules. |
| | Modification of previously approved product verification activities outputs shall be performed as per the Change Control Process. |
| | ***Outputs (Create or Modify)*** |
| | Verification Report(s); |
| | Test Data and Records; |
| | Test Samples and Material Evidence. |
| **J** | ***Implementation Verification Review & Approval*** |
| | ***Review*** |
| | Implementation verification outputs shall be reviewed for accuracy, completeness and conclusions with respect to the implementation outputs capacity to fulfill the predefined inputs (technical and/or product level inputs, with respect to the objectives laid out in the development plan). |
| | Failure to demonstrate through objective evidence that the implementation outputs are fulfilling the requirements previously established and their acceptability criteria shall result in the modification of the implementation as per illustrated on the flowchart above. |
| | ***Approval*** |
| | Scope of the approval requires all **Technical Stakeholders** to agree on the implementation and its verification outcomes, as well as the capacity of the implementation to fulfill the targeted product intended use in validation activities or in **Alpha Testing** (if applicable). All deviations from the previously defined acceptability criteria and their rational for acceptability shall be recorded. |
| | Approval shall minimally include all **Technical Stakeholders** as defined for the design & development project. |
| | In the case of failure of the implementation to fulfill the pre-defined inputs and acceptability criteria, but where it would be considered acceptable to proceed with validation activities based on a partially successful verification, rationale for acceptability and impacts on the design capacity to fulfill its intended use shall be documented and approved by the **Product Stakeholders** as part of the verification review activities described above. |
| | ***Outputs (Create)*** |
| | Implementation Verification Review Activity Report (as per Form 1411). |
| **K** | ***Alpha Testing*** |
| | **Alpha Testing** activity is associated with human-based testing of the design features in order to support their development or minimize uncertainty regarding their capacity to properly fulfill the intended use of the product. |

Document ID: QM4267 - Official Version: 2.0 - Date Approved: 2014-04-14

OSSUR CONFIDENTIALITY NOTICE: This document contains information that is confidential and proprietary to Ossur. Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without the prior written consent of Ossur.

OSS 000026

## Design & Development Process



*Life Without Limitations*

| | |
|---|---|
| | **Alpha Testing** is an optional activity and shall only be performed when required by the Verification Plan previously defined. Rationale for performing, or not, Alpha Testing shall be documented in the Verification Plan or in the Project Plan. |
| | **Alpha Testing** end-points, methodology and test procedures shall be defined and approved prior initiation of the testing activities, following procedure detailed in QM 1686 – Clinical Testing. |
| | **Alpha Testing** activities output documents shall be reviewed and approved following the Documentation Control Procedure structure and rules. |
| | ***Outputs (Create or Modify)*** |
| | Alpha Testing Report; |
| | Test Data and Records; |
| | Test Specifications or Protocols. |
| **L** | ***Alpha Testing Review & Approval*** |
| | This activity is an optional activity that shall only be performed in the case where an Alpha Testing activity is deemed necessary in the specific project context, as per documented in the Product Design & Development Plan. |
| | ***Review*** |
| | **Alpha Testing** outputs shall be reviewed for accuracy, completeness and conclusions with respect to the **Released Prototype** design and/or implementation capacity to fulfill the predefined end-points for the test sequence. |
| | Failure to demonstrate through objective evidence that the **Released Prototype** design and/or implementation is meeting the expected performance level shall require modification of technical inputs and/or product implementation as per illustrated on the flowchart above. |
| | ***Approval*** |
| | Scope of the approval requires all **Technical Stakeholders** to agree on the **Alpha Testing** outcomes, as well as the capacity of the implementation to fulfill the targeted product intended use in validation activities. All deviations from the previously defined acceptability criteria and their rational for acceptability shall be recorded. |
| | Approval shall minimally include all **Technical Stakeholders** as defined for the design & development project. |
| | In the case of failure of the implementation to fulfill the pre-defined inputs and acceptability criteria, but where it would be considered acceptable to proceed with validation activities based on a partially successful verification, rationale for acceptability and impacts on the design capacity to fulfill its intended use shall be documented and approved by the **Product Stakeholders** as part of the **Alpha Testing** review activities described above. |
| | ***Outputs (Create)*** |
| | **Alpha Testing** Review Activity Report (as per Form 1411). |
| **M** | ***Product Validation Activities*** |
| | Product validation activities shall allow demonstrating that devices consistently conform to |

ÖSSUR CONFIDENTIALITY NOTICE: This document contains information that is confidential and proprietary to Össur. Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without the prior written consent of Össur.

OSS 000027

## Design & Development Process



Life Without Limitations

| | |
|---|---|
| | defined user needs and intended uses through provision of objective evidence. |
| | Product validation activities shall include the testing of production units under actual or simulated use conditions. |
| | Product Validation activities shall be performed based on the Validation Plan previously defined and approved, as well as Test Specifications or Protocols previously defined and approved. |
| | Whenever validation activities require the use of human test subjects, framework defined in QM1686 – Clinical Testing shall be used. |
| | Validation output documents shall be reviewed and approved following the Documentation Control Procedure structure and rules. |
| | Modification of previously approved product validation activities outputs shall be performed as per the Change Control Process. |
| | *Outputs (Create or Modify)* |
| | Validation Report(s); |
| | Test Specification(s) or Protocol(s); |
| | Clinical Evaluation Report (as per QM1686, Form 1028); |
| | Test Data and Records; |
| | Risk Management Report (as per QM1673); |
| | Notes on Testing (Form 29). |
| N | *Beta Testing* |
| | **Beta Testing** activity is associated with human-based testing of the completed product as per manufactured in its normal production process in order to generate objective evidence of the product capacity to fulfill its intended uses, medical indications and clinical benefits. |
| | **Beta Testing** is an optional activity and shall only be performed when required by the Validation Plan previously defined. Rationale for performing, or not, **Beta Testing** shall be documented in the Validation Plan or in the Project Plan. |
| | **Beta Testing** end-points, methodology and test procedures shall be defined and approved prior initiation of the testing activities, following procedure detailed in QM 1686 – Clinical Testing. **Beta Testing** shall be executed by individuals with no direct involvement in the technical aspects of the Design & Development Project. |
| | **Beta Testing** activities output documents shall be reviewed and approved following the Documentation Control Procedure structure and rules. |
| | *Outputs (Create or Modify)* |
| | Beta Testing Report; |
| | Questionnaires or other forms for collecting feedback during trials; |
| | Clinical Evaluation Report (as per QM1686, Form 1028); |
| | Test Data and Records; |
| | Test Specifications or Protocols. |

Document ID: QM4267 - Official Version: 2.0 - Date Approved: 2014-04-14

ÖSSUR CONFIDENTIALITY NOTICE: This document contains information that is confidential and proprietary to Össur. Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without the prior written consent of Össur.

OSS 000028

## Design & Development Process



*Life Without Limitations*

| | |
|---|---|
| O | ***Validation Review & Approval*** |
| | ***Review*** |
| | Validation activities outputs shall be reviewed for accuracy, completeness and its conclusions validity with respect to the product capacity to fulfill the predefined inputs (product level inputs, with respect to the objectives laid out in the development plan). |
| | Failure to demonstrate through objective evidence that the product is fulfilling user needs, intended uses, and their acceptability criteria previously established shall result in cycling through the complete process, as per illustrated on the flowchart above, until successful validation is achieved. |
| | ***Approval*** |
| | Scope of the approval requires all **Product Stakeholders** to agree on the capacity of the prototype release to fulfill the targeted product intended uses, for all use environments and scenarios. All deviations from the previously defined acceptability criteria and their rational for acceptability shall be recorded. |
| | Approval shall minimally include all **Product Stakeholders** as defined for the development project. |
| | In the case where it would be considered acceptable to proceed with product launch based on a partially successful validation, due to a failure of the design implementation to fulfill the pre-defined inputs and acceptability criteria, rationale for acceptability and impacts on the design capacity to fulfill its intended use shall be documented and approved by the **Product Stakeholders** as part of the validation review activities records. |
| | ***Outputs (Create)*** |
| | Validation Activities Review Activity Report (as per Form 1411). |
| P | ***Process Exit Point*** |
| | Following completion of the Design and Development activities, formal notification shall be added to the Product Change List. |

OSSUR CONFIDENTIALITY NOTICE: This document contains information that is confidential and proprietary to Össur. Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without the prior written consent of Össur.

OSS 000029

## Design & Development Process



Life Without Limitations®

## 6  General Guidance

This section of the process provides general guidance on the implementation of the process described above, but is not part of the process itself. This section is provided to answer main questions arising from the use of the process in a daily manner and align the process use without constraining it.

### Sequence of Product Inputs and Product Planning Activities

It is to be understood that activities B and D from the flowchart of Figure 1 can be executed concurrently due to their respective nature and the fact that Product Inputs are required in order to properly define the design and development plan. In that context, milestones C and E could be executed at the same time, even if it is preferable to complete definition of Product Inputs prior completing the Product Design & Development Plan.

### Iterative Development

The Design & Development Process illustrated in Figure 1 represents a single iteration workflow, leading to a single prototype implementation and eventually to a single prototype release.

It is to be understood that in the context where the design & development work scope is actually too large or too complex to be effectively addressed through single product design & development iteration, multiple iterations are to be used.

Iterative development shall be detailed in the Design & Development Plan and should be used at all levels of the plan (e.g., Product Iterations, Release Iterations and Prototype Iterations). When Iterative Design & Development iterations are used, individual iteration shall follow the general pattern and sequence of activities outlined in Figure 1.

### Sequence of Activities

Sequence of activities and controls defined above is to be respected and enforced in order to ensure that the regulatory requirements associated with Medical Device development are fulfilled. Hence, all activities associated with a given stage of the design & development process are to be completed prior moving to downstream activities, including document completion and control.

In the case where increased efficiency would be gained by running concurrent activities spanning across a control defined above (e.g., for different subsystem or modules having limited coupling or dependency on configuration management), rationale for acceptability shall be provided as part of the design & development plan.

### Use of the D&D Process for CAPA Work

When the process defined above is used in the context of CAPA work, the same sequence of activities shall be implemented, but only required activities shall be performed following review of required work. It is however recommended to run through the complete process in order to make sure that all aspects of the product and production process have been properly covered.

Change to output documents and materials shall be documented as changes in the original documentation package. When it appears not practical to modify or update existing documentation, new documents shall be created.

It is to be understood that the update or modification of the documentation associated with the product or the production process generates a new revision of the **Design History File** (for the product) or the **Device Master Record** (for the production process).

OSS 000030

# Design & Development Process



ÖSSUR

*Life Without Limitations*

**Interaction with the Change Control Process**

As per outlined in the step-by-step process overview above, modification of document or product/production related outputs is subjects to the constraints defined in the Change Control Process. Whenever practical and allowing to maintain sufficient traceability, the Change Control associated with a given CAPA or iteration of the NDP process shall be lumped together through the *a priori* identification of all changes and their approval as a whole.

**Interaction with the Design Transfer Process**

As per mentioned above, this process does not integrate the activities associated with **Design Transfer**. Design Transfer Process is covered by QM4276 – Design Transfer Process. However, due to the very tight coupling between the product design & development process and the production method design & development process, both process needs to be considered simultaneously throughout the complete project timeline and the nature of the project (i.e., CAPA or NPD).

Design Transfer Process should be initiated as the same time as the Product Inputs are being defined and be considered when defining the Product Design & Development Plan. In that context, Manufacturing & Operations stakeholders are required to participate to the activities and review and approval cycles following the Product Inputs Definition and Product Design & Development Planning.

**Verification & Validation**

As per outlined in the definitions provided above, **Verification** is the activity concerned with showing that the design implementation, or prototype, is able to fulfill the requirements previously defined and agreed upon. In that context, **Verification** is an activity purely technical in nature as it does not necessarily present any direct correlation to the product intended use.

On the other hand, **Validation** is the activity concerned with showing that the product and its production process can consistently fulfill the product intended use, when used by users, in the pre-defined use environments and for all use scenarios. It is to be noted that **Validation** does not necessarily involve testing with users, it can also be done using test equipment that are known to reproduce with high accuracy final product user conditions and environments.

At Össur, **Validation** testing has historically been classified under two main type of testing, referred to as Alpha and Beta testing, see QM1686.

**Alpha Testing** is testing aimed at supporting product development and design improvements and is performed on released prototypes.

**Beta Testing** is carried on products with a frozen design and is aimed at testing the product as a whole, and not only specific design aspects.

Based on these definitions, **Alpha Testing** is a specific type of **Verification** activity which happens to involve test users and aims at measuring performance of design features that could otherwise not be properly assessed in a simulated environment or machine testing. **Alpha Testing** does not necessarily involve field trials, as most, if not all, use conditions and environment of the product can be reproduced in in-house trials and provide results coherent with the final product field use. **Alpha Testing** shall be defined based on end-points that involve verification of specific design aspects.

From the definition above, **Beta Testing** is a **Validation** activity as it involves testing the final product with respect to its intended use. **Beta Testing** shall rely on standardized test methods and measurements in order to generate objective evidence that the product can sustain its intended use and disclosed clinical benefits in a consistent manner.

Document ID: QM4267 - Official Version: 2.0 - Date Approved: 2014-04-14

ÖSSUR CONFIDENTIALITY NOTICE: This document contains information that is confidential and proprietary to Össur. Neither this document nor the information therein may be reproduced, used or distributed to or for the benefit of any third party without the prior written consent of Össur.

OSS 000031

# EXHIBIT 2

| | |
|---|---|
| **From:** | Wayne Calco <calco.wayne@me.com> |
| **Sent:** | Tuesday, November 24, 2015 12:53 PM |
| **To:** | Duane Romo; Chris Webster; Jason Flores; Tatjana Latinovic |
| **Subject:** | adjustable sternum pad concept |
| **Attachments:** | STURNUM PAD ADJUSTMENT OSSUR.vc6.pdf |

CALCO 001221

STERNUM PAD ADJUSTS WITH BALL JOINT AND HIGH ANGLE
SCREW STYLE SHAFT CONCEPT 8/28/2015



PAD

Dial adjust pad

CONFIDENTIAL FOR OSSUR PATENT WAYNE CALCO DESIGNER 8/28/
2015

CALCO 001222

STERNUM PAD ADJUSTS WITH BALL JOINT AND HIGH ANGLE
SCREW STYLE SHAFT CONCEPT 8/28/2015

FINGER TURNS DIAL LEFT OR RIGHT TO RAISE OR LOWER
PAD



BALL JOINT ALLOWS PAD TO LAY
FLAT ON DIFFERING ANATOMYS

CALCO 001223

CONFIDENTIAL FOR OSSUR PATENT WAYNE CALCO DESIGNER 8/28/
2015

**-47-**

# EXHIBIT 3

| | |
|---|---|
| **From**: | Wayne Calco [calco.wayne@me.com] |
| **Sent**: | 1/26/2016 9:22:54 PM |
| **To**: | Duane Romo [dromo@ossur.com]; Tatjana Latinovic [tlatinovic@ossur.com] |
| **CC**: | Larry Roberts [larry@larryrobertslaw.com]; William C. Kersten [kerstenlaw@sbcglobal.net] |
| **Subject**: | side adjustment concept for patent |
| **Attachments**: | side adjustment concept.pdf; updated patent info OssurCollar.pdf |

CONFIDENTIAL

OSS 001250



Inset into sides of
collar adjustment bar





Slides back
to raise suppoort

Ossur CONFIDENTIAL Wayne Calco, Designer 1/
22/2016

CONFIDENTIAL

OSS 001251

## CHIN SUPPORT ADJUST MENT CONCEPT
## WAYNE CALCO, DESIGNER 8/28/2015



geared rack moves blocks

Concave Dial turns like door lock but with index finger and thumb causing blocks to slide out of rubber springs

chin support side view

sliding block prevents spring from compressing

hinge front view

rubber spring

CONFIDENTIAL FOR OSSUR

CONFIDENTIAL

OSS 001252

STERNUM PAD ADJUSTS WITH BALL JOINT AND HIGH ANGLE SCREW
STYLE SHAFT CONCEPT 8/28/2015



PAD

Dial adjust pad

CONFIDENTIAL FOR OSSUR PATENT WAYNE CALCO DESIGNER 8/28/2015

CONFIDENTIAL

OSS 001253

STERNUM PAD ADJUSTS WITH BALL JOINT AND HIGH ANGLE SCREW
STYLE SHAFT CONCEPT 8/28/2015

FINGER TURNS DIAL LEFT OR RIGHT TO RAISE OR LOWER PAD



BALL JOINT ALLOWS PAD TO LAY FLAT
ON DIFFERING ANATOMYS

CONFIDENTIAL FOR OSSUR PATENT WAYNE CALCO DESIGNER 8/28/2015

CONFIDENTIAL

OSS 001254

MOVING RACK LIVES INSIDE CHIN SUPPORT PLATFORM

LOCKED POSITION



BLOCK

BLOCK

FLEXABLE RACK

ADJUST
LOCK/
RELEASE

CHIN SUPPORT ADJUSTMENT CONCEPT
WAYNE CALCO, DESIGNER 8/28/2015

CONFIDENTIAL FOR OSSUR

CONFIDENTIAL

OSS 001255

## MOVING RACK LIVES INSIDE CHIN SUPPORT PLATFORM



BLOCK

UNLOCKED POSITION

BLOCK

FLEXABLE RACK

CONFIDENTIAL FOR OSSUR

CHIN SUPPORT ADJUSTMENT CONCEPT
WAYNE CALCO, DESIGNER 8/28/2015

CONFIDENTIAL

OSS 001256

opposing rubber bands
or "O" rings
stretch when knob is
turned to adjust,
Then, pull the knob back
to vertical.



adjustment release          FRONT
knob

adjustment release knob concept to
make the knob
return to center on its own
wayne calco, designer
CONFIDENTIAL OSSUR
 DECEMBER 4, 2015

CHIN SUPPORT ADJUSTMENT CONCEPT
WAYNE CALCO, DESIGNER 12/04/2015

CONFIDENTIAL                                                     OSS 001257



snaps into logo plate and
releases when strap is pulled

strap is attached to back panel then
travels thru logo plate turnstyle back
to back panel where it velcro locks for
a one time adustment.

fixed legnth strap
to release back panel

LOGO PLATE
SIDE VIEW

Collar back panel ADJUSTMENT CONCEPT
WAYNE CALCO, DESIGNER 12/04/2015

CONFIDENTIAL

OSS 001258



Inset into sides of
collar adjustment bar





Slides back
to raise support

Ossur CONFIDENTIAL  Wayne Calco, Designer 1/
22/2016

CONFIDENTIAL

OSS 001259

CONFIDENTIAL

OSS 001260

# EXHIBIT 4

Doc Code: PA..
Document Description: Power of Attorney

PTO/AIA/82A (07-13)
Approved for use through 11/30/2014  OMB 0651-0051
U.S. Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# TRANSMITTAL FOR POWER OF ATTORNEY TO ONE OR MORE REGISTERED PRACTITIONERS

NOTE: This form is to be submitted with the Power of Attorney by Applicant form (PTO/AIA/82B) to identify the application to which the Power of Attorney is directed, in accordance with 37 CFR 1.5, unless the application number and filing date are identified in the Power of Attorney by Applicant form. If neither form PTO/AIA/82A nor form PTO/AIA82B identifies the application to which the Power of Attorney is directed, the Power of Attorney will not be recognized in the application.

| | |
|---|---|
| Application Number | |
| Filing Date | February 25, 2016 |
| First Named Inventor | Christopher Callicott WEBSTER |
| Title | CERVICAL COLLAR |
| Art Unit | |
| Examiner Name | |
| Attorney Docket Number | 19793.488 |

## SIGNATURE of Applicant or Patent Practitioner

| Signature | /Justin J. Cassell/ | Date (Optional) | February 25, 2016 |
|---|---|---|---|
| Name | Justin J. Cassell | Registration Number | 46,205 |
| Title (if Applicant is a juristic entity) | Attorney for Applicant | | |
| Applicant Name (if Applicant is a juristic entity) | | Ossur Iceland ehf | |

**NOTE:** This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4(d) for signature requirements and certifications. If more than one applicant, use multiple forms.

☑ *Total of 1_____ forms are submitted.

This collection of information is required by 37 CFR 1.131, 1.32, and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

OSS 000460

Doc Code: PA..
Document Description: Power of Attorney

PTO/AIA/82B (07-13)
Approved for use through 11/30/2014. OMB 0651-0051
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

# POWER OF ATTORNEY BY APPLICANT

I hereby revoke all previous powers of attorney given in the application identified in either the attached transmittal letter or the boxes below.

| Application Number | Filing Date |
|---|---|
|  |  |

(Note: The boxes above may be left blank if information is provided on form PTO/AIA/82A.)

[✓] I hereby appoint the Patent Practitioner(s) associated with the following Customer Number as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the application referenced in the attached transmittal letter (form PTO/AIA/82A) or identified above:

22913

OR

[ ] I hereby appoint Practitioner(s) named in the attached list (form PTO/AIA/82C) as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the patent application referenced in the attached transmittal letter (form PTO/AIA/82A) or identified above. (Note: Complete form PTO/AIA/82C.)

**Please recognize or change the correspondence address for the application identified in the attached transmittal letter or the boxes above to:**

[✓] The address associated with the above-mentioned Customer Number

OR

[ ] The address associated with Customer Number: |  |

OR

| Firm or Individual Name | |
|---|---|
| Address | |
| City | State | Zip |
| Country | |
| Telephone | Email |

I am the Applicant (if the Applicant is a juristic entity, list the Applicant name in the box):

| Ossur Iceland ehf |
|---|

[ ] Inventor or Joint Inventor (title not required below)

[ ] Legal Representative of a Deceased or Legally Incapacitated Inventor (title not required below)

[✓] Assignee or Person to Whom the Inventor is Under an Obligation to Assign (provide signer's title if applicant is a juristic entity)

[ ] Person Who Otherwise Shows Sufficient Proprietary Interest (e.g., a petition under 37 CFR 1.46(b)(2) was granted in the application or is concurrently being filed with this document) (provide signer's title if applicant is a juristic entity)

### SIGNATURE of Applicant for Patent

The undersigned (whose title is supplied below) is authorized to act on behalf of the applicant (e.g., where the applicant is a juristic entity).

| Signature | Tatjana Latinovic | Date (Optional) | 19. November 2015 |
|---|---|---|---|
| Name | TATJANA LATINOVIC | | |
| Title | INTELLECTUAL PROPERTY DIRECTOR | | |

**NOTE:** Signature - This form must be signed by the applicant in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. If more than one applicant, use multiple forms.

[✓] Total of   1      forms are submitted.

This collection of information is required by 37 CFR 1.131, 1.32, and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2

OSS 000461

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 19793.488 |
|---|---|---|
| | Application Number | |

| Title of Invention | CERVICAL COLLAR |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76. This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

## Secrecy Order 37 CFR 5.2:

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2 (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

## Inventor Information:

| Inventor | 1 | | | | Remove | |
|---|---|---|---|---|---|---|
| Legal Name | | | | | | |

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Christopher | Callicott | WEBSTER | |

| Residence Information (Select One) | ● US Residency | Non US Residency | Active US Military Service |
|---|---|---|---|

| City | Irvine | State/Province | CA | Country of Residence | US |
|---|---|---|---|---|---|

### Mailing Address of Inventor:

| Address 1 | 14111 Esperanza |
|---|---|
| Address 2 | |

| City | Irvine | State/Province | CA |
|---|---|---|---|

| Postal Code | 92618 | Country i | US |
|---|---|---|---|

| Inventor | 2 | | | | Remove | |
|---|---|---|---|---|---|---|
| Legal Name | | | | | | |

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Wayne | | CALCO | |

| Residence Information (Select One) | ● US Residency | Non US Residency | Active US Military Service |
|---|---|---|---|

| City | Anaheim | State/Province | CA | Country of Residence | US |
|---|---|---|---|---|---|

### Mailing Address of Inventor:

| Address 1 | 1108.5 West Center Street |
|---|---|
| Address 2 | |

| City | Anaheim | State/Province | CA |
|---|---|---|---|

| Postal Code | 92805 | Country i | US |
|---|---|---|---|

| Inventor | 3 | | | | Remove | |
|---|---|---|---|---|---|---|
| Legal Name | | | | | | |

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Harry | Duane | ROMO | |

| Residence Information (Select One) | ● US Residency | Non US Residency | Active US Military Service |
|---|---|---|---|

OSS 000462

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 19793.488 |
|---|---|---|
| | Application Number | |

| Title of Invention | CERVICAL COLLAR |
|---|---|

| City | Aliso Viejo | | State/Province | CA | Country of Residence | US |
|---|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 24 Hulsea | | | |
|---|---|---|---|---|
| Address 2 | | | | |
| City | Aliso Viejo | | State/Province | CA |
| Postal Code | 92656 | Country i | US | |

All Inventors Must Be Listed – Additional Inventor Information blocks may be generated within this form by selecting the **Add** button.  [ Add ]

## Correspondence Information:

Enter either Customer Number or complete the Correspondence Information section below.
For further information see 37 CFR 1.33(a).

☐ An Address is being provided for the correspondence Information of this application.

| Customer Number | 22913 | | |
|---|---|---|---|
| Email Address | docketing@wnlaw.com | [ Add Email ] | [ Remove Email ] |

## Application Information:

| Title of the Invention | CERVICAL COLLAR | | |
|---|---|---|---|
| Attorney Docket Number | 19793.488 | Small Entity Status Claimed | ☐ |
| Application Type | Provisional | | ▾ |
| Subject Matter | Utility | | ▾ |
| Total Number of Drawing Sheets (if any) | 13 | Suggested Figure for Publication (if any) | |

## Filing By Reference:

Only complete this section when filing an application by reference under 35 U.S.C. 111(c) and 37 CFR 1.57(a). Do not complete this section if application papers including a specification and any drawings are being filed. Any domestic benefit or foreign priority information must be provided in the appropriate section(s) below (i.e., "Domestic Benefit/National Stage Information" and "Foreign Priority Information").

For the purposes of a filing date under 37 CFR 1.53(b), the description and any drawings of the present application are replaced by this reference to the previously filed application, subject to conditions and requirements of 37 CFR 1.57(a).

| Application number of the previously filed application | Filing date (YYYY-MM-DD) | Intellectual Property Authority or Country |
|---|---|---|
| | | |

## Publication Information:

☐ Request Early Publication (Fee required at time of Request 37 CFR 1.219)

☐ **Request Not to Publish.** I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing.

EFS Web 2.2.12

OSS 000463

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 19793.488 |
| | Application Number | |
| Title of Invention | CERVICAL COLLAR | |

## Representative Information:

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32).
Either enter Customer Number or complete the Representative Name section below. If both sections are completed the customer Number will be used for the Representative Information during processing.

| Please Select One: | ● Customer Number | US Patent Practitioner | ○ Limited Recognition (37 CFR 11.9) |
| Customer Number | 22913 | | |

## Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, 365(c), or 386(c) or indicate National Stage entry from a PCT application. Providing benefit claim information in the Application Data Sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78.
When referring to the current application, please leave the "Application Number" field blank.

| Prior Application Status | | | Remove |
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) |
| | | | |

Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button.     | Add |

## Foreign Priority Information:

This section allows for the applicant to claim priority to a foreign application. Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55. When priority is claimed to a foreign application that is eligible for retrieval under the priority document exchange program (PDX)[i] the information will be used by the Office to automatically attempt retrieval pursuant to 37 CFR 1.55(i)(1) and (2). Under the PDX program, applicant bears the ultimate responsibility for ensuring that a copy of the foreign application is received by the Office from the participating foreign intellectual property office, or a certified copy of the foreign priority application is filed, within the time period specified in 37 CFR 1.55(g)(1).

| | | | Remove |
| Application Number | Country[i] | Filing Date (YYYY-MM-DD) | Access Code[i] (if applicable) |
| | | | |

Additional Foreign Priority Data may be generated within this form by selecting the **Add** button.     | Add |

EFS Web 2.2.12

OSS 000464

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 19793.488 |
|---|---|---|
| | Application Number | |

| Title of Invention | CERVICAL COLLAR |
|---|---|

## Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications

☐ This application (1) claims priority to or the benefit of an application filed before March 16, 2013 and (2) also contains, or contained at any time, a claim to a claimed invention that has an effective filing date on or after March 16, 2013.
NOTE: By providing this statement under 37 CFR 1.55 or 1.78, this application, with a filing date on or after March 16, 2013, will be examined under the first inventor to file provisions of the AIA.

OSS 000465

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 19793.488 |
|---|---|---|
| | Application Number | |

| Title of Invention | CERVICAL COLLAR |
|---|---|

## Authorization or Opt-Out of Authorization to Permit Access:

When this Application Data Sheet is properly signed and filed with the application, applicant has provided written authority to permit a participating foreign intellectual property (IP) office access to the instant application-as-filed (see paragraph A in subsection 1 below) and the European Patent Office (EPO) access to any search results from the instant application (see paragraph B in subsection 1 below).

Should applicant choose not to provide an authorization identified in subsection 1 below, applicant **must opt-out** of the authorization by checking the corresponding box A or B or both in subsection 2 below.

**NOTE**: This section of the Application Data Sheet is **ONLY** reviewed and processed with the **INITIAL** filing of an application. After the initial filing of an application, an Application Data Sheet cannot be used to provide or rescind authorization for access by a foreign IP office(s). Instead, Form PTO/SB/39 or PTO/SB/69 must be used as appropriate.

### 1. Authorization to Permit Access by a Foreign Intellectual Property Office(s)

**A. Priority Document Exchange (PDX)** - Unless box A in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the European Patent Office (EPO), the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), the State Intellectual Property Office of the People's Republic of China (SIPO), the World Intellectual Property Organization (WIPO), and any other foreign intellectual property office participating with the USPTO in a bilateral or multilateral priority document exchange agreement in which a foreign application claiming priority to the instant patent application is filed, access to: (1) the instant patent application-as-filed and its related bibliographic data, (2) any foreign or domestic application to which priority or benefit is claimed by the instant application and its related bibliographic data, and (3) the date of filing of this Authorization. See 37 CFR 1.14(h)(1).

**B. Search Results from U.S. Application to EPO** – Unless box B in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the EPO access to the bibliographic data and search results from the instant patent application when a European patent application claiming priority to the instant patent application is filed. See 37 CFR 1.14(h)(2).

The applicant is reminded that the EPO's Rule 141(1) EPC (European Patent Convention) requires applicants to submit a copy of search results from the instant application without delay in a European patent application that claims priority to the instant application.

### 2. Opt-Out of Authorizations to Permit Access by a Foreign Intellectual Property Office(s)

☐ A. Applicant **DOES NOT** authorize the USPTO to permit a participating foreign IP office access to the instant application-as-filed. If this box is checked, the USPTO will not be providing a participating foreign IP office with any documents and information identified in subsection 1A above.

☐ B. Applicant **DOES NOT** authorize the USPTO to transmit to the EPO any search results from the instant patent application. If this box is checked, the USPTO will not be providing the EPO with search results from the instant application.

**NOTE:** Once the application has published or is otherwise publicly available, the USPTO may provide access to the application in accordance with 37 CFR 1.14.

OSS 000466

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 19793.488 |
| | Application Number | |
| Title of Invention | CERVICAL COLLAR | |

## Applicant Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

| Applicant | 1 | | Remove |

If the applicant is the inventor (or the remaining joint inventor or inventors under 37 CFR 1.45), this section should not be completed. The information to be provided in this section is the name and address of the legal representative who is the applicant under 37 CFR 1.43; or the name and address of the assignee, person to whom the inventor is under an obligation to assign the invention, or person who otherwise shows sufficient proprietary interest in the matter who is the applicant under 37 CFR 1.46. If the applicant is an applicant under 37 CFR 1.46 (assignee, person to whom the inventor is obligated to assign, or person who otherwise shows sufficient proprietary interest) together with one or more joint inventors, then the joint inventor or inventors who are also the applicant should be identified in this section.

Clear

| ⦿ Assignee | Legal Representative under 35 U.S.C. 117 | Joint Inventor |
| Person to whom the inventor is obligated to assign. | Person who shows sufficient proprietary interest |

If applicant is the legal representative, indicate the authority to file the patent application, the inventor is:

| | ▾ |

Name of the Deceased or Legally Incapacitated Inventor:

If the Applicant is an Organization check here.    ☒

| Organization Name | Ossur Iceland ehf |

### Mailing Address Information For Applicant:

| Address 1 | Grjothals 5 | | |
| Address 2 | | | |
| City | Reykjavik | State/Province | |
| Country | IS | Postal Code | 110 |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Applicant Data may be generated within this form by selecting the Add button.    Add

## Assignee Information including Non-Applicant Assignee Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

EFS Web 2.2.12

OSS 000467

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 19793.488 |
| | Application Number | |

| Title of Invention | CERVICAL COLLAR |

**Assignee** 1

Complete this section if assignee information, including non-applicant assignee information, is desired to be included on the patent application publication. An assignee-applicant identified in the "Applicant Information" section will appear on the patent application publication as an applicant. For an assignee-applicant, complete this section only if identification as an assignee is also desired on the patent application publication.

|  | Remove |

| If the Assignee or Non-Applicant Assignee is an Organization check here. | ☐ |

| Prefix | Given Name | Middle Name | Family Name | Suffix |
| | | | | |

**Mailing Address Information For Assignee including Non-Applicant Assignee:**

| Address 1 | |
| Address 2 | |
| City | | State/Province | |
| Country i | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | |

| Additional Assignee or Non-Applicant Assignee Data may be generated within this form by selecting the Add button. | Add |

## Signature: 
Remove

**NOTE:** This Application Data Sheet must be signed in accordance with 37 CFR 1.33(b). **However, if this Application Data Sheet is submitted with the INITIAL filing of the application and either box A or B is not checked in subsection 2 of the "Authorization or Opt-Out of Authorization to Permit Access" section, then this form must also be signed in accordance with 37 CFR 1.14(c).**

This Application Data Sheet **must** be signed by a patent practitioner if one or more of the applicants is a **juristic entity** (e.g., corporation or association). If the applicant is two or more joint inventors, this form must be signed by a patent practitioner, **all** joint inventors who are the applicant, or one or more joint inventor-applicants who have been given power of attorney (e.g., see USPTO Form PTO/AIA/81) on behalf of **all** joint inventor-applicants.

See 37 CFR 1.4(d) for the manner of making signatures and certifications.

| Signature | /Justin J. Cassell/ | | | Date (YYYY-MM-DD) | 2016-02-25 |
| First Name | Justin | Last Name | Cassell | Registration Number | 46205 |

| Additional Signature may be generated within this form by selecting the Add button. | Add |

EFS Web 2.2.12

OSS 000468

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 19793.488 |
|---|---|---|
| | Application Number | |
| Title of Invention | CERVICAL COLLAR | |

This collection of information is required by 37 CFR 1.76. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 23 minutes to complete, including gathering, preparing, and submitting the completed application data sheet form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.2.12

OSS 000469

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.2.12

OSS 000470

1/22

## CERVICAL COLLAR

[1]    FIELD OF THE DISCLOSURE

[2]    The disclosure relates generally to the field of orthopedic devices, and more specifically to cervical collars having sizing and fitting adjustments.

[3]    BACKGROUND

[4]    Cervical collars are used in the treatment, stabilization, immobilization, and therapy of cervical trauma. A cervical collar is routinely applied after a serious head or neck injury. The collar aids in stabilizing the cervical area, such as the spinal cord, neck or head area, to prevent further injury. Usage of the collar may reduce the possibility of spinal damage, paralysis or death. A collar is used during recovery from traumatic head or neck injuries and after spinal surgery by immobilizing the injured areas and relieving stress from the injured and healing part of the body. As part of the recovery from injury or surgery, patients are instructed to wear the collar until the healing process or treatment ends.

[5]    A critical aspect for patent recovery from injury or surgery is patience compliance of wearing the cervical collar. It has been found that many patients fail to fully comply with treatment plans requiring wearing of cervical collar the entire duration of treatment. As many collars are provided as off-the-shelf devices, it is difficult to meet all patient phenotypes while providing the requisite immobilization and patient comfort to ensure patient compliance.

[6]    There is often a rush to apply these collars onto the wearer due to the acute nature of cervical injuries. The collar must be selected to accommodate the wearer's size in a quick manner for effective stabilization and immobilization of the neck of the wearer. Known cervical collars restrict spine flexion, extension and rotation to promote wearer recovery. Such known collars also include a trachea opening allowing for healthcare clinicians the ability to perform quick carotid pulse monitoring and emergency tracheotomies while providing cervical immobilization.

[7]    A drawback to known collars is that they are individually sized for a variety of standard wearer sizes. There is a need to store many sized collars in inventory which significantly adds to the cost for using such collars. Proper sizing is critical for wearer

OSS 000471

2/22

immobilization and comfort. While there are a variety of standard sizes, the wearer may have dimensions which fall outside of the standard sizes, and wear a poorly fitting collar that insufficiently immobilizes the wearer's neck. Such poor fitting may also cause significant discomfort to the wearer. While some known cervical collars have adaptability to accommodate the body of the patient and the particular ailment prompting the need for wearing a cervical collar, these collars are often found as limited in the degree by which the relative positions of various components are arranged.

[8]    Over time, swelling of the wearer's neck may reduce which further complicates the sizing of the collar. This may lead to the need for disposing the initially selected collar and replacing it with a new collar.

[9]    When sizing a cervical collar, the first notable dimension concerns the height. The height is measured by the vertical distance from the tip of the chin to the sternum; the other key dimension concerns the circumference of the wearer's neck. Besides sizing, proper application of the collar is necessary for immobilization and wearer comfort. A typical collar includes of front and rear components packaged as a set according to the size of the wearer.

[10]    When applying a collar to the wearer, the rear component of the collar applies to the back of the wearer's neck. Once the back is positioned appropriately on the wearer, the front component of the collar is positioned against the front or anterior portion of the neck so a chin support is placed against the chin. The front component is centered to secure neutral alignment.

[11]    According to a configuration, the front component fits inside the rear component. A hook and loop contact is affixed posteriorly facing inward, and arranged for being pulled over and touched down upon the front component where landing zones of appropriate corresponding hook and loop contact closure facing outward. This creates an essentially infinitely adjustable circumference within the designed range of the collar. The front component overlaps the rear component to ensure effective immobilization and comfort. Straps are then tightened to the collar with a bilateral adjustment which secures the wearer's cervical region in neutral alignment.

[12]    In selecting a collar, there are essential points to consider for the front and rear component attachment. The points include (1) creating proper circumferential sizing, (2)

OSS 000472

3/22

allowing mild articulation between the front and rear components in a sagittal plane, and (3) when lying back in the collar, adjustment is preserved (for example, there are no changes in the circumferential setting).

[13]    An issue with known collars is that the collars typically only provide support under the mid-front of the chin, and lack sufficient support under the mandible (lower jaw or jaw bone). From this, there is often undue pressure exerted on the chin of the wearer, which may cause discomfort and sores. Unfortunately, many patients using cervical collars develop decubitus or decubitus ulcers (also known as bed sores, pressure sores, or trophic ulcers) when wearing cervical collars. These ailments, which involve a breakdown of tissue overlying a bone, arise when tissues overlying a bony prominence are subjected to prolonged pressure against an object such as a cervical collar. Besides affecting superficial tissues such as the skin, decubitus and decubitus ulcers also can affect muscle and bone.

[14]    It is desirable to eliminate or at least minimize the effect of pressure points when using cervical collars. The likelihood of contracting decubitus can be greatly reduced by a more even distribution of pressure to several parts of the body of the patient.

[15]    Another issue with known collars having frontal or anterior sternum footplates is that the footplate has a tendency to be positioned closer to the neck than the chin part of the collar, the footplate is too flexible, and the collar can be easily yet detrimentally fitted too tight resulting in the sternum pad to sit on a clavicle. The known collars lack sufficient adjustability of the main or upper portion of the collar relative to the footplate. Further, the known collars may lack the requisite strength to provide a functional footplate, and rather have footplates which yield to movement of the patient.

[16]    Known collars with an adjustable sternum footplate may have a locking or adjustment system insufficiently strong to support the sternum. Such locking or adjustment system may have cumbersome properties locking or unlocking adjustment systems of the collar.

[17]    Collars can be fitted supine or seated in bed, and most often a wearer is inclined less than 45 degree angle. Fitting at that time optimizes comfort in the fitted position. If the collar is fitted in a seated or standing position, when the patient moves to a supine position, the collar can increase pressure on the chin. If the collar is fitted in the supine

OSS 000473

4/22

position, when the patient moves to a seated or standing position, the collar can feel loose. The reason for the maladjustment among different positions is the reason for a sternal pad removal / replacement. Addition of a sternal pad can slightly raise the collar making it better for seated or standing positions. Removal of the pad slightly reduces the height of the collar, making it better for a supine position. Additionally, the patient may also require temporary slightly increasing movement of the chin during eating activities. Removing the pad temporarily in the seated position while eating can facilitate more free mastication of food. Upon completing the meal, the pad would then be replaced under the sternal extension.

[18]    SUMMARY

[19]    The present disclosure describes an improved cervical collar for restricting head and neck movement to promote healing after an injury to the spinal column. The cervical collar has height, circumferential and angular adjustment to accommodate a wide variety of patient phenotypes, otherwise as patient size and anatomical configurations, and to accommodate dimensional changes caused by increased or decreased swelling of the affected anatomical portions of the patients during treatment of the injury. The cervical collar is arranged stabilize and immobilize the cervical area, by restricting lateral, sagittal and coronal movement, while improving comfort, and fit for individual patients.

[20]    These and other features, aspects, and advantages of the present disclosure will become better understood regarding the following description, appended claims, and accompanying drawings.

[21]    BRIEF DESCRIPTION OF THE DRAWINGS

[22]    The drawing figures are not necessarily drawn to scale, but instead are drawn to provide a better understanding of the components thereof, and are not intended to be limiting in scope, but to provide exemplary illustrations. The figures illustrate exemplary configurations of an orthopedic device, and in no way limit the structures or configurations of a liner according to the present disclosure.

[23]    Fig. 1 is a frontal elevational view of a cervical collar.

[24]    Fig. 2 is a side elevational view of the cervical collar of Fig. 1.

[25]    Fig. 3 is a top plan view of the main and lower supports of the cervical collar of Fig. 1.

OSS 000474

[26]    Fig. 4 is a rear elevational view of the main and lower supports of the cervical collar of Fig. 1.

[27]    Fig. 5 is a detail plan view of the lock mechanism in Fig. 3.

[28]    Fig. 6 is a schematic view of a variation of the lock mechanism of Fig. 3.

[29]    Fig. 7 is a schematic plan view of the elongate element in a locked configuration.

[30]    Fig. 8 is a schematic plan view of the elongate element in an unlocked configuration.

[31]    Fig. 9 is a schematic perspective view of the first hinge in a locked configuration.

[32]    Fig. 10 is a schematic perspective view of the first hinge in an unlocked configuration.

[33]    Fig. 11 is a schematic perspective view of a variation of the first hinge in a locked configuration.

[34]    Fig. 12 is a schematic perspective view of the first hinge of Fig. 11 in an unlocked configuration.

[35]    Fig. 13A is an outer exploded perspective view of another variation of the first hinge.

[36]    Fig. 13B is an inner exploded perspective view of the first hinge of Fig. 13.

[37]    Fig. 14A is a schematic view showing variations of return mechanisms.

[38]    Fig. 14B is a schematic view of a locking feature for the hinge.

[39]    Fig. 15 is a schematic side elevational view of the upper support in the main support.

[40]    Fig. 16 is schematic view of the adjustability of the upper support relative to the main support in Fig. 15.

[41]    Fig. 17 is an exploded view of the upper support and the main support.

[42]    Fig. 18 is a plan view of the lower adjustment device in Fig. 1.

[43]    Fig. 19 is an elevational view of the lower adjustment device of Fig. 18.

[44]    Fig. 20 is a schematic elevational view of the lower adjustment device in a contracted configuration.

[45]    Fig. 21 is a schematic elevational view of the lower adjustment device in an extended configuration.

[46]    Fig. 22 is an elevational view of an embodiment of the connector in Fig. 1.

OSS 000475

6/22

[47]     Fig. 23 is a top plan view of the connector in Fig. 22.

[48]     Fig. 24 is a perspective view of another embodiment of the connector in Fig. 1.

[49]     Fig. 25 is an exploded view of the connector in Fig. 24.

[50]     DETAILED DESCRIPTION OF VARIOUS EMBODIMENTS

[51]     A. Introduction

[52]     Embodiments of an orthopedic device are provided for stabilizing and supporting anatomical portions of a wearer, for example, the neck and head of a wearer.

[53]     Although the embodiments of the disclosure are adapted for supporting and stabilizing anatomical portions of many wearers having various anatomical shapes and sizes, the embodiments of the disclosure may also be dimensioned to accommodate different types, shapes and sizes of anatomical portions.

[54]     For ease of understanding the disclosed embodiments of an orthopedic device, the front or anterior, and rear or posterior portions of the orthopedic device are described independently. The anterior and posterior portions of the orthopedic device function together to form a supporting and stabilizing collar that encompasses the anatomical portions of the wearer.

[55]     The term "posterior" also has its ordinary meaning and refers to a location that is behind or to the rear of another location. Lastly, the term "anterior" has its ordinary meaning and refers to a location ahead of or to the front of another location.

[56]     The terms "rigid," "semi-rigid," "flexible," and "compressible" may be used herein to distinguish characteristics of portions of certain features of the orthopedic device. The term "rigid" should denote that an element of the device is generally devoid of flexibility. Within the context of support members or shells that are "rigid," it is intended to indicate that they do not lose their overall shape when force is applied, and they may break if bent with sufficient force. As for the term "semi-rigid," this term is used to connote properties of support members or shells that provide support and are free-standing; however such support members or shells may have some degree of flexibility or resiliency.

[57]     The term "flexible" should denote that features are capable of repeated bending such that the features may be bent into retained shapes or the features do not retain a general shape, but continuously deform when force is applied. The term "compressible"

OSS 000476

7/22

is used to qualify such structural features as being capable of being reduced in size or volume due to the exertion of force applied to the structural feature.

[58]    B. Embodiments of the Cervical Collar

[59]    According to the embodiment of Figs. 1 and 2, a cervical collar 10 has an anterior component 12 arranged for connecting to a posterior component 14. The posterior component 14 may similarly arranged as the similar part in U.S. Pat. No. 7,981,068, granted December 2, 2009, and incorporated by reference. The anterior component 12 comprises a main support 16, an upper support 18 arranged for being received by the main support 16, and a lower support 20 hingedly connected to the main support 16 at first and second hinges 40, 42. A locking mechanism 22 is arranged for locking rotation of the lower support 20 relative to the main support 16.

[60]    The upper support 18 may have a configuration that is the same as in U.S. patent application publication no. 2013/0310722 published on November 21, 2013, and U.S. patent 6,254,560, granted on July 3, 2001, and incorporated herein by reference. The profile of the upper support 18 is taken from the Miami J cervical collar, manufactured by Össur, hf of Reykjavik, Iceland, and is conventionally understood in the prior art.

[61]    Referring to Figs. 7 and 8, the first and second ends 48, 50 of the elongate element 34 are spatially located differently relative to the first and second hinges 40, 42 when in the unlocked configuration. The first end 48 is axially offset from axis 49 from end portions 44, 46 of the main support and the lower support at the first hinge 40 in the unlocked configuration. The end portions 46, 48 of the main and lower supports are generally coaxial relative to one another.

[62]    As illustrated in Figs. 3-5, the elongate element 34 is slidably located within an arcuate tray 54 defined by the main support 16 along an inner side I thereof. The inner side I of the main support 16 defines a plurality of guides 38 for retaining the elongate element 34 within the arcuate tray 54. According to the illustrated embodiment, the guides 38 each define a post 52 having a height greater than a thickness of the guides 38.

[63]    The arcuate tray 54 is defined by a base portion 58 and an upper wall 56 of the main support 16. The base portion 58 extends outwardly from the upper wall 56 in a generally perpendicular orientation.

OSS 000477

8/22

[64]    The main support 16 has a generally arcuate configuration 59 adapted to extend about the mandible of a user, and may be considered to possesses an elongated C- or U-shape.  The lower support has a generally arcuate configuration 60 and contoured for being adapted for securing against a sternum of a user.

[65]    The locking mechanism 22 includes an actuator or dial 30 for adjusting the locking mechanism 22 from locked to unlocked configurations.  The locking mechanism 22 includes an elongate element 34 having first and second ends 48, 50 engaging the first and second hinges 40, 42.  The first and second ends 48, 50 are arranged for being displaceable relative to the first and second hinges 40, 42 between locked and unlocked configurations of the locking mechanism 22.

[66]    In the illustrated embodiment of Figs. 3-5, the locking mechanism 22 includes a pinion 32 and a rack segment 36 for adjusting position of the elongate element 34.  The pinion 32 defines a shaft 61 extending between the outer and inner sides of the main support 16 and a pinion portion 62 at a first end of the shaft 61.  The shaft 61 engages an actuator 30 on the outer side of the main support 16 at a second end of the shaft 61.  The pinion portion 62 engages a geared rack segment 36 defined by the elongate element 34, whereby rotation of the shaft 61 urges the elongate element 34 to slide relative to the main support 16.

[67]    The pinion portion 62 is recessed relative to the shaft 61, such that the shaft 61 has a diameter greater than the pinion portion 62.  The pinion portion 62 is arranged to maintain engagement with the rack segment 36 of the elongate element 34.  An end portion 63 of the pinion on the inner side preferably has a greater diameter than the pinion portion 62.  The pinion portion 62 is recessed relative to the shaft 61 and the end portion 63.  The shaft 61 engages a periphery of an opening 67 of the main support 16 via a threaded engagement 65.

[68]    In the embodiment of Fig. 5, the locking mechanism 22 includes a least one spring element 64 arranged for returning the shaft 61 to a locked configuration after rotation of the shaft 61 to the unlocked configuration of the first and second hinges 40, 42 and release of the actuator 30.  The spring element 64 is a Belleville disc.  The spring element 64 biases against a groove 71 formed by the shaft 61 and a bias element 69 of the

OSS 000478

9/22

main support 16. The return force from the elongate element 34 may drive the actuator into the locked configuration.

[69]     According to the embodiment of Fig. 6, the locking mechanism 22 has at least one elastic element 66A, 66B secured at a first end to a first retainer 73 on the main support 16 and a second retainer 75 on the locking mechanism 22, whereupon release of the locking mechanism, the at least one elastic element 66A, 66B urges the locking mechanism to a predetermined configuration.

[70]     Referring to the depiction in Figs. 9 and 10, the first hinge 40 includes end portions 44, 46 of the main support and the lower support 16, 20, respectively, and a hinge cover 68 defining a hole 74. The end portions 44, 46 each define holes 78, 80 that are coaxial about a first axis 90 to one another and about which the first hinge 40 pivots. The first end portion 48 of the elongate element 34 is arranged to slidably adjust relative to the end portions 44, 46. The first end portion 48 defines an opening 76 that is axially offset from the first axis 90 and defined along a second axis 91 variable in location depending on the configuration of the locking mechanism 22.

[71]     The first end portion 48 of the elongate element 34 defines a detent projection 72 arranged to engage a ridge 86 defined by the end portion 44 of the main support. The end portion 44 defines a ramp 87 leading to the ridge 86 from a recess 88 defined by the end portion 44. The detent projection 72 is arranged to be received by the recess 88 and slide along the ramp 87 to the ridge 87 between locked and unlocked configurations of the locking mechanism 22. The ridge 86, the ramp 87 and the recess 88 are generally concentric with the first axis and the hole 78 of the main support 16.

[72]     A spring element 70, such as an O-ring, is concentrically disposed about the main support hole 78 and biased between a shoulder 92 defined by the main support 16 and an inner surface 94 of the cover 40. As shown in Fig. 9, when the spring 70 is in an expanded configuration, it wedges the inner surface 94 of the cover 40 and the shoulder 92 together.

[73]     The end portion 46 of the main support 16 defines a protrusion or detent 84 arranged to be received by a notch 82 defined by the end portion 44 of the lower support. The detent 84 is received by the notch 82 in the locked configuration of the main support and the lower support. The detent 84 is generally arranged concentrically with the hole

OSS 000479

78 of the main support. As shown in Fig. 9, in the locked configuration, there is vertical interference which prevents movement of the hinge. Fig. 10 shows how in the unlocked configuration the spring element is compressed, and the detent is free to move.

[74]    Figs. 11 and 12 exemplify a variation of the hinge 96 of the hinge embodiment of Figs. 9 and 10, whereby the main support and the lower support define a plurality of cooperating teeth 98, 100 engageable when the locking mechanism is in the locked configuration, and disengaged from one another when the locking mechanism is in an unlocked configuration.

[75]    Figs. 13A and 13B illustrate another embodiment of the hinge 102 wherein the end portion of the elongate element 34 defines an opening 106 and the main support 16 defines an opening 112 through which a post 114 of the lower support 20 extends to secure to the cover 68. Such a construction is similar to the embodiments of Figs. 9-12. The opening 112 and the post 114 are coaxial along axis 118. The opening 106 of the elongate element 34 has an oblong profile arranged for being axially offset relative to the axis 118, and a first surface 111 is arranged for abutting a hinge cover 68.

[76]    The elongate element 34 defines at least one elongate bar 120 protruding from a second surface 113 thereof and is arranged for being received by a corresponding elongate recess 106 formed by the main support 16. The main support 16 defines a plurality of circumferentially spaced recesses 108 arranged for receiving at least one detent 122 formed by the elongate element 34. The main support 16 defines an annular shoulder 110 from a first surface 105 thereof and defined about the opening 112.

[77]    The main support 16 defines a plurality of receptacles 124 circumferentially spaced about the opening 112 along a second surface 107 thereof. The lower support 20 defines a plurality of circumferentially spaced bosses 116 along a first surface 109 thereof, arranged for being received by the receptacles 124.

[78]    Fig. 14A shows different types of spring return mechanisms for the elongate element so that once a user releases the lock mechanism, the spring return mechanism moves the lock mechanism back to the locked configuration. For example, the elongate element may include or have attached thereto a spring finger that is arranged to deflect against a static boss located on the main support or other appropriate structure. In another example, an elastic band may secured to and arranged to stretch between two

OSS 000480

11/22

attachment points, such as one being on the slidelock and one on the mandible body. In yet another example, a spring may be configured into the elongate element, either behind or ahead of the hinge. The spring may be connected to the elongate element as a separate component or alternatively be formed as part of the elongate element.

[79]    Fig. 14B shoes an alternate embodiment of a lock for the hinge which relies on a cam feature connected to or extending from the elongate element. The end portions of the main support and the lower support may include a plurality of peripheral teeth about their peripheries which are arranged to engage one another as the cam feature is urged against the main and lower supports end portions, such that the teeth mesh with one another to prevent movement of the hinge. One of the main support or lower support end portion is located concentrically with one another, and one generally within the periphery of the other. Both the main and lower supports may have an opening into which the cam feature can translate in and out of depending on the locking configuration of the lock mechanism.

[80]    Turning to Figs. 15-17, the upper support 18 is slidably secured to the main support 16, such that continuous padding 28 is arranged about the main support 16. The upper support 18 can be locked in position relative to the main support 16, after adjusting the correct position. The main support 16 defines an elongate lateral slot 130 and the upper support 18 forms an elongate angled slot 132 arranged obliquely relative to the elongate slot 130 of the main support 16. A slider 126 slidably couples the main support 16 and the upper support 18 by the lateral and angled slots 128, 130. According to a variation, a knob of the slider may be rotated to unlock and lock the slider in a desired position. As seen from the components shown, the rotation my simply comprise a tight frictional fit of the slider against the main support 16 and the upper support 18. The lateral slot 130 is preferably arranged generally parallel to a length of the main support 16.

[81]    The main support 16 preferably defines a stationary element 128 proximate the lateral slot 130. The slider 126 has a tightening feature 134 for maintaining the lateral and angled slots in a relative position to another. Adjustment of the mandible angle could also be driven up/down through simple rotating cam mechanism. The object is to elevate

OSS 000481

12/22

the posterior aspect of the chin tray to accommodate the slope of the mandible, thereby increasing stabilization against lateral movement of the head and C-Spine.

[82]    As in the embodiment of Figs. 1 and 2, and referring specifically to Figs. 18 and 19, the lower adjustment device 24 is located centrally along a lowermost portion of the lower support 20.  The lower adjustment device 24 has a sternal pad 136 adjustable in location relative to the lower support 20.  The sternal pad 136 is mounted to a ball joint 142.  The lower adjustment device 24 has an adjustment dial and an extension element 144 arranged for adjustably extending relative to the lower support 20.  The extension element 144 carries the ball joint 142 at an end thereof.  The lower adjustment device 24 includes a dial 138 for adjusting the length of the extension element 144 between the lower support 20 and the sternal pad 136.  The dial 138 is accessible by a recess formed by the lower adjustment device 24.

[83]    Figs. 20 and 21 show a variation of the lower adjustment device 24 including a housing 145 arranged for receiving the extension element 144 in a contracted configuration resulting in reduced or substantially minimization of the distance between the lower support and the sternal pad.  The extension element 145 has a screw thread 147, and the housing 145 defines corresponding threads permitting slidable movement between the extension element 145 and the screw thread 147 according to adjustment of the dial 138.

[84]    As in the embodiment of Figs. 1 and 2, and referring to Figs. 22 and 23, a connector 26 connects the anterior component 12 to the posterior component 14.  The connector 26 includes a base element 148 securing to a plate 150, and the base element 148 has a strap guide 152 about which a strap 146 extending from the posterior component 146 extends.  The connector 26 has a pull tab 154 arranged for detaching the plate 150 from the base 148.

[85]    Figs. 24 and 25 display another embodiment of a connector 160 securing to a plate 164.  A cap 166 is arranged to extend over the base element 162 and secure therewith.  The connector 160 includes a pull tab 170 arranged for detaching the plate 160 from the base element 162 and the cap 166.  The cap 166 defines an opening 168 with the plate 160 for permitting a strap 172 extending therethrough which secures to the posterior component.  The base element 162 defines a platform 178 about which the strap

OSS 000482

13/22

172 extends, and the platform 178 has at least one protuberance 180 over which the strap 172 extends.

[86]    The base element 162 further defines a channel guide 182 proximate to the opening 168 and through which the strap 172 extends.  The base element 162 forms at least one detent 188 proximate to the at least one protuberance 180 for selective engagement of the strap 172 with the at least one protuberance 180.  When the connector 160 is in a locked configuration, the at least one protuberance 180 and the at least one detent 188 arrest the strap 172 from movement as they are urged against each other.

[87]    The plate 164 defines at least one retainer 186 having a channel 190 for selectively receiving a pin 184 protruding from the base element 162, such that the pin 184 slides within the channel 190 between locked and unlocked configurations of the connector 160.  The cap 166 defines a side recess 174 for sliding the cap 166 and base element 162 relative to the plate 164 and permitting the at least one retainer 186 to move therewithin.  The cap 166 defines a front recess 176 through which the strap 172 extends.

[88]    The aforementioned features may be employed in different combinations from those shown in a cervical collar.  While the foregoing embodiments have been described and shown, alternatives and modifications of these embodiments, such as those suggested by others, may be made to fall within the scope of the invention.

OSS 000483

14/22

Claims

A cervical collar 10 having an anterior component 12 arranged for connecting to a posterior component 14, the anterior component 12 comprising:

a main support 16;

an upper support 18 arranged for being received by the main support 16;

a lower support 20 hingedly connected to the main support 16 at first and second hinges 40, 42.

The cervical collar 10, further comprising a locking mechanism 22 arranged for locking rotation of the lower support 20 relative to the main support 16.

The cervical collar, wherein the locking mechanism 22 includes an actuator 30 for adjusting the locking mechanism 22 from locked to unlocked configurations.

The cervical collar, wherein the locking mechanism 22 includes an elongate element 34 having first and second ends 48, 50 engaging the first and second hinges 40, 42, the first and second ends 48, 50 arranged for adjusting relative to the first and second hinges 40, 42 between locked and unlocked configurations of the locking mechanism 22.

The cervical collar, wherein the first and second ends 48, 50 of the elongate element 34 are displaceable relative to the first and second hinges 40, 42 in the locked and unlocked configurations of the locking mechanism 22.

The cervical collar, wherein the first and second ends of the elongate element 34 are spatially located differently relative to the first and second hinges 40, 42 when in the locked configuration.

OSS 000484

15/22

The cervical collar, wherein the first end of the elongate element is axially offset from end portions 44, 46 of the main support and the lower support at the first hinge 40 in the locked configuration, the end portions of the main and lower supports being coaxial.

The cervical collar, wherein the elongate element 34 is slidably located within an arcuate tray 54 defined by the main support 16 along an inner side I thereof.

The cervical collar, wherein the inner side of the main support defines a plurality of guides 38 for retaining the elongate element 34 within the arcuate tray 54.

The cervical collar, wherein the guides 38 each define a post 52 having a height greater than a thickness of the guides 38.

The cervical collar, wherein the arcuate tray 54 is defined by a base portion 58 and an upper wall 56 of the main support 16, the base portion 58 extends generally outwardly from the upper wall 56 in a generally perpendicular orientation.

The cervical collar, wherein the main support has a generally arcuate configuration 59 adapted to extend about the mandible of a user.

The cervical collar, wherein the lower support has a generally arcuate configuration 60 adapted for securing against a sternum of a user.

The cervical collar, wherein the locking mechanism 22 includes a pinion 32 and a rack segment 36 for adjusting position of the elongate element 34.

The cervical collar, wherein the locking mechanism 22 includes a pinion 32 including a shaft 61 extending between the outer and inner sides of the main support 16 and a pinion portion 62 at a first end of the shaft 61, the shaft 61 engaging an actuator 30 on the outer side of the main support 16 at a second end of the shaft 61, the pinion portion 62

OSS 000485

16/22

engaging a geared rack segment 36 defined by the elongate element 34, whereby rotation of the shaft 61 urges the elongate element 34 to slide relative to the main support 16.

The cervical collar, wherein the pinion portion 62 is recessed relative to the shaft 61, such that the shaft 61 has a greater diameter than the pinion portion 62, whereby the pinion portion 62 maintains engagement with the rack segment 36 of the elongate element 34.

The cervical collar, wherein an end portion 63 of the pinion on the inner side has a greater diameter than the pinion portion 62, the pinion portion 62 being recessed relative to the shaft 61 and the end portion 63.

The cervical collar, wherein the shaft 61 engages a periphery of an opening 67 of the main support 16 via a threaded engagement 65.

The cervical collar, wherein the locking mechanism 22 includes a least one spring element 64 arranged for returning the shaft 61 to a locked configuration after rotation of the shaft 61 to the unlocked configuration of the first and second hinges 40, 42 and release of the actuator 30.

The cervical collar, wherein the spring element 64 is a Belleville disc.

The cervical collar, wherein the spring element 64 biases against a groove 71 formed by the shaft 61 and a bias element 69 of the main support 16.

The cervical collar, further comprising at least one elastic element 66A, 66B secured at a first end to a first retainer 73 on the main support 16 and a second retainer 75 on the locking mechanism 22, whereupon release of the locking mechanism, the at least one elastic element 66A, 66B urges the locking mechanism to a predetermined configuration.

The cervical collar, wherein the first hinge 40 includes end portions 44, 46 of the main support and the lower support 16, 20, and a hinge cover 68, the end portions 44, 46 each

OSS 000486

17/22

define holes 78, 80 that are coaxial about a first axis 90 to one another about which the first hinge 40 pivots.

The cervical collar, wherein the first end portion 48 of the elongate element 34 is arranged to slidably adjust relative to the end portions 44, 46.

The cervical collar, wherein the first end portion 48 defines an opening 76 that is axially offset from the first axis 90 and defined along a second axis 91 variable in location depending on the configuration of the locking mechanism 22.

The cervical collar, wherein the first end portion 48 of the elongate element 34 defines a detent projection 72 arranged to engage a ridge 86 defined by the end portion 44 of the main support.

The cervical collar, wherein the end portion 44 defines a ramp 87 leading to the ridge 86 from a recess 88 defined by the end portion 44, the detent projection 72 arranged to be received by the recess 88 and slide along the ramp 87 to the ridge 87 between locked and unlocked configurations of the locking mechanism 22.

The cervical collar, wherein the ridge 86, the ramp 87 and the recess 88 are generally concentric with the first axis and the hole 78 of the main support 16.

The cervical collar, further comprising a spring element 70 concentrically disposed about the main support hole 78 and biased between a shoulder 92 defined by the main support 16 and an inner surface 94 of the cover 40.

The cervical collar, wherein the spring 70 is in an expanded configuration wedges the inner surface 94 of the cover 40 and the shoulder together.

The cervical collar, wherein the end portion 46 of the main support defines a protrusion 84 arranged to be received by a notch 82 defined by the end portion 44 of the lower

OSS 000487

18/22

support, the protrusion 84 being received by the notch 82 in the locked configuration of the main support and the lower support.

The cervical collar, wherein the protrusion 84 is generally arranged concentrically with the hole 78 of the main support.

The cervical collar, wherein the at least one of the main support and the lower support defines a plurality of cooperating teeth 98, 100 engageable when the locking mechanism is in the locked configuration, and disengaged from one another when the locking mechanism is in an unlocked configuration.

The cervical collar, wherein the end portion of the elongate element 34 defines an opening 106 and the main support 16 defines an opening 112 through which a post 114 of the lower support 20 extends to secure to the cover 68, the opening 112 and the post 114 being coaxial along axis 118, the opening 106 of the elongate element 34 having an oblong profile arranged for being axially offset relative to the axis 118, a first surface 111 arranged for abutting a hinge cover 68.

The cervical collar, wherein the elongate element 34 defines at least one elongate bar 120 protruding from a second surface 113 thereof and arranged for being received by a corresponding elongate recess 106 formed by the main support 16.

The cervical collar, wherein the main support 16 defines a plurality of circumferentially spaced recesses 108 arranged for receiving at least one detent 122 formed by the elongate element 34.

The cervical collar, wherein the main support 16 defines an annular shoulder 110 from a first surface 105 thereof and defined about the opening 112.

The cervical collar, wherein the main support 16 defines a plurality of receptacles 124 circumferentially spaced about the opening 112 along a second surface 107 thereof, the

OSS 000488

19/22

lower support 20 defining a plurality of circumferentially spaced bosses 116 along a first surface 109 thereof, arranged for being received by the receptacles 124.

The cervical collar, wherein the upper support 18 is slidably secured to the main support 16, such that continuous padding 28 is arranged about the main support 16.

The cervical collar, wherein the main support 16 defines an elongate lateral slot 130 and the upper support 18 forms an elongate angled slot 132 arranged obliquely relative to the elongate slot 130 of the main support 16, a slider 126 slidably coupling the main support 16 and the upper support 18 by the lateral and angled slots 128, 130.

The cervical collar, wherein the lateral slot 130 is generally arranged parallel to a length of the main support 16.

The cervical collar, wherein the main support 16 defines a stationary element 128 proximate the lateral slot 130.

The cervical collar, wherein the slider 126 includes a tightening feature 134 for maintaining the lateral and angled slots in a relative position to another.

The cervical collar, wherein the lower adjustment device 24 is located centrally along a lowermost portion of the lower support 20.

The cervical collar, wherein the lower adjustment device 24 includes a sternal pad 136 adjustable in location relative to the lower support 20.

The cervical collar, wherein the sternal pad 136 is mounted to a ball joint 142.

The cervical collar, wherein the lower adjustment device 24 includes an adjustment dial and an extension element 144 arranged for adjustably extending relative to the lower support 20.

OSS 000489

20/22

The cervical collar, wherein the extension element 144 carries the ball joint 142 at an end thereof.

The cervical collar, wherein the lower adjustment device 24 includes a dial 138 for adjusting the length of the extension element 144 between the lower support 20 and the sternal pad 136.

The cervical collar, wherein the dial 138 is accessible by a recess formed by the lower adjustment device 24.

The cervical collar, wherein the lower adjustment device 24 includes a housing 145 arranged for receiving the extension element 144 when in a contracted configuration resulting in reduced or substantially minimization of the distance between the lower support and the sternal pad.

The cervical collar, wherein the extension element 145 has a screw thread 147, and the housing 145 defines corresponding threads permitting slidable movement according to adjustment of the dial 138.

The cervical collar, further comprising at least one connector 26 connecting the anterior component 12 to the posterior component 14.

The cervical collar, wherein the connector 26 includes a base element 148 securing to a plate 150, the base element 148 having a strap guide 152 about which a strap 146 extending from the posterior component 146 extends.

The cervical collar, wherein the connector 26 has a pull tab 154 arranged for detaching the plate 150 from the base 148.

OSS 000490

21/22

The cervical collar, wherein the connector 160 has a base element 162 securing to a plate 164, a cap 166 arranged to extend over the base element 162 and secure therewith.

The cervical collar, wherein the connector 160 includes a pull tab 170 arranged for detaching the plate 160 from the base element 162 and the cap 166.

The cervical collar, wherein the cap 166 defines an opening 168 with the plate 160 for permitting a strap 172 extending therethrough which secures to the posterior component.

The cervical collar, wherein the base element 162 defines a platform 178 about which the strap 172 extends about, the platform 178 having at least one protuberance 180 over which the strap 172 extends.

The cervical collar, wherein the base element 162 further defines a channel guide 182 proximate to the opening 168 and through which the strap 172 extends.

The cervical collar, wherein the base element 162 forms at least one detent 188 proximate to the at least one protuberance 180 for selective engagement of the strap 172 with the at least one protuberance 180, such that then the connector 160 is in a locked configuration, the at least one protuberance 180 and the at least one detent 188 arrest the strap 172 from movement as they are urged against each other.

The cervical collar, wherein the plate 164 defines at least one retainer 186 having a channel 190 for selectively receiving a pin 184 protruding from the base element 162, such that the pin 184 slides within the channel 190 between locked and unlocked configurations of the connector 160.

The cervical collar, wherein the cap defines a side recess 174 for sliding the cap 166 and base element 162 relative to the plate 164 and permitting the at least one retainer 186 to move therewithin.

OSS 000491

22/22

The cervical collar, wherein the cap 166 defines a front recess 176 through which the strap 172 extends.

OSS 000492



Fig. 1

Fig. 2

OSS 000493



Fig. 3

Fig. 4

OSS 000494



Fig. 5

Fig. 6

OSS 000495



Fig.7

Fig.8

OSS 000496



Fig. 9

Fig. 10

OSS 000497



Fig. 11



Fig. 12

OSS 000498



Fig. 13A

Fig. 13B

OSS 000499



Fig. 14A



Fig. 14B

OSS 000500



Fig. 15

Fig. 16

Fig. 17

OSS 000501



20

24

142

138

Fig. 18

136

PAD

Dial adjust pad

140

138    24    20

136

142

BALL JOINT ALLOWS PAD TO LAY
FLAT ON DIFFERING ANATOMYS

Fig. 19

OSS 000502



Fig. 20



Fig. 21

OSS 000503



Fig. 22



Fig. 23

OSS 000504



Fig. 24

Fig. 25

OSS 000505

# EXHIBIT 5



US010512559B2

(12) **United States Patent**
Calco et al.

(10) Patent No.: **US 10,512,559 B2**
(45) **Date of Patent:** Dec. 24, 2019

(54) **CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT**

(71) Applicant: **OSSUR ICELAND EHF**, Reykjavik (IS)

(72) Inventors: **Wayne Calco**, Foothill Ranch, CA (US); **Christopher Callicott Webster**, Foothill Ranch, CA (US); **Harry Duane Romo**, Foothill Ranch, CA (US)

(73) Assignee: **OSSUR ICELAND EHF**, Reykjavik (IS)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 430 days.

(21) Appl. No.: **15/442,029**

(22) Filed: **Feb. 24, 2017**

(65) **Prior Publication Data**
US 2017/0246022 A1    Aug. 31, 2017

**Related U.S. Application Data**

(60) Provisional application No. 62/299,766, filed on Feb. 25, 2016.

(51) **Int. Cl.**
*A61F 5/055* (2006.01)
*A61F 5/01* (2006.01)

(52) **U.S. Cl.**
CPC ...... *A61F 5/055* (2013.01); *A61F 2005/0197* (2013.01)

(58) **Field of Classification Search**
CPC ...... A61F 5/055; A61F 5/05883; A61F 5/012; A61F 13/12; A61F 5/05816; A61F 5/028; A42B 3/0473; A61H 9/0078
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,088,207 A | 7/1937 | Kaiser | |
| 2,102,069 A | 12/1937 | Hanicke | |
| 2,735,424 A | 2/1953 | Benjamin | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 1646071 A | 7/2005 | |
| CN | 2933343 Y | 8/2007 | |

(Continued)

OTHER PUBLICATIONS

Levangie et al., "Joint Structure and Function: A Comprehensive Analysis", Fourth Edition,Chapter 4: The Vertebral Column, 2005 F.A. Davis Company, Philadelphia, PA, pp. 161-164.

(Continued)

*Primary Examiner* — Ophelia A Hawthorne

(74) *Attorney, Agent, or Firm* — Workman Nydegger

(57) **ABSTRACT**

A cervical collar has an anterior component including a lower support that is adjustable in angle relative to a main support. The lower support is hingedly connected to the main support at first and second end portions. An elongate element engages the first and second end portions. A lock mechanism is operatively connected to the elongate element, and is arranged for locking rotation of the lower support relative to the main support, by moving the elongate element between locked and unlocked conditions. An upper support is received by the main support at least a front section of the main support, and is arranged to be fitted against a user's chin.

**19 Claims, 20 Drawing Sheets**





OSS 000109

## US 10,512,559 B2
Page 2

(56)                **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2,791,999 A | 5/1954 | Bustamante |
| 2,801,630 A | 8/1957 | Moore |
| 2,806,471 A | 11/1957 | Breese |
| 2,818,063 A | 12/1957 | Smith et al. |
| 2,820,455 A | 1/1958 | Hall |
| 2,911,970 A | 11/1959 | Bartels |
| D188,302 S | 6/1960 | Monfardini |
| 3,024,784 A | 3/1962 | Monfardini |
| 3,027,894 A | 4/1962 | Moore |
| 3,042,027 A | 7/1962 | Monfardini |
| 3,050,052 A | 8/1962 | Grassl |
| 3,060,930 A | 10/1962 | Grassl |
| 3,075,521 A | 1/1963 | Grassi |
| 3,135,256 A | 6/1964 | Gruber |
| 3,177,869 A | 4/1965 | Bartels |
| D203,018 S | 11/1965 | Helferich |
| 3,285,243 A | 11/1966 | Yellin |
| 3,285,244 A | 11/1966 | Cottrell |
| 3,306,284 A | 2/1967 | McKinley |
| 3,313,297 A | 4/1967 | Applegate et al. |
| 3,320,950 A | 5/1967 | McElveney |
| 3,504,667 A | 4/1970 | McFarlane |
| 3,512,523 A | 5/1970 | Barnett |
| 3,756,226 A | 9/1973 | Calabrese et al. |
| 3,916,884 A | 11/1975 | Attenburrow |
| 3,916,885 A | 11/1975 | Gaylord, Jr. |
| 4,099,523 A | 7/1978 | Lowrey |
| 4,173,973 A | 11/1979 | Hendricks |
| 4,205,667 A | 6/1980 | Gaylord, Jr. |
| 4,325,363 A | 4/1982 | Berkeley |
| 4,401,111 A | 8/1983 | Blackstone |
| 4,413,619 A | 11/1983 | Garth |
| D278,747 S | 5/1985 | Peach, Jr. |
| 4,520,801 A | 6/1985 | Lerman |
| 4,538,597 A | 9/1985 | Lerman |
| 4,562,833 A | 1/1986 | Pujals, Jr. |
| 4,582,051 A | 4/1986 | Greene et al. |
| 4,628,913 A | 12/1986 | Lerman |
| 4,643,174 A | 2/1987 | Horiuchi |
| 4,677,969 A | 7/1987 | Calabrese |
| 4,702,233 A | 10/1987 | Omicioli |
| 4,708,129 A | 11/1987 | Pujals, Jr. |
| 4,712,540 A | 12/1987 | Tucker et al. |
| 4,732,144 A | 3/1988 | Cunanan |
| 4,745,922 A | 5/1988 | Taylor |
| 4,827,915 A | 5/1989 | Gorsen |
| 4,854,306 A | 8/1989 | Pujals, Jr. |
| 4,886,052 A | 12/1989 | Calabrese |
| 4,940,043 A | 7/1990 | Burns et al. |
| 4,955,368 A | 9/1990 | Heimann |
| 4,987,891 A | 1/1991 | Gaylord, Jr. et al. |
| D314,623 S | 2/1991 | Calabrese et al. |
| 5,005,563 A | 4/1991 | Veale |
| 5,038,759 A | 8/1991 | Morgenstern |
| 5,058,572 A | 10/1991 | Schmid et al. |
| 5,060,637 A | 10/1991 | Schmid et al. |
| 5,097,824 A | 3/1992 | Garth |
| 5,156,588 A | 10/1992 | Marcune et al. |
| 5,180,361 A | 1/1993 | Moore et al. |
| 5,201,702 A | 4/1993 | Mars |
| 5,215,517 A | 6/1993 | Stevenson et al. |
| 5,230,698 A | 7/1993 | Garth |
| 5,275,581 A | 1/1994 | Bender |
| 5,302,170 A | 4/1994 | Tweardy |
| RE34,714 E | 8/1994 | Burns et al. |
| 5,346,461 A | 9/1994 | Heinz et al. |
| 5,366,438 A | 11/1994 | Martin, Sr. |
| 5,385,535 A | 1/1995 | McGuinness |
| 5,433,696 A | 7/1995 | Osti |
| 5,437,612 A | 8/1995 | Moore et al. |
| 5,437,617 A | 8/1995 | Heinz et al. |
| 5,445,602 A | 8/1995 | Grim et al. |
| D368,527 S | 4/1996 | Brooke |
| D369,660 S | 5/1996 | Myoga |
| 5,520,619 A | 5/1996 | Martin |

| | | |
|---|---|---|
| RE35,290 E | 7/1996 | Druskoczi |
| 5,588,957 A | 12/1996 | Martin, Sr. |
| 5,593,382 A | 1/1997 | Rudy, Jr. et al. |
| 5,622,529 A | 4/1997 | Calabrese |
| 5,624,387 A | 4/1997 | McGuinness |
| D379,232 S | 5/1997 | Brooke |
| 5,632,722 A | 5/1997 | Tweardy et al. |
| 5,688,229 A | 11/1997 | Bauer |
| 5,716,335 A | 2/1998 | Iglesias et al. |
| 5,728,054 A | 3/1998 | Martin |
| D393,718 S | 4/1998 | Traut et al. |
| 5,785,670 A | 7/1998 | Hiebert |
| 5,788,658 A | 8/1998 | Islava |
| 5,795,315 A | 8/1998 | Traut et al. |
| 5,797,713 A | 8/1998 | Tweardy et al. |
| 5,797,863 A | 8/1998 | Kohake |
| RE35,940 E | 10/1998 | Heinz et al. |
| 5,865,773 A | 2/1999 | Koledin |
| 5,904,662 A | 5/1999 | Myoga |
| 5,934,599 A | 8/1999 | Hammerslag |
| 5,964,722 A | 10/1999 | Goralnik et al. |
| 5,976,098 A | 11/1999 | Sereboff |
| 5,993,403 A | 11/1999 | Martin |
| 6,027,467 A | 2/2000 | Nakamura et al. |
| 6,036,664 A | 3/2000 | Martin, Sr. et al. |
| D422,710 S | 4/2000 | Maynard |
| 6,045,522 A | 4/2000 | Grober |
| 6,045,523 A | 4/2000 | Donaldson |
| 6,050,965 A | 4/2000 | Pillai |
| 6,056,711 A | 5/2000 | Dorramski et al. |
| 6,058,517 A | 5/2000 | Hartunian |
| RE36,745 E | 6/2000 | Rudy, Jr. et al. |
| 6,071,255 A | 6/2000 | Calabrese |
| 6,071,256 A | 6/2000 | Lam |
| 6,090,058 A | 7/2000 | Traut et al. |
| 6,165,146 A | 12/2000 | Giebeler |
| 6,183,501 B1 | 2/2001 | Latham |
| 6,202,953 B1 | 3/2001 | Hammerslag |
| 6,245,033 B1 | 6/2001 | Martin |
| 6,254,560 B1 | 7/2001 | Tweardy et al. |
| 6,308,345 B1 | 10/2001 | Williams, Jr. |
| 6,289,558 B1 | 11/2001 | Hammerslag |
| 6,315,746 B1 | 11/2001 | Garth et al. |
| 6,423,020 B1 | 7/2002 | Koledin |
| 6,458,090 B1 | 10/2002 | Walpin |
| 6,494,854 B1 | 12/2002 | Visneos et al. |
| D475,139 S | 5/2003 | Myoga |
| 6,632,722 B2 | 10/2003 | Fujiwara et al. |
| 6,663,581 B1 | 12/2003 | Calabrese |
| 6,663,630 B2 | 12/2003 | Farley et al. |
| 6,726,643 B1 | 4/2004 | Martin |
| 6,733,469 B2 | 5/2004 | Miyaji et al. |
| 6,740,055 B2 | 5/2004 | Dominguez |
| 6,770,046 B2 | 8/2004 | Hansen |
| 6,872,188 B2 | 3/2005 | Caille et al. |
| 6,913,584 B2 | 7/2005 | Rudy, Jr. et al. |
| 6,921,376 B2 | 7/2005 | Tweardy et al. |
| 6,926,686 B2 | 8/2005 | Cheatham |
| 7,018,351 B1 | 3/2006 | Iglesias et al. |
| 7,041,073 B1 | 5/2006 | Patron |
| 7,070,573 B2 | 7/2006 | Axelsson |
| 7,090,652 B2 | 8/2006 | Santelli, Jr. |
| 7,090,653 B2 | 8/2006 | Moeller |
| 7,128,724 B2 | 10/2006 | Marsh |
| 7,141,031 B2 | 11/2006 | Garth et al. |
| 7,198,610 B2 | 4/2007 | Ingimundarson et al. |
| D542,919 S | 5/2007 | Leatt |
| 7,258,677 B2 | 8/2007 | Rudy, Jr. et al. |
| D552,742 S | 10/2007 | Leatt |
| 7,291,121 B2 | 11/2007 | Rudy, Jr. et al. |
| 7,297,127 B2 | 11/2007 | Lee et al. |
| 7,311,686 B1 | 12/2007 | Iglesias et al. |
| 7,371,221 B1 | 5/2008 | Baker |
| 7,371,222 B2 | 5/2008 | Heinz et al. |
| 7,399,288 B2 | 7/2008 | Chao |
| 7,442,176 B2 | 10/2008 | Cojbasic |
| D609,815 S | 2/2010 | Patterson |
| 7,674,234 B2 | 3/2010 | Calco et al. |
| D616,555 S | 5/2010 | Thorgilsdottir et al. |

OSS 000110

**US 10,512,559 B2**

Page 3

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D616,996 | S | 6/2010 | Thorgilsdottir et al. |
| D616,997 | S | 6/2010 | Thorgilsdottir et al. |
| D617,907 | S | 6/2010 | Waller |
| 7,815,585 | B2 | 10/2010 | Vollbrecht |
| 7,846,117 | B2 | 12/2010 | Leatt et al. |
| D631,167 | S | 1/2011 | Leatt et al. |
| 7,878,995 | B2 | 2/2011 | Harty |
| 7,896,827 | B2 | 3/2011 | Ingimundarson et al. |
| 7,981,068 | B2 | 7/2011 | Thorgilsdottir et al. |
| D643,978 | S | 8/2011 | Abajo Alonso et al. |
| D644,331 | S | 8/2011 | Sandhu |
| D644,332 | S | 8/2011 | Sandhu |
| 7,992,261 | B2 | 8/2011 | Hammerslag et al. |
| D647,623 | S | 10/2011 | Thorgilsdottir et al. |
| D647,624 | S | 10/2011 | Thorgilsdottir et al. |
| 8,038,635 | B2 | 10/2011 | Dellanno |
| 8,038,636 | B2 | 10/2011 | Thorgilsdottir et al. |
| D659,842 | S | 5/2012 | Donaldson et al. |
| D662,597 | S | 6/2012 | Chang |
| 8,216,167 | B2 | 7/2012 | Garth et al. |
| D666,302 | S | 8/2012 | Joseph |
| 8,257,292 | B2 | 9/2012 | Linares |
| 8,545,423 | B2 | 8/2013 | Patron |
| D692,568 | S | 10/2013 | Chiang et al. |
| D693,014 | S | 11/2013 | Chiang et al. |
| 8,679,044 | B2 | 3/2014 | Thorgilsdottir et al. |
| 8,864,693 | B2 * | 10/2014 | Suarez ................ A61F 5/055 |
| | | | 128/DIG. 23 |
| 8,932,243 | B2 | 1/2015 | Calabrese |
| 9,132,027 | B2 | 9/2015 | Calco |
| D767,825 | S | 9/2016 | Georgeson et al. |
| 9,713,546 | B2 | 7/2017 | Thorsteinsdottir et al. |
| 2002/0138028 | A1 | 9/2002 | Rudy, Jr. et al. |
| 2002/0156408 | A1 | 10/2002 | Cheatham |
| 2002/0156409 | A1 | 10/2002 | Lee et al. |
| 2002/0169401 | A1 | 11/2002 | Walpin |
| 2002/0173737 | A1 | 11/2002 | Miyaji et al. |
| 2003/0055367 | A1 | 3/2003 | Dominguez |
| 2003/0060744 | A1 | 3/2003 | Caille et al. |
| 2003/0181838 | A1 | 9/2003 | Garth |
| 2004/0039318 | A1 | 2/2004 | Santelli, Jr. |
| 2005/0101896 | A1 | 5/2005 | Calabrese |
| 2007/0027418 | A1 | 2/2007 | Calco et al. |
| 2007/0073203 | A1 | 3/2007 | Moenning et al. |
| 2007/0270728 | A1 | 11/2007 | Chao |
| 2009/0247918 | A1 | 10/2009 | Patron |
| 2010/0137768 | A1 | 6/2010 | Thorgilsdottir et al. |
| 2010/0268139 | A1 | 10/2010 | Garth |
| 2010/0298748 | A1 | 11/2010 | Rosenfeld et al. |
| 2011/0034844 | A1 | 2/2011 | Thorgilsdottir et al. |
| 2011/0066094 | A1 | 3/2011 | Thorgilsdottir et al. |
| 2011/0224591 | A1 | 9/2011 | Thorgilsdottir et al. |
| 2012/0053499 | A1 | 3/2012 | Donaldson et al. |
| 2012/0130295 | A1 | 5/2012 | Haider |
| 2012/0165712 | A1 * | 6/2012 | Calabrese ........... A61F 5/055 |
| | | | 602/18 |
| 2013/0060179 | A1 | 3/2013 | Modglin |
| 2013/0281899 | A1 | 10/2013 | Suarez et al. |
| 2013/0281900 | A1 | 10/2013 | Suarez et al. |
| 2013/0310722 | A1 | 11/2013 | Thorsteinsdottir et al. |
| 2014/0012172 | A1 | 1/2014 | Calco |
| 2014/0107551 | A1 | 4/2014 | Modglin |
| 2014/0323938 | A1 | 10/2014 | Suarez et al. |
| 2015/0216708 | A1 | 8/2015 | Garth et al. |
| 2016/0287424 | A1 | 10/2016 | Webster et al. |
| 2018/0078400 | A1 | 3/2018 | Hsu et al. |
| 2018/0078401 | A1 | 3/2018 | Hsu et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 201150587 Y | 11/2008 |
| CN | 201602923 U | 10/2010 |
| CN | 102227196 A | 10/2011 |
| CN | 202015274 U | 10/2011 |
| DE | 19547115 A1 | 6/1997 |
| DE | 19849302 A1 | 4/2000 |
| DE | 100 57 286 A1 | 5/2002 |
| EP | 1738724 A1 | 1/2007 |
| EP | 2653139 A1 | 10/2013 |
| EP | 2886088 A1 | 6/2015 |
| FR | 2 814 362 A1 | 3/2002 |
| GB | 2 165 157 A | 4/1986 |
| GB | 2 453 996 A | 4/2009 |
| JP | 2007-330808 A | 12/2007 |
| WO | 94/09728 A1 | 5/1994 |
| WO | 95/22304 A1 | 8/1995 |
| WO | 96/40018 A1 | 12/1996 |
| WO | 9843568 A1 | 10/1998 |
| WO | 2014102340 A1 | 7/2014 |

### OTHER PUBLICATIONS

Hsu et al, AAOS Atlas of Orthoses and Assistive Devices, Mosby, Elsevier Fourth Edition, 2008, Philadelphia, PA, p. 117-122.

Product Information Sheet, Philadelphia Tracheotomy Collar, obtained from www.ossur.com, prior to Aug. 6, 2010, 1 page.

Product Information Sheet, Plazazote Sheets, WBC Industries, obtained from www.wbcindustries.com prior to Aug. 6, 2010, 2 pages.

"Range-of-Motion Restriction and Craniofacial Tissue-Interface Pressure From Four Cervical Collars", The Journal of Trauma Injury, Infection, and Critical Care, vol. 63, No. 5, Nov. 2007, pp. 1120-1126.

"Ossur Is Immobilization", www.ossur.com, 2008, pp. 1-16.

"Miami J Patient Care Handbook", www.ossur.com, 2010, pp. 1-16.

Jacobson et al. "Improving Practice Efforts to Reduce Occipital Pressure Ulcers", Journal of Nursing Care Quality, vol. 23, No. 3, 2008, pp. 283-288.

Bell et al. "Assessing Range of Motion to Evaluate the Adverse Effects of Ill-Fitting Cervical Orthoses", The Spine Journal, vol. 9, 2009, pp. 225-231.

Karason et al. "Evaluation of Clinical Efficacy and Safety of Cervical Trauma Collars: Differences in Immobilization, Effect on Jugular Venous Pressure and Patient Comfort", Scandinavian Journal of Trauma, Resuscitation and Emergency Medicine, 2014, pp. 1-7.

Partial International Search Report from PCT Application No. PCT/US2017/050206, dated Dec. 5, 2017.

Product Brochure, "Capital Collar Enhanced," DeRoyal, 2014, 2 Pages.

Product Brochure, "Instructions For Use Eclipse Cervical Collar," VQ OrthoCare, 2015, 2 Pages.

Product Brochure, "Miami J Advanced By OSSUR," www.ossur. com, 2012, 4 Pages.

Product Brochure, "Miami J Cervical Collar," www.ossur.com, 1 Page.

Product Brochure, "Proglide Cervical Collar," OPTEC, www. optecusa.com, 1 Page.

Product Brochure, "Vista Upper Spine," Aspen Medical Products, 2015, 6 Pages.

International Search Report from PCT Application No. PCT/US2017/019391, dated May 18, 2017.

\* cited by examiner

OSS 000111



FIG. 1
(Prior Art)

OSS 000112



FIG. 2A

FIG. 2B

OSS 000113



FIG. 3A

FIG. 3B

OSS 000114



FIG. 4



FIG. 5

OSS 000115



FIG. 6A



FIG. 6B

OSS 000116



FIG. 7A



FIG. 7B

OSS 000117



FIG. 8A



FIG. 8B

OSS 000118



FIG. 9A



FIG. 9B

OSS 000119



FIG. 10

OSS 000120



FIG. 11

FIG. 12

FIG. 13

OSS 000121



FIG. 14A

FIG. 14B

FIG. 14C

OSS 000122



FIG. 15A

FIG. 15B

OSS 000123



FIG. 16A

FIG. 16B

FIG. 17

OSS 000124



FIG. 18A

FIG. 18B

OSS 000125



FIG. 18C

FIG. 18D

OSS 000126



**FIG. 19A**



**FIG. 19B**

OSS 000127



**FIG. 20**



**FIG. 21**

OSS 000128



FIG. 22A



FIG. 22B

OSS 000129



FIG. 23A



FIG. 23B

OSS 000130



**FIG. 24A**



**FIG. 24B**

OSS 000131

US 10,512,559 B2

1

# CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT

## CROSS-REFERENCE TO RELATED APPLICATIONS

This disclosure incorporates by reference U.S. Pat. No. 5,632,722, granted May 27, 1997, U.S. Pat. No. 6,254,560, granted Jul. 3, 2001, U.S. Pat. No. 7,981,068, granted Jul. 19, 2011, U.S. Pat. No. 8,038,636, granted Oct. 18, 2011, U.S. Pat. No. 8,679,044, granted Mar. 25, 2014, U.S. patent application publication no. 2013/0310722 published on Nov. 21, 2013, and U.S. patent application publication no. 2016/0287424, published Oct. 6, 2016.

## FIELD OF THE DISCLOSURE

The present disclosure relates to an orthopedic device, and more specifically to cervical collars having height adjustability at a front part, while providing a platform for securing known other components of a cervical collar thereto without modifying their anatomical contours and connection to the height adjustment components.

## BACKGROUND

Cervical collars are used for treating conditions of the neck and the cervical spine by cervical spine immobilization. These collars may handle whiplash and other such injuries, where support for the head and neck of the patient is needed, and function to partially immobilize the head and neck of the patient and relieve spasm or strain to which the neck muscles or force from the head of the patient to the shoulders or adjacent areas of the patient. Other collars may be arranged for complete or near complete immobilization of the head and neck of the patient to reduce risk of secondary damage to the spinal cord.

A challenge in designing a cervical collar is balancing desired immobilization with user comfort, such as venous pressure. Immobilization may be measured by five planes of movement, including flexion, extension, lateral tilt to right and left, and rotation of the neck to right and left, and is considered generally as cervical range of motion (CROM).

Unfortunately, many patients using cervical collars develop decubitus or decubitus ulcers (also known as bed sores, pressure sores, or trophic ulcers) when wearing cervical collars. These ailments, which involve a breakdown of tissue overlying a bone, arise when tissues overlying a bony prominence are subjected to prolonged pressure against an object such as a cervical collar. Besides affecting superficial tissues such as the skin, decubitus and decubitus ulcers can affect muscle and bone. Restrictive collars are the root causes of skin breakdown in the trauma population. As pressure-ulcers are among the most common, yet serious and costly, complications of routine spinal immobilization, it is desirable to provide cervical collars that minimize the probability of ulcers.

Moisture and pressure are two major factors which contribute to the formation of decubitus. Once a decubitus ulcer forms, there is no good method of determining the extent of tissue damage. Once started, decubitus can continue to progress through the skin and fat tissue to muscle and eventually to bone, and is very difficult to treat and arrest. In extreme cases, surgical replacement of bone, muscle and skin are required to restore that portion of the body of the patient where decubitus has formed.

2

It is desirable to eliminate or at least minimize the effect of pressure points when using cervical collars. The likelihood of contracting decubitus can be greatly reduced by a more even distribution of pressure to several parts of the body of the patient.

Multiple studies have evaluated CROM and the likelihood of tissue-interface pressure (TIP) exerted by commercially-available cervical collars. One of the known commercial collars that has proven successful at striking the balance of minimal TIP and most restriction of CROM is the Miami J collar (Össur; hf, Reykjavik, Iceland). Multiple studies have validated the features of the Miami J collar, including: Tescher, A. N. et al. Range-of-motion restriction and craniofacial tissue-interface pressure from four cervical collars. *Journal of Trauma-Injury Infection & Critical Care;* 2007; 63; 5; 1120-1126; Jacobson, T. M. et al. Efforts to reduce occipital pressure ulcers. *Journal of Nursing Care Quality;* 2008; 23; 3; 283-288; Karason, S. et al. Evaluation of clinical efficacy and safety of cervical trauma collars: differences in immobilization, effect on jugular pressure and patient comfort. *Scandinavian Journal of Trauma, Resuscitation and Emergency Medicine.* 2014. 22:37.

The Miami J collar is also described in U.S. Pat. No. 5,632,722, granted May 27, 1997; U.S. Pat. No. 6,254,560, granted Jul. 3, 2001; U.S. Pat. No. 6,921,376, granted Jul. 26, 2005. Variations of the Miami J collar, embodying the Miami J Advance collar, are described in U.S. Pat. No. 7,981,068, granted Jul. 19, 2011, and U.S. Pat. No. 8,679,044, granted Mar. 25, 2014.

A feature, preferably included in cervical collars to overcome limited adaptability to accommodate the body of the patient and the particular ailment prompting the need for wearing a cervical collar, is the facility for adjusting the relative positions of various components of the cervical collar. Part of the effectiveness of the Miami J collar is due to its ability for customization to different anatomical sizes of users.

As taught in U.S. Pat. No. 6,254,560, the Miami J collar has supports that enable customized pressure distribution and avoid skin breakdown. A front part of the Miami J collar has an adjustable upper support for the mandibular, chin and/or jaw of the user, and mounted to a lower support or sternum brace by means which permit relative movement between the upper support and the lower support. The posterior component or back part of the Miami J collar has an occipital support mounted to a back support by means which permit relative sliding movement between the occipital support and the back support. The shape of the upper support and occipital support are anatomically optimized for superior immobilization and patient comfort.

Both the upper support and the occipital support of the Miami J collar are uniquely anatomically shaped to maximize comfort and immobilization while minimizing pressure on the user. Because the upper support and the occipital support of the Miami J collar are clinically proven, it is desired that any improvements over the current Miami J collar provide means for preserving the function and shape of the upper support and occipital support of the current Miami J collar.

## SUMMARY

The present disclosure describes an improved cervical collar for restricting head and neck movement to promote healing after an injury to the spinal column. The cervical collar has height, circumferential and angular adjustment to accommodate a wide variety of patient sizes and anatomical

OSS 000132

US 10,512,559 B2

3

configurations, and to accommodate dimensional changes caused by increased or decreased swelling of the affected anatomical portions of the patients during treatment of the injury. The cervical collar is arranged to stabilize and immobilize the cervical area, by restricting lateral, sagittal and coronal movement, while improving comfort, and fit for individual patients.

Embodiments of the disclosure relate to a cervical collar having a height adjustment system between main and lower parts forming an anterior component, which permit the use of known upper and occipital supports in the cervical collar to maintain their functionality, comfort and fit, including their anatomical contours and connection to the height adjusted components. The height adjustment system is arranged for adjusting the chin height in a simple and effective manner that limits or mitigates tampering with the height while the collar is worn. The height adjustment system preferably includes using incremental height adjustment so the height may be locked at a desired height setting. The height adjustment system may be arranged to allow usage in existing collar designs, such as the Miami J or Miami J Advance collars, without substantially altering the shape and function of the mandibular and posterior component including an occipital support.

The height adjustment system mitigates or eliminates the need for pre-sizing methods, and is provided in a simplified manner to enable many height settings customizable for different users. The height adjustment system allows use of known upper and posterior components, which have been on the market for many years to serve many users of cervical collars, are clinically proven for their efficacy.

The height adjustment system allows for improved placement and configuration of a cervical collar on patients of different heights. The upper support and posterior component can be properly fitted against the chin and head of a patient by a clinician, followed by the extension of the anterior component against the patient's chest. Likewise the anterior component may be placed against the patient's chest and the upper support and posterior component can then be extended to the chin and head of the patient. The height setting can then be locked at the desired height setting by the clinician to ensure a proper fit for the user.

According to a general embodiment, a cervical collar has an anterior component arranged for connecting to a posterior component. The anterior component comprises a main support, and a lower support hingedly connected to the main support at first and second hinges. An elongate element or slidelock has first and second ends engaging the first and second hinges, such that the first and second ends are arranged for adjusting relative to the first and second hinges. A lock mechanism is configured for locking rotation of the lower support relative to the main support, and moving the elongate element between locked and unlocked conditions. The elongate element is biased into the locked condition, and may be configured to wedge parts of the hinged connection of the parts of the anterior component together in the locked condition.

In a method for adjusting an angle defined between the main support and the lower support, the method involves moving the elongate element relative to the main support and the lower support. A part of the main support is disengaged from a corresponding part of the elongate element to unlock the lower support from the main support. The lower support is moved relative to the main support. Once the lower support is placed at the desired angle relative to the main support, the part of the main support is engaged to the corresponding part of the elongate element to lock the lower

4

support to the main support, which may be accomplish by wedging parts of the hinged connection together.

These and other features, aspects, and advantages of the present disclosure will become better understood regarding the following description, appended claims, and accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

The drawing figures are not necessarily drawn to scale, but instead are drawn to provide a better understanding of the components thereof, and are not intended to be limiting in scope, but to provide exemplary illustrations. The figures illustrate exemplary configurations of an orthopedic device, and in no way limit the structures or configurations of a liner according to the present disclosure.

FIG. 1 is a perspective view of a known cervical collar under the commercial name Miami J.

FIG. 2A is a frontal elevational view of a cervical collar.

FIG. 2B is a side elevational view of an embodiment of a cervical collar of FIG. 2A.

FIG. 3A is a top plan view of the main and lower supports of the cervical collar of FIG. 2A.

FIG. 3B is a rear elevational view of the main and lower supports of the cervical collar of FIG. 2A.

FIG. 4 is a detail plan view of the lock mechanism in FIG. 3A.

FIG. 5 is a schematic view of a variation of the lock mechanism of FIG. 3A.

FIG. 6A is a schematic plan view of the elongate element in a locked condition.

FIG. 6B is a schematic plan view of the elongate element in an unlocked condition.

FIG. 7A is a schematic perspective view of the first hinge in a locked condition.

FIG. 7B is a schematic perspective view of the first hinge in an unlocked condition.

FIG. 8A is a schematic perspective view of a variation of the first hinge in a locked condition.

FIG. 8B is a schematic perspective view of the first hinge of FIG. 8A in an unlocked condition.

FIG. 9A is an outer exploded perspective view of another variation of the first hinge.

FIG. 9B is an inner exploded perspective view of the first hinge of FIG. 9A.

FIG. 10 is a perspective view of another embodiment of a cervical collar.

FIG. 11 is a perspective view of an embodiment of a slidelock in the cervical collar of FIG. 10 and showing a first side thereof.

FIG. 12 is a perspective detail view of the slidelock showing a second side thereof.

FIG. 13 is a perspective schematic view showing the slidelock of FIG. 11 in a portion of the cervical collar of FIG. 10.

FIG. 14A is a perspective schematic view showing the slidelock of FIG. 11 in an end portion of side A of the cervical collar of FIG. 10 in a locked condition.

FIG. 14B is a perspective schematic view showing the slidelock of FIG. 11 in an end portion of side B of the cervical collar of FIG. 10 in an unlocked condition.

FIG. 14C is a detail cross-sectional view XIV C of FIG. 14A showing engagement of features in a locked condition of the collar of FIG. 10.

FIG. 15A is a perspective view of an inside surface of a side cover in the cervical collar of FIG. 10.

OSS 000133

US 10,512,559 B2

**5**

FIG. 15B is a schematic view of a variation of the side cover and main support in FIG. 15A.

FIG. 16A is a schematic view of a variation of a paddle in a slidelock.

FIG. 16B is a schematic view of another variation of a paddle in a slidelock.

FIG. 17 is a schematic view of another variation of a slidelock system for use in a cervical collar.

FIG. 18A is a schematic view of another variation of a slidelock system for use in a cervical collar.

FIG. 18B is a schematic view of the slidelock system in FIG. 18A disassembled.

FIG. 18C is a schematic view of the slidelock system in FIG. 18A in a locked condition.

FIG. 18D is a schematic view of the slidelock system in FIG. 18A in an unlocked condition.

FIG. 19A is a schematic side elevational view of the upper support in the main support.

FIG. 19B is schematic view of the adjustability of the upper support relative to the main support in FIG. 19A.

FIG. 20 is a plan view of the adjustment mechanism in FIG. 2A.

FIG. 21 is an elevational view of the adjustment mechanism of FIG. 20.

FIG. 22A is a schematic elevational view of the adjustment mechanism in a contracted configuration.

FIG. 22B is a schematic elevational view of the adjustment mechanism in an extended configuration.

FIG. 23A is an elevational view of an embodiment of the connector in FIG. 2.

FIG. 23B is a top plan view of the connector in FIG. 23A.

FIG. 24A is a perspective view of another embodiment of the connector in FIG. 2.

FIG. 24B is an exploded view of the connector in FIG. 24A.

DETAILED DESCRIPTION OF VARIOUS EMBODIMENTS

A. Introduction

Embodiments of an orthopedic device are provided for stabilizing and supporting anatomical portions of a wearer, for example, the neck and head of a wearer.

Although the embodiments of the disclosure are adapted for supporting and stabilizing anatomical portions of many wearers having various anatomical shapes and sizes, the embodiments of the disclosure may also be dimensioned to accommodate different types, shapes and sizes of anatomical portions.

A better understanding of different embodiments of the disclosure may be had from the following description read with the accompanying drawings in which like reference characters refer to like elements.

While the disclosure is susceptible to various modifications and alternative constructions, certain illustrative embodiments are in the drawings and are described below. It should be understood, however, there is no intention to limit the disclosure to the embodiments disclosed, but on the contrary, the intention covers all modifications, alternative constructions, combinations, and equivalents falling within the spirit and scope of the disclosure.

It will be understood that, unless a term is defined in this disclosure to possess a described meaning, there is no intent to limit the meaning of such term, either expressly or indirectly, beyond its plain or ordinary meaning.

While the foregoing embodiments have been described and shown, alternatives and modifications of these embodi-

**6**

ments, such as those suggested by others may be made to fall within the scope of the invention. While the cervical collar has been described in combination with collar parts, it will be understood that the principles described may be extended to other types of orthopedic and prosthetic devices.

Reference characters are provided in the claims for explanatory purposes only and are not intended to limit the scope of the claims or restrict each claim limitation to the element in the drawings and identified by the reference character.

For ease of understanding the disclosed embodiments of an orthopedic device, the front or anterior, and rear or posterior portions of the orthopedic device are described independently. The anterior and posterior portions of the orthopedic device function together to form a supporting and stabilizing collar that encompasses the anatomical portions of the wearer.

The term "posterior" also has its ordinary meaning and refers to a location that is behind or to the rear of another location. Lastly, the term "anterior" has its ordinary meaning and refers to a location ahead of or to the front of another location.

The terms "rigid," "semi-rigid," "flexible," and "compressible" may be used herein to distinguish characteristics of portions of certain features of the orthopedic device. The term "rigid" should denote that an element of the device is generally devoid of flexibility. Within the context of support members or shells that are "rigid," it is intended to indicate that they do not lose their overall shape when force is applied, and they may break if bent with sufficient force. As for the term "semi-rigid," this term is used to connote properties of support members or shells that provide support and are free-standing; however such support members or shells may have some degree of flexibility or resiliency.

The term "flexible" should denote that features are capable of repeated bending such that the features may be bent into retained shapes or the features do not retain a general shape, but continuously deform when force is applied. The term "compressible" is used to qualify such structural features as being capable of being reduced in size or volume due to the exertion of force applied to the structural feature.

B. Components for use with following embodiments

FIG. 1 exemplifies the known Miami J collar 1, as taught in the aforementioned patents and publications, particularly U.S. Pat. Nos. 5,632,722 and 6,254,560. The collar 1 includes an upper support 2 intended to support the mandibular, jaw or chin of the user that secures and/or rests upon an anterior component 3 of the collar. The upper support 2 is arranged for sliding movement with the anterior component 3 and for locking therewith by a side adjustment connection 11 and a central tab 15. The upper support 2 preferably has continuous padding 8 along a surface adjacent the user's jaw.

The anterior component 3 defines a sternum part 4, forming an extension adapted to extend below the clavicle of a user and adapted to rest against the sternum. The sternum part 4 carries a sternum pad 9 to avoid decubitus over long periods of wear of the collar. Besides the sternum pad 9, the anterior part 3 likewise includes padding along the surface facing the user.

The Miami J collar may be used by users with injuries other than those for which the cervical collar is most commonly used. The anterior component 3 forms an opening 13 which allows for access to the throat of the user, although because the anterior component is unitary and monolithic, the size of the opening 13 remains fixed.

OSS 000134

US 10,512,559 B2

7

The collar 1 includes a posterior component comprising lower and upper parts 5, 6, with the upper part serving as an occipital support. Both the lower and upper parts 5, 6 preferably include continuous padding, with the lower part intended to rest upon the back of the user, and the upper part intended to rest against the occiput of the head. The lower and upper parts 5, 6 are preferably attached for relative sliding movement between relative positions of the lower and upper parts to allow for different head sizes and proper and even pressure distribution across the body of the user.

Although not shown, the posterior component may be unitary and monolithic because it resembles the posterior component taught by U.S. Pat. No. 7,981,068 and found in the Miami J Advance collar. The posterior component is an anatomically configured 3D support contiguously formed with resilient or compliant edges. The support includes slots to provide ventilation and/or additional resilience or flexibility. The support portion also includes an anatomically shaped flared section shaped to correspond to and support an anatomical portion of a wearer, for example, the occipital region.

Both the upper support, and the anterior and posterior components are generally symmetrical about a vertical center line, and may be formed from rigid or semi-rigid plastic. The material forming the upper support, and the anterior and posterior components, may be flexible prior to donning the collar, but sufficiently rigid once the collar is donned to resist yielding due to weight exerted by the user.

A fastener 7 is used to secure the anterior and posterior components to one another. The fastener 7 comprises cooperating hook-and-loop attachments on the anterior and posterior components, with a strap bearing hook material extending from the posterior component and loop or hook receiving elements located on the anterior component.

Each of these embodiments is arranged to receive the upper support and posterior component of the Miami J collar, or the posterior component of the Miami J Advance collar in order to preserve the clinically recognized superior immobilization and comfort provided by the existing collars. It will be noted, however, that these embodiments are not restricted to only the upper support and posterior component of the Miami J and Miami J Advance collars, but can receive other upper support and posterior components of other known collars or those designed for each of the embodiments.

The height adjusted anterior component is arranged to preserve the anatomical contour and function of the known upper support and posterior component, despite the height adjustment of the anterior component and the tracheal opening thereof. The embodiments may have a varying height adjustment in that a center portion of the collar about the tracheal opening and generally along a vertical center line may increase greater in height than alongside portions of the anterior component proximate the connection to the posterior component. An example, although not limiting, is a 3:1 height difference at the center portion relative to the side portions.

While the embodiments may be associated with varying neck lengths among users, the sternal contour of users may likewise vary. The varying sternal contours of users may be resolved by positioning of the sternal contour, which may be achieved by adjusting the tracheal opening height or the height generally of the collar. While anatomical vertebral height and neck length plays a role in adjustment of the collar, the alignment of the spinal segments also has an effect

8

in overall neck "length," i.e., a more kyphotic or flexed neck position "shortens" an otherwise anatomically longer or taller neck.

Another factor relating to the dimension of the cervical collar is the sternal contour. For instance, a very barrel chested individual (having a more horizontal sternal contour) may have the distal most dimension of the sternal extension of the brace contact considerably closer to the mandible than the patient with a very vertical sternum.

In all situations suggested above, mandible dimensions would be relatively the same, it is the orientation of the neck elements and its attachment to and the contour of the sternal segment that plays the largest role in overall collar height adjustment. The mechanism affording mandible and sternal height adjustment can accommodate the varying contours and dimensions.

C. Embodiments of the Cervical Collar

According to the embodiment of FIGS. 2A and 2B, a cervical collar 10 has an anterior component 12 arranged for connecting to a posterior component 14. The posterior component 14 may be similarly arranged as the similar part in U.S. Pat. No. 7,981,068, as discussed above. The anterior component 12 comprises a main support 16, an upper support 18 arranged for being received by the main support 16, and a lower support 20 hingedly connected to the main support 16 at first and second hinges or end portions of the main and lower supports forming such hinges. In the depicted embodiments, the first and second hinges are formed by such end portions of the main and lower supports, and there are not separate hinges in addition to the end portions. However, the application is not limited to such arrangement, and additional components could be added to the end portions of the main and lower supports which could be considered as hinges in addition to the end portions of the main and lower supports.

A lock mechanism 22 is arranged for locking rotation of the lower support 20 relative to the main support 16, such that the hinges are locked according to different angular configurations of the lower support 20 relative to the main support 16. An adjustment mechanism 24 is located centrally along a lowermost portion of the lower support 20, and may be configured for adjustment relative to and away from a sternum of a user for improving comfort and fit of the cervical collar.

As evident from FIGS. 2A and 2B, the anterior component 12 preserves the general contours known in the Miami J collar, particularly the peripheral outline of the anterior component of both the main support 16 and lower support 20, which enables easy attachment to the known upper or upper support 18 and posterior component 14. Specifically, the upper support 18 may have a configuration that is the same as in U.S. patent application publication no. 2013/0310722, and U.S. Pat. No. 6,254,560. The profile of the upper support 18 is preferably taken from the Miami J collar, however other upper supports may be used and the embodiments are not limited to solely the Miami J collar profile.

Because the main and lower supports are adjustable relative to one another, the upper support is preferably maintained in a stationary relationship with the main support. However, the upper support is not necessarily rigid, but may flex according to the anatomy of the user, but become rigid or stable to movement once the collar is placed and tightened securely on the user.

Generally, when fitting a cervical collar having an anterior component 12, a clinician fits the upper support 18 and posterior component 14 against a patient's chin and head, arranged for the desired level of immobilization and support.

OSS 000135

US 10,512,559 B2

9

The clinician then adjusts the lock mechanism 22 to secure the anterior component 12 against the chest and shoulders of the patient by articulating the lower support 20 relative to the main support 16. A clinician may also first fit the anterior component 12 against the patient's chest and then regulate the lock mechanism 22 to extend the main support 16 and posterior component 14 to the chin and head of the patient. The height setting is maintained by the lock mechanism 22 once released at the desired height setting to ensure a proper fit for the user.

Referring to FIGS. 6A and 6B, the first and second ends 48, 50 of an elongate element 34 or sliding lock or slidelock, as discussed periodically herein, are spatially located ends 48, 50 relative to the first and second hinges 40, 42 when in the unlocked condition. The first end 48 is axially offset from axis 49 from end portions 44, 46 of the main support and the lower support at the first hinge 40 in the unlocked condition. The end portions 44, 46 of the main and lower supports are generally coaxial relative to one another.

As illustrated in FIGS. 3A, 3B and 4, the elongate element 34 is slidably located within an arcuate guide 54 defined by the main support 16 along an inner side I thereof. The inner side I of the main support 16 defines a plurality of guides 38 for retaining the elongate element 34 within the arcuate guide 54. According to the illustrated embodiment, the guides 38 each define a post 52 having a height greater than a thickness of the guides 38. The arcuate guide is depicted as a tray but it may likewise be configured as a flange, boss, segmented protrusions, or other appropriate structure to route the elongate element of the main support or upper support.

The arcuate tray 54 is defined by a base portion 58 and an upper wall 56 of the main support 16. The base portion 58 extends outwardly from the upper wall 56 in a generally perpendicular orientation.

The main support 16 has a generally arcuate configuration 59 adapted to extend about the mandible of a user, and may be considered to possesses an elongated C- or U-shape. The lower support has a generally arcuate configuration 60 and is contoured for being adapted for securing against a sternum of a user.

The lock mechanism 22 includes an actuator or dial 30 for adjusting the lock mechanism 22 from locked to unlocked conditions. The lock mechanism 22 includes the elongate element 34 having first and second ends 48, 50 engaging the first and second hinges 40, 42. The first and second ends 48, 50 are arranged for being displaceable relative to the first and second hinges 40, 42 between locked and unlocked conditions of the lock mechanism 22.

The lock mechanism 22 preferably includes a pinion 32 and a rack segment 36, or geared rack segment 36, for adjusting position of the elongate element 34. The pinion 32 defines a shaft 61 extending between the outer and inner sides of the main support 16 and a pinion portion 62 at a first end of the shaft 61. The shaft 61 engages the actuator 30 on the outer side of the main support 16 at a second end of the shaft 61. The pinion portion 62 engages a rack segment 36 defined by the elongate element 34, whereby rotation of the shaft 61 urges the elongate element 34 to slide relative to the main support 16.

The pinion portion 62 is recessed relative to the shaft 61, such that the shaft 61 has a diameter greater than the pinion portion 62. The pinion portion 62 is arranged to maintain engagement with the rack segment 36 of the elongate element 34. An end portion 63 of the pinion on the inner side preferably has a diameter greater than the pinion portion 62. The pinion portion 62 is recessed relative to the shaft 61 and

10

the end portion 63. The shaft 61 engages a periphery of an opening 67 of the main support 16 via a threaded engagement 65.

While a rack and pinion system is shown and described, other adjustment and engagement systems may be used in combination with the elongate element or slidelock. Such other adjustment and engagement systems may be rotary or linear in nature, such as a slider, for causing displacement of the elongate element relative to the main support.

In the embodiment of FIG. 4, the lock mechanism 22 includes a least one spring element 64 arranged for returning the shaft 61 to a locked condition after rotation of the shaft 61 to the unlocked condition of the first and second hinges 40, 42 and release of the actuator 30. The spring element 64 is a Belleville disc. The spring element 64 biases against a groove 71 formed by the shaft 61 and a bias element 69 of the main support 16. The return force from the elongate element 34 may drive the actuator into the locked condition.

According to the schematic representation in FIG. 5, the lock mechanism 22 has at least one elastic element 66A, 66B secured at a first end to a first retainer 73 on the main support 16 and a second retainer 75 on the lock mechanism 22, whereupon release of the lock mechanism, the at least one elastic element 66A, 66B urges the lock mechanism to a predetermined configuration. The actuator 30 may be resiliently or spring biased, such that it may be activated under force to an unlocked condition whereby such force returns the actuator to a predetermined locked condition; for example by merely releasing the actuator.

Referring to the depiction in FIGS. 7A and 7B, the first hinge or end portion 40 includes end portions 44, 46 of the main support and the lower support 16, 20, respectively, and a hinge cover 68 defining a hole 74. The end portions 44, 46 each define holes 78, 80 that are coaxial about a first axis 90 to one another and about which the first hinge or end portion 40 pivots. The first end 48 of the elongate element 34 is arranged to slidably adjust relative to the end portions 44, 46. The first end 48 defines an opening 76 axially offset from the first axis 90 and defined along a second axis 91 variable in location depending on the configuration of the lock mechanism 22.

The first end 48 of the elongate element 34 defines a detent projection 72 arranged to engage a ridge 86 defined by the end portion 44 of the main support. The end portion 44 defines a ramp 87 leading to the ridge 86 from a recess 88 defined by the end portion 44. The detent projection 72 is arranged to be received by the recess 88 and slide along the ramp 87 to the ridge 86 between locked and unlocked conditions of the lock mechanism 22. The ridge 86, the ramp 87 and the recess 88 are generally concentric with the first axis and the hole 78 of the main support.

A spring element 70, such as an O-ring, is concentrically disposed about the hole 78 of the main support and biased between a shoulder 92 defined by the main support 16 and an inner surface 94 of the cover 68. As shown in FIG. 7A, when the spring 70 is in an expanded configuration, it wedges the inner surface 94 of the cover 68 and the shoulder 92 together.

The end portion 46 of the lower support 20 defines a protrusion or detent 84 arranged to be received by a notch 82 defined by the end portion 44 of the main support. The detent 84 is received by the notch 82 in the locked condition of the main support and the lower support. The detent 84 is generally arranged concentrically with the hole 80 of the main support. As shown in FIG. 7A, in the locked condition, vertical interference prevents movement of the hinge. FIG.

OSS 000136

US 10,512,559 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

7B shows how in the unlocked condition the spring element is compressed, and the detent may move.

FIGS. 8A and 8B exemplify a variation of the hinge 96, whereby the main support and the lower support define a plurality of cooperating teeth 98, 100 engageable when the lock mechanism is in the locked condition, and disengaged from one another when the lock mechanism is in an unlocked condition.

FIGS. 9A and 9B illustrate another embodiment of the hinge 102 wherein the end portion of the elongate element 34 defines an opening 112 through which a post 114 of the lower support 20 extends to secure to the cover 68. Such a construction is similar to the embodiments of FIGS. 7A-8B. The opening 112 and the post 114 are coaxial along axis 118. The opening 104 of the elongate element 34 has an oblong profile arranged for being axially offset relative to the axis 118, and a first surface 111 is arranged for abutting the hinge cover 68.

The elongate element 34 defines at least one elongate bar 120 protruding from a second surface 113 thereof and is arranged for being received by a corresponding elongate recess 106 formed by the main support 16. The main support 16 defines a plurality of circumferentially spaced recesses 108 arranged for receiving at least one detent 122 formed by the elongate element 34. The main support 16 defines an annular shoulder 110 from a first surface 105 thereof and defined about the opening 112.

The main support 16 defines a plurality of receptacles 124 circumferentially spaced about the opening 112 along a second surface 107 thereof. The lower support 20 defines a plurality of circumferentially spaced bosses 116 along a first surface 109 thereof, arranged for being received by the receptacles 124.

FIG. 10 exemplifies another embodiment of an anterior support 202 for a cervical collar 200 having a height adjustment system while preserving the contour 222 of the upper support 214 generally from the Miami J collar. The upper support 214, however, has improvements for securing to the main support 204 and features for increasing lateral immobilization.

The upper support 214 is arranged for easy attachment to the main support 204 by providing snap connections. A central portion at the front section of the main support 204 may have boss snaps 218 that fit and interlock with a corresponding aperture defined by the main support 204. Rear portions of the upper support 214 may define apertures corresponding to fasteners 220 formed by the main support 204 that engage the upper support 214, and aid in maintaining the upper support 214 in a desirable contour. The ability to easily attach an upper support to the main support enables a clinician to use differently-sized upper supports according to the user's anatomy. The upper and main supports may define apertures arranged for receiving fasteners not formed by either support, but are separate elements for securing the upper and main supports together.

The upper support 214 defines lateral extensions 226 on opposed sides thereof which are oriented to extend away from the central portion of the upper support, and effectively lengthen the extent the upper support extends along a user's mandibles. The lateral extensions are found to aid in increasing lateral immobilization of a user when wearing the collar.

The anterior support 202 includes a lower support 206 hingedly connected to the main support 204, and the locking and unlocking of the hinge is obtained by a lock mechanism 212 that may be similar to any of the aforementioned embodiments. A lower or sternum pad 210 is attached to a

lower or lowermost portion of the lower support 206. The lower support 206 may include an adjustment mechanism 208 for adjusting pressures and/or height of the lower pad 210 relative to the user's sternum.

Anterior support 202 has a cover 216 at the rearwardly portions, in contrast to the centrally located lock mechanism 212. The cover 216 generally covers the hinge connection between the main support 204 and the lower support 206, and further serves form part of the lock mechanism. Specifically, the cover 216, forms a plurality of openings 232 through which posts 230 extend from the main support 204.

FIG. 11 depicts an embodiment of an elongate element or slidelock 240 useable in the hinge connection of the collar 200. The slidelock 240 defines a central rack 242 of teeth arranged to correspond and operatively engage elements forming part of the lock mechanism for enabling linear translation of the slidelock 240 relative to the main support, such as in the embodiment of FIGS. 3A-4. The elements of the lock mechanism may be similar to the pinion of FIG. 4, or may be a linear rack of teeth, or any other suitable feature or mechanism for engaging the central rack 242.

In this embodiment, as shown in FIG. 10, the slidelock 240 preferably slides over an outer surface of the main support 204 to cooperate with the main support 204 to arrest or prevent rotation of the lower support 206 relative to the main support 204. The main support 204 and the cover 216, as shown below, operate to guide the linear movement of the slidelock. The linear movement of the slidelock is intended relative to a rear portion of main support within such discrete section, while acknowledging that the slidelock is bendable about the arcuate contour of the main support while traveling between opposed directions, as better depicted referring to FIG. 3A.

The slidelock 240 defines elongate segments 244 extending from opposed sides of the central rack 242 to paddles 250 located at end portions for forming part of the hinge connection. The paddles 250 generally corresponding in proximate location to the end portion 257 of the lower support 206, to stabilize the end portion 257 in both the locked and unlocked conditions. An opening 251 defined by the paddles 250 is arranged so the paddle 250 corresponds to the end portion 257 in both locked and unlocked conditions, whereby it is within the periphery of the end portion 257, as exemplified in FIG. 15B. The slidelock 240 forms hooks 246, 248 along the elongate segments 244 preferably extending from a first surface of the slidelock that are engageable with elastic elements, as discussed more in connection with FIG. 13.

Referring to FIG. 12, the slidelock 240 preferably defines ramp 258 intended to be on Side A of the collar (and ramp 268 intended to be on Side B of the collar in FIG. 14B) preferably extending from a second surface of the slidelock 240 where the elongate segments 244 meet the paddles 250. It is within this area where the travel of the slidelock is intended as traveling linearly. According to the depicted embodiment, the ramp 258 on Side A of the collar generally decreases in height from the paddle 250 toward the central rack 242 and from the second surface of the slidelock 240.

Referring to FIG. 14B, the ramp 268 on Side B of the collar generally increases in height from the paddle 250 toward the central rack 242 and from the second surface of the slidelock 240. In this manner, the ramps 258, 268 have oppositely oriented configurations to accommodate linear movement of the slidelock between locked and unlocked conditions so both Sides A, B undergo simultaneously the same locking or unlocking. The ramps 256, 267 have opposite orientations as the ramps 258, 268. Both ramps

OSS 000137

US 10,512,559 B2

13

258, 268 disengage at the same time from the corresponding ramps 256, 267 of the main support 204 in the unlocked condition, and engage at the same time with the corresponding ramps 256, 267 in the locked condition.

FIGS. 13 and 14A depict how the slidelock 240 operates relative to other components of the anterior component 202. Specifically, the slidelock 240 is slidably held by the main support 204, and may be likewise contained by the cover 216. The main support 204 defines a ramp 256 protruding from an outer surface and configured for engagement with the ramp 258 of the slidelock 240, which urges at least one engaging element 259 defined by a rear portion of the lower support 206 to engage at one engaging element 260 formed by the cover 216. The ramps 256, 258 effectively wedge the at least one engaging elements 259, 260 against one another to lock the hinge connection.

According to the depicted example of FIGS. 14 and 15A, the end portion 257 of the lower support has a disk shape, and rotates about an axis Z-Z of the disk shape relative to a circular boss 262 of the cover 216. The end portion 257 may have a central opening 263 coaxial with the axis Z-Z, which engages the boss 262 and is coaxial with an axis Y-Y of the boss 262. The main support 204 has at least one post 261 extending through the opening 263 and through one of the openings 232 of the cover 216 for providing stability to rotation of the end portion 257. As the ramps 256, 258 engage and disengage, the end portion 257 axially moves relative to the at least one post 261, and the boss 262 has a sufficient height to maintain the engagement of the end portion 257 in both the locked and unlocked conditions. The cooperation of the ramps, and regulation thereof by the slidelock, control height clearance in the hinge and the freedom of the disengagement of the lower support from the main support and/or cover.

As shown in FIGS. 14A and 15A, the at least one engaging elements 259, 260 are teeth adapted to engage one another in a locked condition of the collar 200. For simplicity, the cover 216 is shown transparently. The at least one engaging element 259 of the lower support 206 forms teeth that extend laterally from the disk shape or parallel to the axis Z-Z of the end portion 257. Preferably, the teeth extend laterally relative to the circumference of the end portion 257, and may extend completely or partially about the circumference. The at least one engaging element 260 of the cover 216 may be teeth oriented arcuately to smoothly engage the teeth of the at least one engaging element 259 of the lower support 206.

FIG. 14C shows how the ramps 256, 258 (for both Sides A and B) fall generally within a range of the at least one engaging elements 259, 260 to form an engagement zone 299 when the collar is in a locked condition. According to the engagement zone, the ramps 256, 258 wedge against one another, and are generally juxtaposed or stacked-up coinciding over the at least one engaging elements 259, 260 to urge them to mesh together to assure secure locking of the main support to the lower support, and hence the cervical collar in a selective angulation. According to the unlocked condition (not shown), the ramp 256 of the slidelock 240 falls outside of the engagement zone 299.

It will be understood these are merely examples of the at least one engaging element, which are envisioned to be provided in different structural shapes and orientations, however they are preferably arranged to engage and disengage to lock or unlock the lower support orientation relative to the main support. The cover sandwiches the end portion of the lower support with the main support, and the cover

14

and main support are preferably rigidly secured to one another to assure they do not move relative to one another unlike the lower support relative to the main support in the unlocked condition.

Referring to FIGS. 13 and 15A, the cover 216 may include hooks 252, as may the main support 204, to support an elastic band 254 suspended between the hook 252 and at least one of the hooks 246, 248 of the slidelock 240. The elastic band 254 assists in assuring the lock mechanism is biased in a locked condition. When the slidelock translates according to actuation by the lock mechanism to an unlocked condition that the elastic band is tensioned more than in the locked condition to form a spring return mechanism.

FIG. 15B exemplifies a variation of a cover 264 arranged to fit to the main support 204 by posts 278 arranged for snapping. The main support 204 defines receptacles 269 configured and dimensioned to receive the posts 278 extending from the cover 264. The posts 278 are configured and dimensioned to flexibly extend through or into the receptacles 269 but deflect while pressed through the receptacles 269 to relax once having passed the opening to interlock with the main support 204. Various posts and receptacles are formed by the main support or the cover to interlock with one another.

In the variation of FIG. 15B, the main support 204 defines a boss 265 upon which the end portion 257 of lower support 206 rotates about. The boss 265 may have the receptacles 269 located therewithin to receive the posts 278.

As depicted in FIG. 15B, the end portion 257 defines a plurality of teeth 266 only disposed about a segment short of the entire circumference of the end portion 257 to define a range of rotation of the lower support 206 relative to the main support 204. It may be preferable to limit the rotation of the lower support to assure better selection of angles of the lower support relative to the upper support.

Either the cover 264 or the main support 204 may define at least one elongate guide 277 to guide the slidelock 240. The cover 264 or main support 204 may define an elongate slot for observing and facilitating movement of the slidelock 240, which may cooperate with the elongate guide 277.

In a variation of the embodiments described herein, different spring return mechanisms may be provided for a slidelock or elongate element, preferably so that once a user releases the lock mechanism, the spring return mechanism moves the lock mechanism back to the locked condition. The elongate element may include or have attached thereto a spring feature located at one of the end portions or along a length between the end portions arranged to deflect against a static boss located on the main support or other appropriate structure.

Referring to the examples of FIGS. 16A and 16B, a spring feature may be configured into the elongate element, either behind or ahead of the hinge. The spring feature may be connected to the elongate element as a separate component or be formed as part of the elongate element.

FIG. 16A depicts a slidelock 270 having a paddle 271 defining a compression spring feature 272 and extending from an arm 275. The paddle 271 defines a frame 273 arranged for compression upon sliding of the slidelock 270, such that the spring feature 272 protrudes outwardly from the frame relative to the arm 275. The frame 273 defines interior corner openings 274, 276 permitting it to be compressed upon activation of the slidelock. The top opening 276 may secure a fastener or pin to the frame 273 upon which the paddle 271 compresses.

OSS 000138

US 10,512,559 B2

15

FIG. 16B depicts a slidelock 280 having a paddle defining a tension spring feature 282 and extending from an arm 285. The paddle 281 defines a frame 283 arranged for tension upon sliding of the slidelock 280, such that the spring feature 282 protrudes inwardly from the frame toward the arm 285. The frame 283 defines interior corner openings 284 permitting the paddle 281 to be pulled into tension upon activation of the slidelock.

FIG. 17 shows an alternate embodiment of a lock for the hinge which relies on a cam feature connected to or extending from the slidelock 290. The end portions of the main support and the lower support may include a plurality of peripheral teeth about their peripheries which are arranged to engage one another as the cam feature is urged against the main and lower supports end portions, such that the teeth mesh with one another to prevent movement of the hinge formed by the end portions of the main support and lower support.

One of the main support or lower support end portions is located concentrically with one another, and one generally within the periphery of the other. Both the main and lower supports may have an opening into which the cam feature can translate in and out of depending on the locking configuration of the lock mechanism. The main support defines interiorly facing teeth 294A, 294B located about an interior circumference, and the lower support defines at least one movable set of teeth 296A, 296B that are selectively engageable with the teeth 294A, 294B upon movement of the slidelock 290.

The at least one movable set of teeth 296A, 296B may include two blocks bearing the teeth along one side and along another side forming bearing surfaces 298A, 298B along which the slidelock 290 engages. The two movable sets of teeth 296A, 296B may form a first opening 295 into which the slidelock extends. The slidelock 290 forms a flared end 292 defining first and second sloped surfaces 293A, 293B engageable with the bearing surfaces 298A, 298B for moving the sets of teeth 296A, 296B relative to the teeth 294A, 294B. The sets of teeth 296A, 296B likewise form a second opening 297 through which the flared end 292 may be pushed through to reduce engagement of the sets of teeth 296A, 296B from the teeth 294A, 294B.

FIGS. 18A-18D represent another hinge connection 300 that may be useable in any of the cervical collar embodiments described herein, particularly with a lock mechanism. The hinge connection 300 includes a slidelock 302, an end portion 304 of a main support, an end portion 306 of a lower support, and a cam element 311 located between the end portions 304, 306, and in operative engagement with the slidelock 302. The cam element 311 includes at least one engaging element 316 of the slidelock 302 that is engageable with a corresponding at least one engaging element 326 of the end portion 306. In this example, the at least one engaging element 316 is a plurality of teeth 318, and the at least one engaging element 326 are radially extending teeth.

The slidelock 302 is linearly displaceable relative to the end portion 304, by at least one pin 308 and slot 310 connection. As shown, the slidelock 302 includes at least one pin 308 that is linearly slidable within a corresponding elongate slot 310. In the depicted embodiment, there are three pins 308 and three corresponding elongate slots 310.

FIG. 18D shows the cam element 311 having rear openings 320 arranged to flexibly bias against a periphery of the end portion 306 when in an unlocked condition to urge retraction of the slidelock once released into a locked condition. The cam element 311 further defines front openings 324 spaced apart from a boss 322 defined by the end

16

portion 306 upon which the end portion 304 rotates, and connected to one another from a front frame segment 328. The front and rear frame segments 328, 330 extend about the boss 322, and are adapted to be tensioned thereabout. The front openings 324 receive pins 309 extending oppositely to the at least one pin 308, and carried by arms 312 defined by the slidelock 302.

FIG. 18C shows the cam element 311 in a locked condition with the at least one engaging element 316 engaging the at least one engaging element 318. The cam element 311 is in a predetermined rest position, whereby the rear frame segment 328 is tensioned about the boss 322 to maintain the at least one engaging element 316 locked. FIG. 18D exemplifies the cam element 311 in an unlocked condition whereby the at least one engaging element 316 is pushed or pulled away from the at least one engaging element 318, and the front or rear frame segments 328, 330 are tensioned.

Turning to FIGS. 19A-19B, the upper support 18 is slidably secured to the main support 16, such that continuous padding 28 is arranged about the main support 16. The upper support 18 can be locked in position relative to the main support 16, after adjusting the correct position. The main support 16 defines an elongate lateral slot 130 and the upper support 18 forms an elongate angled slot 132 arranged obliquely relative to the elongate slot 130 of the main support 16. A slider 126 slidably couples the main support 16 and the upper support 18 by the lateral and angled slots 128, 130. According to a variation, a knob of the slider may be rotated to unlock and lock the slider in a desired position. As seen from the components shown, the rotation my simply comprise a tight frictional fit of the slider against the main support 16 and the upper support 18. The lateral slot 130 is preferably arranged generally parallel to a length of the main support 16.

The main support 16 preferably defines a stationary element 128 proximate the lateral slot 130. The slider 126 has a tightening feature 134 for maintaining the lateral and angled slots in a relative position to another. Adjustment of the mandible angle could also be driven up/down through a simple rotating cam mechanism. The object is to elevate the posterior aspect of the chin tray to accommodate the slope of the mandible, thereby increasing stabilization against lateral movement of the head and C-Spine.

As in the embodiment of FIGS. 2A and 2B, and referring specifically to FIGS. 20 and 21, the adjustment mechanism 24 is located centrally along a lowermost portion of the lower support 20. The adjustment mechanism 24 has a sternal pad 136 adjustable in location relative to the lower support 20. The sternal pad 136 is mounted to a ball joint 142. The adjustment mechanism 24 has an adjustment dial and an extension element 144 arranged for adjustably extending relative to the lower support 20. The extension element 144 carries the ball joint 142 at an end thereof. The adjustment mechanism 24 includes a dial 138 for adjusting the length of the extension element 144 between the lower support 20 and the sternal pad 136. The dial 138 is accessible by a recess formed by the adjustment mechanism 24.

FIGS. 22A and 22B show a variation of the adjustment mechanism 24 including a housing 145 arranged for receiving the extension element 144 in a contracted configuration resulting in a reduced or substantially minimized distance between the lower support and the sternal pad. The extension element 145 has a screw thread 147, and the housing 145 defines corresponding threads permitting slidable movement between the extension element 145 and the screw thread 147 according to adjustment of the dial 138.

OSS 000139

US 10,512,559 B2

**17**

As in the embodiment of FIGS. 2A and 2B, and referring to FIGS. 23A and 23B, a connector 26 connects the anterior component 12 to the posterior component 14. The connector 26 includes a base element 148 securing to a plate 150, and the base element 148 has a strap guide 152 about which a strap 146 extending from the posterior component 14 extends. The connector 26 has a pull tab 154 arranged for detaching the plate 150 from the base 148.

FIGS. 24A and 24B display another embodiment of a connector 160 securing to a plate 164. A cap 166 is arranged to extend over the base element 162 and secure therewith. The connector 160 includes a pull tab 170 arranged for detaching the plate 160 from the base element 162 and the cap 166. The cap 166 defines an opening 168 with the plate 160 for permitting a strap 172 extending therethrough which secures to the posterior component. The base element 162 defines a platform 178 about which the strap 172 extends, and the platform 178 has at least one protuberance 180 over which the strap 172 extends.

The base element 162 further defines a channel guide 182 proximate to the opening 168 and through which the strap 172 extends. The base element 162 forms at least one detent 188 proximate to the at least one protuberance 180 for selective engagement of the strap 172 with the at least one protuberance 180. When the connector 160 is in a locked condition, the at least one protuberance 180 and the at least one detent 188 arrest the strap 172 from movement as they are urged against each other.

The plate 164 defines at least one retainer 186 having a channel 190 for selectively receiving a pin 184 protruding from the base element 162, such that the pin 184 slides within the channel 190 between locked and unlocked conditions of the connector 160. The cap 166 defines a side recess 174 for sliding the cap 166 and base element 162 relative to the plate 164 and permitting the at least one retainer 186 to move therewithin. The cap 166 defines a front recess 176 through which the strap 172 extends.

The features may be employed in different combinations from those shown in a cervical collar. While the foregoing embodiments have been described and shown, alternatives and modifications of these embodiments, such as those suggested by others, may be made to fall within the invention.

The invention claimed is:

1. A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising:
   a main support;
   a lower support hingedly connected to the main support at first and second end portions of the anterior component;
   a lock mechanism arranged for locking rotation of the lower support relative to the main support simultaneously at the first and second end portions;
   an elongate element operatively connected to the lock mechanism and extending to the first and second end portions such that actuation of the lock mechanism moves the elongate element relative to the first and second end portions to lock and unlock the main support relative to the lower support.

2. The cervical collar of claim 1, wherein the elongate element has first and second ends engaging the first and second end portions, the first and second ends arranged for adjusting relative to the first and second end portions between locked and unlocked conditions of the lock mechanism.

**18**

3. The cervical collar of claim 2, wherein the elongate element is a single-piece displaceable in its entirety relative to the main support upon adjustment by the lock mechanism.

4. The cervical collar of claim 2, wherein the first and second ends of the elongate element are spatially located differently relative to the first and second end portions when in the locked condition.

5. The cervical collar of claim 2, wherein the first end of the elongate element is axially offset from end portions of the main support and the lower support at the first hinge in the locked condition, the end portions of the main support and lower support being coaxial with one another.

6. The cervical collar of claim 2, wherein the elongate element is slidably located within an arcuate guide defined by the main support.

7. The cervical collar of claim 2, wherein the elongate element is biased relative to the main support in a first configuration according to an elastic element attached thereto.

8. The cervical collar of claim 2, wherein the elongate element and the main support have cooperating ramps along which the elongate element slides relative to between the locked and unlocked conditions.

9. The cervical collar of claim 8, wherein the ramps coincide with an end portion of the lower support, an end portion of the main support being coaxial with the end portion of the lower support, and the end portion of the lower support movable along an axis thereof relative to the main support according to a position of the ramps relative to one another.

10. The cervical collar of claim 9, further comprising a cover extending over the end portion of the lower support, the end portion of the lower support having at least one engaging element arranged to interlock with at least one engaging element of the cover when the elongate element is in a locked condition.

11. The cervical collar of claim 10, wherein in the unlocked condition, the ramps are disengaged from one another, and the at least one engaging element of the lower support is disengaged from the at least one engaging element of the cover.

12. The cervical collar of claim 2, wherein the lock mechanism includes a pinion and a rack segment for adjusting position of the elongate element.

13. The cervical collar of claim 12, wherein the elongate element defines a central rack of teeth arranged to engage the pinion.

14. The cervical collar of claim 12, wherein the lock mechanism includes a pinion including a shaft extending between the outer and inner sides of the main support and a pinion portion at a first end of the shaft, the shaft engaging an actuator on the outer side of the main support at a second end of the shaft, the pinion portion engaging a rack segment defined by the elongate element, wherein rotation of the shaft urges the elongate element to slide relative to the main support.

15. The cervical collar of claim 1, wherein the lock mechanism includes an actuator for adjusting the lock mechanism from locked to unlocked conditions.

16. A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising:
   a main support;
   a lower support hingedly connected to the main support at first and second end portions of the anterior component;

OSS 000140

US 10,512,559 B2

19

an elongate element having first and second ends engaging the first and second end portions, the first and second ends arranged for adjusting relative to the first and second end portions;

a lock mechanism arranged for locking rotation of the lower support relative to the main support, and moving the elongate element between locked and unlocked conditions such that the elongate element is biased into the locked condition.

17. The cervical collar of claim 16, further comprising first and second covers arranged to extend over the first and second end portions, the first and second covers each having at least one engaging element arranged to interlock with at least one locking element defined by the lower support.

18. The cervical collar of claim 17, further comprising at least one elastic element cooperating with the main support or cover, and engaging the elongate element to bias the elongate element in the locked condition.

19. The cervical collar of claim 17, further comprising an upper support support securing to and resting upon the anterior component.

* * * * *

20

OSS 000141

# EXHIBIT 6

| | |
|---|---|
| **From:** | Wayne Calco <calco.wayne@me.com> |
| **Sent:** | Monday, March 6, 2017 2:53 PM |
| **To:** | Duane Romo; Tatjana Latinovic; IS IP Administrator; Þorvaldur Ingvarsson |
| **Cc:** | William C. Kersten |
| **Subject:** | Wayne Calco patents |
| **Attachments:** | 19793.488.1_Formal Drawings.pdf; 19793-488-1_specification.docx; CALCO - declaration_assignment (for signature).pdf |

All,

It was previously agreed that I would be the first named inventor of my designs,  These drawings reflect my ideas and I expect you to keep your promise.  In fact several of the figures are line for line reproductions of my original submissions. Please correct your application while you still have time. I am also confused why you want to patent my designs that you have no intention of producing.

We need to schedule a phone call or meeting with Thorvalder to discuss this disturbing development.

Thanks,

Wayne

1

OSS 000260

1/20



FIG. 1
(Prior Art)

OSS 000261

2/20



FIG. 2A

FIG. 2B

OSS 000262

3/20



FIG. 3A

FIG. 3B

OSS 000263

4/20



FIG. 4



FIG. 5

OSS 000264

5/20



FIG. 6A



FIG. 6B

OSS 000265

6/20



FIG. 7A



FIG. 7B

OSS 000266

7/20



FIG. 8A



FIG. 8B

OSS 000267

8/20



FIG. 9A



FIG. 9B

OSS 000268

9/20



FIG. 10

OSS 000269

10/20



FIG. 11

FIG. 12

FIG. 13

OSS 000270

11/20



FIG. 14A

FIG. 14B

FIG. 14C

OSS 000271

-153-



FIG. 15A

FIG. 15B

OSS 000272

13/20



FIG. 16A

FIG. 16B

FIG. 17

OSS 000273

14/20



FIG. 18A

FIG. 18B

OSS 000274

15/20



FIG. 18C

FIG. 18D

OSS 000275

16/20



**FIG. 19A**



**FIG. 19B**

OSS 000276

17/20



FIG. 20



FIG. 21

OSS 000277

18/20



FIG. 22A



FIG. 22B

OSS 000278

19/20



## FIG. 23A



## FIG. 23B

OSS 000279

20/20



## FIG. 24A



## FIG. 24B

OSS 000280

1/30

CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT

[1]     Cross-reference to related applications

[2]     This disclosure incorporates by reference U.S. patent no. 5,632,722, granted May 27, 1997, U.S. patent no. 6,254,560, granted July 3, 2001, U.S. patent no. 7,981,068, granted July 19, 2011, U.S. patent no. 8,038,636, granted October 18, 2011, U.S. patent no. 8,679,044, granted March 25, 2014, U.S. patent application publication no. 2013/0310722 published on November 21, 2013, and U.S. patent application publication no. 2016/0287424, published October 6, 2016.

[3]     Field of the Disclosure

[4]     The present disclosure relates to an orthopedic device, and more specifically to cervical collars having height adjustability at a front part, while providing a platform for securing known other components of a cervical collar thereto without modifying their anatomical contours and connection to the height adjusted components.

[5]     BACKGROUND

[6]     Cervical collars are used for treating conditions of the neck and the cervical spine by cervical spine immobilization. These collars may handle whiplash and other such injuries, where support for the head and neck of the patient is needed, and function to partially immobilize the head and neck of the patient and relieve spasm or strain to which the neck muscles of the patient might be subjected by transferring weight or force from the head of the patient to the shoulders or adjacent areas of the patient. Other collars may be arranged for complete or near complete immobilization of the head and neck of the patient to reduce risk of secondary damage to the spinal cord.

[7]     A challenge in designing a cervical collar is balancing desired immobilization with user comfort, such as venous pressure.  Immobilization may be measured by five planes of movement, including flexion, extension, lateral tilt to right and left, and rotation of the neck to right and left, and is considered generally as cervical range of motion (CROM).

[8]     Unfortunately, many patients using cervical collars develop decubitus or decubitus ulcers (also known as bed sores, pressure sores, or trophic ulcers) when wearing cervical collars. These ailments, which involve a breakdown of tissue overlying a bone, arise when tissues overlying a bony prominence are subjected to prolonged pressure against an object

OSS 000281

2/30

such as a cervical collar. Besides affecting superficial tissues such as the skin, decubitus and decubitus ulcers also can affect muscle and bone. Restrictive collars are the root causes of skin breakdown in the trauma population. As pressure-ulcers are among the most common, yet serious and costly, complications of routine spinal immobilization, it is desirable to provide cervical collars that minimize the probability of ulcers.

[9]     Moisture and pressure are two major factors which contribute to the formation of decubitus. Once a decubitus ulcer forms, there is no good method of determining the extent of tissue damage. Once started, decubitus can continue to progress through the skin and fat tissue to muscle and eventually to bone, and is very difficult to treat and arrest. In extreme cases, surgical replacement of bone, muscle and skin are required to restore that portion of the body of the patient where decubitus has formed.

[10]    It is desirable to eliminate or at least minimize the effect of pressure points when using cervical collars. The likelihood of contracting decubitus can be greatly reduced by a more even distribution of pressure to several parts of the body of the patient.

[11]    Multiple studies have evaluated CROM and the likelihood of tissue-interface pressure (TIP) exerted by commercially-available cervical collars. One of the known commercial collars that has proven successful at striking the balance of minimal TIP and most restriction of CROM is the Miami J collar (Össur, hf, Reykjavik, Iceland). Multiple studies have validated the features of the Miami J collar, including: Tescher, A.N. et al. Range-of-motion restriction and craniofacial tissue-interface pressure from four cervical collars. *Journal of Trauma-Injury Infection & Critical Care*: 2007; 63; 5; 1120-1126; Jacobson, T.M. et al. Efforts to reduce occipital pressure ulcers. *Journal of Nursing Care Quality*; 2008; 23; 3; 283-288; Karason, S. et al. Evaluation of clinical efficacy and safety of cervical trauma collars: differences in immobilization, effect on jugular pressure and patient comfort. *Scandinavian Journal of Trauma, Resuscitation and Emergency Medicine*. 2014. 22:37.

[12]    The Miami J collar is also described in U.S. patent no. 5,632,722, granted May 27, 1997; U.S. patent no. 6,254,560, granted July 3, 2001; U.S. patent no. 6,921,376, granted July 26, 2005. Variations of the Miami J collar, embodying the Miami J Advance collar, are described in U.S. patent no. 7,981,068, granted July 19, 2011, and U.S. patent no. 8,679,044, granted March 25, 2014.

OSS 000282

3/30

[13]    A feature, preferably included in cervical collars to overcome limited adaptability to accommodate the body of the patient and the particular ailment prompting the need for wearing a cervical collar, is the facility for adjusting the relative positions of various components of the cervical collar.  Part of the effectiveness of the Miami J collar is due to its ability for customization to different anatomical sizes of users.

[14]    As taught in U.S. patent no. 6,254,560, the Miami J collar has supports that enable customized pressure distribution and avoid skin breakdown.  A front part of the Miami J collar has an adjustable upper support for the mandibular, chin and/or jaw of the user, and mounted to a lower support or sternum brace by means which permit relative movement between the upper support and the lower support.  The posterior component or back part of the Miami J collar has an occipital support mounted to a back support by means which permit relative sliding movement between the occipital support and the back support.  The shape of the upper support and occipital support are anatomically optimized for superior immobilization and patient comfort.

[15]    Both the upper support and the occipital support of the Miami J collar are uniquely anatomically shaped to maximize comfort and immobilization while minimizing pressure on the user.  Because the upper support and the occipital support of the Miami J collar are clinically proven, it is desired that any improvements over the current Miami J collar provide means for preserving the function and shape of the upper support and occipital support of the current Miami J collar.

[16]    SUMMARY

[17]    The present disclosure describes an improved cervical collar for restricting head and neck movement to promote healing after an injury to the spinal column. The cervical collar has height, circumferential and angular adjustment to accommodate a wide variety of patient sizes and anatomical configurations, and to accommodate dimensional changes caused by increased or decreased swelling of the affected anatomical portions of the patients during treatment of the injury.  The cervical collar is arranged to stabilize and immobilize the cervical area, by restricting lateral, sagittal and coronal movement, while improving comfort, and fit for individual patients.

[18]    Embodiments of the disclosure relate to a cervical collar having a height adjustment system between main and lower parts forming an anterior component, which permit the

OSS 000283

4/30

use of known upper and occipital supports in the cervical collar to maintain their functionality, comfort and fit, including their anatomical contours and connection to the height adjusted components. The height adjustment system is arranged for adjusting the chin height in a simple and effective manner that limits or mitigates tampering with the height while the collar is worn. The height adjustment system preferably includes using incremental height adjustment so the height may be locked at a desired height setting. The height adjustment system may be arranged to allow usage in existing collar designs, such as the Miami J or Miami J Advance collars, without substantially altering the shape and function of the mandibular and posterior component including an occipital support.

[19]    The height adjustment system mitigates or eliminates the need for pre-sizing methods, and is provided in a simplified manner to enable many height settings customizable for different users. The height adjustment system allows use of known upper and posterior components, which have been on the market for many years to serve many users of cervical collars, are clinically proven for their efficacy.

[20]    The height adjustment system allows for improved placement and configuration of a cervical collar on patients of different heights. The upper support and posterior component can be properly fitted against the chin and head of a patient by a clinician, followed by the extension of the anterior component against the patient's chest. Likewise the anterior component may be placed against the patient's chest and the upper support and posterior component can then be extended to the chin and head of the patient. The height setting can then be locked at the desired height setting by the clinician to ensure a proper fit for the user.

[21]    According to a general embodiment, a cervical collar has an anterior component arranged for connecting to a posterior component.  The anterior component comprises a main support, and a lower support hingedly connected to the main support at first and second hinges.  An elongate element or slidelock has first and second ends engaging the first and second hinges, such that the first and second ends are arranged for adjusting relative to the first and second hinges.  A lock mechanism is configured for locking rotation of the lower support relative to the main support, and moving the elongate element between locked and unlocked conditions.  The elongate element is biased into the locked condition,

OSS 000284

5/30

and may be configured to wedge parts of the hinged connection of the parts of the anterior component together in the locked condition.

[22]    In a method for adjusting an angle defined between the main support and the lower support, the method involves moving the elongate element relative to the main support and the lower support.  A part of the main support is disengaged from a corresponding part of the elongate element to unlock the lower support from the main support.  The lower support is moved relative to the main support.  Once the lower support is placed at the desired angle relative to the main support, the part of the main support is engaged to the corresponding part of the elongate element to lock the lower support to the main support, which may be accomplish by wedging parts of the hinged connection together.

[23]    These and other features, aspects, and advantages of the present disclosure will become better understood regarding the following description, appended claims, and accompanying drawings.

[24]    BRIEF DESCRIPTION OF THE DRAWINGS

[25]    The drawing figures are not necessarily drawn to scale, but instead are drawn to provide a better understanding of the components thereof, and are not intended to be limiting in scope, but to provide exemplary illustrations.  The figures illustrate exemplary configurations of an orthopedic device, and in no way limit the structures or configurations of a liner according to the present disclosure.

[26]    Fig. 1 is a perspective view of a known cervical collar under the commercial name Miami J.

[27]    Fig. 2A is a frontal elevational view of a cervical collar.

[28]    Fig. 2B is a side elevational view of an embodiment of a cervical collar of Fig. 2A.

[29]    Fig. 3A is a top plan view of the main and lower supports of the cervical collar of Fig. 2A.

[30]    Fig. 3B is a rear elevational view of the main and lower supports of the cervical collar of Fig. 2A.

[31]    Fig. 4 is a detail plan view of the lock mechanism in Fig. 3A.

[32]    Fig. 5 is a schematic view of a variation of the lock mechanism of Fig. 3A.

[33]    Fig. 6A is a schematic plan view of the elongate element in a locked condition.

[34]    Fig. 6B is a schematic plan view of the elongate element in an unlocked condition.

OSS 000285

6/30

[35]    Fig. 7A is a schematic perspective view of the first hinge in a locked condition.

[36]    Fig. 7B is a schematic perspective view of the first hinge in an unlocked condition.

[37]    Fig. 8A is a schematic perspective view of a variation of the first hinge in a locked condition.

[38]    Fig. 8B is a schematic perspective view of the first hinge of Fig. 8A in an unlocked condition.

[39]    Fig. 9A is an outer exploded perspective view of another variation of the first hinge.

[40]    Fig. 9B is an inner exploded perspective view of the first hinge of Fig. 9A.

[41]    Fig. 10 is a perspective view of another embodiment of a cervical collar.

[42]    Fig. 11 is a perspective view of an embodiment of a slidelock in the cervical collar of Fig. 10 and showing a first side thereof.

[43]    Fig. 12 is a perspective detail view of the slidelock showing a second side thereof.

[44]    Fig. 13 is a perspective schematic view showing the slidelock of Fig. 11 in a portion of the cervical collar of Fig. 10.

[45]    Fig. 14A is a perspective schematic view showing the slidelock of Fig. 11 in an end portion of side A of the cervical collar of Fig. 10 in a locked condition.

[46]    Fig. 14B is a perspective schematic view showing the slidelock of Fig. 11 in an end portion of side B of the cervical collar of Fig. 10 in an unlocked condition.

[47]    Fig. 14C is a detail cross-sectional view XIV C of Fig. 14A showing engagement of features in a locked condition of the collar of Fig. 10.

[48]    Fig. 15A is a perspective view of an inside surface of a side cover in the cervical collar of Fig. 10.

[49]    Fig. 15B is a schematic view of a variation of the side cover and main support in Fig. 15A.

[50]    Fig. 16A is a schematic view of a variation of a paddle in a slidelock.

[51]    Fig. 16B is a schematic view of another variation of a paddle in a slidelock.

[52]    Fig. 17 is a schematic view of another variation of a slidelock system for use in a cervical collar.

[53]    Fig. 18A is a schematic view of another variation of a slidelock system for use in a cervical collar.

[54]    Fig. 18B is a schematic view of the slidelock system in Fig. 18A disassembled.

OSS 000286

7/30

[55]    Fig. 18C is a schematic view of the slidelock system in Fig. 18A in a locked condition.

[56]    Fig. 18D is a schematic view of the slidelock system in Fig. 18A in an unlocked condition.

[57]    Fig. 19A is a schematic side elevational view of the upper support in the main support.

[58]    Fig. 19B is schematic view of the adjustability of the upper support relative to the main support in Fig. 19A.

[59]    Fig. 20 is a plan view of the adjustment mechanism in Fig. 2A.

[60]    Fig. 21 is an elevational view of the adjustment mechanism of Fig. 20.

[61]    Fig. 22A is a schematic elevational view of the adjustment mechanism in a contracted configuration.

[62]    Fig. 22B is a schematic elevational view of the adjustment mechanism in an extended configuration.

[63]    Fig. 23A is an elevational view of an embodiment of the connector in Fig. 2.

[64]    Fig. 23B is a top plan view of the connector in Fig. 23A.

[65]    Fig. 24A is a perspective view of another embodiment of the connector in Fig. 2.

[66]    Fig. 24B is an exploded view of the connector in Fig. 24A.

[67]    DETAILED DESCRIPTION OF VARIOUS EMBODIMENTS

[68]    A. Introduction

[69]    Embodiments of an orthopedic device are provided for stabilizing and supporting anatomical portions of a wearer, for example, the neck and head of a wearer.

[70]    Although the embodiments of the disclosure are adapted for supporting and stabilizing anatomical portions of many wearers having various anatomical shapes and sizes, the embodiments of the disclosure may also be dimensioned to accommodate different types, shapes and sizes of anatomical portions.

[71]    A better understanding of different embodiments of the disclosure may be had from the following description read with the accompanying drawings in which like reference characters refer to like elements.

[72]    While the disclosure is susceptible to various modifications and alternative constructions, certain illustrative embodiments are in the drawings and are described

OSS 000287

8/30

below. It should be understood, however, there is no intention to limit the disclosure to the embodiments disclosed, but on the contrary, the intention covers all modifications, alternative constructions, combinations, and equivalents falling within the spirit and scope of the disclosure.

[73]    It will be understood that, unless a term is defined in this disclosure to possess a described meaning, there is no intent to limit the meaning of such term, either expressly or indirectly, beyond its plain or ordinary meaning.

[74]    While the foregoing embodiments have been described and shown, alternatives and modifications of these embodiments, such as those suggested by others may be made to fall within the scope of the invention.  While the cervical collar has been described in combination with collar parts, it will be understood that the principles described may be extended to other types of orthopedic and prosthetic devices.

[75]    Reference characters are provided in the claims for explanatory purposes only and are not intended to limit the scope of the claims or restrict each claim limitation to the element in the drawings and identified by the reference character.

[76]    For ease of understanding the disclosed embodiments of an orthopedic device, the front or anterior, and rear or posterior portions of the orthopedic device are described independently. The anterior and posterior portions of the orthopedic device function together to form a supporting and stabilizing collar that encompasses the anatomical portions of the wearer.

[77]    The term "posterior" also has its ordinary meaning and refers to a location that is behind or to the rear of another location. Lastly, the term "anterior" has its ordinary meaning and refers to a location ahead of or to the front of another location.

[78]    The terms "rigid," "semi-rigid," "flexible," and "compressible" may be used herein to distinguish characteristics of portions of certain features of the orthopedic device. The term "rigid" should denote that an element of the device is generally devoid of flexibility. Within the context of support members or shells that are "rigid," it is intended to indicate that they do not lose their overall shape when force is applied, and they may break if bent with sufficient force. As for the term "semi-rigid," this term is used to connote properties of support members or shells that provide support and are free-standing; however such support members or shells may have some degree of flexibility or resiliency.

OSS 000288

-170-

9/30

[79]    The term "flexible" should denote that features are capable of repeated bending such that the features may be bent into retained shapes or the features do not retain a general shape, but continuously deform when force is applied. The term "compressible" is used to qualify such structural features as being capable of being reduced in size or volume due to the exertion of force applied to the structural feature.

[80]    B.  Components for use with following embodiments

[81]    Fig. 1 exemplifies the known Miami J collar 1, as taught in the aforementioned patents and publications, particularly U.S. patent nos. 5,632,722 and 6,254,560.  The collar 1 includes an upper support 2 intended to support the mandibular, jaw or chin of the user that secures and/or rests upon an anterior component 3 of the collar.  The upper support 2 is arranged for sliding movement with the anterior component 3 and for locking therewith by a side adjustment connection 11 and a central tab 15.  The upper support 2 preferably has continuous padding 8 along a surface adjacent the user's jaw.

[82]    The anterior component 3 defines a sternum part 4, forming an extension adapted to extend below the clavicle of a user and adapted to rest against the sternum.  The sternum part 4 carries a sternum pad 9 to avoid decubitus over long periods of wear of the collar. Besides the sternum pad 9, the anterior part 3 likewise includes padding along the surface facing the user.

[83]    The Miami J collar may be used by users with injuries other than those for which the cervical collar is most commonly used.  The anterior component 3 forms an opening 13 which allows for access to the throat of the user, although because the anterior component is unitary and monolithic, the size of the opening 13 remains fixed.

[84]    The collar 1 includes a posterior component comprising lower and upper parts 5, 6, with the upper part serving as an occipital support.  Both the lower and upper parts 5, 6 preferably include continuous padding, with the lower part intended to rest upon the back of the user, and the upper part intended to rest against the occiput of the head.  The lower and upper parts 5, 6 are preferably attached for relative sliding movement between relative positions of the lower and upper parts to allow for different head sizes and proper and even pressure distribution across the body of the user.

[85]    Although not shown, the posterior component may be unitary and monolithic because it resembles the posterior component taught by U.S. patent no. 7,981,068 and

OSS 000289

10/30

found in the Miami J Advance collar. The posterior component is an anatomically configured 3D support contiguously formed with resilient or compliant edges. The support includes slots to provide ventilation and/or additional resilience or flexibility. The support portion also includes an anatomically shaped flared section shaped to correspond to and support an anatomical portion of a wearer, for example, the occipital region.

[86]   Both the upper support, and the anterior and posterior components are generally symmetrical about a vertical center line, and may be formed from rigid or semi-rigid plastic. The material forming the upper support, and the anterior and posterior components, may be flexible prior to donning the collar, but sufficiently rigid once the collar is donned to resist yielding due to weight exerted by the user.

[87]   A fastener 7 is used to secure the anterior and posterior components to one another. The fastener 7 comprises cooperating hook-and-loop attachments on the anterior and posterior components, with a strap bearing hook material extending from the posterior component and loop or hook receiving elements located on the anterior component.

[88]   Each of these embodiments is arranged to receive the upper support and posterior component of the Miami J collar, or the posterior component of the Miami J Advance collar in order to preserve the clinically recognized superior immobilization and comfort provided by the existing collars. It will be noted, however, that these embodiments are not restricted to only the upper support and posterior component of the Miami J and Miami J Advance collars, but can receive other upper support and posterior components of other known collars or those designed for each of the embodiments.

[89]   The height adjusted anterior component is arranged to preserve the anatomical contour and function of the known upper support and posterior component, despite the height adjustment of the anterior component and the tracheal opening thereof. The embodiments may have a varying height adjustment in that a center portion of the collar about the tracheal opening and generally along a vertical center line may increase greater in height than alongside portions of the anterior component proximate the connection to the posterior component. An example, although not limiting, is a 3:1 height difference at the center portion relative to the side portions.

[90]   While the embodiments may be associated with varying neck lengths among users, the sternal contour of users may likewise vary. The varying sternal contours of users may

OSS 000290

11/30

be resolved by positioning of the sternal contour, which may be achieved by adjusting the tracheal opening height or the height generally of the collar. While anatomical vertebral height and neck length plays a role in adjustment of the collar, the alignment of the spinal segments also has an effect in overall neck "length," i.e., a more kyphotic or flexed neck position "shortens" an otherwise anatomically longer or taller neck.

[91]    Another factor relating to the dimension of the cervical collar is the sternal contour. For instance, a very barrel chested individual (having a more horizontal sternal contour) may have the distal most dimension of the sternal extension of the brace contact considerably closer to the mandible than the patient with a very vertical sternum.

[92]    In all situations suggested above, mandible dimensions would be relatively the same, it is the orientation of the neck elements and its attachment to and the contour of the sternal segment that plays the largest role in overall collar height adjustment. The mechanism affording mandible and sternal height adjustment can accommodate the varying contours and dimensions.

[93]    C. Embodiments of the Cervical Collar

[94]    According to the embodiment of Figs. 2A and 2B, a cervical collar 10 has an anterior component 12 arranged for connecting to a posterior component 14. The posterior component 14 may be similarly arranged as the similar part in U.S. Pat. No. 7,981,068, as discussed above. The anterior component 12 comprises a main support 16, an upper support 18 arranged for being received by the main support 16, and a lower support 20 hingedly connected to the main support 16 at first and second hinges or end portions of the main and lower supports forming such hinges. In the depicted embodiments, the first and second hinges are formed by such end portions of the main and lower supports, and there are not separate hinges in addition to the end portions. However, the application is not limited to such arrangement, and additional components could be added to the end portions of the main and lower supports which could be considered as hinges in addition to the end portions of the main and lower supports.

[95]    A lock mechanism 22 is arranged for locking rotation of the lower support 20 relative to the main support 16, such that the hinges are locked according to different angular configurations of the lower support 20 relative to the main support 16. An adjustment mechanism 24 is located centrally along a lowermost portion of the lower

OSS 000291

**-173-**

12/30

support 20, and may be configured for adjustment relative to and away from a sternum of a user for improving comfort and fit of the cervical collar.

[96]     As evident from Figs. 2A and 2B, the anterior component 12 preserves the general contours known in the Miami J collar, particularly the peripheral outline of the anterior component of both the main support 16 and lower support 20, which enables easy attachment to the known upper or upper support 18 and posterior component 14. Specifically, the upper support 18 may have a configuration that is the same as in U.S. patent application publication no. 2013/0310722, and U.S. patent 6,254,560.  The profile of the upper support 18 is preferably taken from the Miami J collar, however other upper supports may be used and the embodiments are not limited to solely the Miami J collar profile.

[97]     Because the main and lower supports are adjustable relative to one another, the upper support is preferably maintained in a stationary relationship with the main support. However, the upper support is not necessarily rigid, but may flex according to the anatomy of the user, but become rigid or stable to movement once the collar is placed and tightened securely on the user.

[98]     Generally, when fitting a cervical collar having an anterior component 12, a clinician fits the upper support 18 and posterior component 14 against a patient's chin and head, arranged for the desired level of immobilization and support. The clinician then adjusts the lock mechanism 22 to secure the anterior component 12 against the chest and shoulders of the patient by articulating the lower support 20 relative to the main support 16.  A clinician may also first fit the anterior component 12 against the patient's chest and then regulate the lock mechanism 22 to extend the main support 16 and posterior component 14 to the chin and head of the patient. The height setting is maintained by the lock mechanism 22 once released at the desired height setting to ensure a proper fit for the user.

[99]     Referring to Figs. 6A and 6B, the first and second ends 48, 50 of an elongate element 34 or sliding lock or slidelock, as discussed periodically herein, are spatially located differently relative to the first and second hinges 40, 42 when in the unlocked condition.   The first end 48 is axially offset from axis 49 from end portions 44, 46 of the main support and the lower support at the first hinge 40 in the unlocked condition. The

OSS 000292

13/30

end portions 44, 46 of the main and lower supports are generally coaxial relative to one another.

[100]   As illustrated in Figs. 3A, 3B and 4, the elongate element 34 is slidably located within an arcuate guide 54 defined by the main support 16 along an inner side I thereof. The inner side I of the main support 16 defines a plurality of guides 38 for retaining the elongate element 34 within the arcuate guide 54. According to the illustrated embodiment, the guides 38 each define a post 52 having a height greater than a thickness of the guides 38. The arcuate guide is depicted as a tray but it may likewise be configured as a flange, boss, segmented protrusions, or other appropriate structure to route the elongate element ot the main support or upper support.

[101]   The arcuate tray 54 is defined by a base portion 58 and an upper wall 56 of the main support 16. The base portion 58 extends outwardly from the upper wall 56 in a generally perpendicular orientation.

[102]   The main support 16 has a generally arcuate configuration 59 adapted to extend about the mandible of a user, and may be considered to possesses an elongated C- or U-shape. The lower support has a generally arcuate configuration 60 and is contoured for being adapted for securing against a sternum of a user.

[103]   The lock mechanism 22 includes an actuator or dial 30 for adjusting the lock mechanism 22 from locked to unlocked conditions. The lock mechanism 22 includes the elongate element 34 having first and second ends 48, 50 engaging the first and second hinges 40, 42. The first and second ends 48, 50 are arranged for being displaceable relative to the first and second hinges 40, 42 between locked and unlocked conditions of the lock mechanism 22.

[104]   The lock mechanism 22 preferably includes a pinion 32 and a rack segment 36, or geared rack segment 36, for adjusting position of the elongate element 34. The pinion 32 defines a shaft 61 extending between the outer and inner sides of the main support 16 and a pinion portion 62 at a first end of the shaft 61. The shaft 61 engages the actuator 30 on the outer side of the main support 16 at a second end of the shaft 61. The pinion portion 62 engages a rack segment 36 defined by the elongate element 34, whereby rotation of the shaft 61 urges the elongate element 34 to slide relative to the main support 16.

OSS 000293

14/30

[105]   The pinion portion 62 is recessed relative to the shaft 61, such that the shaft 61 has a diameter greater than the pinion portion 62. The pinion portion 62 is arranged to maintain engagement with the rack segment 36 of the elongate element 34. An end portion 63 of the pinion on the inner side preferably has a diameter greater than the pinion portion 62. The pinion portion 62 is recessed relative to the shaft 61 and the end portion 63. The shaft 61 engages a periphery of an opening 67 of the main support 16 via a threaded engagement 65.

[106]   While a rack and pinion system is shown and described, other adjustment and engagement systems may be used in combination with the elongate element or slidelock. Such other adjustment and engagement systems may be rotary or linear in nature, such as a slider, for causing displacement of the elongate element relative to the main support.

[107]   In the embodiment of Fig. 4, the lock mechanism 22 includes a least one spring element 64 arranged for returning the shaft 61 to a locked condition after rotation of the shaft 61 to the unlocked condition of the first and second hinges 40, 42 and release of the actuator 30. The spring element 64 is a Belleville disc. The spring element 64 biases against a groove 71 formed by the shaft 61 and a bias element 69 of the main support 16. The return force from the elongate element 34 may drive the actuator into the locked condition.

[108]   According to the schematic representation in Fig. 5, the lock mechanism 22 has at least one elastic element 66A, 66B secured at a first end to a first retainer 73 on the main support 16 and a second retainer 75 on the lock mechanism 22, whereupon release of the lock mechanism, the at least one elastic element 66A, 66B urges the lock mechanism to a predetermined configuration. The actuator 30 may be resiliently or spring biased, such that it may be activated under force to an unlocked condition whereby such force returns the actuator to a predetermined locked condition; for example by merely releasing the actuator.

[109]   Referring to the depiction in Figs. 7A and 7B, the first hinge or end portion 40 includes end portions 44, 46 of the main support and the lower support 16, 20, respectively, and a hinge cover 68 defining a hole 74. The end portions 44, 46 each define holes 78, 80 that are coaxial about a first axis 90 to one another and about which the first hinge or end portion 40 pivots. The first end 48 of the elongate element 34 is arranged to slidably adjust relative to the end portions 44, 46. The first end 48 defines an opening 76 axially offset

OSS 000294

from the first axis 90 and defined along a second axis 91 variable in location depending on the configuration of the lock mechanism 22.

[110]   The first end 48 of the elongate element 34 defines a detent projection 72 arranged to engage a ridge 86 defined by the end portion 44 of the main support.  The end portion 44 defines a ramp 87 leading to the ridge 86 from a recess 88 defined by the end portion 44.  The detent projection 72 is arranged to be received by the recess 88 and slide along the ramp 87 to the ridge 86 between locked and unlocked conditions of the lock mechanism 22.  The ridge 86, the ramp 87 and the recess 88 are generally concentric with the first axis and the hole 78 of the main support 16.

[111]   A spring element 70, such as an O-ring, is concentrically disposed about the hole 78 of the main support and biased between a shoulder 92 defined by the main support 16 and an inner surface 94 of the cover 68.  As shown in Fig. 7A, when the spring 70 is in an expanded configuration, it wedges the inner surface 94 of the cover 68 and the shoulder 92 together.

[112]   The end portion 46 of the lower support 20 defines a protrusion or detent 84 arranged to be received by a notch 82 defined by the end portion 44 of the main support.  The detent 84 is received by the notch 82 in the locked condition of the main support and the lower support.  The detent 84 is generally arranged concentrically with the hole 80 of the main support.  As shown in Fig. 7A, in the locked condition, vertical interference prevents movement of the hinge.  Fig. 7B shows how in the unlocked condition the spring element is compressed, and the detent may move.

[113]   Figs. 8A and 8B exemplify a variation of the hinge 96, whereby the main support and the lower support define a plurality of cooperating teeth 98, 100 engageable when the lock mechanism is in the locked condition, and disengaged from one another when the lock mechanism is in an unlocked condition.

[114]   Figs. 9A and 9B illustrate another embodiment of the hinge 102 wherein the end portion of the elongate element 34 defines an opening 104 and the main support 16 defines an opening 112 through which a post 114 of the lower support 20 extends to secure to the cover 68.  Such a construction is similar to the embodiments of Figs. 7A-8B.  The opening 112 and the post 114 are coaxial along axis 118.  The opening 104 of the elongate element

OSS 000295

34 has an oblong profile arranged for being axially offset relative to the axis 118, and a first surface 111 is arranged for abutting the hinge cover 68.

[115]   The elongate element 34 defines at least one elongate bar 120 protruding from a second surface 113 thereof and is arranged for being received by a corresponding elongate recess 106 formed by the main support 16.  The main support 16 defines a plurality of circumferentially spaced recesses 108 arranged for receiving at least one detent 122 formed by the elongate element 34.  The main support 16 defines an annular shoulder 110 from a first surface 105 thereof and defined about the opening 112.

[116]   The main support 16 defines a plurality of receptacles 124 circumferentially spaced about the opening 112 along a second surface 107 thereof.  The lower support 20 defines a plurality of circumferentially spaced bosses 116 along a first surface 109 thereof, arranged for being received by the receptacles 124.

[117]   Fig. 10 exemplifies another embodiment of an anterior support 202 for a cervical collar 200 having a height adjustment system while preserving the contour 222 of the upper support 214 generally from the Miami J collar.  The upper support 214, however, has improvements for securing to the main support 204 and features for increasing lateral immobilization.

[118]   The upper support 214 is arranged for easy attachment to the main support 204 by providing snap connections.  A central portion at the front section of the main support 204 may have boss snaps 218 that fit and interlock with a corresponding aperture defined by the main support 204.  Rear portions of the upper support 214 may define apertures corresponding to fasteners 220 formed by the main support 204 that engage the upper support 214, and aid in maintaining the upper support 214 in a desirable contour.  The ability to easily attach an upper support to the main support enables a clinician to use differently-sized upper supports according to the user's anatomy.  The upper and main supports may define apertures arranged for receiving fasteners not formed by either support, but are separate elements for securing the upper and main supports together.

[119]   The upper support 214 defines lateral extensions 226 on opposed sides thereof which are oriented to extend away from the central portion of the upper support, and effectively lengthen the extent the upper support extends along a user's mandibles.  The

OSS 000296

17/30

lateral extensions are found to aid in increasing lateral immobilization of a user when wearing the collar.

[120]   The anterior support 202 includes a lower support 206 hingedly connected to the main support 204, and the locking and unlocking of the hinge is obtained by a lock mechanism 212 that may be similar to any of the aforementioned embodiments.  A lower or sternum pad 210 is attached to a lower or lowermost portion of the lower support 206. The lower support 206 may include an adjustment mechanism 208 for adjusting pressures and/or height of the lower pad 210 relative to the user's sternum.

[121]   Anterior support 202 has a cover 216 at the rearwardly portions, in contrast to the centrally located lock mechanism 212.   The cover 216 generally covers the hinge connection between the main support 204 and the lower support 206, and further serves form part of the hinge connection.   Specifically, the cover 216, forms a plurality of openings 232 through which posts 230 extend from the main support 204.

[122]   Fig. 11 depicts an embodiment of an elongate element or slidelock 240 useable in the hinge connection of the collar 200.  The slidelock 240 defines a central rack 242 of teeth arranged to correspond and operatively engage elements forming part of the lock mechanism for enabling linear translation of the slidelock 240 relative to the main support, such as in the embodiment of Figs. 3A-4.  The elements of the lock mechanism may be similar to the pinion of Fig. 4, or may be a linear rack of teeth, or any other suitable feature or mechanism for engaging the central rack 242.

[123]   In this embodiment, as shown in Fig. 10, the slidelock 240 preferably slides over an outer surface of the main support 204 to cooperate with the main support 204 to arrest or prevent rotation of the lower support 206 relative to the main support 204.  The main support 204 and the cover 216, as shown below, operate to guide the linear movement of the slidelock.  The linear movement of the slidelock is intended relative to a rear portion of main support within such discrete section, while acknowledging that the slidelock is bendable about the arcuate contour of the main support while traveling between opposed directions, as better depicted referring to Fig. 3A.

[124]   The slidelock 240 defines elongate segments 244 extending from opposed sides of the central rack 242 to paddles 250 located at end portions for forming part of the hinge connection.  The paddles 250 generally corresponding in proximate location to the end

OSS 000297

18/30

portion 257 of the lower support 206, to stabilize the end portion 257 in both the locked and unlocked conditions. An opening 251 defined by the paddles 250 is arranged so the paddle 250 corresponds to the end portion 257 in both locked and unlocked conditions, whereby it is within the periphery of the end portion 257, as exemplified in Fig. 15B. The slidelock 240 forms hooks 246, 248 along the elongate segments 244 preferably extending from a first surface of the slidelock that are engageable with elastic elements, as discussed more in connection with Fig. 13.

[125]   Referring to Fig. 12, the slidelock 240 preferably defines ramp 258 intended to be on Side A of the collar (and ramp 268 intended to be on Side B of the collar in Fig. 14B) preferably extending from a second surface of the slidelock 240 where the elongate segments 244 meet the paddles 250. It is within this area where the travel of the slidelock is intended as traveling linearly. According to the depicted embodiment, the ramp 258 on Side A of the collar generally decreases in height from the paddle 250 toward the central rack 242 and from the second surface of the slidelock 240.

[126]   Referring to Fig. 14B, the ramp 268 on Side B of the collar generally increases in height from the paddle 250 toward the central rack 242 and from the second surface of the slidelock 240. In this manner, the ramps 258, 268 have oppositely oriented configurations to accommodate linear movement of the slidelock between locked and unlocked conditions so both Sides A, B undergo simultaneously the same locking or unlocking. The ramps 256, 267 have opposite orientations as the ramps 258, 268. Both ramps 258, 268 disengage at the same time from the corresponding ramps 256, 267 of the main support 204 in the unlocked condition, and engage at the same time with the corresponding ramps 256, 267 in the locked condition.

[127]   Figs. 13 and 14A depict how the slidelock 240 operates relative to other components of the anterior component 202. Specifically, the slidelock 240 is slidably held by the main support 204, similarly as in the embodiment of Figs. 3A-4, and may be likewise contained by the cover 216. The main support 204 defines a ramp 256 protruding from an outer surface and configured for engagement with the ramp 258 of the slidelock 240, which urges at least one engaging element 259 defined by a rear portion of the lower support 206 to engage at one engaging element 260 formed by the cover 216. The ramps 256, 258

OSS 000298

19/30

effectively wedge the at least one engaging elements 259, 260 against one another to lock the hinge connection.

[128]    According to the depicted example of Figs. 14 and 15A, the  end portion 257 of the lower support has a disk shape, and rotates about an axis Z-Z of the disk shape relative to a circular boss 262 of the cover 216.  The end portion 257 may have a central opening 263 coaxial with the axis Z-Z, which engages the boss 262 and is coaxial with an axis Y-Y of the boss 262.  The main support 204 has at least one post 261 extending through the opening 263 and through one of the openings 232 of the cover 216 for providing stability to rotation of the end portion 257.  As the ramps 256, 258 engage and disengage, the end portion 257 axially moves relative to the at least one post 261, and the boss 262 has a sufficient height to maintain the engagement of the end portion 257 in both the locked and unlocked conditions.  The cooperation of the ramps, and regulation thereof by the slidelock, control the height clearance in the hinge and the freedom of the disengagement of the lower support from the main support and/or cover.

[129]    As shown in Figs. 14A and 15A, the at least one engaging elements 259, 260 are teeth adapted to engage one another in a locked condition of the collar 200.  For simplicity, the cover 216 is shown transparently.  The at least one engaging element 259 of the lower support 206 forms teeth that extend laterally from the disk shape or parallel to the axis Z-Z of the end portion 257.  Preferably, the teeth extend laterally relative to the circumference of the end portion 257, and may extend completely or partially about the circumference. The at least one engaging element 260 of the cover 216 may be teeth oriented arcuately to smoothly engage the teeth of the at least one engaging element 259 of the lower support 206.

[130]    Fig. 14C shows how the ramps 256, 258 (for both Sides A and B) fall generally within a range of the at least one engaging elements 259, 260 to form an engagement zone 299 when the collar is in a locked condition.  According to the engagement zone, the ramps 256, 258 wedge against one another, and are generally juxtaposed or stacked-up coinciding over the at least one engaging elements 259, 260 to urge them to mesh together to assure secure locking of the main support to the lower support, and hence the cervical collar in a selective angulation.  According to the unlocked condition (not shown), the ramp 256 of the slidelock 240 falls outside of the engagement zone 299.

OSS 000299

20/30

[131]   It will be understood these are merely examples of the at least one engaging element, which are envisioned to be provided in different structural shapes and orientations, however they are preferably arranged to engage and disengage to lock or unlock the lower support orientation relative to the main support.   The cover sandwiches the end portion of the lower support with the main support, and the cover and main support are preferably rigidly secured to one another to assure they do not move relative to one another unlike the lower support relative to the main support in the unlocked condition.

[132]   Referring to Figs. 13 and 15A, the cover 216 may include hooks 252, as may the main support 204, to support an elastic band 254 suspended between the hook 252 and at least one of the hooks 246, 248 of the slidelock 240.  The elastic band 254 assists in assuring the lock mechanism is biased in a locked condition.   When the slidelock translates according to actuation by the lock mechanism to an unlocked condition that the elastic band is tensioned more than in the locked condition to form a spring return mechanism.

[133]   Fig. 15B exemplifies a variation of a cover 264 arranged to fit to the main support 204 by posts 278 arranged for snapping.   The main support 204 defines receptacles 269 configured and dimensioned to receive the posts 278 extending from the cover 264.   The posts 278 are configured and dimensioned to flexibly extend through or into the receptacles 269 but deflect while pressed through the receptacles 269 to relax once having passed the opening to interlock with the main support 204.  Various posts and receptacles are formed by the main support or the cover to interlock with one another.

[134]   In the variation of Fig. 15B, the main support 204 defines a boss 265 upon which the end portion 257 of lower support 206 rotates about.   The boss 265 may have the receptacles 269 located therewithin to receive the posts 278.

[135]   As depicted in Fig. 15B, the end portion 257 defines a plurality of teeth 266 only disposed about a segment short of the entire circumference of the end portion 257 to define a range of rotation of the lower support 206 relative to the main support 204.   It may be preferable to limit the rotation of the lower support to assure better selection of angles of the lower support relative to the upper support.

[136]   Either the cover 264 or the main support 204 may define at least one elongate guide 277 to guide the slidelock 240.   The cover 264 or main support 204 may define an elongate

OSS 000300

**-182-**

slot for observing and facilitating movement of the slidelock 240, which may cooperate with the elongate guide 277.

[137]   In a variation of the embodiments described herein, different spring return mechanisms may be provided for a slidelock or elongate element, preferably so that once a user releases the lock mechanism, the spring return mechanism moves the lock mechanism back to the locked condition.  The elongate element may include or have attached thereto a spring feature located at one of the end portions or along a length between the end portions arranged to deflect against a static boss located on the main support or other appropriate structure.

[138]   Referring to the examples of Figs. 16A and 16B, a spring feature may be configured into the elongate element, either behind or ahead of the hinge.  The spring feature may be connected to the elongate element as a separate component or be formed as part of the elongate element.

[139]   Fig. 16A depicts a slidelock 270 having a paddle 271 defining a compression spring feature 272 and extending from an arm 275.  The paddle 271 defines a frame 273 arranged for compression upon sliding of the slidelock 270, such that the spring feature 272 protrudes outwardly from the frame relative to the arm 275.  The frame 273 defines interior corner openings 274, 276 permitting it to be compressed upon activation of the slidelock.  The top opening 276 may secure a fastener or pin to the frame 273 upon which the paddle 271 compresses.

[140]   Fig. 16B depicts a slidelock 280 having a paddle defining a tension spring feature 282 and extending from an arm 285.  The paddle 281 defines a frame 283 arranged for tension upon sliding of the slidelock 280, such that the spring feature 282 protrudes inwardly from the frame toward the arm 285.  The frame 283 defines interior corner openings 284 permitting the paddle 281 to be pulled into tension upon activation of the slidelock.

[141]   Fig. 17 shows an alternate embodiment of a lock for the hinge which relies on a cam feature connected to or extending from the slidelock 290.  The end portions of the main support and the lower support may include a plurality of peripheral teeth about their peripheries which are arranged to engage one another as the cam feature is urged against the main and lower supports end portions, such that the teeth mesh with one another to

OSS 000301

22/30

prevent movement of the hinge formed by the end portions of the main support and lower support.

[142]   One of the main support or lower support end portions is located concentrically with one another, and one generally within the periphery of the other.  Both the main and lower supports may have an opening into which the cam feature can translate in and out of depending on the locking configuration of the lock mechanism.  The main support defines interiorly facing teeth 294A, 294B located about an interior circumference, and the lower support defines at least one movable set of teeth 296A, 296B that are selectively engageable with the teeth 294A, 294B upon movement of the slidelock 290.

[143]    The at least one movable set of teeth 296A, 296B may include two blocks bearing the teeth along one side and along another side forming bearing surfaces 298A, 298B along which the slidelock 290 engages.  The two movable sets of teeth 296A, 296B may form a first opening 295 into which the slidelock extends.  The slidelock 290 forms a flared end 292 defining first and second sloped surfaces 293A, 293B engageable with the bearing surfaces 298A, 298B for moving the sets of teeth 296A, 296B relative to the teeth 294A, 294B.  The sets of teeth 296A, 296B likewise form a second opening 297 through which the flared end 292 may be pushed through to reduce engagement of the sets of teeth 296A, 296B from the teeth 294A, 294B.

[144]   Figs. 18A-18D represent another hinge connection 300 that may be useable in any of the cervical collar embodiments described herein, particularly with a lock mechanism.  The hinge connection 300 includes a slidelock 302, an end portion 304 of a main support, an end portion 306 of a lower support, and a cam element 311 located between the end portions 304, 306, and in operative engagement with the slidelock 302.  The cam element 311 includes at least one engaging element 316 of the slidelock 302 that is engageable with a corresponding at least one engaging element 326 of the end portion 306.  In this example, the at least one engaging element 316 is a plurality of teeth 318, and the at least one engaging element 326 are radially extending teeth.

[145]   The slidelock 302 is linearly displaceable relative to the end portion 304, by at least one pin 308 and slot 310 connection.  As shown, the slidelock 302 includes at least one pin 308 that is linearly slidable within a corresponding elongate slot 310.  In the depicted embodiment, there are three pins 308 and three corresponding elongate slots 310.

OSS 000302

[146] Fig. 18B shows the cam element 311 having rear openings 320 arranged to flexibly bias against a periphery of the end portion 306 when in an unlocked condition to urge retraction of the slidelock once released into a locked condition. The cam element 311 further defines front openings 324 spaced apart from a boss 322 defined by the end portion 306 upon which the end portion 304 rotates, and connected to one another from a front frame segment 328. The front and rear frame segments 328, 330 extend about the boss 322, and are adapted to be tensioned thereabout. The front openings 324 receive pins 309 extending oppositely to the at least one pin 308, and carried by arms 312 defined by the slidelock 302.

[147] Fig. 18C shows the cam element 311 in a locked condition with the at least one engaging element 316 engaging the at least one engaging element 318. The cam element 311 is in a predetermined rest position, whereby the rear frame segment 328 is tensioned about the boss 322 to maintain the at least one engaging element 316 locked. Fig. 18D exemplifies the cam element 311 in an unlocked condition whereby the at least one engaging element 316 is pushed or pulled away from the at least one engaging element 318, and the front or rear frame segments 328, 330 are tensioned.

[148] Turning to Figs. 19A-19B, the upper support 18 is slidably secured to the main support 16, such that continuous padding 28 is arranged about the main support 16. The upper support 18 can be locked in position relative to the main support 16, after adjusting the correct position. The main support 16 defines an elongate lateral slot 130 and the upper support 18 forms an elongate angled slot 132 arranged obliquely relative to the elongate slot 130 of the main support 16. A slider 126 slidably couples the main support 16 and the upper support 18 by the lateral and angled slots 128, 130. According to a variation, a knob of the slider may be rotated to unlock and lock the slider in a desired position. As seen from the components shown, the rotation my simply comprise a tight frictional fit of the slider against the main support 16 and the upper support 18. The lateral slot 130 is preferably arranged generally parallel to a length of the main support 16.

[149] The main support 16 preferably defines a stationary element 128 proximate the lateral slot 130. The slider 126 has a tightening feature 134 for maintaining the lateral and angled slots in a relative position to another. Adjustment of the mandible angle could also be driven up/down through a simple rotating cam mechanism. The object is to elevate the

OSS 000303

posterior aspect of the chin tray to accommodate the slope of the mandible, thereby increasing stabilization against lateral movement of the head and C-Spine.

[150]    As in the embodiment of Figs. 2A and 2B, and referring specifically to Figs. 20 and 21, the adjustment mechanism 24 is located centrally along a lowermost portion of the lower support 20.  The adjustment mechanism 24 has a sternal pad 136 adjustable in location relative to the lower support 20.  The sternal pad 136 is mounted to a ball joint 142.  The adjustment mechanism 24 has an adjustment dial and an extension element 144 arranged for adjustably extending relative to the lower support 20.  The extension element 144 carries the ball joint 142 at an end thereof.  The adjustment mechanism 24 includes a dial 138 for adjusting the length of the extension element 144 between the lower support 20 and the sternal pad 136.  The dial 138 is accessible by a recess formed by the adjustment mechanism 24.

[151]    Figs. 22A and 22B show a variation of the adjustment mechanism 24 including a housing 145 arranged for receiving the extension element 144 in a contracted configuration resulting in a reduced or substantially minimized distance between the lower support and the sternal pad.  The extension element 145 has a screw thread 147, and the housing 145 defines corresponding threads permitting slidable movement between the extension element 145 and the screw thread 147 according to adjustment of the dial 138.

[152]    As in the embodiment of Figs. 2A and 2B, and referring to Figs. 23A and 23B, a connector 26 connects the anterior component 12 to the posterior component 14.  The connector 26 includes a base element 148 securing to a plate 150, and the base element 148 has a strap guide 152 about which a strap 146 extending from the posterior component 14 extends.  The connector 26 has a pull tab 154 arranged for detaching the plate 150 from the base 148.

[153]    Figs. 24A and 24B display another embodiment of a connector 160 securing to a plate 164.  A cap 166 is arranged to extend over the base element 162 and secure therewith. The connector 160 includes a pull tab 170 arranged for detaching the plate 160 from the base element 162 and the cap 166.  The cap 166 defines an opening 168 with the plate 160 for permitting a strap 172 extending therethrough which secures to the posterior component.  The base element 162 defines a platform 178 about which the strap 172

OSS 000304

25/30

extends, and the platform 178 has at least one protuberance 180 over which the strap 172 extends.

[154]  The base element 162 further defines a channel guide 182 proximate to the opening 168 and through which the strap 172 extends.  The base element 162 forms at least one detent 188 proximate to the at least one protuberance 180 for selective engagement of the strap 172 with the at least one protuberance 180.  When the connector 160 is in a locked condition, the at least one protuberance 180 and the at least one detent 188 arrest the strap 172 from movement as they are urged against each other.

[155]  The plate 164 defines at least one retainer 186 having a channel 190 for selectively receiving a pin 184 protruding from the base element 162, such that the pin 184 slides within the channel 190 between locked and unlocked conditions of the connector 160.  The cap 166 defines a side recess 174 for sliding the cap 166 and base element 162 relative to the plate 164 and permitting the at least one retainer 186 to move therewithin.  The cap 166 defines a front recess 176 through which the strap 172 extends.

[156]  The features may be employed in different combinations from those shown in a cervical collar.  While the foregoing embodiments have been described and shown, alternatives and modifications of these embodiments, such as those suggested by others, may be made to fall within the invention.

OSS 000305

26/30

Claims

1.  A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising:

a main support;

a lower support hingedly connected to the main support at first and second end portions of the anterior component;

a lock mechanism arranged for locking rotation of the lower support relative to the main support simultaneously at the first and second end portions;

an elongate element operatively connected to the lock mechanism and extending to the first and second end portions such that actuation of the lock mechanism moves the elongate element relative to the first and second end portions to lock and unlock the main support relative to the lower support.

2. The cervical collar of claim 1, wherein the lock mechanism includes an actuator for adjusting the lock mechanism from locked to unlocked conditions.

3.  The cervical collar of claim 1, wherein the elongate element has first and second ends engaging the first and second end portions, the first and second ends arranged for adjusting relative to the first and second end portions between locked and unlocked conditions of the lock mechanism.

4.  The cervical collar of claim 3, wherein the elongate element is a single-piece displaceable in its entirety relative to the main support upon adjustment by the lock mechanism.

**OSS 000306**

27/30

5.  The cervical collar of claim 3, wherein the first and second ends of the elongate element are spatially located differently relative to the first and second end portions when in the locked condition.

6.  The cervical collar of claim 3, wherein the first end of the elongate element is axially offset from end portions of the main support and the lower support at the first hinge in the locked condition, the end portions of the main support and lower support being coaxial with one another.

7.  The cervical collar of claim 3, wherein the elongate element is slidably located within an arcuate guide defined by the main support.

8.  The cervical collar of claim 3, wherein the elongate element is biased relative to the main support in a first configuration according to an elastic element attached thereto.

9.  The cervical collar of claim 3, wherein the elongate element and the main support have cooperating ramps along which the elongate element slides relative to between the locked and unlocked conditions.

10.  The cervical collar of claim 9, wherein the ramps coincide with an end portion of the lower support, an end portion of the main support being coaxial with the end portion of the lower support, and the end portion of the lower support movable along an axis thereof relative to the main support according to a position of the ramps relative to one another.

11.  The cervical collar of claim 10, further comprising a cover extending over the end portion of the lower support, the end portion of the lower support having at least one engaging element arranged to interlock with at least one engaging element of the cover when the elongate element is in a locked condition.

OSS 000307

28/30

12.  The cervical collar of claim 11, wherein in the unlocked condition, the ramps are disengaged from one another, and the at least one engaging element of the lower support is disengaged from the at least one engaging element of the cover.

13.  The cervical collar of claim 3, wherein the lock mechanism includes a pinion and a rack segment for adjusting position of the elongate element.

14.  The cervical collar of claim 13, wherein the elongate element defines a central rack of teeth arranged to engage the pinion.

15.  The cervical collar of claim 13, wherein the lock mechanism includes a pinion including a shaft extending between the outer and inner sides of the main support and a pinion portion at a first end of the shaft, the shaft engaging an actuator on the outer side of the main support at a second end of the shaft, the pinion portion engaging a rack segment defined by the elongate element, wherein rotation of the shaft urges the elongate element to slide relative to the main support.

16.  A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising:

a main support;

a lower support hingedly connected to the main support at first and second end portions of the anterior component;

an elongate element having first and second ends engaging the first and second end portions, the first and second ends arranged for adjusting relative to the first and second end portions;

OSS 000308

29/30

a lock mechanism arranged for locking rotation of the lower support relative to the main support, and moving the elongate element between locked and unlocked conditions such that the elongate element is biased into the locked condition.

17.   The cervical collar of claim 16, further comprising first and second covers arranged to extend over the first and second end portions, the first and second covers each having at least one engaging element arranged to interlock with at least one locking element defined by the lower support.

18.   The cervical collar of claim 17, further comprising at least one elastic element cooperating with the main support or cover, and engaging the elongate element to bias the elongate element in the locked condition.

19.   The cervical collar of claim 17, further comprising an upper support support securing to and resting upon the anterior component.

20.   A method for adjusting an angle defined between a main support and a lower support of an anterior component of a cervical collar, the method comprising:

moving an elongate element relative to the main support and the lower support;

disengaging a part of the main support from a corresponding part of the elongate element to unlock the lower support from the main support;

moving the lower support relative to the main support;

engaging part of the main support to the corresponding part of the elongate element to lock the lower support to the main support.

ABRSACT OF THE DISCLOSURE

OSS 000309

30/30

A cervical collar has an anterior component including a lower support that is adjustable in angle relative to a main support. The lower support is hingedly connected to the main support at first and second end portions.  An elongate element engages the first and second end portions.  A lock mechanism is operative connected to the elongate element, and is arranged for locking rotation of the lower support relative to the main support, by moving the elongate element between locked and unlocked conditions.

**OSS 000310**

1/2

**DECLARATION & ASSIGNMENT**

**DECLARATION**

Title of Invention: **CERVICAL COLLAR**

As the below named inventor, I hereby declare that:

This declaration is directed to:

☒   The accompanying utility or design patent application, or

☐   United States application or Patent Cooperative Treaty international

application number:

filed on

1.  The above-identified application was made or authorized to be made by me.

2.  I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

3.  I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

Direct all correspondence to the address associated with **Customer Number: 22913**.

*By signing this declaration, the inventor confirms that the application, including the claims, has been read and understood and that the inventor is aware of the duty to disclose to the U.S. Patent and Trademark Office all information known to the inventor to be material to patentability as defined in 37 CFR§1.56.*

*I authorize an attorney or agent associated with the Customer Number authorized to act in this application to fill in an "Attorney Docket No."; the application number, the filing date, and any other information desirable to identify the application, on the pages of this declaration and assignment, after I sign.*

**ASSIGNMENT**

WHEREAS, I,  the below named inventor, hereinafter referred to as ASSIGNOR, is the or an owner of certain new and useful improvements in the above identified application(hereinafter referred to as the INVENTION).

WHEREAS, **Ossur Iceland ehf**

whose post office address is/are  **Grjothals 5, 110 Reykjavik, Iceland**

Docket No.:  19793.488.1
AIA Declaration/Assignment World rev. 20FEB15

**OSS 000311**

**-193-**

2/2

hereinafter referred to as ASSIGNEE, is desirous of acquiring the entire right, title and interest in and to the INVENTION in the United States;

NOW, THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, I, ASSIGNOR, by these presents do sell, assign and transfer unto said ASSIGNEE, the entire right, title, and interest in and to said INVENTION and application throughout the United States of America, including any and all Letters Patent granted on any division, continuation, continuation-in-part and reissue of said application; and the entire right, title and interest in and to the said INVENTION throughout the world, including the right to apply for patents and inventor certificates in respect thereof and to claim priority pursuant to rights accorded ASSIGNOR under the terms of the Paris International Convention and all other available international conventions and treaties; and the entire right, title and interest in and to any and all patents, patents of addition, utility models, patents of importation, revalidation patents and inventor certificates which may be granted throughout the world in respect of said INVENTION.

ALSO, ASSIGNOR hereby agrees to execute any documents that legally may be required in connection with the filing, prosecution and maintenance of said application or any other patent application(s) in the United States for said INVENTION, including additional documents that may be required to affirm the rights of ASSIGNEE in and to said INVENTION, all without further consideration.  ASSIGNOR also agrees, without further consideration and at ASSIGNEE'S expense, to identify and communicate to ASSIGNEE at ASSIGNEE'S request documents and information concerning the INVENTION that are within ASSIGNOR'S possession or control, and to provide further assurances and testimony on behalf of ASSIGNEE that lawfully may be required of ASSIGNOR in respect of the prosecution, maintenance and defense of any patent application or patent encompassed within the terms of this instrument.  ASSIGNOR'S obligations under this instrument shall extend to ASSIGNOR'S heirs, executors, administrators and other legal representatives.

ALSO, ASSIGNOR hereby authorizes and requests the Commissioner of Patents and Trademarks to issue any and all Letters Patent referred to above to ASSIGNEE, as the ASSIGNEE of the entire right, title and interest in and to the same, for ASSIGNEE'S sole use and behoof; and for the use and behoof of ASSIGNEE'S legal representatives and successors, to the full end of the term for which such Letters Patent may be granted, as fully and entirely as the same would have been held by ASSIGNOR had this assignment and sale not been made.

| LEGAL NAME OF INVENTOR/ASSIGNOR | | | |
|---|---|---|---|
| Name: | **Wayne CALCO** | Date: | |
| Signature: | | | |

Docket No.:  19793.488.1
AIA Declaration/Assignment World rev. 20FEB15

OSS 000312

# EXHIBIT 7



US011478374B2

(12) **United States Patent**
Calco et al.

(10) Patent No.: **US 11,478,374 B2**
(45) Date of Patent: **Oct. 25, 2022**

(54) **CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT**

(71) Applicant: **Ossur Iceland ehf**, Reykjavik (IS)

(72) Inventors: **Wayne Calco**, Foothill Ranch, CA (US); **Christopher Callicott Webster**, Foothill Ranch, CA (US); **Harry Duane Romo**, Foothill Ranch, CA (US)

(73) Assignee: **OSSUR ICELAND EHF**, Reykjavik (IS)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 392 days.

(21) Appl. No.: **16/686,582**

(22) Filed: **Nov. 18, 2019**

(65) **Prior Publication Data**
US 2020/0085607 A1    Mar. 19, 2020

**Related U.S. Application Data**

(63) Continuation of application No. 15/442,029, filed on Feb. 24, 2017, now Pat. No. 10,512,559.
(Continued)

(51) **Int. Cl.**
*A61F 5/055* (2006.01)
*A61F 5/01* (2006.01)

(52) **U.S. Cl.**
CPC ...... *A61F 5/055* (2013.01); *A61F 2005/0197* (2013.01)

(58) **Field of Classification Search**
CPC .................. A61F 5/055; A61F 5/05883; A61F 2250/0004; A61F 5/3707; A61F 5/05891;

A61F 2007/0011; A61F 5/012; A61F 13/12; A61F 5/028; A61F 13/128; A61F 5/05816; A42B 3/0473
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,088,207 A    7/1937    Kaiser
2,102,069 A    12/1937    Hanicke
(Continued)

FOREIGN PATENT DOCUMENTS

CN    1646071 A    7/2005
CN    2933343 Y    8/2007
(Continued)

OTHER PUBLICATIONS

Office Action from corresponding CN Application No. 201780057654. X, dated Oct. 29, 2020.
(Continued)

*Primary Examiner* — Ophelia A Hawthorne
(74) *Attorney, Agent, or Firm* — Workman Nydegger

(57) **ABSTRACT**

A cervical collar has an anterior component including a lower support that is adjustable in angle relative to a main support. The lower support is hingedly connected to the main support at first and second end portions. An elongate element engages the first and second end portions. A lock mechanism is operatively connected to the elongate element, and is arranged for locking rotation of the lower support relative to the main support, by moving the elongate element between locked and unlocked conditions. An upper support is received by the main support at least at a front section of the main support, and is arranged to be fitted against a user's chin.

**15 Claims, 20 Drawing Sheets**



OSS 000344

## US 11,478,374 B2

Page 2

### Related U.S. Application Data

(60) Provisional application No. 62/299,766, filed on Feb. 25, 2016.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2,735,424 A | 2/1953 | Benjamin |
| 2,791,999 A | 5/1954 | Bustamante |
| 2,801,630 A | 8/1957 | Moore |
| 2,806,471 A | 11/1957 | Breese |
| 2,818,063 A | 12/1957 | Smith et al. |
| 2,820,455 A | 1/1958 | Hall |
| 2,911,970 A | 11/1959 | Bartels |
| D188,302 S | 6/1960 | Monfardini |
| 3,024,784 A | 3/1962 | Monfardini |
| 3,027,894 A | 4/1962 | Moore |
| 3,042,027 A | 7/1962 | Monfardini |
| 3,050,052 A | 8/1962 | Grassl |
| 3,060,930 A | 10/1962 | Grassl |
| 3,075,521 A | 1/1963 | Grassl |
| 3,135,256 A | 6/1964 | Gruber |
| 3,177,869 A | 4/1965 | Bartels |
| D203,018 S | 11/1965 | Helfericli |
| 3,285,243 A | 11/1966 | Yellin |
| 3,285,244 A | 11/1966 | Cottrell |
| 3,306,284 A | 2/1967 | McKinley |
| 3,313,297 A | 4/1967 | Applegate et al. |
| 3,320,950 A | 5/1967 | McElvenny |
| 3,504,667 A | 4/1970 | McFarlane |
| 3,512,523 A | 5/1970 | Barnett |
| 3,756,226 A | 9/1973 | Calabrese et al. |
| 3,916,884 A | 11/1975 | Attenburrow |
| 3,916,885 A | 11/1975 | Gaylord, Jr. |
| 4,099,523 A | 7/1978 | Lowrey |
| 4,173,973 A | 11/1979 | Hendricks |
| 4,205,667 A | 6/1980 | Gaylord, Jr. |
| 4,325,363 A | 4/1982 | Berkeley |
| 4,401,111 A | 8/1983 | Blackstone |
| 4,413,619 A | 11/1983 | Garth |
| D278,747 S | 5/1985 | Peach, Jr |
| 4,520,801 A | 6/1985 | Lerman |
| 4,538,597 A | 9/1985 | Lerman |
| 4,562,833 A | 1/1986 | Pujals, Jr. |
| 4,582,051 A | 4/1986 | Greene et al. |
| 4,628,913 A | 12/1986 | Lerman |
| 4,643,174 A | 2/1987 | Horiuchi |
| 4,677,969 A | 7/1987 | Calabrese |
| 4,702,233 A | 10/1987 | Omicioli |
| 4,708,129 A | 11/1987 | Pujals, Jr. |
| 4,712,540 A | 12/1987 | Tucker et al. |
| 4,732,144 A | 3/1988 | Cunanan |
| 4,745,922 A | 5/1988 | Taylor |
| 4,827,915 A | 5/1989 | Gorsen |
| 4,854,306 A | 8/1989 | Pujals, Jr. |
| 4,886,052 A | 12/1989 | Calabrese |
| 4,940,043 A | 7/1990 | Burns et al. |
| 4,955,368 A | 9/1990 | Heimann |
| 4,987,891 A | 1/1991 | Gaylord, Jr. et al. |
| D314,623 S | 2/1991 | Calabrese et al. |
| 5,005,563 A | 4/1991 | Veale |
| 5,038,759 A | 8/1991 | Morgenstern |
| 5,058,572 A | 10/1991 | Schmid et al. |
| 5,060,637 A | 10/1991 | Schmid et al. |
| 5,097,824 A | 3/1992 | Garth |
| 5,156,588 A | 10/1992 | Marcuse et al. |
| 5,180,361 A | 1/1993 | Moore et al. |
| 5,201,702 A | 4/1993 | Mars |
| 5,215,517 A | 6/1993 | Stevenson et al. |
| 5,230,698 A | 7/1993 | Garth |
| 5,275,581 A | 1/1994 | Bender |
| 5,302,170 A | 4/1994 | Tweardy |
| RE34,714 E | 8/1994 | Burns et al. |
| 5,346,461 A | 9/1994 | Heinz et al. |
| 5,366,438 A | 11/1994 | Martin, Sr. |
| 5,385,535 A | 1/1995 | McGuinness |
| 5,433,696 A | 7/1995 | Osti |

| | | |
|---|---|---|
| 5,437,612 A | 8/1995 | Moore et al. |
| 5,437,617 A | 8/1995 | Heinz et al. |
| 5,445,602 A | 8/1995 | Grim et al. |
| D368,527 S | 4/1996 | Brooke |
| D369,660 S | 5/1996 | Myoga |
| 5,520,619 A | 5/1996 | Martin |
| RE35,290 E | 7/1996 | Druskoczi |
| 5,588,957 A | 12/1996 | Martin, Sr. |
| 5,593,382 A | 1/1997 | Rudy, Jr. et al. |
| 5,622,529 A | 4/1997 | Calabrese |
| 5,624,387 A | 4/1997 | McGuinness |
| D379,232 S | 5/1997 | Brooke |
| 5,632,722 A | 5/1997 | Tweardy et al. |
| 5,688,229 A | 11/1997 | Bauer |
| 5,716,335 A | 2/1998 | Iglesias et al. |
| 5,728,054 A | 3/1998 | Martin |
| D393,718 S | 4/1998 | Traut et al. |
| 5,785,670 A | 7/1998 | Hiebert |
| 5,788,658 A | 8/1998 | Islava |
| 5,795,315 A | 8/1998 | Traut et al. |
| 5,797,713 A | 8/1998 | Tweardy et al. |
| 5,797,863 A | 8/1998 | Kohnke |
| RE35,940 E | 10/1998 | Heinz et al. |
| 5,865,773 A | 2/1999 | Koledin |
| 5,904,662 A | 5/1999 | Myoga |
| 5,934,599 A | 8/1999 | Hammerslag |
| 5,964,722 A | 10/1999 | Goralnik et al. |
| 5,976,098 A | 11/1999 | Sereboff |
| 5,993,403 A | 11/1999 | Martin |
| 6,027,467 A | 2/2000 | Nakamura et al. |
| 6,036,664 A | 3/2000 | Martin, Sr et al. |
| D422,710 S | 4/2000 | Maynard |
| 6,045,522 A | 4/2000 | Grober |
| 6,045,523 A | 4/2000 | Donaldson |
| 6,050,965 A | 4/2000 | Pillai |
| 6,056,711 A | 5/2000 | Domanski et al. |
| 6,058,517 A | 5/2000 | Hartunian |
| RE36,745 E | 6/2000 | Rudy, Jr. et al. |
| 6,071,255 A | 6/2000 | Calabrese |
| 6,071,256 A | 6/2000 | Lam |
| 6,090,058 A | 7/2000 | Traut et al. |
| 6,165,146 A | 12/2000 | Giebeler |
| 6,183,501 B1 | 2/2001 | Latham |
| 6,202,953 B1 | 3/2001 | Hammerslag |
| 6,245,033 B1 | 6/2001 | Martin |
| 6,254,560 B1 | 7/2001 | Tweardy et al. |
| 6,308,345 B1 | 10/2001 | Williams, Jr. |
| 6,289,558 B1 | 11/2001 | Hammerslag |
| 6,315,746 B1 | 11/2001 | Garth et al. |
| 6,423,020 B1 | 7/2002 | Koledin |
| 6,458,090 B1 | 10/2002 | Walpin |
| 6,404,854 B1 | 12/2002 | Visness et al. |
| D475,139 S | 5/2003 | Myoga |
| 6,632,722 B2 | 10/2003 | Fujiwara et al. |
| 6,663,581 B1 | 12/2003 | Calabrese |
| 6,663,630 B2 | 12/2003 | Farley et al. |
| 6,726,643 B1 | 4/2004 | Martin |
| 6,733,469 B2 | 5/2004 | Miyaji et al. |
| 6,740,055 B2 | 5/2004 | Dominguez |
| 6,770,046 B2 | 8/2004 | Hansen |
| 6,872,188 B2 | 3/2005 | Caille et al. |
| 6,913,584 B2 | 7/2005 | Rudy, Jr. et al. |
| 6,921,376 B2 | 7/2005 | Tweardy et al. |
| 6,926,686 B2 | 8/2005 | Cheatham |
| 7,018,351 B1 | 3/2006 | Iglesias et al. |
| 7,041,071 B1 | 5/2006 | Patron |
| 7,070,573 B2 | 7/2006 | Axelsson |
| 7,090,652 B2 | 8/2006 | Santelli, Jr. |
| 7,090,653 B2 | 8/2006 | Moeller |
| 7,128,724 B2 | 10/2006 | Marsh |
| 7,141,031 B2 | 11/2006 | Garth et al. |
| 7,198,610 B2 | 4/2007 | Ingimundarson et al. |
| D542,919 S | 5/2007 | Leait |
| 7,258,677 B2 | 8/2007 | Rudy, Jr. et al. |
| D552,742 S | 10/2007 | Leait |
| 7,291,121 B2 | 11/2007 | Rudy, Jr. et al. |
| 7,297,127 B2 | 11/2007 | Lee et al. |
| 7,311,686 B1 | 12/2007 | Iglesias et al. |
| 7,371,221 B1 | 5/2008 | Baker |

OSS 000345

US 11,478,374 B2

Page 3

(56)                    References Cited

U.S. PATENT DOCUMENTS

| 7,371,222 B2 | 5/2008 | Heinz et al. |
| 7,399,288 B2 | 7/2008 | Chao |
| 7,442,176 B2 | 10/2008 | Cojbasic |
| D609,815 S | 2/2010 | Patterson |
| 7,674,234 B2 | 3/2010 | Calco et al. |
| D616,555 S | 5/2010 | Thorgilsdottir et al. |
| D616,996 S | 6/2010 | Thorgilsdottir et al. |
| D616,997 S | 6/2010 | Thorgilsdottir et al. |
| D617,907 S | 6/2010 | Waller |
| 7,815,585 B2 | 10/2010 | Vollbrecht |
| 7,846,117 B2 | 12/2010 | Leatt et al. |
| D631,167 S | 1/2011 | Leatt et al. |
| 7,878,995 B2 | 2/2011 | Harty |
| 7,896,827 B2 | 3/2011 | Ingimundarson et al. |
| 7,981,068 B2 | 7/2011 | Thorgilsdottir et al. |
| D643,978 S | 8/2011 | Abajo Alonso et al. |
| D644,331 S | 8/2011 | Sandhu |
| D644,332 S | 8/2011 | Sandhu |
| 7,992,261 B2 | 8/2011 | Hammerslag et al. |
| D647,623 S | 10/2011 | Thorgilsdottir et al. |
| D647,624 S | 10/2011 | Thorgilsdottir et al. |
| 8,038,635 B2 | 10/2011 | Dellanno |
| 8,038,636 B2 | 10/2011 | Thorgilsdottir et al. |
| D659,842 S | 5/2012 | Donaldson et al. |
| D662,597 S | 6/2012 | Chang |
| 8,216,167 B2 | 7/2012 | Garth et al. |
| D666,302 S | 8/2012 | Joseph |
| 8,257,292 B2 | 9/2012 | Linares |
| 8,545,423 B2 | 8/2013 | Patron |
| D692,568 S | 10/2013 | Chiang et al. |
| D693,014 S | 11/2013 | Chiang et al. |
| 8,679,044 B2 | 3/2014 | Thorgilsdottir et al. |
| 8,864,695 B2 | 10/2014 | Suarez et al. |
| 8,932,243 B2 | 1/2015 | Calabrese |
| 9,132,027 B2 | 9/2015 | Calco |
| D767,825 S | 9/2016 | Georgeson et al. |
| 9,668,906 B2 | 6/2017 | Thorgilsdottir et al. |
| 9,713,546 B2 | 7/2017 | Thorsteinsdottir et al. |
| 10,675,173 B2 | 6/2020 | Thorsteinsdottir et al. |
| 2002/0138028 A1 | 9/2002 | Rudy, Jr. et al. |
| 2002/0156408 A1 | 10/2002 | Cheatham |
| 2002/0156409 A1 | 10/2002 | Lee et al. |
| 2002/0169401 A1 | 11/2002 | Walpin |
| 2002/0173737 A1 | 11/2002 | Miyaji et al. |
| 2003/0055367 A1 | 3/2003 | Dominguez |
| 2003/0060744 A1 | 3/2003 | Caille et al. |
| 2003/0181838 A1 | 9/2003 | Garth |
| 2004/0039318 A1 | 2/2004 | Santelli, Jr. |
| 2005/0101896 A1 | 5/2005 | Calabrese |
| 2007/0027418 A1 | 2/2007 | Calco et al. |
| 2007/0073203 A1 | 3/2007 | Moesning et al. |
| 2007/0270728 A1 | 11/2007 | Chao |
| 2009/0247918 A1 | 10/2009 | Patron |
| 2010/0137768 A1 | 6/2010 | Thorgilsdottir et al. |
| 2010/0268139 A1 | 10/2010 | Garth |
| 2010/0298748 A1 | 11/2010 | Rosenfeld et al. |
| 2011/0034844 A1 | 2/2011 | Thorgilsdottir et al. |
| 2011/0066094 A1 | 3/2011 | Thorgilsdottir et al. |
| 2011/0224591 A1 | 9/2011 | Thorgilsdottir et al. |
| 2012/0053499 A1 | 3/2012 | Donaldson et al. |
| 2012/0130295 A1 | 5/2012 | Haider |
| 2012/0165712 A1 | 6/2012 | Calabrese |
| 2013/0060179 A1 | 3/2013 | Modglin |
| 2013/0281899 A1* | 10/2013 | Suarez ................. A61F 5/055 |
|  |  | 602/18 |
| 2013/0281900 A1 | 10/2013 | Suarez et al. |
| 2013/0310722 A1 | 11/2013 | Thorsteinsdottir et al. |
| 2014/0012172 A1 | 1/2014 | Calco |
| 2014/0107551 A1 | 4/2014 | Modglin |
| 2014/0323938 A1 | 10/2014 | Suarez et al. |
| 2015/0216708 A1 | 8/2015 | Garth et al. |
| 2016/0008158 A1* | 1/2016 | Martin ................. A61F 5/055 |
|  |  | 602/18 |
| 2016/0287424 A1 | 10/2016 | Webster et al. |
| 2017/0252198 A1 | 9/2017 | Thorsteinsdottir et al. |

| 2018/0078400 A1 | 3/2018 | Hsu et al. |
| 2018/0078401 A1 | 3/2018 | Hsu et al. |
| 2020/0281754 A1 | 9/2020 | Thorsteinsdottir et al. |

FOREIGN PATENT DOCUMENTS

| CN | 201150587 Y | 11/2008 |
| CN | 201602923 U | 10/2010 |
| CN | 102227196 A | 10/2011 |
| CN | 202015274 U | 10/2011 |
| CN | 204655220 U | 9/2015 |
| CN | 105120808 A | 12/2015 |
| DE | 19547115 A1 | 6/1997 |
| DE | 19849302 A1 | 4/2000 |
| DE | 100 57 286 A1 | 5/2002 |
| EP | 1738724 A1 | 1/2007 |
| EP | 2653139 A1 | 10/2013 |
| EP | 2886088 A1 | 6/2015 |
| FR | 2 814 362 A1 | 3/2002 |
| GB | 2 165 157 A | 4/1986 |
| GB | 2 453 996 A | 4/2009 |
| JP | 2007-330808 A | 12/2007 |
| WO | 94/09728 A1 | 5/1994 |
| WO | 95/22304 A1 | 8/1995 |
| WO | 96/40018 A1 | 12/1996 |
| WO | 9843568 A1 | 10/1998 |
| WO | 2014102340 A1 | 7/2014 |

OTHER PUBLICATIONS

Levangie et al., "Joint Structure and Function: A Comprehensive Analysis", Fourth Edition, Chapter 4: The Vertebral Column, 2005 F.A. Davis Company, Philadelphia, PA, pp. 161-164.

Hsu et al., AAOS Atlas of Orthoses and Assistive Devices, Mosby, Elsevier Fourth Edition, 2008, Philadelphia, PA, p. 117-122.

Product Information Sheet, Philadelphia Tracheotomy Collar, obtained from www.ossur.com, prior to Aug. 6, 2010, 1 page.

Product Information Sheet, Platazote Sheets, WBC Industries, obtained from www.wbcindustries.com prior to Aug. 6, 2010, 2 pages.

"Range-of-Motion Restriction and Craniofacial Tissue-Interface Pressure From Four Cervical Collars", The Journal of Trauma Injury, Infection, and Critical Care, vol. 63, No. 5, Nov. 2007, pp. 1120-1126.

"Ossur Is Immobilization", www.ossur.com, 2008, pp. 1-16.

"Miami J Patient Care Handbook", www.ossur.com, 2010, pp. 1-16.

Jacobson et al. "Improving Practice Efforts to Reduce Occipital Pressure Ulcers", Journal of Nursing Care Quality, vol. 23, No. 3, 2008, pp. 283-288.

Bell et al. "Assessing Range of Motion to Evaluate the Adverse Effects of Ill-Fitting Cervical Orthoses", The Spine Journal, vol. 9, 2009, pp. 225-231.

Karason et al. "Evaluation of Clinical Efficacy and Safety of Cervical Trauma Collars: Differences in Immobilization, Effect on Jugular Venous Pressure and Patient Comfort", Scandinavian Journal of Trauma, Resuscitation and Emergency Medicine, 2014, pp. 1-7.

International Search Report from PCT Application No. PCT/US2017/019391, dated May 18, 2017.

Partial International Search Report from PCT Application No. PCT/US2017/050206, dated Dec. 5, 2017.

Product Brochure, "Capital Collar Enhanced," DeRoyal, 2014, 2 Pages.

Product Brochure, "Instructions for Use Eclipse Cervical Collar," VQ OrthoCare, 2015, 2 Pages.

Product Brochure, "Miami J Advanced By OSSUR," www.ossur. com, 2012, 4 Pages.

Product Brochure, "Miami J Cervical Collar," www.ossur.com, 1 Page.

Product Brochure, "Proglide Cervical Collar," OPTEC, www. optecusa.com, 1 Page.

Product Brochure, "Vista Upper Spine," Aspen Medical Products, 2015, 6 Pages.

* cited by examiner

OSS 000346



FIG. 1
(Prior Art)

OSS 000347



FIG. 2A

FIG. 2B

OSS 000348



FIG. 3A

FIG. 3B

OSS 000349



FIG. 4



FIG. 5

OSS 000350



FIG. 6A



FIG. 6B

OSS 000351



FIG. 7A



FIG. 7B

OSS 000352



FIG. 8A



FIG. 8B

OSS 000353



FIG. 9A



FIG. 9B

OSS 000354



FIG. 10

OSS 000355





FIG. 11

FIG. 12

FIG. 13

OSS 000356



FIG. 14A

FIG. 14B

FIG. 14C

OSS 000357



FIG. 15A

FIG. 15B

OSS 000358



FIG. 16A

FIG. 16B

FIG. 17

OSS 000359





FIG. 18A

FIG. 18B

OSS 000360



FIG. 18C

FIG. 18D

OSS 000361



**FIG. 19A**



**FIG. 19B**

OSS 000362



FIG. 20



FIG. 21

OSS 000363



**FIG. 22A**



**FIG. 22B**

OSS 000364



FIG. 23A



FIG. 23B

OSS 000365



## FIG. 24A



## FIG. 24B

OSS 000366

US 11,478,374 B2

**1**

# CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT

### CROSS-REFERENCE TO RELATED APPLICATIONS

This disclosure incorporates by reference U.S. Pat. No. 5,632,722, granted May 27, 1997, U.S. Pat. No. 6,254,560, granted Jul. 3, 2001, U.S. Pat. No. 7,981,068, granted Jul. 19, 2011, U.S. Pat. No. 8,038,636, granted Oct. 18, 2011, U.S. Pat. No. 8,679,044, granted Mar. 25, 2014, U.S. Pat. No. 9,713,546 granted on Jul. 25, 2017, and U.S. patent application publication no. 2016/0287424, published Oct. 6, 2016.

### FIELD OF THE DISCLOSURE

The present disclosure relates to an orthopedic device, and more specifically to cervical collars having height adjustability at a front part, while providing a platform for securing known other components of a cervical collar thereto without modifying their anatomical contours and connection to the height adjustable components.

### BACKGROUND

Cervical collars are used for treating conditions of the neck and the cervical spine by cervical spine immobilization. These collars may handle whiplash and other such injuries, where support for the head and neck of the patient is needed, and function to partially immobilize the head and neck of the patient and relieve spasm or strain to which the neck muscles of the patient might be subjected by transferring weight or force from the head of the patient to the shoulders or adjacent areas of the patient. Other collars may be arranged for complete or near complete immobilization of the head and neck of the patient to reduce risk of secondary damage to the spinal cord.

A challenge in designing a cervical collar is balancing desired immobilization with user comfort, such as venous pressure. Immobilization may be measured by five planes of movement, including flexion, extension, lateral tilt to right and left, and rotation of the neck to right and left, and is considered generally as cervical range of motion (CROM).

Unfortunately, many patients using cervical collars develop decubitus or decubitus ulcers (also known as bed sores, pressure sores, or trophic ulcers) when wearing cervical collars. These ailments, which involve a breakdown of tissue overlying a bone, arise when tissues overlying a bony prominence are subjected to prolonged pressure against an object such as a cervical collar. Besides affecting superficial tissues such as the skin, decubitus and decubitus ulcers also can affect muscle and bone. Restrictive collars are the root causes of skin breakdown in the trauma population. As pressure-ulcers are among the most common, yet serious and costly, complications of routine spinal immobilization, it is desirable to provide cervical collars that minimize the probability of ulcers.

Moisture and pressure are two major factors which contribute to the formation of decubitus. Once a decubitus ulcer forms, there is no good method of determining the extent of tissue damage. Once started, decubitus can continue to progress through the skin and fat tissue to muscle and eventually to bone, and is very difficult to treat and arrest. In extreme cases, surgical replacement of bone, muscle and skin are required to restore that portion of the body of the patient where decubitus has formed.

**2**

It is desirable to eliminate or at least minimize the effect of pressure points when using cervical collars. The likelihood of contracting decubitus can be greatly reduced by a more even distribution of pressure to several parts of the body of the patient.

Multiple studies have evaluated CROM and the likelihood of tissue-interface pressure (TIP) exerted by commercially-available cervical collars. One of the known commercial collars that has proven successful at striking the balance of minimal TIP and most restriction of CROM is the Miami J collar (Ossur, hf, Reykjavik, Iceland). Multiple studies have validated the features of the Miami J collar, including: Tescher, A. N. et al. Range-of-motion restriction and craniofacial tissue-interface pressure from four cervical collars. *Journal of Trauma-Injury Infection & Critical Care*: 2007; 63; 5; 1120-1126; Jacobson, T. M. et al. Efforts to reduce occipital pressure ulcers. *Journal of Nursing Care Quality*; 2008; 23; 3; 283-288; Karason, S. et al. Evaluation of clinical efficacy and safety of cervical trauma collars: differences in immobilization, effect on jugular pressure and patient comfort. *Scandinavian Journal of Trauma. Resuscitation and Emergency Medicine*. 2014. 22:37.

The Miami J collar is also described in U.S. Pat. No. 5,632,722, granted May 27, 1997; U.S. Pat. No. 6,254,560, granted Jul. 3, 2001; U.S. Pat. No. 6,921,376, granted Jul. 26, 2005. Variations of the Miami J collar, embodying the Miami J Advance collar; are described in U.S. Pat. No. 7,981,068, granted Jul. 19, 2011, and U.S. Pat. No. 8,679,044, granted Mar. 25, 2014.

A feature, preferably included in cervical collars to overcome limited adaptability to accommodate the body of the patient and the particular ailment prompting the need for wearing a cervical collar, is the facility for adjusting the relative positions of various components of the cervical collar. Part of the effectiveness of the Miami J collar is due to its ability for customization to different anatomical sizes of users.

As taught in U.S. Pat. No. 6,254,560, the Miami J collar has supports that enable customized pressure distribution and avoid skin breakdown. A front part of the Miami J collar has an adjustable upper support for the mandibular, chin and/or jaw of the user, and mounted to a lower support or sternum brace by means which permit relative movement between the upper support and the lower support. The posterior component or back part of the Miami J collar has an occipital support mounted to a back support by means which permit relative sliding movement between the occipital support and the back support. The shape of the upper support and occipital support are anatomically optimized for superior immobilization and patient comfort.

Both the upper support and the occipital support of the Miami J collar are uniquely anatomically shaped to maximize comfort and immobilization while minimizing pressure on the user. Because the upper support and the occipital support of the Miami J collar are clinically proven, it is desired that any improvements over the current Miami J collar provide means for preserving the function and shape of the upper support and occipital support of the current Miami J collar.

### SUMMARY

The present disclosure describes an improved cervical collar for restricting head and neck movement to promote healing after an injury to the spinal column. The cervical collar has height, circumferential and angular adjustment to accommodate a wide variety of patient sizes and anatomical

OSS 000367

US 11,478,374 B2

3

configurations, and to accommodate dimensional changes caused by increased or decreased swelling of the affected anatomical portions of the patients during treatment of the injury. The cervical collar is arranged to stabilize and immobilize the cervical area, by restricting lateral, sagittal and coronal movement, while improving comfort, and fit for individual patients.

Embodiments of the disclosure relate to a cervical collar having a height adjustment system between main and lower parts forming an anterior component, which permit the use of known upper and occipital supports in the cervical collar to maintain their functionality, comfort and fit, including their anatomical contours and connection to the height adjusted components. The height adjustment system is arranged for adjusting the chin height in a simple and effective manner that limits or mitigates tampering with the height while the collar is worn. The height adjustment system preferably includes using incremental height adjustment so the height may be locked at a desired height setting. The height adjustment system may be arranged to allow usage in existing collar designs, such as the Miami J or Miami J Advance collars, without substantially altering the shape and function of the mandibular and posterior component including an occipital support.

The height adjustment system mitigates or eliminates the need for pre-sizing methods, and is provided in a simplified manner to enable many height settings customizable for different users. The height adjustment system allows use of known upper and posterior components, which have been on the market for many years to serve many users of cervical collars, are clinically proven for their efficacy.

The height adjustment system allows for improved placement and configuration of a cervical collar on patients of different heights. The upper support and posterior component can be properly fitted against the chin and head of a patient by a clinician, followed by the extension of the anterior component against the patient's chest. Likewise the anterior component may be placed against the patient's chest and the upper support and posterior component can then be extended to the chin and head of the patient. The height setting can then be locked at the desired height setting by the clinician to ensure a proper fit for the user.

According to a general embodiment, a cervical collar has an anterior component arranged for connecting to a posterior component. The anterior component comprises a main support, and a lower support hingedly connected to the main support at first and second hinges. An elongate element or slidelock has first and second ends engaging the first and second hinges, such that the first and second ends are arranged for adjusting relative to the first and second hinges. A lock mechanism is configured for locking rotation of the lower support relative to the main support, and moving the elongate element between locked and unlocked conditions. The elongate element is biased into the locked condition, and may be configured to wedge parts of the hinged connection of the parts of the anterior component together in the locked condition.

In a method for adjusting an angle defined between the main support and the lower support, the method involves moving the elongate element relative to the main support and the lower support. A part of the main support is disengaged from a corresponding part of the elongate element to unlock the lower support from the main support. The lower support is moved relative to the main support. Once the lower support is placed at the desired angle relative to the main support, the part of the main support is engaged to the corresponding part of the elongate element to lock the lower

4

support to the main support, which may be accomplish by wedging parts of the hinged connection together.

These and other features, aspects, and advantages of the present disclosure will become better understood regarding the following description, appended claims, and accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

The drawing figures are not necessarily drawn to scale, but instead are drawn to provide a better understanding of the components thereof, and are not intended to be limiting in scope, but to provide exemplary illustrations. The figures illustrate exemplary configurations of an orthopedic device, and in no way limit the structures or configurations of a liner according to the present disclosure.

FIG. 1 is a perspective view of a known cervical collar under the commercial name Miami J.

FIG. 2A is a frontal elevational view of a cervical collar.

FIG. 2B is a side elevational view of an embodiment of a cervical collar of FIG. 2A.

FIG. 3A is a top plan view of the main and lower supports of the cervical collar of FIG. 2A.

FIG. 3B is a rear elevational view of the main and lower supports of the cervical collar of FIG. 2A.

FIG. 4 is a detail plan view of the lock mechanism in FIG. 3A.

FIG. 5 is a schematic view of a variation of the lock mechanism of FIG. 3A.

FIG. 6A is a schematic plan view of the elongate element in a locked condition.

FIG. 6B is a schematic plan view of the elongate element in an unlocked condition.

FIG. 7A is a schematic perspective view of the first hinge in a locked condition.

FIG. 7B is a schematic perspective view of the first hinge in an unlocked condition.

FIG. 8A is a schematic perspective view of a variation of the first hinge in a locked condition.

FIG. 8B is a schematic perspective view of the first hinge of FIG. 8A in an unlocked condition.

FIG. 9A is an outer exploded perspective view of another variation of the first hinge.

FIG. 9B is an inner exploded perspective view of the first hinge of FIG. 9A.

FIG. 10 is a perspective view of another embodiment of a cervical collar.

FIG. 11 is a perspective view of an embodiment of a slidelock in the cervical collar of FIG. 10 and showing a first side thereof.

FIG. 12 is a perspective detail view of the slidelock showing a second side thereof.

FIG. 13 is a perspective schematic view showing the slidelock of FIG. 11 in a portion of the cervical collar of FIG. 10.

FIG. 14A is a perspective schematic view showing the slidelock of FIG. 11 in an end portion of side A of the cervical collar of FIG. 10 in a locked condition.

FIG. 14B is a perspective schematic view showing the slidelock of FIG. 11 in an end portion of side B of the cervical collar of FIG. 10 in an unlocked condition.

FIG. 14C is a detail cross-sectional view XIV C of FIG. 14A showing engagement of features in a locked condition of the collar of FIG. 10.

FIG. 15A is a perspective view of an inside surface of a side cover in the cervical collar of FIG. 10.

OSS 000368

US 11,478,374 B2

5

FIG. 15B is a schematic view of a variation of the side cover and main support in FIG. 15A.

FIG. 16A is a schematic view of a variation of a paddle in a slidelock.

FIG. 16B is a schematic view of another variation of a paddle in a slidelock.

FIG. 17 is a schematic view of another variation of a slidelock system for use in a cervical collar.

FIG. 18A is a schematic view of another variation of a slidelock system for use in a cervical collar.

FIG. 18B is a schematic view of the slidelock system in FIG. 18A disassembled.

FIG. 18C is a schematic view of the slidelock system in FIG. 18A in a locked condition.

FIG. 18D is a schematic view of the slidelock system in FIG. 18A in an unlocked condition.

FIG. 19A is a schematic side elevational view of the upper support in the main support.

FIG. 19B is schematic view of the adjustability of the upper support relative to the main support in FIG. 19A.

FIG. 20 is a plan view of the adjustment mechanism in FIG. 2A.

FIG. 21 is an elevational view of the adjustment mechanism of FIG. 20.

FIG. 22A is a schematic elevational view of the adjustment mechanism in a contracted configuration.

FIG. 22B is a schematic elevational view of the adjustment mechanism in an extended configuration.

FIG. 23A is an elevational view of an embodiment of the connector in FIG. 2.

FIG. 23B is a top plan view of the connector in FIG. 23A.

FIG. 24A is a perspective view of another embodiment of the connector in FIG. 2.

FIG. 24B is an exploded view of the connector in FIG. 24A.

## DETAILED DESCRIPTION OF VARIOUS EMBODIMENTS

### A. Introduction

Embodiments of an orthopedic device are provided for stabilizing and supporting anatomical portions of a wearer, for example, the neck and head of a wearer.

Although the embodiments of the disclosure are adapted for supporting and stabilizing anatomical portions of many wearers having various anatomical shapes and sizes, the embodiments of the disclosure may also be dimensioned to accommodate different types, shapes and sizes of anatomical portions.

A better understanding of different embodiments of the disclosure may be had from the following description read with the accompanying drawings in which like reference characters refer to like elements.

While the disclosure is susceptible to various modifications and alternative constructions, certain illustrative embodiments are in the drawings and are described below. It should be understood, however, there is no intention to limit the disclosure to the embodiments disclosed, but on the contrary, the intention covers all modifications, alternative constructions, combinations, and equivalents falling within the spirit and scope of the disclosure.

It will be understood that, unless a term is defined in this disclosure to possess a described meaning, there is no intent to limit the meaning of such term, either expressly or indirectly, beyond its plain or ordinary meaning.

6

While the foregoing embodiments have been described and shown, alternatives and modifications of these embodiments, such as those suggested by others may be made to fall within the scope of the invention. While the cervical collar has been described in combination with collar parts, it will be understood that the principles described may be extended to other types of orthopedic and prosthetic devices.

Reference characters are provided in the claims for explanatory purposes only and are not intended to limit the scope of the claims or restrict each claim limitation to the element in the drawings and identified by the reference character.

For ease of understanding the disclosed embodiments of an orthopedic device, the front or anterior, and rear or posterior portions of the orthopedic device are described independently. The anterior and posterior portions of the orthopedic device function together to form a supporting and stabilizing collar that encompasses the anatomical portions of the wearer.

The term "posterior" also has its ordinary meaning and refers to a location that is behind or to the rear of another location. Lastly, the term "anterior" has its ordinary meaning and refers to a location ahead of or to the front of another location.

The terms "rigid," "semi-rigid," "flexible," and "compressible" may be used herein to distinguish characteristics of portions of certain features of the orthopedic device. The term "rigid" should denote that an element of the device is generally devoid of flexibility. Within the context of support members or shells that are "rigid," it is intended to indicate that they do not lose their overall shape when force is applied, and they may break if bent with sufficient force. As for the term "semi-rigid," this term is used to connote properties of support members or shells that provide support and are free-standing; however such support members or shells may have some degree of flexibility or resiliency.

The term "flexible" should denote that features are capable of repeated bending such that the features may be bent into retained shapes or the features do not retain a general shape, but continuously deform when force is applied. The term "compressible" is used to qualify such structural features as being capable of being reduced in size or volume due to the exertion of force applied to the structural feature.

### B. Components for Use with Following Embodiments

FIG. 1 exemplifies the known Miami J collar 1, as taught in the aforementioned patents and publications, particularly U.S. Pat. Nos. 5,632,722 and 6,254,560. The collar 1 includes an upper support 2 intended to support the mandibular, jaw or chin of the user that secures and/or rests upon an anterior component 3 of the collar. The upper support 2 is arranged for sliding movement with the anterior component 3 and for locking therewith by a side adjustment connection 11 and a central tab 15. The upper support 2 preferably has continuous padding 8 along a surface adjacent the user's jaw.

The anterior component 3 defines a sternum part 4, forming an extension adapted to extend below the clavicle of a user and adapted to rest against the sternum. The sternum part 4 carries a sternum pad 9 to avoid decubitus over long periods of wear of the collar. Besides the sternum pad 9, the anterior part 3 likewise includes padding along the surface facing the user.

OSS 000369

US 11,478,374 B2

7

The Miami J collar may be used by users with injuries other than those for which the cervical collar is most commonly used. The anterior component 3 forms an opening 13 which allows for access to the throat of the user, although because the anterior component is unitary and monolithic, the size of the opening 13 remains fixed.

The collar 1 includes a posterior component comprising lower and upper parts 5, 6, with the upper part serving as an occipital support. Both the lower and upper parts 5, 6 preferably include continuous padding, with the lower part intended to rest upon the back of the user, and the upper part intended to rest against the occiput of the head. The lower and upper parts 5, 6 are preferably attached for relative sliding movement between relative positions of the lower and upper parts to allow for different head sizes and proper and even pressure distribution across the body of the user.

Although not shown, the posterior component may be unitary and monolithic because it resembles the posterior component taught by U.S. Pat. No. 7,981,068 and found in the Miami J Advance collar. The posterior component is an anatomically configured 3D support contiguously formed with resilient or compliant edges. The support includes slots to provide ventilation and/or additional resilience or flexibility. The posterior portion also includes an anatomically shaped flared section shaped to correspond to and support an anatomical portion of a wearer, for example, the occipital region.

Both the upper support, and the anterior and posterior components are generally symmetrical about a vertical center line, and may be formed from rigid or semi-rigid plastic. The material forming the upper support, and the anterior and posterior components, may be flexible prior to donning the collar, but sufficiently rigid once the collar is donned to resist yielding due to weight exerted by the user.

A fastener 7 is used to secure the anterior and posterior components to one another. The fastener 7 comprises cooperating hook-and-loop attachments on the anterior and posterior components, with a strap bearing hook material extending from the posterior component and loop or hook receiving elements located on the anterior component.

Each of these embodiments is arranged to receive the upper support and posterior component of the Miami J collar, or the posterior component of the Miami J Advance collar in order to preserve the clinically recognized superior immobilization and comfort provided by the existing collars. It will be noted, however, that these embodiments are not restricted to only the upper support and posterior component of the Miami J and Miami J Advance collars, but can receive other upper support and posterior components of other known collars or those designed for each of the embodiments.

The height adjusted anterior component is arranged to preserve the anatomical contour and function of the known upper support and posterior component, despite the height adjustment of the anterior component and the tracheal opening thereof. The embodiments may have a varying height adjustment in that a center portion of the collar about the tracheal opening and generally along a vertical center line may increase greater in height than alongside portions of the anterior component proximate the connection to the posterior component. An example, although not limiting, is a 3:1 height difference at the center portion relative to the side portions.

While the embodiments may be associated with varying neck lengths among users, the sternal contour of users may likewise vary. The varying sternal contours of users may be resolved by positioning of the sternal contour, which may be

8

achieved by adjusting the tracheal opening height or the height generally of the collar. While anatomical vertebral height and neck length plays a role in adjustment of the collar, the alignment of the spinal segments also has an effect in overall neck "length," i.e., a more kyphotic or flexed neck position "shortens" an otherwise anatomically longer or taller neck.

Another factor relating to the dimension of the cervical collar is the sternal contour. For instance, a very barrel chested individual (having a more horizontal sternal contour) may have the distal most dimension of the sternal extension of the brace contact considerably closer to the mandible than the patient with a very vertical sternum.

In all situations suggested above, mandible dimensions would be relatively the same, it is the orientation of the neck elements and its attachment to and the contour of the sternal segment that plays the largest role in overall collar height adjustment. The mechanism affording mandible and sternal height adjustment can accommodate the varying contours and dimensions.

C. Embodiments of the Cervical Collar

According to the embodiment of FIGS. 2A and 2B, a cervical collar 10 has an anterior component 12 arranged for connecting to a posterior component 14. The posterior component 14 may be similarly arranged as the similar part in U.S. Pat. No. 7,981,068, as discussed above. The anterior component 12 comprises a main support 16, an upper support 18 arranged for being received by the main support 16, and a lower support 20 hingedly connected to the main support 16 at first and second hinges or end portions of the main and lower supports forming such hinges. In the depicted embodiments, the first and second hinges are formed by such end portions of the main and lower supports, and there are not separate hinges in addition to the end portions. However, the application is not limited to such arrangement, and additional components could be added to the end portions of the main and lower supports which could be considered as hinges in addition to the end portions of the main and lower supports.

A lock mechanism 22 is arranged for locking rotation of the lower support 20 relative to the main support 16, such that the hinges are locked according to different angular configurations of the lower support 20 relative to the main support 16. An adjustment mechanism 24 is located centrally along a lowermost portion of the lower support 20, and may be configured for adjustment relative to and away from a sternum of a user for improving comfort and fit of the cervical collar.

As evident from FIGS. 2A and 2B, the anterior component 12 preserves the general contours known in the Miami J collar, particularly the peripheral outline of the anterior component of both the main support 16 and lower support 20, which enables easy attachment to the known upper or upper support 18 and posterior component 14. Specifically, the upper support 18 may have a configuration that is the same as in U.S. patent application publication no. 2013/0310722, and U.S. Pat. No. 6,254,560. The profile of the upper support 18 is preferably taken from the Miami J collar, however other upper supports may be used and the embodiments are not limited to solely the Miami J collar profile.

Because the main and lower supports are adjustable relative to one another, the upper support is preferably maintained in a stationary relationship with the main support. However, the upper support is not necessarily rigid, but may flex according to the anatomy of the user, but become

OSS 000370

US 11,478,374 B2

9

rigid or stable to movement once the collar is placed and tightened securely on the user.

Generally, when fitting a cervical collar having an anterior component 12, a clinician fits the upper support 18 and posterior component 14 against a patient's chin and head, arranged for the desired level of immobilization and support. The clinician then adjusts the lock mechanism 22 to secure the anterior component 12 against the chest and shoulders of the patient by articulating the lower support 20 relative to the main support 16. A clinician may also first fit the anterior component 12 against the patient's chest and then regulate the lock mechanism 22 to extend the main support 16 and posterior component 14 to the chin and head of the patient. The height setting is maintained by the lock mechanism 22 once released at the desired height setting to ensure a proper fit for the user.

Referring to FIGS. 6A and 6B, the first and second ends 48, 50 of an elongate element 34 or sliding lock or slidelock, as discussed periodically herein, are spatially located differently relative to the first and second hinges 40, 42 when in the unlocked condition. The first end 48 is axially offset from axis 49 from end portions 44, 46 of the main support and the lower support at the first hinge 40 in the unlocked condition. The end portions 44, 46 of the main and lower supports are generally coaxial relative to one another.

As illustrated in FIGS. 3A, 3B and 4, the elongate element 34 is slidably located within an arcuate guide 54 defined by the main support 16 along an inner side I thereof. The inner side I of the main support 16 defines a plurality of guides 38 for retaining the elongate element 34 within the arcuate guide 54. According to the illustrated embodiment, the guides 38 each define a post 52 having a height greater than a thickness of the guides 38. The arcuate guide is depicted as a tray but it may likewise be configured as a flange, boss, segmented protrusions, or other appropriate structure to route the elongate element of the main support or upper support.

The arcuate tray 54 is defined by a base portion 58 and an upper wall 56 of the main support 16. The base portion 58 extends outwardly from the upper wall 56 in a generally perpendicular orientation.

The main support 16 has a generally arcuate configuration 59 adapted to extend about the mandible of a user, and may be considered to possesses an elongated C- or U-shape. The lower support has a generally arcuate configuration 60 and is contoured for being adapted for securing against a sternum of a user.

The lock mechanism 22 includes an actuator or dial 30 for adjusting the lock mechanism 22 from locked to unlocked conditions. The lock mechanism 22 includes the elongate element 34 having first and second ends 48, 50 engaging the first and second hinges 40, 42. The first and second ends 48, 50 are arranged for being displaceable relative to the first and second hinges 40, 42 between locked and unlocked conditions of the lock mechanism 22.

The lock mechanism 22 preferably includes a pinion 32 and a rack segment 36, or geared rack segment 36, for adjusting position of the elongate element 34. The pinion 32 defines a shaft 61 extending between the outer and inner sides of the main support 16 and a pinion portion 62 at a first end of the shaft 61. The shaft 61 engages the actuator 30 on the outer side of the main support 16 at a second end of the shaft 61. The pinion portion 62 engages a rack segment 36 defined by the elongate element 34, whereby rotation of the shaft 61 urges the elongate element 34 to slide relative to the main support 16.

10

The pinion portion 62 is recessed relative to the shaft 61, such that the shaft 61 has a diameter greater than the pinion portion 62. The pinion portion 62 is arranged to maintain engagement with the rack segment 36 of the elongate element 34. An end portion 63 of the pinion on the inner side preferably has a diameter greater than the pinion portion 62. The pinion portion 62 is recessed relative to the shaft 61 and the end portion 63. The shaft 61 engages a periphery of an opening 67 of the main support 16 via a threaded engagement 65.

While a rack and pinion system is shown and described, other adjustment and engagement systems may be used in combination with the elongate element or slidelock. Such other adjustment and engagement systems may be rotary or linear in nature, such as a slider, for causing displacement of the elongate element relative to the main support.

In the embodiment of FIG. 4, the lock mechanism 22 includes a least one spring element 64 arranged for returning the shaft 61 to a locked condition after rotation of the shaft 61 to the unlocked condition of the first and second hinges 40, 42 and release of the actuator 30. The spring element 64 is a Belleville disc. The spring element 64 biases against a groove 71 formed by the shaft 61 and a bias element 69 of the main support 16. The return force from the elongate element 34 may drive the actuator into the locked condition.

According to the schematic representation in FIG. 5, the lock mechanism 22 has at least one elastic element 66A, 66B secured at a first end to a first retainer 73 on the main support 16 and a second retainer 75 on the lock mechanism 22, whereupon release of the lock mechanism, the at least one elastic element 66A, 66B urges the lock mechanism to a predetermined configuration. The actuator 30 may be resiliently or spring biased, such that it may be activated under force to an unlocked condition whereby such force returns the actuator to a predetermined locked condition; for example by merely releasing the actuator.

Referring to the depiction in FIGS. 7A and 7B, the first hinge or end portion 40 includes end portions 44, 46 of the main support and the lower support 16, 20, respectively, and a hinge cover 68 defining a hole 74. The end portions 44, 46 each define holes 78, 80 that are coaxial about a first axis 90 to one another and about which the first hinge or end portion 40 pivots. The first end 48 of the elongate element 34 is arranged to slidably adjust relative to the end portions 44, 46. The first end 48 defines an opening 76 axially offset from the first axis 90 and defined along a second axis 91 variable in location depending on the configuration of the lock mechanism 22.

The first end 48 of the elongate element 34 defines a detent projection 72 arranged to engage a ridge 86 defined by the end portion 44 of the main support. The end portion 44 defines a ramp 87 leading to the ridge 86 from a recess 88 defined by the end portion 44. The detent projection 72 is arranged to be received by the recess 88 and slide along the ramp 87 to the ridge 86 between locked and unlocked conditions of the lock mechanism 22. The ridge 86, the ramp 87 and the recess 88 are generally concentric with the first axis and the hole 78 of the main support 16.

A spring element 70, such as an O-ring, is concentrically disposed about the hole 78 of the main support and biased between a shoulder 92 defined by the main support 16 and an inner surface 94 of the cover 68. As shown in FIG. 7A, when the spring 70 is in an expanded configuration, it wedges the inner surface 94 of the cover 68 and the shoulder 92 together.

The end portion 46 of the lower support 20 defines a protrusion or detent 84 arranged to be received by a notch 82

OSS 000371

US 11,478,374 B2

11

defined by the end portion 44 of the main support. The detent 84 is received by the notch 82 in the locked condition of the main support and the lower support. The detent 84 is generally arranged concentrically with the hole 80 of the main support. As shown in FIG. 7A, in the locked condition, vertical interference prevents movement of the hinge. FIG. 7B shows how in the unlocked condition the spring element is compressed, and the detent may move.

FIGS. 8A and 8B exemplify a variation of the hinge 96, whereby the main support and the lower support define a plurality of cooperating teeth 98, 100 engageable when the lock mechanism is in the locked condition, and disengaged from one another when the lock mechanism is in an unlocked condition.

FIGS. 9A and 9B illustrate another embodiment of the hinge 102 wherein the end portion of the elongate element 34 defines an opening 104 and the main support 16 defines an opening 112 through which a post 114 of the lower support 20 extends to secure to the cover 68. Such a construction is similar to the embodiments of FIGS. 7A-8B. The opening 112 and the post 114 are coaxial along axis 118. The opening 104 of the elongate element 34 has an oblong profile arranged for being axially offset relative to the axis 118, and a first surface 111 is arranged for abutting the hinge cover 68.

The elongate element 34 defines at least one elongate bar 120 protruding from a second surface 113 thereof and is arranged for being received by a corresponding elongate recess 106 formed by the main support 16. The main support 16 defines a plurality of circumferentially spaced recesses 108 arranged for receiving at least one detent 122 formed by the elongate element 34. The main support 16 defines an annular shoulder 110 from a first surface 105 thereof and defined about the opening 112.

The main support 16 defines a plurality of receptacles 124 circumferentially spaced about the opening 112 along a second surface 107 thereof. The lower support 20 defines a plurality of circumferentially spaced bosses 116 along a first surface 109 thereof, arranged for being received by the receptacles 124.

FIG. 10 exemplifies another embodiment of an anterior support 202 for a cervical collar 200 having a height adjustment system while preserving the contour 222 of the upper support 214 generally from the Miami J collar. The upper support 214, however, has improvements for securing to the main support 204 and features for increasing lateral immobilization.

The upper support 214 is arranged for easy attachment to the main support 204 by providing snap connections. A central portion at the front section of the main support 204 may have boss snaps 218 that fit and interlock with a corresponding aperture defined by the main support 204. Rear portions of the upper support 214 may define apertures corresponding to fasteners 220 formed by the main support 204 that engage the upper support 214, and aid in maintaining the upper support 214 in a desirable contour. The ability to easily attach an upper support to the main support enables a clinician to use differently-sized upper supports according to the user's anatomy. The upper and main supports may define apertures arranged for receiving fasteners not formed by either support, but are separate elements for securing the upper and main supports together.

The upper support 214 defines lateral extensions 226 on opposed sides thereof which are oriented to extend away from the central portion of the upper support, and effectively lengthen the extent the upper support extends along a user's

12

mandibles. The lateral extensions are found to aid in increasing lateral immobilization of a user when wearing the collar.

The anterior support 202 includes a lower support 206 hingedly connected to the main support 204, and the locking and unlocking of the hinge is obtained by a lock mechanism 212 that may be similar to any of the aforementioned embodiments. A lower or sternum pad 210 is attached to a lower or lowermost portion of the lower support 206. The lower support 206 may include an adjustment mechanism 208 for adjusting pressures and/or height of the lower pad 210 relative to the user's sternum.

Anterior support 202 has a cover 216 at the rearwardly portions, in contrast to the centrally located lock mechanism 212. The cover 216 generally covers the hinge connection between the main support 204 and the lower support 206, and further serves form part of the hinge connection. Specifically, the cover 216, forms a plurality of openings 232 through which posts 230 extend from the main support 204.

FIG. 11 depicts an embodiment of an elongate element or slidelock 240 useable in the hinge connection of the collar 200. The slidelock 240 defines a central rack 242 of teeth arranged to correspond and operatively engage elements forming part of the lock mechanism for enabling linear translation of the slidelock 240 relative to the main support, such as in the embodiment of FIGS. 3A-4. The elements of the lock mechanism may be similar to the pinion of FIG. 4, or may be a linear rack of teeth, or any other suitable feature or mechanism for engaging the central rack 242.

In this embodiment, as shown in FIG. 10, the slidelock 240 preferably slides over an outer surface of the main support 204 to cooperate with the main support 204 to arrest or prevent rotation of the lower support 206 relative to the main support 204. The main support 204 and the cover 216, as shown below, operate to guide the linear movement of the slidelock. The linear movement of the slidelock is intended relative to a rear portion of main support within such discrete section, while acknowledging that the slidelock is bendable about the arcuate contour of the main support while traveling between opposed directions, as better depicted referring to FIG. 3A.

The slidelock 240 defines elongate segments 244 extending from opposed sides of the central rack 242 to paddles 250 located at end portions for forming part of the hinge connection. The paddles 250 generally corresponding in proximate location to the end portion 257 of the lower support 206, to stabilize the end portion 257 in both the locked and unlocked conditions. An opening 251 defined by the paddles 250 is arranged so the paddle 250 corresponds to the end portion 257 in both locked and unlocked conditions, whereby it is within the periphery of the end portion 257, as exemplified in FIG. 15B. The slidelock 240 forms hooks 246, 248 along the elongate segments 244 preferably extending from a first surface of the slidelock that are engageable with elastic elements, as discussed more in connection with FIG. 13.

Referring to FIG. 12, the slidelock 240 preferably defines ramp 258 intended to be on Side A of the collar (and ramp 268 intended to be on Side B of the collar in FIG. 14B) preferably extending from a second surface of the slidelock 240 where the elongate segments 244 meet the paddles 250. It is within this area where the travel of the slidelock is intended as traveling linearly. According to the depicted embodiment, the ramp 258 on Side A of the collar generally decreases in height from the paddle 250 toward the central rack 242 and from the second surface of the slidelock 240.

Referring to FIG. 14B, the ramp 268 on Side B of the collar generally increases in height from the paddle 250

OSS 000372

US 11,478,374 B2

13

toward the central rack 242 and from the second surface of the slidelock 240. In this manner, the ramps 258, 268 have oppositely oriented configurations to accommodate linear movement of the slidelock between locked and unlocked conditions so both Sides A, B undergo simultaneously the same locking or unlocking. The ramps 256, 267 have opposite orientations as the ramps 258, 268. Both ramps 258, 268 disengage at the same time from the corresponding ramps 256, 267 of the main support 204 in the unlocked condition, and engage at the same time with the corresponding ramps 256, 267 in the locked condition.

FIGS. 13 and 14A depict how the slidelock 240 operates relative to other components of the anterior component 202. Specifically, the slidelock 240 is slidably held by the main support 204, and may be likewise contained by the cover 216. The main support 204 defines a ramp 256 protruding from an outer surface and configured for engagement with the ramp 258 of the slidelock 240, which urges at least one engaging element 259 defined by a rear portion of the lower support 206 to engage at one engaging element 260 formed by the cover 216. The ramps 256, 258 effectively wedge the at least one engaging elements 259, 260 against one another to lock the hinge connection.

According to the depicted example of FIGS. 14 and 15A, the end portion 257 of the lower support has a disk shape, and rotates about an axis Z-Z of the disk shape relative to a circular boss 262 of the cover 216. The end portion 257 may have a central opening 263 coaxial with the axis Z-Z, which engages the boss 262 and is coaxial with an axis Y-Y of the boss 262. The main support 204 has at least one post 261 extending through the opening 263 and through one of the openings 232 of the cover 216 for providing stability to rotation of the end portion 257. As the ramps 256, 258 engage and disengage, the end portion 257 axially moves relative to the at least one post 261, and the boss 262 has a sufficient height to maintain the engagement of the end portion 257 in both the locked and unlocked conditions. The cooperation of the ramps, and regulation thereof by the slidelock, control the height clearance in the hinge and the freedom of the disengagement of the lower support from the main support and/or cover.

As shown in FIGS. 14A and 15A, the at least one engaging elements 259, 260 are teeth adapted to engage one another in a locked condition of the collar 200. For simplicity, the cover 216 is shown transparently. The at least one engaging element 259 of the lower support 206 forms teeth that extend laterally from the disk shape or parallel to the axis Z-Z of the end portion 257. Preferably, the teeth extend laterally relative to the circumference of the end portion 257, and may extend completely or partially about the circumference. The at least one engaging element 260 of the cover 216 may be teeth oriented arcuately to smoothly engage the teeth of the at least one engaging element 259 of the lower support 206.

FIG. 14C shows how the ramps 256, 258 (for both Sides A and B) fall generally within a range of the at least one engaging elements 259, 260 to form an engagement zone 299 when the collar is in a locked condition. According to the engagement zone, the ramps 256, 258 wedge against one another, and are generally juxtaposed or stacked-up coinciding over the at least one engaging elements 259, 260 to urge them to mesh together to assure secure locking of the main support to the lower support, and hence the cervical collar in a selective angulation. According to the unlocked condition (not shown), the ramp 256 of the slidelock 240 falls outside of the engagement zone 299.

14

It will be understood these are merely examples of the at least one engaging element, which are envisioned to be provided in different structural shapes and orientations, however they are preferably arranged to engage and disengage to lock or unlock the lower support orientation relative to the main support. The cover sandwiches the end portion of the lower support with the main support, and the cover and main support are preferably rigidly secured to one another to assure they do not move relative to one another unlike the lower support relative to the main support in the unlocked condition.

Referring to FIGS. 13 and 15A, the cover 216 may include hooks 252, as may the main support 204, to support an elastic band 254 suspended between the hook 252 and at least one of the hooks 246, 248 of the slidelock 240. The elastic band 254 assists in assuring the lock mechanism is biased in a locked condition. When the slidelock translates according to actuation by the lock mechanism to an unlocked condition that the elastic band is tensioned more than in the locked condition to form a spring return mechanism.

FIG. 15B exemplifies a variation of a cover 264 arranged to fit to the main support 204 by posts 278 arranged for snapping. The main support 204 defines receptacles 269 configured and dimensioned to receive the posts 278 extending from the cover 264. The posts 278 are configured and dimensioned to flexibly extend through or into the receptacles 269 but deflect while pressed through the receptacles 269 to relax once having passed the opening to interlock with the main support 204. Various posts and receptacles are formed by the main support or the cover to interlock with one another.

In the variation of FIG. 15B, the main support 204 defines a boss 265 upon which the end portion 257 of lower support 206 rotates about. The boss 265 may have the receptacles 269 located therewithin to receive the posts 278.

As depicted in FIG. 15B, the end portion 257 defines a plurality of teeth 266 only disposed about a segment short of the entire circumference of the end portion 257 to define a range of rotation of the lower support 206 relative to the main support 204. It may be preferable to limit the rotation of the lower support to assure better selection of angles of the lower support relative to the upper support.

Either the cover 264 or the main support 204 may define at least one elongate guide 277 to guide the slidelock 240. The cover 264 or main support 204 may define an elongate slot for observing and facilitating movement of the slidelock 240, which may cooperate with the elongate guide 277.

In a variation of the embodiments described herein, different spring return mechanisms may be provided for a slidelock or elongate element, preferably so that once a user releases the lock mechanism, the spring return mechanism moves the lock mechanism back to the locked condition. The elongate element may include or have attached thereto a spring feature located at one of the end portions or along a length between the end portions arranged to deflect against a static boss located on the main support or other appropriate structure.

Referring to the examples of FIGS. 16A and 16B, a spring feature may be configured into the elongate element, either behind or ahead of the hinge. The spring feature may be connected to the elongate element as a separate component or be formed as part of the elongate element.

FIG. 16A depicts a slidelock 270 having a paddle 271 defining a compression spring feature 272 and extending from an arm 275. The paddle 271 defines a frame 273 arranged for compression upon sliding of the slidelock 270,

OSS 000373

US 11,478,374 B2

15                                                                    16

such that the spring feature 272 protrudes outwardly from the frame relative to the arm 275. The frame 273 defines interior corner openings 274. 276 permitting it to be compressed upon activation of the slidelock. The top opening 276 may secure a fastener or pin to the frame 273 upon which the paddle 271 compresses.

FIG. 16B depicts a slidelock 280 having a paddle defining a tension spring feature 282 and extending from an arm 285. The paddle 281 defines a frame 283 arranged for tension upon sliding of the slidelock 280, such that the spring feature 282 protrudes inwardly from the frame toward the arm 285. The frame 283 defines interior corner openings 284 permitting the paddle 281 to be pulled into tension upon activation of the slidelock.

FIG. 17 shows an alternate embodiment of a lock for the hinge which relies on a cam feature connected to or extending from the slidelock 290. The end portions of the main support and the lower support may include a plurality of peripheral teeth about their peripheries which are arranged to engage one another as the cam feature is urged against the main and lower supports end portions, such that the teeth mesh with one another to prevent movement of the hinge formed by the end portions of the main support and lower support.

One of the main support or lower support end portions is located concentrically with one another, and one generally within the periphery of the other. Both the main and lower supports may have an opening into which the cam feature can translate in and out of depending on the locking configuration of the lock mechanism. The main support defines interiorly facing teeth 294A, 294B located about an interior circumference, and the lower support defines at least one movable set of teeth 296A, 296B that are selectively engageable with the teeth 294A, 294B upon movement of the slidelock 290.

The at least one movable set of teeth 296A, 296B may include two blocks bearing the teeth along one side and along another side forming bearing surfaces 298A, 298B along which the slidelock 290 engages. The two movable sets of teeth 296A, 296B may form a first opening 295 into which the slidelock extends. The slidelock 290 forms a flared end 292 defining first and second sloped surfaces 293A, 293B engageable with the bearing surfaces 298A, 298B for moving the sets of teeth 296A, 296B relative to the teeth 294A, 294B. The sets of teeth 296A, 296B likewise form a second opening 297 through which the flared end 292 may be pushed through to reduce engagement of the sets of teeth 296A, 296B from the teeth 294A, 294B.

FIGS. 18A-18D represent another hinge connection 300 that may be useable in any of the cervical collar embodiments described herein, particularly with a lock mechanism. The hinge connection 300 includes a slidelock 302, an end portion 304 of a main support, an end portion 306 of a lower support, and a cam element 311 located between the end portions 304, 306, and in operative engagement with the slidelock 302. The cam element 311 includes at least one engaging element 316 of the slidelock 302 that is engageable with a corresponding at least one engaging element 326 of the end portion 306. In this example, the at least one engaging element 316 is a plurality of teeth 318, and the at least one engaging element 326 are radially extending teeth.

The slidelock 302 is linearly displaceable relative to the end portion 304, by at least one pin 308 and slot 310 connection. As shown, the slidelock 302 includes at least one pin 308 that is linearly slidable within a corresponding elongate slot 310. In the depicted embodiment, there are three pins 308 and three corresponding elongate slots 310.

FIG. 18B shows the cam element 311 having rear openings 320 arranged to flexibly bias against a periphery of the end portion 306 when in an unlocked condition to urge retraction of the slidelock once released into a locked condition. The cam element 311 further defines front openings 324 spaced apart from a boss 322 defined by the end portion 306 upon which the end portion 304 rotates, and connected to one another from a front frame segment 328. The front and rear frame segments 328, 330 extend about the boss 322, and are adapted to be tensioned thereabout. The front openings 324 receive pins 309 extending oppositely to the at least one pin 308, and carried by arms 312 defined by the slidelock 302.

FIG. 18C shows the cam element 311 in a locked condition with the at least one engaging element 316 engaging the at least one engaging element 318. The cam element 311 is in a predetermined rest position, whereby the rear frame segment 328 is tensioned about the boss 322 to maintain the at least one engaging element 316 locked. FIG. 18D exemplifies the cam element 311 in an unlocked condition whereby the at least one engaging element 316 is pushed or pulled away from the at least one engaging element 318, and the front or rear frame segments 328, 330 are tensioned.

Turning to FIGS. 19A-19B, the upper support 18 is slidably secured to the main support 16, such that continuous padding 28 is arranged about the main support 16. The upper support 18 can be locked in position relative to the main support 16, after adjusting the correct position. The main support 16 defines an elongate lateral slot 130 and the upper support 18 forms an elongate angled slot 132 arranged obliquely relative to the elongate slot 130 of the main support 16. A slider 126 slidably couples the main support 16 and the upper support 18 by the lateral and angled slots 128, 130. According to a variation, a knob of the slider may be rotated to unlock and lock the slider in a desired position. As seen from the components shown, the rotation my simply comprise a tight frictional fit of the slider against the main support 16 and the upper support 18. The lateral slot 130 is preferably arranged generally parallel to a length of the main support 16.

The main support 16 preferably defines a stationary element 128 proximate the lateral slot 130. The slider 126 has a tightening feature 134 for maintaining the lateral and angled slots in a relative position to another. Adjustment of the mandible angle could also be driven up/down through a simple rotating cam mechanism. The object is to elevate the posterior aspect of the chin tray to accommodate the slope of the mandible, thereby increasing stabilization against lateral movement of the head and C-Spine.

As in the embodiment of FIGS. 2A and 2B, and referring specifically to FIGS. 20 and 21, the adjustment mechanism 24 is located centrally along a lowermost portion of the lower support 20. The adjustment mechanism 24 has a sternal pad 136 adjustable in location relative to the lower support 20. The sternal pad 136 is mounted to a ball joint 142. The adjustment mechanism 24 has an adjustment dial and an extension element 144 arranged for adjustably extending relative to the lower support 20. The extension element 144 carries the ball joint 142 at an end thereof. The adjustment mechanism 24 includes a dial 138 for adjusting the length of the extension element 144 between the lower support 20 and the sternal pad 136. The dial 138 is accessible by a recess formed by the adjustment mechanism 24.

FIGS. 22A and 22B show a variation of the adjustment mechanism 24 including a housing 145 arranged for receiving the extension element 144 in a contracted configuration resulting in a reduced or substantially minimized distance

OSS 000374

US 11,478,374 B2

17

between the lower support and the sternal pad. The extension element 145 has a screw thread 147, and the housing 145 defines corresponding threads permitting slidable movement between the extension element 145 and the screw thread 147 according to adjustment of the dial 138.

As in the embodiment of FIGS. 2A and 2B, and referring to FIGS. 23A and 23B, a connector 26 connects the anterior component 12 to the posterior component 14. The connector 26 includes a base element 148 securing to a plate 150, and the base element 148 has a strap guide 152 about which a strap 146 extending from the posterior component 14 extends. The connector 26 has a pull tab 154 arranged for detaching the plate 150 from the base 148.

FIGS. 24A and 24B display another embodiment of a connector 160 securing to a plate 164. A cap 166 is arranged to extend over the base element 162 and secure therewith. The connector 160 includes a pull tab 170 arranged for detaching the plate 160 from the base element 162 and the cap 166. The cap 166 defines an opening 168 with the plate 160 for permitting a strap 172 extending therethrough which secures to the posterior component. The base element 162 defines a platform 178 about which the strap 172 extends, and the platform 178 has at least one protuberance 180 over which the strap 172 extends.

The base element 162 further defines a channel guide 182 proximate to the opening 168 and through which the strap 172 extends. The base element 162 forms at least one detent 188 proximate to the at least one protuberance 180 for selective engagement of the strap 172 with the at least one protuberance 180. When the connector 160 is in a locked condition, the at least one protuberance 180 and the at least one detent 188 arrest the strap 172 from movement as they are urged against each other.

The plate 164 defines at least one retainer 186 having a channel 190 for selectively receiving a pin 184 protruding from the base element 162, such that the pin 184 slides within the channel 190 between locked and unlocked conditions of the connector 160. The cap 166 defines a side recess 174 for sliding the cap 166 and base element 162 relative to the plate 164 and permitting the at least one retainer 186 to move therewithin. The cap 166 defines a front recess 176 through which the strap 172 extends.

The features may be employed in different combinations from those shown in a cervical collar. While the foregoing embodiments have been described and shown, alternatives and modifications of these embodiments, such as those suggested by others, may be made to fall within the invention.

The invention claimed is:

1. A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising:
   a main support;
   a lower support hingedly connected to the main support;
   a sternum pad; and
   an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support;
   wherein the sternum pad is mounted to a ball joint and the adjustment mechanism has an adjustment dial and an extension element arranged for adjustably extending relative to the lower support.

2. The cervical collar of claim 1, wherein the adjustment mechanism includes an extension element variably extendable from the adjustment mechanism.

18

3. The cervical collar of claim 2, wherein the adjustment mechanism includes a dial for adjusting a distance the extension element extends from the adjustment mechanism.

4. The cervical collar of claim 2, wherein the adjustment mechanism includes a housing arranged for receiving the extension element in a contracted configuration.

5. The cervical collar of claim 1, wherein the main support carries an upper support connected to inside the main support and oriented to face a mandible of a user.

6. The cervical collar of claim 5, wherein the upper support is maintained in a stationary relationship with the main support.

7. The cervical collar of claim 5, wherein the upper support is rigid.

8. The cervical collar of claim 1, wherein the adjustment mechanism is located at a lowermost portion of the lower support.

9. The cervical collar of claim 8, wherein the adjustment mechanism is located centrally at the lowermost portion of the lower support.

10. The cervical collar of claim 1, wherein the main support carries a lock mechanism for locking rotation of the lower support relative to the main support.

11. The cervical collar of claim 1, wherein the main support has a generally arcuate configuration adapted to extend about the mandible of a user, and the lower support has a generally arcuate configuration contoured for being adapted for securing against a sternum of the user.

12. A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising:
   a main support;
   a lower support hingedly connected to the main support;
   a sternum pad; and
   an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support;
   wherein the adjustment mechanism includes a housing arranged for receiving an extension element in a contracted configuration resulting in a reduced or substantially minimized distance between the lower support and the sternum pad, the extension element having a screw thread, and the housing defining corresponding threads permitting slidable movement between the extension element and the screw thread according to adjustment of a dial associated with the extension element.

13. The cervical collar of claim 12, wherein the housing defines a recess from which at least a portion of the dial extends.

14. A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising:
   a main support;
   a lower support hingedly connected to the main support;
   a sternum pad; and
   an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support;
   further comprising a lock mechanism for locking rotation of the lower support relative to the main support, the lock mechanism coupled to a slidelock arranged for operatively engaging end portions of the main support and lower support for locking and unlocking rotation of the lower support relative to the main support;

OSS 000375

US 11,478,374 B2

19

20

wherein the slidelock slides over an outer surface of the main support to cooperate with the main support to arrest or prevent rotation of the lower support relative to the main support.

**15**. The cervical collar of claim **14**, wherein the slidelock defines a central rack of teeth arranged to correspond to and operatively engage elements forming part of the lock mechanism for enabling linear translation of the slidelock relative to the main support.

\* \* \* \* \*

OSS 000376

# EXHIBIT 8

**Sent**:        2/16/2017 8:26:07 PM
**To**:          Tatjana Latinovic [tlatinovic@ossur.com]
**Subject**:     new patent idea
**Attachments**: sternum relief unlocked.PNG; sternum relief locked.PNG; 20170216_115726.mp4

I've got something going on the collar that probably should be looked at from a patent protection standpoint.  See attached files.

This is for the sternum contact relief request.  It achieves relief thru a selectable stiffener knob as shown in the pictures.  In the video is a quick and dirty mock up I did to prove out the idea.  That one is a slide mechanism instead of a knob, but the idea is the same.

Henry Hsu
Mechanical Engineer
Ossur Americas
27051 Towne Centre Dr.
Foothill Ranch, CA 92610
949-382-3738
949-861-0870 Cell

CONFIDENTIAL

OSS 008311





CONFIDENTIAL

OSS 008313

# EXHIBIT 9

US 20180078400A1

(19) **United States**
(12) **Patent Application Publication** (10) Pub. No.: US 2018/0078400 A1
HSU et al. (43) Pub. Date: **Mar. 22, 2018**

(54) **CERVICAL COLLAR**

(71) Applicant: **Ossur Iceland ehf**, Reykjavik (IS)

(72) Inventors: **Henry HSU**, Foothill Ranch, CA (US); **Mark Harman POWELL**, Foothill Ranch, CA (US); **Christopher Callicott WEBSTER**, Foothill Ranch, CA (US); **Jared OLIVO**, Foothill Ranch, CA (US)

(21) Appl. No.: **15/696,885**

(22) Filed: **Sep. 6, 2017**

**Related U.S. Application Data**

(60) Provisional application No. 62/396,279, filed on Sep. 19, 2016, provisional application No. 62/430,258, filed on Dec. 5, 2016, provisional application No. 62/504,121, filed on May 10, 2017.

**Publication Classification**

(51) **Int. Cl.**
     *A61F 5/055* (2006.01)
(52) **U.S. Cl.**
     CPC ..................................... *A61F 5/055* (2013.01)

(57) **ABSTRACT**

A cervical collar having an anterior component including a main support, an intermediate support pivotally connecting to the main support at a rear portion of the anterior component, and forming a frontal opening with the main support. An adjustment mechanism connects the main support to the intermediate support and locks a position of the intermediate support relative to the main support at a front portion of anterior component. The adjustment mechanism has an actuator for disengaging the main support from the intermediate support at the front portion and permits the intermediate support to pivot relative to the main support at the rear portion to vary a height of the frontal opening. A posterior component of the cervical collar is adapted to provide improved anterior-posterior and lateral occipital support.



CALCO 002470



FIG. 1
(Prior Art)

CALCO 002471



FIG. 2

CALCO 002472



**FIG. 3**

CALCO 002473



FIG. 4

CALCO 002474



FIG. 5A

FIG. 5B

CALCO 002475

Case 8:22-cv-01971-JWH-KES    Document 110-2    Filed 06/07/24    Page 240 of 637
Page ID #:4707



FIG. 6A



FIG. 6B

CALCO 002476



FIG. 7

CALCO 002477



FIG. 8

CALCO 002478



**FIG. 9A**



**FIG. 9B**

CALCO 002479



FIG. 10A

FIG. 10B

CALCO 002480



FIG. 11

FIG. 12A

FIG. 12B

CALCO 002481

Patent Application Publication    Mar. 22, 2018 Sheet 12 of 18    US 2018/0078400 A1



**FIG. 13A**



**FIG. 13B**

CALCO 002482



FIG. 14A



FIG. 14B

CALCO 002483

Case 8:22-cv-01971-JWH-KES    Document 110-2    Filed 06/07/24    Page 248 of 637
Page ID #:4715



FIG. 15A

FIG. 15B

CALCO 002484



FIG. 15C

CALCO 002485



FIG. 15D



FIG. 15E

CALCO 002486



FIG. 16A

FIG. 16B

FIG. 16C

CALCO 002487



FIG. 17A

FIG. 17B

FIG. 17C

CALCO 002488

US 2018/0078400 A1

Mar. 22, 2018

1

## CERVICAL COLLAR

### CROSS-REFERENCE TO RELATED APPLICATIONS

[0001]  This disclosure incorporates by reference U.S. Pat. No. 5,632,722, granted May 27, 1997, U.S. Pat. No. 6,254, 560, granted Jul. 3, 2001, U.S. Pat. No. 7,981,068, granted Jul. 19, 2011, U.S. Pat. No. 8,038,636, granted Oct. 18, 2011, U.S. Pat. No. 8,679,044, granted Mar. 25, 2014, U.S. patent application publication no. 2013/0310722 published on Nov. 21, 2013, and U.S. patent application publication no. 2016/0287424, published Oct. 6, 2016.

[0002]  This disclosure incorporates by reference U.S. provisional application No. 62/396,279, filed on Sep. 19, 2016, U.S. provisional application No. 62/430,258, filed on Dec. 5, 2016, and U.S. provisional application No. 62/504,121, filed on May 10, 2017.

### FIELD OF THE DISCLOSURE

[0003]  The present disclosure relates to an orthopedic device, and more specifically to cervical collars having height adjustability at a front part, while providing a platform for securing known other components of a cervical collar thereto without significantly modifying their anatomical contours and connection to the height adjusted components.

### BACKGROUND

[0004]  Cervical collars are used for treating conditions of the neck and the cervical spine by cervical spine immobilization. These collars may handle whiplash and other such injuries, where support for the head and neck of the patient is needed, and function to partially immobilize the head and neck of the patient, and to relieve spasm or strain to which the neck muscles of the patient might be subjected by transferring weight or force from the head of the patient to the shoulders or adjacent areas of the patient. Other collars may be arranged for complete or near complete immobilization of the head and neck of the patient to reduce risk of secondary damage to the spinal cord.

[0005]  A challenge in designing a cervical collar is balancing desired immobilization with user comfort, such as venous pressure. Immobilization may be measured by five planes of movement, including flexion, extension, lateral tilt to right and left, and rotation of the neck to right and left, which are collectively considered generally as cervical range of motion (CROM).

[0006]  Unfortunately, many patients using cervical collars develop decubitus or decubitus ulcers (also known as bed sores, pressure sores, or trophic ulcers) when wearing cervical collars. These ailments, which involve a breakdown of tissue overlying a bone, arise when tissues overlying a bony prominence are subjected to prolonged pressure against an object such as a cervical collar. Besides impacting superficial tissues such as the skin, decubitus and decubitus ulcers also can aggravate muscle and bone. Restrictive collars are one of the common causes of skin breakdown in the trauma population. As pressure-ulcers are among the most common, yet serious and costly, complications of routine spinal immobilization, it is desirable to provide cervical collars that minimize the probability of ulcers.

[0007]  Moisture and pressure are two major factors which contribute to the formation of decubitus. Once a decubitus ulcer forms, there is no good method of determining the extent of tissue damage. Further, once started, decubitus can continue to progress through the skin and fat tissue to muscle and eventually to the bone, and is very difficult to treat and arrest. In extreme cases, surgical replacement of bone, muscle, and skin are required to restore that portion of the body of the patient where decubitus has formed.

[0008]  It is desirable to eliminate or at least minimize the effect of pressure points when using cervical collars. The likelihood of contracting decubitus can be greatly reduced by a more even distribution of pressure to several parts of the body of the patient.

[0009]  Multiple studies have evaluated CROM and the likelihood of tissue-interface pressure (TIP) exerted by commercially-available cervical collars. One of the known commercial collars that has proven successful at striking the balance of minimal TIP and most restriction of CROM is the Miami J collar (Össur, hf, Reykjavik, Iceland). Multiple studies have validated the features of the Miami J collar, including: Tescher, A. N. et al. *Range-of-motion restriction and craniofacial tissue-interface pressure from four cervical collars*, Journal of Trauma-Injury Infection & Critical Care 63; 5; 1120-1126 (2007); Jacobson, T. M. et al. *Efforts to reduce occipital pressure ulcers*. Journal of Nursing Care Quality, 23; 3; 283-288 (2008); Karason, S. et al., *Evaluation of clinical efficacy and safety of cervical trauma collars, differences in immobilization, effect on jugular pressure and patient comfort*, Scandinavian Journal of Trauma, Resuscitation and Emergency Medicine, 22:37 (2014).

[0010]  The Miami J collar is also described in U.S. Pat. No. 5,632,722, granted May 27, 1997; U.S. Pat. No. 6,254, 560, granted Jul. 3, 2001; U.S. Pat. No. 6,921,376, granted Jul. 26, 2005. Variations of the Miami J collar, embodying the Miami J Advance collar, are described in U.S. Pat. No. 7,981,068, granted Jul. 19, 2011, and U.S. Pat. No. 8,679, 044, granted Mar. 25, 2014.

[0011]  An important feature, preferably included in cervical collars to overcome limited adaptability to accommodate the body of the patient and the particular ailment prompting the need for wearing a cervical collar, is the facility for adjusting the relative positions of various components of the cervical collar. Part of the effectiveness of the Miami J collar is due to its ability for customization to different anatomical sizes of users.

[0012]  As taught in U.S. Pat. No. 6,254,560, the Miami J collar has supports that enable customized pressure distribution and avoid skin breakdown. A front part of the Miami J collar has an adjustable upper support for the mandibular, chin and/or jaw of the user, and mounted to a lower support or sternum brace by means which permit relative movement between the upper support and the lower support. The posterior component or back part of the Miami J collar has an occipital support mounted to a back support by means which permit relative sliding movement between the occipital support and the back support. The shape of the upper support and occipital support are anatomically optimized for superior immobilization and patient comfort.

[0013]  FIG. 1 exemplifies a known version of the Miami J collar **100**, as taught in the aforementioned patents and publications, particularly U.S. Pat. Nos. 5,632,722 and 6,254,560. The collar **100** generally includes an anterior component **102** and a posterior component **104** connected to one another by a strap system **116**. The anterior component **102** has a main support **106** defining a frontal opening **124**,

CALCO 002489

US 2018/0078400 A1

2

Mar. 22, 2018

and secures to an upper support **108** intended to support the mandibular, jaw, or chin of the user. The upper support **108** is connected to the main support **106** at side sections by a side connection **120**, and is connected at a front section by a front connection **122**, and lacks height adjustability while the collar **100** is being worn. Padding **112** lines the anterior and posterior components **102**, **104**.

[0014]   The anterior component **102** defines a sternal support **110** forming an extension adapted to extend below the clavicle of a user and rest against the sternum. The sternal support **110** carries a sternum pad **114** to avoid decubitus over long periods of wear of the collar **100**. The sternum pad **114** typically has a fixed thickness, and lacks adjustability in the sense that when worn it applies constant pressure.

[0015]   The posterior component **104** comprises lower and upper parts **126**, **128**, with the upper part **128** serving as an occipital support. The lower and upper parts **126**, **128** are connected to one another by a posterior connection **124**. Although not shown, the posterior component **104** may be unitary and monolithic comprising a single part in contrast to the two parts depicted in FIG. **1**, and resemble the posterior component taught by U.S. Pat. No. 7,981,068 and found in the Miami J Advance collar.

[0016]   The upper support **128** and the anterior and posterior components **102**, **104** are generally symmetrical about a vertical center line, and may be formed from rigid or semi-rigid plastic. The material forming the upper support **128** and the anterior and posterior components **102**, **104** may be flexible prior to donning the collar **100**, but sufficiently rigid once the collar **100** is donned to resist yielding due to weight exerted by the user.

[0017]   Both the upper support **128** and the occipital support of the Miami J collar **100** are uniquely anatomically shaped to maximize comfort and immobilization while minimizing pressure on the user. Because the upper support **128** and the occipital support of the Miami J collar **100** are clinically proven, it is desired that any improvements over the current Miami J collar **100** provide means for preserving the function and shape of the upper support **128** and occipital support of the current Miami J collar **100**.

[0018]   Another challenge in designing a cervical collar is providing convenient yet reliable height adjustment of sternum support elements. Sternum support elements normally connect to an anterior portion of a cervical collar via struts or connections that define an anterior aperture that allows clinicians, physicians, and first responders to gain access to a user's trachea for medical procedures and examinations without removal of the collar. Because the sternum support normally attaches to both left and right sides of the anterior portion of the collar in order to define this aperture, adjusting the height of the sternum support requires the inconvenient and potentially uneven adjustment of both left- and right-sided complementary adjustment apparatuses.

[0019]   Another challenge is the design of the adjustment apparatuses themselves. There is a problem of adjustment apparatuses being clumsy and inconvenient for a clinician to operate quickly and easily, and especially for a user to operate while wearing the device on their own neck.

[0020]   Moreover, height adjustment apparatuses are sometimes unfortunately designed in such a way that a user or clinician may inadvertently touch the apparatus in a way that tampers with or adjusts the height in an unplanned and/or undesired way. A desired feature of a cervical collar

is therefore a height adjustment apparatus that, while convenient to operate, is not susceptible to accidental adjustments or tampering.

[0021]   Yet another challenge is the ability of a clinician or user to easily adjust the flexibility of a cervical collar. At certain times, such as during every day, long-term use, a user may need to have greater flexibility for flexion of the neck, i.e. moving the chin toward the sternum. At other times, such as during first response procedures or medical procedures, a user may need to be immobilized from flexion of the neck by exerting greater pressure on the sternum. There is a problem of cervical collars not offering a convenient yet effective method for switching between the collar allowing flexion and disallowing flexion.

[0022]   Another challenge is that existing cervical collars often comprise inadequate or inconvenient strap systems. For example, straps may attach via hook and loop fastener to inconvenient locations on the body of the cervical collar, leading to difficulty in donning the collar correctly and/or consistently. Straps may not be configured to attach closely to the body of the cervical collar and consequently jut out therefrom, leading potentially to damage, injury, inconvenience, and/or unintended removal of or tampering with the collar if the straps catch on an object or are unintentionally pulled, adjusted, or released by a user, clinician, or others.

[0023]   Existing cervical collars often comprise inadequate or poorly-fitted posterior components. For example, posterior components may be overly simplistic in design, comprising flat profiles and no features to mitigate pressure points along the occiput. These designs can lead to or exacerbate decubitus and discomfort.

[0024]   In light of the foregoing considerations, there is a further need for a cervical collar with a height adjustment mechanism on the sternum support that provides for a convenient, effective method for allowing or restricting flexion and is easily and accurately adjustable in height without allowing accidental tampering with the height, as well as an improved strap system for connecting anterior and posterior components of a cervical collar, and an improved shape for a posterior component of a cervical collar.

SUMMARY

[0025]   The present disclosure describes an improved cervical collar for restricting head and neck movement to promote healing after an injury to the spinal column. The cervical collar has height, circumferential and angular adjustment to accommodate a wide variety of patient sizes and anatomical configurations, and to accommodate dimensional changes caused by increased or decreased swelling of the affected anatomical portions of the patients during treatment of the injury. The cervical collar is arranged to stabilize and immobilize the cervical area, by restricting lateral, sagittal, and coronal movement, while improving comfort and fit for individual patients.

[0026]   Embodiments of the disclosure relate to a cervical collar having a height adjustment system between supports forming an anterior component, which permit the use of known supports in the cervical collar to maintain their functionality, comfort, and fit, including their anatomical contours and connection to the height adjusted components. Embodiments of the disclosure also relate to an improved

CALCO 002490

strap system for cervical collars. Yet further embodiments of the disclosure relate to improved posterior components for cervical collars.

[0027]  The height adjustment system is arranged for adjusting the chin height in a simple and effective manner that limits or mitigates tampering with the height while the collar is worn. The height adjustment system preferably includes using incremental height adjustment so the height may be locked at a desired height setting. The height adjustment system may be arranged to allow usage in existing collar designs, such as the Miami J or Miami J Advance collars, without substantially altering the shape and function of the upper support and posterior component including an occipital support.

[0028]  The height adjustment system mitigates or eliminates the need for pre-sizing methods, and is provided in a simplified manner to enable many height settings customizable for different users. The height adjustment system allows for the use of known upper and posterior components, which have been on the market for many years to serve many users of cervical collars, and are clinically proven for their efficacy.

[0029]  The height adjustment system allows for improved placement and configuration of a cervical collar on patients of different heights, which makes adjustment possible and easy while the collar is being worn. The upper support and posterior component can be properly fitted against the chin and head of a patient by a clinician, followed by the extension of the anterior component against the patient's chest. Likewise, the anterior component may be placed against the patient's chest and the upper support and posterior component can then be extended to the chin and head of the patient. The height setting can then be locked at the desired height setting by the clinician to ensure a proper fit for the user.

[0030]  To avoid inadvertent adjustment of the collar height during use, locking means are provided in combination with the height adjustment system. While the height adjustment system arrests the height of the collar, the locking means offers another level of locking in addition to the height adjustment system.

[0031]  Unlike in the prior art where the lower support and corresponding sternum pad are fixed, embodiments of the disclosure permit selective adjustment of pressure applied to the sternum of the user, particularly by locking or unlocking flexibility of the lower support.

[0032]  Embodiments described herein provide a strap system that improves circumferential pressure exerted about the neck of the user by offering greater extension of the strap about the user's neck, and thus the cervical collar. The strap system is arranged to facilitate donning and doffing of the cervical collar by offering improved means for attaching and detaching the anterior component from the posterior component. The anterior and posterior components offer greater circumferential adjustability to accommodate different user anatomical sizes, healing phases, padding thickness, and other reasons for adjusting collar circumference. The strap system further reduces damage, injury, or inadvertent adjustment of the collar due to its improved system for maintaining strap ends close to or flush against the body of the strap.

[0033]  The posterior component in the embodiments offers improved pressure relief properties for areas of a user about the posterior component, and about a user's spinal column. The posterior component is contoured to adapt to the strap while maintaining its pressure relieving properties. Indeed, the posterior component is arranged to provide improved anterior-posterior and lateral occipital support by way of its improved shape, attachment features, and other features on both the inner and outer side of the posterior component.

[0034]  These and other features, aspects, and advantages of the present disclosure will become better understood regarding the following description, appended claims, and accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0035]  FIG. 1 is a perspective view of a prior art cervical collar.

[0036]  FIG. 2 is a perspective view of an embodiment of a cervical collar according to the present disclosure.

[0037]  FIG. 3 is a side elevational view of the cervical collar embodiment of FIG. 2.

[0038]  FIG. 4 is a perspective view of another embodiment of the cervical collar of FIG. 2.

[0039]  FIG. 5A is a schematic view of a sternal height mechanism in a lowered configuration.

[0040]  FIG. 5B is a schematic view of the sternal height mechanism of FIG. 5A in a raised configuration.

[0041]  FIG. 6A is a schematic view of a variation of the sternal height mechanism in FIG. 5A in a lowered configuration.

[0042]  FIG. 6B is a schematic view of the sternal height mechanism of FIG. 6A in a raised configuration.

[0043]  FIG. 7 is a front elevational view of a variation of the anterior component in the cervical collar of FIG. 2.

[0044]  FIG. 8 is a rear elevational view of the anterior component of FIG. 7.

[0045]  FIG. 9A is a schematic view of a sternal relief device in the cervical collar of FIG. 2 in a stiff configuration.

[0046]  FIG. 9B is a schematic view of the sternal relief device of FIG. 9B in a relief configuration.

[0047]  FIG. 10A is a front elevational view of the lower support in the anterior component of FIG. 7 with the lower support depicted in transparent form.

[0048]  FIG. 10B is a plan view of the adjustment mechanism in FIG. 10A with the lower support removed.

[0049]  FIG. 11 is a perspective view of the base in the adjustment mechanism of FIG. 10A.

[0050]  FIG. 12A is an elevational view of the actuator in the adjustment mechanism of FIG. 10A.

[0051]  FIG. 12B is a plan view of the actuator in the adjustment mechanism of FIG. 10A.

[0052]  FIG. 13A is a perspective schematic view of the adjustment mechanism of FIG. 10A in an unlocked configuration.

[0053]  FIG. 13B is a perspective schematic view of the adjustment mechanism of FIG. 10A in a locked configuration.

[0054]  FIG. 14A is a perspective schematic view taken along line XIVA-XIVA in FIG. 10A of the lock mechanism in the locked configuration.

[0055]  FIG. 14B is a perspective schematic view of the lock mechanism in FIG. 10A in the unlocked configuration.

[0056]  FIG. 15A is an elevational view of a variation of the posterior component in the cervical collar of FIG. 2 showing an outer side of the posterior component.

[0057]  FIG. 15B is a detail view taken from detail XV B in FIG. 15A.

CALCO 002491

[0058]  FIG. **15**C is a side elevational view of the posterior component of FIG. **15**A.

[0059]  FIG. **15**D is an elevational view of the posterior component in FIG. **15**A showing an inner side.

[0060]  FIG. **15**E is a top plan view of the posterior component of FIG. **15**A.

[0061]  FIG. **16**A is a perspective view of a first side of a strap tab.

[0062]  FIG. **16**B is a perspective view of a second side of the strap tab of FIG. **16**A.

[0063]  FIG. **16**C is a plan view of a strap system.

[0064]  FIG. **17**A is a schematic view of another embodiment of a strap system on the cervical collar of FIG. **2**.

[0065]  FIG. **17**B is a plan view of a variation of the strap system of FIG. **17**A.

[0066]  FIG. **17**C is a schematic view of yet another embodiment of a strap system on a cervical collar.

[0067]  The drawing figures are not necessarily drawn to scale, but instead are drawn to provide a better understanding of the components thereof, and are not intended to be limiting in scope, but to provide exemplary illustrations. The figures illustrate exemplary configurations of a cervical collar, and in no way limit the structures or configurations of a cervical collar according to the present disclosure.

### DETAILED DESCRIPTION OF VARIOUS EMBODIMENTS

#### A. Introduction

[0068]  Embodiments of an orthopedic device are provided for stabilizing and supporting anatomical portions of a user, for example, the neck and head of a user.

[0069]  Although the embodiments of the disclosure are adapted for supporting and stabilizing anatomical portions of many users having various anatomical shapes and sizes, the embodiments of the disclosure may also be dimensioned to accommodate different types, shapes and sizes of anatomical portions.

[0070]  A better understanding of different embodiments of the disclosure may be had from the following description read with the accompanying drawings in which like reference characters refer to like elements.

[0071]  While the disclosure is susceptible to various modifications and alternative constructions, certain illustrative embodiments are in the drawings and are described below. It should be understood, however, there is no intention to limit the disclosure to the embodiments disclosed, but on the contrary, the intention covers all modifications, alternative constructions, combinations, and equivalents falling within the spirit and scope of the disclosure.

[0072]  It will be understood that, unless a term is defined in this disclosure to represent a described meaning, there is no intent to limit the meaning of such term, either expressly or indirectly, beyond its plain or ordinary meaning.

[0073]  While the foregoing embodiments have been described and shown, alternatives and modifications of these embodiments, such as those suggested by others may be made to fall within the scope of the invention. While the cervical collar has been described in combination with collar parts, it will be understood that the principles described may be extended to other types of orthopedic and prosthetic devices.

[0074]  Reference characters are provided in the claims for explanatory purposes only and are not intended to limit the scope of the claims or restrict each claim limitation to the element in the drawings and identified by the reference character.

[0075]  For ease of understanding the disclosed embodiments of a cervical collar, the front or anterior, and rear or posterior portions of the cervical collar are described independently. The anterior and posterior portions of the cervical collar function together to form a supporting and stabilizing cervical collar that encompasses the anatomical portions of the user.

[0076]  The term "posterior" also has its ordinary meaning and refers to a location that is behind or to the rear of another location. The term "anterior" has its ordinary meaning and refers to a location ahead of or to the front of another location.

[0077]  The terms "rigid," "flexible," "compliant," and "resilient" may be used herein to distinguish characteristics of portions of certain features of the cervical collar. The term "rigid" is intended to denote that an element of the collar is generally devoid of flexibility. Within the context of support members or shells that are "rigid," it is intended to indicate that they do not lose their overall shape when force is applied, and in fact they may break if bent with sufficient force. On the other hand, the term "flexible" is intended to denote that features are capable of repeated bending such that the features may be bent into retained shapes or the features do not retain a general shape, but continuously deform when force is applied. The term "compliant" is used to qualify such flexible features as generally conforming to the shape of another object when placed in contact therewith, via any suitable natural or applied forces, such as gravitational forces, or forces applied by external mechanisms, for example, strap mechanisms. The term "resilient" is used to qualify such flexible features as generally returning to an initial general shape without permanent deformation. As for the term "semi-rigid," this term is used to connote properties of support members or shells that provide support and are free-standing, however such support members or shells may have some degree of flexibility or resiliency.

[0078]  The term "flexible" should denote that features are capable of repeated bending such that the features may be bent into retained shapes or the features do not retain a general shape, but continuously deform when force is applied. The term "compressible" may be used to qualify such structural features as being capable of being reduced in size or volume due to the exertion of force applied to the structural feature.

#### B. Embodiments of the Cervical Collar

[0079]  FIGS. **2** and **3** exemplify an embodiment of a cervical collar **200** of the disclosure. The cervical collar **200** includes an anterior component **202** that secures to a posterior component **204** by a strap system **216**. The anterior component **202** includes a main support **206** upon which the strap system **216** is preferably secured, and has a sternum section **214** that extends to the sternum of a user. The sternum section **214** is formed at least in part by a base component **207** upon which a cover **213** (which may alternatively be called a front casing) housing at least part of an adjustment mechanism **220** is disposed.

[0080]  An intermediate support **210** secures to the main support **206**, and is adjustable relative to the main support **206** by an adjustment mechanism **220**. The intermediate

CALCO 002492

US 2018/0078400 A1

Mar. 22, 2018

5

support **210** and the main support **206** together form a frontal opening **218**. An upper support **208** (which may alternatively be called a chin tray) is located on the intermediate support **210** above the main support **206**. Padding **212** is located along the anterior and posterior components **202**, **204**.

[0081] Referring specifically to FIG. **3**, the strap system **216** is shown in one of several preferred configurations. Specifically, the strap system **216** includes straps **225** located on opposed sides of the collar **200**, and extending between the anterior and posterior components **202**, **204**. Each strap **225** is elongate and has first and second segments **226**, **228**. The first segment **226** is mounted onto a frontal projection **222** of the main support **206**.

[0082] Frontal projections **222** extend toward and over a top portion of the frontal opening **218**. The frontal projections **222** preferably extend anteriorly past and over the adjustment mechanism **220**, as will be evident in following embodiments of the adjustment mechanism **220**. Likewise, the frontal projections **222** enclose at least part of the intermediate support **210**, by extending over a front surface of the intermediate support **210**, and provide greater support to the intermediate support **210** about the user. The frontal projections **222**, at least in exterior or outwardly portions thereof, are preferably rigid or semi rigid along a circumferential or arcuate profile of the intermediate support **210** to provide support to the upper and intermediate supports **208**, **210**. In this manner, the frontal projections **222** do not yield or bend when the strap system **216** is secured thereon in combination with the posterior component **204** about a neck of a user.

[0083] By extending forwardly, the frontal projections **222** provide a portion on the surface of the anterior component **202** for receiving and corresponding to straps **225**. Straps **225** may thus be advantageously adjacent to and/or flush against the anterior component **202** as opposed to jutting outwardly from the collar **200**. This is in contrast to existing collars where straps freely jut outwardly from the collar, leading to risk of inadvertent adjustment, damage to the collar, or injury to a user if the straps are inadvertently tampered with.

[0084] The frontal projections **222** enable a stable platform upon which the strap system **216** can secure and preferably does not interfere with the upper support **208**, thereby allowing removal of the strap system **216**, or on one side thereof without adjusting the integrity of the intermediate support **210**, and the upper support **208**. The additional length provided by the frontal projections **222**, by which they extend over the frontal opening **218**, offers greater adjustability for the strap system **216**, thereby offering more accommodation to users' neck circumferences.

[0085] The frontal projections **222** serve to stabilize the force exerted by the user's chin by generally extending over the main support **206**, as evidenced by force **231**, which generally coincides downwardly with a lower portion of the main support **206**. As the frontal projections **222** straddle the intermediate support **210**, the main support **206** is arranged obliquely downwardly relative to the frontal projections **222**, which generally jut horizontally and preferably parallel to a user's mandible.

[0086] As will be explained below, the intermediate support **210**, while carrying the upper support **208**, moves relative to the main support **206** and does not interfere with the strap system **216** during height adjustment of the anterior

component **202** of the collar **200**. In this manner, the strap system **216** remains intact while securing the anterior and posterior components **202**, **204** to one another. The anterior component **202** can be advantageously adjusted for height while the collar **200** is being worn by the user since the intermediate support **210** (and hence upper support **208**) is moved relative to the main support **206**, but the relationship between main support **206** and posterior component **204** is uninterrupted and unchanged.

[0087] The arrangement of the strap system **216** in combination with the frontal projections **222** enables a clinician to don and size the collar **200** on the user in either direction (i.e. either toward the chin or toward the sternum). Specifically, the clinician may place the upper support **208** against a user's chin, and then use the adjustment mechanism **220** to drop the main support **206** via the intermediate support **210** to the appropriate size to abut the user's sternum. The strap system **216** may first be appropriately secured to the anterior and posterior components **202**, **204**, or secured after the collar **200** has been appropriately sized. Alternatively, the main support **206** may be placed against a user's sternum, and secured to the posterior component **204** by the strap system **216**. The clinician may then use the adjustment mechanism **220** to selectively adjust the upper support **208** via the intermediate support **210** to the appropriate height so as to abut the user's chin, while the collar **200** is already secured to the user.

[0088] The posterior component **204** defines side extensions **232** that define a series of strap slots **234** for securing the straps **225** to the frontal projections **222**. In the depicted embodiment, the straps **225** each have a first segment **226** secured to a fastener **224** on the frontal projections **222**. The first strap segment **226** may be configured in shape to correspond to a shape of the corresponding frontal projection **222**. The strap **225** is looped at loop segment **227** about at least one of the strap slots of the series of strap slots **234**. In this embodiment, the strap **225** loops through first and second slots **234***a*, **234***b* of the series of straps slots **234**. The series of strap slots **234** may define at least two of such strap slots, and in the depicted embodiment the series of strap slots **234** include four strap slots. The clinician may select which strap slots of the series of strap slots **234** to loop the strap **225** according to the size of the user.

[0089] A second strap segment **228** extends from the looped segment **227** and secures over a surface of the first strap segment **226** via a fastener **230**, thereby pulling the posterior component **204** toward the anterior component **202** at the loop segment **227**. In this manner, when the strap **225** is looped about the series of strap slots **234**, the anterior and posterior components **202**, **204** are already secured to one another, and further tensioning and tightening of the strap **225** can be achieved without the necessity of holding the posterior component **204** relative to the anterior component **202**.

[0090] The straps **225** can be tensioned on both sides of the collar **200** simultaneously, or adjusted individually according to the demands of the user. This strap system **216** allows for removal of the collar **200** by only requiring removal of one of the straps **225** on one of the sides of the collar **200** from the corresponding fastener **230**. Because the first segment **226** of the strap **225** remains in place, the user does not need to significantly resize the strap system **216** upon repeated steps of donning and doffing of the collar **200**, particularly when only one of the straps **225** has its second

CALCO 002493

segment **228** detached from the surface of the first segment **226** for removing the collar **200**, while leaving the other strap **225** intact and secured. By minimizing the inconvenience of resizing the strap system **216** upon donning and doffing, user compliance is enhanced especially over long-term use.

[0091]   The side extensions **232** preferably extend over the main support **206** so as not to interfere with the anterior component **202**, which generally bears a significant amount of weight of the user's head and neck and in order to facilitate treatment of a user's injury. As noted above, while the side extensions **232** extend over the main support **206**, they do not interfere with the height adjustment of the anterior component **202** since the side extensions **232** extend over the main support **206** and below the upper and intermediate supports **208**, **210**.

[0092]   FIG. **4** exemplifies another embodiment of a strap system **340**. In this embodiment, a strap **342** extends from the posterior component **204**a and carries a mounting part **344**. The mounting part **344** may be a buckle, latch, ring, or other suitable part that can be carried by the strap **342** and engage an anchor **348** located on the anterior component **202**a. The anchor **348** may comprise a hook protruding from a side of the anterior component **202**a. The strap **342** is looped and secured about the mounting part **344** for length adjustment at loop **346**, and may likewise be looped about the posterior component **204**a in the preceding embodiment, or attached to the posterior component **204**a whereby length adjustment is made relative to the mounting part **344**.

[0093]   In this embodiment, the strap **344** can quickly be attached and detached about the anterior component **202**a. Such an arrangement may be preferable to a user in that the strap length may be set by the clinician, and does not require subsequent adjustment by the user. This convenient arrangement of strap **344** allows a user to easily don and doff the collar repeatedly with minimal or no re-sizing required, thus enhancing compliance and comfort for a user, especially for long-term use.

[0094]   FIG. **4** also exemplifies how a main support **354** is separate from a sternum support **352**. The sternum and main supports **352**, **354** may be selectively adjusted relative to one another by a sternum adjustment mechanism **350**.

[0095]   FIGS. **5**A and **5**B illustrate an exemplary embodiment of the sternum adjustment mechanism **350**, wherein the sternum support **352** is adjustable relative to the main support **354**, to provide differing pressure against the sternum of the user or to provide pressure release. The main support **354** may carry the sternum adjustment mechanism **350** which pivotally connects to the sternum support **352** by a linkage **356** and anchor **358**. The sternum adjustment mechanism **350** includes a lever **360** on a cam **361**. The cam **361** is rotatable relative to a biasing element **362**, and articulates the linkage **356** upon rotation of the cam **361**.

[0096]   FIG. **5**A shows the sternum adjustment mechanism **350** in a lowered or collapsed configuration such that the lever **360** is pulled forward to collapse the linkage **356**, and the sternum support **352** generally abuts the main support **354**. In this manner, there is pressure relief against the sternum. FIG. **5**B shows the sternum adjustment mechanism **350** in a raised or extended configuration such that the lever **360** is articulated rearward, and the cam **361** engages the biasing element **362** to maintain the linkage **356** in the

extended configuration. The sternum support **352** is extended away from the main support **354** by the linkage **356**.

[0097]   FIGS. **6**A and **6**B illustrate another exemplary embodiment of a sternum adjustment mechanism **366**. In this embodiment, the sternum adjustment mechanism **366** comprises a ramp **370** extending from the sternum support **352**. The main support **354** carries a bracket **368** that is slidable along the ramp **370**. The bracket **368** may include a cam surface or other suitable mechanism, such that as the bracket **368** slides along the ramp **370** in a raised or extended configuration in FIG. **6**B, the bracket **368** can be retained along the ramp **370** at a fixed position to extend the sternum support **352** relative to the main support **354** according to a height of the ramp **370**. In the lowered or collapsed configuration of FIG. **6**A, the bracket **368** is located at a different position along the ramp **370** to bring the sternum support **352** adjacent or near the main support **354**.

[0098]   FIGS. **7** and **8** depict an alternative embodiment of an anterior component **236** over the anterior component of FIGS. **2** and **3**. The anterior component **236** has both a main support **238** and intermediate support **240**, and the intermediate support **240** is adapted to receive the upper support **208** of the embodiment of FIGS. **2** and **3**, and the Miami J collar.

[0099]   The upper support **208** is suspended on the intermediate support **240** by being connected at a central tab **264** of the intermediate support **240** extending outwardly relative to an upper periphery of the intermediate support **240** and secured by a pin **270** along a central axis A-A along the front of the anterior component **236**. A grip **266** may be provided below the central tab **264**, and extend along the periphery of the frontal opening **218** and a lower periphery of the intermediate support **240**. The grip **266** may have tactile features to aid grasping the grip **266**, and the grip **266** may protrude outwardly from the periphery of the intermediate support **240** to offer a relief portion for placing a finger or thumb for raising the intermediate support **240** relative to the main support **238**.

[0100]   The upper support **208** has flanks **276** that connect and run on the inside of the intermediate support **240**. The flanks **276** have end portions at which side connections **256** secure to the intermediate support **240**. Thus the upper support **208** is suspended centrally by the central tab **264** and the side connections **256**, thereby enabling to the upper support **208** to contour to the anatomy of the chin and mandibles of the user, and offer improved comfort. The intermediate support **240** may define a scale **262** above the frontal projections **222** so as to provide a relative sizing of the collar **200**.

[0101]   The intermediate support **240** connects to the main support **238** by sliding connections **258** for accommodating height adjustment of the anterior component **236**. The sliding connections **258** are arranged to couple slots **280**, preferably having a curved shape, defined by the intermediate support **240**, and slots **278**, preferably having a curved shape, defined by the main support **238**. The sliding connections **258** may be located and vertically stacked below the side connections **256** to stabilize the upper support **208**, so as to align generally along a stacking axis B-B regardless of the height setting. The intermediate support **240** has flanks **274** that connect to flanks **272** of the main support **238** at pivot points **260**, which accommodate sliding movement of the side connections **256** along the slots **278**, **280**.

CALCO 002494

[0102]    The main support **238** includes a base **242** adapted to be placed adjacent to the user, and a cover **244** adapted to house and cover the adjustment mechanism **220**. The base **242** and cover **244** form the side extensions **222**, whereby the fastener **224** may be placed over the cover **244**. A sternum section **246** extends from the base **242** at a transition **247** between the base **242** and the sternum section **246**. The transition **247** may comprise a narrowed or thinned section from the base **242** and extending to the sternum section **246**. The sternum section **246** may be formed continuously with the base **242** so the sternum section **246** is unitary with the base **242**, or alternatively is attached to the base **242**.

[0103]    The base **242** may define side grips **268** on opposed sides of the sternum support **246**. The side grips **268** may be defined by raised portions of the base **242** that enable a clinician to grip and hold the base **242** when adjusting the height of the anterior component **236**.

[0104]    According to the depicted embodiment, the sternum section **246** is connected to the base **242** by a hinge **248** at the transition **247**. The hinge **248** may be formed as a living hinge formed from a recessed channel **249** on a rear side of the base **244**. Alternatively, the hinge **248** may comprise a compliant portion of the base **242** that bends upon application of force.

[0105]    As illustrated in more detail in FIGS. **9**A and **9**B, a stiffener mechanism **250** may be carried by the sternum section **246** to stiffen the hinge **248** of the sternum section **246** relative to the base **242**. The ability to modify the stiffness of the sternum section **246** is advantageous to provide pressure relief to the user, particularly when sternal or thoracic support is unnecessary or when the user requires minor adjustment of the neck. The stiffener mechanism **250** includes a first portion **372** arranged to selectively extend over the transition **247** and the hinge **248** to prevent or substantially prevent bending of the sternum section **246** away from the base **242**. The first portion **372** preferably extends past the hinge **248**, as shown in FIG. **9**A, to assure the first portion **372** blocks movement of the hinge **248**.

[0106]    The first portion **372** may extend proximate to the cover **244**, however is sized so as not to interfere with the cover **244** upon rotation of the stiffener mechanism **250**. The first portion **372** may have a recessed tip **373** so as not to interfere with the cover **244** upon rotation.

[0107]    The stiffener mechanism **250** has a second portion **374** extending from the first portion **372**, and pivotally mounted on the sternum section **246**. In the preferred embodiment, the second portion **374** is limited in rotation **375** relative to the sternum section **246** so as to assure a stiffened position and a released position of the stiffener mechanism **250**. For example, the rotation **375** of the second portion **374** may only be 90 degrees.

[0108]    The second portion **374** may include a tactile feature **376** to facilitate grasping of the stiffener mechanism **250** from a stiffened position thereby preventing flexure of the sternum section **246** away from the user's sternum, as depicted in FIG. **9**A. The first portion **372** blocks movement of the hinge **248**. FIG. **9**B depicts a released position whereby the sternum section **246** has a flexure **377** both toward and away from a user's sternum, such that the first portion **372** is clear from the hinge **248**.

[0109]    In a variation, when the hinge **248** is formed by a recessed channel **249**, the recessed channel **249** may have a sufficient depth to facilitate cutting the sternum section **246** from the base **242**. Alternatively, the transition **247** may be

formed to make trimming thereof easy so that a clinician may be able to remove the sternum section **246** along a peripheral contour of the base **242**.

[0110]    As shown in FIG. **7**, the adjustment mechanism **220** is located generally along the central axis A-A at the cover **244** and above the sternum section **246**. The adjustment mechanism **220** defines an actuator **252** for actuating the adjustment mechanism **220**, and permitting adjustment in height of the intermediate support **240** relative to the main support **238**. The cover **244** defines a recess **254** about the actuator **252** to facilitate actuation of the actuator **252**, and the actuator **252** is located recessed in the recess **254** so as to prevent inadvertent actuation of the actuator **252**. The actuator **252** is biased in an engaged position such that when not pressed, the actuator **252** maintains the adjustment mechanism **220** in the engaged position. Upon pressing the actuator **252** toward the rear side of the anterior component **236** and deeper into the recess **254**, the adjustment mechanism **220** is placed in a disengaged position to permit adjustment of the height of the anterior component **236**.

[0111]    As shown in FIG. **8**, a lock mechanism **282** is provided as extra assurance of locking the adjustment mechanism **220**. The lock mechanism **282** is located on the rear side of the anterior component **236**. The lock mechanism **282** includes a lever **284** that moves a tab **286** along a limiter **288** for placement between locked and unlocked positions. The limiter **288** may include blocks on opposed sides of an arc of motion relative to the lever **284**, for example between 45 degrees. The clinician or user may place fingers over the cover **244** to switch the lever **284** between the locked and unlocked position. In the locked position, the lock mechanism **282** prevents the actuator **252** from being pressed into the disengaged position. In other words, the locked position of the lock mechanism **282** prevents actuation of the actuator **252**. In the unlocked position, the actuator **252** may be pressed to disengage the adjustment mechanism **220**, and permit height adjustment of the anterior component **236**. The lock mechanism **282** offers an extra layer of protection to assure the adjustment mechanism **220** cannot be tampered with or inadvertently adjusted during normal use.

[0112]    In observing FIGS. **10**A and **10**B, the adjustment mechanism **220** is shown relative to the cover **244**. The adjustment mechanism **220** includes first and second traction elements **290**, **292** that slide along a connector **294** at a lower portion of the cover **244**, and have end portions extending to the slots **278** of the cover **244**. The end portions define bosses **298**, **300** adapted to slide along the slots **278**. A lock element **296** is connected to and biased against the connector **294**. The lock element **296** may form the actuator **252**, and is movable relative to the connector **294**, to engage and disengage from the first and second traction elements **290**, **292**.

[0113]    FIG. **11** shows the connector **294** in greater detail. The connector **294** defines an opening **302** for receiving the actuator **252** and openings **304** for receiving end portions **326**, **328** (shown in FIG. **12**B) of the lock element **296**. The connector **294** has a center portion **306** that defines a cavity **336** on a rear side of the connector **294** for receiving a center section **324** of the lock element **296** adjacent the actuator **252**, and corresponding curved channels **308**, **309** for receiving arms **320**, **322** of the lock element **296**. The connector **294** forms the curved channels **308**, **309** for guiding and receiving the first and second traction elements **290**, **292**,

CALCO 002495

US 2018/0078400 A1

8

Mar. 22, 2018

and peripheral surfaces **312** to the curved channels **308**, **309** to direct the first and second traction elements **290**, **292** upwardly toward the slots **278**. The connector **294** forms center slots **310** through which the first and second traction elements **290**, **292** extend to engage the lock element **296**, as well as side slots **314** to yet further guide the first and second traction elements **290**, **292**. To facilitate assembly and manufacture, the connector **294** may be monolithic and defined by a single part.

[0114]    FIGS. **12**A and **12**B depict the lock element **296** as having the actuator **252** that protrudes from the center section **324**. The center section **324** defines at least one or a series of teeth **316**, **318** along upper and lower portions of the lock element **296** for engaging corresponding teeth of the first and second traction elements **290**, **292**. First and second arms **320**, **322** extend curvingly from the center section **324** and bear the end portions **326**, **328** that are received by the connector **294**. The arms **320**, **322** form springs to bias the lock element **296** against the connector **294**, particularly in that the end portions **326**, **328** engage the connector **294** and the actuator **252** and the teeth **316**, **318** can move relative to the opening **302** to actuate the adjustment mechanism **220**. To facilitate assembly and manufacture, the lock element **296** may be monolithic and defined by a single part. A rear side of the lock element **296** defines a rear recess **334** for engagement with the at least one post **338** of the lock mechanism **282**.

[0115]    FIGS. **13**A and **13**B show how the adjustment mechanism **220** operates to adjust the first and second traction elements **290**, **292**. Unlike in known cervical collars having a rotatable element forming a rack and pinion adjustment mechanism (which disadvantageously cannot be locked), the adjustment mechanism **220** is arranged to be disengaged upon pressing of the actuator **252**, and to automatically lock upon release of the actuator **252**. Such an arrangement is advantageous in that the clinician can assure the adjustment mechanism **220** is not inadvertently bumped or adjusted and thereby unintentionally change the height of the collar. Indeed, by pressing the actuator **252** toward the user, as opposed to pulling away, there is greater stability to maintaining the cervical collar **200** on the user without the tendency of adjusting the location of the main support **206**.

[0116]    Upon disengagement of the adjustment mechanism **220**, the clinician can modify the location of the upper and intermediate supports **208**, **210** relative to the main support **206** with a single hand, as adjustment of the intermediate support **210** can be done freely as the first and second traction elements **290**, **292** slide and permit the intermediate support **210** to articulate relative to the main support **206**. Such an arrangement provides quicker and stable means for changing the height, and enables the first and second traction elements **290**, **292** to include more teeth **330**, **332** and thereby more height settings.

[0117]    As shown in FIG. **13**A in the disengaged position, the lock element **296** moves toward and is biased against a rear side R of the connector **294**. The first and second end portions **326**, **328** are received by the openings **304** of the connector **294**, so that they are fixed relative to the connector **294**. In the disengaged position, the actuator **252** is pressed or biased against the spring force generated by resistance and flexure of the first and second arms **320**, **322**. The first and second sets of teeth **316**, **318** are drawn toward the rear side of the collar **200** and fully disengage from the teeth **330**, **332** of the first and second traction elements **290**, **292**. The

center section **324** and the arms **320**, **322** move within the cavity **336** and arm slots **337**, such that the center section is **324** drawn away or at least partially away from a biasing surface delimiting part of the cavity **336**. The biasing surface of the cavity **336** is located on the rear side of the connector **294**. The base **242** may limit the travel of the lock element **296** at the rear side of the connector **294**.

[0118]    As shown in FIG. **13**B, upon release of the actuator **252** when the adjustment mechanism **220** is in the engaged position, the lock element **296** is biased against the rear side R of the connector **294** yet extends toward the front side F as a result of first and second arms **320**, **322**, and the center section **324** being retained and biased against the biasing surface of the cavity **336**. The first and second sets of teeth **316**, **318** engage the first and second teeth **330**, **332** of the first and second traction elements **290**, **292**. The teeth **316**, **318** are preferably arranged in an elongate row to assure there is at least one tooth engaging corresponding teeth of the first and second traction elements **290**, **292**. The connector **294** is preferably configured so the channels **308**, **309** flatten or substantially flatten the first and second traction elements **290**, **292** within the center slot **310** so there is multiple engagement of the teeth **316**, **318** with the corresponding teeth **330**, **332** of the first and second traction elements **290**, **292**. The adjustment mechanism **220** is arranged so the natural or predetermined position is the engaged position so that when the actuator **252** is released, the teeth **316**, **318** of the lock element **296** and the first and second traction elements **290**, **292** engage one another.

[0119]    The adjustment mechanism **220** is not limited to using the connector **294** and lock element **296** described above, but rather it may include means for providing engagement and disengagement from teeth or other locking elements on the first and second traction elements **290**, **292**, preferably but not limited to automatic engagement upon release of the adjustment mechanism **220**. The adjustment mechanism **220** is arranged for engaging the first and second traction elements **290**, **292** in an engaged position, and is further arranged to disengage from the first and second traction elements **290**, **292** in a disengaged position. In the disengaged position, a clinician can selectively adjust the height of the intermediate support **210**, and hence the upper support **208**, relative to the main support **206** with restriction of gradual adjustment, but can accomplish the feat of height adjustment of the anterior component **236** quickly upon disengagement of the adjustment mechanism **220** and automatic locking at the desired location upon release of the adjustment mechanism **220** so it engages the first and second traction elements **290**, **292** in a fixed location.

[0120]    FIGS. **14**A and **14**B exemplify the lock mechanism **282** that may be used in combination with the adjustment mechanism **220**. The lock mechanism **282** includes a lever **284** that may extend above or just below the inner periphery **245** of the base **242** in order to facilitate adjustment of the lock mechanism **282** without requiring removal of the cervical collar **200**. The lever **284** may include at least one post **338** extending inwardly and on an opposite side of the base **242** as the lever **284**. The at least one post **338** is directed toward the rear cavity **336** opposite the actuator **252**.

[0121]    The at least one post **338** is adapted to rotate according to the position of the lever **284**. In an unlocked position, the at least one post **338** is located within the rear recess **334**, and the actuator **252** can be pressed without

CALCO 002496

interference by the at least one post **338** since the rear recess **334** takes up the at least post **338** when the actuator **252** is pressed toward the rear of the anterior component **236** or the base **242**. In the lock position, the lever **284** is rotated so that the at least one post **338** interferes with the center section **324** of the lock element **296** since the at least one post **338** is out of alignment with the rear recess **334**.

[0122]   FIGS. **15A-15C** depict an embodiment of the posterior component **204**, particularly from the perspective of outside of the posterior component **204**. The posterior component **204** includes a main part **400** and a flexible portion **402**. It will be noted that FIG. **15A** shows an outer side of the posterior component **204** that is intended to face away from the user whereas FIGS. **15D** and **15E** show the inner side of the posterior component **204** arranged to be placed adjacent to the user. From the outer side of the posterior component **204**, the main part **400** defines a central convex portion or rib **404**, whereas the rib **404** is concave on the inner side of the posterior component, protruding from a base section **416** of the main part **400** toward a top section **415** of the main part **400** to accommodate and apply pressure outside of the cervical spine.

[0123]   The depicted embodiment exemplifies how the main part **400** includes resilient or flexible portions forming the flexible portion **402** formed along the peripheral edges of the main part **400**. In this embodiment, the main part **400** and the flexible portion **402** are formed by discretely different materials, wherein the main part **400** is formed from a more structurally rigid material, and the flexible portion **402** is formed from a material more resilient and flexible than the material forming the main part **400**; for example, by overmolding a resilient or compliant material thereon. The use of flexible portions **402** allows the cervical collar **200** to distribute pressure peaks over larger areas in order to avoid the formation of pressure ulcers. The flexible portions **402** can also prevent pressure peaks even when the collar **200** is improperly applied.

[0124]   The flexible portions **402** in the embodiment are continuous in that there are no breaks along the flexible portion **402** about the periphery of the main part **400**. This is in contradistinction to flexible portions that comprise thinned portions forming tabs from the main part **400** that are sequentially provided along a periphery of the main part **400**, and include clearances between each of the tabs to increase their flexibility. An advantage to the continuously formed flexible portion **402** is that there is an even distribution of pressure as opposed to individual and spaced tabs that are required to bear and exert pressure. It will be understood, however, that the continuously extending flexible portions **402** are provided by example, and the disclosure is not limited to the flexible portion **402** being continuous. Although the continuously extending flexible portions **402** embodiment is advantageous, discretely separated tabs or flexible areas may be provided in combination with the embodiments of this disclosure.

[0125]   The main part **400** defines a convex rib **404**, from the perspective of the outer side, that generally runs along a central axis C-C of the posterior component **204**. Side sections **406** flare and curve from sides of the rib **404** and toward side extensions **405**, as discussed above. The side sections **406** form a Y-feature **408** with the rib **404** and the side extensions **405**. The Y-feature **408** flares upwardly

vertically along the cervical spine, and the side sections **406** have a curvature to provide improved anterior-posterior and lateral occipital support.

[0126]   A series of slots **418** extends along the side extensions **405** from the rib **404**, and the slots **418** may be formed as shown above. However, additional slots that may not be sufficiently sized for receiving a strap may be formed and progressively diminish in size as the series of slots **418** approaches the rib **404**. In this manner the side extensions **416** become more rigid as they draw toward the rib **404**, thereby being less flexible and contributing to greater rigidity along the rib **404**, which in turn corresponds to a user's cervical spine. The series of slots **418** sized for receiving straps may provide ventilation and compliance to the anterior component **236** and due to tensioning of the straps.

[0127]   The series of slots **418** and their corresponding pattern provide flexibility to allow the posterior component **204** to conform and fit around the necks of varying anatomical sizes. The pattern of the series of slots **418** allow the posterior component **204** to be flexible where needed, such as along the side extensions **232** that overlap or are proximate to the anterior component **236**, while remaining rigid in the necessary anterior-posterior and lateral directions, particularly along the axis C-C corresponding to the user's cervical spine.

[0128]   The Y-feature **408** is in combination with the side sections **406** that form recesses **407**, which extend to the series of slots **418** on each lateral side of the posterior component **204**, created as a result of the Y-feature **408** protruding from the outer side. The recesses **407** transition in depth between the ends of the side sections **406**, wherein the greatest depth of the recesses **407** is located between the ends of the side sections **406**. The recesses **407** on the opposed sides of the rib **404** and contours of the side sections **406** form a pocket **420** for the anterior component **236** to nest into the posterior component **204** when it is secured therewith. The pocket **420** may enable the posterior component **204** to overlap the anterior component **236**, and the pocket **420** reduces pressure of the anterior component **236** pushing into the neck of the user.

[0129]   The flexible portion **402** is preferably provided around the periphery of the main part **400**, and offers reduced edge pressure about the posterior neck and occiput of the user. The flexible portion **402** may be increased in designated areas to provide enhanced pressure relieving characteristics to the user. For example, there may be an increase in size of the flexible portion **402** from a border of the side extensions **405** to the upper sections **412** that extend on opposed sides of a peripheral recessed section **410** adapted to accommodate a user's occipital region.

[0130]   The peripheral recessed section **410** may have a first flexible portion region **411** that has a width W1 that is greater compared to other areas and corresponding widths (collectively the second flexible portion region W2) of the flexible portion **402** about the periphery of the main part **400**. The width W1 at the first flexible portion area **411** is provided at least in part to provide increased comfort to the user around the occipital bone and posterior neck, as shown by the vertical and horizontal directional arrows A, B within the first flexible portion area **411**, by the yielding of the first flexible portion area **411** in the recessed section **410**. The width of the first flexible portion area **411** may be variable from the upper sections **412** to the nadir of the peripheral recessed section **410** along the center line C-C. The second

CALCO 002497

US 2018/0078400 A1

Mar. 22, 2018

10

flexible portion region W2 may be variable in width depending on the location along the periphery of the main part 400, or may be uniform.

[0131] The upper sections 412 are anatomically shaped flared sections spaced apart by the concave and curved shaped recessed section 410, and a flexible portion of the upper sections 412 is shaped to correspond to and support an occipital region of a user of the collar 200. The upper sections 412 are arranged to gently cradle the side areas of a user's occiput so as not to place undue pressure on the cervical spine of the user. The contour of the recessed section 410 and the gradual rising of the flexible edge 402 between the upper sections 412 and the recessed section 410 provide increased comfort to the user around the occipital bone and posterior neck.

[0132] The main part 400 may be thinned at least at the upper sections 412 in that the main part 400 has a general thickness T1, and the thickness at the upper sections 412 has a gradual reduction or tapered thickness T2 from the general thickness T1 to a tip 423 of the upper sections 412. The tapered thickness T2 results in a thinned section 422 creating a three tiered range of flexure 414: flexure of the main part at the general thickness T1, flexure at the tapered thickness T2 of the main part 400 at the upper sections 412, and flexure at the flexible portion of the upper sections 412.

[0133] The thinned section 422 is covered and/or over-molded by material forming the flexible portion 402, wherein the amount of material forming the flexible portion 402 gradually increases as the thinned section 422 tapers to nothing and the material fully becomes the flexible portion 402 about the periphery or edge of the tip 423 of the thinned section 422. According to an embodiment, the combined thickness of the thinned section 422 and the material of the flexible portion 402 is generally the same as the general thickness T1. The flexible portion 402 may likewise have a same thickness as the general thickness T1.

[0134] As shown in FIG. 15C, the posterior component 204 defines a contoured profile 426 having a general curvature between the recessed section 410 and the base section 416 oppositely disposed relative to the recessed section 410 along the axis C-C. In this manner, pressure is applied to the upper sections 412 and the base section 416 to provide improved anterior-posterior and lateral support, and easing such pressure by the curvature which better corresponds to the anatomical relationship between the occiput and the shoulders of a user. The general curvature thus advantageously provides an improvement over existing cervical collars by providing enhanced support corresponding to a user's needs, as compared to exiting collars which primarily provide flat posterior portions that result in undesirable pressure points and discomfort.

[0135] FIGS. 15D and 15E exemplify an inner side to an alternative embodiment of the posterior component 204 intended to face a user. Fastener tabs 430 are provided at convenient locations to assure a firm grip to a liner of the posterior component 204. The posterior component 204 has a posterior opening 432 intended to be located generally along a cervical column of a user to provide pressure relief and ventilation to the posterior component 204 along the rear rib 404. The rear rib 404 is generally convex on the outer side of the posterior component 204, and is generally concave along the inner side of the posterior component 204. The concave inner side of the rear rib 404 serves to relieve pressure against the cervical column of a user, as evidenced

by the recessed portions 434 generally corresponding to the Y-feature 408 which is on the outer side of the posterior component 204. Strap slots 436 are provided at side portions of the posterior component 204, and are oriented differently from the ventilation openings 428.

[0136] The flexible portion 402 extends along the main part 400 a greater distance along the inner side than the outer side, as evidenced by the boundary 458 corresponding to the extent to which the flexible portion 402 extends along the main part 400 on the outer side. The flexible portion 402 extends longer on the main part 400 and offers greater cushioning due in part to the material forming the flexible portion 402 being preferably softer and more compliant than the material forming the main part 400. For example, the flexible portion 402 material defines an upper flexible portion 448 extending longer than the flexible portion 402 on the outer side (past the boundary 458) so as to offer more cushioning along the inner side that corresponds to the occiput of the user, particularly since there may be substantial pressure exerted on the collar 200 by the user at this location. Within the cavity 438 formed by the Y-feature 408, the flexible portion 402 forms ribs 440, 442, 444 descending into the cavity 438 and generally extending along the curvature 426.

[0137] The ribs 440, 442, 444 are provided to reinforce the curvature 426 along the inner side of the posterior component 204, and better assure proper positioning of the user's neck. As the ribs 440, 442, 444 generally align with the curvature, they offer vertical stiffness to the posterior component 204 and track along the curvature 426. The ribs 440, 442, 444 are spaced from one another forming clearances 446 from one another to avoid pressure points, and to facilitate breathability of the posterior component 204. As the material forming the flexible portion 402 is more compliant, or softer than the material forming the main part 400, the ribs 440, 442, 444 may be trimmable depending on patient anatomy. For example, if the user's neck is substantially straight, some material may be removed from the ribs 440, 442, 444 to make the curvature less severe. This allows the posterior component 204 to be customizable based on individual patients' dimensions, a feature not provided by existing collar designs.

[0138] The Y-feature 408 gradually transitions along the inner side between upper transition 452 and lower transition 454 so that the concavity along the inner side is formed gradually to avoid any pressure points. Either the main part 400 may form such transitions, or the main part 400 may form the transitions in combination with the flexible portion 402 material, as similarly taught in regard to the outer side. The material forming the flexible portion 402 extends along a lower portion 450, and extends into at least one peripheral recess 456 formed by the main part 400, to better interlock the flexible portion 402 to the main part 400.

[0139] FIGS. 16A-16C exemplify improved strap arrangements or systems for connecting the anterior and posterior components 202, 204. A strap tab 500 has a first surface 502 defining a recess 506 for improved gripping of the strap tab 500, and a second surface 504 having traction elements 510 for gripping. A slot 508 is formed for receiving a strap. The strap tab 500 forms a recess 512 for receiving an end portion 518 of a strap 516, as further illustrated in FIG. 16C. The recess 512 enables the end portion 518 of the strap 516 to lie flush in the strap tab 500, so the end portion 518 is confined within the peripheries of the first and second surfaces 502,

CALCO 002498

**504**, without protruding therefrom. This arrangement is provided to maintain the strap tab **500** in a low profile configuration so as not to significantly protrude from the anterior component **202**. Suitable fasteners **514**, such as hook material or hook formed by the strap tab **500** itself, may be located within the recess **512** to removably secure to the end portion **518**. A second end portion **520** of the strap **516** may form a loop for engaging the strap on the posterior component.

[0140]    FIG. **17**A exemplifies another strap arrangement or system. The strap **530** carries a grip **534** on a first end of the strap **530** that is adapted to correspond in geometry to a landing area **532** of the forward projections of the anterior component **202**. A strap body **536** extends to the posterior component **204** from the grip **534** so that a second end **538** loops about a strap slot **540** of the posterior component **204**. The second end **538** may be cinched about the posterior component, or include further means for securing, such as having corresponding hook and loop fastener to secure itself to the strap body **536**. This arrangement advantageously prevents damage or inadvertent tampering with the straps due to accidental contact with the strap or the strap catching on an object, as the strap end is secured flush against the strap body **536**. Additionally, this embodiment allows for a strap system to be repeatedly donned and removed without adjusting the length of the strap **530** each time, thereby enhancing convenience for a user especially over long-term use when the collar is worn more intermittently.

[0141]    FIG. **17**B shows how the strap **530** may include a scale **542** printed thereon for determining sizing of the strap **530**, and may further include logos or other information **546** printed thereon. In the variation of FIG. **17**B, second end **539** of strap **530** defines a loop and is permanently stitched by stitching **544** to maintain its shape. In this embodiment, the loop is permanently secured to the posterior component **204** so that the strap **530** is not adjustable from the posterior component **204**, but rather is only adjustable by pulling from a first end at the anterior component **202**. However, the grip **534** may be removable (as opposed to being permanently disposed on the strap **530**—thereby only being removed by destroying or significantly modifying the strap **530**) from the strap **530**, such that the strap **530** can be trimmed from a first end, and the grip **534** can be subsequently secured once the strap **530** is resized. Any suitable arrangement may be provided to removably attach the grip **534** to the strap **530**, such as by a clamshell arrangement, adhesives, hook and loop fastener, or any other suitable arrangement.

[0142]    FIG. **17**C illustrates another embodiment whereby strap **533** passes through and over a strap slot **540** and secures internally to the posterior component **204**. In this embodiment, an outer surface of the strap **533** may have a hook-receivable surface, and the posterior component **204** can include a corresponding fastener **548** that engages the hook-receivable surface. The strap **533** includes indicia **542** that peer through an opening of the strap slot **540** to show the extent or length the strap **533** is tensioned. This arrangement advantageously prevents damage, as discussed above, by maintaining the strap **533** in close proximity to or flush against the cervical collar **200**, while still providing indicia for convenient and accurate sizing of the collar **200** to accommodate individual users' dimensions.

[0143]    The disclosed embodiments of an orthopedic device, such as a cervical collar, having anterior and posterior components that are positioned about anatomy of a user

such as the neck, to conform thereto and provide support, immobilization, and stabilization thereto, provide improvements that allow a single cervical collar to be applied for treatment to a wide variety of patients having varying sizes or degrees of swelling of anatomical portions.

[0144]    It is understood that while the disclosed embodiments are designed to accommodate users having different sized anatomies, the size of the disclosed embodiments and the components thereof can be adjusted so different users having different sized anatomical portions may benefit from the present designs.

[0145]    It is understood that while the disclosed embodiments of the cervical collar are shown having discrete anterior and posterior components, the anterior and posterior portions may be connected to each other along one side thereof, and a single strap or circumferential adjustment mechanism can be provided between the anterior and posterior component along the other side thereof.

[0146]    It will also be recognized that the flexible portions, and the living hinge and slot structures, can be provided to a collar, without providing other features, such as the height adjustability, to the collar.

[0147]    It is to be understood that not necessarily all objects or advantages may be achieved under any of the particular embodiments. For example, those skilled in the art will recognize that the embodiments may be embodied or carried out in a manner that achieves or optimizes one advantage or group of advantages as taught without achieving other objects or advantages as taught or suggested herein.

[0148]    The skilled artisan will recognize the interchangeability of various disclosed features from the different embodiments. Besides the variations described herein, other known equivalents for each feature can be mixed and matched by one of ordinary skill in this art to construct an orthopedic device under principles of the disclosed embodiments.

[0149]    Although this disclosure is in the context of certain exemplary embodiments and examples, it therefore will be understood by those skilled in the art that the disclosure extends beyond the specifically disclosed embodiments to other alternative embodiments and/or uses of the embodiments, and obvious modifications and equivalents thereof. It is intended that the scope of the present disclosure should not be limited by the particular disclosed embodiments described above.

**1**. A cervical collar having an anterior component, the anterior component comprising:

a main support;

an intermediate support pivotally connecting to the main support at a rear portion of the anterior component, the intermediate support forming a frontal opening with the main support such that the frontal opening is bordered by combined inner peripheries of the intermediate support and the main support;

an adjustment mechanism connecting the main support to the intermediate support and locking a position of the intermediate support relative to the main support at a front portion of the anterior component, the adjustment mechanism having an actuator for disengaging the main support from the intermediate support at the front portion and permitting the intermediate support to pivot relative to the main support at the rear portion to vary a height of the frontal opening.

CALCO 002499

US 2018/0078400 A1

12

Mar. 22, 2018

**2**. The cervical collar of claim **1**, further comprising:

an upper support carried by the intermediate support and abutting an outer periphery of the intermediate support so as to adjust therewith relative to the main support, the upper support located outside of the inner periphery of the intermediate support and connected centrally to the intermediate support along a central axis A-A of the front portion of the anterior component.

**3**. The cervical collar of claim **2**, wherein the intermediate support defines a grip located along a lower periphery of the intermediate support below the upper support and along the central axis A-A.

**4**. The cervical collar of claim **3**, wherein the grip protrudes outwardly from the lower periphery of the intermediate support.

**5**. The cervical collar of claim **1**, wherein the intermediate support defines a height adjustment scale relative to the main support, and visible according to a location of the intermediate support relative to the main support.

**6**. The cervical collar of claim **2**, wherein the intermediate support connects to the main support by sliding connections along first and second sides of the intermediate support, the intermediate support having flanks connecting to flanks of the main support at pivot points, which accommodate sliding movement of the sliding connections.

**7**. The cervical collar of claim **2**, wherein the intermediate support connects to the main support by sliding connections along first and second sides of the intermediate support, the sliding connections being located and vertically stacked below side connections to align generally along a stacking axis B-B regardless of a height setting of the main support relative to the intermediate support.

**8**. The cervical collar of claim **1**, wherein actuator protruding from the main support is adapted for being pressed toward the main support.

**9**. The cervical collar of claim **8**, wherein the main support defines a recess about the actuator.

**10**. The cervical collar of claim **1**, wherein the adjustment mechanism is arranged for a predetermined rest position of the adjustment mechanism to be in an engaged position such that when the actuator is released, the adjustment mechanism is biased outwardly from the anterior component to secure the intermediate support in position relative to the main support, whereas during adjustment of the adjustment mechanism the actuator is arranged to be pressed inwardly toward the anterior component.

**11**. The cervical collar of claim **1**, further comprising a lock mechanism located on a rear side of the main support, the lock mechanism arranged to engage the actuator in a locked position and prevent movement of the actuator, and disengage the actuator in an unlocked position permitting movement of the actuator.

**12**. The cervical collar of claim **11**, wherein the lock mechanism comprises a lever connected to the main support below an upper periphery of the main support, the lever being connected to a limiter adapted to engage and disengage the actuator in the locked and unlocked positions.

**13**. The cervical collar of claim **1**, wherein the main support includes a base adapted to be placed adjacent to a user, and a cover secured over the base and adapted to house and cover the adjustment mechanism.

**14**. The cervical collar of claim **13**, wherein a sternum section extends from the base at a transition between the

base and the sternum section, such that the sternum section is formed continuously and is unitary with the base.

**15**. The cervical collar of claim **14**, wherein the base defines side grips defined by raised portions of the base relative to the cover.

**16**. The cervical collar of claim **13**, wherein the base is generally flat, and more flexible than the cover.

**17**. The cervical collar of claim **1**, wherein the main support defines first and second frontal projections extending toward and over a top portion of the frontal opening, the frontal projections enclose at least part of the intermediate support.

**18**. The cervical collar of claim **1**, further comprising a sternum support extending below the main support along a central axis A-A of the anterior component, a stiffener mechanism is connected to the sternum support and is arranged to selectively stiffen and unstiffen the sternum support relative to the main support.

**19**. A cervical collar having an anterior and a posterior component, the anterior component comprising:

a main support;

an intermediate support pivotally connecting to the main support at a rear portion of the anterior component, the intermediate support forming a frontal opening with the main support such that the frontal opening is bordered by inner peripheries of the intermediate support and the main support;

a strap system connecting the anterior component to the posterior component;

wherein the main support defines first and second frontal projections extending toward and over a top portion of the frontal opening, the frontal projections enclose at least part of the intermediate support, the frontal projections, at least in exterior or outwardly portions thereof, are at least semi-rigid along a circumferential or arcuate profile of the intermediate support to provide support to the intermediate support, the frontal projections arranged to receive a portion of the strap system.

**20**. A cervical collar having an anterior component, the anterior component comprising:

a main support;

an intermediate support pivotally connecting to the main support at a rear portion of the anterior component, the intermediate support forming a frontal opening with the main support such that the frontal opening is bordered by inner peripheries of the intermediate support and the main support;

an adjustment mechanism connecting the main support to the intermediate support and locking a position of the intermediate support relative to the main support at a front portion of the anterior component, the adjustment mechanism including first and second traction elements slidable relative to the main support, and having end portions extending to end portions of the main support and intermediate support whereat the first and second traction elements connect to the main support and intermediate support;

wherein the adjustment mechanism comprises a lock element connected to and biased against the main support, and engaging the first and second traction elements,

wherein the lock element forms an actuator movable relative to the main support, to engage and disengage from the first and second traction elements such that the

CALCO 002500

13

actuator is disengaged from the first and second traction elements by being moved toward the main support, and the actuator engages the first and second traction elements in a rest position of being biased against the main support.

\* \* \* \* \*

CALCO 002501

# EXHIBIT 10



US011452633B2

## (12) United States Patent
### Hsu et al.

(10) Patent No.: **US 11,452,633 B2**
(45) Date of Patent: **Sep. 27, 2022**

(54) **CERVICAL COLLAR**

(71) Applicant: **Ossur Iceland ehf**, Reykjavik (IS)

(72) Inventors: **Henry Hsu**, Foothill Ranch, CA (US); **Mark Harman Powell**, Foothill Ranch, CA (US); **Christopher Callicott Webster**, Foothill Ranch, CA (US); **Jared Olivo**, Foothill Ranch, CA (US)

(73) Assignee: **OSSUR ICELAND EHF**, Reykjavik (IS)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 589 days.

(21) Appl. No.: **15/696,885**

(22) Filed: **Sep. 6, 2017**

(65) **Prior Publication Data**

US 2018/0078400 A1    Mar. 22, 2018

### Related U.S. Application Data

(60) Provisional application No. 62/396,279, filed on Sep. 19, 2016, provisional application No. 62/430,258, (Continued)

(51) **Int. Cl.**
*A61F 5/055* (2006.01)
*A61F 5/37* (2006.01)

(52) **U.S. Cl.**
CPC .............. *A61F 5/055* (2013.01); *A61F 5/37* (2013.01)

(58) **Field of Classification Search**
CPC .......... A61F 7/00; A61F 5/00; A63B 21/4003; A63B 23/025; A61B 5/6822
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,088,207 A | 7/1937 | Kaiser | |
| 2,102,069 A | 12/1937 | Hanicke | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1646071 A | 7/2005 |
| CN | 2933343 Y | 8/2007 |

(Continued)

OTHER PUBLICATIONS

Levangie et al., "Joint Structure and Function: A Comprehensive Analysis", Fourth Edition, Chapter 4: The Vertebral Column, 2005 F.A. Davis Company, Philadelphia, PA, pp. 161-164.
(Continued)

*Primary Examiner* — Erin Deery
*Assistant Examiner* — Robin Han
(74) *Attorney, Agent, or Firm* — Workman Nydegger

(57) **ABSTRACT**

A cervical collar having an anterior component including a main support, an intermediate support pivotally connecting to the main support at a rear portion of the anterior component, and forming a frontal opening with the main support. An adjustment mechanism connects the main support to the intermediate support and locks a position of the intermediate support relative to the main support at a front portion of anterior component. The adjustment mechanism has an actuator for disengaging the main support from the intermediate support and permits the intermediate support to pivot relative to the main support at the rear portion to vary a height of the frontal opening. A posterior component of the cervical collar is adapted to provide improved anterior-posterior and lateral occipital support.

**12 Claims, 18 Drawing Sheets**



OSS 000603

**US 11,452,633 B2**

Page 2

### Related U.S. Application Data

filed on Dec. 5, 2016, provisional application No. 62/504,121, filed on May 10, 2017.

(58) **Field of Classification Search**
USPC .......................................................... 602/18
See application file for complete search history.

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,735,424 A | 2/1953 | Benjamin | |
| 2,791,999 A | 5/1954 | Bustamante | |
| 2,801,630 A | 8/1957 | Moore | |
| 2,806,471 A | 11/1957 | Breese | |
| 2,818,063 A | 12/1957 | Smith et al. | |
| 2,820,455 A | 1/1958 | Hall | |
| 2,911,970 A | 11/1959 | Bartels | |
| D188,302 S | 6/1960 | Monfardini | |
| 3,024,784 A | 3/1962 | Monfardini | |
| 3,027,894 A | 4/1962 | Moore | |
| 3,042,027 A | 7/1962 | Monfardini | |
| 3,050,052 A | 8/1962 | Grassl | |
| 3,060,930 A | 10/1962 | Grassl | |
| 3,075,521 A | 1/1963 | Grassl | |
| 3,135,256 A | 6/1964 | Gruber | |
| 3,177,869 A | 4/1965 | Bartels | |
| D203,018 S | 11/1965 | Helferich | |
| 3,285,243 A | 11/1966 | Yellin | |
| 3,285,244 A | 11/1966 | Cottrell | |
| 3,306,284 A | 2/1967 | McKinley | |
| 3,313,297 A | 4/1967 | Applegate et al. | |
| 3,320,950 A | 5/1967 | McElvenny | |
| 3,504,667 A | 4/1970 | McFarlane | |
| 3,512,523 A | 5/1970 | Barnett | |
| 3,756,226 A | 9/1973 | Calabrese et al. | |
| 3,916,884 A | 11/1975 | Attenburrow | |
| 3,916,885 A | 11/1975 | Gaylord, Jr. | |
| 4,099,523 A | 7/1978 | Lowrey | |
| 4,173,973 A | 11/1979 | Hendricks | |
| 4,205,667 A | 6/1980 | Gaylord, Jr. | |
| 4,325,363 A | 4/1982 | Berkeley | |
| 4,401,111 A | 8/1983 | Blackstone | |
| 4,413,619 A | 11/1983 | Garth | |
| D278,747 S | 5/1985 | Peach, Jr. | |
| 4,520,801 A | 6/1985 | Lerman | |
| 4,538,597 A | 9/1985 | Lerman | |
| 4,562,833 A | 1/1986 | Pujals, Jr. | |
| 4,582,051 A | 4/1986 | Greene et al. | |
| 4,628,913 A | 12/1986 | Lerman | |
| 4,643,174 A | 2/1987 | Horiuchi | |
| 4,677,969 A | 7/1987 | Calabrese | |
| 4,702,233 A | 10/1987 | Omicioli | |
| 4,708,129 A | 11/1987 | Pujals, Jr. | |
| 4,712,540 A | 12/1987 | Tucker et al. | |
| 4,732,144 A | 3/1988 | Cunanan | |
| 4,745,922 A | 5/1988 | Taylor | |
| 4,827,915 A | 5/1989 | Gorsen | |
| 4,854,306 A | 8/1989 | Pujals, Jr. | |
| 4,886,052 A | 12/1989 | Calabrese | |
| 4,940,043 A | 7/1990 | Burns et al. | |
| 4,955,368 A | 9/1990 | Heimann | |
| 4,987,891 A | 1/1991 | Gaylord, Jr. et al. | |
| D314,623 S | 2/1991 | Calabrese et al. | |
| 5,005,563 A | 4/1991 | Veale | |
| 5,038,759 A | 8/1991 | Morgenstern | |
| 5,058,572 A | 10/1991 | Schmid et al. | |
| 5,060,637 A | 10/1991 | Schmid et al. | |
| 5,097,824 A | 3/1992 | Garth | |
| 5,156,588 A | 10/1992 | Marcune et al. | |
| 5,180,361 A | 1/1993 | Moore et al. | |
| 5,201,702 A | 4/1993 | Mars | |
| 5,215,517 A | 6/1993 | Stevenson et al. | |
| 5,230,698 A | 7/1993 | Garth | |
| 5,275,581 A | 1/1994 | Bender | |
| 5,302,170 A | 4/1994 | Tweardy | |
| RE34,714 E | 8/1994 | Burns et al. | |

| | | | |
|---|---|---|---|
| 5,346,461 A | 9/1994 | Heinz et al. | |
| 5,366,438 A | 11/1994 | Martin, Sr. | |
| 5,385,535 A | 1/1995 | McGuinness | |
| 5,403,266 A * | 4/1995 | Bragg | A61F 5/012 |
| | | | 602/13 |
| 5,433,696 A | 7/1995 | Osti | |
| 5,437,612 A | 8/1995 | Moore et al. | |
| 5,437,617 A | 8/1995 | Heinz et al. | |
| 5,445,602 A | 8/1995 | Grim et al. | |
| D368,527 S | 4/1996 | Brooke | |
| D369,660 S | 5/1996 | Myoga | |
| 5,520,619 A | 5/1996 | Martin | |
| RE35,290 E | 7/1996 | Druskoczi | |
| 5,588,957 A | 12/1996 | Martin, Sr. | |
| 5,593,382 A | 1/1997 | Rudy, Jr. et al. | |
| 5,622,529 A | 4/1997 | Calabrese | |
| 5,624,387 A | 4/1997 | McGuinness | |
| D379,232 S | 5/1997 | Brooke | |
| 5,632,722 A | 5/1997 | Tweardy et al. | |
| 5,688,229 A | 11/1997 | Bauer | |
| 5,716,335 A | 2/1998 | Iglesias et al. | |
| 5,728,054 A | 3/1998 | Martin | |
| D393,718 S | 4/1998 | Traut et al. | |
| 5,785,670 A | 7/1998 | Hiebert | |
| 5,788,658 A | 8/1998 | Islava | |
| 5,795,315 A | 8/1998 | Traut et al. | |
| 5,797,713 A | 8/1998 | Tweardy et al. | |
| 5,797,863 A | 8/1998 | Kohnke | |
| RE35,940 E | 10/1998 | Heinz et al. | |
| 5,865,773 A | 2/1999 | Koledin | |
| 5,904,662 A | 5/1999 | Myoga | |
| 5,934,599 A | 8/1999 | Hammerslag | |
| 5,964,722 A | 10/1999 | Goralnik et al. | |
| 5,976,098 A | 11/1999 | Serebolf | |
| 5,993,403 A | 11/1999 | Martin | |
| 6,027,467 A | 2/2000 | Nakamura et al. | |
| 6,036,664 A | 3/2000 | Martin, Sr. et al. | |
| D422,710 S | 4/2000 | Maynard | |
| 6,045,522 A | 4/2000 | Grober | |
| 6,045,523 A | 4/2000 | Donaldson | |
| 6,050,965 A | 4/2000 | Pillai | |
| 6,056,711 A | 5/2000 | Domanski et al. | |
| 6,058,517 A | 5/2000 | Hartunian | |
| RE36,745 E | 6/2000 | Rudy, Jr. et al. | |
| 6,071,255 A | 6/2000 | Calabrese | |
| 6,071,256 A | 6/2000 | Lam | |
| 6,090,058 A | 7/2000 | Traut et al. | |
| 6,165,146 A | 12/2000 | Giebeler | |
| 6,183,501 B1 | 2/2001 | Latham | |
| 6,202,953 B1 | 3/2001 | Hammerslag | |
| 6,245,033 B1 | 6/2001 | Martin | |
| 6,254,560 B1 | 7/2001 | Tweardy et al. | |
| 6,308,345 B1 | 10/2001 | Williams, Jr. | |
| 6,289,558 B1 | 11/2001 | Hammerslag | |
| 6,315,746 B1 | 11/2001 | Garth et al. | |
| 6,423,020 B1 | 7/2002 | Koledin | |
| 6,458,090 B1 | 10/2002 | Wajdi | |
| 6,494,854 B1 | 12/2002 | Visness et al. | |
| D475,139 S | 5/2003 | Myoga | |
| 6,632,722 B2 | 10/2003 | Fujiwara et al. | |
| 6,663,581 B1 | 12/2003 | Calabrese | |
| 6,663,630 B2 | 12/2003 | Farley et al. | |
| 6,726,643 B1 | 4/2004 | Martin | |
| 6,733,469 B2 | 5/2004 | Miyaji et al. | |
| 6,740,055 B2 | 5/2004 | Dominguez | |
| 6,770,046 B2 | 8/2004 | Hansen | |
| 6,872,188 B2 | 3/2005 | Caille et al. | |
| 6,913,584 B2 | 7/2005 | Rudy, Jr. et al. | |
| 6,921,376 B2 | 7/2005 | Tweardy et al. | |
| 6,926,686 B2 | 8/2005 | Cheatham | |
| 7,018,351 B1 | 3/2006 | Iglesias et al. | |
| 7,041,073 B1 | 5/2006 | Patron | |
| 7,070,573 B2 | 7/2006 | Axelsson | |
| 7,090,652 B2 | 8/2006 | Santelli, Jr. | |
| 7,090,653 B2 | 8/2006 | Moeller | |
| 7,128,724 B2 | 10/2006 | Marsh | |
| 7,141,031 B2 | 11/2006 | Garth et al. | |
| 7,198,610 B2 | 4/2007 | Ingimundarson et al. | |
| D542,919 S | 5/2007 | Leatt | |

OSS 000604

US 11,452,633 B2

Page 3

(56)                    References Cited

              U.S. PATENT DOCUMENTS

    7,258,677 B2    8/2007  Rudy, Jr. et al.
    D552,742 S      10/2007 Leatt
    7,291,121 B2    11/2007 Rudy, Jr. et al.
    7,297,127 B2    11/2007 Lee et al.
    7,311,686 B1    12/2007 Iglesias et al.
    7,371,221 B1    5/2008  Baker
    7,371,222 B2    5/2008  Heinz et al.
    7,399,288 B2    7/2008  Chao
    7,442,176 B2    10/2008 Cojbasic
    D609,815 S      2/2010  Patterson
    7,674,234 B2*   3/2010  Calco ................. A61F 5/055
                                                    602/18
    D616,555 S      5/2010  Thorgilsdottir et al.
    D616,996 S      6/2010  Thorgilsdottir et al.
    D616,997 S      6/2010  Thorgilsdottir et al.
    D617,907 S      6/2010  Waller
    7,815,585 B2    10/2010 Vollbrecht
    7,846,117 B2    12/2010 Leatt et al.
    D631,167 S      1/2011  Leatt et al.
    7,878,995 B2    2/2011  Harty
    7,896,827 B2    3/2011  Ingimundarson et al.
    7,981,068 B2    7/2011  Thorgilsdottir et al.
    D643,978 S      8/2011  Abajo Alonso et al.
    D644,331 S      8/2011  Sandhu
    D644,332 S      8/2011  Sandhu
    7,992,261 B2    8/2011  Hammerslag et al.
    D647,623 S      10/2011 Thorgilsdottir et al.
    D647,624 S      10/2011 Thorgilsdottir et al.
    8,038,635 B2    10/2011 Dellanno
    8,038,636 B2    10/2011 Thorgilsdottir et al.
    D659,842 S      5/2012  Donaldson et al.
    D662,597 S      6/2012  Chang
    8,216,167 B2    7/2012  Garth et al.
    D666,302 S      8/2012  Joseph
    8,257,292 B2    9/2012  Linares
    8,545,423 B2    8/2013  Patron
    D692,568 S      10/2013 Chiang et al.
    D693,014 S      11/2013 Chiang et al.
    8,679,044 B2    3/2014  Thorgilsdottir et al.
    8,870,800 B2*   10/2014 Thorgilsdottir ...... A61F 5/055
                                                    602/18
    8,932,243 B2    1/2015  Calabrese
    9,132,027 B2    9/2015  Calco
    D767,825 S      9/2016  Georgeson et al.
    9,713,546 B2*   7/2017  Thorsteinsdottir ...... A61F 5/05
    10,675,173 B2   6/2020  Thorsteinsdottir et al.
    2002/0138028 A1 9/2002  Rudy, Jr. et al.
    2002/0156408 A1 10/2002 Cheatham
    2002/0156409 A1 10/2002 Lee et al.
    2002/0169401 A1 11/2002 Walpin
    2002/0173737 A1 11/2002 Miyaji et al.
    2003/0055367 A1 3/2003  Dominguez
    2003/0060744 A1 3/2003  Caille et al.
    2003/0181838 A1 9/2003  Garth
    2004/0039318 A1 2/2004  Santelli, Jr.
    2005/0101896 A1 5/2005  Calabrese
    2007/0027418 A1 2/2007  Calco et al.
    2007/0073203 A1 3/2007  Moenning et al.
    2007/0270728 A1 11/2007 Chao
    2009/0247918 A1 10/2009 Patron
    2010/0137768 A1* 6/2010  Thorgilsdottir ...... A61F 5/055
                                                    602/18
    2010/0268139 A1 10/2010 Garth
    2010/0298748 A1 11/2010 Rosenfeld et al.
    2011/0034844 A1 2/2011  Thorgilsdottir et al.
    2011/0066094 A1 3/2011  Thorgilsdottir et al.
    2011/0224591 A1 9/2011  Thorgilsdottir et al.
    2012/0053499 A1 3/2012  Donaldson et al.
    2012/0130295 A1 5/2012  Haider
    2012/0165712 A1 6/2012  Calabrese
    2013/0060179 A1* 3/2013  Modglin ................. A61F 5/01
                                                    602/18
    2013/0281899 A1 10/2013 Suarez et al.
    2013/0281900 A1 10/2013 Suarez et al.

    2013/0310722 A1* 11/2013 Thorsteinsdottir .......................
                                                    A61F 5/05883
                                                    602/18
    2014/0012172 A1 1/2014  Calco
    2014/0107551 A1* 4/2014  Modglin ................. A61F 5/055
                                                    602/18
    2014/0323938 A1 10/2014 Suarez et al.
    2015/0216708 A1 8/2015  Garth et al.
    2016/0008158 A1 1/2016  Martin et al.
    2016/0199211 A1* 7/2016  Kantor ................. A61F 5/055
                                                    602/18
    2016/0287424 A1 10/2016 Webster et al.
    2017/0246622 A1 8/2017  Calco et al.
    2017/0252198 A1 9/2017  Thorsteinsdottir et al.
    2018/0078401 A1 3/2018  Hsu et al.
    2020/0281754 A1 9/2020  Thorsteinsdottir et al.

              FOREIGN PATENT DOCUMENTS

    CN     201150587 Y    11/2008
    CN     201602923 U    10/2010
    CN     102227196 A    10/2011
    CN     202015274 U    10/2011
    CN     204655220 U    9/2015
    CN     105120808 A    12/2015
    DE     19547115 A1    6/1997
    DE     19849302 A1    4/2000
    DE     10057286 A1    5/2002
    EP     1738724 A1     1/2007
    EP     2653139 A1     10/2013
    EP     2886088 A1     6/2015
    FR     2814362 A1     3/2002
    GB     2165157 A      4/1986
    GB     2453996 A      4/2009
    JP     2007-330808 A  12/2007
    WO     94/09728 A1    5/1994
    WO     95/22304 A1    8/1995
    WO     96/40018 A1    12/1996
    WO     9843568 A1     10/1998
    WO     2014102340 A1  7/2014

              OTHER PUBLICATIONS

Hsu et al., AAOS Atlas of Orthoses and Assistive Devices, Mosby,
Elsevier Fourth Edition, 2008, Philadelphia, PA, p. 117-122.
Product Information Sheet, Philadelphia Tracheotomy Collar, obtained
from www.ossur.com, prior to Aug. 6, 2010, 1 page.
Product Information Sheet, Plazazote Sheets, WBC Industries, obtained
from www.wbcindustries.com prior to Aug. 6, 2010, 2 pages.
"Range-of-Motion Restriction and Craniofacial Tissue-Interface
Pressure From Four Cervical Collars", The Journal of Trauma
Injury, Infection, and Critical Care, vol. 63, No. 5, Nov. 2007, pp.
1120-1126.
"Ossur Is Immobilization", www.ossur.com, 2008, pp. 1-16.
"Miami J Patient Care Handbook", www.ossur.com, 2010, pp. 1-16.
Jacobson et al. "Improving Practice Efforts to Reduce Occipital
Pressure Ulcers", Journal of Nursing Care Quality, vol. 23, No. 3,
2008, pp. 283-288.
Bell et al. "Assessing Range of Motion to Evaluate the Adverse
Effects of Ill-Fitting Cervical Orthoses", The Spine Journal, vol. 9,
2009, pp. 225-231.
Karason et al. "Evaluation of Clinical Efficacy and Safety of
Cervical Trauma Collars: Differences in Immobilization, Effect on
Jugular Venous Pressure and Patient Comfort", Scandinavian Jour-
nal of Trauma, Resuscitation and Emergency Medicine, 2014, pp.
1-7.
Product Brochure, "Capital Collar Enhanced", DeRoyal, 2014, 2
Pages.
Product Brochure, "Miami J Advanced by OSSUR", www.ossur.
com, 2012, 4 Pages.
Product Brochure, "Miami J Cervical Collar", www.ossur.com, 1
Page.
Product Brochure, "Proglide Cervical Collar", OPTEC, www.
optecusa.com, 1 Page.

OSS 000605

**US 11,452,633 B2**

Page 4

(56)        **References Cited**

OTHER PUBLICATIONS

Product Brochure, "Vista Upper Spine", Aspen Medical Products, 2015. 6 Pages.
Product Brochure, "Instructions for Use Eclipse Cervical Collar", VQ OrthoCare, 2015. 2 Pages.
Partial International Search Report from PCT Application No. PCT/US2017/050206, dated Dec. 5, 2017.
Office Action from corresponding CN Application No. 201780057654 X, dated Oct. 29, 2020.

* cited by examiner

OSS 000606



FIG. 1
(Prior Art)

OSS 000607





FIG. 2

OSS 000608



FIG. 3

OSS 000609



FIG. 4

OSS 000610



FIG. 5A

FIG. 5B

OSS 000611



FIG. 6A



FIG. 6B

OSS 000612



FIG. 7

OSS 000613



FIG. 8

OSS 000614



FIG. 9A

FIG. 9B

OSS 000615



FIG. 10A

FIG. 10B

OSS 000616



FIG. 11



FIG. 12A



FIG. 12B

OSS 000617



FIG. 13A



FIG. 13B

OSS 000618



FIG. 14A



FIG. 14B

OSS 000619



FIG. 15A



FIG. 15B

OSS 000620



FIG. 15C

OSS 000621



FIG. 15D

FIG. 15E

OSS 000622



FIG. 16A

FIG. 16B

FIG. 16C

OSS 000623



FIG. 17A



FIG. 17B



FIG. 17C

OSS 000624

US 11,452,633 B2

1

# CERVICAL COLLAR

## CROSS-REFERENCE TO RELATED APPLICATIONS

This disclosure incorporates by reference U.S. Pat. No. 5,632,722, granted May 27, 1997, U.S. Pat. No. 6,254,560, granted Jul. 3, 2001, U.S. Pat. No. 7,981,068, granted Jul. 19, 2011, U.S. Pat. No. 8,038,636, granted Oct. 18, 2011, U.S. Pat. No. 8,679,044, granted Mar. 25, 2014, U.S. patent application publication no. 20130310722 published on Nov. 21, 2013, and U.S. patent application publication no. 2016/0287424, published Oct. 6, 2016.

This disclosure incorporates by reference U.S. provisional application No. 62/396,279, filed on Sep. 19, 2016, U.S. provisional application No. 62/430,258, filed on Dec. 5, 2016, and U.S. provisional application No. 62/504,121, filed on May 10, 2017.

## FIELD OF THE DISCLOSURE

The present disclosure relates to an orthopedic device, and more specifically to cervical collars having height adjustability at a front part, while providing a platform for securing known other components of a cervical collar thereto without significantly modifying their anatomical contours and connection to the height adjusted components.

## BACKGROUND

Cervical collars are used for treating conditions of the neck and the cervical spine by cervical spine immobilization. These collars may handle whiplash and other such injuries, where support for the head and neck of the patient is needed, and function to partially immobilize the head and neck of the patient, and to relieve spasm or strain to which the neck muscles of the patient might be subjected by transferring weight or force from the head of the patient to the shoulders or adjacent areas of the patient. Other collars may be arranged for complete or near complete immobilization of the head and neck of the patient to reduce risk of secondary damage to the spinal cord.

A challenge in designing a cervical collar is balancing desired immobilization with user comfort, such as venous pressure. Immobilization may be measured by five planes of movement, including flexion, extension, lateral tilt to right and left, and rotation of the neck to right and left, which are collectively considered generally as cervical range of motion (CROM).

Unfortunately, many patients using cervical collars develop decubitus or decubitus ulcers (also known as bed sores, pressure sores, or trophic ulcers) when wearing cervical collars. These ailments, which involve a breakdown of tissue overlying a bone, arise when tissues overlying a bony prominence are subjected to prolonged pressure against an object such as a cervical collar. Besides impacting superficial tissues such as the skin, decubitus and decubitus ulcers also can aggravate muscle and bone. Restrictive collars are one of the common causes of skin breakdown in the trauma population. As pressure-ulcers are among the most common, yet serious and costly, complications of routine spinal immobilization, it is desirable to provide cervical collars that minimize the probability of ulcers.

Moisture and pressure are two major factors which contribute to the formation of decubitus. Once a decubitus ulcer forms, there is no good method of determining the extent of tissue damage. Further, once started, decubitus can continue

2

to progress through the skin and fat tissue to muscle and eventually to the bone, and is very difficult to treat and arrest. In extreme cases, surgical replacement of bone, muscle, and skin are required to restore that portion of the body of the patient where decubitus has formed.

It is desirable to eliminate or at least minimize the effect of pressure points when using cervical collars. The likelihood of contracting decubitus can be greatly reduced by a more even distribution of pressure to several parts of the body of the patient.

Multiple studies have evaluated CROM and the likelihood of tissue-interface pressure (TIP) exerted by commercially-available cervical collars. One of the known commercial collars that has proven successful at striking the balance of minimal TIP and most restriction of CROM is the Miami J collar (Össur, hf. Reykjavik, Iceland). Multiple studies have validated the features of the Miami J collar, including: Tescher, A. N. et al. *Range-of-motion restriction and craniofacial tissue-interface pressure from four cervical collars*, Journal of Trauma-Injury Infection & Critical Care 63; 5; 1120-1126 (2007); Jacobson, T. M. et al. *Efforts to reduce occipital pressure ulcers*. Journal of Nursing Care Quality. 23; 3; 283-288 (2008); Karason, S. et al., *Evaluation of clinical efficacy and safety of cervical trauma collars, differences in immobilization, effect on jugular pressure and patient comfort*, Scandinavian Journal of Trauma, Resuscitation and Emergency Medicine, 22:37 (2014).

The Miami J collar is also described in U.S. Pat. No. 5,632,722, granted May 27, 1997; U.S. Pat. No. 6,254,560, granted Jul. 3, 2001; U.S. Pat. No. 6,921,376, granted Jul. 26, 2005. Variations of the Miami J collar, embodying the Miami J Advance collar, are described in U.S. Pat. No. 7,981,068, granted Jul. 19, 2011, and U.S. Pat. No. 8,679,044, granted Mar. 25, 2014.

An important feature, preferably included in cervical collars to overcome limited adaptability to accommodate the body of the patient and the particular ailment prompting the need for wearing a cervical collar, is the facility for adjusting the relative positions of various components of the cervical collar. Part of the effectiveness of the Miami J collar is due to its ability for customization to different anatomical sizes of users.

As taught in U.S. Pat. No. 6,254,560, the Miami J collar has supports that enable customized pressure distribution and avoid skin breakdown. A front part of the Miami J collar has an adjustable upper support for the mandibular, chin and/or jaw of the user, and mounted to a lower support or sternum brace by means which permit relative movement between the upper support and the lower support. The posterior component or back part of the Miami J collar has an occipital support mounted to a back support by means which permit relative sliding movement between the occipital support and the back support. The shape of the upper support and occipital support are anatomically optimized for superior immobilization and patient comfort.

FIG. 1 exemplifies a known version of the Miami J collar 100, as taught in the aforementioned patents and publications, particularly U.S. Pat. Nos. 5,632,722 and 6,254,560. The collar 100 generally includes an anterior component 102 and a posterior component 104 connected to one another by a strap system 116. The anterior component 102 has a main support 106 defining a frontal opening 124, and secures to an upper support 108 intended to support the mandibular, jaw, or chin of the user. The upper support 108 is connected to the main support 106 at side sections by a side connection 120, and is connected at a front section by a front connection

OSS 000625

US 11,452,633 B2

**3**

122, and lacks height adjustability while the collar 100 is being worn. Padding 112 lines the anterior and posterior components 102, 104.

The anterior component 102 defines a sternal support 110 forming an extension adapted to extend below the clavicle of a user and rest against the sternum. The sternal support 110 carries a sternum pad 114 to avoid decubitus over long periods of wear of the collar 100. The sternum pad 114 typically has a fixed thickness, and lacks adjustability in the sense that when worn it applies constant pressure.

The posterior component 104 comprises lower and upper parts 126, 128, with the upper part 128 serving as an occipital support. The lower and upper parts 126, 128 are connected to one another by a posterior connection 124. Although not shown, the posterior component 104 may be unitary and monolithic comprising a single part in contrast to the two parts depicted in FIG. 1, and resemble the posterior component taught by U.S. Pat. No. 7,981,068 and found in the Miami J Advance collar.

The upper support 128 and the anterior and posterior components 102, 104 are generally symmetrical about a vertical center line, and may be formed from rigid or semi-rigid plastic. The material forming the upper support 128 and the anterior and posterior components 102, 104 may be flexible prior to donning the collar 100, but sufficiently rigid once the collar 100 is donned to resist yielding due to weight exerted by the user.

Both the upper support 128 and the occipital support of the Miami J collar 100 are uniquely anatomically shaped to maximize comfort and immobilization while minimizing pressure on the user. Because the upper support 128 and the occipital support of the Miami J collar 100 are clinically proven, it is desired that any improvements over the current Miami J collar 100 provide means for preserving the function and shape of the upper support 128 and occipital support 35 of the current Miami J collar 100.

Another challenge in designing a cervical collar is providing convenient yet reliable height adjustment of sternum support elements. Sternum support elements normally connect to an anterior portion of a cervical collar via struts or connections that define an anterior aperture that allows clinicians, physicians, and first responders to gain access to a user's trachea for medical procedures and examinations without removal of the collar. Because the sternum support normally attaches to both left and right sides of the anterior portion of the collar in order to define this aperture, adjusting the height of the sternum support requires the inconvenient and potentially uneven adjustment of both left- and right-sided complementary adjustment apparatuses.

Another challenge is the design of the adjustment apparatuses themselves. There is a problem of adjustment apparatuses being clumsy and inconvenient for a clinician to operate quickly and easily, and especially for a user to operate while wearing the device on their own neck.

Moreover, height adjustment apparatuses are sometimes unfortunately designed in such a way that a user or clinician may inadvertently touch the apparatus in a way that tampers with or adjusts the height in an unplanned and/or undesired way. A desired feature of a cervical collar is therefore a height adjustment apparatus that, while convenient to operate, is not susceptible to accidental adjustments or tampering.

Yet another challenge is the ability of a clinician or user to easily adjust the flexibility of pressure exerted by the sternum support of a cervical collar. At certain times, such as during every day, long-term use, a user may need to have greater flexibility for flexion of the neck, i.e. moving the

**4**

chin toward the sternum. At other times, such as during first response procedures or medical procedures, a user may need to be immobilized from flexion of the neck by exerting greater pressure on the sternum. There is a problem of cervical collars not offering a convenient yet effective method for switching between the collar allowing flexion and disallowing flexion.

Another challenge is that existing cervical collars often comprise inadequate or inconvenient strap systems. For example, straps may attach via hook and loop fastener to inconvenient locations on the body of the cervical collar, leading to difficulty in donning the collar correctly and/or consistently. Straps may not be configured to attach closely to the body of the cervical collar and consequently jut out therefrom, leading potentially to damage, injury, inconvenience, and/or unintended removal of or tampering with the collar if the straps catch on an object or are unintentionally pulled, adjusted, or released by a user, clinician, or others.

Existing cervical collars often comprise inadequate or poorly-fitted posterior components. For example, posterior components may be overly simplistic in design, comprising flat profiles and no features to mitigate pressure points along the occiput. These designs can lead to or exacerbate decubitus and discomfort.

In light of the foregoing considerations, there is a further need for a cervical collar with a height adjustment mechanism on the sternum support that provides for a convenient, effective method for allowing or restricting flexion and is easily and accurately adjustable in height without allowing accidental tampering with the height, as well as an improved strap system for connecting anterior and posterior components of a cervical collar, and an improved shape for a posterior component of a cervical collar.

SUMMARY

The present disclosure describes an improved cervical collar for restricting head and neck movement to promote healing after an injury to the spinal column. The cervical collar has height, circumferential and angular adjustment to accommodate a wide variety of patient sizes and anatomical configurations, and to accommodate dimensional changes caused by increased or decreased swelling of the affected anatomical portions of the patients during treatment of the injury. The cervical collar is arranged to stabilize and immobilize the cervical area, by restricting lateral, sagittal, and coronal movement, while improving comfort and fit for individual patients.

Embodiments of the disclosure relate to a cervical collar having a height adjustment system between supports forming an anterior component, which permit the use of known supports in the cervical collar to maintain their functionality, comfort, and fit, including their anatomical contours and connection to the height adjusted components. Embodiments of the disclosure also relate to an improved strap system for cervical collars. Yet further embodiments of the disclosure relate to improved posterior components for cervical collars.

The height adjustment system is arranged for adjusting the chin height in a simple and effective manner that limits or mitigates tampering with the height while the collar is worn. The height adjustment system preferably includes using incremental height adjustment so the height may be locked at a desired height setting. The height adjustment system may be arranged to allow usage in existing collar designs, such as the Miami J or Miami J Advance collars,

OSS 000626

US 11,452,633 B2

5

without substantially altering the shape and function of the upper support and posterior component including an occipital support.

The height adjustment system mitigates or eliminates the need for pre-sizing methods, and is provided in a simplified manner to enable many height settings customizable for different users. The height adjustment system allows for the use of known upper and posterior components, which have been on the market for many years to serve many users of cervical collars, and are clinically proven for their efficacy.

The height adjustment system allows for improved placement and configuration of a cervical collar on patients of different heights, which makes adjustment possible and easy while the collar is being worn. The upper support and posterior component can be properly fitted against the chin and head of a patient by a clinician, followed by the extension of the anterior component against the patient's chest. Likewise, the anterior component may be placed against the patient's chest and the upper support and posterior component can then be extended to the chin and head of the patient. The height setting can then be locked at the desired height setting by the clinician to ensure a proper fit for the user.

To avoid inadvertent adjustment of the collar height during use, locking means are provided in combination with the height adjustment system. While the height adjustment system arrests the height of the collar, the locking means offers another level of locking in addition to the height adjustment system.

Unlike in the prior art where the lower support and corresponding sternum pad are fixed, embodiments of the disclosure permit selective adjustment of pressure applied to the sternum of the user, particularly by locking or unlocking flexibility of the lower support.

Embodiments described herein provide a strap system that improves circumferential pressure exerted about the neck of the user by offering greater extension of the strap about the user's neck, and thus the cervical collar. The strap system is arranged to facilitate donning and doffing of the cervical collar by offering improved means for attaching and detaching the anterior component from the posterior component. The anterior and posterior components offer greater circumferential adjustability to accommodate different user anatomical sizes, healing phases, padding thickness, and other reasons for adjusting collar circumference. The strap system further reduces damage, injury, or inadvertent adjustment of the collar due to its improved system for maintaining strap ends close to or flush against the body of the strap.

The posterior component in the embodiments offers improved pressure relief properties for areas of a user about the posterior component, and about a user's spinal column. The posterior component is contoured to adapt to the strap while maintaining its pressure relieving properties. Indeed, the posterior component is arranged to provide improved anterior-posterior and lateral occipital support by way of its improved shape, attachment features, and other features on both the inner and outer side of the posterior component.

These and other features, aspects, and advantages of the present disclosure will become better understood regarding the following description, appended claims, and accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of a prior art cervical collar.
FIG. 2 is a perspective view of an embodiment of a cervical collar according to the present disclosure.

6

FIG. 3 is a side elevational view of the cervical collar embodiment of FIG. 2.

FIG. 4 is a perspective view of another embodiment of the cervical collar of FIG. 2.

FIG. 5A is a schematic view of a sternal height mechanism in a lowered configuration.

FIG. 5B is a schematic view of the sternal height mechanism of FIG. 5A in a raised configuration.

FIG. 6A is a schematic view of a variation of the sternal height mechanism in FIG. 5A in a lowered configuration.

FIG. 6B is a schematic view of the sternal height mechanism of FIG. 6A in a raised configuration.

FIG. 7 is a front elevational view of a variation of the anterior component in the cervical collar of FIG. 2.

FIG. 8 is a rear elevational view of the anterior component of FIG. 7.

FIG. 9A is a schematic view of a sternal relief device in the cervical collar of FIG. 2 in a stiff configuration.

FIG. 9B is a schematic view of the sternal relief device of FIG. 9B in a relief configuration.

FIG. 10A is a front elevational view of the lower support in the anterior component of FIG. 7 with the lower support depicted in transparent form.

FIG. 10B is a plan view of the adjustment mechanism in FIG. 10A with the lower support removed.

FIG. 11 is a perspective view of the base in the adjustment mechanism of FIG. 10A.

FIG. 12A is an elevational view of the actuator in the adjustment mechanism of FIG. 10A.

FIG. 12B is a plan view of the actuator in the adjustment mechanism of FIG. 10A.

FIG. 13A is a perspective schematic view of the adjustment mechanism of FIG. 10A in an unlocked configuration.

FIG. 13B is a perspective schematic view of the adjustment mechanism of FIG. 10A in a locked configuration.

FIG. 14A is a perspective schematic view taken along line XIVA-XIVA in FIG. 10A of the lock mechanism in the locked configuration.

FIG. 14B is a perspective schematic view of the lock mechanism in FIG. 10A in the unlocked configuration.

FIG. 15A is an elevational view of a variation of the posterior component in the cervical collar of FIG. 2 showing an outer side of the posterior component.

FIG. 15B is a detail view taken from detail XV B in FIG. 15A.

FIG. 15C is a side elevational view of the posterior component of FIG. 15A.

FIG. 15D is an elevational view of the posterior component in FIG. 15A showing an inner side.

FIG. 15E is a top plan view of the posterior component of FIG. 15A.

FIG. 16A is a perspective view of a first side of a strap tab.
FIG. 16B is a perspective view of a second side of the strap tab of FIG. 16A.

FIG. 16C is a plan view of a strap system.
FIG. 17A is a schematic view of another embodiment of a strap system on the cervical collar of FIG. 2.

FIG. 17B is a plan view of a variation of the strap system of FIG. 17A.

FIG. 17C is a schematic view of yet another embodiment of a strap system on a cervical collar.

The drawing figures are not necessarily drawn to scale, but instead are drawn to provide a better understanding of the components thereof, and are not intended to be limiting in scope, but to provide exemplary illustrations. The figures illustrate exemplary configurations of a cervical collar, and

OSS 000627

US 11,452,633 B2

7

in no way limit the structures or configurations of a cervical collar according to the present disclosure.

## DETAILED DESCRIPTION OF VARIOUS EMBODIMENTS

### A. Introduction

Embodiments of an orthopedic device are provided for stabilizing and supporting anatomical portions of a user, for example, the neck and head of a user.

Although the embodiments of the disclosure are adapted for supporting and stabilizing anatomical portions of many users having various anatomical shapes and sizes, the embodiments of the disclosure may also be dimensioned to accommodate different types, shapes and sizes of anatomical portions.

A better understanding of different embodiments of the disclosure may be had from the following description read with the accompanying drawings in which like reference characters refer to like elements.

While the disclosure is susceptible to various modifications and alternative constructions, certain illustrative embodiments are in the drawings and are described below. It should be understood, however, there is no intention to limit the disclosure to the embodiments disclosed, but on the contrary, the intention covers all modifications, alternative constructions, combinations, and equivalents falling within the spirit and scope of the disclosure.

It will be understood that, unless a term is defined in this disclosure to possess a described meaning, there is no intent to limit the meaning of such term, either expressly or indirectly, beyond its plain or ordinary meaning.

While the foregoing embodiments have been described and shown, alternatives and modifications of these embodiments, such as those suggested by others may be made to fall within the scope of the invention. While the cervical collar has been described in combination with collar parts, it will be understood that the principles described may be extended to other types of orthopedic and prosthetic devices.

Reference characters are provided in the claims for explanatory purposes only and are not intended to limit the scope of the claims or restrict each claim limitation to the element in the drawings and identified by the reference character.

For ease of understanding the disclosed embodiments of a cervical collar, the front or anterior, and rear or posterior portions of the cervical collar are described independently. The anterior and posterior portions of the cervical collar function together to form a supporting and stabilizing cervical collar that encompasses the anatomical portions of the user.

The term "posterior" also has its ordinary meaning and refers to a location that is behind or to the rear of another location. The term "anterior" has its ordinary meaning and refers to a location ahead of or to the front of another location.

The terms "rigid," "flexible," "compliant," and "resilient" may be used herein to distinguish characteristics of portions of certain features of the cervical collar. The term "rigid" is intended to denote that an element of the collar is generally devoid of flexibility. Within the context of support members or shells that are "rigid," it is intended to indicate that they do not lose their overall shape when force is applied, and in fact they may break if bent with sufficient force. On the other hand, the term "flexible" is intended to denote that features are capable of repeated bending such that the features may

8

be bent into retained shapes or the features do not retain a general shape, but continuously deform when force is applied. The term "compliant" is used to qualify such flexible features as generally conforming to the shape of another object when placed in contact therewith, via any suitable natural or applied forces, such as gravitational forces, or forces applied by external mechanisms, for example, strap mechanisms. The term "resilient" is used to qualify such flexible features as generally returning to an initial general shape without permanent deformation. As for the term "semi-rigid," this term is used to connote properties of support members or shells that provide support and are free-standing, however such support members or shells may have some degree of flexibility or resiliency.

The term "flexible" should denote that features are capable of repeated bending such that the features may be bent into retained shapes or the features do not retain a general shape, but continuously deform when force is applied. The term "compressible" may be used to qualify such structural features as being capable of being reduced in size or volume due to the exertion of force applied to the structural feature.

### B. Embodiments of the Cervical Collar

FIGS. 2 and 3 exemplify an embodiment of a cervical collar 200 of the disclosure. The cervical collar 200 includes an anterior component 202 that secures to a posterior component 204 by a strap system 216. The anterior component 202 includes a main support 206 upon which the strap system 216 is preferably secured, and has a sternum section 214 that extends to the sternum of a user. The sternum section 214 is formed at least in part by a base component 207 upon which a cover 213 (which may alternatively be called a front casing) housing at least part of an adjustment mechanism 220 is disposed.

An intermediate support 210 secures to the main support 206, and is adjustable relative to the main support 206 by an adjustment mechanism 220. The intermediate support 210 and the main support 206 together form a frontal opening 218. An upper support 208 (which may alternatively be called a chin tray) is located on the intermediate support 210 above the main support 206. Padding 212 is located along the anterior and posterior components 202, 204.

Referring specifically to FIG. 3, the strap system 216 is shown in one of several preferred configurations. Specifically, the strap system 216 includes straps 225 located on opposed sides of the collar 200, and extending between the anterior and posterior components 202, 204. Each strap 225 is elongate and has first and second segments 226, 228. The first segment 226 is mounted onto a frontal projection 222 of the main support 206.

Frontal projections 222 extend toward and over a top portion of the frontal opening 218. The frontal projections 222 preferably extend anteriorly past and over the adjustment mechanism 220, as will be evident in following embodiments of the adjustment mechanism 220. Likewise, the frontal projections 222 enclose at least part of the intermediate support 210, by extending over a front surface of the intermediate support 210, and provide greater support to the intermediate support 210 about the user. The frontal projections 222, at least in exterior or outwardly portions thereof, are preferably rigid or semi rigid along a circumferential or arcuate profile of the intermediate support 210 to provide support to the upper and intermediate supports 208, 210. In this manner, the frontal projections 222 do not yield

OSS 000628

US 11,452,633 B2

9

or bend when the strap system 216 is secured thereon in combination with the posterior component 204 about a neck of a user.

By extending forwardly, the frontal projections 222 provide a portion on the surface of the anterior component 202 for receiving and corresponding to straps 225. Straps 225 may thus be advantageously adjacent to and/or flush against the anterior component 202 as opposed to jutting outwardly from the collar 200. This is in contrast to existing collars where straps freely jut outwardly from the collar, leading to risk of inadvertent adjustment, damage to the collar, or injury to a user if the straps are inadvertently tampered with.

The frontal projections 222 enable a stable platform upon which the strap system 216 can secure and preferably does not interfere with the upper support 208, thereby allowing removal of the strap system 216, or on one side thereof without adjusting the integrity of the intermediate support 210, and the upper support 208. The additional length provided by the frontal projections 222, by which they extend over the frontal opening 218, offers greater adjustability for the strap system 216, thereby offering more accommodation to users' neck circumferences.

The frontal projections 222 serve to stabilize the force exerted by the user's chin by generally extending over the main support 206, as evidenced by force 231, which generally coincides downwardly with a lower portion of the main support 206. As the frontal projections 222 straddle the intermediate support 210, the main support 206 is arranged obliquely downwardly relative to the frontal projections 222, which generally jut horizontally and preferably parallel to a user's mandible.

As will be explained below, the intermediate support 210, while carrying the upper support 208, moves relative to the main support 206 and does not interfere with the strap system 216 during height adjustment of the anterior component 202 of the collar 200. In this manner, the strap system 216 remains intact while securing the anterior and posterior components 202, 204 to one another. The anterior component 202 can be advantageously adjusted for height while the collar 200 is being worn by the user since the intermediate support 210 (and hence upper support 208) is moved relative to the main support 206, but the relationship between main support 206 and posterior component 204 is uninterrupted and unchanged.

The arrangement of the strap system 216 in combination with the frontal projections 222 enables a clinician to don and size the collar 200 on the user in either direction (i.e. either toward the chin or toward the sternum). Specifically, the clinician may place the upper support 208 against a user's chin, and then use the adjustment mechanism 220 to drop the main support 206 via the intermediate support 210 to the appropriate size to abut the user's sternum. The strap system 216 may first be appropriately secured to the anterior and posterior components 202, 204, or secured after the collar 200 has been appropriately sized. Alternatively, the main support 206 may be placed against a user's sternum, and secured to the posterior component 204 by the strap system 216. The clinician may then use the adjustment mechanism 220 to selectively adjust the upper support 208 via the intermediate support 210 to the appropriate height so as to abut the user's chin, while the collar 200 is already secured to the user.

The posterior component 204 defines side extensions 232 that define a series of strap slots 234 for securing the straps 225 to the frontal projections 222. In the depicted embodiment, the straps 225 each have a first segment 226 secured to a fastener 224 on the frontal projections 222. The first

10

strap segment 226 may be configured in shape to correspond to a shape of the corresponding frontal projection 222. The strap 225 is looped at loop segment 227 about at least one of the strap slots of the series of strap slots 234. In this embodiment, the strap 225 loops through first and second slots 234a, 234b of the series of strap slots 234. The series of strap slots 234 may define at least two of such strap slots, and in the depicted embodiment the series of strap slots 234 include four strap slots. The clinician may select which strap slots of the series of strap slots 234 to loop the strap 225 according to the size of the user.

A second strap segment 228 extends from the looped segment 227 and secures over a surface of the first strap segment 226 via a fastener 230, thereby pulling the posterior component 204 toward the anterior component 202 at the loop segment 227. In this manner, when the strap 225 is looped about the series of strap slots 234, the anterior and posterior components 202, 204 are already secured to one another, and further tensioning and tightening of the strap 225 can be achieved without the necessity of holding the posterior component 204 relative to the anterior component 202.

The straps 225 can be tensioned on both sides of the collar 200 simultaneously, or adjusted individually according to the demands of the user. This strap system 216 allows for removal of the collar 200 by only requiring removal of one of the straps 225 on one of the sides of the collar 200 from the corresponding fastener 230. Because the first segment 226 of the strap 225 remains in place, the user does not need to significantly resize the strap system 216 upon repeated steps of donning and doffing of the collar 200, particularly when only one of the straps 225 has its second segment 228 detached from the surface of the first segment 226 for removing the collar 200, while leaving the other strap 225 intact and secured. By minimizing the inconvenience of resizing the strap system 216 upon donning and doffing, user compliance is enhanced especially over long-term use.

The side extensions 232 preferably extend over the main support 206 so as not to interfere with the anterior component 202, which generally bears a significant amount of weight of the user's head and neck and in order to facilitate treatment of a user's injury. As noted above, while the side extensions 232 extend over the main support 206, they do not interfere with the height adjustment of the anterior component 202 since the side extensions 232 extend over the main support 206 and below the upper and intermediate supports 208, 210.

FIG. 4 exemplifies another embodiment of a strap system 340. In this embodiment, a strap 342 extends from the posterior component 204a and carries a mounting part 344. The mounting part 344 may be a buckle, latch, ring, or other suitable part that can be carried by the strap 342 and engage an anchor 348 located on the anterior component 202a. The anchor 348 may comprise a hook protruding from a side of the anterior component 202a. The strap 342 is looped and secured about the mounting part 344 for length adjustment at loop 346, and may likewise be looped about the posterior component 204a in the preceding embodiment, or attached to the posterior component 204a whereby length adjustment is made relative to the mounting part 344.

In this embodiment, the strap 344 can quickly be attached and detached from the anterior component 202a. Such an arrangement may be preferable to a user in that the strap length may be set by the clinician, and does not require subsequent adjustment by the user. This convenient arrangement of strap 344 allows a user to easily don and doff the

OSS 000629

US 11,452,633 B2

11

collar repeatedly with minimal or no re-sizing required, thus enhancing compliance and comfort for a user, especially for long-term use.

FIG. 4 also exemplifies how a main support 354 is separate from a sternum support 352. The sternum and main supports 352, 354 may be selectively adjusted relative to one another by a sternum adjustment mechanism 350.

FIGS. 5A and 5B illustrate an exemplary embodiment of the sternum adjustment mechanism 350, wherein the sternum support 352 is adjustable relative to the main support 354, to provide differing pressure against the sternum of the user or to provide pressure release. The main support 354 may carry the sternum adjustment mechanism 350 which pivotally connects to the sternum support 352 by a linkage 356 and anchor 358. The sternum adjustment mechanism 350 includes a lever 360 on a cam 361. The cam 361 is rotatable relative to a biasing element 362, and articulates the linkage 356 upon rotation of the cam 361.

FIG. 5A shows the sternum adjustment mechanism 350 in a lowered or collapsed configuration such that the lever 360 is pulled forward to collapse the linkage 356, and the sternum support 352 generally abuts the main support 354. In this manner, there is pressure relief against the sternum. FIG. 5B shows the sternum adjustment mechanism 350 in a raised or extended configuration such that the lever 360 is articulated rearward, and the cam 361 engages the biasing element 362 to maintain the linkage 356 in the extended configuration. The sternum support 352 is extended away from the main support 354 by the linkage 356.

FIGS. 6A and 6B illustrate another exemplary embodiment of a sternum adjustment mechanism 366. In this embodiment, the sternum adjustment mechanism 366 comprises a ramp 370 extending from the sternum support 352. The main support 354 carries a bracket 368 that is slidable along the ramp 370. The bracket 368 may include a cam surface or other suitable mechanism, such that as the bracket 368 slides along the ramp 370 in a raised or extended configuration in FIG. 6B, the bracket 368 can be retained along the ramp 370 at a fixed position to extend the sternum support 352 relative to the main support 354 according to a height of the ramp 370. In the lowered or collapsed configuration of FIG. 6A, the bracket 368 is located at a different position along the ramp 370 to bring the sternum support 352 adjacent or near the main support 354.

FIGS. 7 and 8 depict an alternative embodiment of an anterior component 236 over the anterior component of FIGS. 2 and 3. The anterior component 236 has both a main support 238 and intermediate support 240, and the intermediate support 240 is adapted to receive the upper support 208 of the embodiment of FIGS. 2 and 3, and the Miami J collar.

The main support 238 defines a lower portion 241 extending continuously downwardly from and between the first and second frontal projections 222 relative to and along the central axis A-A. The lower portion 241 includes a recessed portion 253 extending posteriorly adjacently below the first and second frontal projections 222. The lower portion 241 has an inner periphery 245 forming an entirety of a segment of the frontal opening 218 below the first and second frontal projections 222. The first and second flanks 276 extend from the first and second frontal projections 222 generally perpendicularly relative to and away from the central axis A-A toward the posterior component. The intermediate support 240 defines a front portion 243 centered about the central axis A-A and having opposed sides extending perpendicularly toward the posterior component. The front portion 243 having an inner periphery 251 joining with an inner periphery of the first and second frontal projections 222 to enclose

12

the frontal opening 218 with the lower portion 241 of the main support by extending between the first and second frontal projections 222 over the front opening 218. The intermediate support 240 forming first and second flanks 274 extending generally perpendicularly to and away from the central axis from opposed sides of the front portion 243 along the first and second flanks 272 of the main support 238. Each of the first and second flanks 274 of the intermediate support 240 have first end portions 277 at locations remote from the central axis A-A and pivotally attached to first end portions 275 of the first and second flanks 272 of the main support 238 at first and second pivot points 260, 261, respectively, remote from the central axis A-A.

The upper support 208 is suspended on the intermediate support 240 by being connected at a central tab 264 of the intermediate support 240 extending outwardly relative to an upper periphery of the intermediate support 240 and secured by a pin 270 along a central axis A-A along the front of the anterior component 236. A grip 266 may be provided below the central tab 264, and extend along the periphery of the frontal opening 218 and a lower periphery of the intermediate support 240. The grip 266 may have tactile features to aid grasping the grip 266, and the grip 266 may protrude outwardly from the periphery of the intermediate support 240 to offer a relief portion for placing a finger or thumb for raising the intermediate support 240 relative to the main support 238.

The upper support 208 has flanks 276 that connect and run on the inside of the intermediate support 240. The flanks 276 have end portions at which side connections 256 secure to the intermediate support 240. Thus the upper support 208 is suspended centrally by the central tab 264 and the side connections 256, thereby enabling to the upper support 208 to contour to the anatomy of the chin and mandibles of the user, and offer improved comfort. The intermediate support 240 may define a scale 262 above the frontal projections 222 so as to provide a relative sizing of the collar 200.

The intermediate support 240 connects to the main support 238 by sliding connections 258 for accommodating height adjustment of the anterior component 236. The sliding connections 258 are arranged to couple slots 280, preferably having a curved shape, defined by the intermediate support 240, and slots 278, preferably having a curved shape, defined by the main support 238. The sliding connections 258 may be located and vertically stacked below the side connections 256 to stabilize the upper support 208, so as to align generally along a stacking axis B-B regardless of the height setting. The intermediate support 240 has flanks 274 that connect to flanks 272 of the main support 238 at pivot points 260, which accommodate sliding movement of the side connections 256 along the slots 278, 280.

The main support 238 includes a base 242 adapted to be placed adjacent to the user, and a cover 244 adapted to house and cover the adjustment mechanism 220. The base 242 and cover 244 form the side extensions 222, whereby the fastener 224 may be placed over the cover 244. A sternum section 246 extends from the base 242 at a transition 247 between the base 242 and the sternum section 246. The transition 247 may comprise a narrowed or thinned section from the base 242 and extending to the sternum section 246. The sternum section 246 may be formed continuously with the base 242 so the sternum section 246 is unitary with the base 242, or alternatively is attached to the base 242.

The base 242 may define side grips 268 on opposed sides of the sternum support 246. The side grips 268 may be defined by raised portions of the base 242 that enable a

OSS 000630

US 11,452,633 B2

13

clinician to grip and hold the base 242 when adjusting the height of the anterior component 236.

According to the depicted embodiment, the sternum section 246 is connected to the base 242 by a hinge 248 at the transition 247. The hinge 248 may be formed as a living hinge formed from a recessed channel 249 on a rear side of the base 244. Alternatively, the hinge 248 may comprise a compliant portion of the base 242 that bends upon application of force.

As illustrated in more detail in FIGS. 9A and 9B, a stiffener mechanism 250 may be carried by the sternum section 246 to stiffen the hinge 248 of the sternum section 246 relative to the base 242. The ability to modify the stiffness of the sternum section 246 is advantageous to provide pressure relief to the user, particularly when sternal or thoracic support is unnecessary or when the user requires minor adjustment of the neck. The stiffener mechanism 250 includes a first portion 372 arranged to selectively extend over the transition 247 and the hinge 248 to prevent or substantially prevent bending of the sternum section 246 away from the base 242. The first portion 372 preferably extends past the hinge 248, as shown in FIG. 9A, to assure the first portion 372 blocks movement of the hinge 248.

The first portion 372 may extend proximate to the cover 244, however is sized so as not to interfere with the cover 244 upon rotation of the stiffener mechanism 250. The first portion 372 may have a recessed tip 373 so as not to interfere with the cover 244 upon rotation.

The stiffener mechanism 250 has a second portion 374 extending from the first portion 372, and pivotally mounted on the sternum section 246. In the preferred embodiment, the second portion 374 is limited in rotation 375 relative to the sternum section 246 so as to assure a stiffened position and a released position of the stiffener mechanism 250. For example, the rotation 375 of the second portion 374 may only be 90 degrees.

The second portion 374 may include a tactile feature 376 to facilitate grasping of the stiffener mechanism 250 from a stiffened position thereby preventing flexure of the sternum section 246 away from the user's sternum, as depicted in FIG. 9A. The first portion 372 blocks movement of the hinge 248. FIG. 9B depicts a released position whereby the sternum section 246 has a flexure 377 both toward and away from a user's sternum, such that the first portion 372 is clear from the hinge 248.

In a variation, when the hinge 248 is formed by a recessed channel 249, the recessed channel 249 may have a sufficient depth to facilitate cutting the sternum section 246 from the base 242. Alternatively, the transition 247 may be formed to make trimming thereof easy so that a clinician may be able to remove the sternum section 246 along a peripheral contour of the base 242.

As shown in FIG. 7, the adjustment mechanism 220 is located generally along the central axis A-A at the cover 244 and above the sternum section 246. The adjustment mechanism 220 defines an actuator 252 for actuating the adjustment mechanism 220, and permitting adjustment in height of the intermediate support 240 relative to the main support 238. The cover 244 defines a recess 254 about the actuator 252 to facilitate actuation of the actuator 252, and the actuator 252 is located recessed in the recess 254 so as to prevent inadvertent actuation of the actuator 252. The actuator 252 is biased in an engaged position such that when not pressed, the actuator 252 maintains the adjustment mechanism 220 in the engaged position. Upon pressing the actuator 252 toward the rear side of the anterior component 236 and deeper into the recess 254, the adjustment mechanism

14

220 is placed in a disengaged position to permit adjustment of the height of the anterior component 236.

As shown in FIG. 8, a lock mechanism 282 is provided as extra assurance of locking the adjustment mechanism 220. The lock mechanism 282 is located on the rear side of the anterior component 236. The lock mechanism 282 includes a lever 284 that moves a tab 286 along a limiter 288 for placement between locked and unlocked positions. The limiter 288 may include blocks on opposed sides of an arc of motion relative to the lever 284, for example between 45 degrees. The clinician or user may place fingers over the cover 244 to switch the lever 284 between the locked and unlocked position. In the locked position, the lock mechanism 282 prevents the actuator 252 from being pressed into the disengaged position. In other words, the locked position of the lock mechanism 282 prevents actuation of the actuator 252. In the unlocked position, the actuator 252 may be pressed to disengage the adjustment mechanism 220, and permit height adjustment of the anterior component 236. The lock mechanism 282 offers an extra layer of protection to assure the adjustment mechanism 220 cannot be tampered with or inadvertently adjusted during normal use.

In observing FIGS. 10A and 10B, the adjustment mechanism 220 is shown relative to the cover 244. The adjustment mechanism 220 includes first and second traction elements 290, 292 that slide along a connector 294 at a lower portion of the cover 244, and have end portions extending to the slots 278 of the cover 244. The end portions define bosses 298, 300 adapted to slide along the slots 278. A lock element 296 is connected to and biased against the connector 294. The lock element 296 may form the actuator 252, and is movable relative to the connector 294, to engage and disengage from the first and second traction elements 290, 292.

FIG. 11 shows the connector 294 in greater detail. The connector 294 defines an opening 302 for receiving the actuator 252 and openings 304 for receiving end portions 326, 328 (shown in FIG. 12B) of the lock element 296. The connector 294 has a center portion 306 that defines a cavity on a rear side of the connector 294 for receiving a center section 324 of the lock element 296 adjacent the actuator 252, and corresponding curved channels 308, 309 for receiving arms 320, 322 of the lock element 296. The connector 294 forms the curved channels 308, 309 for guiding and receiving the first and second traction elements 290, 292, and peripheral surfaces 312 to the curved channels 308, 309 to direct the first and second traction elements 290, 292 upwardly toward the slots 278. The connector 294 forms center slots 310 through which the first and second traction elements 290, 292 extend to engage the lock element 296, as well as side slots 314 to yet further guide the first and second traction elements 290, 292. To facilitate assembly and manufacture, the connector 294 may be monolithic and defined by a single part.

FIGS. 12A and 12B depict the lock element 296 as having the actuator 252 that protrudes from the center section 324. The center section 324 defines at least one or a series of teeth 316, 318 along upper and lower portions of the lock element 296 for engaging corresponding teeth of the first and second traction elements 290, 292. First and second arms 320, 322 extend curvingly from the center section 324 and bear the end portions 326, 328 that are received by the connector 294. The arms 320, 322 form springs to bias the lock element 296 against the connector 294, particularly in that the end portions 326, 328 engage the connector 294 and the actuator 252 and the teeth 316, 318 can move relative to the opening 302 to actuate the adjustment mechanism 220. To facilitate assembly and manufacture, the lock element 296 may be

OSS 000631

US 11,452,633 B2

15

monolithic and defined by a single part. A rear side of the lock element 296 defines a rear recess 334 for engagement with the at least one post 338 of the lock mechanism 282.

FIGS. 13A and 13B show how the adjustment mechanism 220 operates to adjust the first and second traction elements 290, 292. Unlike in known cervical collars having a rotatable element forming a rack and pinion adjustment mechanism (which disadvantageously cannot be locked), the adjustment mechanism 220 is arranged to be disengaged upon pressing of the actuator 252, and to automatically lock upon release of the actuator 252. Such an arrangement is advantageous in that the clinician can assure the adjustment mechanism 220 is not inadvertently bumped or adjusted and thereby unintentionally change the height of the collar. Indeed, by pressing the actuator 252 toward the user, as opposed to pulling away, there is greater stability to maintaining the cervical collar 200 on the user without the tendency of adjusting the location of the main support 206.

Upon disengagement of the adjustment mechanism 220, the clinician can modify the location of the upper and intermediate supports 208, 210 relative to the main support 206 with a single hand, as adjustment of the intermediate support 210 can be done freely as the first and second traction elements 290, 292 slide and permit the intermediate support 210 to articulate relative to the main support 206. Such an arrangement provides quicker and stable means for changing the height, and enables the first and second traction elements 290, 292 to include more teeth 330, 332 and thereby more height settings.

As shown in FIG. 13A in the disengaged position, the lock element 296 moves toward and is biased against a rear side R of the connector 294. The first and second end portions 326, 328 are received by the openings 304 of the connector 294, so that they are fixed relative to the connector 294. In the disengaged position, the actuator 252 is pressed or biased against the spring force generated by resistance and flexure of the first and second arms 320, 322. The first and second sets of teeth 316, 318 are drawn toward the rear side of the collar 200 and fully disengage from the teeth 330, 332 of the first and second traction elements 290, 292. The center section 324 and the arms 320, 322 move within the cavity 336 and arm slots 337, such that the center section is 324 drawn away or at least partially away from a biasing surface delimiting part of the cavity 336. The biasing surface of the cavity 336 is located on the rear side of the connector 294. The base 242 may limit the travel of the lock element 296 at the rear side of the connector 294.

As shown in FIG. 13B, upon release of the actuator 252 when the adjustment mechanism 220 is in the engaged position, the lock element 296 is biased against the rear side R of the connector 294 yet extends toward the front side F as a result of first and second arms 320, 322, and the center section 324 being retained and biased against the biasing surface of the cavity 336. The first and second sets of teeth 316, 318 engage the first and second teeth 330, 332 of the first and second traction elements 290, 292. The teeth 316, 318 are preferably arranged in an elongate row to assure there is at least one tooth engaging corresponding teeth of the first and second traction elements 290, 292. The connector 294 is preferably configured so the channels 308, 309 flatten or substantially flatten the first and second traction elements 290, 292 within the center slot 310 so there is multiple engagement of the teeth 316, 318 with the corresponding teeth 330, 332 of the first and second traction elements 290, 292. The adjustment mechanism 220 is arranged so the natural or predetermined position is the engaged position so that when the actuator 252 is released,

16

the teeth 316, 318 of the lock element 296 and the first and second traction elements 290, 292 engage one another.

The adjustment mechanism 220 is not limited to using the connector 294 and lock element 296 described above, but rather it may include means for providing engagement and disengagement from teeth or other locking elements on the first and second traction elements 290, 292, preferably but not limited to automatic engagement upon release of the adjustment mechanism 220. The adjustment mechanism 220 is arranged for engaging the first and second traction elements 290, 292 in an engaged position, and is further arranged to disengage from the first and second traction elements 290, 292 in a disengaged position. In the disengaged position, a clinician can selectively adjust the height of the intermediate support 210, and raise the upper support 208, relative to the main support 206 with restriction of gradual adjustment, but can accomplish the feat of height adjustment of the anterior component 236 quickly upon disengagement of the adjustment mechanism 220 and automatic locking at the desired location upon release of the adjustment mechanism 220 so it engages the first and second traction elements 290, 292 in a fixed location.

FIGS. 14A and 14B exemplify the lock mechanism 282 that may be used in combination with the adjustment mechanism 220. The lock mechanism 282 includes a lever 284 that may extend above or just below the inner periphery 245 of the base 242 in order to facilitate adjustment of the lock mechanism 282 without requiring removal of the cervical collar 200. The lever 284 may include at least one post 338 extending inwardly and on an opposite side of the base 242 as the lever 284. The at least one post 338 is directed toward the rear cavity 336 opposite the actuator 252.

The at least one post 338 is adapted to rotate according to the position of the lever 284. In an unlocked position, the at least one post 338 is located within the rear recess 334, and the actuator 252 can be pressed without interference by the at least one post 338 since the rear recess 334 takes up the at least one post 338 when the actuator 252 is pressed toward the rear of the anterior component 236 or the base 242. In the lock position, the lever 284 is rotated so that the at least one post 338 interferes with the center section 324 of the lock element 296 since the at least one post 338 is out of alignment with the rear recess 334.

FIGS. 15A-15C depict an embodiment of the posterior component 204, particularly from the perspective of outside of the posterior component 204. The posterior component 204 includes a main part 400 and a flexible portion 402. It will be noted that FIG. 15A shows an outer side of the posterior component 204 that is intended to face away from the user whereas FIGS. 15D and 15E show the inner side of the posterior component 204 arranged to be placed adjacent to the user. From the outer side of the posterior component 204, the main part 400 defines a central convex portion or rib 404, whereas the rib 404 is concave on the inner side of the posterior component, protruding from a base section 416 of the main part 400 toward a top section 415 of the main part 400 to accommodate and apply pressure outside of the cervical spine.

The depicted embodiment exemplifies how the main part 400 includes resilient or flexible portions forming the flexible portion 402 formed along the peripheral edges of the main part 400. In this embodiment, the main part 400 and the flexible portion 402 are formed by discretely different materials, wherein the main part 400 is formed from a more structurally rigid material, and the flexible portion 402 is formed from a material more resilient and flexible than the material forming the main part 400; for example, by over-

OSS 000632

US 11,452,633 B2

17

molding a resilient or compliant material thereon. The use of flexible portions 402 allows the cervical collar 200 to distribute pressure peaks over larger areas in order to avoid the formation of pressure ulcers. The flexible portions 402 can also prevent pressure peaks even when the collar 200 is improperly applied.

The flexible portions 402 in the embodiment are continuous in that there are no breaks along the flexible portion 402 about the periphery of the main part 400. This is in contradistinction to flexible portions that comprise thinned portions forming tabs from the main part 400 that are sequentially provided along a periphery of the main part 400, and include clearances between each of the tabs to increase their flexibility. An advantage to the continuously formed flexible portion 402 is that there is an even distribution of pressure as opposed to individual and spaced tabs that are required to bear and exert pressure. It will be understood, however, that the continuously extending flexible portions 402 are provided by example, and the disclosure is not limited to the flexible portion 402 being continuous. Although the continuously extending flexible portions 402 embodiment is advantageous, discretely separated tabs or flexible areas may be provided in combination with the embodiments of this disclosure.

The main part 400 defines a convex rib 404, from the perspective of the outer side, that generally runs along a central axis C-C of the posterior component 204. Side sections 406 flare and curve from sides of the rib 404 and toward side extensions 405, as discussed above. The side sections 406 form a Y-feature 408 with the rib 404 and the side extensions 405. The Y-feature 408 flares upwardly vertically along the cervical spine, and the side sections 406 have a curvature to provide improved anterior-posterior and lateral occipital support.

A series of slots 418 extends along the side extensions 405 from the rib 404, and the slots 418 may be formed as shown above. However, additional slots that may not be sufficiently sized for receiving a strap may be formed and progressively diminish in size as the series of slots 418 approaches the rib 404. In this manner the side extensions 416 become more rigid as they draw toward the rib 404, thereby being less flexible and contributing to greater rigidity along the rib 404, which in turn corresponds to a user's cervical spine. The series of slots 418 sized for receiving straps may provide ventilation and compliance to the anterior component 236 and due to tensioning of the straps.

The series of slots 418 and their corresponding pattern provide flexibility to allow the posterior component 204 to conform and fit around the necks of varying anatomical sizes. The pattern of the series of slots 418 allow the posterior component 204 to be flexible where needed, such as along the side extensions 232 that overlap or are proximate to the anterior component 236, while remaining rigid in the necessary anterior-posterior and lateral directions, particularly along the axis C-C corresponding to the user's cervical spine.

The Y-feature 408 is in combination with the side sections 406 that form recesses 407, which extend to the series of slots 418 on each lateral side of the posterior component 204, created as a result of the Y-feature 408 protruding from the outer side. The recesses 407 transition in depth between the ends of the side sections 406, wherein the greatest depth of the recesses 407 is located between the ends of the side sections 406. The recesses 407 on the opposed sides of the rib 404 and contours of the side sections 406 form a pocket 420 for the anterior component 236 to nest into the posterior component 204 when it is secured therewith. The pocket 420

18

may enable the posterior component 204 to overlap the anterior component 236, and the pocket 420 reduces pressure of the anterior component 236 pushing into the neck of the user.

The flexible portion 402 is preferably provided around the periphery of the main part 400, and offers reduced edge pressure about the posterior neck and occiput of the user. The flexible portion 402 may be increased in designated areas to provide enhanced pressure relieving characteristics to the user. For example, there may be an increase in size of the flexible portion 402 from a border of the side extensions 405 to the upper sections 412 that extend on opposed sides of a peripheral recessed section 410 adapted to accommodate a user's occipital region.

The peripheral recessed section 410 may have a first flexible portion region 411 that has a width W1 that is greater compared to other areas and corresponding widths (collectively the second flexible portion region W2) of the flexible portion 402 about the periphery of the main part 400. The width W1 at the first flexible portion area 411 is provided at least in part to provide increased comfort to the user around the occipital bone and posterior neck, as shown by the vertical and horizontal directional arrows A, B within the first flexible portion area 411, by the yielding of the first flexible portion area 411 in the recessed section 410. The width of the first flexible portion area 411 may be variable from the upper sections 412 to the nadir of the peripheral recessed section 410 along the center line C-C. The second flexible portion region W2 may be variable in width depending on the location along the periphery of the main part 400, or may be uniform.

The upper sections 412 are anatomically shaped flared sections spaced apart by the concave and curved shaped recessed section 410, and a flexible portion of the upper sections 412 is shaped to correspond to and support an occipital region of a user of the collar 200. The upper sections 412 are arranged to gently cradle the side areas of a user's occiput so as not to place undue pressure on the cervical spine of the user. The contour of the recessed section 410 and the gradual rising of the flexible edge 402 between the upper sections 412 and the recessed section 410 provide increased comfort to the user around the occipital bone and posterior neck.

The main part 400 may be thinned at least at the upper sections 412 in that the main part 400 has a general thickness T1, and the thickness at the upper sections 412 has a gradual reduction or tapered thickness T2 from the general thickness T1 to a tip 423 of the upper sections 412. The tapered thickness T2 results in a thinned section 422 creating a three tiered range of flexure 414: flexure of the main part at the general thickness T1, flexure at the tapered thickness T2 of the main part 400 at the upper sections 412, and flexure at the flexible portion of the upper sections 412.

The thinned section 422 is covered and/or overmolded by material forming the flexible portion 402, wherein the amount of material forming the flexible portion 402 gradually increases as the thinned section 422 tapers to nothing and the material fully becomes the flexible portion 402 about the periphery or edge of the tip 423 of the thinned section 422. According to an embodiment, the combined thickness of the thinned section 422 and the material of the flexible portion 402 is generally the same as the general thickness T1. The flexible portion 402 may likewise have a same thickness as the general thickness T1.

As shown in FIG. 15C, the posterior component 204 defines a contoured profile 426 having a general curvature between the recessed section 410 and the base section 416

OSS 000633

US 11,452,633 B2

19

oppositely disposed relative to the recessed section 410 along the axis C-C. In this manner, pressure is applied to the upper sections 412 and the base section 416 to provide improved anterior-posterior and lateral support, and easing such pressure by the curvature which better corresponds to the anatomical relationship between the occiput and the shoulders of a user. The general curvature thus advantageously provides an improvement over existing cervical collars by providing enhanced support corresponding to a user's needs, as compared to exiting collars which primarily provide flat posterior portions that result in undesirable pressure points and discomfort.

FIGS. 15D and 15E exemplify an inner side to an alternative embodiment of the posterior component 204 intended to face a user. Fastener tabs 430 are provided at convenient locations to assure a firm grip to a liner of the posterior component 204. The posterior component 204 has a posterior opening 432 intended to be located generally along a cervical column of a user to provide pressure relief and ventilation to the posterior component 204 along the rear rib 404. The rear rib 404 is generally convex on the outer side of the posterior component 204, and is generally concave along the inner side of the posterior component 204. The concave inner side of the rear rib 404 serves to relieve pressure against the cervical column of a user, as evidenced by the recessed portions 434 generally corresponding to the Y-feature 408 which is on the outer side of the posterior component 204. Strap slots 436 are provided at side portions of the posterior component 204, and are oriented differently from the ventilation openings 428.

The flexible portion 402 extends along the main part 400 a greater distance along the inner side than the outer side, as evidenced by the boundary 458 corresponding to the extent to which the flexible portion 402 extends along the main part 400 on the outer side. The flexible portion 402 extends longer on the main part 400 and offers greater cushioning due in part to the material forming the flexible portion 402 being preferably softer and more compliant than the material forming the main part 400. For example, the flexible portion 402 material defines an upper flexible portion 448 extending longer than the flexible portion 402 on the outer side (past the boundary 458) so as to offer more cushioning along the inner side that corresponds to the occiput of the user, particularly since there may be substantial pressure exerted on the collar 200 by the user at this location. Within the cavity 438 formed by the Y-feature 408, the flexible portion 402 forms ribs 440, 442, 444 descending into the cavity 438 and generally extending along the curvature 426.

The ribs 440, 442, 444 are provided to reinforce the curvature 426 along the inner side of the posterior component 204, and better assure proper positioning of the user's neck. As the ribs 440, 442, 444 generally align with the curvature, they offer vertical stiffness to the posterior component 204 and track along the curvature 426. The ribs 440, 442, 444 are spaced from one another forming clearances 446 from one another to avoid pressure points, and to facilitate breathability of the posterior component 204. As the material forming the flexible portion 402 is more compliant, or softer than the material forming the main part 400, the ribs 440, 442, 444 may be trimmable depending on patient anatomy. For example, if the user's neck is substantially straight, some material may be removed from the ribs 440, 442, 444 to make the curvature less severe. This allows the posterior component 204 to be customizable based on individual patients' dimensions, a feature not provided by existing collar designs.

20

The Y-feature 408 gradually transitions along the inner side between upper transition 452 and lower transition 454 so that the concavity along the inner side is formed gradually to avoid any pressure points. Either the main part 400 may form such transitions, or the main part 400 may form the transitions in combination with the flexible portion 402 material, as similarly taught in regard to the outer side. The material forming the flexible portion 402 extends along a lower portion 450, and extends into at least one peripheral recess 456 formed by the main part 400, to better interlock the flexible portion 402 to the main part 400.

FIGS. 16A-16C exemplify improved strap arrangements or systems for connecting the anterior and posterior components 202, 204. A strap tab 500 has a first surface 502 defining a recess 506 for improved gripping of the strap tab 500, and a second surface 504 having traction elements 510 for gripping. A slot 508 is formed for receiving a strap. The strap tab 500 forms a recess 512 for receiving an end portion 518 of a strap 516, as further illustrated in FIG. 16C. The recess 512 enables the end portion 518 of the strap 516 to lie flush in the strap tab 500, so the end portion 518 is confined within the peripheries of the first and second surfaces 502, 504, without protruding therefrom. This arrangement is provided to maintain the strap tab 500 in a low profile configuration so as not to significantly protrude from the anterior component 202. Suitable fasteners 514, such as hook material or hook formed by the strap tab 500 itself, may be located within the recess 512 to removably secure to the end portion 518. A second end portion 520 of the strap 516 may form a loop for engaging the strap on the posterior component.

FIG. 17A exemplifies another strap arrangement or system. The strap 530 carries a grip 534 on a first end of the strap 530 that is adapted to correspond in geometry to a landing area 532 of the forward projections of the anterior component 202. A strap body 536 extends to the posterior component 204 from the grip 534 so that a second end 538 loops about a strap slot 540 of the posterior component 204. The second end 538 may be cinched about the posterior component, or include further means for securing, such as having corresponding hook and loop fastener to secure itself to the strap body 536. This arrangement advantageously prevents damage or inadvertent tampering with the straps due to accidental contact with the strap or the strap catching on an object, as the strap end is secured flush against the strap body 536. Additionally, this embodiment allows for a strap system to be repeatedly donned and removed without adjusting the length of the strap 530 each time, thereby enhancing convenience for a user especially over long-term use when the collar is worn more intermittently.

FIG. 17B shows how the strap 530 may include a scale 542 printed thereon for determining sizing of the strap 530, and may further include logos or other information 546 printed thereon. In the variation of FIG. 17B, second end 539 of strap 530 defines a loop and is permanently stitched by stitching 544 to maintain its shape. In this embodiment, the loop is permanently secured to the posterior component 204 so that the strap 530 is not adjustable from the posterior component 204, but rather is only adjustable by pulling from a first end at the anterior component 202. However, the grip 534 may be removable (as opposed to being permanently disposed on the strap 530—thereby only being removed by destroying or significantly modifying the strap 530) from the strap 530, such that the strap 530 can be trimmed from a first end, and the grip 534 can be subsequently secured once the strap 530 is resized. Any suitable arrangement may be provided to removably attach the grip 534 to the strap 530,

OSS 000634

US 11,452,633 B2

21

such as by a clamshell arrangement, adhesives, hook and loop fastener, or any other suitable arrangement.

FIG. **17**C illustrates another embodiment whereby strap **533** passes through and over a strap slot **540** and secures internally to the posterior component **204**. In this embodiment, an outer surface of the strap **533** may have a hook-receivable surface, and the posterior component **204** can include a corresponding fastener **548** that engages the hook-receivable surface. The strap **533** includes indicia **542** that peer through an opening of the strap slot **540** to show the extent or length the strap **533** is tensioned. This arrangement advantageously prevents damage, as discussed above, by maintaining the strap **533** in close proximity to or flush against the cervical collar **200**, while still providing indicia for convenient and accurate sizing of the collar **200** to accommodate individual users' dimensions.

The disclosed embodiments of an orthopedic device, such as a cervical collar, having anterior and posterior components that are positioned about anatomy of a user such as the neck, to conform thereto and provide support, immobilization, and stabilization thereto, provide improvements that allow a single cervical collar to be applied for treatment to a wide variety of patients having varying sizes or degrees of swelling of anatomical portions.

It is understood that while the disclosed embodiments are designed to accommodate users having different sized anatomies, the size of the disclosed embodiments and the components thereof can be adjusted so different users having different sized anatomical portions may benefit from the present designs.

It is understood that while the disclosed embodiments of the cervical collar are shown having discrete anterior and posterior components, the anterior and posterior portions may be connected to each other along one side thereof, and a single strap or circumferential adjustment mechanism can be provided between the anterior and posterior component along the other side thereof.

It will also be recognized that the flexible portions, and the living hinge and slot structures, can be provided to a collar, without providing other features, such as the height adjustability, to the collar.

It is to be understood that not necessarily all objects or advantages may be achieved under any of the particular embodiments. For example, those skilled in the art will recognize that the embodiments may be embodied or carried out in a manner that achieves or optimizes one advantage or group of advantages as taught without achieving other objects or advantages as taught or suggested herein.

The skilled artisan will recognize the interchangeability of various disclosed features from the different embodiments. Besides the variations described herein, other known equivalents for each feature can be mixed and matched by one of ordinary skill in this art to construct an orthopedic device under principles of the disclosed embodiments.

Although this disclosure is in the context of certain exemplary embodiments and examples, it therefore will be understood by those skilled in the art that the disclosure extends beyond the specifically disclosed embodiments to other alternative embodiments and/or uses of the embodiments, and obvious modifications and equivalents thereof. It is intended that the scope of the present disclosure should not be limited by the particular disclosed embodiments described above.

The invention claimed is:

**1**. A cervical collar having an anterior component and a posterior component securable to the anterior component with at least one strap, the anterior component defining a

22

central axis, the anterior component forming a frontal opening, and the anterior component comprising:

a main support defining first and second frontal projections extending over a top segment of the frontal opening, the first and second frontal projections extend laterally and anteriorly toward the central axis such that the first and second frontal projections are arranged to jut horizontally and parallel to a user's mandible, the first and second frontal projections being arranged to receive the at least one strap and having a rigid construction so the first and second frontal projections do not yield or bend when the at least one strap is secured thereto, the main support defining a lower portion extending continuously and obliquely downwardly from and between the first and second frontal projections relative to and along the central axis, the lower portion having an inner periphery forming an entirety of a segment of the frontal opening below the first and second frontal projections and commencing at first and second recessed portions along the inner periphery and extending posteriorly by being formed by the first and second frontal projections, the main support further forming first and second flanks extending from the first and second frontal projections perpendicularly relative to and laterally away from the central axis toward the posterior component;

an intermediate support defining a front portion centered about and having opposed sides extending perpendicularly from the central axis toward the posterior component, the front portion having an inner periphery joining with an inner periphery of the first and second frontal projections to enclose the frontal opening with the lower portion of the main support by extending between the first and second frontal projections over the frontal opening, the intermediate support forming first and second flanks extending perpendicularly to and away from the central axis from the opposed sides of the front portion along an inner surface of the first and second flanks of the main support, each of the first and second flanks of the intermediate support having first end portions at locations remote from the central axis and pivotally attached to first end portions of the first and second flanks of the main support at first and second pivot points, respectively, remote from the central axis;

wherein the intermediate support defines first and second slots proximate the first and second frontal projections of the main support on the opposed sides of the front portion of the intermediate support, respectively, the main support defines first and second slots at second end portions of the first and second flanks adjacent the first and second frontal projections and proximate to the central axis, respectively, the first and second slots of the intermediate support extending in a first direction relative to the central axis, and the first and second slots of the main support extending in a second direction relative to the central axis different from the first direction;

an adjustment mechanism including first and second traction elements each having a first end portion forming a boss coupling to and extending through the first and second slots of the main support and intermediate support, respectively, and defining first and second sliding connections, the first and second traction elements each having a second end portion extending downwardly from the first end portion and relative to the central axis,

OSS 000635

US 11,452,633 B2

23

the second end portion of the first and second traction elements forming a series of teeth, the adjustment mechanism further defining a lock element having upper and lower portions each of which forms a series of teeth for engaging the series of teeth of the first and second traction elements, the lock element having an actuator located along the central axis and protruding through an opening formed by the lower portion of the main support, wherein the lock element is monolithic;

a connector defining an opening for receiving the actuator, and curved channels for receiving first and second arms and through which the first and second traction elements are guided and slidingly engage the upper and lower portions of the lock element, respectively, the connector also defining peripheral surfaces to the curved channels to direct the first and second traction elements upwardly toward the first and second slots, the connector being monolithic and located within the main support and forming a cavity into which the lock element is located;

wherein the lock element forms the first and second arms having first and second end portions and extending curvingly away from opposed first and second sides from a center section of the lock element toward a rear portion of the connector such that the first and second end portions of the first and second arms, respectively, bias against the rear portion of the connector and the center section of the lock element biasing a front portion of the connector, and

wherein the lock element is movable in a first direction toward the rear portion of the connector under a spring bias to disengage the series of teeth of the upper and lower portions of the lock element from the series of teeth of the first and second traction elements, respectively, thereby enabling the intermediate portion to pivot at the first and second pivot points relative to the main support;

wherein upon release of the actuator, the lock element engages the first and second traction elements and the actuator is urged to the second direction toward the front portion of the connector opposite the first direction thereby preventing pivoting of the intermediate support relative to the main support.

2. The cervical collar of claim 1, further comprising:

an upper support carried by the intermediate support and abutting an outer periphery of the intermediate support opposite the inner periphery thereof so as to adjust therewith relative to the main support, the upper support being located above the inner periphery of the intermediate support and connected centrally to the intermediate support along the central axis of the front portion of the intermediate support of the anterior component.

3. The cervical collar of claim 2, wherein the intermediate support defines a central tab extending outwardly away from the outer periphery of the front portion along the central axis upon which a center portion of the upper support is suspended relative to the intermediate support.

4. The cervical collar of claim 2, wherein the upper support has first and second flanks extending along the first and second flanks of the intermediate support, respectively, the upper support having first and second side connections at the first and second flanks with the first and second flanks of the intermediate support, the first and second side connections align with the first and second sliding connections along a stacking axis obliquely arranged relative to the central axis.

24

5. The cervical collar of claim 1, wherein the intermediate support defines a grip located along the inner periphery of the front portion of the intermediate support and along the central axis, the grip protruding outwardly obliquely relative to the central axis from the inner periphery of the intermediate support.

6. The cervical collar of claim 1, wherein the intermediate support defines a height adjustment scale relative to the main support and visible according to a location of the intermediate support relative to the main support.

7. The cervical collar of claim 1, further comprising a lock mechanism located on a rear side of the main support at the lower portion, the lock mechanism arranged to engage the adjustment mechanism in a locked position and prevent movement of the lock element in either of the first and second directions, and disengage from the adjustment mechanism thereby permitting movement of the actuator.

8. The cervical collar of claim 7, wherein the lock mechanism comprises a lever located on the rear side of the main support and having a pivoting axis located on and perpendicular to the central axis.

9. The cervical collar of claim 8, wherein the lever is connected to a limiter adapted to engage and disengage the actuator in the locked position and an unlocked position.

10. The cervical collar of claim 1, wherein the first and second frontal projections extend anteriorly and over at least part of a front surface of the front portion of the intermediate support.

11. A cervical collar having an anterior component and a posterior component securable to the anterior component with at least one strap, the anterior component defining a central axis, the anterior component forming a frontal opening, and the anterior component comprising:

a main support defining first and second frontal projections extending over a top segment of the frontal opening, the first and second frontal projections extend laterally and anteriorly toward the central axis such that the first and second frontal projections are arranged to jut horizontally and parallel to a user's mandible, the first and second frontal projections being arranged to receive the at least one strap and having a rigid construction so the first and second frontal projections do not yield or bend when the at least one strap is secured thereto, the main support defining a lower portion extending continuously and obliquely downwardly from and between the first and second frontal projections relative to and along the central axis, the lower portion having an inner periphery forming an entirety of a segment of the frontal opening below the first and second frontal projections and commencing at first and second recessed portions along the inner periphery and extending posteriorly by being formed by the first and second frontal projections, the main support further forming first and second flanks extending from the first and second frontal projections perpendicularly relative to and laterally away from the central axis toward the posterior component;

an intermediate support defining a front portion centered about and having opposed sides extending perpendicularly from the central axis toward the posterior component, the front portion having an inner periphery joining with an inner periphery of the first and second frontal projections to enclose the frontal opening with the lower portion of the main support by extending between the first and second frontal projections over the frontal opening, the intermediate support forming first and second flanks extending perpendicularly to and

OSS 000636

US 11,452,633 B2

25

away from the central axis from the opposed sides of the front portion along an inner surface of the first and second flanks of the main support, each of the first and second flanks of the intermediate support having first end portions at locations remote from the central axis and pivotally attached to first end portions of the first and second flanks of the main support at first and second pivot points, respectively, remote from the central axis;

wherein the intermediate support defines first and second slots proximate the first and second frontal projections of the main support on the opposed sides of the front portion of the intermediate support, the main support defines first and second slots at second end portions of the first and second flanks adjacent the first and second frontal projections and proximate to the central axis, the first and second slots of the intermediate support extending in a first direction relative to the central axis, and the first and second slots of the main support extending in a second direction relative to the central axis different from the first direction;

an upper support carried by the intermediate support and abutting an outer periphery of the intermediate support opposite an inner periphery of the intermediate support so as to adjust therewith relative to the main support, the upper support being located above the inner periphery of the intermediate support and connected centrally to the intermediate support along the central axis of the anterior component; wherein the intermediate support defines a central tab extending outwardly away from the outer periphery of the intermediate support along the central axis upon which a center portion of the upper support is suspended relative to the intermediate support at said central tab;

a connector defining an opening for receiving an actuator, and curved channels for receiving first and second arms and through which first and second traction elements are guided and slidingly engage upper and lower portions of a lock element, respectively, the connector also defining peripheral surfaces to the curved channels to direct the first and second traction elements upwardly toward the first and second slots, the connector being

26

monolithic and located within the main support and forming a cavity into which the lock element is located;

wherein each of the upper and lower portions of the lock element forms a series of teeth;

wherein the first traction element forms a series of teeth along a lower end portion to slidingly engage the upper portion of the lock element and the second traction element forms a series of teeth along an upper end portion to slidingly engage the lower portion of the lock element;

wherein the lock element is monolithic and forms the first and second arms having first and second end portions and extending curvingly away from opposed first and second sides from a center section of the lock element toward a rear portion of the connector such that the first and second end portions of the first and second arms, respectively, bias against the rear portion of the connector and the center section of the lock element biasing a front portion of the connector;

wherein the lock element is movable in a first direction toward the rear portion of the connector under a spring bias to disengage the series of teeth of the upper and lower portions of the lock element from the series of teeth of the first and second traction elements, respectively, thereby enabling the intermediate portion to pivot at the first and second pivot points relative to the main support;

wherein upon release of the actuator, the lock element engages the first and second traction elements and the actuator is urged to the second direction toward the front portion of the connector opposite the first direction thereby preventing pivoting of the intermediate support relative to the main support.

12. The cervical collar of claim 11, wherein the upper support has first and second flanks extending along the first and second flanks of the intermediate support, the upper support having first and second side connections at the first and second flanks with the first and second flanks of the intermediate support, the first and second side connections align with first and second sliding connections along a stacking axis obliquely arranged relative to the central axis.

* * * * *

OSS 000637

# EXHIBIT 11



US010945872B2

(12) **United States Patent**                    (10) Patent No.:      **US 10,945,872 B2**
    Hsu et al.                                   (45) Date of Patent:        **Mar. 16, 2021**

(54) **CERVICAL COLLAR**

(71) Applicant: **Ossur Iceland ehf**, Reykjavik (IS)

(72) Inventors: **Henry Hsu**, Foothill Ranch, CA (US);
    **Mark Harman Powell**, Foothill Ranch,
    CA (US); **Christopher Callicott
    Webster**, Foothill Ranch, CA (US);
    **Jared Olivo**, Foothill Ranch, CA (US)

(73) Assignee: **OSSUR ICELAND EHF**, Reykjavik
    (IS)

( * ) Notice:    Subject to any disclaimer, the term of this
    patent is extended or adjusted under 35
    U.S.C. 154(b) by 633 days.

(21) Appl. No.: **15/697,021**

(22) Filed:    **Sep. 6, 2017**

(65)    **Prior Publication Data**

    US 2018/0078401 A1    Mar. 22, 2018

    **Related U.S. Application Data**

(60) Provisional application No. 62/396,279, filed on Sep.
    19, 2016, provisional application No. 62/430,258,
    (Continued)

(51) **Int. Cl.**
    **A61F 5/00**    (2006.01)
    **A61F 5/055**    (2006.01)
    **A61F 5/37**    (2006.01)

(52) **U.S. Cl.**
    CPC ................ **A61F 5/055** (2013.01); **A61F 5/37**
    (2013.01)

(58) **Field of Classification Search**
    CPC .. A61F 7/00; A61F 5/37; A61F 5/3707; A61F
    5/05; A61F 5/055; A61F 5/05883;
    (Continued)

(56)    **References Cited**

    U.S. PATENT DOCUMENTS

    2,088,207 A    7/1937    Kaiser
    2,102,069 A    12/1937    Hanicke
    (Continued)

    FOREIGN PATENT DOCUMENTS

    CN    1646071 A    7/2005
    CN    2933343 Y    8/2007
    (Continued)

    OTHER PUBLICATIONS

    Partial International Search Report from PCT Application No.
    PCT/US2017/050206, dated Dec. 5, 2017.
    (Continued)

*Primary Examiner* — Victoria J Hicks
(74) *Attorney, Agent, or Firm* — Workman Nydegger

(57)    **ABSTRACT**

A cervical collar having an anterior component including a
main support, an intermediate support pivotally connecting
to the main support at a rear portion of the anterior compo-
nent, and forming a frontal opening with the main support.
An adjustment mechanism connects the main support to the
intermediate support and locks a position of the intermediate
support relative to the main support at a front portion of
anterior component. The adjustment mechanism has an
actuator for disengaging the main support from the inter-
mediate support at the front portion and permits the inter-
mediate support to pivot relative to the main support at the
rear portion to vary a height of the frontal opening. A
posterior component of the cervical collar is adapted to
provide improved anterior-posterior and lateral occipital
support.

**18 Claims, 18 Drawing Sheets**



## US 10,945,872 B2

Page 2

### Related U.S. Application Data

filed on Dec. 5, 2016, provisional application No.
62/504,121, filed on May 10, 2017.

(58) **Field of Classification Search**
CPC .... A61F 5/5816; A61F 5/05891; A61F 13/12;
A61F 13/128; A61F 5/04; A61F 5/01;
A61B 5/6822; A41D 13/0512; A61H
1/0218; A61H 1/0292; A61H 1/0296;
A63B 1/4003; A63B 23/025
USPC ........... 602/1, 5, 17, 18, 60, 74; 2/410, 468;
128/857
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,735,424 | A | 2/1953 | Benjamin |
| 2,791,999 | A | 5/1954 | Bustamante |
| 2,801,630 | A | 8/1957 | Moore |
| 2,806,471 | A | 11/1957 | Breese |
| 2,818,063 | A | 12/1957 | Smith et al. |
| 2,820,455 | A | 1/1958 | Hall |
| 2,911,970 | A | 11/1959 | Bartels |
| D188,302 | S | 6/1960 | Monfardini |
| 3,024,784 | A | 3/1962 | Monfardini |
| 3,027,894 | A | 4/1962 | Moore |
| 3,042,027 | A | 7/1962 | Monfardini |
| 3,050,052 | A | 8/1962 | Grassl |
| 3,060,930 | A | 10/1962 | Grassl |
| 3,075,521 | A | 1/1963 | Grassl |
| 3,135,256 | A | 6/1964 | Gruber |
| 3,177,869 | A | 4/1965 | Bartels |
| D203,018 | S | 11/1965 | Helferich |
| 3,285,243 | A | 11/1966 | Yellin |
| 3,285,244 | A | 11/1966 | Cottrell |
| 3,306,284 | A | 2/1967 | McKinley |
| 3,313,297 | A | 4/1967 | Applegate et al. |
| 3,320,950 | A | 5/1967 | McElvenny |
| 3,504,667 | A | 4/1970 | McFarlane |
| 3,512,523 | A | 5/1970 | Barnett |
| 3,756,226 | A | 9/1973 | Calabrese et al. |
| 3,916,884 | A | 11/1975 | Attenburrow |
| 3,916,885 | A | 11/1975 | Gaylord, Jr. |
| 4,099,523 | A | 7/1978 | Lowrey |
| 4,173,973 | A | 11/1979 | Hendricks |
| 4,205,667 | A | 6/1980 | Gaylord, Jr. |
| 4,325,363 | A | 4/1982 | Berkeley |
| 4,401,111 | A | 8/1983 | Blackstone |
| 4,413,619 | A | 11/1983 | Garth |
| D278,747 | S | 5/1985 | Peach, Jr. |
| 4,520,801 | A | 6/1985 | Lerman |
| 4,538,597 | A | 9/1985 | Lerman |
| 4,562,833 | A | 1/1986 | Pujals, Jr. |
| 4,582,051 | A | 4/1986 | Greene et al. |
| 4,628,913 | A | 12/1986 | Lerman |
| 4,643,174 | A | 2/1987 | Horiuchi |
| 4,677,969 | A | 7/1987 | Calabrese |
| 4,702,233 | A | 10/1987 | Omicioli |
| 4,708,129 | A | 11/1987 | Pujals, Jr. |
| 4,712,540 | A | 12/1987 | Tucker et al. |
| 4,732,144 | A | 3/1988 | Cunanan |
| 4,745,922 | A | 5/1988 | Taylor |
| 4,827,915 | A | 5/1989 | Gorsen |
| 4,854,306 | A | 8/1989 | Pujals, Jr. |
| 4,886,052 | A | 12/1989 | Calabrese |
| 4,940,043 | A | 7/1990 | Burns et al. |
| 4,955,368 | A | 9/1990 | Heimann |
| 4,987,891 | A | 1/1991 | Gaylord, Jr. et al. |
| D314,623 | S | 2/1991 | Calabrese et al. |
| 5,005,563 | A | 4/1991 | Veale |
| 5,038,759 | A | 8/1991 | Morgenstern |
| 5,058,572 | A | 10/1991 | Schmid et al. |
| 5,060,637 | A | 10/1991 | Schmid et al. |
| 5,097,824 | A | 3/1992 | Garth |
| 5,156,588 | A | 10/1992 | Marcune et al. |
| 5,180,361 | A | 1/1993 | Moore et al. |
| 5,201,702 | A | 4/1993 | Mars |
| 5,215,517 | A | 6/1993 | Stevenson et al. |
| 5,230,698 | A | 7/1993 | Garth |
| 5,275,581 | A | 1/1994 | Bender |
| 5,302,170 | A | 4/1994 | Tweardy |
| RE34,714 | E | 8/1994 | Burns et al. |
| 5,346,461 | A | 9/1994 | Heinz et al. |
| 5,366,438 | A | 11/1994 | Martin, Sr. |
| 5,385,535 | A | 1/1995 | McGuinness |
| 5,433,696 | A | 7/1995 | Osti |
| 5,437,612 | A | 8/1995 | Moore et al. |
| 5,437,617 | A | 8/1995 | Heinz et al. |
| 5,445,602 | A | 8/1995 | Grim et al. |
| D368,527 | S | 4/1996 | Brooke |
| D369,660 | S | 5/1996 | Myoga |
| 5,520,619 | A | 5/1996 | Martin |
| RE35,290 | E | 7/1996 | Druskoczi |
| 5,588,957 | A | 12/1996 | Martin, Sr. |
| 5,593,382 | A | 1/1997 | Rudy, Jr. et al. |
| 5,622,529 | A | 4/1997 | Calabrese |
| 5,624,387 | A | 4/1997 | McGuinness |
| D379,232 | S | 5/1997 | Brooke |
| 5,632,722 | A | 5/1997 | Tweardy et al. |
| 5,688,229 | A | 11/1997 | Bauer |
| 5,716,335 | A | 2/1998 | Iglesias et al. |
| 5,728,054 | A | 3/1998 | Martin |
| D393,718 | S | 4/1998 | Traut et al. |
| 5,785,670 | A | 7/1998 | Hiebert |
| 5,788,658 | A | 8/1998 | Islava |
| 5,795,315 | A | 8/1998 | Traut et al. |
| 5,797,713 | A | 8/1998 | Tweardy et al. |
| 5,797,863 | A | 8/1998 | Kohnke |
| RE35,940 | E | 10/1998 | Heinz et al. |
| 5,865,773 | A | 2/1999 | Koledin |
| 5,904,662 | A | 5/1999 | Myoga |
| 5,934,599 | A | 8/1999 | Hammerslag |
| 5,964,722 | A | 10/1999 | Goralnik et al. |
| 5,976,098 | A | 11/1999 | Sereboff |
| 5,993,403 | A | 11/1999 | Martin |
| 6,027,467 | A | 2/2000 | Nakamura et al. |
| 6,036,664 | A | 3/2000 | Martin, Sr. et al. |
| D422,710 | S | 4/2000 | Maynard |
| 6,045,522 | A | 4/2000 | Grober |
| 6,045,523 | A | 4/2000 | Donaldson |
| 6,050,965 | A | 4/2000 | Pillai |
| 6,056,711 | A | 5/2000 | Domamski et al. |
| 6,058,517 | A | 5/2000 | Hartunian |
| RE36,745 | E | 6/2000 | Rudy, Jr. et al. |
| 6,071,255 | A | 6/2000 | Calabrese |
| 6,071,256 | A | 6/2000 | Lam |
| 6,090,058 | A | 7/2000 | Traut et al. |
| 6,165,146 | A | 12/2000 | Giebeler |
| 6,183,501 | B1 | 2/2001 | Latham |
| 6,202,953 | B1 | 3/2001 | Hammerslag |
| 6,245,033 | B1 | 6/2001 | Martin |
| 6,254,560 | B1 | 7/2001 | Tweardy et al. |
| 6,308,345 | B1 | 10/2001 | Williams, Jr. |
| 6,289,558 | B1 | 11/2001 | Hammerslag |
| 6,315,746 | B1 | 11/2001 | Garth et al. |
| 6,423,020 | B1 | 7/2002 | Koledin |
| 6,458,090 | B1 | 10/2002 | Walpin |
| 6,494,854 | B1 | 12/2002 | Visness et al. |
| D475,139 | S | 5/2003 | Myoga |
| 6,632,722 | B2 | 10/2003 | Fujiwara et al. |
| 6,663,581 | B1 | 12/2003 | Calabrese |
| 6,663,630 | B2 | 12/2003 | Farley et al. |
| 6,726,643 | B1 | 4/2004 | Martin |
| 6,733,469 | B2 | 5/2004 | Miyaji et al. |
| 6,740,055 | B2 | 5/2004 | Dominguez |
| 6,770,046 | B2 | 8/2004 | Hansen |
| 6,872,188 | B2 | 3/2005 | Caille et al. |
| 6,913,584 | B2 | 7/2005 | Rudy, Jr. et al. |
| 6,921,376 | B2 | 7/2005 | Tweardy et al. |
| 6,926,686 | B2 | 8/2005 | Cheatham |
| 7,018,351 | B1 | 3/2006 | Iglesias et al. |
| 7,041,073 | B1 | 5/2006 | Patron |
| 7,070,573 | B2 | 7/2006 | Axelsson |
| 7,090,652 | B2 | 8/2006 | Santelli, Jr. |

**US 10,945,872 B2**

Page 3

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,090,653 | B2 | 8/2006 | Moeller |
| 7,128,724 | B2 | 10/2006 | Marsh |
| 7,141,031 | B2 | 11/2006 | Garth et al. |
| 7,198,610 | B2 | 4/2007 | Ingimundarson et al. |
| D542,919 | S | 5/2007 | Leatt |
| 7,258,677 | B2 | 8/2007 | Rudy, Jr. et al. |
| D552,742 | S | 10/2007 | Leatt |
| 7,291,121 | B2 | 11/2007 | Rudy, Jr. et al. |
| 7,297,127 | B2 | 11/2007 | Lee et al. |
| 7,311,686 | B1 | 12/2007 | Iglesias et al. |
| 7,371,221 | B1 | 5/2008 | Baker |
| 7,371,222 | B2 | 5/2008 | Heinz et al. |
| 7,399,288 | B2 | 7/2008 | Chao |
| 7,442,176 | B2 | 10/2008 | Cojbasic |
| D609,815 | S | 2/2010 | Patterson |
| 7,674,234 | B2 | 3/2010 | Calco et al. |
| D616,555 | S | 5/2010 | Thorgilsdottir et al. |
| D616,996 | S | 6/2010 | Thorgilsdottir et al. |
| D616,997 | S | 6/2010 | Thorgilsdottir et al. |
| D617,907 | S | 6/2010 | Waller |
| 7,815,585 | B2 | 10/2010 | Vollbrecht |
| 7,846,117 | B2 | 12/2010 | Leatt et al. |
| D631,167 | S | 1/2011 | Leatt et al. |
| 7,878,995 | B2 | 2/2011 | Harty |
| 7,896,827 | B2 | 3/2011 | Ingimundarson et al. |
| 7,981,068 | B2 | 7/2011 | Thorgilsdottir et al. |
| D643,978 | S | 8/2011 | Abajo Alonso et al. |
| D644,331 | S | 8/2011 | Sandhu |
| D644,332 | S | 8/2011 | Sandhu |
| 7,992,261 | B2 | 8/2011 | Hammerslag et al. |
| D647,623 | S | 10/2011 | Thorgilsdottir et al. |
| D647,624 | S | 10/2011 | Thorgilsdottir et al. |
| 8,038,635 | B2 | 10/2011 | Dellanno |
| 8,038,636 | B2 | 10/2011 | Thorgilsdottir et al. |
| D659,842 | S | 5/2012 | Donaldson et al. |
| D662,597 | S | 6/2012 | Chang |
| 8,216,167 | B2 | 7/2012 | Garth et al. |
| D666,302 | S | 8/2012 | Joseph |
| 8,257,292 | B2 | 9/2012 | Linares |
| 8,545,423 | B2 | 8/2013 | Patron |
| D692,568 | S | 10/2013 | Chiang et al. |
| D693,014 | S | 11/2013 | Chiang et al. |
| 8,679,044 | B2 | 3/2014 | Thorgilsdottir et al. |
| 8,932,243 | B2 | 1/2015 | Calabrese |
| 9,132,027 | B2 | 9/2015 | Calco |
| D767,825 | S | 9/2016 | Georgeson et al. |
| 9,713,546 | B2 | 7/2017 | Thorsteinsdottir et al. |
| 2002/0138028 | A1 | 9/2002 | Rudy, Jr. et al. |
| 2002/0156408 | A1 | 10/2002 | Cheatham |
| 2002/0156409 | A1 | 10/2002 | Lee et al. |
| 2002/0169401 | A1 | 11/2002 | Walpin |
| 2002/0173737 | A1 | 11/2002 | Miyaji et al. |
| 2003/0055367 | A1 | 3/2003 | Dominguez |
| 2003/0060744 | A1 | 3/2003 | Caille et al. |
| 2003/0181838 | A1 | 9/2003 | Garth |
| 2004/0039318 | A1 | 2/2004 | Santelli, Jr. |
| 2005/0101896 | A1 | 5/2005 | Calabrese |
| 2007/0027418 | A1 | 2/2007 | Calco et al. |
| 2007/0073203 | A1 | 3/2007 | Moenning et al. |
| 2007/0270728 | A1 | 11/2007 | Chao |
| 2009/0247918 | A1 | 10/2009 | Patron |
| 2010/0137768 | A1 | 6/2010 | Thorgilsdottir et al. |
| 2010/0268139 | A1 | 10/2010 | Garth |
| 2010/0298748 | A1 | 11/2010 | Rosenfeld et al. |
| 2011/0034844 | A1 | 2/2011 | Thorgilsdottir et al. |
| 2011/0066094 | A1 | 3/2011 | Thorgilsdottir et al. |
| 2011/0224591 | A1 | 9/2011 | Thorgilsdottir et al. |
| 2012/0053499 | A1 | 3/2012 | Donaldson et al. |
| 2012/0130295 | A1 | 5/2012 | Haider |
| 2012/0165712 | A1 | 6/2012 | Calabrese |
| 2013/0060179 | A1 | 3/2013 | Modglin |
| 2013/0281899 | A1 | 10/2013 | Suarez et al. |
| 2013/0281900 | A1 | 10/2013 | Suarez et al. |
| 2013/0310722 | A1 | 11/2013 | Thorsteinsdottir et al. |
| 2014/0012172 | A1 | 1/2014 | Calco |
| 2014/0107551 | A1 | 4/2014 | Modglin |
| 2014/0323938 | A1 | 10/2014 | Suarez et al. |
| 2015/0216708 | A1 | 8/2015 | Calco et al. |
| 2016/0287424 | A1 | 10/2016 | Webster et al. |
| 2017/0246022 | A1 | 8/2017 | Calco et al. |
| 2018/0078400 | A1 | 3/2018 | Hsu et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 201150587 Y | 11/2008 |
| CN | 201602923 U | 10/2010 |
| CN | 102227196 A | 10/2011 |
| CN | 202015274 U | 10/2011 |
| DE | 19547115 A1 | 6/1997 |
| DE | 19849302 A1 | 4/2000 |
| DE | 10057286 A1 | 5/2002 |
| EP | 1738724 A1 | 1/2007 |
| EP | 2653139 A1 | 10/2013 |
| EP | 2886088 A1 | 6/2015 |
| FR | 2814362 A1 | 3/2002 |
| GB | 2165157 A | 4/1986 |
| GB | 2453996 A | 4/2009 |
| JP | 2007-330808 A | 12/2007 |
| WO | 94/09728 A1 | 5/1994 |
| WO | 95/22304 A1 | 8/1995 |
| WO | 96/40018 A1 | 12/1996 |
| WO | 9843568 A1 | 10/1998 |
| WO | 2014102340 A1 | 7/2014 |

OTHER PUBLICATIONS

Levangie et al., "Joint Structure and Function: A Comprehensive Analysis", Fourth Edition,Chapter 4: The Vertebral Column, 2005 F.A. Davis Company, Philadelphia, PA, pp. 161-164.

Hsu et al., AAOS Atlas of Orthoses and Assistive Devices, Mosby, Elsevier Fourth Edition, 2008, Philadelphia, PA, p. 117-122.

Product Information Sheet, Philadelphia Tracheotomy Collar, obtained from www.ossur.com, prior to Aug. 6, 2010, 1 page.

Product Information Sheet, Platazote Sheets, WBC Industries, obtained from www.wbcindustries.com prior to Aug. 6, 2010, 2 pages.

"Range-of-Motion Restriction and Craniofacial Tissue-Interface Pressure From Four Cervical Collars", The Journal of Trauma Injury, Infection, and Critical Care, vol. 63, No. 5, Nov. 2007, pp. 1120-1126.

"Ossur Is Immobilization", www.ossur.com, 2008, pp. 1-16.

"Miami J Patient Care Handbook", www.ossur.com, 2010, pp. 1-16.

Jacobson et al. "Improving Practice Efforts to Reduce Occipital Pressure Ulcers", Journal of Nursing Care Quality, vol. 23, No. 3, 2008, pp. 283-288.

Bell et al. "Assessing Range of Motion to Evaluate the Adverse Effects of Ill-Fitting Cervical Orthoses", The Spine Journal, vol. 9, 2009, pp. 225-231.

Karason et al. "Evaluation of Clinical Efficacy and Safety of Cervical Trauma Collars: Differences in Immobilization, Effect on Jugular Venous Pressure and Patient Comfort", Scandinavian Journal of Trauma, Resuscitation and Emergency Medicine, 2014, pp. 1-7.

Product Brochure, "Capital Collar Enhanced", DeRoyal, 2014, 2 Pages.

Product Brochure, "Miami J Advanced by OSSUR", www.ossur.com, 2012, 4 Pages.

Product Brochure, "Miami J Cervical Collar", www.ossur.com, 1 Page.

Product Brochure, "Proglide Cervical Collar", OPTEC, www.optecusa.com, 1 Page.

Product Brochure, "Vista Upper Spine", Aspen Medical Products, 2015, 6 Pages.

Product Brochure, "Instructions for Use Eclipse Cervical Collar", VQ OrthoCare, 2015, 2 Pages.



FIG. 1
(Prior Art)



## FIG. 2



## FIG. 3



FIG. 4



FIG. 5A

FIG. 5B



**FIG. 6A**



**FIG. 6B**



**FIG. 7**



**FIG. 8**



FIG. 9A

FIG. 9B





FIG. 10A

FIG. 10B



FIG. 11

FIG. 12A

FIG. 12B



**FIG. 13A**



**FIG. 13B**



FIG. 14A



FIG. 14B



FIG. 15A

FIG. 15B



FIG. 15C

Page ID #:4788



**FIG. 15D**



**FIG. 15E**



FIG. 16A

FIG. 16B

FIG. 16C



FIG. 17A



FIG. 17B

FIG. 17C

US 10,945,872 B2

1

# CERVICAL COLLAR

## CROSS-REFERENCE TO RELATED APPLICATIONS

This disclosure incorporates by reference U.S. Pat. No. 5,632,722, granted May 27, 1997, U.S. Pat. No. 6,254,560, granted Jul. 3, 2001, U.S. Pat. No. 7,981,068, granted Jul. 19, 2011, U.S. Pat. No. 8,038,636, granted Oct. 18, 2011, U.S. Pat. No. 8,679,044, granted Mar. 25, 2014, U.S. patent application publication no. 2013/0310722 published on Nov. 21, 2013, and U.S. patent application publication no. 2016/0287424, published Oct. 6, 2016.

This disclosure incorporates by reference U.S. provisional application No. 62/396,279, filed on Sep. 19, 2016, U.S. provisional application No. 62/430,258, filed on Dec. 5, 2016, and U.S. provisional application No. 62/504,121, filed on May 10, 2017.

## FIELD OF THE DISCLOSURE

The present disclosure relates to an orthopedic device, and more specifically to cervical collars having height adjustability at a front part, while providing a platform for securing known other components of a cervical collar thereto without significantly modifying their anatomical contours and connection to the height adjusted components.

## BACKGROUND

Cervical collars are used for treating conditions of the neck and the cervical spine by cervical spine immobilization. These collars may handle whiplash and other such injuries, where support for the head and neck of the patient is needed, and function to partially immobilize the head and neck of the patient, and to relieve spasm or strain to which the neck muscles of the patient might be subjected by transferring weight or force from the head of the patient to the shoulders or adjacent areas of the patient. Other collars may be arranged for complete or near complete immobilization of the head and neck of the patient to reduce risk of secondary damage to the spinal cord.

A challenge in designing a cervical collar is balancing desired immobilization with user comfort, such as venous pressure. Immobilization may be measured by five planes of movement, including flexion, extension, lateral tilt to right and left, and rotation of the neck to right and left, which are collectively considered generally as cervical range of motion (CROM).

Unfortunately, many patients using cervical collars develop decubitus or decubitus ulcers (also known as bed sores, pressure sores, or trophic ulcers) when wearing cervical collars. These ailments, which involve a breakdown of tissue overlying a bone, arise when tissues overlying a bony prominence are subjected to prolonged pressure against an object such as a cervical collar. Besides impacting superficial tissues such as the skin, decubitus and decubitus ulcers also can aggravate muscle and bone. Restrictive collars are one of the common causes of skin breakdown in the trauma population. As pressure-ulcers are among the most common, yet serious and costly, complications of routine spinal immobilization, it is desirable to provide cervical collars that minimize the probability of ulcers.

Moisture and pressure are two major factors which contribute to the formation of decubitus. Once a decubitus ulcer forms, there is no good method of determining the extent of tissue damage. Further, once started, decubitus can continue

2

to progress through the skin and fat tissue to muscle and eventually to the bone, and is very difficult to treat and arrest. In extreme cases, surgical replacement of bone, muscle, and skin are required to restore that portion of the body of the patient where decubitus has formed.

It is desirable to eliminate or at least minimize the effect of pressure points when using cervical collars. The likelihood of contracting decubitus can be greatly reduced by a more even distribution of pressure to several parts of the body of the patient.

Multiple studies have evaluated CROM and the likelihood of tissue-interface pressure (TIP) exerted by commercially-available cervical collars. One of the known commercial collars that has proven successful at striking the balance of minimal TIP and most restriction of CROM is the Miami J collar (Össur, hf, Reykjavik, Iceland). Multiple studies have validated the features of the Miami J collar, including: Tescher, A. N. et al. *Range-of-motion restriction and craniofacial tissue-interface pressure from four cervical collars*, Journal of Trauma-Injury Infection & Critical Care 63; 5; 1120-1126 (2007); Jacobson, T. M. et al. *Efforts to reduce occipital pressure ulcers*. Journal of Nursing Care Quality, 23; 3; 283-288 (2008); Karason, S. et al., *Evaluation of clinical efficacy and safety of cervical trauma collars, differences in immobilization, effect on jugular pressure and patient comfort*, Scandinavian Journal of Trauma, Resuscitation and Emergency Medicine, 22:37 (2014).

The Miami J collar is also described in U.S. Pat. No. 5,632,722, granted May 27, 1997; U.S. Pat. No. 6,254,560, granted Jul. 3, 2001; U.S. Pat. No. 6,921,376, granted Jul. 26, 2005. Variations of the Miami J collar, embodying the Miami J Advance collar, are described in U.S. Pat. No. 7,981,068, granted Jul. 19, 2011, and U.S. Pat. No. 8,679,044, granted Mar. 25, 2014.

An important feature, preferably included in cervical collars to overcome limited adaptability to accommodate the body of the patient and the particular ailment prompting the need for wearing a cervical collar, is the facility for adjusting the relative positions of various components of the cervical collar. Part of the effectiveness of the Miami J collar is due to its ability for customization to different anatomical sizes of users.

As taught in U.S. Pat. No. 6,254,560, the Miami J collar has supports that enable customized pressure distribution and avoid skin breakdown. A front part of the Miami J collar has an adjustable upper support for the mandibular, chin and/or jaw of the user, and mounted to a lower support or sternum brace by means which permit relative movement between the upper support and the lower support. The posterior component or back part of the Miami J collar has an occipital support mounted to a back support by means which permit relative sliding movement between the occipital support and the back support. The shape of the upper support and occipital support are anatomically optimized for superior immobilization and patient comfort.

FIG. **1** exemplifies a known version of the Miami J collar **100**, as taught in the aforementioned patents and publications, particularly U.S. Pat. Nos. 5,632,722 and 6,254,560. The collar **100** generally includes an anterior component **102** and a posterior component **104** connected to one another by a strap system **116**. The anterior component **102** has a main support **106** defining a frontal opening **124**, and secures to an upper support **108** intended to support the mandibular, jaw, or chin of the user. The upper support **108** is connected to the main support **106** at side sections by a side connection **120**, and is connected at a front section by a front connection

US 10,945,872 B2

3

**122**, and lacks height adjustability while the collar **100** is being worn. Padding **112** lines the anterior and posterior components **102**, **104**.

The anterior component **102** defines a sternal support **110** forming an extension adapted to extend below the clavicle of a user and rest against the sternum. The sternal support **110** carries a sternum pad **114** to avoid decubitus over long periods of wear of the collar **100**. The sternum pad **114** typically has a fixed thickness, and lacks adjustability in the sense that when worn it applies constant pressure.

The posterior component **104** comprises lower and upper parts **126**, **128**, with the upper part **128** serving as an occipital support. The lower and upper parts **126**, **128** are connected to one another by a posterior connection **124**. Although not shown, the posterior component **104** may be unitary and monolithic comprising a single part in contrast to the two parts depicted in FIG. **1**, and resemble the posterior component taught by U.S. Pat. No. 7,981,068 and found in the Miami J Advance collar.

The upper support **128** and the anterior and posterior components **102**, **104** are generally symmetrical about a vertical center line, and may be formed from rigid or semi-rigid plastic. The material forming the upper support **128** and the anterior and posterior components **102**, **104** may be flexible prior to donning the collar **100**, but sufficiently rigid once the collar **100** is donned to resist yielding due to weight exerted by the user.

Both the upper support **128** and the occipital support of the Miami J collar **100** are uniquely anatomically shaped to maximize comfort and immobilization while minimizing pressure on the user. Because the upper support **128** and the occipital support of the Miami J collar **100** are clinically proven, it is desired that any improvements over the current Miami J collar **100** provide means for preserving the function and shape of the upper support **128** and occipital support of the current Miami J collar **100**.

Another challenge in designing a cervical collar is providing convenient yet reliable height adjustment of sternum support elements. Sternum support elements normally connect to an anterior portion of a cervical collar via struts or connections that define an anterior aperture that allows clinicians, physicians, and first responders to gain access to a user's trachea for medical procedures and examinations without removal of the collar. Because the sternum support normally attaches to both left and right sides of the anterior portion of the collar in order to define this aperture, adjusting the height of the sternum support requires the inconvenient and potentially uneven adjustment of both left- and right-sided complementary adjustment apparatuses.

Another challenge is the design of the adjustment apparatuses themselves. There is a problem of adjustment apparatuses being clumsy and inconvenient for a clinician to operate quickly and easily, and especially for a user to operate while wearing the device on their own neck.

Moreover, height adjustment apparatuses are sometimes unfortunately designed in such a way that a user or clinician may inadvertently touch the apparatus in a way that tampers with or adjusts the height in an unplanned and/or undesired way. A desired feature of a cervical collar is therefore a height adjustment apparatus that, while convenient to operate, is not susceptible to accidental adjustments or tampering.

Yet another challenge is the ability of a clinician or user to easily adjust the flexibility of pressure exerted by the sternum support of a cervical collar. At certain times, such as during every day, long-term use, a user may need to have greater flexibility for flexion of the neck, i.e. moving the

4

chin toward the sternum. At other times, such as during first response procedures or medical procedures, a user may need to be immobilized from flexion of the neck by exerting greater pressure on the sternum. There is a problem of cervical collars not offering a convenient yet effective method for switching between the collar allowing flexion and disallowing flexion.

Another challenge is that existing cervical collars often comprise inadequate or inconvenient strap systems. For example, straps may attach via hook and loop fastener to inconvenient locations on the body of the cervical collar, leading to difficulty in donning the collar correctly and/or consistently. Straps may not be configured to attach closely to the body of the cervical collar and consequently jut out therefrom, leading potentially to damage, injury, inconvenience, and/or unintended removal of or tampering with the collar if the straps catch on an object or are unintentionally pulled, adjusted, or released by a user, clinician, or others.

Existing cervical collars often comprise inadequate or poorly-fitted posterior components. For example, posterior components may be overly simplistic in design, comprising flat profiles and no features to mitigate pressure points along the occiput. These designs can lead to or exacerbate decubitus and discomfort.

In light of the foregoing considerations, there is a further need for a cervical collar with a height adjustment mechanism on the sternum support that provides for a convenient, effective method for allowing or restricting flexion and is easily and accurately adjustable in height without allowing accidental tampering with the height, as well as an improved strap system for connecting anterior and posterior components of a cervical collar, and an improved shape for a posterior component of a cervical collar.

SUMMARY

The present disclosure describes an improved cervical collar for restricting head and neck movement to promote healing after an injury to the spinal column. The cervical collar has height, circumferential and angular adjustment to accommodate a wide variety of patient sizes and anatomical configurations, and to accommodate dimensional changes caused by increased or decreased swelling of the affected anatomical portions of the patients during treatment of the injury. The cervical collar is arranged to stabilize and immobilize the cervical area, by restricting lateral, sagittal, and coronal movement, while improving comfort and fit for individual patients.

Embodiments of the disclosure relate to a cervical collar having a height adjustment system between supports forming an anterior component, which permit the use of known supports in the cervical collar to maintain their functionality, comfort, and fit, including their anatomical contours and connection to the height adjusted components. Embodiments of the disclosure also relate to an improved strap system for cervical collars. Yet further embodiments of the disclosure relate to improved posterior components for cervical collars.

The height adjustment system is arranged for adjusting the chin height in a simple and effective manner that limits or mitigates tampering with the height while the collar is worn. The height adjustment system preferably includes using incremental height adjustment so the height may be locked at a desired height setting. The height adjustment system may be arranged to allow usage in existing collar designs, such as the Miami J or Miami J Advance collars,

US 10,945,872 B2

5

without substantially altering the shape and function of the upper support and posterior component including an occipital support.

The height adjustment system mitigates or eliminates the need for pre-sizing methods, and is provided in a simplified manner to enable many height settings customizable for different users. The height adjustment system allows for the use of known upper and posterior components, which have been on the market for many years to serve many users of cervical collars, and are clinically proven for their efficacy.

The height adjustment system allows for improved placement and configuration of a cervical collar on patients of different heights, which makes adjustment possible and easy while the collar is being worn. The upper support and posterior component can be properly fitted against the chin and head of a patient by a clinician, followed by the extension of the anterior component against the patient's chest. Likewise, the anterior component may be placed against the patient's chest and the upper support and posterior component can then be extended to the chin and head of the patient. The height setting can then be locked at the desired height setting by the clinician to ensure a proper fit for the user.

To avoid inadvertent adjustment of the collar height during use, locking means are provided in combination with the height adjustment system. While the height adjustment system arrests the height of the collar, the locking means offers another level of locking in addition to the height adjustment system.

Unlike in the prior art where the lower support and corresponding sternum pad are fixed, embodiments of the disclosure permit selective adjustment of pressure applied to the sternum of the user, particularly by locking or unlocking flexibility of the lower support.

Embodiments described herein provide a strap system that improves circumferential pressure exerted about the neck of the user by offering greater extension of the strap about the user's neck, and thus the cervical collar. The strap system is arranged to facilitate donning and doffing of the cervical collar by offering improved means for attaching and detaching the anterior component from the posterior component. The anterior and posterior components offer greater circumferential adjustability to accommodate different user anatomical sizes, healing phases, padding thickness, and other reasons for adjusting collar circumference. The strap system further reduces damage, injury, or inadvertent adjustment of the collar due to its improved system for maintaining strap ends close to or flush against the body of the strap.

The posterior component in the embodiments offers improved pressure relief properties for areas of a user about the posterior component, and about a user's spinal column. The posterior component is contoured to adapt to the strap while maintaining its pressure relieving properties. Indeed, the posterior component is arranged to provide improved anterior-posterior and lateral occipital support by way of its improved shape, attachment features, and other features on both the inner and outer side of the posterior component.

These and other features, aspects, and advantages of the present disclosure will become better understood regarding the following description, appended claims, and accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of a prior art cervical collar.
FIG. 2 is a perspective view of an embodiment of a cervical collar according to the present disclosure.

6

FIG. 3 is a side elevational view of the cervical collar embodiment of FIG. 2.

FIG. 4 is a perspective view of another embodiment of the cervical collar of FIG. 2.

FIG. 5A is a schematic view of a sternal height mechanism in a lowered configuration.

FIG. 5B is a schematic view of the sternal height mechanism of FIG. 5A in a raised configuration.

FIG. 6A is a schematic view of a variation of the sternal height mechanism in FIG. 5A in a lowered configuration.

FIG. 6B is a schematic view of the sternal height mechanism of FIG. 6A in a raised configuration.

FIG. 7 is a front elevational view of a variation of the anterior component in the cervical collar of FIG. 2.

FIG. 8 is a rear elevational view of the anterior component of FIG. 7.

FIG. 9A is a schematic view of a sternal relief device in the cervical collar of FIG. 2 in a stiff configuration.

FIG. 9B is a schematic view of the sternal relief device of FIG. 9B in a relief configuration.

FIG. 10A is a front elevational view of the lower support in the anterior component of FIG. 7 with the lower support depicted in transparent form.

FIG. 10B is a plan view of the adjustment mechanism in FIG. 10A with the lower support removed.

FIG. 11 is a perspective view of the base in the adjustment mechanism of FIG. 10A.

FIG. 12A is an elevational view of the actuator in the adjustment mechanism of FIG. 10A.

FIG. 12B is a plan view of the actuator in the adjustment mechanism of FIG. 10A.

FIG. 13A is a perspective schematic view of the adjustment mechanism of FIG. 10A in an unlocked configuration.

FIG. 13B is a perspective schematic view of the adjustment mechanism of FIG. 10A in a locked configuration.

FIG. 14A is a perspective schematic view taken along line XIVA-XIVA in FIG. 10A of the lock mechanism in the locked configuration.

FIG. 14B is a perspective schematic view of the lock mechanism in FIG. 10A in the unlocked configuration.

FIG. 15A is an elevational view of a variation of the posterior component in the cervical collar of FIG. 2 showing an outer side of the posterior component.

FIG. 15B is a detail view taken from detail XV B in FIG. 15A.

FIG. 15C is a side elevational view of the posterior component of FIG. 15A.

FIG. 15D is an elevational view of the posterior component in FIG. 15A showing an inner side.

FIG. 15E is a top plan view of the posterior component of FIG. 15A.

FIG. 16A is a perspective view of a first side of a strap tab.

FIG. 16B is a perspective view of a second side of the strap tab of FIG. 16A.

FIG. 16C is a plan view of a strap system.

FIG. 17A is a schematic view of another embodiment of a strap system on the cervical collar of FIG. 2.

FIG. 17B is a plan view of a variation of the strap system of FIG. 17A.

FIG. 17C is a schematic view of yet another embodiment of a strap system on a cervical collar.

The drawing figures are not necessarily drawn to scale, but instead are drawn to provide a better understanding of the components thereof, and are not intended to be limiting in scope, but to provide exemplary illustrations. The figures illustrate exemplary configurations of a cervical collar, and

US 10,945,872 B2

7

in no way limit the structures or configurations of a cervical collar according to the present disclosure.

DETAILED DESCRIPTION OF VARIOUS EMBODIMENTS

A. Introduction

Embodiments of an orthopedic device are provided for stabilizing and supporting anatomical portions of a user, for example, the neck and head of a user.

Although the embodiments of the disclosure are adapted for supporting and stabilizing anatomical portions of many users having various anatomical shapes and sizes, the embodiments of the disclosure may also be dimensioned to accommodate different types, shapes and sizes of anatomical portions.

A better understanding of different embodiments of the disclosure may be had from the following description read with the accompanying drawings in which like reference characters refer to like elements.

While the disclosure is susceptible to various modifications and alternative constructions, certain illustrative embodiments are in the drawings and are described below. It should be understood, however, there is no intention to limit the disclosure to the embodiments disclosed, but on the contrary, the intention covers all modifications, alternative constructions, combinations, and equivalents falling within the spirit and scope of the disclosure.

It will be understood that, unless a term is defined in this disclosure to possess a described meaning, there is no intent to limit the meaning of such term, either expressly or indirectly, beyond its plain or ordinary meaning.

While the foregoing embodiments have been described and shown, alternatives and modifications of these embodiments, such as those suggested by others may be made to fall within the scope of the invention. While the cervical collar has been described in combination with collar parts, it will be understood that the principles described may be extended to other types of orthopedic and prosthetic devices.

Reference characters are provided in the claims for explanatory purposes only and are not intended to limit the scope of the claims or restrict each claim limitation to the element in the drawings and identified by the reference character.

For ease of understanding the disclosed embodiments of a cervical collar, the front or anterior, and rear or posterior portions of the cervical collar are described below. The anterior and posterior portions of the cervical collar function together to form a supporting and stabilizing cervical collar that encompasses the anatomical portions of the user.

The term "posterior" also has its ordinary meaning and refers to a location that is behind or to the rear of another location. The term "anterior" has its ordinary meaning and refers to a location ahead of or to the front of another location.

The terms "rigid," "flexible," "compliant," and "resilient" may be used herein to distinguish characteristics of portions of certain features of the cervical collar. The term "rigid" is intended to denote that an element of the collar is generally devoid of flexibility. Within the context of support members or shells that are "rigid," it is intended to indicate that they do not lose their overall shape when force is applied, and in fact they may break if bent with sufficient force. On the other hand, the term "flexible" is intended to denote that features are capable of repeated bending such that the features may

8

be bent into retained shapes or the features do not retain a general shape, but continuously deform when force is applied. The term "compliant" is used to qualify such flexible features as generally conforming to the shape of another object when placed in contact therewith, via any suitable natural or applied forces, such as gravitational forces, or forces applied by external mechanisms, for example, strap mechanisms. The term "resilient" is used to qualify such flexible features as generally returning to an initial general shape without permanent deformation. As for the term "semi-rigid," this term is used to connote properties of support members or shells that provide support and are free-standing, however such support members or shells may have some degree of flexibility or resiliency.

The term "flexible" should denote that features are capable of repeated bending such that the features may be bent into retained shapes or the features do not retain a general shape, but continuously deform when force is applied. The term "compressible" may be used to qualify such structural features as being capable of being reduced in size or volume due to the exertion of force applied to the structural feature.

B. Embodiments of the Cervical Collar

FIGS. **2** and **3** exemplify an embodiment of a cervical collar **200** of the disclosure. The cervical collar **200** includes an anterior component **202** that secures to a posterior component **204** by a strap system **216**. The anterior component **202** includes a main support **206** upon which the strap system **216** is preferably secured, and has a sternum section **214** that extends to the sternum of a user. The sternum section **214** is formed at least in part by a base component **207** upon which a cover **213** (which may alternatively be called a front casing) housing at least part of an adjustment mechanism **220** is disposed.

An intermediate support **210** secures to the main support **206**, and is adjustable relative to the main support **206** by an adjustment mechanism **220**. The intermediate support **210** and the main support **206** together form a frontal opening **218**. An upper support **208** (which may alternatively be called a chin tray) is located on the intermediate support **210** above the main support **206**. Padding **212** is located along the anterior and posterior components **202**, **204**.

Referring specifically to FIG. **3**, the strap system **216** is shown in one of several preferred configurations. Specifically, the strap system **216** includes straps **225** located on opposed sides of the collar **200**, and extending between the anterior and posterior components **202**, **204**. Each strap **225** is elongate and has first and second segments **226**, **228**. The first segment **226** is mounted onto a frontal projection **222** of the main support **206**.

Frontal projections **222** extend toward and over a top portion of the frontal opening **218**. The frontal projections **222** preferably extend anteriorly past and over the adjustment mechanism **220**, as will be evident in following embodiments of the adjustment mechanism **220**. Likewise, the frontal projections **222** enclose at least part of the intermediate support **210**, by extending over a front surface of the intermediate support **210**, and provide greater support to the intermediate support **210** about the user. The frontal projections **222**, at least in exterior or outwardly portions thereof, are preferably rigid or semi rigid along a circumferential or arcuate profile of the intermediate support **210** to provide support to the upper and intermediate supports **208**, **210**. In this manner, the frontal projections **222** do not yield

US 10,945,872 B2

9                                              10

or bend when the strap system **216** is secured thereon in combination with the posterior component **204** about a neck of a user.

By extending forwardly, the frontal projections **222** provide a portion on the surface of the anterior component **202** for receiving and corresponding to straps **225**. Straps **225** may thus be advantageously adjacent to and/or flush against the anterior component **202** as opposed to jutting outwardly from the collar **200**. This is in contrast to existing collars where straps freely jut outwardly from the collar, leading to risk of inadvertent adjustment, damage to the collar, or injury to a user if the straps are inadvertently tampered with.

The frontal projections **222** enable a stable platform upon which the strap system **216** can secure and preferably does not interfere with the upper support **208**, thereby allowing removal of the strap system **216**, or on one side thereof without adjusting the integrity of the intermediate support **210**, and the upper support **208**. The additional length provided by the frontal projections **222**, by which they extend over the frontal opening **218**, offers greater adjustability for the strap system **216**, thereby offering more accommodation to users' neck circumferences.

The frontal projections **222** serve to stabilize the force exerted by the user's chin by generally extending over the main support **206**, as evidenced by force **231**, which generally coincides downwardly with a lower portion of the main support **206**. As the frontal projections **222** straddle the intermediate support **210**, the main support **206** is arranged obliquely downwardly relative to the frontal projections **222**, which generally jut horizontally and preferably parallel to a user's mandible.

As will be explained below, the intermediate support **210**, while carrying the upper support **208**, moves relative to the main support **206** and does not interfere with the strap system **216** during height adjustment of the anterior component **202** of the collar **200**. In this manner, the strap system **216** remains intact while securing the anterior and posterior components **202**, **204** to one another. The anterior component **202** can be advantageously adjusted for height while the collar **200** is being worn by the user since the intermediate support **210** (and hence upper support **208**) is moved relative to the main support **206**, but the relationship between main support **206** and posterior component **204** is uninterrupted and unchanged.

The arrangement of the strap system **216** in combination with the frontal projections **222** enables a clinician to don and size the collar **200** on the user in either direction (i.e. either toward the chin or toward the sternum). Specifically, the clinician may place the upper support **208** against a user's chin, and then use the adjustment mechanism **220** to drop the main support **206** via the intermediate support **210** to the appropriate size to abut the user's sternum. The strap system **216** may first be appropriately secured to the anterior and posterior components **202**, **204**, or secured after the collar **200** has been appropriately sized. Alternatively, the main support **206** may be placed against a user's sternum, and secured to the posterior component **204** by the strap system **216**. The clinician may then use the adjustment mechanism **220** to selectively adjust the upper support **208** via the intermediate support **210** to the appropriate height so as to abut the user's chin, while the collar **200** is already secured to the user.

The posterior component **204** defines side extensions **232** that define a series of strap slots **234** for securing the straps **225** to the frontal projections **222**. In the depicted embodiment, the straps **225** each have a first segment **226** secured to a fastener **224** on the frontal projections **222**. The first

strap segment **226** may be configured in shape to correspond to a shape of the corresponding frontal projection **222**. The strap **225** is looped at loop segment **227** about at least one of the strap slots of the series of strap slots **234**. In this embodiment, the strap **225** loops through first and second slots **234***a*, **234***b* of the series of straps slots **234**. The series of strap slots **234** may define at least two of such strap slots, and in the depicted embodiment the series of strap slots **234** include four strap slots. The clinician may select which strap slots of the series of strap slots **234** to loop the strap **225** according to the size of the user.

A second strap segment **228** extends from the looped segment **227** and secures over a surface of the first strap segment **226** via a fastener **230**, thereby pulling the posterior component **204** toward the anterior component **202** at the loop segment **227**. In this manner, when the strap **225** is looped about the series of strap slots **234**, the anterior and posterior components **202**, **204** are already secured to one another, and further tensioning and tightening of the strap **225** can be achieved without the necessity of holding the posterior component **204** relative to the anterior component **202**.

The straps **225** can be tensioned on both sides of the collar **200** simultaneously, or adjusted individually according to the demands of the user. This strap system **216** allows for removal of the collar **200** by only requiring removal of one of the straps **225** on one of the sides of the collar **200** from the corresponding fastener **230**. Because the first segment **226** of the strap **225** remains in place, the user does not need to significantly resize the strap system **216** upon repeated steps of donning and doffing of the collar **200**, particularly when only one of the straps **225** has its second segment **228** detached from the surface of the first segment **226** for removing the collar **200**, while leaving the other strap **225** intact and secured. By minimizing the inconvenience of resizing the strap system **216** upon donning and doffing, user compliance is enhanced especially over long-term use.

The side extensions **232** preferably extend over the main support **206** so as not to interfere with the anterior component **202**, which generally bears a significant amount of weight of the user's head and neck and in order to facilitate treatment of a user's injury. As noted above, while the side extensions **232** extend over the main support **206**, they do not interfere with the height adjustment of the anterior component **202** since the side extensions **232** extend over the main support **206** and below the upper and intermediate supports **208**, **210**.

FIG. **4** exemplifies another embodiment of a strap system **340**. In this embodiment, a strap **342** extends from the posterior component **204***a* and carries a mounting part **344**. The mounting part **344** may be a buckle, latch, ring, or other suitable part that can be carried by the strap **342** and engage an anchor **348** located on the anterior component **202***a*. The anchor **348** may comprise a hook protruding from a side of the anterior component **202***a*. The strap **342** is looped and secured about the mounting part **344** for length adjustment at loop **346**, and may likewise be looped about the posterior component **204***a* in the preceding embodiment, or attached to the posterior component **204***a* whereby length adjustment is made relative to the mounting part **344**.

In this embodiment, the strap **344** can quickly be attached and detached from the anterior component **202***a*. Such an arrangement may be preferable to a user in that the strap length may be set by the clinician, and does not require subsequent adjustment by the user. This convenient arrangement of strap **344** allows a user to easily don and doff the

US 10,945,872 B2

11

collar repeatedly with minimal or no re-sizing required, thus enhancing compliance and comfort for a user, especially for long-term use.

FIG. **4** also exemplifies how a main support **354** is separate from a sternum support **352**. The sternum and main supports **352**, **354** may be selectively adjusted relative to one another by a sternum adjustment mechanism **350**.

FIGS. **5**A and **5**B illustrate an exemplary embodiment of the sternum adjustment mechanism **350**, wherein the sternum support **352** is adjustable relative to the main support **354**, to provide differing pressure against the sternum of the user or to provide pressure release. The main support **354** may carry the sternum adjustment mechanism **350** which pivotally connects to the sternum support **352** by a linkage **356** and anchor **358**. The sternum adjustment mechanism **350** includes a lever **360** on a cam **361**. The cam **361** is rotatable relative to a biasing element **362**, and articulates the linkage **356** upon rotation of the cam **361**.

FIG. **5**A shows the sternum adjustment mechanism **350** in a lowered or collapsed configuration such that the lever **360** is pulled forward to collapse the linkage **356**, and the sternum support **352** generally abuts the main support **354**. In this manner, there is pressure relief against the sternum. FIG. **5**B shows the sternum adjustment mechanism **350** in a raised or extended configuration such that the lever **360** is articulated rearward, and the cam **361** engages the biasing element **362** to maintain the linkage **356** in the extended configuration. The sternum support **352** is extended away from the main support **354** by the linkage **356**.

FIGS. **6**A and **6**B illustrate another exemplary embodiment of a sternum adjustment mechanism **366**. In this embodiment, the sternum adjustment mechanism **366** comprises a ramp **370** extending from the sternum support **352**. The main support **354** carries a bracket **368** that is slidable along the ramp **370**. The bracket **368** may include a cam surface or other suitable mechanism, such that as the bracket **368** slides along the ramp **370** in a raised or extended configuration in FIG. **6**B, the bracket **368** can be retained along the ramp **370** at a fixed position to extend the sternum support **352** relative to the main support **354** according to a height of the ramp **370**. In the lowered or collapsed configuration of FIG. **6**A, the bracket **368** is located at a different position along the ramp **370** to bring the sternum support **352** adjacent or near the main support **354**.

FIGS. **7** and **8** depict an alternative embodiment of an anterior component **236** over the anterior component of FIGS. **2** and **3**. The anterior component **236** has both a main support **238** and intermediate support **240**, and the intermediate support **240** is adapted to receive the upper support **208** of the embodiment of FIGS. **2** and **3**, and the Miami J collar.

The upper support **208** is suspended on the intermediate support **240** by being connected at a central tab **264** of the intermediate support **240** extending outwardly relative to an upper periphery of the intermediate support **240** and secured by a pin **270** along a central axis A-A along the front of the anterior component **236**. A grip **266** may be provided below the central tab **264**, and extend along the periphery of the frontal opening **218** and a lower periphery of the intermediate support **240**. The grip **266** may have tactile features to aid grasping the grip **266**, and the grip **266** may protrude outwardly from the periphery of the intermediate support **240** to offer a relief portion for placing a finger or thumb for raising the intermediate support **240** relative to the main support **238**.

The upper support **208** has flanks **276** that connect and run on the inside of the intermediate support **240**. The flanks **276** have end portions at which side connections **256** secure to

12

the intermediate support **240**. Thus the upper support **208** is suspended centrally by the central tab **264** and the side connections **256**, thereby enabling to the upper support **208** to contour to the anatomy of the chin and mandibles of the user, and offer improved comfort. The intermediate support **240** may define a scale **262** above the frontal projections **222** so as to provide a relative sizing of the collar **200**.

The intermediate support **240** connects to the main support **238** by sliding connections **258** for accommodating height adjustment of the anterior component **236**. The sliding connections **258** are arranged to couple slots **280**, preferably having a curved shape, defined by the intermediate support **240**, and slots **278**, preferably having a curved shape, defined by the main support **238**. The sliding connections **258** may be located and vertically stacked below the side connections **256** to stabilize the upper support **208**, so as to align generally along a stacking axis B-B regardless of the height setting. The intermediate support **240** has flanks **274** that connect to flanks **272** of the main support **238** at pivot points **260**, which accommodate sliding movement of the side connections **256** along the slots **278**, **280**.

The main support **238** includes a base **242** adapted to be placed adjacent to the user, and a cover **244** adapted to house and cover the adjustment mechanism **220**. The base **242** and cover **244** form the side extensions **222**, whereby the fastener **224** may be placed over the cover **244**. A sternum section **246** extends from the base **242** at a transition **247** between the base **242** and the sternum section **246**. The transition **247** may comprise a narrowed or thinned section from the base **242** and extending to the sternum section **246**. The sternum section **246** may be formed continuously with the base **242** so the sternum section **246** is unitary with the base **242**, or alternatively is attached to the base **242**.

The base **242** may define side grips **268** on opposed sides of the sternum support **246**. The side grips **268** may be defined by raised portions of the base **242** that enable a clinician to grip and hold the base **242** when adjusting the height of the anterior component **236**.

According to the depicted embodiment, the sternum section **246** is connected to the base **242** by a hinge **248** at the transition **247**. The hinge **248** may be formed as a living hinge formed from a recessed channel **249** on a rear side of the base **244**. Alternatively, the hinge **248** may comprise a compliant portion of the base **242** that bends upon application of force.

As illustrated in more detail in FIGS. **9**A and **9**B, a stiffener mechanism **250** may be carried by the sternum section **246** to stiffen the hinge **248** of the sternum section **246** relative to the base **242**. The ability to modify the stiffness of the sternum section **246** is advantageous to provide pressure relief to the user, particularly when sternal or thoracic support is unnecessary or when the user requires minimal adjustment of the neck. The stiffener mechanism **250** includes a first portion **372** arranged to selectively extend over the transition **247** and the hinge **248** to prevent or substantially prevent bending of the sternum section **246** away from the base **242**. The first portion **372** preferably extends past the hinge **248**, as shown in FIG. **9**A, to assure the first portion **372** blocks movement of the hinge **248**.

The first portion **372** may extend proximate to the cover **244**, however is sized so as not to interfere with the cover **244** upon rotation of the stiffener mechanism **250**. The first portion **372** may have a recessed tip **373** so as not to interfere with the cover **244** upon rotation.

The stiffener mechanism **250** has a second portion **374** extending from the first portion **372**, and pivotally mounted on the sternum section **246**. In the preferred embodiment,

US 10,945,872 B2

13

the second portion 374 is limited in rotation 375 relative to the sternum section 246 so as to assure a stiffened position and a released position of the stiffener mechanism 250. For example, the rotation 375 of the second portion 374 may only be 90 degrees.

The second portion 374 may include a tactile feature 376 to facilitate grasping of the stiffener mechanism 250 from a stiffened position thereby preventing flexure of the sternum section 246 away from the user's sternum, as depicted in FIG. 9A. The first portion 372 blocks movement of the hinge 248. FIG. 9B depicts a released position whereby the sternum section 246 has a flexure 377 both toward and away from a user's sternum, such that the first portion 372 is clear from the hinge 248.

In a variation, when the hinge 248 is formed by a recessed channel 249, the recessed channel 249 may have a sufficient depth to facilitate cutting the sternum section 246 from the base 242. Alternatively, the transition 247 may be formed to make trimming thereof easy so that a clinician may be able to remove the sternum section 246 along a peripheral contour of the base 242.

As shown in FIG. 7, the adjustment mechanism 220 is located generally along the central axis A-A at the cover 244 and above the sternum section 246. The adjustment mechanism 220 defines an actuator 252 for actuating the adjustment mechanism 220, and permitting adjustment in height of the intermediate support 240 relative to the main support 238. The cover 244 defines a recess 254 about the actuator 252 to facilitate actuation of the actuator 252, and the actuator 252 is located recessed in the recess 254 so as to prevent inadvertent actuation of the actuator 252. The actuator 252 is biased in an engaged position such that when not pressed, the actuator 252 maintains the adjustment mechanism 220 in the engaged position. Upon pressing the actuator 252 toward the rear side of the anterior component 236 and deeper into the recess 254, the adjustment mechanism 220 is placed in a disengaged position to permit adjustment of the height of the anterior component 236.

As shown in FIG. 8, a lock mechanism 282 is provided as extra assurance of locking the adjustment mechanism 220. The lock mechanism 282 is located on the rear side of the anterior component 236. The lock mechanism 282 includes a lever 284 that moves a tab 286 along a limiter 288 for placement between locked and unlocked positions. The limiter 288 may include blocks on opposed sides of an arc of motion relative to the lever 284, for example between 45 degrees. The clinician or user may place fingers over the cover 244 to switch the lever 284 between the locked and unlocked position. In the locked position, the lock mechanism 282 prevents the actuator 252 from being pressed into the disengaged position. In other words, the locked position of the lock mechanism 282 prevents actuation of the actuator 252. In the unlocked position, the actuator 252 may be pressed to disengage the adjustment mechanism 220, and permit height adjustment of the anterior component 236. The lock mechanism 282 offers an extra layer of protection to assure the adjustment mechanism 220 cannot be tampered with or inadvertently adjusted during normal use.

In observing FIGS. 10A and 10B, the adjustment mechanism 220 is shown relative to the cover 244. The adjustment mechanism 220 includes first and second traction elements 290, 292 that slide along a connector 294 at a lower portion of the cover 244, and have end portions extending to the slots 278 of the cover 244. The end portions define bosses 298, 300 adapted to slide along the slots 278. A lock element 296 is connected to and biased against the connector 294. The lock element 296 may form the actuator 252, and is

14

movable relative to the connector 294, to engage and disengage from the first and second traction elements 290, 292.

FIG. 11 shows the connector 294 in greater detail. The connector 294 defines an opening 302 for receiving the actuator 252 and openings 304 for receiving end portions 326, 328 (shown in FIG. 12B) of the lock element 296. The connector 294 has a center portion 306 that defines a cavity 336 on a rear side of the connector 294 for receiving a center section 324 of the lock element 296 adjacent the actuator 252, and corresponding curved channels 308, 309 for receiving arms 320, 322 of the lock element 296. The connector 294 forms the curved channels 308, 309 for guiding and receiving the first and second traction elements 290, 292, and peripheral surfaces 312 to the curved channels 308, 309 to direct the first and second traction elements 290, 292 upwardly toward the slots 278. The connector 294 forms center slots 310 through which the first and second traction elements 290, 292 extend to engage the lock element 296, as well as side slots 314 to yet further guide the first and second traction elements 290, 292. To facilitate assembly and manufacture, the connector 294 may be monolithic and defined by a single part.

FIGS. 12A and 12B depict the lock element 296 as having the actuator 252 that protrudes from the center section 324. The center section 324 defines at least one or a series of teeth 316, 318 along upper and lower portions of the lock element 296 for engaging corresponding teeth of the first and second traction elements 290, 292. First and second arms 320, 322 extend curvingly from the center section 324 and bear the end portions 326, 328 that are received by the connector 294. The arms 320, 322 form springs to bias the lock element 296 against the connector 294, particularly in that the end portions 326, 328 engage the connector 294 and the actuator 252 and the teeth 316, 318 can move relative to the opening 302 to actuate the adjustment mechanism 220. To facilitate assembly and manufacture, the lock element 296 may be monolithic and defined by a single part. A rear side of the lock element 296 defines a rear recess 334 for engagement with the at least one post 338 of the lock mechanism 282.

FIGS. 13A and 13B show how the adjustment mechanism 220 operates to adjust the first and second traction elements 290, 292. Unlike in known cervical collars having a rotatable element forming a rack and pinion adjustment mechanism (which disadvantageously cannot be locked), the adjustment mechanism 220 is arranged to be disengaged upon pressing of the actuator 252, and to automatically lock upon release of the actuator 252. Such an arrangement is advantageous in that the clinician can assure the adjustment mechanism 220 is not inadvertently bumped or adjusted and thereby unintentionally change the height of the collar. Indeed, by pressing the actuator 252 toward the user, as opposed to pulling away, there is greater stability to maintaining the cervical collar 200 on the user without the tendency of adjusting the location of the main support 206.

Upon disengagement of the adjustment mechanism 220, the clinician can modify the location of the upper and intermediate supports 208, 210 relative to the main support 206 with a single hand, as adjustment of the intermediate support 210 can be done freely as the first and second traction elements 290, 292 slide and permit the intermediate support 210 to articulate relative to the main support 206. Such an arrangement provides quicker and stable means for changing the height, and enables the first and second traction elements 290, 292 to include more teeth 330, 332 and thereby more height settings.

As shown in FIG. 13A in the disengaged position, the lock element 296 moves toward and is biased against a rear side

US 10,945,872 B2

15        16

R of the connector **294**. The first and second end portions **326, 328** are received by the openings **304** of the connector **294**, so that they are fixed relative to the connector **294**. In the disengaged position, the actuator **252** is pressed or biased against the spring force generated by resistance and flexure of the first and second arms **320, 322**. The first and second sets of teeth **316, 318** are drawn toward the rear side of the collar **200** and fully disengage from the teeth **330, 332** of the first and second traction elements **290, 292**. The center section **324** and the arms **320, 322** move within the cavity **336** and arm slots **337**, such that the center section is **324** drawn away or at least partially away from a biasing surface delimiting part of the cavity **336**. The biasing surface of the cavity **336** is located on the rear side of the connector **294**. The base **242** may limit the travel of the lock element **296** at the rear side of the connector **294**.

As shown in FIG. **13**B, upon release of the actuator **252** when the adjustment mechanism **220** is in the engaged position, the lock element **296** is biased against the rear side R of the connector **294** yet extends toward the front side F as a result of first and second arms **320, 322**, and the center section **324** being retained and biased against the biasing surface of the cavity **336**. The first and second sets of teeth **316, 318** engage the first and second teeth **330, 332** of the first and second traction elements **290, 292**. The teeth **316, 318** are preferably arranged in an elongate row to assure there is at least one tooth engaging corresponding teeth of the first and second traction elements **290, 292**. The connector **294** is preferably configured so the channels **308, 309** flatten or substantially flatten the first and second traction elements **290, 292** within the center slot **310** so there is multiple engagement of the teeth **316, 318** with the corresponding teeth **330, 332** of the first and second traction elements **290, 292**. The adjustment mechanism **220** is arranged so the natural or predetermined position is the engaged position so that when the actuator **252** is released, the teeth **316, 318** of the lock element **296** and the first and second traction elements **290, 292** engage one another.

The adjustment mechanism **220** is not limited to using the connector **294** and lock element **296** described above, but rather it may include means for providing engagement and disengagement from teeth or other locking elements on the first and second traction elements **290, 292**, preferably but not limited to automatic engagement upon release of the adjustment mechanism **220**. The adjustment mechanism **220** is arranged for engaging the first and second traction elements **290, 292** in an engaged position, and is further arranged to disengage from the first and second traction elements **290, 292** in a disengaged position. In the disengaged position, a clinician can selectively adjust the height of the intermediate support **210**, and hence the upper support **208**, relative to the main support **206** with restriction of gradual adjustment, but can accomplish the feat of height adjustment of the anterior component **236** quickly upon disengagement of the adjustment mechanism **220** and automatic locking at the desired location upon release of the adjustment mechanism **220** so it engages the first and second traction elements **290, 292** in a fixed location.

FIGS. **14**A and **14**B exemplify the lock mechanism **282** that may be used in combination with the adjustment mechanism **220**. The lock mechanism **282** includes a lever **284** that may extend above or just below the inner periphery **245** of the base **242** in order to facilitate adjustment of the lock mechanism **282** without requiring removal of the cervical collar **200**. The lever **284** may include at least one post **338** extending inwardly and on an opposite side of the base **242**

as the lever **284**. The at least one post **338** is directed toward the rear cavity **336** opposite the actuator **252**.

The at least one post **338** is adapted to rotate according to the position of the lever **284**. In an unlocked position, the at least one post **338** is located within the rear recess **334**, and the actuator **252** can be pressed without interference by the at least one post **338** since the rear recess **334** takes up the at least one post **338** when the actuator **252** is pressed toward the rear of the anterior component **236** or the base **242**. In the lock position, the lever **284** is rotated so that the at least one post **338** interferes with the center section **324** of the lock element **296** since the at least one post **338** is out of alignment with the rear recess **334**.

FIGS. **15**A-**15**C depict an embodiment of the posterior component **204**, particularly from the perspective of outside of the posterior component **204**. The posterior component **204** includes a main part **400** and a flexible portion **402**. It will be noted that FIG. **15**A shows an outer side of the posterior component **204** that is intended to face away from the user whereas FIGS. **15**D and **15**E show the inner side of the posterior component **204** arranged to be placed adjacent to the user. From the outer side of the posterior component **204**, the main part **400** defines a central convex portion or rib **404**, whereas the rib **404** is concave on the inner side of the posterior component, protruding from a base section **424** of the main part **400** toward a top section **415** of the main part **400** to accommodate and apply pressure outside of the cervical spine.

The depicted embodiment exemplifies how the main part **400** includes resilient or flexible portions forming the flexible portion **402** formed along the peripheral edges of the main part **400**. In this embodiment, the main part **400** and the flexible portion **402** are formed by discretely different materials, wherein the main part **400** is formed from a more structurally rigid material, and the flexible portion **402** is formed from a material more resilient and flexible than the material forming the main part **400**; for example, by overmolding a resilient or compliant material thereon. The use of flexible portions **402** allows the cervical collar **200** to distribute pressure peaks over larger areas in order to avoid the formation of pressure ulcers. The flexible portions **402** can also prevent pressure peaks even when the collar **200** is improperly applied.

The flexible portions **402** in the embodiment are continuous in that there are no breaks along the flexible portion **402** about the periphery of the main part **400**. This is in contradistinction to flexible portions that comprise thinned portions forming tabs from the main part **400** that are sequentially provided along a periphery of the main part **400**, and include clearances between each of the tabs to increase their flexibility. An advantage to the continuously formed flexible portion **402** is that there is an even distribution of pressure as opposed to individual and spaced tabs that are required to bear and exert pressure. It will be understood, however, that the continuously extending flexible portions **402** are provided by example, and the disclosure is not limited to the flexible portion **402** being continuous. Although the continuously extending flexible portions **402** embodiment is advantageous, discretely separated tabs or flexible areas may be provided in combination with the embodiments of this disclosure.

The main part **400** defines a convex rib **404**, from the perspective of the outer side, that generally runs along a central axis C-C of the posterior component **204**. Side sections **406** flare and curve from sides of the rib **404** and toward side extensions **405**, as discussed above. The side sections **406** form a Y-feature **408** with the rib **404** and the

US 10,945,872 B2

17                                                                18

side extensions **405**. The Y-feature **408** flares upwardly vertically along the cervical spine, and the side sections **406** have a curvature to provide improved anterior-posterior and lateral occipital support.

A series of slots **418** extends along the side extensions **405** from the rib **404**, and the slots **418** may be formed as shown above. However, additional slots that may not be sufficiently sized for receiving a strap may be formed and progressively diminish in size as the series of slots **418** approaches the rib **404**. In this manner the side extensions **405** become more rigid as they draw toward the rib **404**, thereby being less flexible and contributing to greater rigidity along the rib **404**, which in turn corresponds to a user's cervical spine. The series of slots **418** sized for receiving straps may provide ventilation and compliance to the anterior component **236** and due to tensioning of the straps.

The series of slots **418** and their corresponding pattern provide flexibility to allow the posterior component **204** to conform and fit around the necks of varying anatomical sizes. The pattern of the series of slots **418** allow the posterior component **204** to be flexible where needed, such as along the side extensions **232** that overlap or are proximate to the anterior component **236**, while remaining rigid in the necessary anterior-posterior and lateral directions, particularly along the axis C-C corresponding to the user's cervical spine.

The Y-feature **408** is in combination with the side sections **406** that form recesses **407**, which extend to the series of slots **418** on each lateral side of the posterior component **204**, created as a result of the Y-feature **408** protruding from the outer side. The recesses **407** transition in depth between the ends of the side sections **406**, wherein the greatest depth of the recesses **407** is located between the ends of the side sections **406**. The recesses **407** on the opposed sides of the rib **404** and contours of the side sections **406** form a pocket **420** for the anterior component **236** to nest into the posterior component **204** when it is secured therewith. The pocket **420** may enable the posterior component **204** to overlap the anterior component **236**, and the pocket **420** reduces pressure of the anterior component **236** pushing into the neck of the user.

The flexible portion **402** is preferably provided around the periphery of the main part **400**, and offers reduced edge pressure about the posterior neck and occiput of the user. The flexible portion **402** may be increased in designated areas to provide enhanced pressure relieving characteristics to the user. For example, there may be an increase in size of the flexible portion **402** from a border of the side extensions **405** to the upper sections **412** that extend on opposed sides of a peripheral recessed section **410** adapted to accommodate a user's occipital region.

The peripheral recessed section **410** may have a first flexible portion region **411** that has a width **W1** that is greater compared to other areas and corresponding widths (collectively the second flexible portion region **W2**) of the flexible portion **402** about the periphery of the main part **400**. The width **W1** at the first flexible portion area **411** is provided at least in part to provide increased comfort to the user around the occipital bone and posterior neck, as shown by the vertical and horizontal directional arrows A, B within the first flexible portion area **411**, by the yielding of the first flexible portion area **411** in the recessed section **410**. The width of the first flexible portion area **411** may be variable from the upper sections **412** to the nadir of the peripheral recessed section **410** along the center line C-C. The second

flexible portion region **W2** may be variable in width depending on the location along the periphery of the main part **400**, or may be uniform.

The upper sections **412** are anatomically shaped flared sections spaced apart by the concave and curved shaped recessed section **410**, and a flexible portion of the upper sections **412** is shaped to correspond to and support an occipital region of a user of the collar **200**. The upper sections **412** are arranged to gently cradle the side areas of a user's occiput so as not to place undue pressure on the cervical spine of the user. The contour of the recessed section **410** and the gradual rising of the flexible edge **402** between the upper sections **412** and the recessed section **410** provide increased comfort to the user around the occipital bone and posterior neck.

The main part **400** may be thinned at least at the upper sections **412** in that the main part **400** has a general thickness T1, and the thickness at the upper sections **412** has a gradual reduction or tapered thickness T2 from the general thickness T1 to a tip **423** of the upper sections **412**. The tapered thickness T2 results in a thinned section **422** creating a three tiered range of flexure **414**: flexure of the main part at the general thickness T1, flexure at the tapered thickness T2 of the main part **400** at the upper sections **412**, and flexure at the flexible portion of the upper sections **412**.

The thinned section **422** is covered and/or overmolded by material forming the flexible portion **402**, wherein the amount of material forming the flexible portion **402** gradually increases as the thinned section **422** tapers to nothing and the material fully becomes the flexible portion **402** about the periphery or edge of the tip **423** of the thinned section **422**. According to an embodiment, the combined thickness of the thinned section **422** and the material of the flexible portion **402** is generally the same as the general thickness T1. The flexible portion **402** may likewise have a same thickness as the general thickness T1.

As shown in FIG. **15**C, the posterior component **204** defines a contoured profile having a general curvature **426** between the recessed section **410** and the base section **424** oppositely disposed relative to the recessed section **410** along the axis C-C. In this manner, pressure is applied to the upper sections **412** and the base section **424** to provide improved anterior-posterior and lateral support, and easing such pressure by the curvature which better corresponds to the anatomical relationship between the occiput and the shoulders of a user. The general curvature thus advantageously provides an improvement over existing cervical collars by providing enhanced support corresponding to a user's needs, as compared to exiting collars which primarily provide flat posterior portions that result in undesirable pressure points and discomfort.

FIGS. **15**D and **15**E exemplify an inner side to an alternative embodiment of the posterior component **204** intended to face a user. Fastener tabs **430** are provided at convenient locations to assure a firm grip to a liner of the posterior component **204**. The posterior component **204** has a posterior opening **432** intended to be located generally along a cervical column of a user to provide pressure relief and ventilation to the posterior component **204** along the rear rib **404**. The rear rib **404** is generally convex on the outer side of the posterior component **204**, and is generally concave along the inner side of the posterior component **204**. The concave inner side of the rear rib **404** serves to relieve pressure against the cervical column of a user, as evidenced by the recessed portions **434** generally corresponding to the Y-feature **408** which is on the outer side of the posterior component **204**. Strap slots **436** are provided at side portions

US 10,945,872 B2

19 20

of the posterior component 204, and are oriented differently from the ventilation openings 428.

The flexible portion 402 extends along the main part 400 a greater distance along the inner side than the outer side, as evidenced by the boundary 458 corresponding to the extent to which the flexible portion 402 extends along the main part 400 on the outer side. The flexible portion 402 extends longer on the main part 400 and offers greater cushioning due in part to the material forming the flexible portion 402 being preferably softer and more compliant than the material forming the main part 400. For example, the flexible portion 402 material defines an upper flexible portion 448 extending longer than the flexible portion 402 on the outer side (past the boundary 458) so as to offer more cushioning along the inner side that corresponds to the occiput of the user, particularly since there may be substantial pressure exerted on the collar 200 by the user at this location. Within the cavity 438 formed by the Y-feature 408, the flexible portion 402 forms ribs 440, 442, 444 descending into the cavity 438 and generally extending along the curvature 426.

The ribs 440, 442, 444 are provided to reinforce the curvature 426 along the inner side of the posterior component 204, and better assure proper positioning of the user's neck. As the ribs 440, 442, 444 generally align with the curvature, they offer vertical stiffness to the posterior component 204 and track along the curvature 426. The ribs 440, 442, 444 are spaced from one another forming clearances 446 from one another to avoid pressure points, and to facilitate breathability of the posterior component 204. As the material forming the flexible portion 402 is more compliant, or softer than the material forming the main part 400, the ribs 440, 442, 444 may be trimmable depending on patient anatomy. For example, if the user's neck is substantially straight, some material may be removed from the ribs 440, 442, 444 to make the curvature less severe. This allows the posterior component 204 to be customizable based on individual patients' dimensions, a feature not provided by existing collar designs.

The Y-feature 408 gradually transitions along the inner side between upper transition 452 and lower transition 454 so that the concavity along the inner side is formed gradually to avoid any pressure points. Either the main part 400 may form such transitions, or the main part 400 may form the transitions in combination with the flexible portion 402 material, as similarly taught in regard to the outer side. The material forming the flexible portion 402 extends along a lower portion 450, and extends into at least one peripheral recess 456 formed by the main part 400, to better interlock the flexible portion 402 to the main part 400.

FIGS. 16A-16C exemplify improved strap arrangements or systems for connecting the anterior and posterior components 202, 204. A strap tab 500 has a first surface 502 defining a recess 506 for improved gripping of the strap tab 500, and a second surface 504 having traction elements 510 for gripping. A slot 508 is formed for receiving a strap. The strap tab 500 forms a recess 512 for receiving an end portion 518 of a strap 516, as further illustrated in FIG. 16C. The recess 512 enables the end portion 518 of the strap 516 to lie flush in the strap tab 500, so the end portion 518 is confined within the peripheries of the first and second surfaces 502, 504, without protruding therefrom. This arrangement is provided to maintain the strap tab 500 in a low profile configuration so as not to significantly protrude from the anterior component 202. Suitable fasteners 514, such as hook material or hook formed by the strap tab 500 itself, may be located within the recess 512 to removably secure to

the end portion 518. A second end portion 520 of the strap 516 may form a loop for engaging the strap on the posterior component.

FIG. 17A exemplifies another strap arrangement or system. The strap 530 carries a grip 534 on a first end of the strap 530 that is adapted to correspond in geometry to a landing area 532 of the forward projections of the anterior component 202. A strap body 536 extends to the posterior component 204 from the grip 534 so that a second end 538 loops about a strap slot 540 of the posterior component 204. The second end 538 may be cinched about the posterior component, or include further means for securing, such as having corresponding hook and loop fastener to secure itself to the strap body 536. This arrangement advantageously prevents damage or inadvertent tampering with the straps due to accidental contact with the strap or the strap catching on an object, as the strap end is secured flush against the strap body 536. Additionally, this embodiment allows for a strap system to be repeatedly donned and removed without adjusting the length of the strap 530 each time, thereby enhancing convenience for a user especially over long-term use when the collar is worn more intermittently.

FIG. 17B shows how the strap 530 may include a scale 542 printed thereon for determining sizing of the strap 530, and may further include logos or other information 546 printed thereon. In the variation of FIG. 17B, second end 539 of strap 530 defines a loop and is permanently stitched by stitching 544 to maintain its shape. In this embodiment, the loop is permanently secured to the posterior component 204 so that the strap 530 is not adjustable from the posterior component 204, but rather is only adjustable by pulling from a first end at the anterior component 202. However, the grip 534 may be removable (as opposed to being permanently disposed on the strap 530—thereby only being removed by destroying or significantly modifying the strap 530) from the strap 530, such that the strap 530 can be trimmed from a first end, and the grip 534 can be subsequently secured once the strap 530 is resized. Any suitable arrangement may be provided to removably attach the grip 534 to the strap 530, such as by a clamshell arrangement, adhesives, hook and loop fastener, or any other suitable arrangement.

FIG. 17C illustrates another embodiment whereby strap 533 passes through and over a strap slot 540 and secures internally to the posterior component 204. In this embodiment, an outer surface of the strap 533 may have a hook-receivable surface, and the posterior component 204 can include a corresponding fastener 548 that engages the hook-receivable surface. The strap 533 includes indicia 542 that peer through an opening of the strap slot 540 to show the extent or length the strap 533 is tensioned. This arrangement advantageously prevents damage, as discussed above, by maintaining the strap 533 in close proximity to or flush against the cervical collar 200, while still providing indicia for convenient and accurate sizing of the collar 200 to accommodate individual users' dimensions.

The disclosed embodiments of an orthopedic device, such as a cervical collar, having anterior and posterior components that are positioned about anatomy of a user such as the neck, to conform thereto and provide support, immobilization, and stabilization thereto, provide improvements that allow a single cervical collar to be applied for treatment to a wide variety of patients having varying sizes or degrees of swelling of anatomical portions.

It is understood that while the disclosed embodiments are designed to accommodate users having different sized anatomies, the size of the disclosed embodiments and the com-

US 10,945,872 B2

21

ponents thereof can be adjusted so different users having different sized anatomical portions may benefit from the present designs.

It is understood that while the disclosed embodiments of the cervical collar are shown having discrete anterior and posterior components, the anterior and posterior portions may be connected to each other along one side thereof, and a single strap or circumferential adjustment mechanism can be provided between the anterior and posterior component along the other side thereof.

It will also be recognized that the flexible portions, and the living hinge and slot structures, can be provided to a collar, without providing other features, such as the height adjustability, to the collar.

It is to be understood that not necessarily all objects or advantages may be achieved under any of the particular embodiments. For example, those skilled in the art will recognize that the embodiments may be embodied or carried out in a manner that achieves or optimizes one advantage or group of advantages as taught without achieving other objects or advantages as taught or suggested herein.

The skilled artisan will recognize the interchangeability of various disclosed features from the different embodiments. Besides the variations described herein, other known equivalents for each feature can be mixed and matched by one of ordinary skill in this art to construct an orthopedic device under principles of the disclosed embodiments.

Although this disclosure is in the context of certain exemplary embodiments and examples, it therefore will be understood by those skilled in the art that the disclosure extends beyond the specifically disclosed embodiments to other alternative embodiments and/or uses of the embodiments, and obvious modifications and equivalents thereof. It is intended that the scope of the present disclosure should not be limited by the particular disclosed embodiments described above.

The invention claimed is:

1. A posterior component for a cervical collar, the posterior component having an inner side arranged to face a user when wearing the cervical collar and an outer side opposite the inner side, the posterior component comprising: a main part defining a rear rib generally running along a central axis of the posterior component and protruding outwardly from the outer side of the posterior component, the rear rib being convex along the outer side of the posterior component and concave along the inner side of the posterior component, an outer side of the main part defining convex first and second side sections extending from opposed first and second sides of the rear rib; wherein the first and second side sections and the rear rib forms a Y-feature arranged to flare upward vertically from a base section of the posterior component to a top section of the main part, such that the first and second side sections extend away from the central axis; wherein the main part defines a posterior opening and the rear rib extending on opposed sides of the posterior opening along the central axis, the first and second side sections extending away from the central axis at about a location of the central axis corresponding to an upper section of the posterior opening, the posterior opening being entirely confined within the rear rib and extending through the main part; wherein the main part defines a single continuous arcuate peripheral edge formed by the rear rib and the first and second side sections at the top section of the main part; and the first and second side sections progressively tapering in depth toward first and second lateral ends of the Y-feature, respectively, as the first and second side sections extend away from the central axis.

22

2. The posterior component of claim 1, further comprising a flexible portion provided about a periphery of the main part.

3. The posterior component of claim 2, wherein the flexible portion defines a peripheral recessed section extending and varying in width between upper sections of the main part, a top peripheral recess of the main part being coextensive to the peripheral recessed section of the flexible portion.

4. The posterior component of claim 3, wherein the top peripheral recess of the main part varies in depth relative to the peripheral recessed section of the flexible portion between the upper sections.

5. The posterior component of claim 4, wherein the main part has a general thickness, and a thickness at the upper sections has a gradual reduction in thickness from the general thickness to a tip of the upper sections.

6. The posterior component of claim 5, wherein the flexible portion extends from the main part at the upper sections and has a thickness that varies according to the thickness of the upper sections.

7. The posterior component of claim 3, wherein a width of the flexible portion between the upper sections has a greatest width along the central axis of the posterior component.

8. The posterior component of claim 3, wherein the peripheral recessed section having a nadir between the upper sections of the main part along the central axis of the posterior component.

9. The posterior component of claim 1, wherein a flexible portion extends along a periphery of the main part, and extends over an inner side of the top section of the main part toward a base section.

10. The posterior component of claim 9, wherein the flexible portion forms at least one interior rib extending from the top section and over the main part within a cavity on the inner side of the posterior component formed by the rear rib protruding outwardly from the outer side and said first and second side sections extending from opposed sides of the rear rib with the cavity.

11. The posterior component of claim 10, wherein the at least one interior rib tapering in thickness from the top section to the base section according to a tapering depth of the concavity of the rear rib on the inner side.

12. The posterior component of claim 10, wherein the at least one interior rib includes first and second sets of interior ribs on first and second sides of the central axis of the posterior component, the first and second sets of interior ribs each including at least two interior ribs having different heights according to an extent the interior ribs extend relative to a concavity of the rear rib and the first and second side sections.

13. The posterior component of claim 1, wherein the rear rib diminishes as it tapers in depth toward a base section of the main part.

14. The posterior component of claim 1, wherein the main part forms recesses underneath said first and second side section extending from opposed sides of the rear rib and are spaced apart by the rear rib, the recesses form a plurality of slots therein such that the rear rib protrudes outwardly relative to a base section of the main part outside of the rear rib and increases in protruding relative to the base section of the main part as the rear rib extends toward the top section.

15. The posterior component of claim 1, wherein the posterior component defines a contoured profile having a general curvature between the top section and the base

US 10,945,872 B2

23

section oppositely disposed relative to one another along the central axis of the posterior component.

**16**. The posterior component of claim **1**, wherein the main part defines first and second upper sections formed as flared sections spaced apart by a concave and curved shaped recessed section.

**17**. A posterior component for a cervical collar, the posterior component having an inner side arranged to face a user when wearing the cervical collar and an outer side opposite the inner side, the posterior component comprising: a main part defining a rear rib forming a convex portion on an outer side, and a cavity formed by a concave portion on the inner side corresponding to the convex portion, the rear rib centered along a central axis of the posterior component; first and second interior ribs extending generally parallel and elongate to the central axis within a cavity on the inner side of the main part, the first and second interior ribs being formed from a more flexible material than the main part and extending along opposed sides of the central axis, the first and second interior ribs protruding outwardly from the inner side of the main part; wherein the posterior component defines a contoured profile having a general curvature between a top section and a base section oppositely disposed relative to one another along the central axis of the posterior component; the outer side of the main part defining convex first and second side sections extending from sides of the rear rib; wherein the first and second side sections and the rear rib form a Y-feature arranged to flare upward vertically from the base section of the posterior component to a top section of the main part; and the first and second side

24

sections progressively tapering in depth toward first and second lateral ends of the Y-feature, respectively, as the first and second side sections extend away from the central axis.

**18**. A posterior component for a cervical collar, the posterior component having an inner side arranged to face a user when wearing the cervical collar and an outer side opposite the inner side, the posterior component comprising: a main part defining a rear rib generally running along a central axis of the posterior component, the rear rib being convex along the outer side of the posterior component, an outer side of the main part defining convex first and second side sections extending from sides of the rear rib; wherein the first and second side sections and the rear rib form a Y-feature arranged to flare upward vertically from a base section of the posterior component to a top section of the main part, such that the first and second side sections extend away from the central axis; wherein the rear rib and first and second side sections protrude outwardly from the outer surface of the main part relative to portions of the main part outside of the Y-feature, the rear rib tapering in an extent by which it protrudes outwardly from the outer surface toward the base section, and the first and second side sections progressively tapering in depth toward first and second lateral ends of the Y-feature, respectively, as the first and second side sections extend away from the central axis, the first and second side sections being more rigid closer to the central axis than at the first and second lateral ends of the Y-feature.

\*　\*　\*　\*　\*

# EXHIBIT 12





Instructions for Use

MIAMI J® SELECT



                                                      3

EN  |  Instructions for Use                          6

DE  |  Gebrauchsanweisung                            10

FR  |  Notice d'utilisation                          14

ES  |  Instrucciones para el uso                     18

IT  |  Istruzioni per l'uso                          23

NO  |  Bruksanvisning                                27

DA  |  Brugsanvisning                                31

SV  |  Bruksanvisning                                35

EL  |  Οδηγίες Χρήσης                                38

FI  |  Käyttöohjeet                                  43

NL  |  Gebruiksaanwijzing                            47

PT  |  Instruções de Utilização                      51

PL  |  Instrukcja użytkowania                        56

TR  |  Kullanım Talimatları                          60

RU  |  Инструкция по использованию                   64

JA  |  取扱説明書                                      68

ZH  |  中文说明书                                      72

KO  |  사용 설명서                                     75

SL  |  Indikácie pre použitie                        79

RO  |  Indicaţii de utilizare                        83







3













4



# ENGLISH

**SYMBOLS**

 Medical Device

 Magnetic Resonance (MR) safe

**Product overview (Fig. 1):**
a. Front
b. Height Indicator Marks
c. Chin Support
d. Hook Landing Area
e. Tracheal Opening
f. Patient Compliance Lockout
g. Height Adjustment Button
h. Sternum Relief Knob
i. Sternum Contact
j. Back Panel
k. Repeatable Fit Tabs (sold separately)
l. Strap

**INTENDED USE**

The device is intended to provide gross immobilization to the cervical spine
X-ray and CT lucent.
The device must be fitted and adjusted by a healthcare professional.

*Indications for use*

Conditions requiring gross immobilization of the cervical spine. This may include:
- C-Spine precaution for trauma patients
- Immobilization for pre and post c-spine surgery
- Other conditions requiring gross immobilization of the mid-cervical spine

*Contraindications*
- Patients with a compromised airway or known spinal deformities such as ankylosing spondylitis.
- Patients with penetrating trauma injuries.

**Warnings and Cautions:**

**Warning:** If an unstable fracture is suspected or unknown, with or without a sustained trauma, ensure additional spinal precautions are implemented to immobilize the spine.

**Warning:** Use of a cervical collar may increase intracranial pressure (ICP) through jugular venous compression.

**Warning:** Use of a cervical collar may increase complexity of airway management.

**Warning:** Cervical spine immobilization, including use of a cervical collar, has been associated with:
- Impaired respiratory effort and forced expiratory volume
- Pneumonia
- Aspiration
- Worsening of existing cervical spine injury
- Severe neurological deterioration in patients with ankylosing spondylitis

6

- Triggering of non-compliance or agitation
- Delay to definitive treatment
- Impaired physical examination/secondary survey

**Caution:** Cervical spine immobilization, including use of a cervical collar, has been associated with:
- Increased pain and discomfort, which may lead to increased spinal movement
- Impaired swallowing

**Caution:** Perfumes and harsh cleaning agents should not be used on or under the collar, as they may compromise the integrity of materials.
**Caution:** Use of a cervical collar for cervical spine immobilization is not recommended in situations where patients are awake, alert, not intoxicated, without neck tenderness or pain and without abnormal sensory or motor findings on examination.
**Caution:** Regular cleaning of the collar, pads and the skin beneath along with inspection of the skin for any signs of irritation is required to reduce the risk of skin ulceration. Bedridden patients are at an increased risk for skin ulceration.
**Precautions:**
- At least two persons are needed for initial collar placement: one to maintain the patient's head and neck in proper alignment, the second to fit the collar.
- Collar removal or any adjustments to the collar should be done with physician permission only and according to the physician's instructions.
- Unless otherwise specified by the physician, the patient should not remove the collar except to wash under it and change the pads.
- The patient will need a second person to help when cleaning the collar.

**These instructions do not supersede hospital protocol and/or direct orders of the patient's healthcare professional.**

### GENERAL SAFETY INSTRUCTIONS

The healthcare professional should inform the patient about everything in this document that is required for safe use of this device.
Any serious incident in relation to the device must be reported to the manufacturer and relevant authorities.
The patient should immediately contact a healthcare professional:
- If there is a change or loss in device functionality, or if the device shows signs of damage or wear hindering its normal functions.
- If any pain, skin irritation, or unusual reaction occurs with the use of the device.
The device is for single patient – multiple use.

### FITTING INSTRUCTIONS

*Size Selection*
- Miami J Select is an adjustable collar suitable for most adult and adolescent patients; some patient phenotypes **(Fig. 2)** and anatomical variations may not be accommodated.
  - The Miami J Select is suitable for Stout **(Fig. 2b)**, Tall **(Fig. 2d)**, Regular **(Fig. 2e)**, and Short **(Fig. 2f )** patient phenotypes.
  - The Miami J Select has not been tested in Super Short **(Fig. 2a)** and XSmall **(Fig. 2c)** patient phenotypes and should therefore not be used on these patients.

7

- Adjust to the height that fits most comfortably and maintains desired treatment position.
  - Height settings 2-5 will be used most frequently. Height settings 1, 6, and 7 will be required less frequently.
- Once patient can sit/stand following initial application, check spine is in desired treatment position and adjust height setting if necessary.
- To ensure proper sizing, it is a good idea to fit operative patients prior to surgery.
  - Collar size may be incorrectly identified in the presence of postoperative dressings and swelling.

### Device Application

Ensure that correct spinal protocol is followed.

1. Ensure the padding extends beyond the edge of the plastic and the Sternum Relief Knob is oriented vertically as shown in **Fig. 4**.
2. Slide the Back Panel behind the patient's neck and center it, noting arrow on panel pointing up **(Fig. 3)**.
   **Note:** Long hair should be placed outside of the plastic.
3. Slide the Front of collar up the chest wall until the bottom of the tracheal opening is at the level of sternal notch. Chin Support may not contact chin at this point **(Fig. 4)**. Sides of the collar Front should be oriented up, off the trapezius, and toward the ears.
4. Holding the collar against the chest with the bottom of the tracheal opening at the level of the sternal notch, depress the Height Adjustment Button and manually adjust the Chin Support to achieve the desired height **(Fig. 5)**.
5. When desired height is attained, release Height Adjustment Button to lock in place.
6. Verify that desired height is achieved on both sides of the device. Depress Height Adjustment Button and make micro-adjustments as necessary.
7. While holding the Front securely, place the sides of the collar Front within the sides of the Back Panel. Apply the Straps of the back panel to the Hook Landing Areas on the front. Tighten Straps alternately to an equal length on both sides. **(Fig. 6)**
8. If further height adjustment is required, depress Height Adjustment Button, and manually move to position. Use the Height Indicator Marks to record patient's collar height.
9. When desired position is attained, engage the Patient Compliance Lockout located behind the Height Adjustment Button by moving the lever to the left. **(Fig. 7)**
10. Straps must be aligned with the Hook Landing Areas. When patient is properly fit, there should be equal amounts of excess straps overhanging the Hook Landing Area. These may be trimmed **(Fig. 8)**.

### Device Adjustments

1. Optional Repeatable Fit Tabs can be applied to trimmed straps to provide a contact point for the patient to don and doff the collar to a repeatable position. To use, thread the strap end through the tab and attach to the hook molded into the tab **(Fig. 9)**.
2. The blue Sternum Relief Knob adds a degree of freedom for the patient so that activities such as eating or talking can be performed with greater comfort. The knob turns 90 degrees to a horizontal position. **(Fig. 10)**
3. Upon healthcare professionals recommendation, collar corners and edges may be modified or trimmed to relieve discomfort or pressure.

8

### Final Fitting Checklist

A properly applied device will look like **Fig. 11**.

- Collar extends from mandible to just below sternal notch.
- Chin is centered comfortably in Chin Support. Chin should not extend over edge of Sorbatex™ pad, nor fall inside collar.
- Straps are aligned to the Hook landing area and are an equal length.
- Sides of Back should overlap sides of Front.
- Front of collar angled up toward ears. Lower plastic edge should not be resting on patient´s clavicles nor digging into trapezius.
- No plastic touching skin. Sorbatex™ pads extend beyond all plastic edges.
- No slack or gaps in any of the straps.
- Tracheal opening and posterior vent are midline.
- Collar sits away from the neck. There should be a *"finger"* gap between the tracheal opening and the neck.

If the collar is fit too closely/tightly to the neck, size up to the next taller size.

### Accessories and Replacement Parts

Please refer to the Össur catalog for a list of available replacement parts or accessories.

### USAGE

### Cleaning and care

Remove the pads from the plastic shells **(Fig. 12)**

- Hand-wash using mild detergent and rinse thoroughly.
- Wring out the excess water and squeeze in a towel. Lay flat to air dry.

**Note:** Do not machine-wash, tumble dry, iron, bleach, or wash with fabric softener.

**Note**: Avoid contact with salt water or chlorinated water. In case of contact, rinse with fresh water and air dry.

Device plastic can be washed with a damp cloth and mild soap.

- Replace the pads by attaching the grey/dull side to the hook on the inside of the plastic shells.

### DISPOSAL

The device and packaging must be disposed of in accordance with respective local or national environmental regulations.

### LIABILITY

Össur does not assume liability for the following:

- Device not maintained as instructed by the instructions for use.
- Device assembled with components from other manufacturers.
- Device used outside of recommended use condition, application, or environment.

9

# EXHIBIT 13





ÖSSUR®

LIFE WITHOUT LIMITATIONS

# MIAMI J® SELECT

Comfort to compliance

Patient Guide

# MIAMI J® SELECT

The Miami J Select cervical collar by Össur offers the comfort, immobilization and quality you expect during recovery. Featuring quick-dry Sorbatex™ padding that is anti-microbial to help prevent bacterial build-up and easy-to-use blue patient touch-points, the Miami J Select is designed to support your successful outcome.

## Fitting Instructions

1. Open a blue strap on one side of the collar. While holding the front of the collar with one hand, and the blue strap with the other hand, place the collar at the neck so that it is centered in the middle.

2. Push the collar up toward the chin, making sure that the collar is centered with the tip of the chin.

3. The hand that holds the blue strap moves around the head so that the collar back attaches itself accordingly.

4. Secure the blue strap to the front of the collar, making sure that it is centered along the grey hook. Confirm that both blue straps are secured evenly.

5. Check that both the collar front and collar back are centered to your midline, and that your chin is resting comfortably in the chin tray.

6. If additional comfort during eating or sitting up is desired, turn the blue sternal dial clockwise (your left) to the horizontal position.

## NOTE:

It is important that the collar is fit correctly to ensure adequate support and optimal comfort. These instructions do not supersede hospital protocol and/or direct orders of a patient's physician. Consult your physician before removing a cervical collar on your own, and for instructions on the proper position based on your injury.



## Removing Instructions

- Open the blue strap on one side of the brace with one had supporting the front
- The hand that has opened the collar can now remove it over the shoulder
- Close the strap accordingly for safe-keeping.

  


Össur hf.
Grjótháls 1-5
110 Reykjavík
Iceland

## Care Instructions



- The padding can be removed for cleaning every 12-24 hours if a replacement pad set is available
- Hand wash in warm water (30 °C) with mild detergent
- Rinse thoroughly
- Air dry flat
- The plastic parts can be wiped clean with a damp cloth and mild soap
- Re-attach pads with grey side to the collar and blue side to the skin
- Do not machine wash
- Do not tumble dry

View the patient fitting video at
www.ossur.com/miami-j-select

   



WWW.OSSUR.COM    ©Copyright Össur 2019    UGI 1363_004    Rev. 1

# EXHIBIT 14





# EXHIBIT 15

| | |
|---|---|
| **From:** | IS IP Administrator |
| **Sent:** | Friday, February 24, 2017 5:45 AM |
| **To:** | Wayne Calco |
| **Cc:** | Tatjana Latinovic; Shane Fedon |
| **Subject:** | FW: Documents for Signature; Your ref: P2810US00; WN ref: 19793.488.1 [IWOV-1.FID1778896] |
| **Attachments:** | 19793.488.1_Formal Drawings.pdf; 19793-488-1_specification.docx; CALCO - declaration_assignment (for signature).pdf |

Hi,

Please find the final draft for the regular US application.  Please review the application and drawings and if you are fine with it, please send me your signed declaration ASAP via e-mail.  The deadline for filing the application is next Monday, Feb. 27.

Thanks
Caroline

Kind Regards



Caroline Levasseur
IP Administrator, Research & Development
Document Controller for Product Documentation
Össur Head Office
Grjothals 1-5
110 Reykjavik
Iceland

Tel: +354 664 1113
E-mail: ipadministrator@ossur.com
www.ossur.com
Email-disclaimer

  

1

OSS 000206

1/20



FIG. 1
(Prior Art)

OSS 000207

2/20



FIG. 2A

FIG. 2B

OSS 000208

3/20



FIG. 3A

FIG. 3B

OSS 000209

4/20



FIG. 4



FIG. 5

OSS 000210

5/20



FIG. 6A



FIG. 6B

OSS 000211

6/20



FIG. 7A



FIG. 7B

OSS 000212

7/20



FIG. 8A



FIG. 8B

OSS 000213

8/20



**FIG. 9A**



**FIG. 9B**

OSS 000214

9/20



FIG. 10

OSS 000215

10/20



FIG. 11

FIG. 12

FIG. 13

OSS 000216

11/20



FIG. 14A

FIG. 14B

FIG. 14C

OSS 000217



FIG. 15A

FIG. 15B

OSS 000218

13/20



FIG. 16A

FIG. 16B

FIG. 17

OSS 000219

14/20



FIG. 18A

FIG. 18B

OSS 000220

15/20



FIG. 18C

FIG. 18D

OSS 000221

16/20



## FIG. 19A



## FIG. 19B

OSS 000222



## FIG. 20



## FIG. 21

OSS 000223

18/20



FIG. 22A



FIG. 22B

OSS 000224

19/20



FIG. 23A



FIG. 23B

OSS 000225

20/20



FIG. 24A



FIG. 24B

OSS 000226

1/30

CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT

[1]     Cross-reference to related applications

[2]     This disclosure incorporates by reference U.S. patent no. 5,632,722, granted May 27, 1997, U.S. patent no. 6,254,560, granted July 3, 2001, U.S. patent no. 7,981,068, granted July 19, 2011, U.S. patent no. 8,038,636, granted October 18, 2011, U.S. patent no. 8,679,044, granted March 25, 2014, U.S. patent application publication no. 2013/0310722 published on November 21, 2013, and U.S. patent application publication no. 2016/0287424, published October 6, 2016.

[3]     Field of the Disclosure

[4]     The present disclosure relates to an orthopedic device, and more specifically to cervical collars having height adjustability at a front part, while providing a platform for securing known other components of a cervical collar thereto without modifying their anatomical contours and connection to the height adjusted components.

[5]     BACKGROUND

[6]     Cervical collars are used for treating conditions of the neck and the cervical spine by cervical spine immobilization. These collars may handle whiplash and other such injuries, where support for the head and neck of the patient is needed, and function to partially immobilize the head and neck of the patient and relieve spasm or strain to which the neck muscles of the patient might be subjected by transferring weight or force from the head of the patient to the shoulders or adjacent areas of the patient. Other collars may be arranged for complete or near complete immobilization of the head and neck of the patient to reduce risk of secondary damage to the spinal cord.

[7]     A challenge in designing a cervical collar is balancing desired immobilization with user comfort, such as venous pressure.  Immobilization may be measured by five planes of movement, including flexion, extension, lateral tilt to right and left, and rotation of the neck to right and left, and is considered generally as cervical range of motion (CROM).

[8]     Unfortunately, many patients using cervical collars develop decubitus or decubitus ulcers (also known as bed sores, pressure sores, or trophic ulcers) when wearing cervical collars. These ailments, which involve a breakdown of tissue overlying a bone, arise when tissues overlying a bony prominence are subjected to prolonged pressure against an object

OSS 000227

2/30

such as a cervical collar. Besides affecting superficial tissues such as the skin, decubitus and decubitus ulcers also can affect muscle and bone. Restrictive collars are the root causes of skin breakdown in the trauma population. As pressure-ulcers are among the most common, yet serious and costly, complications of routine spinal immobilization, it is desirable to provide cervical collars that minimize the probability of ulcers.

[9]     Moisture and pressure are two major factors which contribute to the formation of decubitus. Once a decubitus ulcer forms, there is no good method of determining the extent of tissue damage. Once started, decubitus can continue to progress through the skin and fat tissue to muscle and eventually to bone, and is very difficult to treat and arrest. In extreme cases, surgical replacement of bone, muscle and skin are required to restore that portion of the body of the patient where decubitus has formed.

[10]     It is desirable to eliminate or at least minimize the effect of pressure points when using cervical collars. The likelihood of contracting decubitus can be greatly reduced by a more even distribution of pressure to several parts of the body of the patient.

[11]     Multiple studies have evaluated CROM and the likelihood of tissue-interface pressure (TIP) exerted by commercially-available cervical collars. One of the known commercial collars that has proven successful at striking the balance of minimal TIP and most restriction of CROM is the Miami J collar (Össur, hf, Reykjavik, Iceland). Multiple studies have validated the features of the Miami J collar, including: Tescher, A.N. et al. Range-of-motion restriction and craniofacial tissue-interface pressure from four cervical collars. *Journal of Trauma-Injury Infection & Critical Care*: 2007; 63; 5; 1120-1126; Jacobson, T.M. et al. Efforts to reduce occipital pressure ulcers. *Journal of Nursing Care Quality*; 2008; 23; 3; 283-288; Karason, S. et al. Evaluation of clinical efficacy and safety of cervical trauma collars: differences in immobilization, effect on jugular pressure and patient comfort. *Scandinavian Journal of Trauma, Resuscitation and Emergency Medicine*. 2014. 22:37.

[12]     The Miami J collar is also described in U.S. patent no. 5,632,722, granted May 27, 1997; U.S. patent no. 6,254,560, granted July 3, 2001; U.S. patent no. 6,921,376, granted July 26, 2005. Variations of the Miami J collar, embodying the Miami J Advance collar, are described in U.S. patent no. 7,981,068, granted July 19, 2011, and U.S. patent no. 8,679,044, granted March 25, 2014.

OSS 000228

**-377-**

3/30

[13]    A feature, preferably included in cervical collars to overcome limited adaptability to accommodate the body of the patient and the particular ailment prompting the need for wearing a cervical collar, is the facility for adjusting the relative positions of various components of the cervical collar.  Part of the effectiveness of the Miami J collar is due to its ability for customization to different anatomical sizes of users.

[14]    As taught in U.S. patent no. 6,254,560, the Miami J collar has supports that enable customized pressure distribution and avoid skin breakdown.  A front part of the Miami J collar has an adjustable upper support for the mandibular, chin and/or jaw of the user, and mounted to a lower support or sternum brace by means which permit relative movement between the upper support and the lower support.  The posterior component or back part of the Miami J collar has an occipital support mounted to a back support by means which permit relative sliding movement between the occipital support and the back support.  The shape of the upper support and occipital support are anatomically optimized for superior immobilization and patient comfort.

[15]    Both the upper support and the occipital support of the Miami J collar are uniquely anatomically shaped to maximize comfort and immobilization while minimizing pressure on the user.  Because the upper support and the occipital support of the Miami J collar are clinically proven, it is desired that any improvements over the current Miami J collar provide means for preserving the function and shape of the upper support and occipital support of the current Miami J collar.

[16]    SUMMARY

[17]    The present disclosure describes an improved cervical collar for restricting head and neck movement to promote healing after an injury to the spinal column. The cervical collar has height, circumferential and angular adjustment to accommodate a wide variety of patient sizes and anatomical configurations, and to accommodate dimensional changes caused by increased or decreased swelling of the affected anatomical portions of the patients during treatment of the injury.  The cervical collar is arranged to stabilize and immobilize the cervical area, by restricting lateral, sagittal and coronal movement, while improving comfort, and fit for individual patients.

[18]    Embodiments of the disclosure relate to a cervical collar having a height adjustment system between main and lower parts forming an anterior component, which permit the

OSS 000229

4/30

use of known upper and occipital supports in the cervical collar to maintain their functionality, comfort and fit, including their anatomical contours and connection to the height adjusted components. The height adjustment system is arranged for adjusting the chin height in a simple and effective manner that limits or mitigates tampering with the height while the collar is worn. The height adjustment system preferably includes using incremental height adjustment so the height may be locked at a desired height setting. The height adjustment system may be arranged to allow usage in existing collar designs, such as the Miami J or Miami J Advance collars, without substantially altering the shape and function of the mandibular and posterior component including an occipital support.

[19]    The height adjustment system mitigates or eliminates the need for pre-sizing methods, and is provided in a simplified manner to enable many height settings customizable for different users. The height adjustment system allows use of known upper and posterior components, which have been on the market for many years to serve many users of cervical collars, are clinically proven for their efficacy.

[20]    The height adjustment system allows for improved placement and configuration of a cervical collar on patients of different heights. The upper support and posterior component can be properly fitted against the chin and head of a patient by a clinician, followed by the extension of the anterior component against the patient's chest. Likewise the anterior component may be placed against the patient's chest and the upper support and posterior component can then be extended to the chin and head of the patient. The height setting can then be locked at the desired height setting by the clinician to ensure a proper fit for the user.

[21]    According to a general embodiment, a cervical collar has an anterior component arranged for connecting to a posterior component.  The anterior component comprises a main support, and a lower support hingedly connected to the main support at first and second hinges.  An elongate element or slidelock has first and second ends engaging the first and second hinges, such that the first and second ends are arranged for adjusting relative to the first and second hinges.  A lock mechanism is configured for locking rotation of the lower support relative to the main support, and moving the elongate element between locked and unlocked conditions.  The elongate element is biased into the locked condition,

OSS 000230

5/30

and may be configured to wedge parts of the hinged connection of the parts of the anterior component together in the locked condition.

[22]    In a method for adjusting an angle defined between the main support and the lower support, the method involves moving the elongate element relative to the main support and the lower support. A part of the main support is disengaged from a corresponding part of the elongate element to unlock the lower support from the main support. The lower support is moved relative to the main support. Once the lower support is placed at the desired angle relative to the main support, the part of the main support is engaged to the corresponding part of the elongate element to lock the lower support to the main support, which may be accomplish by wedging parts of the hinged connection together.

[23]    These and other features, aspects, and advantages of the present disclosure will become better understood regarding the following description, appended claims, and accompanying drawings.

[24]    BRIEF DESCRIPTION OF THE DRAWINGS

[25]    The drawing figures are not necessarily drawn to scale, but instead are drawn to provide a better understanding of the components thereof, and are not intended to be limiting in scope, but to provide exemplary illustrations. The figures illustrate exemplary configurations of an orthopedic device, and in no way limit the structures or configurations of a liner according to the present disclosure.

[26]    Fig. 1 is a perspective view of a known cervical collar under the commercial name Miami J.

[27]    Fig. 2A is a frontal elevational view of a cervical collar.

[28]    Fig. 2B is a side elevational view of an embodiment of a cervical collar of Fig. 2A.

[29]    Fig. 3A is a top plan view of the main and lower supports of the cervical collar of Fig. 2A.

[30]    Fig. 3B is a rear elevational view of the main and lower supports of the cervical collar of Fig. 2A.

[31]    Fig. 4 is a detail plan view of the lock mechanism in Fig. 3A.

[32]    Fig. 5 is a schematic view of a variation of the lock mechanism of Fig. 3A.

[33]    Fig. 6A is a schematic plan view of the elongate element in a locked condition.

[34]    Fig. 6B is a schematic plan view of the elongate element in an unlocked condition.

OSS 000231

6/30

[35]    Fig. 7A is a schematic perspective view of the first hinge in a locked condition.

[36]    Fig. 7B is a schematic perspective view of the first hinge in an unlocked condition.

[37]    Fig. 8A is a schematic perspective view of a variation of the first hinge in a locked condition.

[38]    Fig. 8B is a schematic perspective view of the first hinge of Fig. 8A in an unlocked condition.

[39]    Fig. 9A is an outer exploded perspective view of another variation of the first hinge.

[40]    Fig. 9B is an inner exploded perspective view of the first hinge of Fig. 9A.

[41]    Fig. 10 is a perspective view of another embodiment of a cervical collar.

[42]    Fig. 11 is a perspective view of an embodiment of a slidelock in the cervical collar of Fig. 10 and showing a first side thereof.

[43]    Fig. 12 is a perspective detail view of the slidelock showing a second side thereof.

[44]    Fig. 13 is a perspective schematic view showing the slidelock of Fig. 11 in a portion of the cervical collar of Fig. 10.

[45]    Fig. 14A is a perspective schematic view showing the slidelock of Fig. 11 in an end portion of side A of the cervical collar of Fig. 10 in a locked condition.

[46]    Fig. 14B is a perspective schematic view showing the slidelock of Fig. 11 in an end portion of side B of the cervical collar of Fig. 10 in an unlocked condition.

[47]    Fig. 14C is a detail cross-sectional view XIV C of Fig. 14A showing engagement of features in a locked condition of the collar of Fig. 10.

[48]    Fig. 15A is a perspective view of an inside surface of a side cover in the cervical collar of Fig. 10.

[49]    Fig. 15B is a schematic view of a variation of the side cover and main support in Fig. 15A.

[50]    Fig. 16A is a schematic view of a variation of a paddle in a slidelock.

[51]    Fig. 16B is a schematic view of another variation of a paddle in a slidelock.

[52]    Fig. 17 is a schematic view of another variation of a slidelock system for use in a cervical collar.

[53]    Fig. 18A is a schematic view of another variation of a slidelock system for use in a cervical collar.

[54]    Fig. 18B is a schematic view of the slidelock system in Fig. 18A disassembled.

OSS 000232

7/30

[55]    Fig. 18C is a schematic view of the slidelock system in Fig. 18A in a locked condition.

[56]    Fig. 18D is a schematic view of the slidelock system in Fig. 18A in an unlocked condition.

[57]    Fig. 19A is a schematic side elevational view of the upper support in the main support.

[58]    Fig. 19B is schematic view of the adjustability of the upper support relative to the main support in Fig. 19A.

[59]    Fig. 20 is a plan view of the adjustment mechanism in Fig. 2A.

[60]    Fig. 21 is an elevational view of the adjustment mechanism of Fig. 20.

[61]    Fig. 22A is a schematic elevational view of the adjustment mechanism in a contracted configuration.

[62]    Fig. 22B is a schematic elevational view of the adjustment mechanism in an extended configuration.

[63]    Fig. 23A is an elevational view of an embodiment of the connector in Fig. 2.

[64]    Fig. 23B is a top plan view of the connector in Fig. 23A.

[65]    Fig. 24A is a perspective view of another embodiment of the connector in Fig. 2.

[66]    Fig. 24B is an exploded view of the connector in Fig. 24A.

[67]    DETAILED DESCRIPTION OF VARIOUS EMBODIMENTS

[68]    A. Introduction

[69]    Embodiments of an orthopedic device are provided for stabilizing and supporting anatomical portions of a wearer, for example, the neck and head of a wearer.

[70]    Although the embodiments of the disclosure are adapted for supporting and stabilizing anatomical portions of many wearers having various anatomical shapes and sizes, the embodiments of the disclosure may also be dimensioned to accommodate different types, shapes and sizes of anatomical portions.

[71]    A better understanding of different embodiments of the disclosure may be had from the following description read with the accompanying drawings in which like reference characters refer to like elements.

[72]    While the disclosure is susceptible to various modifications and alternative constructions, certain illustrative embodiments are in the drawings and are described

OSS 000233

8/30

below. It should be understood, however, there is no intention to limit the disclosure to the embodiments disclosed, but on the contrary, the intention covers all modifications, alternative constructions, combinations, and equivalents falling within the spirit and scope of the disclosure.

[73]    It will be understood that, unless a term is defined in this disclosure to possess a described meaning, there is no intent to limit the meaning of such term, either expressly or indirectly, beyond its plain or ordinary meaning.

[74]    While the foregoing embodiments have been described and shown, alternatives and modifications of these embodiments, such as those suggested by others may be made to fall within the scope of the invention.  While the cervical collar has been described in combination with collar parts, it will be understood that the principles described may be extended to other types of orthopedic and prosthetic devices.

[75]    Reference characters are provided in the claims for explanatory purposes only and are not intended to limit the scope of the claims or restrict each claim limitation to the element in the drawings and identified by the reference character.

[76]    For ease of understanding the disclosed embodiments of an orthopedic device, the front or anterior, and rear or posterior portions of the orthopedic device are described independently. The anterior and posterior portions of the orthopedic device function together to form a supporting and stabilizing collar that encompasses the anatomical portions of the wearer.

[77]    The term "posterior" also has its ordinary meaning and refers to a location that is behind or to the rear of another location. Lastly, the term "anterior" has its ordinary meaning and refers to a location ahead of or to the front of another location.

[78]    The terms "rigid," "semi-rigid," "flexible," and "compressible" may be used herein to distinguish characteristics of portions of certain features of the orthopedic device. The term "rigid" should denote that an element of the device is generally devoid of flexibility. Within the context of support members or shells that are "rigid," it is intended to indicate that they do not lose their overall shape when force is applied, and they may break if bent with sufficient force. As for the term "semi-rigid," this term is used to connote properties of support members or shells that provide support and are free-standing; however such support members or shells may have some degree of flexibility or resiliency.

OSS 000234

-383-

9/30

[79]    The term "flexible" should denote that features are capable of repeated bending such that the features may be bent into retained shapes or the features do not retain a general shape, but continuously deform when force is applied. The term "compressible" is used to qualify such structural features as being capable of being reduced in size or volume due to the exertion of force applied to the structural feature.

[80]    B.  Components for use with following embodiments

[81]    Fig. 1 exemplifies the known Miami J collar 1, as taught in the aforementioned patents and publications, particularly U.S. patent nos. 5,632,722 and 6,254,560.  The collar 1 includes an upper support 2 intended to support the mandibular, jaw or chin of the user that secures and/or rests upon an anterior component 3 of the collar.  The upper support 2 is arranged for sliding movement with the anterior component 3 and for locking therewith by a side adjustment connection 11 and a central tab 15.  The upper support 2 preferably has continuous padding 8 along a surface adjacent the user's jaw.

[82]    The anterior component 3 defines a sternum part 4, forming an extension adapted to extend below the clavicle of a user and adapted to rest against the sternum.  The sternum part 4 carries a sternum pad 9 to avoid decubitus over long periods of wear of the collar.  Besides the sternum pad 9, the anterior part 3 likewise includes padding along the surface facing the user.

[83]    The Miami J collar may be used by users with injuries other than those for which the cervical collar is most commonly used.  The anterior component 3 forms an opening 13 which allows for access to the throat of the user, although because the anterior component is unitary and monolithic, the size of the opening 13 remains fixed.

[84]    The collar 1 includes a posterior component comprising lower and upper parts 5, 6, with the upper part serving as an occipital support.  Both the lower and upper parts 5, 6 preferably include continuous padding, with the lower part intended to rest upon the back of the user, and the upper part intended to rest against the occiput of the head.  The lower and upper parts 5, 6 are preferably attached for relative sliding movement between relative positions of the lower and upper parts to allow for different head sizes and proper and even pressure distribution across the body of the user.

[85]    Although not shown, the posterior component may be unitary and monolithic because it resembles the posterior component taught by U.S. patent no. 7,981,068 and

OSS 000235

10/30

found in the Miami J Advance collar. The posterior component is an anatomically configured 3D support contiguously formed with resilient or compliant edges. The support includes slots to provide ventilation and/or additional resilience or flexibility. The support portion also includes an anatomically shaped flared section shaped to correspond to and support an anatomical portion of a wearer, for example, the occipital region.

[86]    Both the upper support, and the anterior and posterior components are generally symmetrical about a vertical center line, and may be formed from rigid or semi-rigid plastic. The material forming the upper support, and the anterior and posterior components, may be flexible prior to donning the collar, but sufficiently rigid once the collar is donned to resist yielding due to weight exerted by the user.

[87]    A fastener 7 is used to secure the anterior and posterior components to one another. The fastener 7 comprises cooperating hook-and-loop attachments on the anterior and posterior components, with a strap bearing hook material extending from the posterior component and loop or hook receiving elements located on the anterior component.

[88]    Each of these embodiments is arranged to receive the upper support and posterior component of the Miami J collar, or the posterior component of the Miami J Advance collar in order to preserve the clinically recognized superior immobilization and comfort provided by the existing collars. It will be noted, however, that these embodiments are not restricted to only the upper support and posterior component of the Miami J and Miami J Advance collars, but can receive other upper support and posterior components of other known collars or those designed for each of the embodiments.

[89]    The height adjusted anterior component is arranged to preserve the anatomical contour and function of the known upper support and posterior component, despite the height adjustment of the anterior component and the tracheal opening thereof. The embodiments may have a varying height adjustment in that a center portion of the collar about the tracheal opening and generally along a vertical center line may increase greater in height than alongside portions of the anterior component proximate the connection to the posterior component. An example, although not limiting, is a 3:1 height difference at the center portion relative to the side portions.

[90]    While the embodiments may be associated with varying neck lengths among users, the sternal contour of users may likewise vary. The varying sternal contours of users may

OSS 000236

-385-

11/30

be resolved by positioning of the sternal contour, which may be achieved by adjusting the tracheal opening height or the height generally of the collar. While anatomical vertebral height and neck length plays a role in adjustment of the collar, the alignment of the spinal segments also has an effect in overall neck "length," i.e., a more kyphotic or flexed neck position "shortens" an otherwise anatomically longer or taller neck.

[91]    Another factor relating to the dimension of the cervical collar is the sternal contour. For instance, a very barrel chested individual (having a more horizontal sternal contour) may have the distal most dimension of the sternal extension of the brace contact considerably closer to the mandible than the patient with a very vertical sternum.

[92]    In all situations suggested above, mandible dimensions would be relatively the same, it is the orientation of the neck elements and its attachment to and the contour of the sternal segment that plays the largest role in overall collar height adjustment. The mechanism affording mandible and sternal height adjustment can accommodate the varying contours and dimensions.

[93]    C. Embodiments of the Cervical Collar

[94]    According to the embodiment of Figs. 2A and 2B, a cervical collar 10 has an anterior component 12 arranged for connecting to a posterior component 14. The posterior component 14 may be similarly arranged as the similar part in U.S. Pat. No. 7,981,068, as discussed above. The anterior component 12 comprises a main support 16, an upper support 18 arranged for being received by the main support 16, and a lower support 20 hingedly connected to the main support 16 at first and second hinges or end portions of the main and lower supports forming such hinges. In the depicted embodiments, the first and second hinges are formed by such end portions of the main and lower supports, and there are not separate hinges in addition to the end portions. However, the application is not limited to such arrangement, and additional components could be added to the end portions of the main and lower supports which could be considered as hinges in addition to the end portions of the main and lower supports.

[95]    A lock mechanism 22 is arranged for locking rotation of the lower support 20 relative to the main support 16, such that the hinges are locked according to different angular configurations of the lower support 20 relative to the main support 16. An adjustment mechanism 24 is located centrally along a lowermost portion of the lower

OSS 000237

12/30

support 20, and may be configured for adjustment relative to and away from a sternum of a user for improving comfort and fit of the cervical collar.

[96]    As evident from Figs. 2A and 2B, the anterior component 12 preserves the general contours known in the Miami J collar, particularly the peripheral outline of the anterior component of both the main support 16 and lower support 20, which enables easy attachment to the known upper or upper support 18 and posterior component 14. Specifically, the upper support 18 may have a configuration that is the same as in U.S. patent application publication no. 2013/0310722, and U.S. patent 6,254,560.  The profile of the upper support 18 is preferably taken from the Miami J collar, however other upper supports may be used and the embodiments are not limited to solely the Miami J collar profile.

[97]    Because the main and lower supports are adjustable relative to one another, the upper support is preferably maintained in a stationary relationship with the main support. However, the upper support is not necessarily rigid, but may flex according to the anatomy of the user, but become rigid or stable to movement once the collar is placed and tightened securely on the user.

[98]    Generally, when fitting a cervical collar having an anterior component 12, a clinician fits the upper support 18 and posterior component 14 against a patient's chin and head, arranged for the desired level of immobilization and support. The clinician then adjusts the lock mechanism 22 to secure the anterior component 12 against the chest and shoulders of the patient by articulating the lower support 20 relative to the main support 16.  A clinician may also first fit the anterior component 12 against the patient's chest and then regulate the lock mechanism 22 to extend the main support 16 and posterior component 14 to the chin and head of the patient. The height setting is maintained by the lock mechanism 22 once released at the desired height setting to ensure a proper fit for the user.

[99]    Referring to Figs. 6A and 6B, the first and second ends 48, 50 of an elongate element 34 or sliding lock or slidelock, as discussed periodically herein, are spatially located differently relative to the first and second hinges 40, 42 when in the unlocked condition.   The first end 48 is axially offset from axis 49 from end portions 44, 46 of the main support and the lower support at the first hinge 40 in the unlocked condition. The

OSS 000238

13/30

end portions 44, 46 of the main and lower supports are generally coaxial relative to one another.

[100]    As illustrated in Figs. 3A, 3B and 4, the elongate element 34 is slidably located within an arcuate guide 54 defined by the main support 16 along an inner side I thereof. The inner side I of the main support 16 defines a plurality of guides 38 for retaining the elongate element 34 within the arcuate guide 54.  According to the illustrated embodiment, the guides 38 each define a post 52 having a height greater than a thickness of the guides 38.  The arcuate guide is depicted as a tray but it may likewise be configured as a flange, boss, segmented protrusions, or other appropriate structure to route the elongate element ot the main support or upper support.

[101]    The arcuate tray 54 is defined by a base portion 58 and an upper wall 56 of the main support 16.  The base portion 58 extends outwardly from the upper wall 56 in a generally perpendicular orientation.

[102]    The main support 16 has a generally arcuate configuration 59 adapted to extend about the mandible of a user, and may be considered to possesses an elongated C- or U-shape.  The lower support has a generally arcuate configuration 60 and is contoured for being adapted for securing against a sternum of a user.

[103]    The lock mechanism 22 includes an actuator or dial 30 for adjusting the lock mechanism 22 from locked to unlocked conditions.  The lock mechanism 22 includes the elongate element 34 having first and second ends 48, 50 engaging the first and second hinges 40, 42.  The first and second ends 48, 50 are arranged for being displaceable relative to the first and second hinges 40, 42 between locked and unlocked conditions of the lock mechanism 22.

[104]    The lock mechanism 22 preferably includes a pinion 32 and a rack segment 36, or geared rack segment 36, for adjusting position of the elongate element 34.  The pinion 32 defines a shaft 61 extending between the outer and inner sides of the main support 16 and a pinion portion 62 at a first end of the shaft 61.  The shaft 61 engages the actuator 30 on the outer side of the main support 16 at a second end of the shaft 61.  The pinion portion 62 engages a rack segment 36 defined by the elongate element 34, whereby rotation of the shaft 61 urges the elongate element 34 to slide relative to the main support 16.

OSS 000239

14/30

[105]   The pinion portion 62 is recessed relative to the shaft 61, such that the shaft 61 has a diameter greater than the pinion portion 62. The pinion portion 62 is arranged to maintain engagement with the rack segment 36 of the elongate element 34. An end portion 63 of the pinion on the inner side preferably has a diameter greater than the pinion portion 62. The pinion portion 62 is recessed relative to the shaft 61 and the end portion 63. The shaft 61 engages a periphery of an opening 67 of the main support 16 via a threaded engagement 65.

[106]   While a rack and pinion system is shown and described, other adjustment and engagement systems may be used in combination with the elongate element or slidelock. Such other adjustment and engagement systems may be rotary or linear in nature, such as a slider, for causing displacement of the elongate element relative to the main support.

[107]   In the embodiment of Fig. 4, the lock mechanism 22 includes a least one spring element 64 arranged for returning the shaft 61 to a locked condition after rotation of the shaft 61 to the unlocked condition of the first and second hinges 40, 42 and release of the actuator 30. The spring element 64 is a Belleville disc. The spring element 64 biases against a groove 71 formed by the shaft 61 and a bias element 69 of the main support 16. The return force from the elongate element 34 may drive the actuator into the locked condition.

[108]   According to the schematic representation in Fig. 5, the lock mechanism 22 has at least one elastic element 66A, 66B secured at a first end to a first retainer 73 on the main support 16 and a second retainer 75 on the lock mechanism 22, whereupon release of the lock mechanism, the at least one elastic element 66A, 66B urges the lock mechanism to a predetermined configuration. The actuator 30 may be resiliently or spring biased, such that it may be activated under force to an unlocked condition whereby such force returns the actuator to a predetermined locked condition; for example by merely releasing the actuator.

[109]   Referring to the depiction in Figs. 7A and 7B, the first hinge or end portion 40 includes end portions 44, 46 of the main support and the lower support 16, 20, respectively, and a hinge cover 68 defining a hole 74. The end portions 44, 46 each define holes 78, 80 that are coaxial about a first axis 90 to one another and about which the first hinge or end portion 40 pivots. The first end 48 of the elongate element 34 is arranged to slidably adjust relative to the end portions 44, 46. The first end 48 defines an opening 76 axially offset

OSS 000240

15/30

from the first axis 90 and defined along a second axis 91 variable in location depending on the configuration of the lock mechanism 22.

[110]   The first end 48 of the elongate element 34 defines a detent projection 72 arranged to engage a ridge 86 defined by the end portion 44 of the main support.  The end portion 44 defines a ramp 87 leading to the ridge 86 from a recess 88 defined by the end portion 44.  The detent projection 72 is arranged to be received by the recess 88 and slide along the ramp 87 to the ridge 86 between locked and unlocked conditions of the lock mechanism 22.  The ridge 86, the ramp 87 and the recess 88 are generally concentric with the first axis and the hole 78 of the main support 16.

[111]   A spring element 70, such as an O-ring, is concentrically disposed about the hole 78 of the main support and biased between a shoulder 92 defined by the main support 16 and an inner surface 94 of the cover 68.  As shown in Fig. 7A, when the spring 70 is in an expanded configuration, it wedges the inner surface 94 of the cover 68 and the shoulder 92 together.

[112]   The end portion 46 of the lower support 20 defines a protrusion or detent 84 arranged to be received by a notch 82 defined by the end portion 44 of the main support.  The detent 84 is received by the notch 82 in the locked condition of the main support and the lower support.  The detent 84 is generally arranged concentrically with the hole 80 of the main support.  As shown in Fig. 7A, in the locked condition, vertical interference prevents movement of the hinge.  Fig. 7B shows how in the unlocked condition the spring element is compressed, and the detent may move.

[113]   Figs. 8A and 8B exemplify a variation of the hinge 96, whereby the main support and the lower support define a plurality of cooperating teeth 98, 100 engageable when the lock mechanism is in the locked condition, and disengaged from one another when the lock mechanism is in an unlocked condition.

[114]   Figs. 9A and 9B illustrate another embodiment of the hinge 102 wherein the end portion of the elongate element 34 defines an opening 104 and the main support 16 defines an opening 112 through which a post 114 of the lower support 20 extends to secure to the cover 68.  Such a construction is similar to the embodiments of Figs. 7A-8B.  The opening 112 and the post 114 are coaxial along axis 118.  The opening 104 of the elongate element

OSS 000241

34 has an oblong profile arranged for being axially offset relative to the axis 118, and a first surface 111 is arranged for abutting the hinge cover 68.

[115]   The elongate element 34 defines at least one elongate bar 120 protruding from a second surface 113 thereof and is arranged for being received by a corresponding elongate recess 106 formed by the main support 16.  The main support 16 defines a plurality of circumferentially spaced recesses 108 arranged for receiving at least one detent 122 formed by the elongate element 34.  The main support 16 defines an annular shoulder 110 from a first surface 105 thereof and defined about the opening 112.

[116]   The main support 16 defines a plurality of receptacles 124 circumferentially spaced about the opening 112 along a second surface 107 thereof.  The lower support 20 defines a plurality of circumferentially spaced bosses 116 along a first surface 109 thereof, arranged for being received by the receptacles 124.

[117]   Fig. 10 exemplifies another embodiment of an anterior support 202 for a cervical collar 200 having a height adjustment system while preserving the contour 222 of the upper support 214 generally from the Miami J collar.  The upper support 214, however, has improvements for securing to the main support 204 and features for increasing lateral immobilization.

[118]   The upper support 214 is arranged for easy attachment to the main support 204 by providing snap connections.  A central portion at the front section of the main support 204 may have boss snaps 218 that fit and interlock with a corresponding aperture defined by the main support 204.  Rear portions of the upper support 214 may define apertures corresponding to fasteners 220 formed by the main support 204 that engage the upper support 214, and aid in maintaining the upper support 214 in a desirable contour.  The ability to easily attach an upper support to the main support enables a clinician to use differently-sized upper supports according to the user's anatomy.  The upper and main supports may define apertures arranged for receiving fasteners not formed by either support, but are separate elements for securing the upper and main supports together.

[119]   The upper support 214 defines lateral extensions 226 on opposed sides thereof which are oriented to extend away from the central portion of the upper support, and effectively lengthen the extent the upper support extends along a user's mandibles.  The

OSS 000242

17/30

lateral extensions are found to aid in increasing lateral immobilization of a user when wearing the collar.

[120]  The anterior support 202 includes a lower support 206 hingedly connected to the main support 204, and the locking and unlocking of the hinge is obtained by a lock mechanism 212 that may be similar to any of the aforementioned embodiments. A lower or sternum pad 210 is attached to a lower or lowermost portion of the lower support 206. The lower support 206 may include an adjustment mechanism 208 for adjusting pressures and/or height of the lower pad 210 relative to the user's sternum.

[121]  Anterior support 202 has a cover 216 at the rearwardly portions, in contrast to the centrally located lock mechanism 212. The cover 216 generally covers the hinge connection between the main support 204 and the lower support 206, and further serves form part of the hinge connection. Specifically, the cover 216, forms a plurality of openings 232 through which posts 230 extend from the main support 204.

[122]  Fig. 11 depicts an embodiment of an elongate element or slidelock 240 useable in the hinge connection of the collar 200. The slidelock 240 defines a central rack 242 of teeth arranged to correspond and operatively engage elements forming part of the lock mechanism for enabling linear translation of the slidelock 240 relative to the main support, such as in the embodiment of Figs. 3A-4. The elements of the lock mechanism may be similar to the pinion of Fig. 4, or may be a linear rack of teeth, or any other suitable feature or mechanism for engaging the central rack 242.

[123]  In this embodiment, as shown in Fig. 10, the slidelock 240 preferably slides over an outer surface of the main support 204 to cooperate with the main support 204 to arrest or prevent rotation of the lower support 206 relative to the main support 204. The main support 204 and the cover 216, as shown below, operate to guide the linear movement of the slidelock. The linear movement of the slidelock is intended relative to a rear portion of main support within such discrete section, while acknowledging that the slidelock is bendable about the arcuate contour of the main support while traveling between opposed directions, as better depicted referring to Fig. 3A.

[124]  The slidelock 240 defines elongate segments 244 extending from opposed sides of the central rack 242 to paddles 250 located at end portions for forming part of the hinge connection. The paddles 250 generally corresponding in proximate location to the end

OSS 000243

portion 257 of the lower support 206, to stabilize the end portion 257 in both the locked and unlocked conditions. An opening 251 defined by the paddles 250 is arranged so the paddle 250 corresponds to the end portion 257 in both locked and unlocked conditions, whereby it is within the periphery of the end portion 257, as exemplified in Fig. 15B. The slidelock 240 forms hooks 246, 248 along the elongate segments 244 preferably extending from a first surface of the slidelock that are engageable with elastic elements, as discussed more in connection with Fig. 13.

[125]   Referring to Fig. 12, the slidelock 240 preferably defines ramp 258 intended to be on Side A of the collar (and ramp 268 intended to be on Side B of the collar in Fig. 14B) preferably extending from a second surface of the slidelock 240 where the elongate segments 244 meet the paddles 250. It is within this area where the travel of the slidelock is intended as traveling linearly. According to the depicted embodiment, the ramp 258 on Side A of the collar generally decreases in height from the paddle 250 toward the central rack 242 and from the second surface of the slidelock 240.

[126]   Referring to Fig. 14B, the ramp 268 on Side B of the collar generally increases in height from the paddle 250 toward the central rack 242 and from the second surface of the slidelock 240. In this manner, the ramps 258, 268 have oppositely oriented configurations to accommodate linear movement of the slidelock between locked and unlocked conditions so both Sides A, B undergo simultaneously the same locking or unlocking. The ramps 256, 267 have opposite orientations as the ramps 258, 268. Both ramps 258, 268 disengage at the same time from the corresponding ramps 256, 267 of the main support 204 in the unlocked condition, and engage at the same time with the corresponding ramps 256, 267 in the locked condition.

[127]   Figs. 13 and 14A depict how the slidelock 240 operates relative to other components of the anterior component 202. Specifically, the slidelock 240 is slidably held by the main support 204, similarly as in the embodiment of Figs. 3A-4, and may be likewise contained by the cover 216. The main support 204 defines a ramp 256 protruding from an outer surface and configured for engagement with the ramp 258 of the slidelock 240, which urges at least one engaging element 259 defined by a rear portion of the lower support 206 to engage at one engaging element 260 formed by the cover 216. The ramps 256, 258

OSS 000244

effectively wedge the at least one engaging elements 259, 260 against one another to lock the hinge connection.

[128]    According to the depicted example of Figs. 14 and 15A, the  end portion 257 of the lower support has a disk shape, and rotates about an axis Z-Z of the disk shape relative to a circular boss 262 of the cover 216.  The end portion 257 may have a central opening 263 coaxial with the axis Z-Z, which engages the boss 262 and is coaxial with an axis Y-Y of the boss 262.  The main support 204 has at least one post 261 extending through the opening 263 and through one of the openings 232 of the cover 216 for providing stability to rotation of the end portion 257.  As the ramps 256, 258 engage and disengage, the end portion 257 axially moves relative to the at least one post 261, and the boss 262 has a sufficient height to maintain the engagement of the end portion 257 in both the locked and unlocked conditions.  The cooperation of the ramps, and regulation thereof by the slidelock, control the height clearance in the hinge and the freedom of the disengagement of the lower support from the main support and/or cover.

[129]    As shown in Figs. 14A and 15A, the at least one engaging elements 259, 260 are teeth adapted to engage one another in a locked condition of the collar 200.  For simplicity, the cover 216 is shown transparently.  The at least one engaging element 259 of the lower support 206 forms teeth that extend laterally from the disk shape or parallel to the axis Z-Z of the end portion 257.  Preferably, the teeth extend laterally relative to the circumference of the end portion 257, and may extend completely or partially about the circumference. The at least one engaging element 260 of the cover 216 may be teeth oriented arcuately to smoothly engage the teeth of the at least one engaging element 259 of the lower support 206.

[130]    Fig. 14C shows how the ramps 256, 258 (for both Sides A and B) fall generally within a range of the at least one engaging elements 259, 260 to form an engagement zone 299 when the collar is in a locked condition.  According to the engagement zone, the ramps 256, 258 wedge against one another, and are generally juxtaposed or stacked-up coinciding over the at least one engaging elements 259, 260 to urge them to mesh together to assure secure locking of the main support to the lower support, and hence the cervical collar in a selective angulation.  According to the unlocked condition (not shown), the ramp 256 of the slidelock 240 falls outside of the engagement zone 299.

OSS 000245

20/30

[131]   It will be understood these are merely examples of the at least one engaging element, which are envisioned to be provided in different structural shapes and orientations, however they are preferably arranged to engage and disengage to lock or unlock the lower support orientation relative to the main support.  The cover sandwiches the end portion of the lower support with the main support, and the cover and main support are preferably rigidly secured to one another to assure they do not move relative to one another unlike the lower support relative to the main support in the unlocked condition.

[132]   Referring to Figs. 13 and 15A, the cover 216 may include hooks 252, as may the main support 204, to support an elastic band 254 suspended between the hook 252 and at least one of the hooks 246, 248 of the slidelock 240.  The elastic band 254 assists in assuring the lock mechanism is biased in a locked condition.  When the slidelock translates according to actuation by the lock mechanism to an unlocked condition that the elastic band is tensioned more than in the locked condition to form a spring return mechanism.

[133]   Fig. 15B exemplifies a variation of a cover 264 arranged to fit to the main support 204 by posts 278 arranged for snapping.  The main support 204 defines receptacles 269 configured and dimensioned to receive the posts 278 extending from the cover 264.  The posts 278 are configured and dimensioned to flexibly extend through or into the receptacles 269 but deflect while pressed through the receptacles 269 to relax once having passed the opening to interlock with the main support 204.  Various posts and receptacles are formed by the main support or the cover to interlock with one another.

[134]   In the variation of Fig. 15B, the main support 204 defines a boss 265 upon which the end portion 257 of lower support 206 rotates about.  The boss 265 may have the receptacles 269 located therewithin to receive the posts 278.

[135]   As depicted in Fig. 15B, the end portion 257 defines a plurality of teeth 266 only disposed about a segment short of the entire circumference of the end portion 257 to define a range of rotation of the lower support 206 relative to the main support 204.  It may be preferable to limit the rotation of the lower support to assure better selection of angles of the lower support relative to the upper support.

[136]   Either the cover 264 or the main support 204 may define at least one elongate guide 277 to guide the slidelock 240.  The cover 264 or main support 204 may define an elongate

OSS 000246

slot for observing and facilitating movement of the slidelock 240, which may cooperate with the elongate guide 277.

[137]   In a variation of the embodiments described herein, different spring return mechanisms may be provided for a slidelock or elongate element, preferably so that once a user releases the lock mechanism, the spring return mechanism moves the lock mechanism back to the locked condition.  The elongate element may include or have attached thereto a spring feature located at one of the end portions or along a length between the end portions arranged to deflect against a static boss located on the main support or other appropriate structure.

[138]   Referring to the examples of Figs. 16A and 16B, a spring feature may be configured into the elongate element, either behind or ahead of the hinge.  The spring feature may be connected to the elongate element as a separate component or be formed as part of the elongate element.

[139]   Fig. 16A depicts a slidelock 270 having a paddle 271 defining a compression spring feature 272 and extending from an arm 275.  The paddle 271 defines a frame 273 arranged for compression upon sliding of the slidelock 270, such that the spring feature 272 protrudes outwardly from the frame relative to the arm 275.  The frame 273 defines interior corner openings 274, 276 permitting it to be compressed upon activation of the slidelock.  The top opening 276 may secure a fastener or pin to the frame 273 upon which the paddle 271 compresses.

[140]   Fig. 16B depicts a slidelock 280 having a paddle defining a tension spring feature 282 and extending from an arm 285.  The paddle 281 defines a frame 283 arranged for tension upon sliding of the slidelock 280, such that the spring feature 282 protrudes inwardly from the frame toward the arm 285.  The frame 283 defines interior corner openings 284 permitting the paddle 281 to be pulled into tension upon activation of the slidelock.

[141]   Fig. 17 shows an alternate embodiment of a lock for the hinge which relies on a cam feature connected to or extending from the slidelock 290.  The end portions of the main support and the lower support may include a plurality of peripheral teeth about their peripheries which are arranged to engage one another as the cam feature is urged against the main and lower supports end portions, such that the teeth mesh with one another to

OSS 000247

22/30

prevent movement of the hinge formed by the end portions of the main support and lower support.

[142]   One of the main support or lower support end portions is located concentrically with one another, and one generally within the periphery of the other.  Both the main and lower supports may have an opening into which the cam feature can translate in and out of depending on the locking configuration of the lock mechanism.  The main support defines interiorly facing teeth 294A, 294B located about an interior circumference, and the lower support defines at least one movable set of teeth 296A, 296B that are selectively engageable with the teeth 294A, 294B upon movement of the slidelock 290.

[143]    The at least one movable set of teeth 296A, 296B may include two blocks bearing the teeth along one side and along another side forming bearing surfaces 298A, 298B along which the slidelock 290 engages.  The two movable sets of teeth 296A, 296B may form a first opening 295 into which the slidelock extends.  The slidelock 290 forms a flared end 292 defining first and second sloped surfaces 293A, 293B engageable with the bearing surfaces 298A, 298B for moving the sets of teeth 296A, 296B relative to the teeth 294A, 294B.  The sets of teeth 296A, 296B likewise form a second opening 297 through which the flared end 292 may be pushed through to reduce engagement of the sets of teeth 296A, 296B from the teeth 294A, 294B.

[144]   Figs. 18A-18D represent another hinge connection 300 that may be useable in any of the cervical collar embodiments described herein, particularly with a lock mechanism. The hinge connection 300 includes a slidelock 302, an end portion 304 of a main support, an end portion 306 of a lower support, and a cam element 311 located between the end portions 304, 306, and in operative engagement with the slidelock 302.  The cam element 311 includes at least one engaging element 316 of the slidelock 302 that is engageable with a corresponding at least one engaging element 326 of the end portion 306.  In this example, the at least one engaging element 316 is a plurality of teeth 318, and the at least one engaging element 326 are radially extending teeth.

[145]   The slidelock 302 is linearly displaceable relative to the end portion 304, by at least one pin 308 and slot 310 connection.  As shown, the slidelock 302 includes at least one pin 308 that is linearly slidable within a corresponding elongate slot 310.  In the depicted embodiment, there are three pins 308 and three corresponding elongate slots 310.

OSS 000248

23/30

[146]  Fig. 18B shows the cam element 311 having rear openings 320 arranged to flexibly bias against a periphery of the end portion 306 when in an unlocked condition to urge retraction of the slidelock once released into a locked condition.  The cam element 311 further defines front openings 324 spaced apart from a boss 322 defined by the end portion 306 upon which the end portion 304 rotates, and connected to one another from a front frame segment 328.  The front and rear frame segments 328, 330 extend about the boss 322, and are adapted to be tensioned thereabout.  The front openings 324 receive pins 309 extending oppositely to the at least one pin 308, and carried by arms 312 defined by the slidelock 302.

[147]  Fig. 18C shows the cam element 311 in a locked condition with the at least one engaging element 316 engaging the at least one engaging element 318.  The cam element 311 is in a predetermined rest position, whereby the rear frame segment 328 is tensioned about the boss 322 to maintain the at least one engaging element 316 locked.  Fig. 18D exemplifies the cam element 311 in an unlocked condition whereby the at least one engaging element 316 is pushed or pulled away from the at least one engaging element 318, and the front or rear frame segments 328, 330 are tensioned.

[148]  Turning to Figs. 19A-19B, the upper support 18 is slidably secured to the main support 16, such that continuous padding 28 is arranged about the main support 16.  The upper support 18 can be locked in position relative to the main support 16, after adjusting the correct position.  The main support 16 defines an elongate lateral slot 130 and the upper support 18 forms an elongate angled slot 132 arranged obliquely relative to the elongate slot 130 of the main support 16.  A slider 126 slidably couples the main support 16 and the upper support 18 by the lateral and angled slots 128, 130.  According to a variation, a knob of the slider may be rotated to unlock and lock the slider in a desired position.  As seen from the components shown, the rotation my simply comprise a tight frictional fit of the slider against the main support 16 and the upper support 18.  The lateral slot 130 is preferably arranged generally parallel to a length of the main support 16.

[149]  The main support 16 preferably defines a stationary element 128 proximate the lateral slot 130.  The slider 126 has a tightening feature 134 for maintaining the lateral and angled slots in a relative position to another.  Adjustment of the mandible angle could also be driven up/down through a simple rotating cam mechanism. The object is to elevate the

OSS 000249

posterior aspect of the chin tray to accommodate the slope of the mandible, thereby increasing stabilization against lateral movement of the head and C-Spine.

[150]    As in the embodiment of Figs. 2A and 2B, and referring specifically to Figs. 20 and 21, the adjustment mechanism 24 is located centrally along a lowermost portion of the lower support 20.  The adjustment mechanism 24 has a sternal pad 136 adjustable in location relative to the lower support 20.  The sternal pad 136 is mounted to a ball joint 142.  The adjustment mechanism 24 has an adjustment dial and an extension element 144 arranged for adjustably extending relative to the lower support 20.  The extension element 144 carries the ball joint 142 at an end thereof.  The adjustment mechanism 24 includes a dial 138 for adjusting the length of the extension element 144 between the lower support 20 and the sternal pad 136.  The dial 138 is accessible by a recess formed by the adjustment mechanism 24.

[151]    Figs. 22A and 22B show a variation of the adjustment mechanism 24 including a housing 145 arranged for receiving the extension element 144 in a contracted configuration resulting in a reduced or substantially minimized distance between the lower support and the sternal pad.  The extension element 145 has a screw thread 147, and the housing 145 defines corresponding threads permitting slidable movement between the extension element 145 and the screw thread 147 according to adjustment of the dial 138.

[152]    As in the embodiment of Figs. 2A and 2B, and referring to Figs. 23A and 23B, a connector 26 connects the anterior component 12 to the posterior component 14.  The connector 26 includes a base element 148 securing to a plate 150, and the base element 148 has a strap guide 152 about which a strap 146 extending from the posterior component 14 extends.  The connector 26 has a pull tab 154 arranged for detaching the plate 150 from the base 148.

[153]    Figs. 24A and 24B display another embodiment of a connector 160 securing to a plate 164.  A cap 166 is arranged to extend over the base element 162 and secure therewith.  The connector 160 includes a pull tab 170 arranged for detaching the plate 160 from the base element 162 and the cap 166.  The cap 166 defines an opening 168 with the plate 160 for permitting a strap 172 extending therethrough which secures to the posterior component.  The base element 162 defines a platform 178 about which the strap 172

OSS 000250

25/30

extends, and the platform 178 has at least one protuberance 180 over which the strap 172 extends.

[154]   The base element 162 further defines a channel guide 182 proximate to the opening 168 and through which the strap 172 extends.  The base element 162 forms at least one detent 188 proximate to the at least one protuberance 180 for selective engagement of the strap 172 with the at least one protuberance 180.  When the connector 160 is in a locked condition, the at least one protuberance 180 and the at least one detent 188 arrest the strap 172 from movement as they are urged against each other.

[155]   The plate 164 defines at least one retainer 186 having a channel 190 for selectively receiving a pin 184 protruding from the base element 162, such that the pin 184 slides within the channel 190 between locked and unlocked conditions of the connector 160.  The cap 166 defines a side recess 174 for sliding the cap 166 and base element 162 relative to the plate 164 and permitting the at least one retainer 186 to move therewithin.  The cap 166 defines a front recess 176 through which the strap 172 extends.

[156]   The features may be employed in different combinations from those shown in a cervical collar.  While the foregoing embodiments have been described and shown, alternatives and modifications of these embodiments, such as those suggested by others, may be made to fall within the invention.

OSS 000251

26/30

Claims

1.  A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising:

a main support;

a lower support hingedly connected to the main support at first and second end portions of the anterior component;

a lock mechanism arranged for locking rotation of the lower support relative to the main support simultaneously at the first and second end portions;

an elongate element operatively connected to the lock mechanism and extending to the first and second end portions such that actuation of the lock mechanism moves the elongate element relative to the first and second end portions to lock and unlock the main support relative to the lower support.

2. The cervical collar of claim 1, wherein the lock mechanism includes an actuator for adjusting the lock mechanism from locked to unlocked conditions.

3.  The cervical collar of claim 1, wherein the elongate element has first and second ends engaging the first and second end portions, the first and second ends arranged for adjusting relative to the first and second end portions between locked and unlocked conditions of the lock mechanism.

4.  The cervical collar of claim 3, wherein the elongate element is a single-piece displaceable in its entirety relative to the main support upon adjustment by the lock mechanism.

**OSS 000252**

27/30

5.  The cervical collar of claim 3, wherein the first and second ends of the elongate element are spatially located differently relative to the first and second end portions when in the locked condition.

6.  The cervical collar of claim 3, wherein the first end of the elongate element is axially offset from end portions of the main support and the lower support at the first hinge in the locked condition, the end portions of the main support and lower support being coaxial with one another.

7.  The cervical collar of claim 3, wherein the elongate element is slidably located within an arcuate guide defined by the main support.

8.  The cervical collar of claim 3, wherein the elongate element is biased relative to the main support in a first configuration according to an elastic element attached thereto.

9.  The cervical collar of claim 3, wherein the elongate element and the main support have cooperating ramps along which the elongate element slides relative to between the locked and unlocked conditions.

10.  The cervical collar of claim 9, wherein the ramps coincide with an end portion of the lower support, an end portion of the main support being coaxial with the end portion of the lower support, and the end portion of the lower support movable along an axis thereof relative to the main support according to a position of the ramps relative to one another.

11.  The cervical collar of claim 10, further comprising a cover extending over the end portion of the lower support, the end portion of the lower support having at least one engaging element arranged to interlock with at least one engaging element of the cover when the elongate element is in a locked condition.

OSS 000253

28/30

12. The cervical collar of claim 11, wherein in the unlocked condition, the ramps are disengaged from one another, and the at least one engaging element of the lower support is disengaged from the at least one engaging element of the cover.

13. The cervical collar of claim 3, wherein the lock mechanism includes a pinion and a rack segment for adjusting position of the elongate element.

14. The cervical collar of claim 13, wherein the elongate element defines a central rack of teeth arranged to engage the pinion.

15. The cervical collar of claim 13, wherein the lock mechanism includes a pinion including a shaft extending between the outer and inner sides of the main support and a pinion portion at a first end of the shaft, the shaft engaging an actuator on the outer side of the main support at a second end of the shaft, the pinion portion engaging a rack segment defined by the elongate element, wherein rotation of the shaft urges the elongate element to slide relative to the main support.

16. A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising:

a main support;

a lower support hingedly connected to the main support at first and second end portions of the anterior component;

an elongate element having first and second ends engaging the first and second end portions, the first and second ends arranged for adjusting relative to the first and second end portions;

OSS 000254

29/30

a lock mechanism arranged for locking rotation of the lower support relative to the main support, and moving the elongate element between locked and unlocked conditions such that the elongate element is biased into the locked condition.

17.  The cervical collar of claim 16, further comprising first and second covers arranged to extend over the first and second end portions, the first and second covers each having at least one engaging element arranged to interlock with at least one locking element defined by the lower support.

18.  The cervical collar of claim 17, further comprising at least one elastic element cooperating with the main support or cover, and engaging the elongate element to bias the elongate element in the locked condition.

19.  The cervical collar of claim 17, further comprising an upper support support securing to and resting upon the anterior component.

20.  A method for adjusting an angle defined between a main support and a lower support of an anterior component of a cervical collar, the method comprising:

moving an elongate element relative to the main support and the lower support;

disengaging a part of the main support from a corresponding part of the elongate element to unlock the lower support from the main support;

moving the lower support relative to the main support;

engaging part of the main support to the corresponding part of the elongate element to lock the lower support to the main support.

ABRACT OF THE DISCLOSURE

OSS 000255

30/30

A cervical collar has an anterior component including a lower support that is adjustable in angle relative to a main support. The lower support is hingedly connected to the main support at first and second end portions.  An elongate element engages the first and second end portions.  A lock mechanism is operative connected to the elongate element, and is arranged for locking rotation of the lower support relative to the main support, by moving the elongate element between locked and unlocked conditions.

OSS 000256

1/2

## DECLARATION & ASSIGNMENT

### DECLARATION

Title of Invention: **CERVICAL COLLAR**

As the below named inventor, I hereby declare that:

This declaration is directed to:

☒   The accompanying utility or design patent application, or

☐   United States application or Patent Cooperative Treaty international

application number:

filed on

1.  The above-identified application was made or authorized to be made by me.

2.  I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

3.  I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

Direct all correspondence to the address associated with **Customer Number: 22913**.

*By signing this declaration, the inventor confirms that the application, including the claims, has been read and understood and that the inventor is aware of the duty to disclose to the U.S. Patent and Trademark Office all information known to the inventor to be material to patentability as defined in 37 CFR§1.56.*

*I authorize an attorney or agent associated with the Customer Number authorized to act in this application to fill in an "Attorney Docket No."; the application number, the filing date, and any other information desirable to identify the application, on the pages of this declaration and assignment, after I sign.*

### ASSIGNMENT

WHEREAS, I,  the below named inventor, hereinafter referred to as ASSIGNOR, is the or an owner of certain new and useful improvements in the above identified application(hereinafter referred to as the INVENTION).

WHEREAS, **Ossur Iceland ehf**

whose post office address is/are  **Grjothals 5, 110 Reykjavik, Iceland**

Docket No.:  19793.488.1
AIA Declaration/Assignment World rev. 20FEB15

OSS 000257

**-406-**

2/2

hereinafter referred to as ASSIGNEE, is desirous of acquiring the entire right, title and interest in and to the INVENTION in the United States;

NOW, THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, I, ASSIGNOR, by these presents do sell, assign and transfer unto said ASSIGNEE, the entire right, title, and interest in and to said INVENTION and application throughout the United States of America, including any and all Letters Patent granted on any division, continuation, continuation-in-part and reissue of said application; and the entire right, title and interest in and to the said INVENTION throughout the world, including the right to apply for patents and inventor certificates in respect thereof and to claim priority pursuant to rights accorded ASSIGNOR under the terms of the Paris International Convention and all other available international conventions and treaties; and the entire right, title and interest in and to any and all patents, patents of addition, utility models, patents of importation, revalidation patents and inventor certificates which may be granted throughout the world in respect of said INVENTION.

ALSO, ASSIGNOR hereby agrees to execute any documents that legally may be required in connection with the filing, prosecution and maintenance of said application or any other patent application(s) in the United States for said INVENTION, including additional documents that may be required to affirm the rights of ASSIGNEE in and to said INVENTION, all without further consideration. ASSIGNOR also agrees, without further consideration and at ASSIGNEE'S expense, to identify and communicate to ASSIGNEE at ASSIGNEE'S request documents and information concerning the INVENTION that are within ASSIGNOR'S possession or control, and to provide further assurances and testimony on behalf of ASSIGNEE that lawfully may be required of ASSIGNOR in respect of the prosecution, maintenance and defense of any patent application or patent encompassed within the terms of this instrument. ASSIGNOR'S obligations under this instrument shall extend to ASSIGNOR'S heirs, executors, administrators and other legal representatives.

ALSO, ASSIGNOR hereby authorizes and requests the Commissioner of Patents and Trademarks to issue any and all Letters Patent referred to above to ASSIGNEE, as the ASSIGNEE of the entire right, title and interest in and to the same, for ASSIGNEE'S sole use and behoof; and for the use and behoof of ASSIGNEE'S legal representatives and successors, to the full end of the term for which such Letters Patent may be granted, as fully and entirely as the same would have been held by ASSIGNOR had this assignment and sale not been made.

| LEGAL NAME OF INVENTOR/ASSIGNOR | | | |
|---|---|---|---|
| Name: | **Wayne CALCO** | Date: | |
| Signature: | | | |

Docket No.: 19793.488.1
AIA Declaration/Assignment World rev. 20FEB15

OSS 000258

# EXHIBIT 16

| | |
|---|---|
| **From:** | Wayne Calco <calco.wayne@me.com> |
| **Sent:** | Friday, February 24, 2017 10:06 AM |
| **To:** | IS IP Administrator |
| **Cc:** | Tatjana Latinovic; Þorvaldur Ingvarsson |
| **Subject:** | Re: Documents for Signature; Your ref: P2810US00; WN ref: 19793.488.1 [IWOV-1.FID1778896] |

Hello Caroline,

I am not available right now, I am on my way to the Chicago. I have questions about the project that I need to discuss with Thorvalder. My attorney advised that it is very common to file the signatures after the fact so there should be no issues. I will schedule a call with Thorvalder and afterward we can execute the documents.

Best regards,

Wayne Calco


> On Feb 24, 2017, at 5:45 AM, IS IP Administrator <ipadministrator@ossur.com> wrote:
>
> Hi,
>
> Please find the final draft for the regular US application. Please review the application and drawings and if you are fine with it, please send me your signed declaration ASAP via e-mail. The deadline for filing the application is next Monday, Feb. 27.
>
> Thanks
> Caroline
>
>
> Kind Regards
>
> <image005.gif>    Caroline Levasseur
> IP Administrator, Research & Development
> Document Controller for Product Documentation
> Össur Head Office
> Grjothals 1-5
> 110 Reykjavik
> Iceland
>
> Tel: +354 664 1113
> E-mail: ipadministrator@ossur.com
> www.ossur.com
> Email-disclaimer
>
> <image006.gif><image007.gif><image008.gif>
>
> <19793.488.1_Formal Drawings.pdf><19793-488-1_specification.docx><CALCO - declaration_assignment (for signature).pdf>

1

**OSS 000259**

# EXHIBIT 17

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/686.582 | 11/18/2019 | Wayne CALCO | 19793.488.1.1 | 4587 |

22913        7590        02/17/2022
Workman Nydegger
60 East South Temple
Suite 1000
Salt Lake City, UT 84111

| EXAMINER |
|---|
| HAWTHORNE, OPHELIA ALTHEA |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3786 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 02/17/2022 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

docketing@wnlaw.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No.<br>16/686,582 | Applicant(s)<br>CALCO et al. | |
|---|---|---|---|
| | Examiner<br>OPHELIA A HAWTHORNE | Art Unit<br>3786 | AIA (FITF) Status<br>Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

    A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

  1) ☑ Responsive to communication(s) filed on <u>18 November 2019</u>.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
  2a) ☐ This action is **FINAL.**    2b) ☑ This action is non-final.
  3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
  4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

  5) ☑ Claim(s) <u>1-20</u> is/are pending in the application.
    5a) Of the above claim(s) _____ is/are withdrawn from consideration.
  6) ☐ Claim(s) _____ is/are allowed.
  7) ☑ Claim(s) <u>1-12,16-17 and 19-20</u> is/are rejected.
  8) ☑ Claim(s) <u>13-15 and 18</u> is/are objected to.
  9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

\* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

  10) ☑ The specification is objected to by the Examiner.
  11) ☑ The drawing(s) filed on <u>18 November 2019</u> is/are:  a) ☐ accepted or  b) ☑ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

  12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
    a) ☐ All    b) ☐ Some**    c) ☐ None of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____.
      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)
2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date _____.
3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date _____.
4) ☐ Other: _____.

U.S. Patent and Trademark Office

PTOL-326 (Rev. 11-13)            **Office Action Summary**            Part of Paper No./Mail Date 20220202

Application/Control Number: 16/686,582                                          Page 2
Art Unit: 3786

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

The present application, filed on or after March 16, 2013, is being examined under the

first inventor to file provisions of the AIA.

### *Specification*

The specification is objected to as failing to provide proper antecedent basis for the

claimed subject matter.  See 37 CFR 1.75(d)(1) and MPEP § 608.01(o).  Correction of the

following is required: in claim 8 the limitation "the main support is **only c**onnected to the lower

support at end portions of each of the main support and lower support" is not found to have

proper antecedent basis for this claimed subject matter in the original filed disclosure.

### *Claim Interpretation*

The following is a quotation of 35 U.S.C. 112(f):

> (f) Element in Claim for a Combination. – An element in a claim for a combination may be expressed
> as a means or step for performing a specified function without the recital of structure, material, or acts
> in support thereof, and such claim shall be construed to cover the corresponding structure, material, or
> acts described in the specification and equivalents thereof.

The following is a quotation of pre-AIA 35 U.S.C. 112, sixth paragraph:

> An element in a claim for a combination may be expressed as a means or step for performing a
> specified function without the recital of structure, material, or acts in support thereof, and such claim
> shall be construed to cover the corresponding structure, material, or acts described in the specification
> and equivalents thereof.

The claims in this application are given their broadest reasonable interpretation using the

plain meaning of the claim language in light of the specification as it would be understood by

one of ordinary skill in the art.  The broadest reasonable interpretation of a claim element (also

Application/Control Number: 16/686,582                                          Page 3
Art Unit: 3786

commonly referred to as a claim limitation) is limited by the description in the specification

when 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, is invoked.

As explained in MPEP § 2181, subsection I, claim limitations that meet the following

three-prong test will be interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth

paragraph:

(A)      the claim limitation uses the term "means" or "step" or a term used as a substitute for

         "means" that is a generic placeholder (also called a nonce term or a non-structural term

         having no specific structural meaning) for performing the claimed function;

(B)      the term "means" or "step" or the generic placeholder is modified by functional

         language, typically, but not always linked by the transition word "for" (e.g., "means for")

         or another linking word or phrase, such as "configured to" or "so that"; and

(C)      the term "means" or "step" or the generic placeholder is not modified by sufficient

         structure, material, or acts for performing the claimed function.

Use of the word "means" (or "step") in a claim with functional language creates a

rebuttable presumption that the claim limitation is to be treated in accordance with 35 U.S.C.

112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph. The presumption that the claim limitation is

interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, is rebutted when

the claim limitation recites sufficient structure, material, or acts to entirely perform the recited

function.

Absence of the word "means" (or "step") in a claim creates a rebuttable presumption that

the claim limitation is not to be treated in accordance with 35 U.S.C. 112(f) or pre-AIA 35

U.S.C. 112, sixth paragraph. The presumption that the claim limitation is not interpreted under

35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, is rebutted when the claim

Application/Control Number: 16/686,582                                    Page 4
Art Unit: 3786

limitation recites function without reciting sufficient structure, material or acts to entirely

perform the recited function.

    Claim limitations in this application that use the word "means" (or "step") are being

interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, except as

otherwise indicated in an Office action. Conversely, claim limitations in this application that do

not use the word "means" (or "step") are not being interpreted under 35 U.S.C. 112(f) or pre-

AIA 35 U.S.C. 112, sixth paragraph, except as otherwise indicated in an Office action.

    This application includes one or more claim limitations that do not use the word "means,"

but are nonetheless being interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth

paragraph, because the claim limitation(s) uses a generic placeholder that is coupled with

functional language without reciting sufficient structure to perform the recited function and the

generic placeholder is not preceded by a structural modifier.  Such claim limitation(s) is/are: an

adjustment mechanism as set forth in claims 1-6,13-14 and 19-20; a locking mechanism as set

forth in claims 7 and 16.

    Because this/these claim limitation(s) is/are being interpreted under 35 U.S.C. 112(f) or

pre-AIA 35 U.S.C. 112, sixth paragraph, it/they is/are being interpreted to cover the

corresponding structure described in the specification as performing the claimed function, and

equivalents thereof.

    Note: there are a variation of "the adjustment mechanisms" disclosed in Applicant's

specification.

    As per paragraph [0141] of the specification, the adjustment mechanism 24 has an

adjustment dial and an extension element 144 arranged for adjustably extending relative to the

lower support 20. The extension element 144 carries the ball joint 142 at an end thereof. The

Application/Control Number: 16/686,582                                              Page 5
Art Unit: 3786

adjustment mechanism 24 includes a dial 138 for adjusting the length of the extension element

144 between the lower support 20 and the sternal pad 136. As per paragraph [0142] FIGS. 22A

and 22B show a variation of the adjustment mechanism 24 including a housing 145 arranged for

receiving the extension element 144 in a contracted configuration resulting in a reduced or

substantially minimized distance between the lower support and the sternal pad. The extension

element 145 has a screw thread 147, and the housing 145 defines corresponding threads

permitting slidable movement between the extension element 145 and the screw thread 147

according to adjustment of the dial 138.

As per paragraph [0094] The lock mechanism 22 includes an actuator or dial 30 for

adjusting the lock mechanism 22 from locked to unlocked conditions and [0113] FIG. 11 depicts

an embodiment of an elongate element or slidelock 240 useable in the hinge connection of the

collar 200. The slidelock 240 defines a central rack 242 of teeth arranged to correspond and

operatively engage elements forming part of the lock mechanism for enabling linear translation

of the slidelock 240 relative to the main support, such as in the embodiment of FIGS. 3A-4. The

elements of the lock mechanism may be similar to the pinion of FIG. 4, or may be a linear rack

of teeth, or any other suitable feature or mechanism for engaging the central rack 242.

If applicant does not intend to have this/these limitation(s) interpreted under 35 U.S.C.

112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, applicant may: (1) amend the claim

limitation(s) to avoid it/them being interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112,

sixth paragraph (e.g., by reciting sufficient structure to perform the claimed function); or (2)

present a sufficient showing that the claim limitation(s) recite(s) sufficient structure to perform

the claimed function so as to avoid it/them being interpreted under 35 U.S.C. 112(f) or pre-AIA

35 U.S.C. 112, sixth paragraph.

Application/Control Number: 16/686,582                                    Page 6
Art Unit: 3786

### *Claim Rejections - 35 USC § 112*

1.      The following is a quotation of 35 U.S.C. 112(a):
(a) IN GENERAL.—The specification shall contain a written description of the invention, and of
the manner and process of making and using it, in such full, clear, concise, and exact terms as to
enable any person skilled in the art to which it pertains, or with which it is most nearly
connected, to make and use the same, and shall set forth the best mode contemplated by the
inventor or joint inventor of carrying out the invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), first paragraph:
The specification shall contain a written description of the invention, and of the manner and
process of making and using it, in such full, clear, concise, and exact terms as to enable any
person skilled in the art to which it pertains, or with which it is most nearly connected, to make
and use the same and shall set forth the best mode contemplated by the inventor of carrying out
his invention.

2.      Claim 8 is rejected under 35 U.S.C. 112(a) or 35 U.S.C. 112 (pre-AIA), first paragraph,

as failing to comply with the written description requirement.  The claim(s) contains subject

matter which was not described in the specification in such a way as to reasonably convey to one

skilled in the relevant art that the inventor or a joint inventor, or for pre-AIA the inventor(s), at

the time the application was filed, had possession of the claimed invention.  The added material

which is not supported by the original disclosure is as follows: " wherein the main support is

only connected to the lower support at end portions of each of the main support and lower

support ".  The original filed disclosure does not provide evidence that Applicant possessed these

claim limitations at the time the application was filed.

An objective standard for determining compliance with the written description

requirement is, "does the description clearly allow persons of ordinary skill in the art to

recognize that he or she invented what is claimed." *In reGosteli*, 872 F.2d 1008, 1012, 10

USPQ2d 1614, 1618 (Fed. Cir. 1989). Under *Vas-Cath, Inc.v. Mahurkar*, 935 F.2d 1555, 1563-

64, 19 USPQ2d 1111, 1117 (Fed. Cir. 1991), to satisfy the written description requirement, an

applicant must convey with reasonable clarity to those skilled in the art that, as of the filing date

Application/Control Number: 16/686,582                                     Page 7
Art Unit: 3786

sought, he or she was in possession of the invention, and that the invention, in that context, is

whatever is now claimed. The test for sufficiency of support in a parent application is whether

the disclosure of the application relied upon "reasonably conveys to the artisan that the inventor

had possession at that time of the later claimed subject matter." *Ralston Purina Co.v.Far-Mar-*

*Co., Inc.*, 772 F.2d 1570, 1575, 227 USPQ 177, 179 (Fed. Cir. 1985) (quoting *In reKaslow*, 707

F.2d 1366, 1375, 217 USPQ 1089, 1096 (Fed. Cir. 1983)).


### *Claim Rejections - 35 USC § 102*

In the event the determination of the status of the application as subject to AIA 35 U.S.C.

102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the

statutory basis for the rejection will not be considered a new ground of rejection if the prior art

relied upon, and the rationale supporting the rejection, would be the same under either status.

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(a)(1) the claimed invention was patented, described in a printed publication, or in public use, on sale,
or otherwise available to the public before the effective filing date of the claimed invention.

3. **Claim(s) 1-2, 4-7, 9-12 and 16-17 are rejected under 35 U.S.C. 102(a)(1) as being**

**anticipated by Martin et al. *U.S. Publication No*. (20160008158 A1).**

With respect to claim 1, Martin et al. discloses a cervical collar (100, figs.1-8B) having

an anterior or front component arranged for connecting to a posterior or back component, the

anterior component comprising:

a main support or chin support (104);

Application/Control Number: 16/686,582                                    Page 8
Art Unit: 3786

a lower support (114) hingedly or pivotal connected via (pivotal connection 118) and

[0042] to the main support (138, fig.1D);

a sternum pad (114, fig.1C); and

an adjustment mechanism (108, fig.2) and [0045] and [0052] located on the lower

support and the sternum pad is connected thereto such that the sternum pad is movable relative to

the lower support.

With respect to claim 2, Martin et al. discloses the adjustment mechanism (108) is located

at a lowermost portion of the lower support (as shown in fig.3).

With respect to claim 4, Martin et al. discloses the adjustment mechanism (108) includes

an extension element or height adjustment member (122) variably extendable from the

adjustment mechanism (108). The extension element or height adjustment member extends

through height adjustment aperture (120) and [0047]. **The height adjustment aperture 120 may**

**be an opening through a side portion 116 that permits a height adjustment member 122 to**

**externally extend through the main collar body 102 and translate through the height adjustment**

**aperture 120 relative to the main collar body 102 [0047].**

With respect to claim 5, Martin et al. discloses the adjustment mechanism includes a dial

(108) for adjusting a distance the extension element or height adjustment member (122) extends

from the adjustment mechanism. The extension element or height adjustment member extends

through height adjustment aperture (120) and [0047]. The extension element or height

adjustment member extends through height adjustment aperture (120) and [0047] and extends

from the adjustment member (108).

With respect to claim 6, Martin et al. discloses the adjustment mechanism (108) includes

a housing (shown in the reproduced image of fig.3 below) arranged for receiving the extension

Application/Control Number: 16/686,582                                    Page 9
Art Unit: 3786

element or height adjustment member (122) in a contracted configuration [0055. The height

adjustment aperture 120 may comprise openings through the main collar body 102 on the side

portions 116. In the embodiments shown, the main collar body 102 comprises two height

adjustment apertures 120, but in other embodiments, one or more than two apertures may be

formed according to the needs of the designer. Height adjustment apertures 120 may beneficially

be formed adjacent to or within the portions of the internal surface 134 having ridges 142. This

may allow the movement of the height adjustment member 122 inward or (contracted) and

outward in the height adjustment aperture 120 to more directly affect the position of the ridges

142 relative to ridges 144 on the chin support member 104 than ridges positioned farther from

the aperture 120].



FIG. 3

Application/Control Number: 16/686,582                                           Page 10
Art Unit: 3786

With respect to claim 7, Martin et al. discloses the main support (104) carries a lock

mechanism (108) for locking rotation of the lower support relative to the main support [0048, in

conjunction with the pivotal connections 118, the chin support member or main support 104 may

thus tilt or rotate along a path defined by travel of the height adjustment members 122 along the

height adjustment apertures 120. The height adjustment members 122 may be prevented from

withdrawal through the height adjustment apertures 120 by interference with the locking

members 108 and/or by tabs extending radially from the end of the members 122. See, e.g., tabs

550 in FIG. 5.

With respect to claim 9, Martin et al. discloses the main support carries an upper support

(200, fig.3) connected to inside the main support and oriented to face a mandible of a user [0059,

padding 200 is attached to main support or chin support 104 shown in fig.2, as such, when

assembled and worn supports the mandible of the user].

With respect to claim 10, Martin et al. discloses the upper support is maintained in a

stationary relationship with the main support (shown in fig.3 when assembled and donned to the

anatomy of the user).

With respect to claim 11, Martin et al. discloses the upper support (200) is rigid (the

support impart some degree of rigidity).

With respect to claim 12, Martin et al. discloses the main support (138, fig.2) has a

generally arcuate configuration adapted to extend about the mandible of a user (as shown in

fig.3), and the lower support (114) has a generally arcuate configuration contoured for being

adapted for securing against a sternum of the user (as shown in fig.3).

With respect to claim 16, Martin et al. discloses a lock mechanism or ridges for locking

rotation of the lower support (114) relative to the main support or chin support (104), the lock

Application/Control Number: 16/686,582                                        Page 11
Art Unit: 3786

mechanism coupled to a slidelock arranged for operatively engaging end portions of the main

support and lower support for locking and unlocking rotation of the lower support relative to the

main support (abstract. as the locking member is moved between locked and unlocked positions,

ridges on a main collar body and on a chin support member may be interlocked or allowed to

slide over each other from one desired position to another) and [0039, ridges may be provided on

opposing surfaces of the chin support member and the main collar body that interlock in a

plurality of positions corresponding to various heights of the front of the chin support member.

These ridges may be made either relatively slidable or relatively immobilized upon movement of

a tensioning member or locking member].

   With respect to claim 17, Martin et al. discloses the slidelock defines a central rack of

teeth (142 and 144, an example is shown in fig.4A) arranged to correspond to and operatively

engage elements forming part of the lock mechanism for enabling linear translation of the

slidelock relative to the main support [0050].

With respect to claim 18. The cervical collar of claim 16, wherein the slidelock slides over an

outer surface of the main support to cooperate with the main support to arrest or prevent rotation

of the lower support relative to the main support.


### *Claim Rejections - 35 USC § 103*

   In the event the determination of the status of the application as subject to AIA 35 U.S.C.

102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the

statutory basis for the rejection will not be considered a new ground of rejection if the prior art

relied upon, and the rationale supporting the rejection, would be the same under either status.

Application/Control Number: 16/686,582                                      Page 12
Art Unit: 3786

The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness

rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not
> identically disclosed as set forth in section 102, if the differences between the claimed invention and the
> prior art are such that the claimed invention as a whole would have been obvious before the effective
> filing date of the claimed invention to a person having ordinary skill in the art to which the claimed
> invention pertains. Patentability shall not be negated by the manner in which the invention was made.

4.      **Claims 3 and 8 are rejected under 35 U.S.C. 103 as being unpatentable over Martin**

**et al. as applied to claims 1 and 2 above, and further in view of Suarez et al.** *U.S.*

*Publication No.* **(20130281899 A1).**

With respect to claim 3, Martin et al. substantially discloses the invention as claimed

except the adjustment mechanism is located centrally at the lowermost portion of the lower

support.

Suarez et al., however, teaches in an analogous art, a cervical collar (shown in figs.1-2)

comprising a lower support (20) comprising adjustment mechanism or dial (60, figs.1-2) is

located centrally (shown in figs.1-2) at the lowermost portion of the lower support (20).

In view of the teachings of Suarez et al., it would have been obvious to one of ordinary

skill in the art before the effective filing date of the invention to modify the cervical collar of

Martin et al. by positioning the adjustment mechanism is located centrally at the lowermost

portion of the lower support for **adjusting to and away from a sternum of a user for improving**

**comfort and fit of the cervical collar.**

With respect to claim 8, the combination of Martin et al./Suarez et al. substantially

discloses the invention as claimed.  Suarez et al. further teaches the main support is only

connected to the lower support at end portions of each of the main support and lower support (as

shown in fig.1).

Application/Control Number: 16/686,582                                            Page 13
Art Unit: 3786

5.      **Claims 19-20 are rejected under 35 U.S.C. 103 as being unpatentable over Martin et al. _U.S. Publication No._ (20160008158 A1) in view of Suarez et al. _U.S. Publication No._ (20130281899 A1).**

With respect to claim 19, Martin et al. discloses a cervical collar (100, figs 1-8B) having an anterior or front component arranged for connecting to a posterior or back component, the anterior component comprising:

a main support or chin support (104);

a lower support (114) hingedly or pivotal connected via (pivotal connection 118) and [0042] to the main support (138, fig.1D);

a sternum pad (114, fig.1C); and

an adjustment mechanism (108, fig.2) and [0045] and [0052] located on the lower support the sternum pad (114) being connected to the adjustment mechanism such that the sternum pad is movable relative to the lower support [0043, **The height of the chin support member 104 may be referred to as the relative distance between a front portion 124 of the chin support member 104 and a front portion 114 of the main collar body 102. A lower height is a smaller distance between the front portions 114, 124, and a higher or taller height is a larger distance between them];**

the adjustment mechanism (108) including an extension element or height adjustment member (122) variably extendable from the adjustment mechanism (108) and securing to the sternum pad; The extension element or height adjustment member extends through height adjustment aperture (120) and [0047]. **The height adjustment aperture 120 may be an opening through a side portion 116 that permits a height adjustment member 122 to externally extend through the main collar body 102 and translate through the height adjustment aperture 120 relative to the main collar body 102 [0047]; and a housing (shown in the reproduced image of**

Application/Control Number: 16/686,582                                          Page 14
Art Unit: 3786

fig.3 below) arranged for receiving the extension element or height adjustment member (122) in a contracted configuration [0055, The height adjustment aperture 120 may comprise openings through the main collar body 102 on the side portions 116. In the embodiments shown, the main collar body 102 comprises two height adjustment apertures 120, but in other embodiments, one or more than two apertures may be formed according to the needs of the designer. Height adjustment apertures 120 may beneficially be formed adjacent to or within the portions of the internal surface 134 having ridges 142. This may allow the movement of the height adjustment member 122 inward or (contracted) and outward in the height adjustment aperture 120 to more directly affect the position of the ridges 142 relative to ridges 144 on the chin support member 104 than ridges positioned farther from the aperture 120].

Martin et al. substantially discloses the invention as claimed except the adjustment mechanism is located centrally at the lowermost portion of the lower support.

Suarez et al., however, teaches in an analogous art, a cervical collar (shown in figs.1-2) comprising a lower support (20) comprising adjustment mechanism or dial (60, figs.1-2) is located centrally (shown in figs.1-2) at the lowermost portion of the lower support (20).

In view of the teachings of Suarez et al., it would have been obvious to one of ordinary skill in the art before the effective filing date of the invention to modify the cervical collar of Martin et al. by positioning the adjustment mechanism is located centrally at the lowermost portion of the lower support for adjusting to and away from a sternum of a user for improving comfort and fit of the cervical collar.

Application/Control Number: 16/686,582                                          Page 15
Art Unit: 3786



**FIG. 3**

With respect to claim 20, Martin et al. discloses a cervical collar (100, figs. 1-8B) having

an anterior or front component arranged for connecting to a posterior or back component, the

anterior component comprising:

a rigid main support or chin support (104) and [0044, chin support comprises a generally

rigid material **such as a polymer or composite material**];

a lower support (114) hingedly or pivotal connected via (pivotal connection 118) and

[0042] to the main support (138, fig. 1D);

a lock mechanism or dial (108) mounted to the rigid main support and arranged for

locking rotation of the lower support (114) relative to the rigid main support or chin support

(104) at the end portions thereof [0048, **in conjunction with the pivotal connections 118, the chin**

Application/Control Number: 16/686,582                                    Page 16
Art Unit: 3786

support member or main support 104 may thus tilt or rotate along a path defined by travel of the

height adjustment members 122 along the height adjustment apertures 120. The height

adjustment members 122 may be prevented from withdrawal through the height adjustment

apertures 120 by interference with the locking members 108 and/or by tabs extending radially

from the end of the members 122. See, e.g., tabs 550 in FIG. 5.

        a sternum pad (114, fig.1C); and

an adjustment mechanism (108, fig.2) and [0045] and [0052] located on the lower support the

sternum pad (114) being connected to the adjustment mechanism such that the sternum pad is

movable relative to the lower support [0043. The height of the chin support member 104 may be

referred to as the relative distance between a front portion 124 of the chin support member 104

and a front portion 114 of the main collar body 102. A lower height is a smaller distance between

the front portions 114, 124, and a higher or taller height is a larger distance between them];

        the adjustment mechanism (108) including an extension element or height adjustment

member (122) variably extendable from the adjustment mechanism (108) and securing to the

sternum pad; The extension element or height adjustment member extends through height

adjustment aperture (120) and [0047].  The height adjustment aperture 120 may be an opening

through a side portion 116 that permits a height adjustment member 122 to externally extend

through the main collar body 102 and translate through the height adjustment aperture 120

relative to the main collar body 102 [0047]; and a housing (shown in the reproduced image of

fig.3 below) arranged for receiving the extension element or height adjustment member (122) in

a contracted configuration [0055. The height adjustment aperture 120 may comprise openings

through the main collar body 102 on the side portions 116. In the embodiments shown, the main

collar body 102 comprises two height adjustment apertures 120, but in other embodiments, one

Application/Control Number: 16/686,582                                    Page 17
Art Unit: 3786

or more than two apertures may be formed according to the needs of the designer. Height

adjustment apertures 120 may beneficially be formed adjacent to or within the portions of the

internal surface 134 having ridges 142. This may allow the movement of the height adjustment

member 122 inward or (contracted) and outward in the height adjustment aperture 120 to more

directly affect the position of the ridges 142 relative to ridges 144 on the chin support member

104 than ridges positioned farther from the aperture 120].

        Martin et al. substantially discloses the invention as claimed except the adjustment

mechanism is located centrally at the lowermost portion of the lower support.

        Suarez et al., however, teaches in an analogous art, a cervical collar (shown in figs.1-2)

comprising a lower support (20) comprising adjustment mechanism or dial (60, figs.1-2) is

located centrally (shown in figs.1-2) at the lowermost portion of the lower support (20).

        In view of the teachings of Suarez et al., it would have been obvious to one of ordinary

skill in the art before the effective filing date of the invention to modify the cervical collar of

Martin et al. by positioning the adjustment mechanism is located centrally at the lowermost

portion of the lower support for adjusting to and away from a sternum of a user for improving

comfort and fit of the cervical collar.

Application/Control Number: 16/686,582                                          Page 18
Art Unit: 3786



FIG. 3

### *Allowable Subject Matter*

6.      Claims 13-15 are objected to as being dependent upon a rejected base claim, but would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims.

### *Reasons for Allowance*

The following is an examiner's statement of reasons for allowance:

The closest prior art of record fails to show or make obvious the claimed combinations of elements particularly the limitations as set forth in dependent claims and 13-15 which recite features not taught or suggested by the prior art of record.

Application/Control Number: 16/686,582                                Page 19
Art Unit: 3786

The prior art of record fails to disclose or fairly suggest the sternum pad is mounted to a ball joint and the adjustment mechanism has an adjustment dial and an extension element arranged for adjustably extending relative to the lower support and wherein the adjustment mechanism includes a housing arranged for receiving an extension element in a contracted configuration resulting in a reduced or substantially minimized distance between the lower support and the sternum pad, the extension element having a screw thread, and the housing defining corresponding threads permitting slidable movement between the extension element and the screw thread according to adjustment of a dial associated with the extension element, in combination with the other elements (or steps) of the apparatus and method recited in the claims.

Accordingly, a prima facie case of obviousness or an anticipation rejection cannot be established with respect to the claimed subject matter as set forth in claims 13-14.

7.      Claim 15 is allowed insofar as they depend from the allowed base claim 14.


*Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to OPHELIA ALTHEA HAWTHORNE whose telephone number is (571)270-3860. The examiner can normally be reached M-F 8:00 AM-5:00 PM, EST.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

Application/Control Number: 16/686,582                                    Page 20
Art Unit: 3786

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Alireza Nia can be reached on 5712703076. The fax phone number for the

organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be

obtained from Patent Center. Unpublished application information in Patent Center is available

to registered users. To file and manage patent submissions in Patent Center, visit:

https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-center for more

information about Patent Center and https://www.uspto.gov/patents/docx for information about

filing in DOCX format. For additional questions, contact the Electronic Business Center (EBC)

at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service

Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/OPHELIA A HAWTHORNE/
Primary Examiner, Art Unit 3786

# EXHIBIT 18

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

7/9

REMARKS

Reconsideration of the pending application is respectfully requested in view of these observations.

Amendment to the Claims

Claim 1 is amended with the allowable subject matter of claim 13. Claim 1 and the claims dependent on claim 1 are therefore in condition for allowance. Claims 8 and 13 are canceled.

Claim 14, identified as reciting allowable subject matter, is placed in independent form including the limitations of claim 1. Claims 14 and 15 are in condition for allowance.

Claim 16 is placed in independent form including the limitations of claim 1 and the allowable subject matter of claim 18. Claim 18 is canceled. Claims 16 and 17 are in condition for allowance.

Claim 18 was not rejected by the prior art, and is considered to recite allowable subject matter.

Claims 19 and 20 are canceled without prejudice or disclaimer to expedite the allowance of the pending application.

Entry of the amendment to the claims is kindly requested.

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

8/9

Specification

The objection to the specification is moot given the amendment to claim 8.

Claim Rejections – 35 U.S.C. § 112

Withdrawal of the rejection of claim 8 under 35 U.S.C. § 112(b) is kindly requested in view of the cancelation of claim 8.

Claim Rejections – 35 U.S.C. § 102

*Rejection of claims 1, 2, 4-7, 9-12, 16 and 17 under 35 U.S.C. § 102 as anticipated by US 2016/0008158 (Martin)*

Reconsideration of this rejection is kindly requested in view of the amendment to claim 1, which is placed in condition for allowance.

Withdrawal of the rejection is kindly requested.

Claim Rejections – 35 U.S.C. § 103

*Rejection of claims 3 and 8 under 35 U.S.C. § 103 as unpatentable over US 2016/0008158 (Martin) in view of US 2013/0281899 (Suarez)*

*Rejection of claims 19 and 20 under 35 U.S.C. § 103 as unpatentable over US 2016/0008158 (Martin) in view of US 2013/0281899 (Suarez)*

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

9/9

Reconsideration of the rejection of claim 3 is kindly requested in view of the amendment to claim 1, which is placed in condition for allowance.

Claims 19 and 20 are canceled.

Withdrawal of the rejection is kindly requested.

Conclusion

The application is in condition for allowance because of the amendment to the claims and the preceding remarks.

If any issues remain that may be resolved by a telephone or facsimile communication with the Applicant's attorney, the Examiner is invited to contact the undersigned at the numbers shown below.

Respectfully submitted,

/Justin J. Cassell/

JUSTIN J. CASSELL
Attorney for Applicant
Registration No.: 46,205

WORKMAN NYDEGGER
60 East South Temple, Suite 1000
Salt Lake City, UT 84111
Phone: (801) 533-9800

Date: May 20, 2022

# TAB B

1  Scott R. Hatch, Bar No. 241563
     shatch@calljensen.com
2  Joshua G. Simon, Bar No. 264714
     jsimon@calljensen.com
3  Rebecca I Makitalo, Bar No. 330258
     rmakitalo@calljensen.com
4  CALL & JENSEN
   A Professional Corporation
5  610 Newport Center Drive, Suite 700
   Newport Beach, CA  92660
6  Tel:   (949) 717-3000
7
8  Attorneys for Defendants, Össur Americas, Inc. and Össur hf

9

10              **UNITED STATES DISTRICT COURT**

11              **CENTRAL OF CALIFORNIA**

12

13  WAYNE CALCO, an individual,          Case No.  8:22-cv-01971 JWH (KESx)

14              Plaintiff,                **DECLARATION OF JOSHUA G.
                                          SIMON IN SUPPORT OF
15        vs.                             DEFENDANTS' MOTION FOR
                                          PARTIAL SUMMARY JUDGMENT**
16
   ÖSSUR AMERICAS, INC., a California
17  corporation; Össur hf, an Icelandic
   company; and DOES 1 through 10,
18  inclusive,                           Date:  July 11, 2024
                                         Time:  1:30 p.m.
19              Defendants.              Place:  Courtroom 9D

20

21

22                                       Complaint Filed:   October 26, 2022
                                         Trial Date:        October 21, 2024
23

24

25

26

27

28

OSS02-02:3907066_1:5-31-24
DECLARATION OF JOSHUA G. SIMON IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY
JUDGMENT

**-437-**

I, Joshua G. Simon, declare as follows:

1.    I am a partner and shareholder at Call & Jensen, APC, attorneys for Defendants Össur Americas, Inc. and Össur hf (together, "Össur"). I have personal knowledge of the facts stated in this declaration, and if called to testify concerning them I could do so competently.

2.    On February 22, 2021 Össur and Mr. Calco entered into a Tolling Agreement. Attached hereto as **Exhibit 19** is a true and correct copy of the Tolling Agreement.

3.    Attached hereto as **Exhibit 20** is a true and correct copy of the face page and relevant excerpts of testimony and exhibits from Volume I of the transcript of Mr. Calco's deposition taken on November 29, 2023.

4.    Attached hereto as **Exhibit 21** is a true and correct copy of the face page and relevant excerpts of testimony and exhibits from Volume II of the transcript of Mr. Calco's deposition taken on November 30, 2023.

5.    On October 30, 2023, Mr. Calco served Plaintiff's Responses to Defendants' Request for Admissions (Set One). Attached hereto as **Exhibit 22** is a true and correct copy of excerpts of Plaintiff's Responses to Defendants' Request for Admissions (Set One) served on October 30, 2023.

6.    Attached as **Exhibit 23** is a true and correct copy of relevant excerpts of Plaintiff's Responses to Defendants' Special Interrogatories (Set One) served on October 30, 2023.

7.    Although Calco states in several interrogatory responses that "Claim 1 of the '374 Patent also makes the sternum pad movable relative to the lower support of the cervical collar," nowhere does Calco state that Claim 1 covers the Sternal Relief-Dial; i.e., that every limitation of Claim is present in the Sternal-Relief Dial. Plaintiff's contention that Claim 1 covers the Sternal-Relief Dial of the Miami J Select was first raised by Plaintiff's expert, Larry K. Roberts, in opposition to Defendants' previously filed Motion for Summary Judgment. (Dkt. No. 50, ¶ 3.)

8.      On Friday, February 23, 2024 at 4:46 pm, Plaintiff's counsel emailed me and stated: "Josh Plaintiff has elected to withdraw its contention that Claims 12 and 13 of the US 11,478,374 patent cover the device incorporated the Miami J Select adjustable cervical collar which the Defendants refer to as the 'sternal relief dial'." Plaintiff's counsel subsequently confirmed by email: "Plaintiff maintains his contentions with respect to Claim 1 of the '374 Patent." A true and correct copy of these emails is attached hereto as **Exhibit 24**.

9.      During the pre-trial conference of counsel held on February 19, 2024, counsel for both Plaintiff and Defendants agreed that the unjust enrichment claim is moot given how Plaintiff pleaded the claim. On Saturday, February 24, 2024, Plaintiff's counsel provided a draft stipulation for dismissal of the unjust enrichment claim. However, the dismissal was without prejudice and was contingent upon Defendants' waiver of costs and fees. Defendants are not willing to agree to such a stipulation at this time.

10.      At the February 19, 2024 pre-trial conference of counsel, Plaintiff's counsel stated that he did not know whether or not he would proceed to trial on Claims 7 and 8 should Defendants' Motion for Partial Summary Judgment be granted.

I declare under penalty of perjury under the laws of the United States that the foregoing is true. This declaration was signed at Newport Beach, California.

Dated: May 31, 2024                    Signed:  */s/ Joshua G. Simon*
                                       Joshua G. Simon

# EXHIBIT 19

## TOLLING AGREEMENT

This Tolling Agreement (the " Agreement") is entered into by and between Wayne Calco ("Calco"), on the one hand, and Össur Americas, Inc., a California corporation, and Össur HF, an Icelandic company, Össur on the other hand.

## RECITALS

A.    Calco asserts that he has claims against Össur Americas, Inc. and Össur HF and/or their parent companies, subsidiaries, and affiliates arising out of (i) the Services Agreement that was entered into between Calco and Össur Americas, Inc. on October 29, 2015 ("Agreement") (ii) the services performed by Calco pursuant to the Agreement, and (iii) related facts, events and occurrences. Calco asserts that such claims include, but are not limited to, claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty and fraud. Any and all claims that Calco has, may have and/or believes that he has against Össur Americas, Inc. and Össur HF and/or their parent companies, subsidiaries, and affiliates shall be referred to hereinafter collectively as "the Claims". Össur Americas, Inc. and Össur HF Össur and their parent companies, subsidiaries, and affiliates shall be referred to hereinafter collectively as "Össur". Calco and Össur shall be referred to hereinafter collectively as "the Parties".

B.    The Parties believe that it is in their best interests to discuss the resolution of the Claims and any potential counterclaims, ("Counterclaims") rather than to proceed at this time to litigation. The Parties therefore wish to toll the running of any applicable statutes of limitation, statutes of repose, equitable defenses of laches, and all other time-related bars and defenses under the terms set forth herein, to the extent that such statutes of limitation, statutes of repose, equitable defenses of laches, and all other time-related bars and defenses have not already run or do not otherwise bar the Claims and the relief sought thereon or any Counterclaims and the relief sought thereon that Össur may have against Calco, for the purpose of engaging in settlement discussions in an attempt to resolve the Claims and any Counterclaims without the need to resort to litigation. For purposes of clarity, this Agreement applies only to statutes of limitations, statutes of repose, equitable defenses of laches and all other time-related bars and defenses that have not already run or do not otherwise bar the Claims or Counterclaims and the relief sought thereon. By executing this Agreement the Parties in no way waive, and expressly preserve, their rights to assert and rely upon any and all statutes of limitations, statutes of repose, equitable defenses of laches, and all other time-related bars and defenses that would bar the Claims or Counterclaims and the relief sought thereon before the execution of this Agreement.

## AGREEMENT

In consideration of the mutual promises and covenants made in this Agreement, the Parties agree as follows:

1

CALCO 000220

1.      This Agreement shall not be binding or of any force or effect unless and until it is executed and delivered by all Parties. The Effective Date of this Agreement shall be the date it becomes executed and delivered by all Parties (the "Effective Date").

2.      All statutes of limitations, statutes of repose, equitable defenses of laches, and all other time-related bars and defenses which do not already bar the Claims and the relief sought thereon against Össur or Counterclaims that could be brought by Össur and the relief sought thereon as of the Effective Date (hereinafter collectively referred to as "Time Defenses") that are or may be applicable to the Claims and Counterclaims, shall be tolled from the Effective Date to and including the date which is exactly ninety (90) days after the Effective Date (hereinafter referred to as "the Tolling Period"). With regard to the Time Defenses only, the Tolling Period shall not be included in computing the time for commencing any actions or lawsuits by Calco for his Claims, or by Össur for its Counterclaims, or for determining the applicability or validity of any Time Defenses to the Parties' respective Claims and Counterclaims.

3.      This Agreement contains and constitutes the entire Agreement between the Parties concerning the matters addressed herein. This Agreement may be modified only by a written agreement signed by all Parties.

4.      This Agreement shall be binding on and inure to the benefit of the Parties and their respective parent companies, subsidiaries, affiliates, agents, employees, successors and assigns. All persons signing this Agreement represent and warrant that they have the authority to sign this Agreement on behalf of the Parties for whom they are signing this Agreement.

5.      By entering into this Agreement, Össur is not acknowledging or admitting that Calco has any valid claims of any kind or nature against Össur and/or Össur's parent companies, subsidiaries, affiliates, agents, employees, successors or assigns, and nothing herein shall be construed to constitute or imply any such acknowledgement or admission. Likewise, by entering into this Agreement, Calco is not acknowledging or admitting that Össur has any valid Counterclaims of any kind or nature against Calco and/or his agents, employees, successors or assigns, and nothing herein shall be construed to constitute or imply any such acknowledgement or admission.

6.      This Agreement may be executed in multiple counterparts and signatures exchanged by facsimile or electronically, each of which shall be deemed to be an original document, and all of which together shall constitute one and the same document.

Dated: February ___, 2021          _____
                                    Wayne Calco

2

CALCO 000221

-442-

Dated: February 22, 2021

Össur Americas, Inc.

*Christian Robinson*

By: Christian Robinson
Its: Executive Vice President

Dated: February ___, 2021

Össur HF

By: _____
Its: _____

3

CALCO 000222

Dated: February ___, 2021

Össur Americas, Inc.

By: _____
Its: _____

Dated: February 22, 2021

Össur HF

By: Kristleifur Kristjánsson
Its: EVP of Research and Development

3

CALCO 000223

## TOLLING AGREEMENT

This Tolling Agreement (the " Agreement") is entered into by and between Wayne Calco ("Calco"), on the one hand, and Össur Americas, Inc., a California corporation, and Össur HF, an Icelandic company, Össur on the other hand.

## RECITALS

A.    Calco asserts that he has claims against Össur Americas, Inc. and Össur HF and/or their parent companies, subsidiaries, and affiliates arising out of (i) the Services Agreement that was entered into between Calco and Össur Americas, Inc. on October 29, 2015 ("Agreement") (ii) the services performed by Calco pursuant to the Agreement, and (iii) related facts, events and occurrences. Calco asserts that such claims include, but are not limited to, claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty and fraud. Any and all claims that Calco has, may have and/or believes that he has against Össur Americas, Inc. and Össur HF and/or their parent companies, subsidiaries, and affiliates shall be referred to hereinafter collectively as "the Claims". Össur Americas, Inc. and Össur HF Össur and their parent companies, subsidiaries, and affiliates shall be referred to hereinafter collectively as "Össur". Calco and Össur shall be referred to hereinafter collectively as "the Parties".

B.    The Parties believe that it is in their best interests to discuss the resolution of the Claims and any potential counterclaims, ("Counterclaims") rather than to proceed at this time to litigation. The Parties therefore wish to toll the running of any applicable statutes of limitation, statutes of repose, equitable defenses of laches, and all other time-related bars and defenses under the terms set forth herein, to the extent that such statutes of limitation, statutes of repose, equitable defenses of laches, and all other time-related bars and defenses have not already run or do not otherwise bar the Claims and the relief sought thereon or any Counterclaims and the relief sought thereon that Össur may have against Calco, for the purpose of engaging in settlement discussions in an attempt to resolve the Claims and any Counterclaims without the need to resort to litigation. For purposes of clarity, this Agreement applies only to statutes of limitations, statutes of repose, equitable defenses of laches and all other time-related bars and defenses that have not already run or do not otherwise bar the Claims or Counterclaims and the relief sought thereon. By executing this Agreement the Parties in no way waive, and expressly preserve, their rights to assert and rely upon any and all statutes of limitations, statutes of repose, equitable defenses of laches, and all other time-related bars and defenses that would bar the Claims or Counterclaims and the relief sought thereon before the execution of this Agreement.

## AGREEMENT

In consideration of the mutual promises and covenants made in this Agreement, the Parties agree as follows:

1

CALCO 000232

1.    This Agreement shall not be binding or of any force or effect unless and until it isexecuted and delivered by all Parties. The Effective Date of this Agreement shall be the date it becomes executed and delivered by all Parties (the "EffectiveDate").

2.    All statutes of limitations, statutes of repose, equitable defenses of laches, and all other time-related bars and defenses which do not already bar the Claims and the relief sought thereon against Össur or Counterclaims that could be brought by Össur and the relief sought thereon as of the Effective Date (hereinafter collectively referred to as "Time Defenses") that are or may be applicable to the Claims and Counterclaims, shall be tolled from the Effective Date to and including the date which is exactly ninety (90) days after the Effective Date (hereinafter referred to as "the Tolling Period"). With regard to the Time Defenses only, the Tolling Period shall not be included in computing the time for commencing any actions or lawsuits by Calco for his Claims, or by Össur for its Counterclaims, or for determining the applicability or validity of any Time Defenses to the Parties' respective Claims and Counterclaims.

3.    This Agreement contains and constitutes the entire Agreement between the Parties concerning the matters addressed herein. This Agreement may be modified only by a written agreement signed by all Parties.

4.    This Agreement shall be binding on and inure to the benefit of the Parties and theirrespective parent companies, subsidiaries, affiliates, agents, employees, successors and assigns. All persons signing this Agreement represent and warrant that they have the authority to sign this Agreement on behalf of the Parties for whom they are signing this Agreement.

5.    By entering into this Agreement, Össur is not acknowledging or admitting that Calco has any valid claims of any kind or nature against Össur and/or Össur's parent companies, subsidiaries, affiliates, agents, employees, successors or assigns, and nothing herein shall be construed to constitute or imply any such acknowledgement or admission. Likewise, by entering into this Agreement, Calco is not acknowledging or admitting that Össur has any valid Counterclaims of any kind or nature against Calco and/or his agents, employees, successors or assigns, and nothing herein shall be construed to constitute or imply any such acknowledgement or admission.

6.    This Agreement may be executed in multiple counterparts and signatures exchanged by facsimile or electronically, each of which shall be deemed to be an original document, and all of which together shall constitute one and the same document.

Dated: February **22**, 2021

_____
Wayne Calco

CALCO 000233

Dated: February __, 2021                Össur Americas, Inc.

                                        _____
                                        By: _____
                                        Its: _____

Dated: February __, 2021                Össur HF

                                        _____
                                        By: _____
                                        Its: _____

3

CALCO 000234

# EXHIBIT 20

```
1                UNITED STATES DISTRICT COURT

2                  CENTRAL OF CALIFORNIA

3

4    WAYNE CALCO, an individual,  )
                                  )
5               Plaintiff,        )
                                  )
6    vs.                          )  Case No.:
                                  )  8:22-cv-01971
7    OSSUR AMERICAS, INC., a      )  CJC-KES
     California corporation;      )
8    Ossur hf, an Icelandic       )  VOLUME I
     company; and DOES 1 through  )
9    10, inclusive,               )
                                  )
10              Defendants.       )
     _____)

11

12

13      REMOTE VIDEOTAPED DEPOSITION OF WAYNE CALCO

14                 NOVEMBER 29TH, 2023

15                  IRVINE, CALIFORNIA

16

17

18

19

20

21

22

23

24   JOB NO.:       J10596224
     REPORTED BY:   MARIE WILSON
25                  CSR NO. 13480
```



800.211.DEPO (3376)
EsquireSolutions.com

WAYNE CALCO VOL. I                                November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                            2

1

2

3                    2:12 p.m.

4                    November 29th, 2023

5

6            REMOTE VIDEOTAPED DEPOSITION OF

7    WAYNE CALCO, taken on behalf of Defendants.

8    The Witness was located in Irvine, California.

9    The deposition was stenographically recorded

10   by Marie Wilson, Certified Shorthand Reporter,

11   No. 13480.

12

13

14

15

16

17

18

19

20

21

22

23

24

25



800.211.DEPO (3376)
EsquireSolutions.com

WAYNE CALCO VOL. I                                    November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                              3

```
 1        A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4    LAW OFFICES OF GEORGE B. PIGGOTT
      BY:   GEORGE B. PIGGOTT, ESQ.
 5    2603 Main Street, Penthouse
      Irvine, California
 6    (949) 261-0500

 7

      FOR THE DEFENDANTS:
 8
      CALL & JENSEN
 9    BY:   JOSHUA G. SIMON, ESQ.
      610 Newport Center Drive, Suite 700
10    Newport Beach, California 92660
      (949) 717-3000
11

12    ALSO PRESENT:

13    REBECCA MAKITALO, ESQ.

14    ALEX COFFIN

15    DANA BACHMAN, LEGAL VIDEOGRAPHER

16

17

18

19

20

21

22

23

24

25
```



WAYNE CALCO VOL. I                                      November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                                    19

```
 1   He has said he was speaking to himself.  He
 2   corrected himself.  Let's move on.
 3          MR. SIMON:  Yeah, I highly doubt that that
 4   was the case, but I think I have enough here to --
 5   to seek a protective order given this situation and    02:32
 6   the fact that you're in the room there with the
 7   witness feeding him responses, so we can do one of
 8   two things, we can get you on the screen or --
 9   because this is a remote deposition.  It was our
10   understanding you would be on the screen remotely     02:32
11   or we can wait until tomorrow and do this in
12   person.  So you decide.
13          MR. PIGGOTT:  I can be on the screen.
14   That's fine.
15          MR. SIMON:  Okay.  Then that works for me.     02:32
16          MR. PIGGOTT:  So there we are.
17          MR. SIMON:  All right.
18     Q.   Moving on, we named a number of
19   individuals.  We named Jason.  Is that Jason
20   Thorne?                                                02:33
21     A.   There were two Jasons.
22     Q.   What were their last names?  Do you
23   recall?
24     A.   Well, I know Thorne was one of them.  I
25   can't recall the other Jason's last name.  He was,    02:33
```



WAYNE CALCO VOL. I                                November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                              20

 1    like, the project manager.

 2        Q.    The other Jason, not Jason Thorne, was the

 3    project manager; is that correct?

 4        A.    I don't recall.  There were two Jasons.

 5        Q.    Okay.  There were two Jasons that you              02:33

 6    interacted with, there was an Ana, there was a John

 7    Powell Harmon that was British, Zack, a guy at the

 8    Mexico plant and Jared Olivo.  Was there anybody

 9    else that you interacted with at Ossur, other than

10    those listed, Chris Webster, Duane Romo, anybody       02:33

11    else?

12        A.    Let's see, I talked to some -- someone --

13    one or two people in accounting, I don't remember

14    their names, and of course there was Shane.

15        Q.    When was your first interaction with          02:34

16    Shane?

17        A.    Sometime after he joined the company.

18        Q.    When did he join the company, what's your

19    best estimate?

20        A.    I don't recall.  It was at least a couple     02:34

21    months into the project.

22        Q.    So Shane was not at the company when you

23    entered into negotiations with Ossur --

24        A.    That's correct.  Sorry.

25        Q.    Yeah, let me finish the question.             02:34



WAYNE CALCO VOL. I                                November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                              21

1          Shane was not at Ossur when you entered
2    into negotiations with Ossur to work as a
3    consultant for Ossur; is that correct?
4        A.   Correct.
5        Q.   And Shane was not at the company, he was    02:34
6    not at Ossur when you signed the services agreement
7    between you and Ossur; is that correct?
8        A.   Yes, correct.
9        Q.   Did you look at any documents that
10   refreshed your recollection as to the facts          02:35
11   regarding this case?
12       A.   Yes.
13       Q.   What documents did you review that
14   refreshed your recollection about the underlying
15   facts of this case?                                  02:35
16       A.   The complaint.
17       Q.   Anything else?
18       A.   Those other interrogatories.
19       Q.   Anything else?
20       A.   That set.  Like, there is one admissions,   02:35
21   those three things.
22       Q.   Were those admissions that were
23   directed -- were they requests for admissions and
24   your responses or were they request for admissions
25   and responses that were directed at Ossur?          02:36



WAYNE CALCO VOL. I                                 November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                              22

1        A.   I think my responses.

2        Q.   And the interrogatories, were those your

3    responses or were those the responses of Ossur?

4        A.   I think I only looked at mine.

5        Q.   And the complaint that you reviewed, was            02:36

6    that the federal complaint, state complaint or

7    both?

8        A.   I think it is just the federal complaint.

9        Q.   Other than the complaint, interrogatories

10   and requests for admission responses, did you          02:36

11   review any other documents in preparation for your

12   deposition that refreshed your recollection?

13       A.   No, I don't think so.

14       Q.   Did you meet with counsel in preparation

15   for your deposition?                                    02:37

16       A.   No.

17       Q.   Did you speak with anyone, other than

18   counsel, about today's proceedings?

19            MR. PIGGOTT:  Asked and answered.

20            You can answer.                                02:37

21            THE WITNESS:  No.  I told my mom I was

22   going to a deposition and that I would come over

23   and see her after.

24   BY MR. SIMON:

25       Q.   Did you speak with your mom at all about       02:37



WAYNE CALCO VOL. I                                    November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                            46

```
 1   to engage with me.
 2       Q.   So when did you first engage with Ossur in
 3   terms of negotiating the services agreement?
 4       A.   I guess a couple months or so before we
 5   signed.                                                    03:11
 6       Q.   You had a lawyer involved in that process;
 7   is that correct?
 8       A.   Yes.
 9       Q.   Who was that lawyer?
10       A.   William Kersten.                                  03:11
11       Q.   And he practices in Orange County; is that
12   correct?
13       A.   Yes.
14       Q.   Were drafts of the services agreement
15   exchanged between the parties?                             03:12
16       A.   Yes.
17       Q.   Did you and your lawyer make edits to the
18   draft services agreement?
19       A.   Well, I remember submitting a proposal to
20   Duane, and I think what happened after that was he         03:12
21   said they wanted to take the lead on the proposal,
22   and so I think that was the last that my proposal
23   came into discussion.  The next thing I think
24   happened was they sent me something and -- a
25   proposal and that's what we went back and forth on.        03:12
```



WAYNE CALCO VOL. I                                November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                            47

```
 1        Q.    And when you say they sent you something,
 2   who sent --
 3        A.    Duane.
 4        Q.    Duane.  Was Duane the primary person in
 5   negotiating the contract with you?                        03:12
 6        A.    Yes, but he had a lot of -- you know,
 7   Tatjana and Thor Baulder, he talked about them
 8   having to agree to things and that kind of thing.
 9        Q.    Did you ever have one-on-one interaction
10   with Thor Baulder in relation to negotiating the         03:13
11   services agreement?
12        A.    I don't think so.
13        Q.    Did you ever have one-on-one interaction
14   with Tatjana in negotiating the services agreement?
15        A.    No, I don't think so.                          03:13
16        Q.    So is Duane the only person you interacted
17   with in terms of negotiating the services
18   agreement?
19        A.    To the best of my recollection, yes.
20        Q.    And Duane at the time, did he ever tell        03:13
21   you he had counsel involved in negotiating the
22   services agreement with you?
23        A.    No, not that I recall.
24        Q.    With respect to the services agreement
25   that was negotiated between you and Ossur, is there       03:14
```



WAYNE CALCO VOL. I                                November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                              48

1   anything specifically that you remember regarding

2   those negotiations that you -- that made you want

3   to enter into the agreement with Ossur?

4       A.   Well, other than the fact that there was

5   going to be a royalty, that was my main -- that was    03:14

6   the main benefit.

7       Q.   So the royalty payment was attractive to

8   you; is that correct?

9       A.   Yes.

10      Q.   Was it the percentage of the royalty          03:14

11  payment or was it something else about the royalty?

12      A.   Well, the royalty was a requirement on my

13  side.

14      Q.   What was the requirement on your side?

15      A.   That they be willing to pay a royalty.        03:15

16      Q.   Okay.  So that is a term that you insisted

17  be in the contract, that there be a percent royalty

18  payment on --

19      A.   Yes.

20      Q.   Okay.  And they ultimately agreed on a        03:15

21  four-percent royalty payment on net sales of

22  patented products which is defined in the

23  agreement; is that correct?

24      A.   Yes.

25      Q.   Okay.  And the definitions in the draft       03:15



WAYNE CALCO VOL. I                              November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                          92

 1      Q.   Did he tell you a reason why you shouldn't
 2   come in?
 3      A.   I know there was one event where he said
 4   they had some unrelated meetings that they had to
 5   do, and then I think there was one other time when     04:50
 6   he -- I think it's written down.  I don't remember
 7   off the top of my head.  He definitely said to stay
 8   away on a couple of occasions.
 9      Q.   So Chris told you to stay away; is that
10   correct?                                               04:51
11      A.   Yeah, uh-huh.
12      Q.   And by stay away, he meant stay away from
13   Ossur's offices; is that right?
14      A.   Well, he just meant don't be coming in to
15   work with me because I'm going to be busy with         04:51
16   something else or, you know, there is -- just
17   something else is going on.
18      Q.   Did he tell you what else was going on?
19      A.   No, not beyond -- I don't remember.  I can
20   look in my notes.  Maybe there is something there,     04:51
21   but pretty much.
22      Q.   Did you ever have any conversations with
23   Duane Feten -- I'm sorry, Shane Feten about
24   reducing your contribution or role to the collar
25   project?                                               04:52



800.211.DEPO (3376)
EsquireSolutions.com

**-459-**

WAYNE CALCO VOL. I                                November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                           93

1        A.    No, not that I remember.

2        Q.    Did you ever have conversations with Shane

3    Feten about him wanting you to have more of a

4    support role for the development of the collar

5    product?                                              04:52

6        A.    Maybe, you know, at some point -- at some

7    point they -- you know, this other thing that was

8    going on was revealed and -- to me and yeah, I

9    think I do -- I think I did -- I don't know if it

10   was Shane or something, but I definitely understood  04:52

11   that they were not using my height adjustment, and,

12   you know, it was presented to me at a meeting, I

13   think also with Tatjana and Justin Cassell and

14   Shane was definitely there and saying that he had

15   concerns about the doctrine of equivalency and the  04:53

16   solution that I had suggested for the height

17   adjustment.

18          And I had told him that, you know, as the

19   sole inventor of the product that they were

20   concerned about, I was certain there wouldn't be an  04:53

21   equivalence thing, but there was really no

22   convincing them of that, so then I suggested some

23   revisions to it that could, you know, in my opinion

24   guarantee there would be no possibility of that,

25   but it wasn't -- it wasn't going to happen.          04:53



WAYNE CALCO VOL. I                              November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                            94

1          Shane had, you know, told me, "Hey, it's

2     this doctrine of equivalence," and I remember

3     that -- I think Shane did more talking than Justin

4     Cassell at that meeting, and, you know, I was just

5     having to accept it, you know, that's the way it          04:54

6     is.

7          And so after that point -- and then at

8     some point I was then contributing to what became

9     the production product.  I was working on the back

10    panel.  I was working on -- we did a lot of work on        04:54

11    the repeatable-fit-tab concepts, several iterations

12    of how that could take place and what that would

13    be.  There was work on the chin support, and it's

14    somewhere in that time where I made a comment to

15    Chris that I was concerned that it might be too            04:54

16    similar to the Aspen, but the way that it was built

17    it was -- I think the first prototypes were black

18    and they were opaque and, you know, I could only

19    surmise a very small amount based on looking at it,

20    so -- you know, and Chris didn't -- it didn't go           04:55

21    any further than that.

22          After that point I never heard about it

23    again, but we did continue to work on this -- on

24    the product with the opposed racks or what looked

25    to me like might be opposed racks, so things like         04:55



WAYNE CALCO VOL. I                              November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                          95

1    the grip and, like I said, the back panel and there

2    may have been a conversation what you're suggesting

3    where Shane where -- I know that I was amicable

4    about whatever was developing.  I was, you know,

5    not going to have a hissy fit about it.  It was          04:55

6    just there -- I could tell that, you know, it

7    was -- I couldn't convince them otherwise.

8         Q.   When you say you couldn't convince them

9    otherwise, who are you referring to specifically?

10        A.   I guess Shane.  I mean, this whole             04:55

11   equivalence thing, I didn't -- I really didn't

12   believe that it could be happening, that that could

13   really be an issue.  I just didn't believe that it

14   could really be any kind of exposure, so --

15        Q.   When you said that you couldn't convince       04:56

16   them and it was clear it wasn't -- hold on -- it

17   wasn't going to happen, what are you referring to?

18   What wasn't going to happen?

19        A.   I didn't believe that there would be --

20   that the VQ company would accuse Ossur of having an      04:56

21   equivalent mechanism.  I didn't think that that

22   would be -- that there would be any real exposure

23   for that.  I didn't think that it was an

24   equivalence, but when I said something like that, I

25   said something like, "Shane, come on.  You know,        04:56



WAYNE CALCO VOL. I                                    November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                              96

1    I'm familiar with the other product.  There isn't,

2    you know" -- "I really don't think there is any

3    kind of an equivalence issue," but I remember I

4    don't think he -- you know, it was, kind of, like

5    falling on deaf ears.  That was that.                04:57

6        Q.   Why do you say it was "falling on deaf

7    ears"?

8        A.   Well, we didn't continue developing my

9    height adjustment.  A switch was made.

10       Q.   How long before your consultancy          04:57

11   terminated did they stop development of your height

12   adjustment -- sorry, let me ask it again.  How long

13   before your termination would you estimate that

14   Ossur stopped development of your height adjustment

15   collar?                                             04:57

16       A.   I don't really know.  I think that -- I'm

17   not going to speculate.  I don't know.

18       Q.   It was sometime in 2016; is that correct?

19       A.   I would have to look at my notes.

20       Q.   You said when it was revealed, that        04:58

21   another thing was going on.  What did you mean by

22   that in your response?

23       A.   Well, at some point we started working on

24   the prototypes with this alternative height

25   adjustment, and so that -- you know, it was clear    04:58



WAYNE CALCO VOL. I                              November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                          97

1    to me that this was being developed simultaneously

2    with -- you know, there was some kind of -- like

3    what Chris had alluded to, there was some kind of

4    parallel effort, like, kind of, secret, top-secret

5    thing happening.                                    04:58

6        Q.   So you became aware that there was

7    parallel development --

8        A.   Well, that was just --

9        Q.   -- collar; is that accurate?

10       A.   Well, what happened was Chris showed me    04:59

11   the latest prototype of our project, and it had

12   this other height adjustment on it, you know, after

13   this whole issue of the equivalence was thrown out

14   there, and so, you know, okay, if this is what you

15   want to go with on this, fine.  I'll, you know,     04:59

16   continue to be a contributor and help and work on

17   it with you.

18       Q.   Did Chris, when he showed you the other

19   prototype that did not have your height adjustment

20   in it, did he say what the name of that prototype   04:59

21   was?

22       A.   I don't recall.

23       Q.   Did that happen -- sorry, did Chris show

24   you the prototype that did not use your height

25   adjustment in the fall of 2016?                     05:00



WAYNE CALCO VOL. I                          November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                      98

1      A.   I don't -- you know, I can't remember.

2    I'm going to have to look at my calendar.

3      Q.   But certainly Chris showed you the

4    prototype that did not include your height

5    adjustment before your consultancy terminated;      05:00

6    correct?

7      A.   Yes.

8      Q.   And so you were aware that there was a

9    parallel development of the adjustable -- of a

10   different adjustable collar while you were still     05:00

11   under contract with Ossur; is that correct?

12         MR. PIGGOTT:   You said different

13   adjustable collar --

14         THE WITNESS:   Different adjustment system.

15   You know, the height adjustment was changed, that's  05:00

16   what I'm talking about.

17         MR. SIMON:   Fair enough.   Let me re-ask.

18         THE WITNESS:   Let me elaborate slightly.

19   He just, kind of, showed it to me, "Here it is,"

20   so, you know, I have no idea really what kind of a   05:01

21   time frame was involved, but it seemed in my mind

22   to line up with what Chris had said was that there

23   is some whacky idea going around and it's all going

24   to work out, don't worry about it.   I'll -- you

25   know, that's kind of what he said to me.            05:01



WAYNE CALCO VOL. I                                November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                           99

```
 1              It was very vague, but, you know, when

 2    you're a consultant, you know, you don't -- you

 3    can't call the shots.

 4    BY MR. SIMON:

 5        Q.   So when Chris showed you this prototype of    05:01

 6    a collar that did not use your height adjustment,

 7    did that prototype have a wheel on the sternum?

 8              MR. PIGGOTT:  A wheel?  I'm going to

 9    object.  It's vague and ambiguous.  W-H-E-E-L.

10              MR. SIMON:  Uh-huh, yes.                      05:02

11              MR. PIGGOTT:  You can answer it if you

12    can.

13              THE WITNESS:  Are you talking about the

14    sternal area?

15              MR. SIMON:  Correct.                          05:02

16              THE WITNESS:  The prototype that he showed

17    me had no sternum area at all.  There was nothing

18    there.

19    BY MR. SIMON:

20        Q.   So the prototype that Chris showed you        05:02

21    during your consultancy for Ossur --

22        A.   The first time I saw it.

23        Q.   So the first time you saw the prototype

24    that Chris showed you during your consultancy of

25    Ossur that did not have your height adjustment,        05:02
```



WAYNE CALCO VOL. I                                    November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                              100

1   that prototype also did not have a sternum

2   adjustment, is that what you're saying?

3       A.   Right, and it didn't have a sternum

4   extension either.  Typical collars would have a

5   sternum extension, but it was completely devoid of    05:03

6   anything down there.

7            During -- during our development, one of

8   the issues that was critical was the dimension from

9   the chin support to the bottom of the sternum pad,

10  and we used the dimension from a Vista collar to     05:03

11  determine that, but collars come without -- not

12  every collar has any kind of a sternum on it.

13           When there is a sternum pad or a sternum

14  extension, it -- it falls into a more expensive

15  category and not every collar has it.  However,      05:03

16  during our development on this project, it was

17  determined that we would not do one without the

18  sternum extension.

19           So when he showed me that, I remember

20  thinking, "Oh, there is no sternum" -- "there is no   05:04

21  sternum extension or no upper dial," but I was just

22  taking in the other aspects of it, and he was --

23  you know, he started -- we started talking about

24  how to improve it, you know, what my observations

25  were, things like that, and I think that ties back   05:04



*800.211.DEPO (3376)*
*EsquireSolutions.com*

WAYNE CALCO VOL. I                                November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                              101

1    into what you said about Shane.

2        I think that at some point I understood

3    that I was developing the new collar without the

4    height adjustment mechanism that I had originally

5    developed, and so I was okay with that.                    05:04

6        Q.   And let's talk a little bit about the

7    first prototype that Chris Webster showed you that

8    did not have your height adjustment.  It's true

9    that the prototype that Chris Webster showed you

10   during your consultancy with Ossur also did not    05:05

11   include any sort of sternum mechanism, whether it

12   was adjustment or extension; is that correct?

13       A.   Yes, the first thing I saw I think was

14   black -- there are photos of that in the document

15   production.                                         05:05

16       Q.   So you would agree with me that the

17   prototype that Chris Webster showed you that did

18   not have your height-adjustment concept that you

19   provided to Ossur with written records after you

20   signed the agreement also did not include your    05:05

21   sternum-adjustment concept that you documented and

22   provided to Ossur; is that correct?

23       A.   Yes, the first sample that I was ever

24   shown, it was just devoid of -- it didn't have all

25   of the features of anything.  I think that it was a    05:06



WAYNE CALCO VOL. I                                      November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                                  102

 1  development wheel for the height adjustment.

 2      Q.   The prototype that you were shown by Chris

 3  Webster with the height adjustment that was not

 4  yours, did it have repeatable fit tabs?

 5      A.   I don't recall, but I think we were still          05:06

 6  working on that but maybe not.  I'd have to look.

 7  I have -- you know, like I said, it's in the

 8  document production.  I have photos and photos and

 9  photos of everything we were working on, including

10  this.                                                       05:06

11      Q.   I'm hoping that we can look at those in a

12  little bit.  I just want to get the lay of the land

13  here.  So let's talk a little bit about this grip

14  that you mentioned.  You said that you contributed

15  to this concept of a grip; is that correct?                 05:07

16      A.   Yes.

17      Q.   Now, the grip that you're referring to,

18  was that the grip that was on this new collar with

19  this height adjustment that wasn't yours or was

20  that on the previous collar that you were working        05:07

21  on that had your height adjustment and your sternum

22  adjustment?

23      A.   Neither.  The prototype -- the first time

24  Chris -- that I started working on this with this

25  alternate height adjustment, there was no grip of         05:07



WAYNE CALCO VOL. I                              November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                          110

```
 1              MR. PIGGOTT:  Yes.
 2              MR. SIMON:  Let me know when you're ready.
 3    Do you have the document pulled up?
 4              MR. PIGGOTT:  We do.
 5    BY MR. SIMON:                                            05:19
 6        Q.   Okay.  This is a document that's been
 7    marked as Exhibit 1 in this deposition, and it's
 8    bates stamped OSF001534 through OSF001536.  The
 9    cover page is an email from Wayne Calco to Duane
10    Romo, Chris Webster, Jason Flores, Tatjana          05:20
11    Latinovic.  Did I read that correctly?
12              MR. PIGGOTT:  It looks right.
13    BY MR. SIMON:
14        Q.   November 24th, 2015, is that correct?
15        A.   That's right.                                  05:20
16        Q.   The subject is "Adjustable Sternum Pad
17    Concept."  Did I read that right?
18        A.   Sternum.
19              MR. PIGGOTT:  Sternum pad adjustment.  Oh,
20    that's attachment.  Adjustable sternum pad concept.  05:20
21    Yes.
22              MR. SIMON:  I'm sorry, Mr. Piggott, you're
23    not the witness, so --
24              THE WITNESS:  It says subject, "Adjustable
25    Sternum Pad Concept" --                                 05:20
```



WAYNE CALCO VOL. I                          November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                    111

1           MR. SIMON:  Mr. Piggott, have you been the

2    one answering the questions?

3           MR. PIGGOTT:  No.  Mr. Calco is talking.

4           MR. SIMON:  Okay.

5       Q.   So, Mr. Calco, the subject of this email          05:20

6    dated November 24th, 2015, is "Adjustable Sternum

7    Pad Concept"; correct.

8       A.   Yes.

9       Q.   And the attachments that are listed here

10   states, "Sternum Pad Adjustment Ossur VC6.PDF."         05:21

11           Did I read that right?

12      A.   Yes.

13      Q.   Turn to the second page of this document.

14   It appears to be a CAD drawing with some writing on

15   it; is that correct?                                     05:21

16      A.   Yes.

17      Q.   And at the top of the page it states,

18   "Sternum pad adjusts with ball joint and high-angle

19   screw-style shaft concept 8/28/2015;" is that

20   correct?                                                 05:21

21      A.   Uh-huh.

22      Q.   And below on the bottom of page 2, it has

23   the word "Pad" and the word "Dial Adjust Pad" with

24   lines from those words to the drawing; is that

25   correct?                                                 05:22



WAYNE CALCO VOL. I                                November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                            112

1        A.    Yes.

2        Q.    And then it states, "Confidential for

3    Ossur patent.  Wayne Calco designer 8/28/2015."

4              Did I read that all correctly?

5        A.    Yeah.                                        05:22

6        Q.    Then on the third page there is a document

7    that appears to be a CAD drawing at the top of it.

8    It states, "Sternum pad adjusts with ball joint and

9    high-angle screw-style shaft concept, 8/28/2015."

10             Did I read that correctly?                   05:22

11       A.    Uh-huh.

12       Q.    Is that a yes?

13       A.    Yes.

14       Q.    And then below that it states, "Finger

15   turns dial left or right to raise or lower pad."      05:22

16             Did I read that correctly?

17       A.    Yes.

18       Q.    And below the -- sorry, under that, there

19   is a drawing with some text next to it that states,

20   "Ball joint allows pad to lay flat on differing       05:23

21   anatomies."  Did I read that correctly?

22       A.    Yes.

23       Q.    And below that there is writing that says,

24   "Confidential for Ossur patent.  Wayne Calco

25   designer 8/28/2015."  Did I read that correctly?      05:23



WAYNE CALCO VOL. I                          November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                    113

1        A.   Yes.

2        Q.   Mr. Calco, are these -- was this email

3    sent after the agreement was signed to reflect the

4    concepts that you conceived of before the agreement

5    was signed?                                          05:23

6        A.   Yeah, I think so.

7        Q.   And this email with these CAD drawings,

8    this reflects the sternum-pad-adjustment concept

9    that you had provided to Ossur; is that correct?

10       A.   A version of it, yes.                        05:24

11       Q.   Were there other written versions of the

12   sternum-pad-adjustment concept that you provided to

13   Ossur on or around this time?

14       A.   I don't recall, but remember, we were

15   working on these, so these were the kind of proof     05:24

16   of concept in a way, and then Chris and I started

17   working on everything, and the -- you know, we had

18   prototypes that, you know, did not have a ball

19   joint.  You know, we were developing it together.

20       Q.   Did you provide any other drawings          05:24

21   initially as your proof of concept to Ossur of the

22   sternum-pad-adjustment concept other than these

23   drawings here?

24       A.   I think these were, like, the formal

25   submissions, but, you know, I may have shown Duane    05:25



WAYNE CALCO VOL. I                          November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                      114

1    some other drawings and I think Duane saw this

2    stuff maybe -- maybe ahead of Tatjana.

3        Q.   So you had -- these were the formal

4    submissions that you provided to Ossur?

5        A.   Uh-huh, that's right.                      05:25

6        Q.   And these were the formal submissions you

7    provided to Ossur for the purposes of proving your

8    conception of -- concepts before the agreement was

9    signed; correct?

10       A.   Yes.                                       05:25

11       Q.   And this -- these drawings were the formal

12   submission to Ossur to prove your creation of the

13   concept of sternum adjustments -- sorry, scrap

14   that.  Sorry.

15            Okay.  And now did you -- are you aware of  05:26

16   any other formal submissions that you submitted to

17   Ossur that concerned your conception of sternum pad

18   adjustments before the agreement was signed?

19            MR. PIGGOTT:  I'm going to object.  We've

20   been talking about formal.  I should have objected   05:26

21   vague and ambiguous.  What do you mean by formal?

22   CAD drawing?

23            MR. SIMON:  He used "formal," so I'm using

24   his terms.

25            MR. PIGGOTT:  Okay.  Did you use "formal"?   05:26



WAYNE CALCO VOL. I                              November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                          115

 1  | I don't remember.
 2  |         THE WITNESS:  I don't remember.
 3  |         MR. SIMON:  He did.
 4  |    Q.   But go ahead.
 5  |    A.   Well, these are CAD drawings they              05:26
 6  | represent an iteration on the concept to show them,
 7  | "Okay, here is one way we can do it."
 8  |    Q.   And you were aware that the contract
 9  | required you to prove the concepts that you
10  | conceived of before the agreement with written       05:27
11  | records; correct?
12  |         MR. PIGGOTT:  Could you repeat that or the
13  | court reporter, could you read that?  It's getting
14  | late.
15  |         (The question was read back as follows:      05:27
16  |         "Q. And you were aware that the
17  |         contract required you to prove the
18  |         concepts that you conceived of before
19  |         the agreement with written records;
20  |         correct?")                                    05:27
21  |         MR. PIGGOTT:  I don't quite understand
22  | that.
23  |         MR. SIMON:  I'm sorry you don't
24  | understand.  Let's see if the witness does.
25  |         MR. PIGGOTT:  Yeah, vague and ambiguous.      05:27



WAYNE CALCO VOL. I                                    November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                          116

```
 1            THE WITNESS:  Could you maybe rephrase
 2   that?
 3            MR. SIMON:  Sure.
 4     Q.   Why did you submit Ossur these drawings
 5   here?                                               05:27
 6     A.   To show an iteration of all of the
 7   concepts I was submitting.
 8     Q.   And did you -- did you provide any other
 9   written records to Ossur at this time to show the
10   concepts that you had conceived of before signing   05:28
11   the agreement?
12            MR. PIGGOTT:  Hold on, the concepts, we've
13   been talking about sternum adjustment.  You're
14   now -- all concepts?
15            MR. SIMON:  Fair enough.                    05:28
16     Q.   Let's stick strictly to sternum
17   adjustment.  Are you aware of any other written
18   records that you provided to Ossur at this time to
19   show your proof of concept with respect to sternum
20   adjustment?                                          05:28
21            MR. PIGGOTT:  I'm going to object to that
22   question.  Proof of concept, that's a different
23   term than you used before.
24            THE WITNESS:  Yeah, I didn't use proof of
25   concept.                                             05:29
```



800.211.DEPO (3376)
EsquireSolutions.com

WAYNE CALCO VOL. I                          November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                          117

```
 1              MR. SIMON:  I believe you did but okay.
 2         Q.   So let's go back to that other question
 3    since you seem to change it after your counsel
 4    testifies about it.  This is my deposition.  Please
 5    stop testifying.  Why did you submit these --          05:29
 6              MR. PIGGOTT:  He is the witness.
 7    BY MR. SIMON:
 8         Q.   Why did you submit these drawings to Ossur
 9    on November 24th, 2015?
10         A.   Because that was the deal.  I was going to  05:29
11    show them iterations of these concepts, all of
12    them.
13         Q.   What was the deal?
14         A.   That after we had a signed agreement, I
15    would submit the concepts.                             05:29
16         Q.   Okay.  So when it came to the sternum
17    adjustment concepts, are these the only documents
18    that you submitted to Ossur as part of the deal?
19              MR. PIGGOTT:  Exhibit 1?
20              MR. SIMON:  Correct.                          05:30
21              THE WITNESS:  Well, there are some
22    drawings that I know that Chris and I saw, but I
23    think for the purposes of -- these were the ones
24    that -- these drawings were the ones that Tatjana
25    thanked me for these three concepts and she was        05:30
```



WAYNE CALCO VOL. I                                         November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                                    118

1    sending them to Justin Cassell.

2    BY MR. SIMON:

3         Q.    Okay.  Did you submit any other drawings

4    for sternum-adjustment concept to Tatjana other

5    than these two?                                          05:30

6         A.    Again, maybe -- I think that's it, but

7    this is -- you know, this is not the definitive.

8         Q.    Mr. Calco, I'm not asking that.  I am

9    asking you about what you provided to Tatjana?

10        A.    I don't -- I think that is it.               05:31

11        Q.    Okay.  So this is -- what we see in

12   Exhibit 1 is all you provided to Tatjana Latinovic

13   with respect to your sternum-adjustment concept; is

14   that correct?

15        A.    I think so, yes.                             05:31

16        Q.    Now, with respect to sending it to Tatjana

17   as opposed to just the drawing that you come up

18   with with Duane, you understood that by submitting

19   this document to Tatjana, that it would go on to

20   Mr. Cassell for patent prosecution; is that          05:31

21   correct?

22        A.    Well, not for patent prosecution.  The

23   first step that Cassell was going to take was to,

24   kind of, vet these concepts and see if he believed

25   that these concepts could be subjects of successful   05:31



WAYNE CALCO VOL. I                          November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                    119

1   patents.

2       Q.   Okay.  So your understanding was

3   Ms. Tatjana Latinovic would forward these drawings

4   to Mr. Cassell to explore possible patent claims

5   for these drawings; is that correct?                    05:32

6       A.   I don't want to mislead, but the process

7   was that Chris and I were going to start developing

8   these concepts together, so this -- what you're

9   looking at is not including any input from Chris.

10  This is not including any -- any work on the          05:32

11  concept to make it more perfect for Ossur or for

12  their production methods.  This was just the little

13  starting point to say, "Okay, here are these three

14  concepts.  Chris and Wayne are going to develop

15  these concepts into custom things for Ossur."         05:32

16          And I think the things that Cassell would

17  have ultimately started filing patents on were

18  iterations of this.  Not exactly this.

19          Does that make sense?

20      Q.   Sure, if you say so.                           05:33

21          Let's ask you this, so these drawings here

22  do not contain any input from Mr. Webster; is that

23  right?

24      A.   That's right.

25      Q.   These drawings here do not contain any       05:33



WAYNE CALCO VOL. I                                November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                        120

1    input from Mr. Shu; is that correct?

2        A.    That's correct.

3        Q.    And so these drawings here only reflect

4    your iteration of the sternum-adjustment concept

5    that you came up with before the agreement was          05:33

6    signed; is that correct?

7        A.    Yes.

8        Q.    And you are not aware of any other

9    drawings that you submitted to Ms. Latinovic for

10   purposes of forwarding on to Mr. Cassell at this        05:34

11   time in November of 2015 to explore potential

12   patent prosecution; is that correct?

13       A.    Yeah.  Like I said, it was a little early

14   for patent prosecution.  It was just enough

15   information to determine whether he thought they        05:34

16   could get patents on the things around these.  This

17   concept.

18       Q.    So the purpose of forwarding this on to

19   Mr. -- Ms. Latinovic was twofold; first, to show

20   proof that you conceived of this mechanism, and,        05:34

21   second, for Mr. Cassell to explore possible patent

22   prosecution down the road"; correct?

23       A.    Well, I wouldn't say -- it's more the

24   concept, not the mechanism itself, because I was

25   aware that the mechanisms would evolve.                 05:35



WAYNE CALCO VOL. I                                November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                            121

1       Q.   So let me rephrase it, then.  The purpose
2   of sending this to Ms. Latinovic was twofold;
3   first, to provide proof of -- that you conceived of
4   this sternum-adjustment concept as reflected here,
5   and that you were providing documentation for        05:35
6   Mr. Cassell to explore potential patent
7   prosecution; is that fair?
8       A.   Yes, on the concept, yes.
9       Q.   Okay.  All right.  Let's go to Exhibit 2.
10  I'm going to drop it in the chat.                     05:35
11           THE WITNESS:  You're going to have to
12  click off of this.
13           (Exhibit 2 was marked.)
14           MR. SIMON:  Let me know when you have it.
15           MR. PIGGOTT:  We have it.                     05:36
16  BY MR. SIMON:
17      Q.   All right.  I'll show you what's been
18  marked as Exhibit 2.  It's an email from Wayne
19  Calco to Duane Romo, Tatjana Latinovic.  Larry
20  Roberts and William Kersten are copied.  It's dated  05:36
21  January 26th, 2016.
22           Did I read all of that correctly?
23      A.   Yes.
24      Q.   It has a number of pages that follow.  Can
25  you tell me generally the sum and substance of what  05:37



WAYNE CALCO VOL. I                                November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                            122

1    these pages are?

2        A.    You've got to scroll down to the images.

3              Yes, this was a concept developed to do a

4    micro-adjust on the chin support.

5        Q.    Are you looking at the second page there?    05:37

6        A.    OSS001251.

7        Q.    Yes.

8        A.    So those -- that slide mechanism is on the

9    side of the cheeks when you're wearing the collar

10   under the chin support, and the idea was that we     05:37

11   could have a little raised bump that you could

12   slide it back and it would give you some -- micro

13   adjustment for the chin support.

14       Q.    Now, the date on here is 1/22/2016;

15   correct?                                              05:38

16       A.    Uh-huh.

17       Q.    And does that indicate the date that you

18   came up with this concept?

19       A.    Well, on or around, yeah.  That was during

20   the development, not prior to the signing of the     05:38

21   agreement.

22       Q.    Got it.

23             So this drawing is -- this concept that

24   you came up with was during your consultancy, it

25   was not prior to signing the agreement; is that      05:38



WAYNE CALCO VOL. I                                      November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                                123

1    correct?

2        A.    Right.  It's just like with the grip.

3    It's patentable and it -- it didn't make it into

4    production, but if it had, then I would have to be

5    named on the patent because of that, even though it          05:38

6    wouldn't -- this particular thing would not be

7    connected to royalties.

8        Q.    Got it.

9              And so if we go to page 3, what are we

10   looking at here?  And I'll identify it.  At the top          05:38

11   of page 3 it says, "Chin-support-adjustment

12   concept.  Wayne Calco designer 8/28/2015."

13             Did I read that right?

14       A.    Yeah, that's the height-adjustment

15   concept.                                                     05:39

16       Q.    Okay.  And that is a concept you conceived

17   of before signing the agreement; correct?

18       A.    Yes.

19       Q.    Let me go to the next page, page 3.  Is

20   this the CAD drawing and writing that we --                  05:39

21       A.    Yes.

22       Q.    -- looked at in Exhibit 1; is that

23   correct?

24       A.    Yes.

25       Q.    Okay.  And then page 4, is that also the          05:39



WAYNE CALCO VOL. I                                November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                           124

1    CAD drawing writing that we looked at in
2    Exhibit 1 --
3        A.   Yes.
4        Q.   -- for the sternum adjustment; is that
5    correct?                                              05:39
6        A.   Yeah.
7        Q.   Remember to let me finish my questions.
8             Page 6, what is this document entitled,
9    "Moving Rack Lives Inside Chin Support Platform,"
10   with a date of 8/28/2015?                             05:39
11       A.   This is part of the additional description
12   of the height adjustment.
13       Q.   Okay.  And that is a concept that you
14   conceived of before entering into the agreement
15   with Ossur; is that correct?                          05:40
16       A.   Yes.
17       Q.   And this is your proof of that; correct?
18       A.   I guess so, yeah.  It's just additional
19   information.
20       Q.   All right.  How about the next page, 7?      05:40
21   "Moving Rack Lives Inside Chin Support Platform,"
22   it's also dated 8/28/2015.
23       A.   Yeah, uh-huh, yes.
24       Q.   What is this document?
25       A.   That's the height adjustment.                05:40



WAYNE CALCO VOL. I                                  November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                              125

```
 1        Q.   Okay.  Next page, "Chin-support-adjustment
 2   concept.  Wayne Calco designer, 12/04/2015."
 3             What is this document?
 4        A.   That is just an illustration showing that
 5   I wanted to use some rubber springs to bring the          05:40
 6   dial back.  So to activate it, you would turn it to
 7   the right, and then let go and it would return on
 8   its own.
 9        Q.   Was this a dial to adjust the height
10   adjustment or the sternum adjustment?                      05:41
11        A.   The height adjustment.
12        Q.   The next page, page 9, it's a document
13   entitled, "Collar-Back-Panel-Adjustment Concept,
14   Wayne Calco designer 12/4/2015."
15             Did I read that correctly?                       05:41
16        A.   Yes.
17        Q.   What are we looking at here?
18        A.   That's the repeatable fit tab.
19        Q.   Okay.  Now, if we go up above with the
20   chin-support-adjustment concept, that date,               05:41
21   12/04/2015, was that after -- before or after you
22   signed the agreement with Ossur?
23        A.   Well, I don't recall what the exact date
24   is.  That may have been just providing
25   additional -- additional detail or concept on how         05:42
```



WAYNE CALCO VOL. I                                November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                            126

1   this could work.

2       Q.   Did you conceive of this concept before

3   signing your agreement with Ossur or did you

4   conceive of it on the date reflected here, December

5   4th, 2015?                                           05:42

6       A.   I think I conceived of it before.  I'm

7   just -- see, it's not essential that we use an

8   O-ring the way I'm calling it out here.  There are

9   many ways of doing it.  This is one way that I

10  conceived of doing it.                               05:42

11      Q.   Let's go down to what you described as

12  repeatable fit tabs on page 9 of Exhibit 2.  This

13  date December 4th, 2015.  Does that reflect the

14  date you conceived of this concept?

15      A.   No.  I think it's when I -- when I drew it  05:42

16  up.

17      Q.   Do you have any written records, other

18  than this one, indicating the date on which you

19  conceived of repeatable fit tabs?

20      A.   I don't recall.                             05:43

21      Q.   Are you aware of any other documents

22  reflecting written records of your conception of

23  repeatable fit tabs before you signed the agreement

24  with Ossur?

25      A.   Well, they would be in the document        05:43



800.211.DEPO (3376)
EsquireSolutions.com

WAYNE CALCO VOL. I                                          November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                                    127

1   production, so there is probably drawings of that

2   in a notebook or something.

3       Q.   What is the -- why did you put this date

4   on here?

5            MR. PIGGOTT:   Asked and answered.                    05:43

6   BY MR. SIMON:

7       Q.   Why did you put the date of December 4th,

8   2015, on your CAD drawing of repeatable fit tabs?

9       A.   Well, I think it's because that's the date

10  I drew it up.                                                  05:44

11      Q.   Let's go to the next page, 10.  This

12  document is bates -- it's, kind of, small.  I've

13  got to zoom in here.  There is smaller drawing

14  here, but it states, "Ossur confidential, Wayne

15  Calco designer 1/22/2016."  I believe we looked at         05:44

16  this before, but what is this document?

17      A.   I think that would be -- that's that

18  chin -- that micro-adjust on the chin support, but

19  I thought of that after we signed.

20      Q.   All right.  And this email, the cover           05:45

21  email for all of these drawings, you copy Larry

22  Roberts and William Kersten.  Those were your

23  lawyers at the time; correct?

24      A.   Yes.

25      Q.   And what was the reason that you sent this      05:45



WAYNE CALCO VOL. I                                    November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                              128

 1   email with all of these drawings to Duane Romo,

 2   Tatjana Latinovic, copying your lawyers on January

 3   26th, 2016?

 4       A.   I think Duane may have asked me to -- to

 5   send everything again.  I think that's -- oh,                05:45

 6   actually, it could just be -- see it says,

 7   "Subject:  Side Adjustment Concept For Patient" --

 8   "For Patent"?  I may have just included that other

 9   stuff because I was sending that concept at the

10   same time.  It says, "Updated patent info for Ossur         05:46

11   collar," and then I think I just figured it would

12   be good for Larry and William to both have copies

13   of that stuff.

14       Q.   Why did you think that?

15       A.   Well, I always copy them on important              05:46

16   stuff.

17       Q.   Why was this important?

18       A.   Well, just the concepts what I was working

19   on at the time.

20       Q.   Why is what you were working on at the             05:46

21   time important?

22       A.   Well, it always is.

23       Q.   All right.  Let's go to the next exhibit.

24   Wait, let me go back -- do you have Exhibit 1

25   again?                                                      05:47



WAYNE CALCO VOL. I                                      November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                    140

1   STATE OF CALIFORNIA        )
                               )  ss.
2   COUNTY OF SAN BERNARDINO   )

3

4          I, MARIE WILSON, CSR 13480, a Certified

5   Shorthand Reporter in and for the State of

6   California, County of San Bernardino, do hereby

7   certify:

8          That WAYNE CALCO, the witness named in the

9   foregoing deposition, before the commencement of

10  the deposition, was duly administered an oath in

11  accordance with CCP 2094;

12         That said deposition was taken down in

13  stenograph writing by me and thereafter transcribed

14  into typewriting under my direction.

15         I further certify that I am neither

16  related to any party to said action, nor in any way

17  interested, financially or otherwise, in the

18  outcome thereof.

19

20         Dated this 6th day of December, 2023.

21

22

23         

24         MARIE WILSON, CSR NO. 13480

25

EXHIBIT 1

| | |
|---|---|
| **From:** | Wayne Calco [calco.wayne@me.com] |
| **Sent:** | 11/24/2015 8:52:41 PM |
| **To:** | Duane Romo [dromo@ossur.com]; Chris Webster [cwebster@ossur.com]; Jason Flores [jflores@bgalawyers.com]; Tatjana Latinovic [tlatinovic@ossur.com] |
| **Subject:** | adjustable sternum pad concept |
| **Attachments:** | STURNUM PAD ADJUSTMENT OSSUR.vc6.pdf |

DEFENDANT'S
EXHIBIT 1
W. CALCO
11/29/2023

EXHIBIT 1

STERNUM PAD ADJUSTS WITH BALL JOINT AND HIGH ANGLE
SCREW STYLE SHAFT CONCEPT 8/28/2015



PAD

Dial adjust pad

CONFIDENTIAL FOR OSSUR PATENT WAYNE CALCO DESIGNER 8/28/
2015

CONFIDENTIAL

OSS 001535

EXHIBIT 1

STERNUM PAD ADJUSTS WITH BALL JOINT AND HIGH ANGLE
SCREW STYLE SHAFT CONCEPT 8/28/2015



FINGER TURNS DIAL LEFT OR RIGHT TO RAISE OR LOWER
PAD

BALL JOINT ALLOWS PAD TO LAY
FLAT ON DIFFERING ANATOMYS

CONFIDENTIAL FOR OSSUR PATENT WAYNE CALCO DESIGNER 8/28/
2015

CONFIDENTIAL

OSS 001536

# EXHIBIT 21

1                UNITED STATES DISTRICT COURT

2                  CENTRAL OF CALIFORNIA

3

4

5    WAYNE CALCO, an individual,      )
                                      )
6                 Plaintiff,          )
                                      )
7        vs.                          ) Case No. 8:22-cv-01971
                                      ) CJC-KES
8    OSSUR AMERICAS, INC., a          )
     California corporation, Ossur    )
9    hf, an Icelandic company; and    )
     DOES 1 through 10, inclusive,    )
10                                    )
                  Defendants.         )
11                                    )

12

13

14

15

16              VIDEOTAPED DEPOSITION OF

17                    WAYNE CALCO

18                     VOLUME 2

19

20              November 30, 2023

21                   8:16 a.m.

22

23              Via videoconference

24

25         Melinda Johnson, CSR No. 13931



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                    APPEARANCES OF COUNSEL

 2

 3

 4        On behalf of WAYNE CALCO, an individual:

 5        LAW OFFICES OF GEORGE B. PIGGOTT
          BY:  GEORGE PIGGOTT, ESQ.
 6        2603 Main Street, Penthouse
          Irvine, California 92614
 7        949.261.0500
          George@piggottlaw.com
 8

 9        On behalf of OSSUR AMERICAS, INC., a California
     corporation, Ossur hf, an Icelandic company; and DOES 1
10   through 10, inclusive:

11        CALL & JENSEN
          BY:  JOSHUA G. SIMON, ESQ.
12        BY:  REBECCA MAKITALO, ESQ.
          610 Newport Center Drive, Suite 700
13        Newport Beach, California 92660
          949.717.3000
14        Jsimon@calljensen.com

15
          Also Present:
16
          Adam Mason, Videographer
17

18

19

20

21

22

23

24

25
```



WAYNE CALCO Vol.2                                    November 30, 2023
CALCO vs OSSUR AMERICAS                                              5

| | | |
|---|---|---|
| 1 | --oOo-- | 07:22AM |
| 2 | THE VIDEOGRAPHER:  We are now on the record. | 07:22AM |
| 3 | The time is 8:16 a.m. Pacific Standard Time, on | 08:16AM |
| 4 | November 30th, 2023. | 08:16AM |
| 5 | This begins the videoconference deposition of | 08:16AM |
| 6 | Wayne Calco, taken in the matter of Wayne Calco versus | 08:16AM |
| 7 | Ossur Americas, Inc., et al., filed in the United States | 08:16AM |
| 8 | District Court, Central of California, Case Number of | 08:17AM |
| 9 | which is 8:22-cv-01971 CJC-KES. | 08:17AM |
| 10 | My name is Adam Mason.  I am your remote | 08:17AM |
| 11 | videographer today.  The court reporter is Melinda | 08:17AM |
| 12 | Johnson.  We are representing Esquire Deposition | 08:17AM |
| 13 | Solutions. | 08:17AM |
| 14 | As a courtesy, will everyone who is not | 08:17AM |
| 15 | speaking please mute your audio, and please remember to | 08:17AM |
| 16 | unmute your audio when you are ready to speak. | 08:17AM |
| 17 | Will everyone present please identify | 08:17AM |
| 18 | themselves, and state who you represent, after which the | 08:17AM |
| 19 | witness will be sworn in. | 08:17AM |
| 20 | MR. SIMON:  Joshua Simon for Ossur Americas, | 08:17AM |
| 21 | Inc., and I'm joined by my colleague, Rebecca Makitalo, | 08:17AM |
| 22 | and also a client contact, Alex Coffin, who's listening | 08:17AM |
| 23 | in.  Both Rebecca and Alex won't be participating in | 08:17AM |
| 24 | today's proceedings, just listening in. | 08:18AM |
| 25 | MR. PIGGOTT:  I see an Adam Mason.  Oh, that's | 08:18AM |



WAYNE CALCO Vol.2                                    November 30, 2023
CALCO vs OSSUR AMERICAS                                                6

```
 1    the videographer.  Okay.  George Piggott for Wayne    08:18AM
 2    Calco.                                                08:18AM
 3                    WAYNE CALCO,                          08:18AM
 4    having been first duly sworn, testified as follows:   08:18AM
 5                    EXAMINATION                           08:18AM
 6    BY MR. SIMON:                                         08:18AM
 7        Q    Good morning, Mr. Calco.  I dropped in       08:18AM
 8    Exhibit 18 to the chat.                               08:18AM
 9             Have you had a chance to look at that document?  08:18AM
10        A    No.                                          08:18AM
11        Q    Can you please pull it up, and let me know when  08:18AM
12    you're ready.                                         08:18AM
13        A    I got it.                                    08:18AM
14             (Plaintiff's Exhibit 18 was marked for       08:18AM
15             identification.)                             08:18AM
16        Q    All right.  What are these documents?        08:19AM
17        A    Just -- these are the invoices.              08:19AM
18        Q    Who are the invoices from?                   08:19AM
19        A    From me to Ossur.                            08:19AM
20        Q    And are these invoices related to work       08:19AM
21    performed for Ossur?  Is that correct?                08:19AM
22        A    Yes.                                         08:19AM
23        Q    Okay.  Did you provide invoices every month  08:19AM
24    that you worked at Ossur?                             08:19AM
25        A    I think so.                                  08:19AM
```



WAYNE CALCO Vol.2                                    November 30, 2023
CALCO vs OSSUR AMERICAS                                              7

1     Q    Let's turn to page 7 of the PDF Exhibit 18.        08:19AM

2    The invoice is dated May 31st, 2016, correct?           08:19AM

3     A    Yes.                                               08:19AM

4     Q    Under the invoice total, it says, "OSSUR          08:19AM

5    ADJUSTABLE COLLAR PROJECT."  Do you see that?           08:19AM

6     A    Yes.                                               08:19AM

7     Q    And there is no further detail about what you     08:19AM

8    did that month other than that description; is that     08:19AM

9    correct?                                                08:20AM

10    A    Yes.                                               08:20AM

11    Q    What did you do that month?                        08:20AM

12    A    I have to look at my notes.                         08:20AM

13    Q    Okay.  You don't recall as you sit here today?     08:20AM

14    A    Not specifically.  I know I typically would be     08:20AM

15   working on the project.  I'd have to look at notes to   08:20AM

16   correspond with that date, and all that.                08:20AM

17    Q    And when you say typically you'd be working on     08:20AM

18   the project, you mean the adjustable collar project that 08:20AM

19   you listed here?                                         08:20AM

20    A    Yeah, uh-huh.                                       08:20AM

21    Q    All right.  We go to June.  You see there is a     08:20AM

22   list of activities you performed and put on the invoice, 08:20AM

23   and at the very end, there is something called "IFU      08:20AM

24   draft document."  Do you see that?                       08:20AM

25    A    Uh-huh.                                            08:20AM



WAYNE CALCO Vol.2                                    November 30, 2023
CALCO vs OSSUR AMERICAS                                             8

| | | | |
|---|---|---|---|
| 1 | Q | What is IF- -- | 08:20AM |
| 2 | | MR. PIGGOTT:  You've got to answer yes. | 08:20AM |
| 3 | A | Yes. | 08:20AM |
| 4 | Q | What is IFU? | 08:21AM |
| 5 | A | It's a document that -- I think it stands for | 08:21AM |
| 6 | | information for use. | 08:21AM |
| 7 | Q | Had you ever prepared an IFU before you did so | 08:21AM |
| 8 | | for Ossur? | 08:21AM |
| 9 | A | I don't -- can you repeat the question. | 08:21AM |
| 10 | Q | Had you ever prepared an IFU before you | 08:21AM |
| 11 | | prepared it for Ossur? | 08:21AM |
| 12 | A | I think I had, but, you know, not -- not | 08:21AM |
| 13 | | solely.  You know, usually they have other people's | 08:21AM |
| 14 | | input, and all that. | 08:21AM |
| 15 | Q | If we go to July, there's an entry here on the | 08:21AM |
| 16 | | fourth line down on your invoice details that says, | 08:21AM |
| 17 | | "Final draft for IFU delivered."  Did I read that | 08:22AM |
| 18 | | correct? | 08:22AM |
| 19 | A | Yeah. | 08:22AM |
| 20 | Q | So is it true that you delivered the final | 08:22AM |
| 21 | | draft of the IFU in July of 2016? | 08:22AM |
| 22 | A | I assume so. | 08:22AM |
| 23 | Q | Well, what was the IFU for? | 08:22AM |
| 24 | A | Instructions for use. | 08:22AM |
| 25 | Q | For what product? | 08:22AM |



WAYNE CALCO Vol.2                                    November 30, 2023
CALCO vs OSSUR AMERICAS                                            9

| | | | |
|---|---|---|---|
| 1 | A | The Miami JS. | 08:22AM |
| 2 | Q | Was it the collar that had your height | 08:22AM |
| 3 | | adjustment on it? | 08:22AM |
| 4 | A | I don't recall. | 08:22AM |
| 5 | Q | Did the IFU say that it was the Miami JS? | 08:22AM |
| 6 | A | I don't recall. | 08:22AM |
| 7 | Q | Did you call it the Miami JS at the time? | 08:22AM |
| 8 | A | I don't recall. | 08:22AM |
| 9 | Q | Can you tell me a single document that had | 08:22AM |
| 10 | | Miami JS that you worked on? | 08:22AM |
| 11 | A | I don't recall. | 08:23AM |
| 12 | Q | So let's take a look at -- it's toward the | 08:23AM |
| 13 | | bottom here.  It says, "Meeting with ARRK Prototype | 08:23AM |
| 14 | | tooling."  Do you see that? | 08:23AM |
| 15 | A | Yes. | 08:23AM |
| 16 | Q | What is ARRK Prototype tooling? | 08:23AM |
| 17 | A | They are a subcontractor to Ossur that made | 08:23AM |
| 18 | | prototype -- oh, I don't know if they did this, but -- | 08:23AM |
| 19 | | but Ossur wanted to have a prototype run of -- of | 08:23AM |
| 20 | | collars made, and this is a company that provides that. | 08:23AM |
| 21 | Q | Okay.  After that, it says, "models to meet | 08:23AM |
| 22 | | Prototype 2 IRB needs."  Did I read that correctly? | 08:23AM |
| 23 | A | Yes. | 08:23AM |
| 24 | Q | What is Prototype 2? | 08:23AM |
| 25 | A | I don't recall. | 08:23AM |



WAYNE CALCO Vol.2                                    November 30, 2023
CALCO vs OSSUR AMERICAS                                            10

```
 1     Q    Does this -- and this doesn't jog your memory    08:24AM
 2   as to what Prototype 2 was?                             08:24AM
 3     A    No.  I mean, I'm assuming that that was to       08:24AM
 4   delineate that it was not the first prototype but the   08:24AM
 5   second prototype.                                       08:24AM
 6     Q    And when you say, "the first prototype," do you  08:24AM
 7   mean the prototype that had your height adjustment?     08:24AM
 8     A    I don't recall.                                  08:24AM
 9     Q    Is the --                                        08:24AM
10     A    What is the date?                                08:24AM
11     Q    Go ahead.                                        08:24AM
12     A    Oh, okay.  July.  You know, I can't recall       08:24AM
13   without looking at -- into my documents.                08:24AM
14     Q    Okay.  Prototype 2, do you recall whether that   08:24AM
15   had your height adjustment?                             08:24AM
16     A    I do.                                            08:24AM
17     Q    Now, the Miami JS, that does not have your       08:24AM
18   height adjustment?                                      08:24AM
19     A    Correct.                                         08:25AM
20     Q    Let's scroll down to page 10.  And I'll          08:25AM
21   represent to you that I've provided all of the invoices 08:25AM
22   that you gave to Ossur here in this document.           08:25AM
23        And I see that there's an August invoice, but      08:25AM
24   if you go to the next page, it skips to October.        08:25AM
25   There's no September invoice.  And, in fact, on the     08:25AM
```



WAYNE CALCO Vol.2                                      November 30, 2023
CALCO vs OSSUR AMERICAS                                                11

```
 1   October invoice, there is September 2016 written.      08:25AM
 2        Do you recall why you didn't submit a September   08:25AM
 3   invoice?                                               08:25AM
 4   A   I don't recall.  I -- are there 15?  I think       08:25AM
 5   that there was a total of 15 invoices.                 08:25AM
 6   Q   Okay.  Am I missing one here in this set?          08:25AM
 7   A   I would have to look.                              08:25AM
 8   Q   All right.  Fair enough.  We'll figure that        08:25AM
 9   out.                                                   08:25AM
10        But in the October 31st invoice, it states,       08:25AM
11   "Wayne:  Meet to discuss new design and Vista Collar   08:26AM
12   strap length comparison with Chris."                   08:26AM
13        What are you referring to when you -- when you    08:26AM
14   say, "new design and Vista Collar"?                    08:26AM
15   A   I -- we would -- it was the adjustable collar      08:26AM
16   project for Ossur, new design compared to the Vista    08:26AM
17   Collar strap length comparison.                        08:26AM
18        That was when we were working on the              08:26AM
19   repeatable fit tabs at some point, and we wanted to    08:26AM
20   compare what we were working on to the Vista Collar.   08:26AM
21   Q   Okay.  And what were you working on?               08:26AM
22        Were you working on a collar with your height     08:26AM
23   adjustment at this time, or were you working on a collar 08:26AM
24   without your height adjustment at this time?           08:26AM
25   A   I don't recall.  I'd have to put it together to    08:26AM
```



WAYNE CALCO Vol.2                                    November 30, 2023
CALCO vs OSSUR AMERICAS                                            12

```
 1  my stuff.                                              08:27AM
 2      Q    All right.  I'm going to go to Exhibit 19 and 08:27AM
 3  drop that into the chat.  Let me know when you have that 08:27AM
 4  ready.                                                  08:27AM
 5      A    I got it.                                      08:27AM
 6          (Plaintiff's Exhibit 19 was marked for         08:27AM
 7           identification.)                               08:27AM
 8      Q    All right.  Exhibit 19 -- well, there is no    08:27AM
 9  Bates stamp on it.  I can represent that it was         08:27AM
10  produced.  I just -- when I printed it from the system, 08:27AM
11  I didn't put a Bates stamp on it, but I'll get -- I'll  08:28AM
12  get that Bates stamp before the end here.               08:28AM
13          MR. SIMON:  And, in fact, Rebecca, can you --   08:28AM
14  can you look up this document, and -- so we can get on  08:28AM
15  the record what the Bates stamp number is?              08:28AM
16          MS. MAKITALO:  Yes.                             08:28AM
17          MR. SIMON:  Okay.                               08:28AM
18  BY MR. SIMON:                                           08:28AM
19      Q    This is an e-mail from Wayne Calco to          08:28AM
20  Paola Vargas, with a copy to Chris Webster, sent        08:28AM
21  Wednesday, July 13th, 2016.  Do I have that correctly?  08:28AM
22      A    Yes.                                           08:28AM
23      Q    And there is a subject here, Ossur adjustable  08:28AM
24  collar, 2016 draft IFU.  Do I have that right?          08:28AM
25      A    Yes.                                           08:28AM
```



WAYNE CALCO Vol.2                                    November 30, 2023
CALCO vs OSSUR AMERICAS                                             13

| | | |
|---|---|---|
| 1 | Q    And there is an attachment, a Word document and | 08:28AM |
| 2 | a PDF document.  If we go down to the PDF document, on | 08:28AM |
| 3 | page 8 -- beginning on page 8, going to page -- | 08:29AM |
| 4 | MR. PIGGOTT:  Of the PDF? | 08:29AM |
| 5 | MR. SIMON:  Correct.  The entire document, | 08:29AM |
| 6 | Exhibit 19. | 08:29AM |
| 7 | BY MR. SIMON: | 08:29AM |
| 8 | Q    If you look at -- let's see.  Let's go to | 08:29AM |
| 9 | page 12.  Do you see that -- that product there? | 08:29AM |
| 10 | A    Yeah. | 08:29AM |
| 11 | Q    What is that? | 08:29AM |
| 12 | A    That was the adjustable collar project at that | 08:29AM |
| 13 | point. | 08:29AM |
| 14 | Q    Okay.  And this document -- I'm sorry -- this | 08:29AM |
| 15 | collar here where it -- you see where it says, Ossur on | 08:29AM |
| 16 | the sternum? | 08:29AM |
| 17 | A    Uh-huh. | 08:29AM |
| 18 | Q    Below it, there is what looks like a wheel, but | 08:29AM |
| 19 | you tell me.  What is that? | 08:29AM |
| 20 | A    It's a -- a dial. | 08:29AM |
| 21 | Q    You'd call it a dial? | 08:29AM |
| 22 | A    You could call it a wheel, a dial. | 08:29AM |
| 23 | Q    Okay.  So that wheel, dial, what was the | 08:30AM |
| 24 | purpose of that wheel, dial? | 08:30AM |
| 25 | A    That was used to lock and unlock the sternum | 08:30AM |



WAYNE CALCO Vol.2                                         November 30, 2023
CALCO vs OSSUR AMERICAS                                              14

| | | |
|---|---|---|
| 1 | pad so that it could change angle. | 08:30AM |
| 2 | Q    That wheel and dial actually locked and | 08:30AM |
| 3 | unlocked the sternum pad? | 08:30AM |
| 4 | A    Yes. | 08:30AM |
| 5 | Q    Okay.  So it -- | 08:30AM |
| 6 | A    It was a prototype.  So it wasn't fully | 08:30AM |
| 7 | developed, but okay. | 08:30AM |
| 8 | Q    Okay.  When you say it locked and unlocked the | 08:30AM |
| 9 | sternum pad, were there only two options?  It's either | 08:30AM |
| 10 | locked or unlocked? | 08:30AM |
| 11 | A    Well, it -- you could also use it -- it would | 08:30AM |
| 12 | lock and unlock, and there was a -- the more you turned | 08:30AM |
| 13 | it, then you could have -- it would allow more flexion. | 08:31AM |
| 14 | Q    When you turned it, would the distance between | 08:31AM |
| 15 | the sternum pad and the collar be increased? | 08:31AM |
| 16 | MR. PIGGOTT:  I'm going to object as the | 08:31AM |
| 17 | question is vague and ambiguous. | 08:31AM |
| 18 | BY MR. SIMON: | 08:31AM |
| 19 | Q    Do you see that piece -- I'll rephrase the | 08:31AM |
| 20 | question. | 08:31AM |
| 21 | Do you see that piece that has Ossur on it? | 08:31AM |
| 22 | A    Yes. | 08:31AM |
| 23 | Q    And then below that, there is another piece. | 08:31AM |
| 24 | What did you call that piece? | 08:31AM |
| 25 | A    That's the dial or the lock. | 08:31AM |



WAYNE CALCO Vol.2                                    November 30, 2023
CALCO vs OSSUR AMERICAS                                             25

```
 1   does not understand.  Do you --                      08:45AM
 2        MR. SIMON:  That is not how it works, and I'm    08:45AM
 3   going to suspend this deposition and get you sanctioned.  08:45AM
 4   You're wasting our time and money.  That's not how    08:45AM
 5   depositions work.                                     08:45AM
 6        He can try to answer the question.  If he        08:45AM
 7   doesn't understand it, he tells me.  You get to       08:45AM
 8   object -- that's all you get to do -- not testify and 08:46AM
 9   coach the witness --                                  08:46AM
10        (Simultaneous speakers.)                         08:46AM
11        MR. PIGGOTT:  I'm not testifying.  Stop your     08:46AM
12   commentary, Mr. Simon.                                08:46AM
13        MR. SIMON:  You stop objecting, Mr. Piggott.     08:46AM
14        MR. PIGGOTT:  That is not objectionable.         08:46AM
15        MR. SIMON:  I have a very few --                 08:46AM
16        MR. PIGGOTT:  Ask a question.                    08:46AM
17        MR. SIMON:  Stop it.                             08:46AM
18        MR. PIGGOTT:  Ask a question.                    08:46AM
19   BY MR. SIMON:                                         08:46AM
20     Q    I assume, Mr. Calco, you don't recall the      08:46AM
21   question that I asked, or do you?                     08:46AM
22     A    No.  You asked if I worked on other iterations 08:46AM
23   of the concept?                                       08:46AM
24     Q    No.  That is not my question.  My question was, 08:46AM
25   looking at this collar in Exhibit 19 -- do you see that? 08:46AM
```



WAYNE CALCO Vol.2                                    November 30, 2023
CALCO vs OSSUR AMERICAS                                            26

1        A     Yes.                                          08:46AM

2        Q     Did you work on any other iterations on the  08:46AM

3    Ossur collar that featured your sternum adjustment      08:46AM

4    mechanism after you submitted this IFU?                 08:46AM

5              MR. PIGGOTT:  Objection.  Vague and ambiguous. 08:47AM

6        A     We were continuing to work on it.  It was a  08:47AM

7    work in progress.  Even the IFU was just a preliminary. 08:47AM

8        Q     Okay.  But you had a final IFU, correct?     08:47AM

9        A     No.  I have what I submitted, but that was just 08:47AM

10   a -- a preliminary to -- you know, the -- somebody on   08:47AM

11   the Ossur staff would have to execute the real deal.    08:47AM

12   This was a guide to try to help them.                   08:47AM

13       Q     So let me ask you, this collar here with the  08:47AM

14   sternum adjustment, were there any other prototypes that 08:47AM

15   you worked on that featured the sternum adjustment      08:47AM

16   mechanism after this collar that we're looking at here? 08:47AM

17             MR. PIGGOTT:  Objection.  Vague and ambiguous. 08:47AM

18       A     I think the answer is yes.  There were -- I   08:48AM

19   know that there were other prototypes that were more    08:48AM

20   finished looking than this, and there were a round of   08:48AM

21   white prototypes.  And so that's my answer.  I think,   08:48AM

22   yes, we did continue working on it.                     08:48AM

23       Q     Fair enough.  Now, the collar that you        08:48AM

24   worked on that featured both your height adjustment      08:48AM

25   and your sternum adjustment, when was that final        08:48AM



WAYNE CALCO Vol.2                                November 30, 2023
CALCO vs OSSUR AMERICAS                                        27

```
 1   prototype created?  You mentioned it might have been    08:48AM
 2   white?                                                  08:48AM
 3          MR. PIGGOTT:  Vague and ambiguous, and           08:48AM
 4   misstates testimony, and lacking in foundation.         08:48AM
 5      A    There -- to my knowledge, there was no final    08:48AM
 6   anything.  Everything was in a state of development.    08:49AM
 7   And the -- that's my answer.                            08:49AM
 8      Q    Okay.  Here -- this white sternum adjustment    08:49AM
 9   mechanism here, was this white version before or after 08:49AM
10   the black version you see up above it?                  08:49AM
11          MR. PIGGOTT:  Objection.  Vague and ambiguous.   08:49AM
12   Did you have a white version, or you --                 08:49AM
13          MR. SIMON:  It's on the same page, George.       08:49AM
14          MR. PIGGOTT:  So just scroll to it?              08:49AM
15          MR. SIMON:  Yeah.  Sorry.  Yeah.  Page 12.       08:49AM
16      A    I don't know the order.                         08:49AM
17      Q    You don't recall the order?                     08:49AM
18      A    No.  I would -- I don't want to guess.  I --    08:49AM
19   I -- I don't know.  I could look at the -- I have photos 08:50AM
20   of all of this stuff that are dated.  So I could look   08:50AM
21   and -- and figure it out.                               08:50AM
22      Q    All right.  You could look and figure it out.   08:50AM
23   That's good to know.  We'll have you look and figure it 08:50AM
24   out at trial.                                           08:50AM
25          Okay.  Let's go back in time to Exhibit 4.  I'm  08:50AM
```



WAYNE CALCO Vol.2                                November 30, 2023
CALCO vs OSSUR AMERICAS                                        29

```
1          MR. SIMON:  The exhibit we were looking at.     08:58AM
2          MR. PIGGOTT:  Exhibit -- which?                 08:58AM
3          MR. SIMON:  Okay.                               08:58AM
4          THE WITNESS:  I know what he means.             08:58AM
5          MR. PIGGOTT:  He sure does.                     08:58AM
6          MR. SIMON:  Okay.  And I was just going to say  08:58AM
7    I had a trial a few weeks ago.  I have a trial on     08:58AM
8    Monday.  And what you're doing you know you can't do at 08:58AM
9    trial.  So stop it.                                   08:58AM
10          You state your objection, and we move on.       08:58AM
11   Mr. Calco knows what I'm talking about.  Everybody else 08:58AM
12   knows what I'm talking.  But you want to testify.  Stop 08:58AM
13   it.  Objections only.                                 08:58AM
14          MR. PIGGOTT:  Stop it yourself, your           08:58AM
15   commentary.                                           08:58AM
16   BY MR. SIMON:                                          08:58AM
17     Q    Okay.  Mr. Calco, did you submit any other     08:58AM
18   IFUs?                                                 08:58AM
19     A    I don't recall.                                08:59AM
20     Q    Fair enough.  Thank you.  I feel like we would 08:59AM
21   be able to talk very plainly and clearly, and we will at 08:59AM
22   trial, or at least Mark Eisen (phonetic) will with you 08:59AM
23   without all of this interference.                     08:59AM
24          So let's move on to Exhibit 5, and pull that up 08:59AM
25   once you have it.                                     08:59AM
```



WAYNE CALCO Vol.2                                November 30, 2023
CALCO vs OSSUR AMERICAS                                        30

```
1              Actually, let's start with Exhibit 4, if you     08:59AM
2    can look at that first.  Let me know when you have it.      08:59AM
3              MR. PIGGOTT:  We have it.                         08:59AM
4    BY MR. SIMON:                                               08:59AM
5         Q     The document that is marked as Exhibit 4 from    09:00AM
6    Wayne Calco to Shane Fedon, copy to Duane Romo, with a      09:00AM
7    date of June 6th, 2016.  Did I get that correctly?          09:00AM
8         A     Yes.                                             09:00AM
9         Q     The subject is, "Re:  Most of my original ideas  09:00AM
10   and the provisional patent application;" is that right?     09:00AM
11        A     Yes.                                             09:00AM
12        Q     "Is updated patent info OssurCollar.pdf;         09:00AM
13   Untitled.htm," correct?                                     09:00AM
14        A     Yes.                                             09:00AM
15        Q     And attached is a number of drawings; is that    09:00AM
16   correct?                                                    09:00AM
17        A     He's scrolling to it.  Yeah.  This is all the    09:00AM
18   original submissions.                                       09:01AM
19        Q     By original submissions, what do you mean?       09:01AM
20        A     These were the stuff that Justin Cassell         09:01AM
21   (phonetic) used to vet the concepts.                        09:01AM
22        Q     And it's what he used to file the provisional    09:01AM
23   patent application, correct?                                09:01AM
24              MR. PIGGOTT:  Objection.  Vague and ambiguous,   09:01AM
25   calls for speculation.                                      09:01AM
```



WAYNE CALCO Vol.2                                              November 30, 2023
CALCO vs OSSUR AMERICAS                                                        31

| | | |
|---|---|---|
| 1 | A    I don't think they used these for that. | 09:01AM |
| 2 | Q    You don't think that these drawings were in the | 09:01AM |
| 3 | provisional patent application filed by Justin in early | 09:01AM |
| 4 | 2016? | 09:01AM |
| 5 | A    I don't recall.  I -- I would think it was a | 09:01AM |
| 6 | later iteration. | 09:01AM |
| 7 | Q    Let's look at Exhibit 5.  Let me know when you | 09:01AM |
| 8 | have it. | 09:02AM |
| 9 | MR. PIGGOTT:  We have it. | 09:02AM |
| 10 | (Defendant's Exhibits 5 and 6 were | 09:02AM |
| 11 | marked for identification.) | 09:02AM |
| 12 | BY MR. SIMON: | 09:02AM |
| 13 | Q    And I'm going to drop in Exhibit 6.  If you can | 09:02AM |
| 14 | read 5 while I drop in Exhibit 6, that will save us some | 09:02AM |
| 15 | time, and we'll go through these.  Exhibit 6 was | 09:02AM |
| 16 | earlier.  It was sent at 7:35 -- | 09:02AM |
| 17 | MR. PIGGOTT:  Hold on.  Hold on.  All right. | 09:02AM |
| 18 | We have Exhibit 6. | 09:02AM |
| 19 | BY MR. SIMON: | 09:02AM |
| 20 | Q    All right.  Exhibit 6 is from you to Shane with | 09:02AM |
| 21 | the same subject, "Most of my original ideas and the | 09:02AM |
| 22 | provisional patent application," sent at 7:35 a.m., | 09:02AM |
| 23 | correct? | 09:02AM |
| 24 | A    Yes. | 09:02AM |
| 25 | Q    In this document, you sent the original | 09:02AM |



WAYNE CALCO Vol.2                                     November 30, 2023
CALCO vs OSSUR AMERICAS                                            32

1   submissions, is what you described just a second ago,        09:02AM

2   along with the application documents as filed, dot, PDF;     09:02AM

3   is that correct?                                             09:03AM

4       A    I see it here, yeah.  I didn't recall that          09:03AM

5   there was more than that.                                    09:03AM

6       Q    Okay.  So we scroll through here.  There's --       09:03AM

7       A    These are not this iteration.                       09:03AM

8       Q    I haven't asked you a question.                     09:03AM

9            You see that there is the drawings that were in     09:03AM

10  the previous e-mail we looked at in Exhibit 4, correct?      09:03AM

11      A    Yes.                                                09:03AM

12      Q    And then followed by a provisional patent           09:03AM

13  application with a date of February 25th, 2016,              09:03AM

14  correct?                                                     09:03AM

15      A    Uh-huh.                                             09:03AM

16      Q    Is that a yes?                                      09:03AM

17      A    Yes.                                                09:03AM

18      Q    And then we scroll down, and there are -- if we     09:03AM

19  look -- starting on page 44, there is a number of            09:03AM

20  drawings.  If we scroll down...                              09:03AM

21           MR. PIGGOTT:  Page 44?                              09:03AM

22  BY MR. SIMON:                                                09:03AM

23      Q    44 to 66 there is a number of drawings; is that     09:04AM

24  fair?                                                        09:04AM

25      A    Yes.                                                09:04AM



WAYNE CALCO Vol.2                                    November 30, 2023
CALCO vs OSSUR AMERICAS                                            33

```
 1      Q    And on page 53, we see a drawing.  On 54, 55,     09:04AM
 2   56, are those all your drawings?                           09:04AM
 3      A    The first two and this one --                      09:04AM
 4           MR. PIGGOTT:  This one.  He doesn't know           09:04AM
 5   what --                                                    09:04AM
 6           MR. SIMON:  What page are you on?                  09:04AM
 7           MR. PIGGOTT:  55.                                  09:04AM
 8   BY MR. SIMON:                                              09:04AM
 9      Q    Okay.  So 55, you were talking about -- what       09:04AM
10   about it?                                                  09:04AM
11      A    It's -- these are a combination of the drawings    09:04AM
12   we developed together with Chris at Ossur and some of      09:05AM
13   the original submissions sprinkled in.                     09:05AM
14      Q    Got it.  So what happened is they -- they took     09:05AM
15   the original submissions and modified it and put some      09:05AM
16   arrows and numbers to describe the original submissions.   09:05AM
17   Is that fair to say?                                       09:05AM
18           MR. PIGGOTT:  Objection.  Vague and ambiguous.     09:05AM
19   BY MR. SIMON:                                              09:05AM
20      Q    Is that -- is that correct?                        09:05AM
21      A    I -- I don't follow you, what you just said.       09:05AM
22      Q    Well, I'm trying to just fairly represent what     09:05AM
23   you're saying.                                             09:05AM
24           So beginning on 53, do you see those drawings,     09:05AM
25   those two drawings?                                        09:05AM
```



WAYNE CALCO Vol.2                                      November 30, 2023
CALCO vs OSSUR AMERICAS                                        50

```
 1   can, because I want to ask him about the --           09:29AM

 2   BY MR. SIMON:                                          09:29AM

 3       Q    So is this the second drawing, or was it the 09:30AM

 4   other drawing?                                         09:30AM

 5       A    It's the second drawing.                      09:30AM

 6       Q    Okay.  Good.  And this drawing says, "Add     09:30AM

 7   Spring, Plastic Spring" --                             09:30AM

 8       A    Yeah.                                          09:30AM

 9       Q    And what was the purpose of you forwarding that 09:30AM

10   e-mail to Mr. Webster?                                 09:30AM

11       A    So that he would have a record of what we     09:30AM

12   worked on at that session.                             09:30AM

13       Q    And did you work on this concept at that      09:30AM

14   session?                                               09:30AM

15            MR. PIGGOTT:  Objection.  Vague and ambiguous. 09:30AM

16       A    We were brainstorming iterations on the sternum 09:30AM

17   adjust.                                                09:30AM

18       Q    Is it your testimony that this is -- the same 09:31AM

19   concept is what you brought to Ossur initially?        09:31AM

20            MR. PIGGOTT:  Objection.  Vague and ambiguous. 09:31AM

21   BY MR. SIMON:                                          09:31AM

22       Q    Go ahead.                                     09:31AM

23       A    This is the iteration of the original concept, 09:31AM

24   yes.                                                   09:31AM

25       Q    Okay.  And this is -- you would agree is a    09:31AM
```



WAYNE CALCO Vol.2                                    November 30, 2023
CALCO vs OSSUR AMERICAS                                              51

| | | |
|---|---|---|
| 1 | written record, correct? | 09:31AM |
| 2 | A    Yes. | 09:31AM |
| 3 | Q    And it's dated September 28th -- | 09:31AM |
| 4 | A    Yes. | 09:31AM |
| 5 | Q    Sorry.  Let me finish.  It's dated | 09:31AM |
| 6 | September 28th, 2016, correct? | 09:31AM |
| 7 | A    Yes. | 09:31AM |
| 8 | Q    All right.  Let's go to the next exhibit.  I | 09:31AM |
| 9 | dropped in Exhibit 12. | 09:31AM |
| 10 | (Defendant's Exhibit 12 was marked for | 09:31AM |
| 11 | identification.) | 09:32AM |
| 12 | MR. PIGGOTT:  Hold on.  We've got an error | 09:32AM |
| 13 | here. | 09:32AM |
| 14 | BY MR. SIMON: | 09:32AM |
| 15 | Q    As you review this document note that the -- | 09:32AM |
| 16 | the e-mail on page 2 starts from the bottom.  That's the | 09:32AM |
| 17 | earlier sent e-mail, and the one at the top is the most | 09:32AM |
| 18 | recent. | 09:32AM |
| 19 | A    Uh-huh. | 09:32AM |
| 20 | Q    Okay.  This document is Bates stamped CALCO | 09:32AM |
| 21 | 002138 through 002152.  Did I get that right? | 09:32AM |
| 22 | A    2138, 2152 at the bottom. | 09:33AM |
| 23 | Q    Is that correct? | 09:33AM |
| 24 | A    Yes. | 09:33AM |
| 25 | Q    This is a document that you produced? | 09:33AM |



WAYNE CALCO Vol.2                               November 30, 2023
CALCO vs OSSUR AMERICAS                                        52

1     A    I guess so, yeah.                         09:33AM

2     Q    Yes or no.                               09:33AM

3     A    Yes.                                     09:33AM

4     Q    All right.  It's an e-mail from Wayne Calco to    09:33AM

5  Duane Romo, Tatjana Latinovic and Porvaldur Ingvarsson,    09:33AM

6  correct?                                         09:33AM

7     A    Yes.                                     09:33AM

8     Q    And you copied William C. Kersten, your    09:33AM

9  attorney; is that right?                         09:33AM

10    A    Uh-huh.                                  09:33AM

11    Q    Is that yes?                             09:33AM

12    A    Yes.                                     09:33AM

13    Q    The subject is Wayne Calco patents, correct?    09:33AM

14    A    Yes.                                     09:33AM

15    Q    And you write, all, it was previously agreed    09:33AM

16  that I would be the first named inventor of my designs;    09:34AM

17  these drawings reflect my ideas, and I expect you to    09:34AM

18  keep your promise; in fact, several of the figures    09:34AM

19  online are line-for-line reproductions of my original    09:34AM

20  submission; please correct your application while you    09:34AM

21  still have time; I'm also confused why you want to    09:34AM

22  patent my designs that you have no intention of    09:34AM

23  producing; we need to schedule a phone call or meeting    09:34AM

24  with Porvaldur -- I can't say it, sorry -- with    09:34AM

25  Porvaldur to discuss this disturbing development;    09:34AM



WAYNE CALCO Vol.2                                November 30, 2023
CALCO vs OSSUR AMERICAS                                        53

1    thanks, Wayne.                                        09:34AM
2            Did I read that right?                        09:34AM
3    A    Yes.                                             09:34AM
4    Q    Now -- now, what is attached to your e-mail is  09:34AM
5    a patent application, correct?                        09:34AM
6            THE WITNESS:  Yeah.  Go up a little bit,      09:34AM
7    George.                                               09:34AM
8    A    It's some kind of transmittal form, but I think 09:35AM
9    it's the one where they had Chris Webster as the first 09:35AM
10   named.  I think that's what that is, but I'd have to see 09:35AM
11   it.                                                   09:35AM
12   Q    Okay.  Let's go to page 7.  This document here, 09:35AM
13   this is a patent application.  Did you understand that? 09:35AM
14   Is that correct?                                      09:35AM
15   A    Yes.                                             09:35AM
16   Q    And --                                           09:35AM
17   A    Well, not exactly.  It's a transmittal form, I  09:35AM
18   think, is what it is.                                 09:35AM
19   Q    Okay.  Do you see at the top of the document,   09:35AM
20   it says, application dated C37 CFR 1.76?  Did I read  09:35AM
21   that right?                                           09:35AM
22   A    Yeah.  I think this is what Tatjana sent me to  09:35AM
23   show that they had corrected it and taken Chris out of 09:35AM
24   the Number 1 inventor spot.                           09:35AM
25   Q    Okay.  And you see that under inventor name,    09:35AM



WAYNE CALCO Vol.2                                    November 30, 2023
CALCO vs OSSUR AMERICAS                                            54

1    inventor information, it has you listed --                 09:36AM

2        A    Yes.                                              09:36AM

3        Q    How were you made aware of the patent            09:36AM

4    application in the first place?                            09:36AM

5        A    I -- I don't recall exactly, but I probably      09:36AM

6    received something like this to sign.                     09:36AM

7             MR. PIGGOTT:  No.  Don't -- don't speculate.     09:36AM

8        A    Okay.  I don't --                                09:36AM

9        Q    Go ahead.  Do you recall?                        09:36AM

10       A    I -- I don't recall.  I know I don't recall.     09:36AM

11       Q    Were you ever sent a patent application to sign  09:36AM

12   after your consultancy with Ossur terminated?             09:36AM

13       A    I don't recall.                                  09:36AM

14       Q    All right.  So let me ask you about this.  Your  09:36AM

15   recollection is that you somehow became aware that you    09:37AM

16   were not the first named inventor on a patent             09:37AM

17   application that Ossur filed; is that correct?            09:37AM

18       A    Yes.                                             09:37AM

19       Q    And then you indicated that the drawings         09:37AM

20   reflect your ideas that -- and some of them are line      09:37AM

21   reproductions of your original submissions; is that      09:37AM

22   right?                                                    09:37AM

23            MR. PIGGOTT:  Objection to the question.  The    09:37AM

24   document speaks for itself.                               09:37AM

25   BY MR. SIMON:                                             09:37AM



WAYNE CALCO Vol.2                                      November 30, 2023
CALCO vs OSSUR AMERICAS                                              75

```
1      A    Yeah.                                              10:15AM
2      Q    And up above on the collar, where there is the    10:15AM
3   dial?                                                      10:15AM
4      A    Yes.                                               10:15AM
5      Q    Was that a dial to adjust height?                 10:15AM
6      A    Yes.                                               10:15AM
7      Q    All right.  And then the repeatable fit tabs,     10:15AM
8   is that on this drawing?                                  10:15AM
9      A    Yes.                                               10:15AM
10     Q    Okay.                                             10:15AM
11     A    On the side view.                                 10:16AM
12     Q    On the side view?                                 10:16AM
13     A    You can see the pull tabs, the yellow pull        10:16AM
14  tabs.                                                     10:16AM
15     Q    Okay.                                             10:16AM
16     A    Again, this is just a rendering --                10:16AM
17         MR. PIGGOTT:  You've answered the question.        10:16AM
18  BY MR. SIMON:                                             10:16AM
19     Q    So this is a rendering of repeatable fit tabs     10:16AM
20  at the time you prepared this presentation; is that       10:16AM
21  correct?                                                  10:16AM
22     A    Well, all of it is -- would be based on my        10:16AM
23  original concepts, yes.                                   10:16AM
24     Q    All right.  So what are we looking at on the --   10:16AM
25  in the profile view, there is a -- there is a slide       10:16AM
```



WAYNE CALCO Vol.2                                          November 30, 2023
CALCO vs OSSUR AMERICAS                                                    76

1    knob, and then there is --                                  10:16AM

2        A    That was the idea for some adjustment on the       10:16AM

3    chin support.                                               10:16AM

4        Q    Okay.  And then the repeatable fit tabs is this    10:16AM

5    yellow thing; is that right?                                10:16AM

6        A    Yeah.                                              10:16AM

7        Q    And that's to the left of the piece that has       10:16AM

8    the Miami Ultra insignia on it; is that correct?            10:16AM

9        A    No.  It's the whole thing.                         10:17AM

10       Q    All right.  Describe that.  What is the            10:17AM

11   repeatable --                                               10:17AM

12       A    The yellow ribbed pull tab is connected to that    10:17AM

13   little plastic buckle, and that's -- you know, that's...    10:17AM

14       Q    And what does the buckle do?                       10:17AM

15       A    It would connect to the -- it would connect the    10:17AM

16   back to the front.                                          10:17AM

17       Q    And would the buckle lock on the -- the collar?    10:17AM

18       A    It could be attached any way, yeah.  I mean, it    10:17AM

19   could be Velcro'd on, locked in.  Again, it was -- this     10:17AM

20   is just a visual.                                           10:17AM

21       Q    Okay.  So the key issue is that it's attached,     10:17AM

22   right?                                                      10:17AM

23       A    Well, the back panel and the -- and the front     10:17AM

24   panel are shown connected there, yes.                       10:17AM

25       Q    Let me ask you, while you were at Ossur -- just    10:18AM



WAYNE CALCO Vol.2                                    November 30, 2023
CALCO vs OSSUR AMERICAS                                            77

```
 1   a few follow-up questions -- while you were at Ossur,      10:18AM
 2   did any of the products that you worked on that had your   10:18AM
 3   height adjustment, were -- did any of them receive their   10:18AM
 4   FDA registrations?                                         10:18AM
 5            MR. PIGGOTT:  Objection to the question as        10:18AM
 6   vague and ambiguous, compound.                             10:18AM
 7        A    And I have no idea.                              10:18AM
 8        Q    Why do you have no idea?                         10:18AM
 9        A    I don't know.                                    10:18AM
10        Q    Were you part of the FDA registration at all?   10:18AM
11        A    I don't think so.                                10:18AM
12        Q    Did you ever discuss FDA registration with      10:18AM
13   anyone regarding any one of the products you worked on?    10:18AM
14        A    You're -- I guess you have to clarify that.  It  10:18AM
15   sounds like you're referring to more than one project.    10:19AM
16        Q    I am referring to exactly what I asked, but did  10:19AM
17   you --                                                     10:19AM
18        A    My answer is I don't recall, okay?  So there    10:19AM
19   you go.                                                    10:19AM
20        Q    Well, did you -- do you recall having any       10:19AM
21   conversation about FDA registration about any product     10:19AM
22   that you worked on while you were at Ossur?               10:19AM
23        A    I don't recall.  I don't know if that -- that   10:19AM
24   one -- that IFU, I don't know if that's part of that or   10:19AM
25   not.  It might be.  I don't recall.                        10:19AM
```



WAYNE CALCO Vol.2                                November 30, 2023
CALCO vs OSSUR AMERICAS                                        78

| | | |
|---|---|---|
| 1 | Q    Do you have a specific recollection of having a | 10:19AM |
| 2 | conversation with somebody in which FDA registration was | 10:19AM |
| 3 | discussed regarding any of the collars you were working | 10:20AM |
| 4 | on at Ossur? | 10:20AM |
| 5 | A    I don't recall. | 10:20AM |
| 6 | Q    Do you recall any quote that was sent to a | 10:20AM |
| 7 | manufacturer to produce on a mass scale any product that | 10:20AM |
| 8 | you worked on while you were at Ossur? | 10:20AM |
| 9 | MR. PIGGOTT:  Objection to the question as | 10:20AM |
| 10 | vague and ambiguous. | 10:20AM |
| 11 | A    I don't recall. | 10:20AM |
| 12 | Q    Is that because you don't remember or because | 10:20AM |
| 13 | it didn't happen? | 10:20AM |
| 14 | A    Well, I don't know if it happened or not.  I | 10:20AM |
| 15 | know we met with their Mexican manufacturing, and this | 10:20AM |
| 16 | would all be around that Gate 2.1 and like that e-mail | 10:20AM |
| 17 | you showed saying that the -- about the meeting being | 10:21AM |
| 18 | moved. | 10:21AM |
| 19 | I recall that it was ready to go.  I think | 10:21AM |
| 20 | that -- well, like what we were asking -- and I think | 10:21AM |
| 21 | what Chris asked -- are we ready to go.  It was like we | 10:21AM |
| 22 | needed other people to say yes or no. | 10:21AM |
| 23 | Q    So when you spoke with the Mexican | 10:21AM |
| 24 | manufacturer, was that about the collar that had your | 10:21AM |
| 25 | height adjustment or about the collar that did not have | 10:21AM |



800.211.DEPO (3376)
EsquireSolutions.com

WAYNE CALCO Vol.2                                        November 30, 2023
CALCO vs OSSUR AMERICAS                                               79

```
 1   your height adjustment?                                   10:21AM

 2       A    I don't recall because I continued working with  10:21AM

 3   them on the project.  I don't remember.                   10:21AM

 4       Q    You continued to work with whom?                 10:21AM

 5       A    With Ossur.                                       10:21AM

 6       Q    Okay.  So you worked with Ossur on both          10:21AM

 7   collars.  Is that what you're saying?                     10:21AM

 8            MR. PIGGOTT:  Object to the question as vague     10:21AM

 9   and ambiguous, what is meant by "both."                   10:22AM

10   BY MR. SIMON:                                             10:22AM

11       Q    Is that correct?                                 10:22AM

12       A    Well, my perception of it is as a single         10:22AM

13   project, the new Miami -- or the new Ossur adjustable     10:22AM

14   collar may --                                             10:22AM

15       Q    But my question was about the two different      10:22AM

16   collars we've talked about, one with your height          10:22AM

17   adjustment, one without.                                  10:22AM

18            And my question was, you continued to work on    10:22AM

19   both collars -- one without your height adjustment, one   10:22AM

20   with -- while you were working at Ossur, correct?         10:22AM

21            MR. PIGGOTT:  Object to the question as vague     10:22AM

22   and ambiguous and argumentative.  He's answered the       10:22AM

23   question.                                                 10:22AM

24   BY MR. SIMON:                                             10:22AM

25       Q    Is that correct?                                 10:22AM
```



```
 1                    CERTIFICATE OF REPORTER

 2

 3        I, Melinda Johnson, a Certified Shorthand Reporter

 4   in and for the State of California, do hereby certify:

 5

 6        That the foregoing witness was by me duly sworn;

 7   that the deposition was then taken before me at the time

 8   and place herein set forth; that the testimony and

 9   proceedings were reported stenographically by me and

10   later transcribed into typewriting under my direction;

11   that the foregoing is a true record of the testimony and

12   proceedings taken at that time.

13

14        IN WITNESS WHEREOF, I hereunto set my hand on this

15   21st day of December, 2023,

16

17

18                      Melinda Johnson, CSR No. 13931

19

20

21

22

23

24

25
```



| From: | Tatjana Latinovic <tlatinovic@ossur.com> |
| Sent: | Tuesday, March 7, 2017 5:58 AM |
| To: | Wayne Calco |
| Cc: | William C. Kersten; Shane Fedon; Duane Romo; IS IP Administrator; Þorvaldur Ingvarsson |
| Subject: | RE: Wayne Calco patents |
| Attachments: | PCT request form.pdf; ADS.PDF |

Hello Wayne,

I confirm that we listed you as the first inventor in both the US and PCT applications in this case. You can see from the attached documents that you are the first listed inventor (in the PCT application you come after Ossur, the applicant). As a reminder, these filings claim priority to provisional application S/N 62/299,766 that was filed on February 25, 2016 and that you have already reviewed and accepted. It is based on the designs that you created before we entered into agreement and it was agreed that we will file. Please see Section 9. Company Work and Rights in Adaptations of the Services Agreement for grounds for filing. In addition to that, I can offer following explanation: Össur always tries to protect the field around its products and designs in order to secure ia broader freedom to operate and not all patent applications/patents end up being utilized in products. It is therefore completely understandeable that we would file for these designs even though the design process itself went into another direction.

I also refer to the same Section 9. regarding your obligation to sign the declaration:

Upon the request of the Company, Consultant shall promptly take such further actions, including execution and delivery of all appropriate instruments of conveyance, as may be necessary to assist the Company to prosecute, register, perfect, record or enforce its rights in any Subject Intellectual Property.

I hope that this explains the situation. Please let me know if you have any other questions, otherwise I am looking forward to receiving signed paperwork from you.

Kind regards

Tatjana Latinovic
VP of Intellectual Property
Össur Head Office

Tel: +354 5151311
Mobile: + 354 6641034
E-mail: tlatinovic@ossur.com
www.ossur.com
Email-disclaimer

-----Original Message-----
From: Wayne Calco [mailto:calco.wayne@me.com]

CALCO 002138

**-525-**

Sent: 6. mars 2017 22:53
To: Duane Romo <dromo@ossur.com>; Tatjana Latinovic <tlatinovic@ossur.com>; IS IP Administrator
<ipadministrator@ossur.com>; Þorvaldur Ingvarsson <thingvarsson@ossur.com>
Cc: William C. Kersten <kerstenlaw@sbcglobal.net>
Subject: Wayne Calco patents

All,

It was previously agreed that I would be the first named inventor of my designs,  These drawings reflect my ideas and I
expect you to keep your promise.  In fact several of the figures are line for line reproductions of my original submissions.
Please correct your application while you still have time. I am also confused why you want to patent my designs that you
have no intention of producing.

We need to schedule a phone call or meeting with Thorvalder to discuss this disturbing development.

Thanks,

Wayne

CALCO 002139

**-526-**

19793-488a

1/4

**PCT REQUEST**

Original (for **SUBMISSION** )

| 0 | For receiving Office use only | |
|---|---|---|
| 0-1 | International Application No. | |
| 0-2 | International Filing Date | |
| 0-3 | Name of receiving Office and "PCT International Application" | |

| 0-4 | Form PCT/RO/101 PCT Request | |
|---|---|---|
| 0-4-1 | Prepared Using | PCT-SAFE [EFS-Web mode] Version 3.51.076.252 MT/FOP 20170101/0.20.5.24 |
| 0-5 | Petition | |
| | The undersigned requests that the present international application be processed according to the Patent Cooperation Treaty | |
| 0-6 | Receiving Office (specified by the applicant) | United States Patent and Trademark Office (USPTO) (RO/US) |
| 0-7 | Applicant's or agent's file reference | 19793-488a |
| I | Title of Invention | CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT |
| II | Applicant | |
| II-1 | This person is | Applicant only |
| II-2 | Applicant for | All designated States |
| II-4 | Name | OSSUR ICELAND EHF |
| II-5 | Address | Grjothals 5 110 Reykjavik Iceland |
| II-6 | State of nationality | IS |
| II-7 | State of residence | IS |
| III-1 | Applicant and/or inventor | |
| III-1-1 | This person is | Applicant only |
| III-1-2 | Applicant for | AP: (MW); MW |
| III-1-4 | Name | OSSUR AMERICAS, INC. |
| III-1-5 | Address | 27051 Towne Centre Drive Foothill Ranch, California 92610 United States of America |
| III-1-6 | State of nationality | US |
| III-1-7 | State of residence | US |

CALCO 002140

19793-488a

2/4

**PCT REQUEST**

Original (for **SUBMISSION**)

| | | |
|---|---|---|
| **III-2** | **Applicant and/or inventor** | |
| III-2-1 | This person is | Inventor only |
| III-2-3 | Inventor for | All designated States |
| III-2-4 | Name (LAST, First) | CALCO, Wayne |
| III-2-5 | Address | c/o OSSUR AMERICAS, INC.<br>27051 Towne Centre Drive<br>Foothill Ranch, California 92610<br>United States of America |
| **III-3** | **Applicant and/or inventor** | |
| III-3-1 | This person is | Inventor only |
| III-3-3 | Inventor for | All designated States |
| III-3-4 | Name (LAST, First) | CALLICOTT, Christopher |
| III-3-5 | Address | c/o OSSUR AMERICAS, INC.<br>27051 Towne Centre Drive<br>Foothill Ranch, California 92610<br>United States of America |
| **III-4** | **Applicant and/or inventor** | |
| III-4-1 | This person is | Inventor only |
| III-4-3 | Inventor for | All designated States |
| III-4-4 | Name (LAST, First) | ROMO, Harry Duane |
| III-4-5 | Address | c/o OSSUR AMERICAS, INC.<br>27051 Towne Centre Drive<br>Foothill Ranch, California 92610<br>United States of America |
| **IV-1** | **Agent or common representative; or address for correspondence**<br>The person identified below is hereby/ has been appointed to act on behalf of the applicant(s) before the competent International Authorities as: | Agent |
| IV-1-1 | Name (LAST, First) | CASSELL, Justin J. |
| IV-1-2 | Address | WORKMAN NYDEGGER<br>60 East South Temple, Suite 1000<br>Salt Lake City, Utah 84111<br>United States of America |
| IV-1-3 | Telephone No. | 801-533-9800 |
| IV-1-4 | Facsimile No. | 801-328-1707 |
| IV-1-5 | e-mail | docketing@wnlaw.com |
| IV-1-5(a) | E-mail authorization<br>The receiving Office, the International Searching Authority, the International Bureau and the International Preliminary Examining Authority are authorized to use this e-mail address, if the Office or Authority so wishes, to send notifications issued in respect of this international application: | exclusively in electronic form (no paper notifications will be sent) |
| IV-1-6 | Agent's registration No. | 46205 |

CALCO 002141

19793-488a

3/4

**PCT REQUEST**

Original (for **SUBMISSION** )

| V | DESIGNATIONS | |
|---|---|---|
| **V-1** | **The filing of this request constitutes under Rule 4.9(a), the designation of all Contracting States bound by the PCT on the international filing date, for the grant of every kind of protection available and, where applicable, for the grant of both regional and national patents.** | |
| **VI-1** | **Priority claim of earlier national application** | |
| VI-1-1 | Filing date | 25 February 2016 (25.02.2016) |
| VI-1-2 | Number | 62/299,766 |
| VI-1-3 | Country or Member of WTO | US |
| **VI-2** | **Priority document request** | |
| | The receiving Office is requested to prepare and transmit to the International Bureau a certified copy of the earlier application(s) identified above as item(s): | VI-1 |
| **VI-3** | **Incorporation by reference :** | |
| | where an element of the international application referred to in Article 11(1)(iii)(d) or (e) or a part of the description, claims or drawings referred to in Rule 20.5(a) is not otherwise contained in this international application but is completely contained in an earlier application whose priority is claimed on the date on which one or more elements referred to in Article 11(1)(iii) were first received by the receiving Office, that element or part is, subject to confir- mation under Rule 20.6, incorporated by reference in this international application for the purposes of Rule 20.6. | |
| **VII-1** | **International Searching Authority Chosen** | European Patent Office (EPO) (ISA/EP) |
| **VIII** | **Declarations** | Number of declarations |
| VIII-1 | Declaration as to the identity of the inventor | – |
| VIII-2 | Declaration as to the applicant's entitlement, as at the international filing date, to apply for and be granted a patent | – |
| VIII-3 | Declaration as to the applicant's entitlement, as at the international filing date, to claim the priority of the earlier application | – |
| VIII-4 | Declaration of inventorship (only for the purposes of the designation of the United States of America) | – |
| VIII-5 | Declaration as to non-prejudicial disclosures or exceptions to lack of novelty | – |

CALCO 002142

19793-488a

4/4

**PCT REQUEST**

Original (for **SUBMISSION** )

| IX | Check list | Number of sheets | Electronic file(s) attached |
|---|---|---|---|
| IX-1 | Request (including declaration sheets) | 4 | ✓ |
| IX-2 | Description | 23 | − |
| IX-3 | Claims | 3 | − |
| IX-4 | Abstract | 1 | ✓ |
| IX-5 | Drawings | 20 | − |
| IX-7 | TOTAL | 51 | |
| | **Accompanying Items** | Paper document(s) attached | Electronic file(s) attached |
| IX-8 | Fee calculation sheet | ✓ | − |
| IX-11 | Copy of general power of attorney | Reference no. 19793.488a | − |
| **IX-20** | **Figure of the drawings which should accompany the abstract** | 10 | |
| **IX-21** | **Language of filing of the international application** | English | |
| **X-1** | **Signature of applicant, agent or common representative** | /Justin J. Cassell, 46205/ | |
| **X-1-1** | Name | OSSUR ICELAND EHF | |
| **X-1-2** | Name of signatory | Justin J. Cassell | |
| **X-1-3** | Capacity (if such capacity is not obvious from reading the request) | Attorney for Applicant | |

**FOR RECEIVING OFFICE USE ONLY**

| 10-1 | Date of actual receipt of the purported international application | |
|---|---|---|
| **10-2** | **Drawings:** | |
| 10-2-1 | Received | |
| 10-2-2 | Not received | |
| 10-3 | Corrected date of actual receipt due to later but timely received papers or drawings completing the purported international application | |
| 10-4 | Date of timely receipt of the required corrections under PCT Article 11(2) | |
| 10-5 | International Searching Authority | ISA/EP |
| 10-6 | Transmittal of search copy delayed until search fee is paid | |

**FOR INTERNATIONAL BUREAU USE ONLY**

| 11-1 | Date of receipt of the record copy by the International Bureau | |
|---|---|---|

CALCO 002143

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017.  OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 19793.488.1 |
|---|---|---|
| | Application Number | |

| Title of Invention | CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76. This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

## Secrecy Order 37 CFR 5.2:

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2 (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

## Inventor Information:

| Inventor | 1 | | | | | Remove | | |
|---|---|---|---|---|---|---|---|---|
| **Legal Name** | | | | | | | | |

| Prefix | Given Name | | Middle Name | | | Family Name | | Suffix |
|---|---|---|---|---|---|---|---|---|
| | Wayne | | | | | CALCO | | |

| Residence Information (Select One) | ● US Residency | ○ Non US Residency | ○ Active US Military Service |
|---|---|---|---|

| City | Foothill Ranch | State/Province | CA | Country of Residence | US |
|---|---|---|---|---|---|

### Mailing Address of Inventor:

| Address 1 | c/o OSSUR AMERICAS, INC. |
|---|---|
| Address 2 | 27051 Towne Centre Drive |

| City | Foothill Ranch | | State/Province | CA |
|---|---|---|---|---|
| Postal Code | 92610 | Country i | US | |

| Inventor | 2 | | | | | Remove | | |
|---|---|---|---|---|---|---|---|---|
| **Legal Name** | | | | | | | | |

| Prefix | Given Name | | Middle Name | | | Family Name | | Suffix |
|---|---|---|---|---|---|---|---|---|
| | Christopher | | | | | CALLICOTT | | |

| Residence Information (Select One) | ● US Residency | ○ Non US Residency | ○ Active US Military Service |
|---|---|---|---|

| City | Foothill Ranch | State/Province | CA | Country of Residence | US |
|---|---|---|---|---|---|

### Mailing Address of Inventor:

| Address 1 | c/o OSSUR AMERICAS, INC. |
|---|---|
| Address 2 | 27051 Towne Centre Drive |

| City | Foothill Ranch | | State/Province | CA |
|---|---|---|---|---|
| Postal Code | 92610 | Country i | US | |

| Inventor | 3 | | | | | Remove | | |
|---|---|---|---|---|---|---|---|---|
| **Legal Name** | | | | | | | | |

| Prefix | Given Name | | Middle Name | | | Family Name | | Suffix |
|---|---|---|---|---|---|---|---|---|
| | Harry | | Duane | | | ROMO | | |

| Residence Information (Select One) | ● US Residency | ○ Non US Residency | ○ Active US Military Service |
|---|---|---|---|

EFS Web 2.2.12

CALCO 002144

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 19793.488.1 |
| | Application Number | |

| Title of Invention | CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT |
|---|---|

| City | Foothill Ranch | | State/Province | CA | Country of Residence | US |
|---|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | c/o OSSUR AMERICAS, INC. | | | |
|---|---|---|---|---|
| Address 2 | 27051 Towne Centre Drive | | | |
| City | Foothill Ranch | | State/Province | CA |
| Postal Code | 92610 | Country i | US | |

All Inventors Must Be Listed – Additional Inventor Information blocks may be generated within this form by selecting the **Add** button.          [Add]

## Correspondence Information:

**Enter either Customer Number or complete the Correspondence Information section below.
For further information see 37 CFR 1.33(a).**

| ☐ An Address is being provided for the correspondence Information of this application. | | |
|---|---|---|
| Customer Number | 22913 | |
| Email Address | docketing@wnlaw.com | [Add Email] [Remove Email] |

## Application Information:

| Title of the Invention | CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT | | |
|---|---|---|---|
| Attorney Docket Number | 19793.488.1 | Small Entity Status Claimed | ☐ |
| Application Type | Nonprovisional | | |
| Subject Matter | Utility | | |
| Total Number of Drawing Sheets (if any) | 20 | Suggested Figure for Publication (if any) | |

## Filing By Reference:

Only complete this section when filing an application by reference under 35 U.S.C. 111(c) and 37 CFR 1.57(a). Do not complete this section if application papers including a specification and any drawings are being filed. Any domestic benefit or foreign priority information must be provided in the appropriate section(s) below (i.e., "Domestic Benefit/National Stage Information" and "Foreign Priority Information").

For the purposes of a filing date under 37 CFR 1.53(b), the description and any drawings of the present application are replaced by this reference to the previously filed application, subject to conditions and requirements of 37 CFR 1.57(a).

| Application number of the previously filed application | Filing date (YYYY-MM-DD) | Intellectual Property Authority or Country |
|---|---|---|
| | | |

## Publication Information:

| ☐ Request Early Publication (Fee required at time of Request 37 CFR 1.219) |
|---|
| ☐ **Request Not to Publish.** I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing. |

EFS Web 2.2.12

CALCO 002145

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | | Attorney Docket Number | 19793.488.1 |
|---|---|---|---|
| | | Application Number | |
| Title of Invention | CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT | | |

## Representative Information:

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32). Either enter Customer Number or complete the Representative Name section below. If both sections are completed the customer Number will be used for the Representative Information during processing.

| Please Select One: | ◉ Customer Number | ◯ US Patent Practitioner | ◯ Limited Recognition (37 CFR 11.9) |
|---|---|---|---|
| Customer Number | 22913 | | |

## Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, 365(c), or 386(c) or indicate National Stage entry from a PCT application. Providing benefit claim information in the Application Data Sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78.
When referring to the current application, please leave the "Application Number" field blank.

| Prior Application Status | Pending | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) |
| | Claims benefit of provisional | 62/299766 | 2016-02-25 |

Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button.

## Foreign Priority Information:

This section allows for the applicant to claim priority to a foreign application. Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55. When priority is claimed to a foreign application that is eligible for retrieval under the priority document exchange program (PDX)[i] the information will be used by the Office to automatically attempt retrieval pursuant to 37 CFR 1.55(i)(1) and (2). Under the PDX program, applicant bears the ultimate responsibility for ensuring that a copy of the foreign application is received by the Office from the participating foreign intellectual property office, or a certified copy of the foreign priority application is filed, within the time period specified in 37 CFR 1.55(g)(1).

| Application Number | Country[i] | Filing Date (YYYY-MM-DD) | Remove Access Code[i] (if applicable) |
|---|---|---|---|
| | | | |

Additional Foreign Priority Data may be generated within this form by selecting the **Add** button.

EFS Web 2.2.12

CALCO 002146

**-533-**

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 19793.488.1 |
|---|---|---|
| | Application Number | |
| Title of Invention | CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT | |

## Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications

☐ This application (1) claims priority to or the benefit of an application filed before March 16, 2013 and (2) also contains, or contained at any time, a claim to a claimed invention that has an effective filing date on or after March 16, 2013.
NOTE: By providing this statement under 37 CFR 1.55 or 1.78, this application, with a filing date on or after March 16, 2013, will be examined under the first inventor to file provisions of the AIA.

EFS Web 2.2.12

CALCO 002147

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 19793.488.1 |
|---|---|---|
| | Application Number | |
| Title of Invention | CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT | |

## Authorization or Opt-Out of Authorization to Permit Access:

When this Application Data Sheet is properly signed and filed with the application, applicant has provided written authority to permit a participating foreign intellectual property (IP) office access to the instant application-as-filed (see paragraph A in subsection 1 below) and the European Patent Office (EPO) access to any search results from the instant application (see paragraph B in subsection 1 below).

Should applicant choose not to provide an authorization identified in subsection 1 below, applicant **must opt-out** of the authorization by checking the corresponding box A or B or both in subsection 2 below.

**NOTE**: This section of the Application Data Sheet is **ONLY** reviewed and processed with the **INITIAL** filing of an application. After the initial filing of an application, an Application Data Sheet cannot be used to provide or rescind authorization for access by a foreign IP office(s). Instead, Form PTO/SB/39 or PTO/SB/69 must be used as appropriate.

**1. Authorization to Permit Access by a Foreign Intellectual Property Office(s)**

**A. Priority Document Exchange (PDX)** - Unless box A in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the European Patent Office (EPO), the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), the State Intellectual Property Office of the People's Republic of China (SIPO), the World Intellectual Property Organization (WIPO), and any other foreign intellectual property office participating with the USPTO in a bilateral or multilateral priority document exchange agreement in which a foreign application claiming priority to the instant patent application is filed, access to: (1) the instant patent application-as-filed and its related bibliographic data, (2) any foreign or domestic application to which priority or benefit is claimed by the instant application and its related bibliographic data, and (3) the date of filing of this Authorization. See 37 CFR 1.14(h)(1).

**B. Search Results from U.S. Application to EPO** - Unless box B in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the EPO access to the bibliographic data and search results from the instant patent application when a European patent application claiming priority to the instant patent application is filed. See 37 CFR 1.14(h)(2).

The applicant is reminded that the EPO's Rule 141(1) EPC (European Patent Convention) requires applicants to submit a copy of search results from the instant application without delay in a European patent application that claims priority to the instant application.

**2. Opt-Out of Authorizations to Permit Access by a Foreign Intellectual Property Office(s)**

☐ A. Applicant **DOES NOT** authorize the USPTO to permit a participating foreign IP office access to the instant application-as-filed. If this box is checked, the USPTO will not be providing a participating foreign IP office with any documents and information identified in subsection 1A above.

☐ B. Applicant **DOES NOT** authorize the USPTO to transmit to the EPO any search results from the instant patent application. If this box is checked, the USPTO will not be providing the EPO with search results from the instant application.

**NOTE:** Once the application has published or is otherwise publicly available, the USPTO may provide access to the application in accordance with 37 CFR 1.14.

CALCO 002148

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 19793.488.1 |
|---|---|---|
| | Application Number | |
| Title of Invention | CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT | |

## Applicant Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

**Applicant  1**

If the applicant is the inventor (or the remaining joint inventor or inventors under 37 CFR 1.45), this section should not be completed. The information to be provided in this section is the name and address of the legal representative who is the applicant under 37 CFR 1.43; or the name and address of the assignee, person to whom the inventor is under an obligation to assign the invention, or person who otherwise shows sufficient proprietary interest in the matter who is the applicant under 37 CFR 1.46. If the applicant is an applicant under 37 CFR 1.46 (assignee, person to whom the inventor is obligated to assign, or person who otherwise shows sufficient proprietary interest) together with one or more joint inventors, then the joint inventor or inventors who are also the applicant should be identified in this section.

Clear

| ◉ Assignee | ○ Legal Representative under  35 U.S.C. 117 | ○ Joint Inventor |
|---|---|---|

| ○ Person to whom the inventor is obligated to assign. | ○ Person who shows sufficient proprietary interest |
|---|---|

If applicant is the legal representative, indicate the authority to file the patent application, the inventor is:

Name of the Deceased or Legally Incapacitated Inventor:

If the Applicant is an Organization check here.   ⊠

| Organization Name | OSSUR ICELAND EHF |
|---|---|

**Mailing Address Information For Applicant:**

| Address 1 | Grjothals 5 |
|---|---|
| Address 2 | |

| City | | Reykjavik | State/Province | |
|---|---|---|---|---|
| Country | IS | | Postal Code | 110 |
| Phone Number | | | Fax Number | |
| Email Address | | | | |

Additional Applicant Data may be generated within this form by selecting the Add button.

## Assignee Information including Non-Applicant Assignee Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

EFS Web 2.2.12

CALCO 002149

**-536-**

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 19793.488.1 |
|---|---|---|
| | Application Number | |

| Title of Invention | CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT |
|---|---|

---

**Assignee   1**

Complete this section if assignee information, including non-applicant assignee information, is desired to be included on the patent application publication. An assignee-applicant identified in the "Applicant Information" section will appear on the patent application publication as an applicant. For an assignee-applicant, complete this section only if identification as an assignee is also desired on the patent application publication.

| If the Assignee or Non-Applicant Assignee is an Organization check here. | | | | ☐ |
|---|---|---|---|---|
| Prefix | Given Name | Middle Name | Family Name | Suffix |
| | | | | |

**Mailing Address Information For Assignee including Non-Applicant Assignee:**

| Address 1 | | | |
|---|---|---|---|
| Address 2 | | | |
| City | | State/Province | |
| Country i | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Assignee or Non-Applicant Assignee Data may be generated within this form by selecting the Add button.

## Signature:

**NOTE:** This Application Data Sheet must be signed in accordance with 37 CFR 1.33(b). **However, if this Application Data Sheet is submitted with the INITIAL filing of the application and either box A or B is not checked in subsection 2 of the "Authorization or Opt-Out of Authorization to Permit Access" section, then this form must also be signed in accordance with 37 CFR 1.14(c).**

This Application Data Sheet **must** be signed by a patent practitioner if one or more of the applicants is a **juristic entity** (e.g., corporation or association). If the applicant is two or more joint inventors, this form must be signed by a patent practitioner, **all** joint inventors who are the applicant, or one or more joint inventor-applicants who have been given power of attorney (e.g., see USPTO Form PTO/AIA/81) on behalf of **all** joint inventor-applicants.
See 37 CFR 1.4(d) for the manner of making signatures and certifications.

| Signature | /Justin J. Cassell/ | | | Date  (YYYY-MM-DD) | 2017-02-24 |
|---|---|---|---|---|---|
| First Name | Justin | Last Name | Cassell | Registration Number | 46205 |

Additional Signature may be generated within this form by selecting the Add button.

EFS Web 2.2.12

CALCO 002150

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017.  OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 19793.488.1 |
|---|---|---|
| | Application Number | |
| Title of Invention | CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT | |

This collection of information is required by 37 CFR 1.76.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 23 minutes to complete, including gathering, preparing, and submitting the completed application data sheet form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS.  **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.2.12

CALCO 002151

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent CooperationTreaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.2.12

CALCO 002152

Wayne Calco

VENDOR A05715

INVOICE #112015

11/01/2015 THRU 11/30/2015

Amount:  $11,000.00

OSSUR ADJUSTABLE COLLAR PROJECT

14 HOURS: MEETINGS WITH OSSUR FHR

100 HOURS: ADJUSTMENT CONCEPT FOR

 CHIN SUPPORT

20 HOURS: ADJUSTMENT CONCEPT FOR STURNUM

PAD ADJUSTMENT

26 HOURS: COLLAR DEVELOPMENT FOR RETENTION

OF TRADITIONAL MIAMI COLLAR FIT.

160 HOURS TOTAL

*net 5 days please and thanks!





**Wayne Calco**

VENDOR  A05715

INVOICE #123115

12/01/2015 THRU 12/31/2015

Amount:  $10,000.00

**OSSUR ADJUSTABLE COLLAR PROJECT**

6 HOURS: MEETINGS WITH OSSUR

140 Hours: Collar Concept Refinement,
Back Panel attachment/adjustment
concepts. Adjustment Knob auto return
concept.

14 Hours: Renderings with color exploration.

**160 Hours total**

*net  5 days thanks!



CONFIDENTIAL

**-541-**

OSS 001788



January 29, 2016

Wayne Calco

VENDOR A05715

01/01/2016 THRU 01/29/2016

CONTRACT AMOUNT: $10,000.00

ADDITIONAL ENGINEERING: $500.00

INVOICE TOTAL: $10,500.00

OSSUR ADJUSTABLE COLLAR PROJECT

17 HOURS: MEETINGS WITH OSSUR FHR

60 HOURS: STYLING REFINEMENT FOR COLLAR AND BACK PANEL

40 HOURS: COLLAR FIT LEFT AND RIGHT SIDE ADJUSTMENT CONCEPT

43 HOURS: BACK PANEL ATTACH/ADJUST

160 HOURS TOTAL

*net 5 days please and thanks!



CONFIDENTIAL

OSS 001501

February 29, 2016

**Wayne Calco**
**VENDOR A05715**

02/01/2016 THRU 02/29/2016
CONTRACT AMOUNT: $10,000.00

ADDITIONAL ENGINEERING: $10,125.00
(81 HOURS) BACK PANEL ATTACH/ADJUST
STERNUM SUPPORT/PAD ADJUSTMENT SYSYTEM

**INVOICE TOTAL: $20,125.00**

**OSSUR ADJUSTABLE COLLAR PROJECT**
20 HOURS: MEETINGS WITH OSSUR

16 HOURS: MEETINGS WITH ADDITIONAL
ENGINEERING CONSULTANT

124 HOURS: STERNUM SUPPORT CONCEPT, BACK PANEL
CONCEPT REFINEMENT, BACK PANEL ATTACH/ADJUST
OVERALL STYLING REFINEMENT/DEVELOPMENT

160 Total hours for Wayne

81 Total hours for Robert

\*net 5 days



CONFIDENTIAL

OSS 001248

**-543-**

March 31, 2016

**Wayne Calco
VENDOR A05715**

03/01/2016 THRU 03/31/2016
CONTRACT AMOUNT: $10,000.00

ADDITIONAL ENGINEERING: $2,125.00
(17 HOURS) BACK PANEL ATTACH/ADJUST
STERNUM SUPPORT/PAD ADJUSTMENT SYSYTEM

**\*\*\*INVOICE TOTAL: $12,125.00\*\*\***

**OSSUR ADJUSTABLE COLLAR PROJECT**
18 HOURS: MEETINGS WITH OSSUR

17 HOURS:  ADDITIONAL ENGINEERING

142 HOURS: BACK PANEL SHAPE EXPLORATION,
CONCEPT REFINEMENT, BACK PANEL ATTACH/ADJUST
OVERALL STYLING REFINEMENT/DEVELOPMENT

160 TOTAL HOURS: DESIGN

17 HOURS ADDITIONAL ENGINEERING

\*net 5 days



CONFIDENTIAL

OSS 001708

**-544-**



April 30, 2016

**Wayne Calco**
**VENDOR A05715**
**Adjustable Collar**

04/01/2016 thru 04/30/2016
As per contract  $10,000.00

20 hours: Meetings with Össur
2 hours: Meetings with RTP RE:Color Resins

138 hours: Interactive design refinment,
Back panel adjust/attachment,
Styling refinement, Color exploration

160 Total hours

\*net 5 days



CONFIDENTIAL

OSS 001449



May 31, 2016

**Wayne Calco**
**VENDOR A05715**

05/01/2016 THRU 05/31/2016
CONTRACT AMOUNT:  $10,000.00

**\*\*\*INVOICE TOTAL: $10,000.00**\*\*\*

**OSSUR ADJUSTABLE COLLAR PROJECT**

\*\*\*As per our contract

\*net 5 days



CONFIDENTIAL

OSS 002475

June 30, 2016

**Wayne Calco**
**VENDOR A05715**
**Adjustable Collar**

06/01/2016 thru 06/30/2016
As per contract  $10,000.00

June 2016:
Meetings Össur FHR: 24 hours

Wayne:
Interactive engineering design refinement with Chris,
Back panel adjust/attachment, Human factors
design refinement for chin tray placement,
Collar pad density options and samples,
Ease of assembly discussions, Extension of side
attach panels, Styling updates with Mark and Chris.
IFU draft document

\*net 5 days



CONFIDENTIAL

OSS 002484

**-547-**

July 31, 2016

**Wayne Calco**
**VENDOR A05715**
**Adjustable Collar**

07/01/2016 thru 07/31/2016
As per contract  $10,000.00

July 2016:
Meetings Össur FHR: 26 hours

Wayne:
Interactive engineering design refinement with Chris,
Chin support design and testing method,
Refinement to sternum support over the shoulder area,
Final draft for IFU delivered, Assembly of prototypes,
Rubber band installation discussion,
Slide lock ramp design refinement for easy return of lock dial,
Reduction of gear teeth for smoother action of adjustment,
EPDM material assessment for spacing,
Ultimate height and low positions discussion,
Meeting with ARRK Prototype tooling and models to meet Prototype 2 IRB needs,
Meeting with Ossur tooling personnel from Mexico re: assembly capabilities
and concerns, Dial and gear additional robustness needed discussion,
Group discussion re: colors, Revise chin support to close gap on larger patients,
Make new chin support prototype and pads, add texture to dial
where fingers touch.

*net 5 days



CONFIDENTIAL

OSS 002496

**-548-**



August 31, 2016

**Wayne Calco**
**VENDOR A05715**
**Adjustable Collar**

08/01/2016 thru 08/31/2016
As per contract  $10,000.00
August 2016:

Meetings Össur FHR: 21 hours

Wayne:
Interactive engineering design refinement with Chris,
Chin support design and testing method,
Refinement to sternum support over the shoulder area,
Assembly of prototypes,
Additional discussion on rubber band material and installation
and collar assembly, Deformation issues under load,Ultrasonic welding,
Meeting with Branson vendor, More material evaluation, Snap assembly
discussion, Several parts need ruggedization changes,
Slide lock molded springs discussion, Sternum part needs additional overlap
between back panel and front of collar, Close underside of side attach,
Gear teeth noise reduction, Review focus group feedback, Meet with Jason
to revise project timeline, (2.1 = Gate 3 now)
first shipments now July 2017, Need thicker pads

*net 5 days



CONFIDENTIAL

OSS 002499



October 31, 2016

**Wayne Calco**
**VENDOR A05715**
**Adjustable Collar 10**

10/01/2016 thru 10/31/2016
As per contract  $10,000.00
September 2016:

Meetings Össur FHR: 1 hour

Wayne: Meet to discuss new design and Vista Collar
strap length comparison with Chris.

*net 5 days



CONFIDENTIAL

OSS 002473

**-550-**

November 30, 2016

**Wayne Calco**
**VENDOR A05715**
**Adjustable Collar Project**

11/01/2016 thru11/30/2016
As per contract  $10,000.00
November 2016:

Meetings Össur: 1 hour

Wayne:
L0172 vrs. L0174 Code reasearch and phone conversation with Chris.
.

\*net 5 days



CONFIDENTIAL

OSS 002441

December 31, 2016

**Wayne Calco**
**VENDOR A05715**
**Adjustable Collar Project**

12/01/2016 thru12/31/2016
As per contract  $10,000.00
December 2016:

Meetings Össur: 1 hour

Wayne:
Addition discussion L0172 vrs. L0174. Design of new back panel conversation
with Chris.

*net 5 days



CONFIDENTIAL

**-552-**

OSS 002471



January 31, 2017

**Wayne Calco**
**VENDOR A05715**
**Adjustable Collar Project**

1/01/2017 thru 1/31/2017
As per contract  $10,000.00
January 2017:

Meetings Össur: 0

Wayne: 0

*net 5 days



CONFIDENTIAL

OSS 002430

**-553-**

| | |
|---|---|
| **From:** | Wayne Calco <calco.wayne@me.com> |
| **Sent:** | Wednesday, July 13, 2016 12:03 PM |
| **To:** | Paola Vargas |
| **Cc:** | Chris Webster |
| **Subject:** | Ossur Adjustable Collar 2016 DRAFT IFU |
| **Attachments:** | Ossur '16 Adjustable Cervical Collar IFU.docx; Ossur 2016 Adjustable Cervical Collar IFU.pdf |

Paola,

Here is the word doc.

Wayne

EXHIBIT

**19**

CALCO 000844

**Product Name: Eclipse Ossur Adjustable Collar 2016**
**Description: IFU, Eclipse Ossur Adjustable Collar 2016**
**IFU P/N: 13-**

**BEFORE USING THE DEVICE, PLEASE READ THE FOLLOWING INSTRUCTIONS COMPLETELY AND CAREFULLY. CORRECT APPLICATION IS VITAL TO THE PROPER FUNCTIONING OF THE DEVICE.**

**INTENDED USE/INDICATIONS:** Restricts cervical spine flexion, extension and rotation to promote patient recovery.

**CONTRAINDICATIONS:** None

**WARNINGS AND PRECAUTIONS:** If you experience any pain, swelling, sensation changes, or any unusual reactions while using this product, consult your medical professional immediately.

**APPLICATION INFORMATION:**

1. Remove back panel from the front panel by peeling Velcro straps from side attach panels (fig. 1A)



CALCO 000845

2. With the patient lying down and the neck in a neutral position, slide the back panel behind the patient's neck. Center the back panel so the panel is between the ear and trapezius.





CALCO 000846

3. Position the front panel so that it rests against the patient's chest and chin.



CALCO 000847

4. Turn the dial (below the chin tray) clockwise and raise the chin support up to the chin, keeping the head in neutral. The dial will spring back and lock when released. Ensure that the collar does not press on the throat.



5. Attach in the Velcro straps on both sides.



CALCO 000848

6. Adjust the straps forward evenly on both sides until back panel is snug against neck and chin is resting in chin piece. If necessary, trim strap ends with scissors, leaving at least an inch from past the attachment panels.



7. Fine tune fit and comfort by adjusting the Sternum Pad by turning the Sternum Adjustment Dial.



CALCO 000849

**REMOVAL:**

> Remove the Velcro straps on one side, open up collar and remove. Size is set for next application.

**REAPPLICATION:**

> With one side detached, place neck in brace with chin resting in chin piece. Attach Velcro strap on the open side. Straps do not need to be
> Re-adjusted unless they are uncomfortable.

**CLEANING INSTRUCTIONS:** Foam pad liners can be hand washed in 86°F (30°C) water with mild soap. AIR DRY. Do not put foam pads in the dryer or use other heat source to dry.

**MATERIAL COMPONENTS** Shell/Straps/Selector
Buttons: Thermoplastic Liner: Nylon/Polyester
fabric and Urethane foam

**For single patient use only.**
**RX ONLY**

**WARRANTY:** Ossur Americas, will repair or replace all or part of the unit and its accessories for material or workmanship defects for a period of six months from the date of sale??

CALCO 000850

**Product Name: Eclipse Ossur Adjustable Collar 2016**
**Description: IFU, Eclipse Ossur Adjustable Collar 2016**
**IFU P/N: 13-**

**BEFORE USING THE DEVICE, PLEASE READ THE FOLLOWING INSTRUCTIONS COMPLETELY AND CAREFULLY. CORRECT APPLICATION IS VITAL TO THE PROPER FUNCTIONING OF THE DEVICE.**

**INTENDED USE/INDICATIONS:** Restricts cervical spine flexion, extension and rotation to promote patient recovery.

**CONTRAINDICATIONS:** None

**WARNINGS AND PRECAUTIONS:** If you experience any pain, swelling, sensation changes, or any unusual reactions while using this product, consult your medical professional immediately.

**APPLICATION INFORMATION:**

1. Remove back panel from the front panel by peeling Velcro straps from side attach panels (fig. 1A)



CALCO 000851

2. With the patient lying down and the neck in a neutral position, slide the back panel behind the patient's neck. Center the back panel so the panel is between the ear and trapezius.





CALCO 000852

3. Position the front panel so that it rests against the patient's chest and chin.



CALCO 000853

4. Turn the dial (below the chin tray) clockwise and raise the chin support up to the chin, keeping the head in neutral. The dial will spring back and lock when released. Ensure that the collar does not press on the throat.



5. Attach in the Velcro straps on both sides.



CALCO 000854

6.  Adjust the straps forward evenly on both sides until back panel is snug against neck and chin is resting in chin piece.  If necessary, trim strap ends with scissors, leaving at least an inch from past the attachment panels.



7.  Fine tune fit and comfort by adjusting the Sternum Pad by turning the Sternum Adjustment Dial.



CALCO 000855

**REMOVAL:**

> Remove the Velcro straps on one side, open up collar and remove. Size is set for next application.

**REAPPLICATION:**

> With one side detached, place neck in brace with chin resting in chin piece. Attach Velcro strap on the open side. Straps do not need to be
> Re-adjusted unless they are uncomfortable.

**CLEANING INSTRUCTIONS:** Foam pad liners can be hand washed in 86°F (30°C) water with mild soap. AIR DRY. Do not put foam pads in the dryer or use other heat source to dry.

**MATERIAL COMPONENTS**
Shell/Straps/Selector Buttons: Thermoplastic
Liner: Nylon/Polyester fabric and Urethane foam

**For single patient use only.**
**RX ONLY**

**WARRANTY:** Ossur Americas, will repair or replace all or part of the unit and its accessories for material or workmanship defects for a period of six months from the date of sale??

CALCO 000856

# EXHIBIT 22

1   GEORGE B. PIGGOTT (SBN 68227)
    a member of GEORGE B. PIGGOTT,
2   A PROFESSIONAL CORPORATION
    2603 Main Street, Penthouse
3   Irvine, California 92614
    Tel:   (949) 261-0500
4   Fax:   (949) 261-1085
    Email: george@piggottlaw.com
5
    Attorney for Plaintiff Wayne Calco
6

7

8                  UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11  WAYNE CALCO, an individual,          **Case No. 8:22-cv-01971-CJC-KES**

12                       Plaintiff,

13          vs.                          **PLAINTIFF'S RESPONSES TO
                                         DEFENDANTS' REQUEST FOR
14  ÖSSUR AMERICAS, INC., a California   ADMISSIONS (SET ONE)**
    corporation; ÖSSUR hf, an Icelandic company;
15  and DOES 1 through 10, inclusive,

16                       Defendants.

17
                                         Complaint Filed: October 26, 2022
18                                       Trial Date: None Set

19

20

21

22

23

24

25

26

27

28

| 1 | **PROPOUNDING PARTIES:** | Defendants ÖSSUR AMERICAS, INC. and OSSUR hf |
| 2 | **RESPONDING PARTY:** | Plaintiff WAYNE CALCO |
| 3 | **SET NO.:** | ONE |

**PRELIMINARY STATEMENT**

The responses below represent the current knowledge and information of Plaintiff Wayne Calco ("Responding Party"). Responding Party has not completed his investigation of the facts and evidence relating to this matter, and has not completed discovery and preparation for trial. Responding Party's responses to Defendants' Request for Admissions herein below may therefore be incomplete, and there is also the possibility that information that Responding Party subsequently obtains and/or discovers will alter his responses herein below. Responding Party reserves the right to supplement or modify his responses herein below based on any such information which is subsequently discovered, but he is not assuming any responsibility to do so that he does not otherwise have under applicable law or rules, if any. Responding Party further reserves the right to introduce as evidence in this matter any information which he may discover subsequent to this response. Except for explicit admissions contained herein, Responding Party makes no admissions of any nature or kind whatsoever which might otherwise be implied or inferred from the responses or objections set forth herein or the absence of objections. This Preliminary Statement is incorporated by this reference into each of the responses below.

**GENERAL OBJECTIONS**

Responding Party objects to each of the Requests for Admission to the extent any or all of the Requests for Admission seek information which is protected from disclosure pursuant to the attorney-client communication privilege, the attorney work product doctrine (including, but not limited to, expert information and opinions and communications by or to experts), and/or other applicable privileges or protection. The foregoing objections and qualifications are incorporated by reference in the responses below to the individual Requests for Admission to the extent applicable to the specific responses as though fully set forth therein. The fact that Responding Party does not assert the foregoing objections and qualification in his responses below to an individual Request for Admission shall not be deemed a waiver of the protection afforded by the applicable privileges or protection

2

**PLAINTIFF'S RESPONSES TO DEFENDANTS' REQUEST FOR ADMISSIONS (SET ONE)**

1   **REQUEST FOR ADMISSION NO. 1**

2   Admit the '374 Patent does not cover the Miami J Select.

3   **RESPONSE TO REQUEST FOR ADMISSION NO. 1**

4   Responding Party objects to this Request as being vague and ambiguous and further objects to

5   this Request to the extent it calls for information which is privileged and protected from discovery by

6   the attorney-client communication privilege, the attorney work product doctrine (including, but not

7   limited to, expert information and opinions and communications by or to experts), and/or other

8   applicable privileges or protection. Subject to and without waiver of the foregoing objections,

9   Responding Party responds as follows: Deny.

10  **REQUEST FOR ADMISSION NO. 2**

11  Admit the '374 Patent does not include a claim for Repeatable Fit Tabs.

12  **RESPONSE TO REQUEST FOR ADMISSION NO .2**

13  Responding Party objects to this Request as being vague and ambiguous and further objects to

14  this Request to the extent it calls for information which is privileged and protected from discovery by

15  the attorney-client communication privilege, the attorney work product doctrine (including, but not

16  limited to, expert information and opinions and communications by or to experts), and/or other

17  applicable privileges or protection. Subject to and without waiver of the foregoing objections,

18  Responding Party responds as follows: Admit.

19  **REQUEST FOR ADMISSION NO. 3**

20  Admit the '374 Patent does not include a claim for a Sternal-Relief Dial.

21  **RESPONSE TO REQUEST FOR ADMISSION NO. 3**

22  Responding Party objects to this Request as being vague and ambiguous and further objects to

23  this Request to the extent it calls for information which is privileged and protected from discovery by

24  the attorney-client communication privilege, the attorney work product doctrine (including, but not

25  limited to, expert information and opinions and communications by or to experts), and/or other

26  applicable privileges or protection. Subject to and without waiver of the foregoing objections,

27  Responding Party responds as follows: Deny.

28  .

3
**PLAINTIFF'S RESPONSES TO DEFENDANTS' REQUEST FOR ADMISSIONS (SET ONE)**

**REQUEST FOR ADMISSION NO. 4**

Admit there is no patent claim that covers the Repeatable Fit Tabs.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4**

Responding Party objects to this Request as being vague and ambiguous and further objects to this Request to the extent it calls for information which is privileged and protected from discovery by the attorney-client communication privilege, the attorney work product doctrine (including, but not limited to, expert information and opinions and communications by or to experts), and/or other applicable privileges or protection. Subject to and without waiver of the foregoing objections, Responding Party responds as follows: Responding Party cannot admit or deny Request for Admission No. 4. Responding Party has not conducted a search for a patent that covers the Repeatable Fit Tabs, but Responding Party has no information of the existence of a patent that covers the Repeatable Fit Tabs.

**REQUEST FOR ADMISSION NO. 5**

Admit Claim 12 of the '374 Patent does not cover the Miami J Select.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15**

Responding Party objects to this Request as being vague and ambiguous and further objects to this Request to the extent it calls for information which is privileged and protected from discovery by the attorney-client communication privilege, the attorney work product doctrine (including, but not limited to, expert information and opinions and communications by or to experts), and/or other applicable privileges or protection. Subject to and without waiver of the foregoing objections, Responding Party responds as follows: Deny.

**REQUEST FOR ADMISSION NO. 6**

Admit Claim 13 of the '374 Patent does not cover the Miami J Select.

**RESPONSE TO REQUEST FOR ADMISSION NO.61**

Responding Party objects to this Request as being vague and ambiguous and further objects to this Request to the extent it calls for information which is privileged and protected from discovery by the attorney-client communication privilege, the attorney work product doctrine (including, but not limited to, expert information and opinions and communications by or to experts), and/or other

4

**PLAINTIFF'S RESPONSES TO DEFENDANTS' REQUEST FOR ADMISSIONS (SET ONE)**

1  applicable privileges or protection. Subject to and without waiver of the foregoing objections,

2  Responding Party responds as follows: Deny.

3  **REQUEST FOR ADMISSION NO. 7**

4      Admit there is no structure in the Miami J Select that performs the claimed function of Claim

5  12 of the '374 Patent.

6  **RESPONSE TO REQUEST FOR ADMISSION NO. 7**

7      Responding Party objects to this Request as being vague and ambiguous as to what is meant by

8  "structure in the Miami J Select" and further objects to this Request to the extent it calls for

9  information which is privileged and protected from discovery by the attorney-client communication

10  privilege, the attorney work product doctrine (including, but not limited to, expert information and

11  opinions and communications by or to experts), and/or other applicable privileges or protection.

12  Subject to and without waiver of the foregoing objections, Responding Party responds as follows:

13  Deny.

14  **REQUEST FOR ADMISSION NO. 8**

15      Admit there is no material in the Miami J Select that performs the claimed function of Claim 12

16  of the '374 Patent.

17  **RESPONSE TO REQUEST FOR ADMISSION NO. 8**

18      Responding Party objects to this Request as being vague and ambiguous as to what is meant by

19  "material in the Miami J Select" and further objects to this Request to the extent it calls for information

20  which is privileged and protected from discovery by the attorney-client communication privilege, the

21  attorney work product doctrine (including, but not limited to, expert information and opinions and

22  communications by or to experts), and/or other applicable privileges or protection. Subject to and

23  without waiver of the foregoing objections, Responding Party responds as follows: Deny.

24  **REQUEST FOR ADMISSION NO. 9**

25      Admit there is no structure in the Miami J Select that performs the claimed function of Claim

26  13 of the '374 Patent.

27

28

1    privilege, the attorney work product doctrine (including, but not limited to, expert information and

2    opinions and communications by or to experts), and/or other applicable privileges or protection.

3    Subject to and without waiver of the foregoing objections, Responding Party responds as follows:

4    Deny.

5    **REQUEST FOR ADMISSION NO. 30**

6         Admit the repeatable fit option of the Miami J Select does not have the same function as the

7    Repeatable Fit Tabs.

8    **RESPONSE TO REQUEST FOR ADMISSION NO. 30**

9         Responding Party objects to this Request as being vague and ambiguous and further objects to

10   this Request to the extent it calls for information which is privileged and protected from discovery by

11   the attorney-client communication privilege, the attorney work product doctrine (including, but not

12   limited to, expert information and opinions and communications by or to experts), and/or other

13   applicable privileges or protection. Subject to and without waiver of the foregoing objections,

14   Responding Party responds as follows: Deny.

15   **REQUEST FOR ADMISSION NO. 31**

16        Admit the repeatable fit option of the Miami J Select does not produce the same result as the

17   Repeatable Fit Tabs.

18   **RESPONSE TO REQUEST FOR ADMISSION NO. 31**

19        Responding Party objects to this Request as being vague and ambiguous and further objects to

20   this Request to the extent it calls for information which is privileged and protected from discovery by

21   the attorney-client communication privilege, the attorney work product doctrine (including, but not

22   limited to, expert information and opinions and communications by or to experts), and/or other

23   applicable privileges or protection. Subject to and without waiver of the foregoing objections,

24   Responding Party responds as follows: Deny.

25   **REQUEST FOR ADMISSION NO. 32**

26        Admit the Height Adjustment concept is not used in the Miami J Select.

27   **RESPONSE TO REQUEST FOR ADMISSION NO. 32**

28        Responding Party objects to this Request as being vague and ambiguous and further objects to

13
**PLAINTIFF'S RESPONSES TO DEFENDANTS' REQUEST FOR ADMISSIONS (SET ONE)**

1    this Request to the extent it calls for information which is privileged and protected from discovery by

2    the attorney-client communication privilege, the attorney work product doctrine (including, but not

3    limited to, expert information and opinions and communications by or to experts), and/or other

4    applicable privileges or protection. Subject to and without waiver of the foregoing objections,

5    Responding Party responds as follows: Deny.

6    **REQUEST FOR ADMISSION NO. 33**

7        Admit the '559 Patent does not cover the Miami J Select.

8    **RESPONSE TO REQUEST FOR ADMISSION NO. 133**

9        Responding Party objects to this Request as being vague and ambiguous and further objects to

10   this Request to the extent it calls for information which is privileged and protected from discovery by

11   the attorney-client communication privilege, the attorney work product doctrine (including, but not

12   limited to, expert information and opinions and communications by or to experts), and/or other

13   applicable privileges or protection. Subject to and without waiver of the foregoing objections,

14   Responding Party responds as follows: Admit.

15   **REQUEST FOR ADMISSION NO. 34**

16       Admit the '559 Patent does not include a claim for Repeatable Fit Tabs.

17   **RESPONSE TO REQUEST FOR ADMISSION NO. 34**

18       Responding Party objects to this Request as being vague and ambiguous and further objects to this

19   Request to the extent it calls for information which is privileged and protected from discovery by the

20   attorney-client communication privilege, the attorney work product doctrine (including, but not limited

21   to, expert information and opinions and communications by or to experts), and/or other applicable

22   privileges or protection. Subject to and without waiver of the foregoing objections, Responding Party

23   responds as follows: Admit.

24   **REQUEST FOR ADMISSION NO. 35**

25       Admit the '559 Patent does not include a claim for a Sternal-Relief Dial.

26   **RESPONSE TO REQUEST FOR ADMISSION NO. 35**

27       Responding Party objects to this Request as being vague and ambiguous and further objects to this

28   Request to the extent it calls for information which is privileged and protected from discovery by the

14
**PLAINTIFF'S RESPONSES TO DEFENDANTS' REQUEST FOR ADMISSIONS (SET ONE)**

1  **RESPONSE TO REQUEST FOR ADMISSION NO. 58**

2      Responding Party objects to this Request as being vague and ambiguous and further objects to this

3  Request to the extent it calls for information which is privileged and protected from discovery by the

4  attorney-client communication privilege, the attorney work product doctrine (including, but not limited

5  to, expert information and opinions and communications by or to experts), and/or other applicable

6  privileges or protection. Subject to and without waiver of the foregoing objections, Responding Party

7  responds as follows: Admit.

8  **REQUEST FOR ADMISSION NO. 59**

9      Admit that even if YOU were named an inventor on the '633 Patent, YOU are not entitled to

10  royalties under the AGREEMENT for sales of the Miami J Select under the '633 Patent.

11  **RESPONSE TO REQUEST FOR ADMISSION NO. 59**

12      Responding Party objects to this Request as being vague and ambiguous and further objects to this

13  Request to the extent it calls for information which is privileged and protected from discovery by the

14  attorney-client communication privilege, the attorney work product doctrine (including, but not limited

15  to, expert information and opinions and communications by or to experts), and/or other applicable

16  privileges or protection. Subject to and without waiver of the foregoing objections, Responding Party

17  responds as follows: Admit.

18  **REQUEST FOR ADMISSION NO. 60**

19      Admit that of the PATENTS-IN-SUIT, only the '633 Patent covers the Miami J Select.

20  **RESPONSE TO REQUEST FOR ADMISSION NO. 60**

21      Responding Party objects to this Request as being vague and ambiguous and further objects to this

22  Request to the extent it calls for information which is privileged and protected from discovery by the

23  attorney-client communication privilege, the attorney work product doctrine (including, but not limited

24  to, expert information and opinions and communications by or to experts), and/or other applicable

25  privileges or protection. Subject to and without waiver of the foregoing objections, Responding Party

26  responds as follows: Deny. .

27  **REQUEST FOR ADMISSION NO. 61**

28      Admit ÖSSUR has made no claim to Repeatable Fits Tabs in the PATENTS-IN-SUIT.

23

**PLAINTIFF'S RESPONSES TO DEFENDANTS' REQUEST FOR ADMISSIONS (SET ONE)**

1    AGREEMENT.

2    **RESPONSE TO REQUEST FOR ADMISSION NO. 82**

3    Responding Party objects to this Request as being vague and ambiguous and further objects to this

4    Request to the extent it calls for information which is privileged and protected from discovery by the

5    attorney-client communication privilege, the attorney work product doctrine (including, but not limited

6    to, expert information and opinions and communications by or to experts), and/or other applicable

7    privileges or protection. Subject to and without waiver of the foregoing objections, Responding Party

8    responds as follows: Deny.

9    **REQUEST FOR ADMISSION NO. 83**

10    Admit YOU did not rely on any false representations of fact by ÖSSUR that caused you to enter

11    into the AGREEMENT.

12    **RESPONSE TO REQUEST FOR ADMISSION NO. 83**

13    Responding Party objects to this Request as being vague and ambiguous and further objects to this

14    Request to the extent it calls for information which is privileged and protected from discovery by the

15    attorney-client communication privilege, the attorney work product doctrine (including, but not limited

16    to, expert information and opinions and communications by or to experts), and/or other applicable

17    privileges or protection. Subject to and without waiver of the foregoing objections, Responding Party

18    responds as follows: Deny.

19    Dated: October 30, 2023

20    GEORGE B. PIGGOTT (68227)
21    a member of George B. Piggott, A Professional
      Corporation
22    Attorney for Plaintiff WAYNE CALCO

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**VERIFICATION**</u>

I, Wayne Calco, have read the foregoing **PLAINTIFF'S RESPONSES TO DEFENDANTS' REQUEST FOR ADMISSIONS (SET ONE)** and know its contents. I am a party to this action. The matters stated in the foregoing document are true of my own knowledge, except to those matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct, and that this Verification was executed on October 30, 2023, at Anaheim, California.

Wayne Calco

VERIFICATION

1

## PROOF OF SERVICE

2

3      I am employed in the County of Orange, State of California.  I am over the age of eighteen (18) years and not a party to the within action; my business address is 2603 Main Street, Penthouse, Irvine, California 92614.

4

5      On October 30, 2023, I served the foregoing document described as: **PLAINTIFF'S RESPONSES TO DEFENDANTS' REQUEST FOR ADMISSIONS (SET ONE)** on the parties interested in said action, as follows:

6

7    Scott R. Hatch, Esq.
     Joshua G. Simon, Esq.

8    Rebecca Makitalo, Esq.
     CALL & JENSEN

9    610 Newport Center Drive, Suite 700
     Newport Beach, CA 92660

10   Email: shatch@calljensen.com

11         jsimon@calljensen.com
           rmakitalo@calljensen.com

12

**[ X ] BY MAIL**

13

14     I caused [   ] the original [ X ] a true copy of above-described document to be placed in a sealed envelope addressed to the addressee(s) listed above. I am readily familiar with the firm's practice of collecting and processing of the mail.  Under that practice it would be deposited with United States Postal Service on that same day with postage thereon fully prepaid at Irvine, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing affidavit.

15

16

17

**[ X ] BY ELECTRONIC SERVICE**

18

19     I caused a PDF copy of the above-described document to be served by e-mail to the email address of the addressee(s) listed above.

20

21     I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed on October 30, 2023. at Irvine, California.

22

23

24                                        _____
                                          George R. Piggott

25

26

27

28

PROOF OF SERVICE

# EXHIBIT 23

1  GEORGE B. PIGGOTT (SBN 68227)
   a member of GEORGE B. PIGGOTT,
2  A PROFESSIONAL CORPORATION
   2603 Main Street, Penthouse
3  Irvine, California 92614
   Tel:    (949) 261-0500
4  Fax:    (949) 261-1085
   Email: george@piggottlaw.com
5
   Attorney for Plaintiff Wayne Calco
6

7

8                  UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10

11  WAYNE CALCO, an individual,              **Case No. 8:22-cv-01971-CJC-KES**

12                              Plaintiff,
                   vs.
13                                            **PLAINTIFF'S RESPONSES TO**
                                              **DEFENDANTS' SPECIAL**
14  ÖSSUR AMERICAS, INC., a California        **INTERROGATORIES (SET ONE)**
    corporation; ÖSSUR hf, an Icelandic company;
15  and DOES 1 through 10, inclusive,

16                              Defendants.

17

18                                            Complaint Filed: October 26, 2022
                                              Trial Date: None Set
19

20

21

22

23

24

25

26

27

28

                                     1
         **PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

| 1 | **PROPOUNDING PARTIES:** | Defendants ÖSSUR AMERICAS, INC. and OSSUR hf |
| 2 | **RESPONDING PARTY:** | Plaintiff WAYNE CALCO |
| 3 | **SET NO.:** | ONE |

**PRELIMINARY STATEMENT**

The responses below represent the current knowledge and information of Plaintiff Wayne Calco ("Responding Party"). Responding Party has not completed his investigation of the facts and evidence relating to this matter, and has not completed discovery and preparation for trial. Responding Party's responses to Defendant's Special Interrogatories herein below may therefore be incomplete, and there is also the possibility that information that Responding Party subsequently obtains and/or discovers will alter his responses herein below. Responding Party reserves the right to supplement or modify his responses herein below based on any such information which is subsequently discovered, but he is not assuming any responsibility to do so that he does not otherwise have under applicable law or rules, if any. Responding Party further reserves the right to introduce as evidence in this matter any information which he may discover subsequent to this response. Except for explicit admissions contained herein, Responding Party makes no admissions of any nature or kind whatsoever which might otherwise be implied or inferred from the responses or objections set forth herein or the absence of objections. This Preliminary Statement is incorporated by this reference into each of the responses below.

Defendants Ossur Americas, Inc. and Ossur hf are sometimes referred to hereinafter collectively as the "Defendants."

**GENERAL OBJECTIONS**

Responding Party objects to each of the Special Interrogatories to the extent any or all of the Special Interrogatories seek information which is protected from disclosure pursuant to the attorney-client communication privilege, the attorney work product doctrine (including, but not limited to, expert information and opinions and communications by or to experts), and/or other applicable privileges or protection. The foregoing objections and qualifications are incorporated by reference in the responses below to the individual Special Interrogatories to the extent applicable to the specific responses as though fully set forth therein. The fact that Responding Party does not assert the foregoing

2
**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1  objections and qualification in his responses below to an individual Special Interrogatory shall not be

2  deemed a waiver of the protection afforded by the applicable privileges or protection

3  **SPECIAL INTERROGATORY NO. 1:**

4  State each and every fact known to YOU upon which YOU base YOUR

5  contention, set forth in YOUR FAC (*See* FAC at ¶ 29.) that ÖSSUR failed to pay a royalty to

6  YOU for sales of the Miami J Select.

7  **RESPONSE TO SPECIAL INTERROGATORY NO. 1:**

8  Responding Party objects to this Request as being vague and ambiguous and further objects to

9  this Request to the extent it calls for information which is privileged and protected from discovery by

10  the attorney-client communication privilege, the attorney work product doctrine (including, but not

11  limited to, expert information and opinions and communications by or to experts), and/or other

12  applicable privileges or protection. Subject to and without waiver of the foregoing objections,

13  Responding Party responds as follows: The requirements set forth in the AGREEMENT for payment of

14  the future royalty to Plaintiff have been satisfied, and alternatively as set forth more specifically below,

15  Defendants have breached their obligations under the AGREEMENT such that Plaintiff is entitled to a

16  future royalty; sales of the Miami J Select have occurred; and Defendants have failed to pay to Plaintiff

17  the future royalty specified in the AGREEMENT based on those sales. More specifically, and without

18  limiting the generality of the foregoing or the allegations of the First Amended Complaint, which are

19  incorporated in full herein, the sternum adjustment that is incorporated in the Miami J Select, referred

20  to by Defendants in their sales literature as the "sternal relief dial", is based on a concept created by

21  Plaintiff prior to entering into the AGREEMENT as evidenced by written records; the sternum

22  adjustment is protected and covered by one or more valid issued claims contained in the '374 Patent

23  that is owned or controlled by Defendants and names Plaintiff as a co-inventor; Defendants are

24  estopped to assert that those claims do not cover the Miami J Select or that the sternal relief dial is not

25  patentable by stating in their sales literature that the sternal relief dial is patented; and Defendants have

26  been selling the Miami J Select since at least 2019. Defendants have also failed to pay Plaintiff the

27  future royalty specified in the AGREEMENT that would be due for sales of the Miami J Select if

28  Defendants had pursued patent claims for the sternal relief dial in good faith, including other claims

3

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

and/or broader claims for the sternal relief dial than those contained in the '374 Patent, which would have issued and would be valid to protect and cover the Miami J Select. In addition, the repeatable fit tabs that are incorporated in the Miami J Select, referred to by Defendants in their sales literature as the "reproducible fit option", are based on a concept created by Plaintiff prior to entering into the AGREEMENT as evidenced by written records; Defendants have failed to pursue any patent claims for the reproducible fit option; if Defendants had pursued patent claims for the reproducible fit option in good faith naming Plaintiff as an inventor or co-inventor, such claims would have issued and would be valid to protect and cover the Miami J Select. Defendants; and Defendants are estopped to assert that the reproducible fit option is not patented or patentable because Defendants have been stating in their sales literature that the reproducible fit option is patented

**SPECIAL INTERROGATORY NO. 4:**

State each and every fact known to YOU upon which YOU base YOUR contention that the structure in the Miami J Select performs the claimed function of Claim 12 of the '374 Patent.

**RESPONSE TO SPECIAL INTERROGATORY NO. 4:**

Responding Party objects to this Request as being vague and ambiguous as to what is meant by "the structure in the Miami J Select" and further objects to this Request to the extent it calls for information which is privileged and protected from discovery by the attorney-client communication privilege, the attorney work product doctrine (including, but not limited to, expert information and opinions and communications by or to experts), and/or other applicable privileges or protection. With respect specifically to facts known to experts, as well as opinions held by experts, such information is privileged from discovery by means of contention interrogatory and is only discoverable through the procedure set for in Rule 26(b(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). Subject to and without waiver of the foregoing objections, Responding Party responds as follows: The sternum adjustment used in the Miami J Select, which Defendants refer to as the "sternal relief dial", and the "adjustment mechanism" described in Claim 12 of the '374 Patent, each make the sternum pad movable relative to the lower support of the cervical collar.

In addition, the adjustment mechanism described in Claim 1 of the '374 Patent also makes the

4

PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)

1  sternum pad movable relative to the lower support of the cervical collar.

2  **SPECIAL INTERROGATORY NO. 7:**

3       State each and every fact known to YOU upon which YOU base YOU

4  contention that the material in the Miami J Select performs the claimed function of Claim 12 of

5  the '374 Patent.

6  **RESPONSE TO SPECIAL INTERROGATORY NO. 7:**

7       Responding Party objects to this Request as being vague and ambiguous as to what is meant by

8  "the material in the Miami J Select" and further objects to this Request to the extent it calls for

9  information which is privileged and protected from discovery by the attorney-client communication

10  privilege, the attorney work product doctrine (including, but not limited to, expert information and

11  opinions and communications by or to experts), and/or other applicable privileges or protection.

12  Subject to and without waiver of the foregoing objections, Responding Party responds as follows:

13  With respect specifically to facts known to experts, as well as opinions held by experts, such

14  information is privileged from discovery by means of contention interrogatory and is only discoverable

15  through the procedure set for in Rule 26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424,

16  428-429 (N.D. Cal. 1989). Subject to and without waiver of the foregoing objections, Responding

17  Party responds as follows: The sternum adjustment used in the Miami J Select, which Defendants

18  refers to as the "sternal relief dial", and the "adjustment mechanism" described in Claim 12 of the '374

19  Patent, each make the sternum pad movable relative to the lower support of the cervical collar.

20       In addition, the adjustment mechanism described in Claim 1 of the '374 Patent makes the

21  sternum pad movable relative to the lower support of the cervical collar.

22  **SPECIAL INTERROGATORY NO. 10:**

23       State each and every fact known to YOU upon which YOU base YOUR

24  contention that the structure in the Miami J Select performs the claimed function of Claim 13 of

25  the '374 Patent.

26  **RESPONSE TO SPECIAL INTERROGATORY NO. 10:**

27       Responding Party objects to this Request as being vague and ambiguous as to what is meant by

28  "the structure in the Miami J Select" and further objects to this Request to the extent it calls for

5

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

information which is privileged and protected from discovery by the attorney-client communication

privilege, the attorney work product doctrine (including, but not limited to, expert information and

opinions and communications by or to experts), and/or other applicable privileges or protection.

Subject to and without waiver of the foregoing objections, Responding Party responds as follows:

With respect specifically to facts known to experts, as well as opinions held by experts, such

information is privileged from discovery by means of contention interrogatory and is only discoverable

through the procedure set for in Rule 26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424,

428-429 (N.D. Cal. 1989). Subject to and without waiver of the foregoing objections, Responding

Party responds as follows: Claim 13 of the '374 Patent is a dependent claim of Claim 12. The sternum

adjustment used in the Miami J Select, which Defendants refer to as the "sternal relief dial", and the

"adjustment mechanism" described in Claim 12 of the '374 Patent, each make the sternum pad

movable relative to the lower support of the cervical collar.

      In addition, the adjustment mechanism described in Claim 1 of the '374 Patent makes the

sternum pad movable relative to the lower support of the cervical collar.

**SPECIAL INTERROGATORY NO. 13:**

      State each and every fact known to YOU upon which YOU base YOUR

contention that the material in the Miami J Select performs the claimed function of Claim 13 of

the '374 Patent.

**RESPONSE TO SPECIAL INTERROGATORY NO. 13:**

      Responding Party objects to this Request as being vague and ambiguous as to what is meant by

"the material in the Miami J Select" and further objects to this Request to the extent it calls for

information which is privileged and protected from discovery by the attorney-client communication

privilege, the attorney work product doctrine (including, but not limited to, expert information and

opinions and communications by or to experts), and/or other applicable privileges or protection.

Subject to and without waiver of the foregoing objections, Responding Party responds as follows:

With respect specifically to facts known to experts, as well as opinions held by experts, such

information is privileged from discovery by means of contention interrogatory and is only discoverable

through the procedure set for in Rule 26(b)(4)(A) of the FRCP. *Roberts v. Heim*, 130 F.R.D. 424, 428-

6

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

429 (N.D. Cal. 1989). Subject to and without waiver of the foregoing objections, Responding Party responds as follows: Claim 13 of the '374 Patent is a dependent claim of Claim 12. The sternum adjustment used in the Miami J Select, which Defendants refers to as the "sternal relief dial", and the "adjustment mechanism" described in Claim 12 of the '374 Patent, each make the sternum pad movable relative to the lower support of the cervical collar.

In addition, the adjustment mechanism described in Claim 1 of the '374 Patent also makes the sternum pad movable relative to the lower support of the cervical collar.

**SPECIAL INTERROGATORY NO. 16**:

State each and every fact known to YOU upon which YOU base YOUR contention that the Sternal-Relief Dial of the Miami J Select performs the claimed function of Claim 12 of the '374 Patent.

**RESPONSE TO SPECIAL INTERROGATORY NO. 16:**

Responding Party objects to this Request as being vague and ambiguous and further objects to this Request to the extent it calls for information which is privileged and protected from discovery by the attorney-client communication privilege, the attorney work product doctrine (including, but not limited to, expert information and opinions and communications by or to experts), and/or other applicable privileges or protection. With respect specifically to facts known to experts, as well as opinions held by experts, such information is privileged from discovery by means of contention interrogatory and is only discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). Subject to and without waiver of the foregoing objections, Responding Party responds as follows: The sternum adjustment used in the Miami J Select, which Defendants refer to as the "sternal relief dial", and the "adjustment mechanism" described in Claim 12 of the '374 Patent, each make the sternum pad movable relative to the lower support of the cervical collar.

In addition, the adjustment mechanism described in Claim 1 of the '374 Patent makes the sternum pad movable relative to the lower support of the cervical collar.

**SPECIAL INTERROGATORY NO. 19:**

State each and every fact known to YOU upon which YOU base YOUR

1  information which is privileged and protected from discovery by the attorney-client communication

2  privilege, the attorney work product doctrine (including, but not limited to, expert information and

3  opinions and communications by or to experts), and/or other applicable privileges or protection. With

4  respect specifically to facts known to experts, as well as opinions held by experts, such information is

5  privileged from discovery by means of contention interrogatory and is only discoverable through the

6  procedure set for in Rule 26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424, 428-429

7  (N.D. Cal. 1989). The information requested calls for expert opinion and Plaintiff therefore objects to

8  providing that information by means of answering this interrogatory.

9  **SPECIAL INTERROGATORY NO. 31:**

10  State each and every fact known to YOU upon which YOU base YOUR

11  contention that the Sternal-Relief dial of the Miami J Select produces the same result as Claim 13 of

12  the '374 Patent.

13  **RESPONSE TO SPECIAL INTERROGATORY NO. 31:**

14  Responding Party objects to this Request as being vague and ambiguous and further objects to

15  this Request to the extent it calls for information which is privileged and protected from discovery by

16  the attorney-client communication privilege, the attorney work product doctrine (including, but not

17  limited to, expert information and opinions and communications by or to experts), and/or other

18  applicable privileges or protection. With respect specifically to facts known to experts, as well as

19  opinions held by experts, such information is privileged from discovery by means of contention

20  interrogatory and is only discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP.

21  See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). Subject to and without waiver of the

22  foregoing objections, Responding Party responds as follows: Claim 13 of the '374 Patent is a

23  dependent claim of Claim 12 of the '374 Patent. The sternum adjustment used in the Miami J Select,

24  which Defendants refer to as the "sternal relief dial", and the "adjustment mechanism" described in

25  Claim 12 of the '374 Patent, each make the cervical collar more comfortable for the user to wear by

26  enabling the user to relax or tighten the pressure of the sternum support pad on the sternum.

27  **SPECIAL INTERROGATORY NO. 34:**

28  State each and every fact known to YOU upon which YOU base YOUR

10

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1  contention that the '374 Patent covers the Sternal-Relief Dial of the Miami J Select.

2  **RESPONSE TO SPECIAL INTERROGATORY NO. 34:**

3      Responding Party objects to this Request as being vague and ambiguous and further objects to

4  this Request to the extent it calls for information which is privileged and protected from discovery by

5  the attorney-client communication privilege, the attorney work product doctrine (including, but not

6  limited to, expert information and opinions and communications by or to experts), and/or other

7  applicable privileges or protection. With respect specifically to facts known to experts, as well as

8  opinions held by experts, such information is privileged from discovery by means of contention

9  interrogatory and is only discoverable through the procedure set for in Rule 26(b(4)(A) of the FRCP.

10  See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). The information requested calls for

11  expert opinion and Plaintiff therefore objects to providing that information by means of answering this

12  interrogatory.

13  **SPECIAL INTERROGATORY NO. 37:**

14      State each and every fact known to YOU upon which YOU base YOUR

15  contention that the '374 Patent covers the Sternal-Relief Dial of the Miami J Select.

16  **RESPONSE TO SPECIAL INTERROGATORY NO. 37:**

17      Responding Party objects to this Request as being vague and ambiguous and further objects to

18  this Request to the extent it calls for information which is privileged and protected from discovery by

19  the attorney-client communication privilege, the attorney work product doctrine (including, but not

20  limited to, expert information and opinions and communications by or to experts), and/or other

21  applicable privileges or protection. With respect specifically to facts known to experts, as well as

22  opinions held by experts, such information is privileged from discovery by means of contention

23  interrogatory and is only discoverable through the procedure set for in Rule 26(b(4)(A) of the FRCP.

24  See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). The information requested calls for

25  expert opinion and Plaintiff therefore objects to providing that information by means of answering this

26  interrogatory.

27  **SPECIAL INTERROGATORY NO. 40:**

28      State each and every fact known to YOU upon which YOU base YOUR

11

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1   co-inventor in the application for the '633 Patent; Defendants failed inform the PTO that Responding

2   Party was an inventor of the '633 Patent; and Defendants failed to advise the PTO of the facts that

3   made Responding Party an inventor of the '633 Patent.

4

5   Dated: October 30, 2023

6                              GEORGE B. PIGGOTT (68227)

7                              a member of George B. Piggott, A Professional
                             Corporation

8                              Attorney for Plaintiff WAYNE CALCO

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, Wayne Calco, have read the foregoing **PLAINTIFF'S RESPONSES TO DEFENDANTS'**

**SPECIAL INTERROGATORIES (SET ONE)** and know its contents. I am a party to this action. The

matters stated in the foregoing document are true of my own knowledge, except to those matters that are

stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California and the United States

of America that the foregoing is true and correct, and that this Verification was executed on October 30,

2023, at _Anaheim_, California.

_Wayne Calco_

Wayne Calco

VERIFICATION

1

## PROOF OF SERVICE

2

3    I am employed in the County of Orange, State of California.  I am over the age of eighteen (18) years and not a party to the within action; my business address is 2603 Main Street, Penthouse, Irvine, California 92614.

4

5    On October 30, 2023, I served the foregoing document described as: **PLAINTIFF'S RESPONSES TO DEFENDANTS' SPECIAL INTERROGATORIES (SET ONE)** on the parties interested in said action, as follows:

6

7    Scott R. Hatch, Esq.
     Joshua G. Simon, Esq.

8    Rebecca Makitalo, Esq.
     CALL & JENSEN

9    610 Newport Center Drive, Suite 700
     Newport Beach, CA 92660

10   Email: shatch@calljensen.com

11         jsimon@calljensen.com
           rmakitalo@calljensen.com

12   **[ X ] BY MAIL**

13

14   I caused [   ] the original [ X ] a true copy of above-described document to be placed in a sealed envelope addressed to the addressee(s) listed above. I am readily familiar with the firm's practice of collecting and processing of the mail.  Under that practice it would be deposited with United States Postal Service on that same day with postage thereon fully prepaid at Irvine, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing affidavit.

15

16

17   **[ X ] BY ELECTRONIC SERVICE**

18

19   I caused a PDF copy of the above-described document to be served by e-mail to the email address of the addressee(s) listed above.

20

21   I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed on October 30, 2023. at Irvine, California.

22

23

24   George B. Piggott

25

26

27

28

PROOF OF SERVICE

# EXHIBIT 24

**Joshua Simon**

| | |
|---|---|
| **From:** | George Piggott <george@piggottlaw.com> |
| **Sent:** | Friday, February 23, 2024 5:24 PM |
| **To:** | Rebecca Makitalo |
| **Cc:** | Joshua Simon; Scott Hatch |
| **Subject:** | RE: Wayne Calco v. Ossur Americas, Inc., et. al./USCD Case No. 8:22-cv-01971 CJC KES |

Rebecca

Plaintiff maintains his contentions with respect to Claim 1 of the '374 Patent.

George B. Piggott
Law Offices of George B. Piggott
A Professional Corporation
2603 Main Street, Penthouse
Irvine, CA 92614
Office: (949) 261-0500
Fax: (949) 261-1085
Email: george@piggottlaw.com

NOTE: The information contained in this email may
contain attorney-client privileged and/or confidential information
intended only for the use of the individual or entity named above. If
the reader of this message is not the intended recipient, or the
employee or agent responsible to deliver it to the intended recipient,
you are hereby notified that any dissemination, distribution or copying
of this communication is strictly prohibited.

**From:** Rebecca Makitalo <rmakitalo@calljensen.com>
**Sent:** Friday, February 23, 2024 5:05 PM
**To:** George Piggott <george@piggottlaw.com>
**Cc:** Joshua Simon <jsimon@calljensen.com>; Scott Hatch <shatch@calljensen.com>
**Subject:** RE: Wayne Calco v. Ossur Americas, Inc., et. al./USCD Case No. 8:22-cv-01971 CJC KES

George,

Received. Please confirm Plaintiff maintains his contention with respect to the adjustable mechanism described in Claim 1 of the '374 Patent.

Thank you,

**REBECCA MAKITALO**
**ASSOCIATE ATTORNEY**
**CALL & JENSEN, APC**

1

**-593-**

610 Newport Center Drive, Suite 700
Newport Beach, CA 92660
(949) 717-3000
rmakitalo@calljensen.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

**From:** George Piggott <george@piggottlaw.com>
**Sent:** Friday, February 23, 2024 4:46 PM
**To:** Joshua Simon <jsimon@calljensen.com>; Rebecca Makitalo <rmakitalo@calljensen.com>; Scott Hatch <shatch@calljensen.com>
**Subject:** Wayne Calco v. Ossur Americas, Inc., et. al./USCD Case No. 8:22-cv-01971 CJC KES

Josh

Plaintiff has elected to withdraw its contention that Claims 12 and 13 of the US 11,478,374 patent cover the device incorporated the Miami J Select adjustable cervical collar which the Defendants refer to as the "sternal relief dial".

George B. Piggott
Law Offices of George B. Piggott
A Professional Corporation
2603 Main Street, Penthouse
Irvine, CA 92614
Office: (949) 261-0500
Fax: (949) 261-1085
Email: george@piggottlaw.com

NOTE: The information contained in this email may
contain attorney-client privileged and/or confidential information
intended only for the use of the individual or entity named above. If
the reader of this message is not the intended recipient, or the
employee or agent responsible to deliver it to the intended recipient,
you are hereby notified that any dissemination, distribution or copying
of this communication is strictly prohibited.

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

2

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

3

**TAB C**

DocuSign Envelope ID: FE0265F5-1C98-4A72-B077-61D9A4E578A2

Scott R. Hatch, Bar No. 241563
  shatch@calljensen.com
Joshua G. Simon, Bar No. 264714
  jsimon@calljensen.com
Rebecca I Makitalo, Bar No. 330258
  rmakitalo@calljensen.com
CALL & JENSEN
A Professional Corporation
610 Newport Center Drive, Suite 700
Newport Beach, CA  92660
Tel:   (949) 717-3000

Attorneys for Defendants, Össur Americas, Inc. and Össur hf

# UNITED STATES DISTRICT COURT

## CENTRAL OF CALIFORNIA

| | |
|---|---|
| WAYNE CALCO, an individual,<br><br>        Plaintiff,<br><br>        vs.<br><br>ÖSSUR AMERICAS, INC., a California corporation; Össur hf, an Icelandic company; and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No.  8:22-cv-01971 CJC-KES<br><br>**DECLARATION OF HENRY HSU ISO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br><br>Date:  July 11, 2024<br>Time:  10:00 a.m.<br>Place:  Courtroom 9D<br><br><br>Complaint Filed:  October 26, 2022<br>Trial Date:      April 9, 2024 |



- 1 -
DECLARATION OF HENRY HSU ISO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

DocuSign Envelope ID: FE0265F5-1C98-4A72-B077-61D9A4E578A2

I, Henry Hsu, declare as follows:

1.      I have personal knowledge of the facts in this declaration, and if called to testify concerning them, I could do so competently.

2.      After receiving my Bachelor of Science in Mechanical Engineering from UCLA in 1998 with an emphasis in manufacturing processes, I worked for a number of companies as a mechanical engineer, including Omnica, where I worked on the designs and prototypes of medical devices and tools for a variety of client companies. Unlike Mr. Calco, who is not a mechanical engineer, the bulk of my career has been spent working as a mechanical engineer in medical devices. I am a named inventor on many patents for medical devices, including US 11,452,633 for a cervical collar, US 7455696 for dynamic seals for a prosthetic knee, and US 7101487 for magnetorheological fluid compositions and prosthetic knees. My patented and non-patented designs have been used in the brain, heart, eyes, and spine. I have also developed products to replace feet and knees with hydraulics and computer control. I have had major contributions to medical equipment like surgical tools, a specialty pelvic surgery chair, and a table top rapid PCR device for my current employer Omnica, where I work as a Senior Mechanical Engineer (2022–Present). Most recently for Össur, I created from start to finish, bracing for the neck and knees in the Miami J Select and CTI3 motocross brace. I should also note that I had trained in the UCLA School of Engineering prototype machine shop (not the student shop, the professional shop) for three years in school and worked in mold design alongside Össur's plastic injection machines.

3.      I was employed by Össur Americas, Inc. as a Lead Product Engineer from Jul 2013 to Feb 2022 and previously from April 2000 to December 2003. During that time, I worked on a number of development projects, wherein I resolved design issues and led research and development on new prosthetic and orthotic product lines, including the Miami J Select.

4.      As the Lead Product Engineer for the Miami J Select, I am familiar with who worked on its design and development. I worked on that product's development

DocuSign Envelope ID: FE0265F5-1C98-4A72-B077-61D9A4E578A2

from start to finish. Mr. Calco did not work on the development of the Miami J Select. I have personal knowledge of that fact because I headed up the entire engineering and design team of the Miami J Select, and I am familiar with everyone who worked on the design and development of the collar. Mr. Calco was not part of the Miami J Select team. In fact, I made my involvement with the development of the Miami J Select contingent on Mr. Calco *not* being involved with its development.

5.    I am also familiar with the previous failed attempt by Össur to develop an adjustable cervical collar with Mr. Calco's concepts, including his ideas for height adjustment and sternum adjustment. As the Lead Project Engineer for Össur, it was part of my job duties to review the prototypes Mr. Calco developed during his consultancy and to examine them from a design and manufacturing standpoint. As I delved into Mr. Calco's proposed designs, I found them lacking in reliability, manufacturability, moldability, and practicality. They were too complicated with too many parts, too clunky, too costly to manufacture, and too difficult to assemble. As discussed further below, I examined Mr. Calco's prototypes in 2016 and then again recently in detail on March 12, 2024 when Mr. Calco's lawyer made them available to me. My review of Mr. Calco's prototypes confirmed the conclusions I made in 2016 and that I made the right decision to abandon Calco's designs entirely and go in a different direction with the Miami J Select.

6.    In addition to the flaws in Calco's prototypes from a design and manufacturing standpoint, Calco's height adjustment concept proved to be likely infringing of other patents on which Mr. Calco was a named inventor. This was conveyed to me by Össur's patent lawyer, Justin Cassell, who told me there was a high risk that Mr. Calco's height adjustment was infringing of the Eclipse patent that names Calco as an inventor. I was specifically asked to find a work-around Mr. Calco's Eclipse patent and/or the Vista patent. I did so by designing the Miami J Select with a remote rack and push button to adjust the height of the collar, rather than with a locking mechanism that actuated at the hinge point of the brace, as proposed by Mr. Calco.

DocuSign Envelope ID: FE0265F5-1C98-4A72-B077-61D9A4E578A2

7.     Thus, the development of Mr. Calco's proposed collar for Össur was a dead end from a design, intellectual property, and manufacturing standpoint. In fact, no manufacturer was ever selected, and no formal discussions ever materialized to manufacture Mr. Calco's proposed collar. As the Lead Project Engineer for Össur, it was part of my job duties and responsibilities to know what prototypes made it to the molding and manufacturing stage. Calco's prototypes did not. They simply could not be manufactured because of the weaknesses in their design.

8.     Mr. Calco did not work on the design or development of the Miami J Select, and I made sure to exclude him based on his poor track record and because of his lack of design or prototyping skills; he would have brought nothing to the table. Notably, the Miami J Select does not use Mr. Calco's height adjustment that had a locking mechanism that actuated at the hinge point of the brace. Instead, I designed the Miami J Select with a rack and a push button to adjust the height of the collar for the reasons discussed above.

9.     The Miami J Select also did not use Mr. Calco's sternum adjustment concept. Rather, the Miami J Select features the Sternal-Relief Dial, which is something I conceived of while examining the original Miami J design, which uses a pad that flexes the sternal contact. I wondered if I could adjust the flexibility of the sternal contact with a knob or slider to achieve a similar effect. I conceived of this and developed what ultimately became the Sternal-Relief Dial in February 2017. Mr. Calco had no input into the Sternal-Relief Dial whatsoever. Exhibit 8 attached to the declaration of Tatjana Latinovic is a true and correct copy of the February 17, 2017 email I sent with my original conception of the Sternal-Relief Dial.

10.     The Sternal-Relief Dial is in no way based on the sternum adjustment concept Mr. Calco conceived or what he suggested for Össur. There are many differences between the two devices, the most glaring being that Mr. Calco's sternum adjustment concept uses a screw mechanism to translate the contact pad and uses multiple components. It is also located on the lower support structure of the collar,

DocuSign Envelope ID: FE0265F5-1C98-4A72-B077-61D9A4E578A2

which I call the "cover plate." In contrast, the Sternal-Relief Dial relies on a flexure and is located on the sternal contact.

11.    Mr. Calco's concept also changed the distance between the sternum pad and the lower support whereas with the Sternal-Relief Dial, the sternum pad does not get any closer to or further away from the lower support. The Sternal-Relief Dial simply allows or inhibits additional flexure of the sternum contact pad as it rests against the sternum of the patient. When in the vertical orientation, as seen in the picture on the left of the Miami J Select below, the top of the sternal relief knob is immediately adjacent to the cover plate such that as the sternum contact pad flexes upward, it causes the knob to abut the cover plate which limits how far the lower sternal pad can flex. Alternately, when the knob is pivoted to the horizontal orientation, as seen in the picture on the right below, a gap is left between the knob and the cover plate which permits a greater range of flexibility between the sternum contact pad and the cover plate.



12.    There are other major differences between the Sternal-Relief Dial and Mr. Calco's sternum adjustment concept. Notably, there is no "extension element" in the Sternal-Relief Dial. A rotating knob does not extend or retract. The sternal relief knob simply rotates between a vertical orientation and a horizontal orientation. Rotation is not extension or retraction. There is also no linear movement produced by the rotation

CALL &
JENSEN

DocuSign Envelope ID: FE0265F5-1C98-4A72-B077-61D9A4E578A2

of the knob. Whether the sternal relief knob is in the vertical or horizontal position, the distance between the sternum pad and the lower support remains unchanged.

13. On March 12, 2024, I inspected the physical prototypes for which Mr. Calco provided photos in Exhibits 31, 32, and 33 of his declaration at the office of Mr. Calco's lawyer, Mr. George Piggot. I inspected the prototypes and did not see any living hinge geometry of any kind. I dissembled the prototypes to examine them further, and I did not see any internal living hinge geometry of any kind.

14. Lastly, in paragraph 6 of his declaration, Mr. Calco states that he brought three allegedly new and novel cervical collar concepts to Össur. In paragraph 8 of his declaration, Mr. Calco goes on to describe that his concepts were depicted in drawings he provided to Össur which have been produced as Exhibits 2 and 3 of the Latinovic Declaration. I have reviewed these drawings, and I can confirm that none of the features depicted in the drawings appear in the Miami J Select.

a. Exhibit 2 appears to be a sternum adjustment mechanism that is very similar to what is in Calco's prototypes that I examined in 2016 and on March 12, 2024. For the reasons stated in my declaration and herein, Mr. Calco's sternum adjustment feature is not in the Miami J Select. Re-familiarizing myself with Calco's prototypes on March 12 reminded me of two other criticisms I had for his design: 1) the screw mechanism has such a coarse pitch that force applied to the sternal contact would backdrive the mechanism to the most retracted position and 2) the components were proposed to be mounted inline with this force such that unintentional disassembly is likely, and showed itself during examination.

b. Exhibit 3 has a variety of pictures including Mr. Calco's height adjustment mechanism, which Mr. Calco admits was not used in the Miami J Select.

c. As for the drawing dated 12/04/2015 entitled "Collar back panel ADJUSTMENT CONCEPT," that also does not appear in the Miami J Select. To the extent Calco contends this is his "Repeatable Fit Tabs" concept and that such

DocuSign Envelope ID: FE0265F5-1C98-4A72-B077-61D9A4E578A2

1    is the same as the "*Reproducible* Fit *Option*" in the Miami J Select, that is
2    certainly not the case. Calco's drawing states that his mechanism "snaps into logo
3    plate and releases when strap is pulled." There is not anything like that on the
4    Miami J Select. Rather, the Reproducible Fit Option on the Miami J Select is
5    simply optional plastic tabs that can be added to the ends of the hook and loop
6    straps. The tabs themselves do not secure to the collar. Structurally, they do
7    nothing more than secure to the end of the strap so as to make it easier to remove
8    the strap from the hook and loop fastener on the collar. This is clearly not
9    described in Calco's 12/04/2015 drawing, which requires some sort of locking
10   mechanism to the collar.

11       I declare under penalty of perjury under the laws of the United States that the
12   foregoing is true. This declaration was signed at Irvine, California.

14   Date: _____6/3/2024_____          Signed: _____

15                                                        Henry Hsu

**TAB D**

1   Scott R. Hatch, Bar No. 241563
      shatch@calljensen.com
2   Joshua G. Simon, Bar No. 264714
      jsimon@calljensen.com
3   Rebecca I Makitalo, Bar No. 330258
      rmakitalo@calljensen.com
4   CALL & JENSEN
    A Professional Corporation
5   610 Newport Center Drive, Suite 700
    Newport Beach, CA  92660
6   Tel:    (949) 717-3000
7

8   Attorneys for Defendants, Össur Americas, Inc. and Össur hf

9

10                 UNITED STATES DISTRICT COURT

11                 CENTRAL OF CALIFORNIA

12

13  WAYNE CALCO, an individual,            Case No.  8:22-cv-01971 JWH (KESx)

14              Plaintiff,                 **DEFENDANTS ÖSSUR AMERICAS,**
                                           **INC. AND ÖSSUR hf'S REQUEST**
15              vs.                        **FOR JUDICIAL NOTICE IN**
                                           **SUPPORT OF MOTION FOR**
16                                         **PARTIAL SUMMARY JUDGMENT**
17  ÖSSUR AMERICAS, INC., a California
    corporation; Össur hf, an Icelandic
18  company; and DOES 1 through 10,
    inclusive,                             Date:  July 11, 2024
19                                         Time: 1:30 p.m.
              Defendants.                  Place: Courtroom 9D
20

21

22                                         Complaint Filed:   October 26, 2022
                                           Trial Date:        October 21, 2024
23

24

25

26

27

28

---

DEFENDANTS ÖSSUR AMERICAS, INC. AND ÖSSUR hf'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT

**-606-**

Defendants Össur Americas, Inc. and Össur hf (collectively, "Defendants") hereby request that the Court take judicial notice of the following matters, pursuant to Fed.R.Evid. 201. This request is made in support of Defendants' Motion for Partial Summary Judgment.

1.    Wayne Calco's Complaint filed in the Superior Court of California on May 24, 2021. Attached hereto as **Exhibit 25** is a true and correct copy of the Superior Court Complaint.

2.    The Superior Court of California's November 19, 2021 Minute Order. Attached hereto as **Exhibit 26** is a true and correct copy of the Superior Court's Minute Order.

Pursuant to Fed.R.Evid. 201(a), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201. The court must take judicial notice if a party requests it and supplies the court with the requisite information. Fed.R.Evid. 201(d). A court may take judicial notice of court records and court proceedings. *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001); *see also Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (stating that courts may take judicial notice of undisputed matters of public record, including documents on file in federal or state courts).

## I.    CONCLUSION

For the aforementioned reasons, this Court should grant Defendants' Request for Judicial Notice of **Exhibits 25** and **26** attached hereto.

Dated:  May 31, 2024

CALL & JENSEN
A Professional Corporation


By: */s/ Joshua G. Simon*
    Joshua G. Simon
Attorneys for Defendants
Össur Americas, Inc. and Össur hf

- 2 -
DEFENDANTS ÖSSUR AMERICAS, INC. AND ÖSSUR hf'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT

-607-

# EXHIBIT 25

Electronically Filed by Superior Court of California, County of Orange, 05/24/2021 11:45:57 PM.
30-2021-01202543-CU-BC-CXC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By Georgina Ramirez, Deputy Clerk.

1  GEORGE B. PIGGOTT (SBN 68227)
   LAW OFFICES OF GEORGE B. PIGGOTT,
2  A Professional Corporation
   2603 Main Street, Penthouse
3  Irvine, California 92614-6232
   Tel: (949) 261-0500
4  Fax: (949) 261-1085
   Email: george@piggottlaw.com
5
6  Attorney for Plaintiff Wayne Calco

7

8              SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE

9                          CENTRAL JUSTICE CENTER

10

11  WAYNE CALCO, an individual;                Case No.  30-2021-01202543-CU-BC-CXC

12                              Plaintiff,     ASSIGNED TO: Assigned for all Purposes

13              vs.                                      Judge William Claster    CX-104

    ÖSSUR AMERICAS, INC., a California
14  corporation; ÖSSUR hf, an Icelandic company;  COMPLAINT FOR BREACH OF
    and DOES 1 through 20, inclusive,            WRITTEN CONTRACT AND IMPLIED
15                                               COVENANT OF GOOD FAITH AND FAIR
16                              Defendants.      DEALING; DECLARATORY RELIEF;
                                                FRAUD; AND UNJUST ENRICHMENT
17

18      Plaintiff, WAYNE CALCO, alleges and claims as follows:

19                              **THE PARTIES**

20      1.    Plaintiff, WAYNE CALCO, is an individual and shall be referred to hereinafter as either

21  "Plaintiff" or "CALCO".

22      2.    Plaintiff is informed and believes and thereon alleges that Defendant ÖSSUR

23  AMERICAS, INC. is a corporation organized under the laws of the State of California and is

24  headquartered in the County of Orange, State of Caifornia.

25      3.    Plaintiff is informed and believes and thereon alleges that Defendant ÖSSUR hf is a

26  company of unknown legal nature organized under the laws of Iceland and/or Denmark. Plaintiff is

27  informed and believes and thereon alleges that Defendant ÖSSUR AMERICAS, INC. is ostensibly a

28  subsidiary of ÖSSUR hf but there is such a lack of separation and control both legally and financially

                                          1
    COMPLAINT FOR BREACH OF WRITTEN CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR
            DEALING; DECLARATORY RELIEF; FRAUD; AND UNJUST ENRICHMENT

1    that Defendants ÖSSUR AMERICAS, INC. and ÖSSUR hf are in fact one and the same entity and

2    should be treated as such. ÖSSUR AMERICAS, INC. and ÖSSUR hf shall be collectively referred to

3    hereinafter as "ÖSSUR."

4         4.    Plaintiff is unaware of the true names of Defendants DOES 1 through 20, inclusive,

5    and therefore sues them by such fictitious names. Plaintiff will amend this complaint to allege the true

6    names of Defendants DOES 1 through 20, inclusive, when the same have been ascertained. Plaintiff

7    is informed and believe and thereon alleges that Defendants DOES 1 through 20, inclusive, are

8    responsible and/or liable in some manner for the matters alleged herein.

9         5.    Plaintiff is informed and believe and thereon allege that each of the defendants named

10   and sued herein are the agents, servants, employees, and/or co-venturers of each of the other

11   defendants, and were, in committing the acts and/or omissions alleged herein, acting in the course and

12   scope of such capacity.

13                              **BACKGROUND FACTS**

14   **The Services Agreement**

15        6.    CALCO and ÖSSUR AMERICAS, INC. entered into a written agreement entitled the

16   "Services Agreement" on or about October 29, 2015 ("the Agreement").  Pursuant to the Agreement,

17   CALCO was retained as an independent contractor to perform design services for ÖSSUR related to its

18   adjustable cervical collar project. The Agreement provided, *inter alia*, that CALCO was to be

19   compensated for his services by ÖSSUR's payment to him of consultancy fees of $150,000 at the rate

20   of $10,000 per month, plus a royalty (hereinafter referred to as "the Royalty") based on sales made by

21   ÖSSUR of patented products, designs or processes that are protected and covered by valid issued

22   claims contained in patents  owned or controlled by ÖSSUR that name CALCO as an inventor or co-

23   inventor and that are based on concepts that he created prior to entering into the Agreement as

24   evidenced by written records. The Royalty was four percent of the "net selling price", as that term is

25   defined in the Agreement, of sales of patented products that are made by ÖSSUR to its customers,

26   payable for the life of the patent or patents.  CALCO was to receive two advanced royalty payments,

27   regardless of whether or not the Royalty was ultimately due to CALCO. The first advanced payment

28   was $30,000, which was due upon signing of the Agreement and was paid to CALCO. The second

                                            2
COMPLAINT FOR BREACH OF WRITTEN CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALING; DECLARATORY RELIEF; FRAUD; AND UNJUST ENRICHMENT

1  advanced payment was $20,000, which was due upon successful completion of the product

2  development phase called "Gate 2.1" in the Agreement. The second advanced payment was never paid

3  to CALCO. The Agreement further provided, *inter alia,* that all documents, materials, products,

4  therapies, data, drawings, designs, analyses, graphs, reports, tooling, physical property, computer

5  programs, ideas, methods, discoveries, improvements, concepts, ideas and other forms of tangible

6  expression, inventions or developments, in any media now or hereafter produced, created, or conceived

7  by CALCO in connection with the services provided under the Agreement, or which are otherwise the

8  results or proceeds of the services  performed under the Agreement,   would at all times be and remain

9  the exclusive property of ÖSSUR AMERICAS, INC. and its affiliates, including but not limited to

10 ÖSSUR hf. Such property is referred to hereinafter as "the Intellectual Property."

11    **CALCO's Inventions**

12    7.    ÖSSUR had approached CALCO about assisting it with the design and development of

13 an adjustable cervical collar in September of 2015. ÖSSUR's representatives told CALCO that they had

14 been attempting to design an adjustable cervical collar for the previous several years without success

15 and ÖSSUR needed his expertise to assist it with the design and development of a competitive product.

16 CALCO's expertise included designing adjustable cervical collars for two of ÖSSUR's competitors, the

17 "Vista" collar sold by Aspen and the "Eclipse" collar sold by VQ OrthoCare ("VQ"), which resulted in

18 issuance of patents in which CALCO is the first named inventor (US 7674234) and sole inventor (US

19 9132027), respectively. The inventions in those patents included an adjustable height mechanism,

20 which CALCO discussed with his ÖSSUR team members. CALCO even brought exemplars of the

21 Vista and Eclipse collars to ÖSSUR, which he disassembled for his team members and explained and

22 demonstrated to them how the height adjustment features that were incorporated in the collars were

23 designed and functioned.

24    8.    CALCO brought to ÖSSUR a concept he created for a mechanism to adjust the height of

25 the chin support for a cervical collar  ("the New Height Adjustment" concept), in addition to concepts

26 for mechanisms he created for adjusting the cervical collar's fit and comfort by tightening or relaxing

27 the pressure of the sternum support pad and allowing a forward flexing and angle change of the support

28 pad ("the Sternum Adjustment"), and plastic/fabric pull tabs that fix the size of the circumference

3

COMPLAINT FOR BREACH OF WRITTEN CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALING; DECLARATORY RELIEF; FRAUD; AND UNJUST ENRICHMENT

1    around the neck and repeat that size without adjustment when the collar is put back on again after being

2    removed ("Repeatable Fit Tabs"). CALCO also brought to ÖSSUR a concept he had created for a

3    mechanism to be used in adjusting the height of the chin support other than the New Height Adjustment

4    concept, which was disclosed in the patent issued to Aspen that lists CALCO as the first named

5    inventor.  This concept shall be referred to hereinafter as the "Opposite Racks". All of these concepts

6    were created by CALCO prior to the Agreement as evidenced by written records.

7        **ÖSSUR'S Miami J Select Adjustable Cervical Collar**

8        9.    The mechanism used in ÖSSUR's adjustable cervical collar that it sells under the brand

9    name of "Miami J Select" ("Miami JS") for adjusting the height of the chin support, hereinafter referred

10    to as the "Alternative Height Adjustment", incorporates CALCO's Opposite Racks concept as well as a

11    feature based on his concept that was part of CALCO's New Height Adjustment that shall be referred

12    to hereinafter as "the Grip". The Opposite Racks are used to unlock the chin support in order to adjust

13    its height and to then lock the chin support into place after adjustment. The Grip is a user-apparent and

14    centrally located structure that protrudes from the chin support, which is gripped by the user with the

15    thumb and index finger to manually adjust the height of the chin support.  The Miami JS also uses

16    mechanisms based on CALCO's Sternum Adjustment and Repeatable Fit Tabs concepts. ÖSSUR's

17    online brochure for the Miami JS describes the Sternum Adjustment feature as "Simplified comfort

18    adjustments with integrated and patented Sternal-Relief Dial". The Repeatable Fit Tabs feature is

19    described in ÖSSUR's online brochure as "Easy to don and doff with patented Reproducible Fit

20    option." Although the brochure refers to both features as "patented", CALCO is informed and believes

21    and thereon alleges that neither is in fact patented.

22        **ÖSSUR's Patents and Patent Applications**

23        10.    ÖSSUR applied for a patent that was published on August 31, 2017 and ultimately

24    issued on December 24, 2019 as Patent No. US 10,512,559 B2 ("the 559 Patent"), which lists CALCO

25    as the first named co-inventor. The 559 Patent describes the Sternum Adjustment and Repeatable Fit

26    Tabs features and includes figures showing embodiments of the collar that incorporate these features,

27    but the patent does not include claims for either of these concepts. The 559 Patent does include a claim

28    for the New Height Adjustment concept that CALCO created. The 559 Patent claims priority from a

4

COMPLAINT FOR BREACH OF WRITTEN CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALING; DECLARATORY RELIEF; FRAUD; AND UNJUST ENRICHMENT

1  provisional application that was filed by ÖSSUR in February of 2016, which did include claims for

2  CALCO's New Height Adjustment, Sternum Adjustment and Repeatable Fit Tabs concepts.

3        11.    Claims for the Alternative Height Adjustment, including the Opposite Racks and the

4  Grip, and the Sternum Adjustment, were included in a patent application filed by ÖSSUR on September

5  6, 2017, Application No. 15/696,885, Publication No. US 2018/0078400 A1 ("78400 Publication"),

6  which was published on March 22, 2018. The 78400 Publication did not name CALCO as an inventor.

7  The claim for the Sternum Adjustment was subsequently withdrawn by ÖSSUR from the 78400

8  Publication in October of 2020. The 78400 Publication describes and shows embodiments of the

9  Repeatable Fit Tabs concept, but does not include any claims for this concept. The application for the

10  78400 Publication is still pending.

11        12.    ÖSSUR filed another patent application on September 6, 2017, Application No.

12  15/697,021, Publication No. US 2018/0078401, which was published on March 22, 2018. A United

13  States Patent, US 10,945,872 B2, subsequently issued on that application on March 16, 2021

14  (hereinafter "the 872 Patent"). The 872 Patent also describes features that include the Sternum

15  Adjustment and Repeatable Fit Tabs, but there are no claims for these features. CALCO is not named

16  as an inventor in the 872 Patent or the application on which it issued.

17        13.    ÖSSUR filed a continuation application for the 559 Patent on November 18, 2019,

18  Application No. 16/686,582, Publication No. US 2020/0085607, which includes a claim for the

19  Sternum Adjustment.

20        14.    Except for the provisional application from which the 559 Patent claims priority,

21  CALCO is informed and believes and thereon alleges that no patent application has been filed by

22  ÖSSUR that includes any claims for CALCO's Repeatable Fit Tabs concept.

23      **Other Facts**

24        15.    In the course of working with ÖSSUR on the Miami JS product, CALCO met with

25  ÖSSUR's IP director and its patent lawyers in January of 2016 to review CALCO's concepts for the

26  New Height Adjustment, Sternum Adjustment and Repeatable Fit Tabs and to discuss patent filing. The

27  lawyers said that CALCO's concepts were patentable and would not infringe other patents and they

28  approved proceeding with patent applications. However, following this meeting, Shane Fedon, a

5
COMPLAINT FOR BREACH OF WRITTEN CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALING; DECLARATORY RELIEF; FRAUD; AND UNJUST ENRICHMENT

-613-

1  member of ÖSSUR's management, asserted in conflict with ÖSSUR's patent lawyers that under the

2  doctrine of equivalents, CALCO's New Height Adjustment concept infringed the patent that had been

3  issued to VQ for its cervical collar called the "Eclipse". As alleged above, CALCO is named the sole

4  inventor in that patent. CALCO was confident his design did not infringe VQ's patent for the Eclipse

5  collar. Despite his belief that his design did not infringe the VQ patent, CALCO suggested some

6  changes to his New Height Adjustment to address ÖSSUR's concern. Nevertheless, ÖSSUR began

7  working on another height adjustment concept that was based on CALCO's height adjustment concept

8  that is disclosed in the patent issued to Aspen for its "Vista" collar. CALCO was concerned that this

9  other height adjustment design infringed the patent issued to Aspen for the Vista collar and warned his

10 counterparts at ÖSSUR about his concern. In the meantime, CALCO continued to provide his support

11 and input to the ÖSSUR team for the design of chin support height adjustment, including but not

12 limited to, the Opposite Racks and the Grip, in addition to the Sternum Adjustment and Repeatable Fit

13 Tabs, and ÖSSUR postponed the "Gate 2.1" phase that was the trigger for the payment to CALCO of

14 the second advanced royalty of $20,000. The term of Agreement expired on January 31, 2017, at which

15 point CALCO's services terminated. At the time the term of the Agreement expired and CALCO's

16 services terminated, the adjustable cervical collar that he was working on that ultimately became the

17 Miami JS was still in the design and development phase, the production cost review and design of the

18 collar had not been completed, and the collar was not ready for production.

19     16.     In or about June of 2019, CALCO found the Miami JS on the ÖSSUR website. He

20 discovered that the Miami JS incorporated his Sternum Adjustment and that the Repeatable Fit Tabs

21 were offered as an option. CALCO was unable to determine from the information on the website the

22 design of the height adjustment mechanism used by the Miami JS.

23     17.     Shortly after his discovery of the Miami JS on the ÖSSUR website, CALCO had a brief

24 meeting over coffee with an ÖSSUR officer, Duane Romo, in which they discussed the Miami JS.

25 CALCO told Mr. Romo that he had recently found the Miami JS for sale online and had noted that it

26 included his Sternum Adjustment concept. Mr. Romo testily replied that the feature being used in the

27 Miami JS was "different" and abruptly ended the meeting before CALCO could say anything else.

28

6
COMPLAINT FOR BREACH OF WRITTEN CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALING; DECLARATORY RELIEF; FRAUD; AND UNJUST ENRICHMENT

18.    Following CALCO's meeting with Duane Romo, ÖSSUR filed a continuation application for the 559 Patent to add a claim for the Sternum Adjustment, and withdrew the claim in the 78400 Publication for the Sternum Adjustment, which did not name CALCO as an inventor but should have. CALCO was able to obtain a Miami JS adjustable cervical collar in or about May of 2020 and upon examination of the product he discovered that the height adjustment design it uses, referred to hereinabove as the "Alternative Height Adjustment", includes his Opposite Racks concept that is disclosed in the patent issued to Aspen for its "Vista" collar, and the Grip concept.

19.    Plaintiff is informed and believes and thereon alleges that Defendant ÖSSUR is falsely claiming in its advertising and product literature that the Miami JS's Sternum Adjustment and Repeatable Fit Tab features are patented, when in fact they are not. These false representations show that Defendant ÖSSUR knows that these features are patentable and should be patented; these false representations also demonstrate ÖSSUR's capacity to commit fraud and breach its obligations under the Agreement.

## FIRST CAUSE OF ACTION

**(For Breach of Written Contract and Implied Covenant of Good Faith and Fair Dealing – against
All Defendants)**

20.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 19, inclusive, as though set forth in full herein.

21.    The Agreement provides *inter alia* that California law governs the execution, interpretation and performance of the Agreement, and that ÖSSUR shall have the authority to seek patents for the Intellectual Property.

22.    California law provides that there is implied in every contract a covenant of good faith and fair dealing which requires each of the parties not to do anything that will deprive the other parties of the benefits of the contract. This covenant not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible, but also the duty to do everything that the contract presupposes that each party will do to accomplish its purpose. This duty includes interpreting the provisions of the Agreement for their performance to effectuate the parties' intent. This duty was in fact made express in paragraph 18(c) of the Agreement, which provides

7
COMPLAINT FOR BREACH OF WRITTEN CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALING; DECLARATORY RELIEF; FRAUD; AND UNJUST ENRICHMENT

-615-

1  that "The provisions of this Agreement shall be interpreted in a reasonable manner to effectuate the

2  intent of the Parties."

3      23.    The implied covenant of good faith and fair dealing and paragraph 18(c) of the

4  Agreement require ÖSSUR to pursue in good faith patent claims for CALCO's Sternum Adjustment

5  and Repeatable Fit Tabs concepts that are used in the Miami JS product. The implied covenant and

6  paragraph 18(c) preclude ÖSSUR from failing to apply for patents and failing to use good faith efforts

7  in pursing patent applications for CALCO's Sternum Adjustment and Repeatable Fit Tabs concepts in

8  order to avoid paying the Royalty to CALCO as provided for in the Agreement. The implied covenant

9  and paragraph 18(c) also preclude ÖSSUR from failing to use CALCO's New Height Adjustment

10  concept in the Miami JS in order to avoid paying CALCO the Royalty pursuant to the Agreement, even

11  though ÖSSUR's use of the Grip is alone sufficient to entitle CALCO to the Royalty.  The implied

12  covenant and paragraph 18(c) further preclude ÖSSUR from failing to name CALCO as an inventor in

13  patent applications where he conceived the subject matter of at least one claim and/or he collaborated

14  with others to produce the invention through aggregate efforts, which ÖSSUR is also legally required to

15  do.

16      24.    CALCO has performed all of the obligations and conditions under the Agreement that he

17  was required to perform. ÖSSUR has breached the terms and conditions of the Agreement that it was

18  required to perform, including, but not limited to paragraph 18(c), and the implied covenant of good

19  faith and fair dealing, by means of: (i) failing to pursue patent claims for the Sternum Adjustment and

20  Repeatable Fit Tabs concepts in the non-provisional application which issued as the 559 Patent, and

21  failing to do so despite the fact that ÖSSUR's patent lawyers told CALCO these concepts were

22  patentable and that the provisional application included claims for the Sternum Adjustment and

23  Repeatable Fit Tabs; (ii) belatedly filing a continuation application for the 559 Patent to add a claim for

24  the Sternum Adjustment, and withdrawing that portion of its 78400 Publication that included a claim

25  for the Sternum Adjustment, to make it appear that it is trying to patent the Sternum Adjustment and to

26  give credit to CALCO for the Sternum Adjustment; (iii) failing to name CALCO as a co-inventor in the

27  78400 Publication and the patent application that resulted in the issuance of the 872 Patent; (iv) using

28  the Alternative Height Adjustment feature for the Miami JS instead of CALCO's New Height

8
COMPLAINT FOR BREACH OF WRITTEN CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALING; DECLARATORY RELIEF; FRAUD; AND UNJUST ENRICHMENT

1    Adjustment, and doing so despite the fact that ÖSSUR's patent lawyers told CALCO the New Height

2    Adjustment was patentable and would not infringe other patents and it was in fact patented in the 559

3    Patent; (v) failing to pay the second advanced royalty payment of $20,000 to CALCO; and (vi) failing

4    to pay the Royalty to CALCO, and instead taking the actions alleged in sub-paragraphs (i) through (iv)

5    herein that were designed and intended by ÖSSUR to avoid paying the Royalty.

6        25.    As a proximate result of ÖSSUR's breaches alleged in paragraph 24 above, CALCO has

7    sustained compensatory damages consisting of $20,000 for the second advanced royalty, and  amounts

8    for the Royalty according to proof at trial which CALCO is informed and believes and thereon alleges

9    currently exceed $1 Million and will grow larger in amount over time.

10                  **SECOND CAUSE OF ACTION**

11            **(For Declaratory Relief – against All Defendants)**

12        26.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 25,

13    inclusive, as though set forth in full herein.

14        27.    Plaintiff contends, and he is informed and believes and thereon alleges that Defendant

15    ÖSSUR denies, that he is entitled under the Agreement to be paid the Royalty by ÖSSUR. A legal

16    controversy therefore exists between Plaintiff and Defendant ÖSSUR that requires the Court's

17    determination and adjudication.

18        28.    Plaintiff requests that the Court declare and adjudicate that he is entitled to be paid the

19    Royalty by Defendant ÖSSUR.

20                  **THIRD CAUSE OF ACTION**

21              **(For Fraud – against All Defendants)**

22        29.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 28,

23    inclusive, as though set forth in full herein.

24        30.    Plaintiff is informed and believes and thereon alleges that at the time Defendant ÖSSUR

25    entered into the Agreement it had no intention of paying the Royalty to Plaintiff, contrary to its express

26    promise and representation in the Agreement and in the negotiations of the Agreement, and to avoid

27    paying the Royalty to Plaintiff, ÖSSUR did not intend to pursue patent applications for Plaintiff's

28    inventions or name him in as an inventor for his inventions in patent applications that it did file.

9
COMPLAINT FOR BREACH OF WRITTEN CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALING; DECLARATORY RELIEF; FRAUD; AND UNJUST ENRICHMENT

-617-

1  ÖSSUR fraudulently represented to Plaintiff that it would pay him the Royalty in order to induce him to

2  enter into the Agreement and to provide his services and inventions to ÖSSUR.

3      31.    CALCO was fraudulently induced to enter into the Agreement and provide his services

4  and inventions to ÖSSUR in reliance on ÖSSUR's express promise and representation in the

5  Agreement and in the negotiations of the Agreement that it would pay to him the Royalty. In

6  negotiating the Agreement, CALCO agreed to accept a lower consultancy fee in consideration for a

7  higher royalty rate than ÖSSUR had originally proposed. CALCO had also initially demanded a royalty

8  at a higher percentage rate if a patent issued as well as a royalty at a lower percentage rate if a patent

9  did not issue. ÖSSUR insisted that a royalty would only be paid if a patent issued naming CALCO as

10 an inventor.  CALCO relented to ÖSSUR's demand due to his ignorance of ÖSSUR's intent not to seek

11 patent claims for the inventions that CALCO created and/or not to name him as an inventor in patent

12 applications where he should have been named as an inventor. At the time he entered into the

13 Agreement, CALCO was unaware of ÖSSUR's true intentions and reasonably relied on ÖSSUR's

14 express promise and representation that it would pay him the Royalty. CALCO did not discover

15 ÖSSUR's true intentions to not pay him the Royalty until after he had provided his services and

16 inventions to ÖSSUR.

17     32.    ÖSSUR's fraudulent intent as alleged above is further evidenced by the fact that Shane

18 Fedon criticized CALCO's Agreement with ÖSSUR to him while he was performing his services under

19 the Agreement, and in particular, Shane Fedon complained to CALCO about his right to receive a

20 royalty in addition to consultancy fees. At the time of Shane Fedon's complaint, CALCO thought that

21 his complaint was motivated by professional envy and jealousy. However, after CALCO's discovery

22 that the Miami JS includes features that are based on CALCO's Sternum Adjustment, Repeatable Fit

23 Tabs, and Grip concepts, in addition to his Opposite Racks concept instead of the New Height

24 Adjustment, in combination with his discovery of other facts, including, but not limited to the facts

25 alleged above and below, CALCO concluded that Shane Fedon's complaint revealed ÖSSUR's

26 fraudulent intent. Moreover, ÖSSUR failed to name CALCO as an inventor as it was required to do by

27 law in the application that resulted in the issuance of the 872 Patent and in the application for the 78400

28 Publication, as well as two applications for design patents that issued, despite his contributions with

10
COMPLAINT FOR BREACH OF WRITTEN CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALING; DECLARATORY RELIEF; FRAUD; AND UNJUST ENRICHMENT

respect to certain features that are the subject of claims in the 872 Patent and 78400 Publication and the design patents that might not even qualify for payment of the Royalty to CALCO under the Agreement. ÖSSUR failed to do so because of its fraudulent and bad faith intent to avoid any claim by CALCO that he was entitled to a Royalty as a co-inventor of any such patent claims.

33.     As a proximate result of ÖSSUR's fraud as alleged above, CALCO has sustained compensatory damages consisting of the Royalty in amounts according to proof at trial which CALCO is informed and believes and thereon alleges currently exceed $1 Million and will grow larger in amount over time.

34.     Defendant ÖSSUR's fraud was willful, intentional and committed in conscious disregard of CALCO'S rights. CALCO is therefore entitled to recover punitive damages against Defendant ÖSSUR in amounts according to proof at trial to punish ÖSSUR and deter it from committing fraud in the future.

### FOURTH CAUSE OF ACTION

### (For Unjust Enrichment – against All Defendants)

35.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 34, inclusive, as though set forth in full herein.

36.     While Defendant ÖSSUR has been selling the Miami JS without paying the Royalty to CALCO, it has been falsely claiming in its advertising and product literature that the Miami JS's Sternum Adjustment and Repeatable Fit Tab features are patented, when in fact they are not. ÖSSUR's false representations show that it knows that these features are patentable and should be patented and yet it has failed to pay the Royalty to CALCO. ÖSSUR has been unjustly enriched by making these false representations and retaining the Royalty that it should be paying to CALCO on the sale of the Miami JS.

37.     Defendant ÖSSUR must disgorge to CALCO an amount equal to the Royalty for its sales of the Miami JS so that it is not unjustly enriched.

WHEREFORE, Plaintiff prays for judgment as follows:

1.     On the First Cause of Action, for compensatory damages of $20,000 for the second

11
COMPLAINT FOR BREACH OF WRITTEN CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; DECLARATORY RELIEF; FRAUD; AND UNJUST ENRICHMENT

1    advanced royalty payment, and for amounts according to proof at trial for the Royalty in excess of $1

2    Million, plus interest thereon at the maximum legal rate;

3         2.    On the Third and Fourth Causes of Action, for compensatory damages for amounts

4    according to proof at trial for the Royalty in excess of $1 Million, plus interest thereon at the maximum

5    legal rate;

6         3.    On the Second Cause of Action, for declaratory relief as alleged therein;

7         4.    On the Third Cause of Action, for punitive damages in amounts according to proof at

8    trial;

9         5.    On all causes of action, for Plaintiff's costs suit incurred herein; and

10        6.    On all causes of action, for such other and further relief as the court deems just and

11   proper.

12

13   Dated: May 24, 2021                    LAW OFFICES OF GEORGE B. PIGGOTT,
                                            A PROFESSIONAL CORPORATION

14

15

16                                          By: GEORGE B. PIGGOTT
                                            Attorney for Plaintiff WAYNE CALCO

17

18

19

20

21

22

23

24

25

26

27

28

12
COMPLAINT FOR BREACH OF WRITTEN CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALING; DECLARATORY RELIEF; FRAUD; AND UNJUST ENRICHMENT

-620-

# EXHIBIT 26

**SUPERIOR COURT OF CALIFORNIA,
COUNTY OF ORANGE
CIVIL COMPLEX CENTER**

**MINUTE ORDER**

DATE: 11/19/2021                    TIME: 09:00:00 AM          DEPT: CX104

JUDICIAL OFFICER PRESIDING: William Claster
CLERK: Gus Hernandez
REPORTER/ERM: Michelle G. Cooper CSR# 13572
BAILIFF/COURT ATTENDANT: None

CASE NO: **30-2021-01202543-CU-BC-CXC** CASE INIT.DATE: 05/24/2021
CASE TITLE: **Calco vs. Ossur Americas, Inc.**
CASE CATEGORY: Civil - Unlimited     CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 73631019

**EVENT TYPE:** Motion - Other
MOVING PARTY: Ossur Americas, Inc., Ossur hf
CAUSAL DOCUMENT/DATE FILED: Motion to Seal confidential exhibits, 10/20/2021

EVENT ID/DOCUMENT ID: 73627969

**EVENT TYPE:** Demurrer to Amended Complaint
MOVING PARTY: Ossur Americas, Inc., Ossur hf
CAUSAL DOCUMENT/DATE FILED: Demurrer to Amended Complaint, 10/15/2021

**APPEARANCES**
George B. Piggott, from Law Offices of George B. Piggott, present for Plaintiff(s) telephonically.
Joshua G. Simon, from Call & Jensen, present for Defendant(s) telephonically.

**1.Defendants Ossur Americas, Inc. and Ossur hf's Demurrer to First Amended Complaint (ROA # 79)**

**2.Defendants Ossur Americas, Inc. and Ossur hf's Motion to Seal Confidential Exhibit to Request for Judicial Note and Memorandum of Points and Authorities in Support of Demurrer to First Amended Complaint (ROA # 84)**

Tentative Ruling posted on the Internet.

Hearing held.

The Court hears oral argument and confirms the tentative ruling as to the demurrer. The Court's ruling is attached hereto and incorporated herein by reference.

**LATER SAME DATE:** The Court inadvertently ended the hearing on these motions without taking oral argument on the Defendants' motion to seal. Counsel listed above once again appear telephonically and proceed with the hearing without the presence of a court reporter due to the court reporters unavailability.

The Court hears oral argument as to Defendants' motion to seal and confirms the Court's tentative ruling. The Court's ruling is attached hereto and incorporated herein by reference.

Counsel for Defendants is to give notice as to the entirety of the Court's ruling.

DATE: 11/19/2021                    MINUTE ORDER                         Page 1
DEPT: CX104                                                          Calendar No.

## CALCO v. OSSUR AMERICAS, INC. 21-1202543

### DEMURRER

Defendants Ossur Americas, Inc. and Ossur hf (collectively, "Ossur") demur to the first amended complaint (FAC) of Plaintiff Wayne Calco. The Court rules as follows:

1. Any claims based on future royalties owed under the contract between Ossur and Calco are subject to the exclusive jurisdiction of the federal courts because they arise under patent law. As a result, this Court lacks jurisdiction over the second, third and fourth causes of action as currently pled. It also lacks jurisdiction over the first cause of action insofar as it is based on future royalties.

2. However, claims based on past royalties owed for the alleged completion of "Gate 2.1" do not arise under patent law and may be heard by this Court. The Court therefore has jurisdiction to consider the first cause of action insofar as it is based on the Gate 2.1 royalties.

3. As a result of the foregoing:

   a. The demurrer is SUSTAINED as to the second, third and fourth causes of action.

   b. The demurrer is OVERRULED as to the first cause of action because a demurrer does not lie to a portion to a cause of action. However, as pled, the Court only has jurisdiction to consider the Gate 2.1 claim.

4. The Court will grant leave to amend to plead claims that do not arise under patent law. Calco shall have until December 17, 2021 to file a second amended complaint.

Ruling Page 1

**CALCO v. OSSUR AMERICAS, INC. 21-1202543**


Ossur's unopposed request for judicial notice is GRANTED.


**I.    Allegations of FAC**


Ossur retained Calco as a consultant to perform design services for Ossur relating to an adjustable cervical collar project. Calco would be paid a consulting fee of $10,000 per month for the life of the contract (15 months). In addition, Calco was to receive a royalty on patented products sold by Ossur that incorporated Calco's concepts to the extent Calco was a named co-inventor on the patents. A $30,000 advance on the royalty was due upon execution of the agreement. A further advance of $20,000 was due when the cervical collar project reached a design stage referred to in the contract as "Gate 2.1." In the event the project never resulted in a marketable product, Calco had no obligation to repay the advances.


Ossur paid the first advance. It never paid the second advance tied to the completion of Gate 2.1. Nor has it ever paid royalties for the sale of cervical collars. Calco alleges that after the expiration of his contract, Ossur began marketing a cervical collar called the "Miami JS" that incorporates his concepts. He acknowledges that Ossur never filed patent applications naming him as a co-inventor. He also acknowledges that the contract gives Ossur the sole discretion to decide whether or not to pursue patent applications. He alleges that an Ossur executive said he didn't believe Calco's concepts weren't patentable. Calco disagrees, based on his own experience as the inventor of one of the patents Ossur allegedly told him was prior art. He further alleges that Ossur intentionally avoided naming him as a co-inventor on the patent applications it filed to avoid paying him royalties he otherwise would be due.


Calco filed suit. His operative FAC brings four causes of action: (1) breach of contract, (2) declaratory relief, (3) fraud, and (4) unjust enrichment.

Ruling Page 2


**-624-**

**CALCO v. OSSUR AMERICAS, INC. 21-1202543**

II.    **Discussion**

The Court notes that Ossur has abandoned its arguments relating to the statute of limitations.  (See ROA 102.)

A.    **Exclusive Federal Jurisdiction**

Ossur argues this Court cannot hear Calco's claims because they arise under patent law and therefore are committed to the exclusive jurisdiction of federal courts.  Because this argument goes to the Court's ability to hear the case, the Court considers it first.

28 U.S.C. § 1338(a) gives federal district courts original jurisdiction over "any civil action arising under any Act of Congress relating to patents."  "For cases falling within the patent-specific arising under jurisdiction of [28 U.S.C] § 1338(a) . . . Congress has not only provided for federal jurisdiction but also eliminated state jurisdiction." (*Gunn v. Minton* (2013) 568 U.S. 251, 257.)  For purposes of § 1338(a), even claims that have their origin in state law (such as Calco's here) may arise under patent law.  Specifically, a state law claim arises under patent law if a patent law issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." (*Id.*, at p. 258.)

1.    **Background Law**

Calco relies on *Gunn*, a case where the United States Supreme Court found a state law claim for legal malpractice didn't arise under patent law.  In *Gunn*, the inventor sued an alleged infringer in federal court.  The infringer successfully

Ruling Page 3

CALCO v. OSSUR AMERICAS, INC. 21-1202543

argued that the inventor's patent was invalid, and the invalidity determination
was upheld on appeal to the Federal Circuit. The inventor then sued his attorney
in state court for malpractice, arguing the attorney should have put on a better
response to the invalidity argument. All parties agreed the malpractice "case
within a case" analysis would require the state court to decide contested
questions of patent law, because the inventor could prevail only if he proved his
patent wouldn't have been invalidated but for the attorney's malpractice.
Nevertheless, the Supreme Court held this question wasn't so "substantial" as to
arise under patent law. It was a purely backward-looking, hypothetical issue. The
patent had been finally judged invalid; nothing the state court said in the
malpractice suit could change that. Nor would it upset the uniform development
of patent law to let state courts conduct case within a case analyses in
malpractice cases, for state courts could be expected to adhere to federal court
decisions on patentability. (*Gunn*, *supra*, 568 U.S. at pp. 261-262.)


Ossur cites *Jang v. Boston Scientific Corp.* (Fed. Cir. 2014) 767 F.3d 1334. *Jang* was
a royalty dispute arising from the plaintiff's assignment of his stent patents to
defendants. In exchange, the defendants agreed to pay a royalty on the sale of
stents covered by his patents. The Federal Circuit concluded that unlike in *Gunn*,
the patent law questions were substantial. The plaintiff was only owed royalties if
the stents were covered by his patents, i.e., if the stents would have infringed
upon his patents absent the assignment. (*Id.*, at p. 1336.) In addition, under the
terms of the parties' contract, patent invalidity would be a defense, so a court
could be asked to rule existing patents invalid. (*Id.*, at p. 1337.) Finally, the
defendants intended to file infringement claims against other stent
manufacturers. Allowing the contract case to be appealed to another appellate
court while the expected claims against other manufacturers went to the Federal
Circuit could result in conflicting decisions about the validity of the same patent,
which would undermine the uniform development of patent law. (*Id.*, at p. 1338.)


Finally, both parties cite *HIF Bio, Inc. v. Yung Shin Pharmaceuticals Indus. Co., Ltd.*
(Fed. Cir. 2010) 600 F.3d 1347. *HIF Bio*, like this case, involved numerous state
law claims that were all patent-related; the question was whether they arose
under patent law. Two claims undisputedly arose under patent law. First, patent
law governed a state-law declaratory judgment claim seeking a declaration that

Ruling Page 4

## CALCO v. OSSUR AMERICAS, INC. 21-1202543

the plaintiffs were the true inventors of the product the defendants had patented. "[T]he field of federal patent law preempts any state law that purports to define rights based on inventorship." (*Id.*, at p. 1353.) Second, patent law governed the plaintiffs' slander of title claim, because the gravamen of this claim was that the defendants disparaged plaintiffs' "true" title to the invention by falsely claiming the defendants had invented it. A court would have to determine the true inventor to decide the claim, which only federal courts may do. (*Id.*, at p. 1355.)

On the other hand, the plaintiffs' fraud, contract and unjust enrichment claims, though they included patent allegations, did not *necessarily* require a court to adjudicate patent issues. For example, the fraud claim could be proven based on the non-patent allegations that (1) the defendants promised to engage in collaborative research with the plaintiffs, and (2) in reliance on that promise, the plaintiffs turned over nonpublic data to the defendants. The contract claim could be proven based on the defendants' breach of an alleged promise not to commercialize the invention. And the unjust enrichment claim could be proven based on the defendants' alleged misappropriation of the plaintiffs' nonpublic data for profit. (*Id.*, at pp. 1356-57.)

### 2.    Application in This Case

### a.  Declaratory Relief (2nd COA)

Calco seeks the following declarations (FAC ¶ 31):

1. That he is entitled to be paid royalties.

2. That the Miami JS device incorporates and uses his Sternum Adjustment,

Ruling Page 5

**-627-**

**CALCO v. OSSUR AMERICAS, INC. 21-1202543**

Repeatable Fit Tabs, Opposite Racks, and Grip concepts.

3. That his Sternum Adjustment concept is protected and covered by multiple claims in a continuation application filed on November 18, 2019 for Patent No. 10,512,559. (Calco is listed as a co-inventor on this patent; the question is whether his Sternum Adjustment concept is covered by it.)

4. That his Opposite Racks concept is protected and covered by multiple claims in Application No. 15/696,885, which is pending at the USPTO.

5. That his Grips concept is protected and covered by multiple claims in the '885 application.

6. That he should be named as an inventor or co-inventor on the '885 application.

Calco is only entitled to declaration 1 if he succeeds on the remaining declarations. A royalty is only owed on products that (1) "are protected and covered by valid issued claims contained in patents owned by or controlled by [Ossur] that name [Calco] as an inventor or co-inventor" and (2) "are based on the concepts that [Calco] has created prior to entering into" the contract. (RJN, Ex. A, at Ex. 3 thereto.)

Declarations 3-6 are core patent law questions. They ask the Court to construe the scope of existing patents or existing patent applications, or to determine inventorship.

Declaration 2 is akin to the question in *Jang*. There, the Federal Circuit noted that the royalty was only owed if the stents were covered by the assigned patents. That is, the court would have to conduct an infringement analysis to determine

Ruling Page 6

**CALCO v. OSSUR AMERICAS, INC. 21-1202543**

whether royalties were owed.  The Court would have to do the same here.
Assume Calco prevails on declarations 3-6: he is properly considered the co-
inventor, and his concepts are protected by the patents or applications.  Would
the Miami JS infringe on the patents or applications if Ossur didn't already own
them?

Declaration 1 is the sum of the previous five.  Royalties are only owed if Calco's
concepts are protected by Ossur-owned patents on which he is the co-inventor
(declarations 3-6), and if those concepts are incorporated into Ossur's devices
(declaration 2).  The Court can only make declaration 1 if it first makes
declarations 2-6, all of which are patent law declarations.

Unlike *Gunn*, these patent law questions aren't hypothetical and backward-
looking.  Calco asks the Court to make pronouncements that would affect existing
patents (or pending patent applications).  Accordingly, the Court lacks jurisdiction
over this cause of action.

### b. Fraud, Unjust Enrichment (3rd & 4th COAs)

For both of these claims, the measure of damages is the royalty Calco would be
owed on future sales.  (See FAC ¶ 36 [proximate result of Ossur's fraud is
"compensatory damages consisting of the royalty"]; ¶ 39 [in the event the
contract is unenforceable, Calco is still entitled to the royalty to prevent Ossur
from being unjustly enriched by failing to pay the royalty].)  Calco has alleged no
other damages proximately caused by Ossur's fraud, nor has he alleged any other
way in which Ossur has been unjustly enriched at his expense.

Again, Calco isn't owed the royalty unless (1) his concepts are protected by Ossur-
owned patents that list him as co-inventor and (2) the Miami JS incorporates
those concepts.  Unless both of those conditions are satisfied, these claims fail.

Ruling Page 7

**CALCO v. OSSUR AMERICAS, INC. 21-1202543**

Because the Court cannot decide these questions, it lacks jurisdiction over these causes of action.

### c.  Breach of Contract (1st COA)

For the contract claim, there are two alleged breaches, each with a separate measure of damages.

First, Ossur has breached the contract by failing to take appropriate steps to patent Calco's concepts or to name him as a co-inventor on patent applications. The measure of damages for this breach is the future royalty. For the reasons set forth above, the Court lacks jurisdiction to adjudicate this claim.

Second, Ossur has breached the contract by failing to pay Calco past royalties owed when Gate 2.1 was completed. Calco alleges that Gate 2.1 was merged into Gate 3.0 when all design specifications for the Miami JS were to be finalized. (FAC, ¶ 16.) He reasons that because the Miami JS is now on the market, design specifications were finalized. Gate 3.0 and, by merger, Gate 2.1 were completed. Calco is thus owed $20,000.

In its reply papers, Ossur insists that Calco can only collect the Gate 2.1 royalty if he is named as co-inventor on a patent. (Reply at p. 10 ["There is simply no way of determining whether Gate 2.1 occurred such that the royalty is due without determining inventorship."].) But unlike the future royalty, Ossur points to no specific language in the contract stating that Gate 2.1 depends on inventorship or the granting of a patent. The "Gates" and the project timeline are attached to the contract as Exhibit 1. One of the conditions precedent to Gate 2.1 is "Submit applications for IP." (RJN, Ex. A, at Ex. 1 thereto, p. 2.) Calco alleges, and Ossur doesn't dispute, that some applications were submitted, and these applications didn't list Calco as an inventor. But the project timeline doesn't say "Submit

Ruling Page 8

**-630-**

## CALCO v. OSSUR AMERICAS, INC. 21-1202543

applications for IP that list Calco as co-inventor." At the demurrer stage, Ossur hasn't shown that inventorship is necessary to resolve the question of whether Calco is owed the Gate 2.1 royalty.

While the Court lacks jurisdiction over the contract claim insofar as it is based on future royalties, it has jurisdiction at this stage insofar as the claim is based on the Gate 2.1 royalty. "A demurrer does not lie to a portion of a cause of action." (*PH II, Inc. v. Superior Court* (1995) 33 Cal.App.4th 1680, 1682.) Therefore, the Court must consider the merits of the contract claim before it can rule on the demurrer to the contract claim.

### 3.    Calco's Arguments to Avoid Patent Questions

In his opposition, Calco argues that Ossur has waived its ability to insist on a patent as a precondition to the royalty, that it is estopped from insisting on the same, and that his performance on this point is excused. As the Court understands these arguments, the waiver, estoppel, or excuse of the patent condition would (1) allow the Court to award the future royalty without considering patent law questions and (2) allow the Court to enter a declaration that Calco is owed the royalty without considering patent law questions.

#### a.    Waiver

As to waiver, Calco alleges Ossur says in marketing materials that the Miami JS is patented when it actually isn't. This, Calco argues, is intentional relinquishment of the right to insist on a patent as a condition precedent to paying the royalty. But Calco cites no authority for the proposition that statements a company makes to the general public in marketing campaigns can operate as an intentional waiver of specific contractual rights. Absent such authority, this argument fails.

Ruling Page 9

**CALCO v. OSSUR AMERICAS, INC. 21-1202543**

### b.    Estoppel

The estoppel argument is based on the same facts. In support, Calco cites *Austin v. Hallmark Oil Co.* (1943) 21 Cal.2d 718, where the California Supreme Court rejected the defendants' attempt to deny the validity of an assignment for one purpose while relying on its validity for another purpose *in court*. Here, Ossur isn't alleged to be taking opposite positions in court. Absent authority holding that out-of-court marketing statements to the general public can estop the assertion of specific contractual rights in court, this argument fails.

### c.    Excuse

Calco argues he is excused from having to show a patented product in order to collect the royalty because Ossur never submitted a patent application. He argues a party cannot avoid liability by taking voluntary actions that make conditions precedent impossible to fulfill. But as Ossur points out in reply, the contract gives it the sole right *not* to pursue patent applications. (RJN, Ex. A, at Ex. 3 thereto ["[Ossur] shall have full and sole discretionary authority with regard to patenting or seeking patents"].) Neither case cited by Calco on excuse involves a clause giving the defendant the sole discretion to determine whether a condition precedent will take place. Rather, both involve the defendant taking *extra-contractual* actions that make a condition precedent impossible to fulfill.

Here, Ossur's decision not to submit any patent applications was a right afforded it by the plain language of the contract. Calco and Ossur bargained for this contractual term (see FAC, ¶ 34 [discussing contract negotiations]). Calco can hardly insist that Ossur's exercise of the bargained-for right excuses his conditions precedent. (Compare *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 ["We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement."].)

Ruling Page 10

**-632-**

**CALCO v. OSSUR AMERICAS, INC. 21-1202543**

### 4.    Conclusion on Exclusive Federal Jurisdiction

The Court lacks jurisdiction over claims arising from the future royalties allegedly owed Calco because they arise under federal patent law. The Court therefore sustains the demurrer to the second, third and fourth causes of action. However, because a demurrer does not lie to a portion of a cause of action, the Court will proceed to the merits on the Gate 2.1 portion of the first cause of action.

### B.    Merits of Gate 2.1 Claim

The majority of Ossur's contract-related briefing is dedicated to the various reasons the future royalty claim fails. The only two arguments about Gate 2.1 appear to be (1) Gate 2.1 was never even started, let alone completed; and (2) Gate 2.1 requires the Court to decide whether Calco is an inventor.

The first argument is a factual dispute the Court cannot decide on demurrer. Again, Calco alleges that Gate 2.1 was merged into Gate 3.0, and that Gate 3.0 was a necessary step to putting the Miami JS on the market. He reasons that because the Miami JS is on the market, Gate 3.0 was completed, and because Gate 3.0 was completed, the merged Gate 2.1 was completed as well. Therefore, the Gate 2.1 royalty is owed. At the demurrer stage, this is enough to state a claim for relief. Ossur's argument to the contrary would require the Court to decide questions of fact.

The second argument fails for the reason set forth above: based on material properly considered at the demurrer stage, the only patent-related condition precedent to Gate 2.1 was "Submission of IP applications," not "Submission of IP applications that listed Calco as inventor." No one disputes that at least one application was filed.

Ruling Page 11

**-633-**

**CALCO v. OSSUR AMERICAS, INC. 21-1202543**

III.    **Conclusion**

For the reasons set forth above, Ossur's demurrer is sustained as to the second, third and fourth causes of action and overruled as to the first cause of action. The Court cautions, however, that any claim based on recovery of future royalties owed is subject to the exclusive jurisdiction of the federal courts.

Because Calco pleads a cause of action over which this Court has jurisdiction (the contract claim, insofar as it is based on Gate 2.1), the Court has jurisdiction to permit leave to amend. The Court therefore grants Calco leave to amend to plead claims for relief that do not arise under patent law.

**MOTION TO SEAL**

Defendants Ossur Americas, Inc. and Ossur hf's (collectively, "Ossur") motion to seal is GRANTED IN PART. The Clerk is ordered to permanently seal the copies of Ossur's request for judicial notice at ROA 77 and demurrer at ROA 79. Ossur is ordered to publicly file the following by December 1, 2021:

1. A copy of its contract with Plaintiff Wayne Calco that redacts (or substitutes with a slip sheet) only Exhibits 1, 4, and 5 to the contract. The main body of the contract and Exhibits 2-3 are to be unredacted.

2. A copy of the demurrer that unredacts any discussion of the main body of the contract or Exhibits 2-3 that is currently redacted in the version currently on file at ROA 88.

Ruling Page 12

**CALCO v. OSSUR AMERICAS, INC. 21-1202543**

**GROUNDS FOR RULING**

This case concerns a contract between Calco and Ossur.  Ossur has filed a copy of the contract in support of its demurrer.  It contends that the contract contains proprietary and trade secret material, and it requests that the contract be sealed.

A court may order a record to be filed under seal only if it expressly finds facts establishing:

1. There exists an overriding interest that overcomes the right of public access to the record;
2. The overriding interest supports sealing the record;
3. A substantial probability exists that the overriding interest will be prejudiced if the record is not sealed;
4. The proposed sealing is narrowly tailored; and
5. No less restrictive means exist to achieve the overriding interest.

(Cal. Rules of Court, rule 2.550(d).)

Ossur's moving papers repeatedly stress that the contract contains a confidentiality clause under which both sides agree to keep its contents confidential and not disclose them in any way.  But "mere agreement of the parties alone is insufficient to constitute an overriding interest to justify sealing." (*McNair v. National Collegiate Athletic Assn.* (2015) 234 Cal.App.4th 25, 36.) Rather, the agreement must be coupled with "a specific showing of serious injury." (*Id.*, at p. 35.)

Ossur argues the entire agreement is either proprietary or trade secret material. The Court disagrees in part.  First, Ossur makes no showing that the main body of

Ruling Page 13

**CALCO v. OSSUR AMERICAS, INC. 21-1202543**

the contract (as opposed to the exhibits) contains confidential, proprietary information that would be valuable to Ossur's competitors. It claims that the term of the agreement (listed in the main body) would be valuable, but it never explains how or why simply knowing the term of the agreement would give competitors an advantage. From the Court's review of the main body of the contract, nothing appears to have any particular value simply because it remains confidential. Because Ossur has not shown a serious injury that would result from disclosure, the main body of the contract is not entitled to sealing.

Second, Ossur makes no argument at all regarding the proprietary nature of Exhibit 2, which is a form of time sheet for Calco to record his hours worked. It is simply a blank table to be filled in by Calco. This document is not entitled to sealing.

That said, the Court agrees Exhibits 1, 3, and 4-5 contain confidential, proprietary information.

Exhibits 1 and 4-5 contain detailed descriptions of Ossur's product development processes and workflow. In opposition, Calco argues that these exhibits are "clearly based on an enterprise software program" apparently used to facilitate product development. (Opp., at p. 3.) But as Calco concedes, "How much of that program content the Defendants are using and to what extent they may have customized its content cannot be determined" on the present record. (Id., at p. 4.) The uncertainty identified by Calco is exactly why these exhibits are valuable. Like Calco, Ossur's competitors have no idea whether its product development processes are simply the implementation of software straight out of the box, or if Ossur has extensively customized the software its processes are apparently based upon. Apart from brief discussion of the general nature of the "Gates," and of one specific task in the product development process (the submission of patent applications), none of this information is publicly disclosed in the record or in the Court's ruling on Ossur's demurrer. As to these specific exhibits, the Court finds that all five factors for sealing are satisfied.

Ruling Page 14

**CALCO v. OSSUR AMERICAS, INC. 21-1202543**

Exhibit 3 sets forth the terms of Calco's compensation. Again, the Court agrees that this information is confidential and proprietary. Ordinarily, it would be entitled to protection. But here, Calco has already discussed the terms of his compensation in considerable detail in his publicly filed FAC. Paragraph 6 and 7 mention all of the following terms relevant to Calco's compensation:

1. A services fee totaling $150,000, paid in $10,000 monthly installments
2. The royalty due Calco for the sale of certain products, including a definition of the eligible products and the specifics of how the royalty is to be calculated
3. The $30,000 and $20,000 advances on royalties to be paid to Calco and the events that trigger those advances
4. Ossur's sole discretion to decide whether to pursue patents based on intellectual property developed by Calco (which is relevant to whether the royalty is owed)

For better or worse, the details of Calco's compensation were made public in the FAC. The Court therefore finds Ossur will suffer no prejudice if Exhibit 3 is unsealed.

Ruling Page 15