# TAB E

1  GEORGE B. PIGGOTT (SBN 68227)
   a member of GEORGE B. PIGGOTT,
2  A PROFESSIONAL CORPORATION
   2603 Main Street, Penthouse
3  Irvine, California 92614
   Tel:   (949) 261-0500
4  Fax:   (949) 261-1085
   Email: george@piggottlaw.com
5
   Attorney for Plaintiff Wayne Calco
6

7

8              **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  WAYNE CALCO, an individual, | **Case No. 8:22-cv-01971-CJC-KES** |
| 12                                Plaintiff, | |
| 13      vs. | **DECLARATION OF WAYNE CALCO IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| 14  ÖSSUR AMERICAS, INC., a California corporation; ÖSSUR hf, an Icelandic company; and DOES 1 through 10, inclusive, | |
| 17                          Defendants. | Date: July 11, 2024<br>Time: 11:0 a.m.<br>Place: Courtroom 9D |
| 19 | Complaint Filed: October 26, 2022<br>Trial Date: April 9, 2024 |

21

22

23

24

25

26

27

28

I, Wayne Calco, declare that:

1.      I am over the age of 18 and the Plaintiff in this action. I make this Declaration in support of my Opposition to the Motion for Summary Judgment ("MSJ") filed herein by defendants Ossur Americas, Inc. and Ossur hf (collectively "Ossur"). I have reviewed Ossur's MSJ and supporting papers, including declarations and exhibits, and I am familiar with their contents. Except as otherwise stated, I have personal knowledge of the facts stated herein and could competently testify thereto under oath.

2.      I am an inventor and industrial designer. I have worked as an industrial designer since my graduation from the Cleveland Institute of Art in 1984, from which I received a Bachelor of Fine Arts degree. I also have a Certificate from the MIT Sloan School of Management in Managing Complex Product Development Projects. I am named an inventor or co-inventor on over thirty patents. I designed adjustable cervical collars for two of Össur's competitors, the "Vista" collar sold by Aspen Medical Products ("Aspen") and the "Eclipse" collar sold by VQ OrthoCare ("VQ"), which resulted in issuance of patents in which I am the first named inventor (US 7,674,234) and sole inventor (US 9,132,027), respectively, in addition to a co-inventor of US 8,216,167. Among other positions I have held as an industrial designer, I was the Director of Research & Development of Aspen from 2003 to 2008. I left Aspen to accept the position of Vice President of Design and Product Development at Atlantic, Inc., which makes media storage and gaming desks and accessories. I was at Atlantic until 2013, when I left to devote full time to my own consulting business to provide industrial design services on an independent contractor basis to companies that make many different kinds of products, including medical devices, furniture, industrial equipment, toys (including the Vortex Mega Flight Football made by Hasbro), glassware, hydration bottles, and more. Attached hereto as Exhibit 27 is a true and correct copy of a portfolio of a representative sampling of various industrial design projects in which I have been engaged.

3.      In or about September 2015, Duane Romo of Össur approached me about

2

DECLARATION OF WAYNE CALCO IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

assisting Ossur with the design and development of an adjustable cervical collar. Mr. Romo told me that Ossur had been attempting to design an adjustable cervical collar for several years without success and wanted my expertise and assistance for the design and development of as adjustable cervical collar that would compete with Aspen's Vista collar and VQ's Eclipse collar. I subsequently negotiated the terms of an agreement with Mr. Romo to provide my concepts and services to Ossur for the development of an adjustable cervical collar. On or about October 29, 2015, I signed a written "Services Agreement" with Ossur (the "Agreement"). The Agreement is attached as Exhibit 1 to the Declaration of Tajana Latinovic ("Latinovic Dec.").

4.    The Agreement included provisions for bringing inventive concepts to Ossur For its Adjustable Cervical Collar Project that I had created prior to entering into the Agreement and to perform design services for the project. The Agreement was to continue until January 31, 2017, unless terminated earlier.

5.    My compensation under the Agreement was to be as follows: (i) consultancy fees of $150,000, payable at $10,000 per month; (ii) advanced royalty payment of $30,000 at time of execution of Agreement; (iii) second advanced royalty payment of $20,000 upon completion of the "Gate 2.1" development phase; (iv) future royalties on sales of products based upon concepts conceived by me prior to the Agreement and subject to issued patent(s) upon which I was named an inventor or co-inventor. *See* Ex. 3 to Ex. 1. I was paid the consultancy fees and the first advanced royalty payment. I have not been paid the second advanced royalty payment or any future royalties.

6.    I brought to Össur three concepts for an adjustable cervical collar that I had conceived of and created prior to entering into the Agreement, including concepts for (i) a mechanism to adjust the cervical collar's fit and comfort by tightening or relaxing the pressure of the sternum support pad and allowing a forward flexing and angle change of the support pad ("the Sternum Adjustment"), and (ii) plastic/fabric pull tabs that set the size of the circumference around the neck and  keep that size without adjustment when

3

DECLARATION OF WAYNE CALCO IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

the collar is put back on again after being removed ("Repeatable Fit Tabs").  A third concept I created and brought to Össur was a mechanism for adjusting the height of the chin support for a cervical collar ("the Height Adjustment" concept). Based upon my prior employment with Aspen and my experience developing cervical collars for Aspen and VQ, I believed the concepts I brought to Ossur were new and unique.

7.     In a meeting with Ossur's Vice President of Intellectual Property, Tatjana Latinovic, and Mr. Romo, that occurred in Ossur's Foothill Ranch office in Orange County, California immediately following my execution of the Agreement on or about October 29, 2015, I described to them my Sternum Adjustment, Repeatable Fit Tabs and Height Adjustment concepts that I had previously developed. The following morning, I met with Mr. Romo in Ossur's office and discussed in greater detail with him my three concepts and the objective and timing of Ossur's adjustable cervical collar project. The concepts I described to Ms. Latinovic and Mr. Romo were a mechanism to adjust the cervical collar's fit and comfort by tightening or relaxing the pressure of the sternum support pad and allowing a forward flexing and angle change of the support pad ("the Sternum Adjustment"), and plastic/fabric pull tabs that set the size of the circumference around the neck and  keep that size without adjustment when the collar is put back on again after being removed ("Repeatable Fit Tabs").  I also described a third concept, which was a mechanism for adjusting the height of the chin support for a cervical collar ("the Height Adjustment"). In the afternoon, I was introduced to the Ossur employees who comprised the team that I would be working with to develop its adjustable cervical collar, as well as the majority of Ossur's other R&D staff.

8.     I subsequently provided Ossur with the drawings I prepared depicting examples of my concepts, which are included in Exhibits 2 and 3 to the Latinovic Declaration. The drawings represent examples of the possible implementations or embodiments of my concepts, which Ossur refers to in its "Gate" Product development and life cycle process protocol as "iterations". [See Latinovic Declaration, Ex. 1, OSS 00015, Gate 2].

9.    I note that Ossur argues in its motion that because the CAD drawing of an example of my Repeatable Fit Tabs concept that is included in the Exhibit 3 to the Latinovic Declaration is dated December 4, 2015 (OSS 001258), Ossur is claiming that I did not create the concept prior to entering in the Agreement and/or provide written evidence that I had done so. I am attaching hereto as Exhibit 28 a true and correct copy of a rendering that I prepared on August 28, 2015 for my Repeatable Fit Tabs concept. The CAD drawing that is included in Exhibit 3 to the Latinovic Declaration was intended as a more formal presentation of my Repeatable Fit Tabs concept than the rendering that is attached as Exhibit 28, which was produced in discovery in this case.

10.    On December 9, 2015, I gave a PowerPoint presentation concerning my concepts to the Ossur employees on the adjustable cervical collar team that I would be working with.  A true and correct copy of that presentation is attached hereto as Exhibit 29.  The Ossur representatives expressed very positive feedback to my concepts.  The PowerPoint references "unique sternum pad comfort adjustment system", which is my Sternum Adjustment concept; "repeatable back panel sizing/comfort system", which is my Repeatable Fit Tabs concept; and "unique chin height adjustment system", which is my "Height Adjustment" concept. I explained all of these concepts to the participants. Referring to the illustrations in the PowerPoint, my explanation included the purpose and function of my concepts.  Again, based upon my prior experience developing cervical collars, I described all of the concepts as being unique. In particular, I was unaware of any other cervical collar being sold which had a feature like my Sternum Adjustment concept, and this concept was the first to address the need to adjust the fit of that portion of the cervical collar that rests on the patient's sternum. This need is particularly acute for people who are obese or have a thick build.

11.    The drawings that I emailed to Ms. Latinovic were not presented or ever represented by me to be the only implementations or embodiments of my concepts. The same is true with respect to the illustrations in my PowerPoint presentation. They represent only examples of the multiple ways to achieve the function of the concept,

DECLARATION OF WAYNE CALCO IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1  which were to be further developed. This was fully known and understood by Ossur, as

2  confirmed by an email I received from Jason Taylor of Ossur on December 21, 2015. A

3  copy of Mr. Taylor's December 21, 2015 email to me is attached hereto as Exhibit 30.

4  In his email, Mr. Taylor states:

5      "As we let the recent design renderings "breathe", I have suggested below a list of

6      next deliverables we need focus on from you…..I'd like to have something

7      delivered (renderings, line-drawings, sketches) on at least 2 of these by  Dec. 31.

8      Outstanding features:

9      ·      Back sub-assembly design

10     ·      Attachment mechanism (front to back)

11     ·      Sternal Pad Height Mechanism

12     ·      Lateral Height Adjustment

13     Please let me know your thoughts on tackling these. I am very excited to keep the

14     momentum on this project."

15  Contrary to Ossur's argument that my drawings and only my drawings were my

16  concepts, Mr. Taylor is not stating that my "recent design renderings" are "it", but,

17  rather, that they must be allowed to "breathe" and developed further with "next

18  deliverables", so he asked me "to have something delivered", such as renderings, line-

19  drawings, or sketches. The outstanding features he identified include my three concepts:

20  the repeatable fit tabs - attachment mechanism (front and back); sternum adjustment –

21  sternal pad height mechanism; and the height adjustment – lateral height adjustment; as

22  well as a back panel sub-assembly design.

23      12.    In January 2016, I met with Ms. Latinovic, Mr.  Romo, Össur's Director,

24  R& D, Functional Healing, and Össur's patent lawyers, Justin Cassell and Timothy

25  Nichols, to review my concepts and to discuss patent filing. The lawyers said they had

26  conducted an investigation concerning my concepts and concluded that they were

27  patentable and would not infringe other patents and they approved proceeding with

28  patent applications for those concepts. However, following this meeting, Shane Fedon, a

6

DECLARATION OF WAYNE CALCO IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1   new member of Össur's management, asserted that under the doctrine of equivalents, he

2   believed my Height Adjustment concept infringed the patent that had been issued to VQ

3   for its cervical collar called the "Eclipse", on which I was named as the sole inventor.

4   Being the inventor of the "Eclipse" and having knowledge of its patent, I did not agree

5   with Mr. Fedon that my design for the Height Adjustment infringed the Eclipse collar,

6   but I suggested some changes to my Height Adjustment to address Össur's concern.

7   Nevertheless, Össur began working on another height adjustment concept that was based

8   on my height adjustment concept disclosed in the patent issued to Aspen for its "Vista"

9   collar, on which I am the first named inventor. In fact, after discovering the "Miami JS"

10  cervical collar on the Internet long after my Agreement with Ossur terminated, as

11  discussed more fully below, I purchased a Miami JS collar and removed its height

12  adjustment mechanism and replaced it the height adjustment mechanism from Aspen's

13  Vista collar, which functioned in the Miami JS.

14      13.    During the course of providing services to Ossur under the Agreement, I

15  developed multiple prototypes of my Sternum Adjustment and Repeatable FitTabs

16  concepts with Ossur's employees. At least two of the prototypes for the Sternum

17  Adjustment utilized a "living hinge" instead of a ball joint to perform the same function.

18  Attached hereto as Exhibits 31, 32 and 33, respectively, are pictures of those portions of

19  the two prototypes I created that utilized a living hinge. These were not production parts,

20  but early-stage developmental prototypes that were made from hard plastic using 3-D

21  printing or a similar process. Channels for openings were created in each prototype to

22  weaken the plastic material so that they would flex as a living hinge. Exhibit 31 shows

23  the panel to which the sternum pad is attached on the underside. It has four openings,

24  two larger openings at the top and bottom and two smaller openings on the left and right

25  sides. The larger openings allow flexion to occur on a horizonal axis through each and

26  the openings on the sides weaken the structure to facilitate that flexion. Exhibit 32

27  shows a panel on the other prototype with an opening above the sternum pad. Exhibit 33

28  shows a shaft mounted in that opening. The shaft is cylindrical and half of the cylinder

DECLARATION OF WAYNE CALCO IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

is missing. The cylinder is designed to pivot on the notches on the left and rights sides of the cylinder so that the pad flexes on a horizontal axis running through the notches. In each prototype, flexion occurs in a single plane. The final designed part would have been made with injection molded polypropylene or similar material to optimize the flexion of the living hinge.

14.     After working almost a year on the adjustable cervical collar project, it became apparent to me that efforts were being made to exclude me from the development work for Ossur's alternative height adjustment, but my input was still sought for the height adjustment, which included my creation of the "grip" that is discussed below. I was also consulted and provided input concerning the design of the back panel. And my  work  continued unabated on my Sternum Adjustment and Repeatable Fit Tabs concepts.  At the time my Agreement expired on January 31, 2017, I was still working on those concepts with Ossur's employees, but I had not been advised of any final decision as to what concepts Ossur intended to use.

15.     I had no further involvement on Ossur's adjustable cervical collar project after my Agreement expired. In February of 2017, Mr. Fedon contacted me and asked me to sign a non-provisional patent application that was being filed by Ossur for my Height Adjustment. In response, on March 6, 2017, I sent the email to Ossur that is attached to Ms. Latinovic's Declaration as Exhibit 6, in which I expressed confusion as to why Ossur would be patenting my designs for the Height Adjustment that it had no intention of using.  The following day, on March 7, 2017, Ms. Latinovic sent me a reply email , a true and correct copy of which is attached hereto as Exhibit 34. In her email, Ms. Latinovic explained that "Ossur always tries to protect the field around its products and designs in order to secure broader freedom to operate and not all patent applications/patents end up being utilized in products. It is therefore completely understandable that we would file for these designs even though the design process itself went into another direction."

16.     Following my departure from Ossur, I occasionally checked Ossur's website

8

1  to determine the status of the adjustable cervical collar project. In or around June 2019, I

2  went to Ossur's website and found that it was selling an adjustable cervical collar called

3  the "Miami JS." The Miami JS includes features based upon my Sternum Adjustment and

4  Repeatable Fit Tabs concepts. Prior to this discovery of the Miami JS on Ossur's website,

5  I was unaware that Ossur had decided to use and was using these concepts and selling a

6  device with my concepts. I have never received any future royalty payments. I went to

7  the Ossur website and viewed the online brochure on Ossur's website on May 28, 2020,

8  which I printed. A true and correct copy of the brochure is attached hereto as Exhibit 35.

9      17.    I also never received the second advanced royalty payment that I was to

10  receive pursuant to the Agreement upon the completion of Gate 2.1 for the project. On

11  June 6, 2016, I received the attached email from Shane Fedon advising me that Gate 2.1

12  was being postponed "with the project pushed", which was in reference to the delays the

13  project had experienced. A true and correct copy of Mr. Fedon's June 6, 2016 email is

14  attached hereto as Exhibit 36.  Mr. Fedon's email assured me that "Your second royalty

15  payment does come through at Gate 2.1 though."  I was later advised by Mr. Fedon that

16  Gate 2.1 had been merged with Gate 3.0. Gate 2.1 was a necessary phase of

17  development for any product offered for sale. Given the fact that the Miami JS is

18  obviously being manufactured and sold, it was necessary that Gate 2.1 and Gate 3.0,

19  along with all of the other phases of Ossur's product development protocol, be

20  completed and were completed.

21      18.    As I understand Ossur's arguments in its MSJ, it does not assert that

22  Gate 2.1, or the development phase represented by Gate 2.1, was not completed for the

23  Miami JS. Rather, Ossur is arguing that the Miami JS is the result of a different project

24  than the project I worked on while at Ossur and that the project I worked on did not

25  result in a manufacturable product. This is not true. There was only one adjustable

26  cervical collar project being pursued by Ossur at the time and that project resulted in the

27  Miami JS, and I was on the "team" for that project.

28      19.    To support its silly argument that I was working on a different project,

9

DECLARATION OF WAYNE CALCO IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Ossur relies on the declaration of Henry Hsu. Mr. Hsu is a mechanical engineer with whom I worked at Ossur in connection with the Miami JS project.

20.    In Paragraph 5 of his Declaration, Mr. Hsu states that I "did not work on the design or development of the Miami JS, and [Hsu] made sure to exclude [me] based upon [my] poor track record and because of [my] lack of design or prototyping skills." This is false. Throughout the duration of the Agreement, I worked on development of the Miami JS and although Ossur decided not to use my Height Adjustment concept, I continued to work on the project, including my concepts. Neither Mr. Hsu nor anyone at Ossur ever told me that I had a "poor track record" or that I lacked "design or prototyping skills" or that I was excluded from the Miami JS project. Mr. Hsu also states in paragraph 4 of his Declaration that my "designs proved unworkable . . . ." Mr. Hsu further claims that he "delved into [my] proposed designs, I found them lacking in reliability, manufacturability, moldability, and practicability" and that development of my "proposed collar for Ossur was a dead end from a design, intellectual property, and manufacturing standpoint." At no time did Mr. Hsu or anyone at Ossur express anything like this to me, nor are these outrageous claims supported by any documents submitted by Ossur in support of its motion.

21. To the contrary, my input was sought until my contract terminated, and Ossur wound up using not only my Sternum Adjustment and Repeatable Fit Tabs concepts, but also my "grip" concept, which is discussed below. Further contradicting Mr. Hsu's claims, my Agreement with Ossur includes a provision for "Termination for Cause" at paragraph 16, but at no time did Ossur advise me that it was considering early termination of the Agreement and at no time did Ossur attempt to exercise this right. Moreover, paragraph 17 allowed either party to terminate the Agreement upon thirty days prior notice to the other party. If Ossur had been unhappy with my services as Mr. Hsu claims, it could have exercised that right at any time, which it did not do.

22.    A sampling of emails received or sent by me and my meeting notes also contradict Mr. Hsu's claims:

1    ● An email from Jason Taylor, the Sr. Project Manager, to me on November

2    11, 2015 concerning he "Project Kickoff – Adjustable Collar", a true and correct

3    copy of which is attached hereto as Exhibit 37;

4    ● An email from Jason Taylor, the Sr. Project Manager, to me on January 27,

5    2016 attaching the "Project Team Contact List – Adjustable Collar", a true and

6    correct copy of which is attached hereto as Exhibit 38;

7    ● An email from Jason Taylor to me on February 23, 2016 referencing the

8    subject "beefed up sternum part" and stating "Nice… it is looking better!", a true

9    and correct copy of which is attached hereto as Exhibit 39;

10   ● An email from Jason Taylor to me and others on April 15, 2016,

11   referencing the subject "Adjustable Collar – Project Plan Draft" addressed to "Hi

12   Team" and attaching a graph showing project milestones," a true and correct copy

13   of which is attached hereto as Exhibit 40;

14   ● An email from Chris Webster to me and others on May 2, 2016 referencing

15   "Adjustable Collar design team" announcing daily, recurring meetings "as we

16   spring towards releasing tools for Prototype 1 on May 20….", a true and correct

17   copy of which is attached hereto as Exhibit 41;

18   ● An email thread from Chris Webster to me and others on May 4, 2016

19   requesting my input on the design of the repeatable fit tabs for the adjustable

20   collar on the second page of the thread (CALCO 000514), a true and correct copy

21   of which is attached hereto was Exhibit 42;

22   ● An email thread between Shane Fedon and me on May 18, 2016 starting

23   with Mr. Fedon's email to me stating in part "Thanks for getting the work done

24   and over to Chris. I think we can still work on the back in terms of really

25   buttoning up design…. But over all, fantastic job! I wanted to reach out to say

26   thank you for the hard work!....", a true and correct copy of which is attached

27   hereto as Exhibit 43;

28   ● An email from Chris Webster to me and others on June 1, 2016, a true and

11

DECLARATION OF WAYNE CALCO IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

correct copy of which is attached hereto as Exhibit 44, referencing the subject "Miami Adjustable discussion" and reporting meeting minutes and outcome and stating, *inter alia*, "New Design based off of Miami J Advanced Back to be finalized by end of day Thursday. Wayne working on design, in collaboration with Mark";

● An email from Jason Taylor to me on June 7, 2016 referencing the subject "Adjustable Collar – Weekly Status", which discusses the recurring weekly meeting he is running, which he states "is for the core team, including you", a true and correct copy of which is attached hereto as Exhibit 45;

● My notes of a "meeting with Mexico" [the manufacturer] on July 19, 2016, a true and correct copy of which is attached hereto as Exhibit 46;

● An email from Chris Webster to me and others, including Henry Hsu, on August 1, 2016, attached hereto as Exhibit 47, which references the subject "Adjustable Collar Team". It appears that Mr. Hsu was added to the team at this time, as I believe this is his first appearance on emails on which I was included;

● An email thread on August 3, 2015 referencing "Design Review" that includes both me and Mr. Hsu and others, a copy of which is attached hereto as Exhibit 48;

● An email from Chris Webster to me and Mr. Hsu and others on August 5, 2016 referencing "Adjustable Collar – Friday Meeting minutes", a true and correct copy of which is attached hereto as Exhibit 49;

● My notes of a meeting on August 8, 2016 of "Jason, Zak, Wayne, Mike, Henry [Hsu], Hank and Sharon, a true and correct copy of which is attached hereto as Exhibit 50;

● My notes of a general product meeting on August 23, 2016 about beefing up the ports, snap bits, sternum and spring, a true and correct copy of which is attached hereto as Exhibit 51;

● A series of emails between me and representatives of Ossur concerning the

12
DECLARATION OF WAYNE CALCO IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

design of the back panel for the adjustable collar, true and correct copies of which are attached hereto as Exhibits 52. 53, 54, 55 and 56;

● A series of emails from me to Chris Webster on September 28, 2016, true and correct copies of which are attached hereto as Exhibits 57 and 58 concern my conceiving and illustrating to Webster the "grip", which is concept for a touch point that is used on the Miami JS when adjusting the chin height. Exhibits 59 and 60, respectively, concern the Sternum Adjustment and Ossur's height adjustment and the pressure put on a patient's sternum when activating the height adjustment; and

● An email from Chris Webster to Henry Hsu and others on December 9, 2016 summarizing my input at a meeting I had with Chris concerning "latest design", a true and correct copy of which is attached hereto as Exhibit 61.

23. The email samples above also reflects that the process of developing products, including medical products such as cervical collars, is an evolutionary process that starts with a concept which is developed into a final product, often after going through multiple design changes that includes a determination of the manufacturability the product and the cost to make it, as well as testing by mock users. That occurred with prototypes of the Miami JS, which were tested at a facility that Ossur referred to as the "Ossur Academy". I interfaced with representatives of Ossur's manufacturing facility in Mexico concerning the manufacturability. I was not involved in costing, which came after the term of my Agreement has ended. Attached hereto as Exhibit 62 is a true and correct copy of an email to me from Chris Webster on December 9, 2016 forwarding an email to me with an attachment concerning Ossur Academy feedback.

24. Mr. Hsu also claims in his Declaration that he conceived of the sternal adjustment feature in the Miami JS shortly after I left Ossur. During the time I worked for Ossur, Mr. Hsu never told me he was working on or had conceived of any unique concepts for the Miami JS. I disclosed my Sternum Adjustment concept to Mr. Hsu at the same time I disclosed it to the other members of the adjustable cervical collar team.

13

DECLARATION OF WAYNE CALCO IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

The sternal adjustment feature in Miami JS, which Hsu claims to have designed, is actually another iteration or implementation of my concept, which utilizes a living hinge that was first used in two prototypes of the Sternum Adjustment that I developed several months before Mr. Hsu's email in February of 2017 concerning his purported invention. The Repeatable Fit tabs that are used in the Miami JS are likewise another iteration of my concept.

25.    In its MSJ, Ossur argues that various "facts" show that I knew or should have known by March 6, 2017, that Ossur did not intend to perform the Agreement, or would breach the Agreement. I disagree.

- Fedon's criticism: Sometime before the end of the Agreement, Shane Feldon complained to be about my right to receive a royalty, in addition to consultancy fees, under the Agreement. At the time, I did not interpret this criticism as expressing Ossur's intent not to perform its promises under the Agreement. In fact, in Exhibit 36, Fedon reassures me about the second advanced royalty payment and I had no reason to believe that Ossur would not pay it or perform other obligations.

- Fedon's assertion of the "doctrine of equivalents": This related only to my Height Adjustment and although I disagreed with his opinion, I did not infer from this that Ossur did not intend to perform the Agreement;

- My testimony about a "switch" in product development: This refers to Volume 1 of my deposition testimony on pages 93-101 (Ex. 20 to Simon Declaration). On pages 96:8-97:17, wherein I refer to a "switch" and a "parallel effort," I was referring only to my Height Adjustment, not to my other concepts. Later in my testimony, at pages 99:5-101:25, I do discuss my Sternum Adjustment but this is in the context of a "prototype" Ossur showed me with a different height adjustment. This prototype did not have a sternum area at all: "there was nothing there", as I testified at page 99:16-18. As I further explained, at page 100:4-6: "Typical collars would have

14

sternum extension, but it was completely devoid of anything down there."
My Sternum Adjustment adjusted the fit of the sternum extension, which
adds additional length to the collar that fits over the patient's sternum.
Because there was no sternum extension, there could be no Sternum
Adjustment. I understood that Ossur wanted the collar to have a sternum
extension, which would qualify for a higher medical reimbursement for the
end user – Code 174. That was an additional selling point for Ossur's
customers and my unique Sternum Adjustment added a feature that was
another selling point due to its function. From all of my communications
with Ossur, before and during the Agreement, I understood that the cervical
collar to be developed would include a sternum extension. I assumed the
prototype I was discussing was only intended for the height adjustment,
which is what I said at page 101:5-102:1 of my deposition: "I think that it
was a development wheel for the height adjustment." The prototype
therefore did not and could not cause me to conclude anything about
Ossur's plan for the Sternum Adjustment, including any "switch" in their
plans.

- The non-provisional patent application filed February 24, 2017: This
  application was for my Height Adjustment. It did not include claims for my
  Sternum Adjustment or Repeatable Fit Tabs, which had been included in
  the non-provisional application that preceded it. At the time the non-
  provisional application was filed on February 24, 2017, I had not been
  advised of any decision by Ossur as to whether or not it was going to use
  my Sternum Adjustment or Repeatable Fits Tabs concepts. The omission of
  claims for those concepts in the non-provisional application caused me to
  conclude that Ossur was not going to use those concepts. I had no reason to
  believe, and did not believe, that Ossur would use those concepts without
  pursuing patent claims for them, which they could have done later by

15

DECLARATION OF WAYNE CALCO IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1   means of a continuation application. That is exactly what they allege to

2   have done with respect to the Sternum Adjustment that issued as the '374

3   Patent.

4   • My email to Ossur on March 6, 2017: In this email I expressed confusion as

5   to why Ossur wanted to patent designs it had no intention of using. This

6   referred to the February 24, 2017 non-provisional application for my

7   Height Adjustment.  I was confused because Ossur had already indicated

8   that it was not going to use that concept. As noted above, Ms. Latinovic

9   explained why Ossur filed the February 24, 2017 application and this

10  explanation seemed reasonable at the time.

11      26.    Ossur is claiming in its MSJ that Claim 1 of the '374 Patent does not cover

12  the Miami JS because Claim 1 refers to a "ball joint" and a ball joint is not the

13  equivalent of the living hinge in the Miami JS. A ball joint can have the same axial

14  movement in a single plane as the living hinge has in the Miami JS. Ossur claims that a

15  ball joint can only have conical movement because a ball joint is a ball and socket in a

16  spherical socket, while the living hinge on the Miami JS allows flexing in only a single

17  axis plane. Ossur ignores that the socket can have a cut-out that causes it to rotate on the

18  ball in the plane of a single axis and not in a conical mode. I have prepared two

19  illustrations of such a ball and socket that are attached hereto as Exhibits 63 and 64.

20  Exhibit 63 shows a ball with a "mowhawk" ridge that runs around a portion of the ball's

21  vertical circumference at its center. The mowhawk fits into a socket that has a cut-out

22  with a same height and width as the mowhawk plus a tolerance to allow fit and

23  movement. The socket with the cut-out rotates around the ball on the single axis of the

24  mowhawk. Exhibit 64 shows a ball with a stem attached to it. The ball fits into a socket

25  with a cut-out that is the same width as the stem plus a tolerance to allow fit and

26  movement. The socket moves around the ball and the stem in the single axis of the cut-

27  out.

28      27.    Attached hereto as Exhibit 65 is a true and correct copy of the definition of

ball-and-socket joint (ball joint) from the Dictionary of Mechanical Engineering, G.H.F. Nayler (Fourth Edition), which defines a ball-and-socket joint as "A joint in which a spherical end is placed within a socket that has been recessed to fit it, thus permitting free motion within a given cone or cut-out in the socket. It is the same as "ball joint".

28.     In the Declaration of Nathan Macdonald that Ossur has submitted in support of its motion, Mr. Macdonald asserts that a cutout for the socket of a ball and socket joint can only expand the conical range of motion rather than constrain the movement to a single plane. That is not my understanding and I disagree. Mr. Macdonald states that the illustration in Exhibit 64 shows a ball joint but asserts that its movement is not limited to a single axis. More specifically, Mr. Macdonald states that the ball joint shown in Exhibit 64 allows extended travel in an elongated cutout, which is in one axis, but also allows movement in a second, horizontal axis for pivoting about an orthogonal axis aligned with the stem. The pivot about an orthogonal axis that Mr. Macdonald describes is not permitted by my design, because the ball in Exhibit 64 has an annular ridge similar to the ball shown in Exhibit 65. However, the annular ridge detail shown in Exhibit 64 is very small and should have been better defined by me. I also mistakenly omitted to show a corresponding annular groove like that shown in Exhibit 63. Accordingly, the ball joint shown in Exhibit 64 is constrained to move in a single plane. But even without the annular ridge and groove, the ball joint shown in Exhibit 64 is not going to pivot about an orthogonal axis on the patient. The ball joint is going to move with the sternum pad in a single plane as the patient moves his or her head up or down, which is also constrained to a single plane. The only way in which the ball joint shown in Exhibit 64 could pivot about an orthogonal axis is if someone were to somehow spin the stem that is attached to the ball in a circular motion. Assuming that the cervical collar is used for its intended purpose, that is simply not going to occur.

29.     By denying that it is using my Sternum Adjustment and Repeatable Fit Tabs in the Miami JS, Ossur is trying to not only deny me the future royalty I am due under the Agreement, it is also trying to deny my value and contribution. I am an

industrial designer. As illustrated in my portfolio that is attached as Exhibit 27, I create concepts to make products or to make products better. That is what I do and that is what I did for Ossur and I am proud of that. My inventions have value to both me and my clients, including the Sternum Adjustment and Repeatable Fit Tabs that I created and gave to Ossur.  Ossur's attempt to deny me that value should not succeed.

      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This Declaration was executed this ___ day of June, 2024 at Anaheim, California.


_____

Wayne Calco

18
DECLARATION OF WAYNE CALCO IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# EXHIBIT 27



Monday, November 21, 11

# Toys & Games

## Portfolio

Monday, November 21, 11



Monday, November 21, 11



Koosh Sport Boingo Ball



Monday, November 21, 11







Monday, November 21, 11

# iPod & Electronics

## Portfolio

Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11

 

# DLO HomeDock





Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11





Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



# DLO Transpod for iPod Shuffle

Winner | Best of Show | MacWorld Expo Boston 2005



# DLO Cool Caps



DLO FlexDock




DLO FlipClip




DLO Autopod

Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11

 

Griffin iFM concept

 

# Griffin iTalk concepts




# Griffin iTalk concepts



Monday, November 21, 11



Buy it...



**MP3 music player** plus **video player**, plus **JPEG photo viewer** plus **128MB MMC card** now at **$129.95!**

 Buy it now

Get Downloads to go...



Cool, **ready-to-play videos** you can download now!

▶ Free ZVUE Videos

▶ StoryPipe Films!

**ZVUE™**
MP4 VIDEO PLAYER
▨ Click to see it play!

Have some FUN with it...



Radio Shack Bluetooth telephone headset concept



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11

# Housewares

## Portfolio

Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Original Design Concept





production version

Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11

# Retail & POP

## Portfolio

Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11

# Entertainment Furniture

## Portfolio

Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Centipede Gaming Hub

Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11

# Industrial Equipment

## Portfolio

Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11

# Products in Motion

## Portfolio

Monday, November 21, 11





Monday, November 21, 11

# Medical Orthotics

## Portfolio

Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11







Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11





Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11



Monday, November 21, 11

# EXHIBIT 28



CALCO 002662

# EXHIBIT 29



CONFIDENTIAL
OSS 001547

## INNOVATION AND FEATURES

- TRADITIONAL MIAMI J COLLAR FIT AND COMFORT

- UNIQUE CHIN HEIGHT ADJUSTMENT SYSTEM

- UNIQUE STERNUM PAD COMFORT ADJUSTMENT SYSTEM

- ULTRA LARGE TRACHEAL OPENING

- REPEATABLE BACK PANEL SIZING/COMFORT SYSTEM

Össur CONFIDENTIAL

CONFIDENTIAL

OSS 001548



CONFIDENTIAL

OSS 001549



Dark Gray with Silver Band

CONFIDENTIAL

OSS 001550





CONFIDENTIAL

OSS 001552



CONFIDENTIAL

OSS 001553





CONFIDENTIAL

OSS 001555



CONFIDENTIAL

OSS 001556



CONFIDENTIAL

OSS 001557





# EXHIBIT 30

| From: | Jason Taylor <jataylor@ossur.com> |
|---|---|
| Sent: | Monday, December 21, 2015 4:07 PM |
| To: | Wayne Calco (calco.wayne@me.com) |
| Cc: | Chris Webster; Duane Romo |
| Subject: | Adjustable Collar - Next targets |

Hi Wayne,

I want to touch base on the next steps of the Adjustable Collar project. As we let the recent design renderings "breathe", I have suggested a list below of the next deliverables we need focus on from you. Can you please proceed with your work on these over the next week? I'd like to have something delivered (renderings, line-drawings, sketches) on at least 2 of these on Dec. 31.

Outstanding Features:
- Back sub-assembly design
- Attachment mechanism (front to back)
- Sternal Pad Height Mechanism
- Lateral Height Adjustment

Please let me know your thoughts on tackling these. I am very excited to keep the momentum on this project.

As we move into the holidays, we will see some staggered vacation time among the team. I will be out of the office 12/24 through 12/30. Chris will be back on 12/28.

Best regards,
Jason Taylor
949.528.5776

CALCO 001846

# EXHIBIT 31



**-789-**

# EXHIBIT 32



**-791-**

# EXHIBIT 33



**-793-**

# EXHIBIT 34

| | |
|---|---|
| **From:** | Tatjana Latinovic <tlatinovic@ossur.com> |
| **Sent:** | Tuesday, March 7, 2017 5:58 AM |
| **To:** | Wayne Calco |
| **Cc:** | William C. Kersten; Shane Fedon; Duane Romo; IS IP Administrator; Þorvaldur Ingvarsson |
| **Subject:** | RE: Wayne Calco patents |
| **Attachments:** | PCT request form.pdf; ADS.PDF |

Hello Wayne,

I confirm that we listed you as the first inventor in both the US and PCT applications in this case. You can see from the attached documents that you are the first listed inventor (in the PCT application you come after Ossur, the applicant). As a reminder, these filings claim priority to provisional application S/N 62/299,766 that was filed on February 25, 2016 and that you have already reviewed and accepted. It is based on the designs that you created before we entered into agreement and it was agreed that we will file. Please see Section 9. Company Work and Rights in Adaptations of the Services Agreement for grounds for filing. In addition to that, I can offer following explanation: Össur always tries to protect the field around its products and designs in order to secure ia broader freedom to operate and not all patent applications/patents end up being utilized in products. It is therefore completely understandeable that we would file for these designs even though the design process itself went into another direction.

I also refer to the same Section 9. regarding your obligation to sign the declaration:

Upon the request of the Company, Consultant shall promptly take such further actions, including execution and delivery of all appropriate instruments of conveyance, as may be necessary to assist the Company to prosecute, register, perfect, record or enforce its rights in any Subject Intellectual Property.

I hope that this explains the situation. Please let me know if you have any other questions, otherwise I am looking forward to receiving signed paperwork from you.


Kind regards


Tatjana Latinovic
VP of Intellectual Property
Össur Head Office

Tel: +354 5151311
Mobile: + 354 6641034
E-mail: tlatinovic@ossur.com
www.ossur.com
Email-disclaimer




-----Original Message-----
From: Wayne Calco [mailto:calco.wayne@me.com]

CALCO 002138

# EXHIBIT 35

5/28/2020                                    Miami J® Select

COVID19 – OUR SERVICES   VIEW HERE

**ÖSSUR.**





SPINE

# Miami J® Select

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select

1/7

CALCO 002767

5/28/2020                                    Miami J® Select

The Miami J Select cervical collar by Össur offers the widest range of height adjustability in the market with a single, universal design that replicates the comfort, immobilization and quality you expect from a Miami J product. Featuring a patented, first-to-market locking mechanism to encourage patient compliance and anti-microbial Sorbatex padding, Miami J Select is designed to support successful patient outcomes.

REQUEST MORE INFORMATION

Overview        Details

# Comfort to compliance

Adjustability, comfort and compliance from the brand you trust. Perfected with continuous input from Trauma Managers & Practitioners and decades of experience in design, the Miami J Select offers a universal cervical collar that doesn't compromise immobilization or comfort.





### High comfort, low pressure

Replicating the clinically proven comfort and low tissue interface pressure of the Miami J†

### Immobilization

Tamper-resistance and proven 3-plane immobilization†

£

CALCO 002768

-798-

5/28/2020                                    Miami J® Select

## Cost-Savings

Sorbatex, with 3X the durability, outlasts
other padding†



01:43

CALCO 002769

5/28/2020                                      Miami J® Select



## Miami J Select Competency Course

The Miami J Select Competency Course is available to healthcare professionals 24/7. Instruction includes
sizing, adjustability, locking the height in place, fitting, adjustments, cleaning, and skin care. Accessory

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select                    4/7

CALCO 002770

5/28/2020                                      Miami J® Select

products such as the Occian Back and the JTO are also included.
Login to start course >

# Fitting Videos

05:47





**MIAMI J® SELECT – PRACTITIONER FITTING VIDEO**

**MIAMI J® SELECT – PATIENT FITTING VIDEO**

*† Data on file at Össur*

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select                    5/7

CALCO 002771

5/28/2020    Miami J® Select

# Discover more bracing & supports products

**SPINE**





**MIAMI LSO™**

Miami LSO is a low profile, easy to use spinal orthosis designed for pain...

**FORMFIT® PRO BACK**

Össur Formfit® Pro Back is a lightweight, compressive back support for...

COMPANY

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select

6/7

CALCO 002772

5/28/2020                                          Miami J® Select

About Össur

News

Careers at Össur

Compliance

Company Background


**SUPPORT**

Customer Service

Event Calendar

Contact Us

Document Finder

Find a Bracing Practitioner

Find Upper Limb Practitioner


**COMMUNITY**

Team Össur

Ambassadors

Philanthropic Partnerships

Life Without Limitations


**FOLLOW US**

Facebook

Instagram

Linkedin

Twitter

Youtube


Privacy Policy   Cookie Policy

© 2020 Össur

CALCO 002773

**-803-**

COVID19 – OUR SERVICES   VIEW HERE



**ÖSSUR.**

SPINE

# Miami J® Select

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select

1/5

CALCO 002774

5/28/2020                                    Miami J® Select

The Miami J Select cervical collar by Össur offers the widest range of height adjustability in the market with a single, universal design that replicates the comfort, immobilization and quality you expect from a Miami J product. Featuring a patented, first-to-market locking mechanism to encourage patient compliance and anti-microbial Sorbatex padding, Miami J Select is designed to support successful patient outcomes.

REQUEST MORE INFORMATION

Overview        Details

## Product description

The Miami J Select cervical collar by Össur offers the widest range of height adjustability in the market with a single, universal design that replicates the comfort, immobilization and quality you expect from a Miami J product. Featuring a patented, first-to-market locking mechanism to encourage patient compliance and anti-microbial Sorbatex padding, Miami J Select is designed to support successful patient outcomes.

## Key features

- Easy height adjustability with a tamper-proof locking mechanism – 'Left to Lock'.

- Anti-microbial & biocompatible Sorbatex™ padding prevents bacterial build-up.

- Universal design that doesn't compromise immobilization or comfort.

- 7 precise fitting sizes with opportunity to fine-tune.

- Miami J® inspired chin tray.

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select                2/5

CALCO 002775

- One-piece, anatomically inspired collar back with Flex Edge® designed to reduce occipital pressure.

- Easy to don and doff with patented Reproducible Fit option.

- Intuitive blue Patient Touch-Points to send patients home with confidence – Blue is You™.

- Simplified comfort adjustments with integrated and patented Sternal-Relief Dial.

- Large tracheal opening – improved function for ICU patients.

- Easy to clean and replace multi-colored padding.

- X-ray and CT lucent, MR-safe.

- Compatible with Occian™ Back & Miami JTO® accessories.

## Indications

Situations requiring gross immobilization of the cervical spine, these may include: - Pre- and post c-spine surgery - C-spine precaution for trauma patients

## General information

### Available sizes

Universal

## Documents

📄 **Catalog** | Miami J Select [161 kB]

📄 **Instructions for use** | Miami J Select [2 MB]

CALCO 002776

5/28/2020                                    Miami J® Select

# Discover more bracing & supports products

**SPINE**





**MIAMI LSO™**

Miami LSO is a low profile, easy to use spinal orthosis designed for pain...

**FORMFIT® PRO BACK**

Össur Formfit® Pro Back is a lightweight, compressive back support for...

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select                    4/5

CALCO 002777

5/28/2020                                    Miami J® Select

**COMPANY**

About Össur

News

Careers at Össur

Compliance

Company Background

**SUPPORT**

Customer Service

Event Calendar

Contact Us

Document Finder

Find a Bracing Practitioner

Find Upper Limb Practitioner

**COMMUNITY**

Team Össur

Ambassadors

Philanthropic Partnerships

Life Without Limitations

**FOLLOW US**

Facebook

Instagram

Linkedin

Twitter

Youtube

Privacy Policy    Cookie Policy

© 2020 Össur

CALCO 002778

# EXHIBIT 36

| | |
|---|---|
| **From:** | Shane Fedon <sfedon@ossur.com> |
| **Sent:** | Monday, June 6, 2016 7:50 AM |
| **To:** | Wayne Calco |
| **Subject:** | RE: Most of my original ideas and the provisional patent application |

Wayne,

Thanks man!
So you know, as I just looked into things, The April Gate, was 2.0, which was finalized in early May. Gate 2.1 is slated originally for mid-July, but it looks like with the project pushed, won't happen until Sept....I'll dig deeper. Your second royalty payment does come at Gate 2.1 though.

It looks like the Non-provisional was in fact filed in late April...so that's awesome the application might be published as soon as the start of the 3rd quarter...but as you know, it should depend on the uspto back log.

I'll look forward to getting the backlog of deliverables from you concerning the Exhibit#2, as per the contract, the monthly report from your work and the output. Thanks for getting that together...I would like to show the value you have brought to the team as its important to show the ROI for us!!

Thanks for being on the Team!!


All my best,



Shane Fedon
Director R&D | Research & Development
Foothill Ranch, CA 92610

Tel: +1.949.382.3862
Tel: 1023862
Mobile: +1.949.521.4886
E-mail: sfedon@ossur.com
www.ossur.com
Email-disclaimer



**From:** Wayne Calco [mailto:calco.wayne@me.com]
**Sent:** Monday, June 06, 2016 7:35 AM
**To:** Shane Fedon <sfedon@ossur.com>
**Subject:** Most of my original ideas and the provisional patent application

CALCO 002043

# EXHIBIT 37

| | |
|---|---|
| **From:** | Jason Taylor <jataylor@ossur.com> |
| **Sent:** | Wednesday, November 11, 2015 8:46 AM |
| **To:** | Wayne Calco (calco.wayne@me.com) |
| **Cc:** | Duane Romo |
| **Subject:** | Project Kickoff - Adjustable Collar |

Hi Wayne,
I would like to invite you in on **Friday** to formally kick off the development project with the Össur team. This will be an opportunity to introduce our primary resources and their roles on the project and give you an orientation on how we develop products here.  Then we can get into some design discussions.

WHEN:        Friday 2015-11-13
                  10:00am-12:00pm  PST

WHERE:       Össur R&D/Joshua Tree Conference Room (Spine Platform war room)

AGENDA:      Part 1 – 60 min
- Project Overview - Scope
- Quick overview of Össur's product development process
  - Who will be doing what and when
- Rough Plan for Phase 2 (Gate 2 – Business Case Milestone)

Part 2 – 60 min
- Product background (clinical need and high level requirements)
- General discussion on product concepts
- Establish immediate deliverables for the next 2 weeks

I will send you a separate meeting invitation through Outlook so that it can integrate with your calendar (if needed).  Please let me know at your earliest opportunity if you are able to join us.


                  Kind regards,

                  Jason R. Taylor
                  Sr. Project Manager, R&D Injury Solutions
                  Ossur Americas
                  Foothill Ranch, CA

                  Tel: +1 949.528.5776
                  E-mail: jataylor@ossur.com
                  www.ossur.com
                  Email-disclaimer


                  

# EXHIBIT 38

| | |
|---|---|
| **From:** | Jason Taylor <jataylor@ossur.com> |
| **Sent:** | Wednesday, January 27, 2016 12:03 PM |
| **To:** | Wayne Calco (calco.wayne@me.com) |
| **Cc:** | Duane Romo |
| **Subject:** | Össur Contact List – Adjustable Collar.xlsx |
| **Attachments:** | Ossur Contact List – Adjustable Collar.xlsx |

Hi Wayne,
I have attached a quick contact list of all the direct project team members for your convenience.

Best regards,
Jason Taylor

CALCO 001836

**Project Team Contact List - Adjustable Collar**

| NAME | TITLE | ROLE | EMAIL |
|---|---|---|---|
| Jason Taylor | Sr. Project Manager | Project Manager | jataylor@ossur.com |
| Chris Webster | Platform Lead Engineer, Spine & Upper Ex | Techncial Lead Engineer | cwebster@ossur.com |
| Micah Nicholls | Medical Director Osteoarthritis & Injury Solutions | Medical Office | mnicholls@ossur.com |
| Duane Romo | Director R&D, Injury Solutions | Project Owner | dromo@ossur.com |
| Paola Vargas | Global Product Manager | Global Product Manager | pvargas@ossur.com |
| | | | |
| Jason Thorne | VP Global Marketing OA & Injury Solutions | Stakeholder | jthorne@ossur.com |
| Thorvaldur Ingvarsson | Executive V.P. Research and Development | Stakeholder | thingvarsson@ossur.com |

CALCO 001837

# EXHIBIT 39

| | |
|---|---|
| **From:** | Jason Taylor <jataylor@ossur.com> |
| **Sent:** | Tuesday, February 23, 2016 11:29 PM |
| **To:** | Wayne Calco |
| **Cc:** | Chris Webster; Duane Romo |
| **Subject:** | Re: beefed up sternum part |

Nice....it is looking better!

Best regards,
Jason Taylor

> On Feb 23, 2016, at 11:19 PM, Wayne Calco <calco.wayne@me.com> wrote:
>
>
>
>
>
> <Collar assy03.pdf>
> <sternam03.sldprt>

CALCO 001820

# EXHIBIT 40

| | |
|---|---|
| **From:** | Jason Taylor <jataylor@ossur.com> |
| **Sent:** | Friday, April 15, 2016 3:50 PM |
| **To:** | Wayne Calco (calco.wayne@me.com); Chris Webster; Francisco Narvaez; Martin Ayala; Paola Vargas |
| **Cc:** | Duane Romo |
| **Subject:** | Adjustable Collar - Project Plan Draft |
| **Attachments:** | D151001 Adjustable Collar - Project Plan Draft - 2016-04-15.pdf |

Hi Team,
I want to share with you where we are with the project plan. The attached PDF shows some initial estimates on the project milestones. With the Gate 2 coming up, we must update and finalize this on Tuesday.

Keep in mind, this is only a first pass. I encourage each of you to find reliable/realistic opportunities to pull weeks out of this plan.

Here are a few key points pending discussion:
1. Limited Launch? How long?
2. Build limited launch ISQ during Sample Run?
3. Tooling procurement
4. Manufacturing location (this plan reflects mfg at OMX)
5. 4 week "design sprint" for Proto1...is this too aggressive?

Best regards,
Jason Taylor

CALCO 001711

## Adjustable Collar

| Task | Date |
|---|---|
| Gate 2 | 22-Apr |
| Technical Inputs Review | 5/20/2016 |
| Proto 1 - Design and fabrication | |
| Proto 1 - Delivery | |
| Proto 1 - Market Feedback | |
| Verification | |
| Proto 2 - Design and fabrication | |
| Proto 2 - Delivery | |
| Proto 2 - Market Feedback | |
| Proto 2 - Design Review | |
| Proto 3 - Design Revision | |
| Proto 3 - Finalize Drawings | |
| IV/2 | |
| Implementation Review | |
| Process Specifications Review | |
| Gate 2.1 | September? |
| | |
| BOM | |
| Item Master | |
| Supplier Quotation | |
| Sample Order - Tools and Materials | |
| Sample Run | |
| Sample Run - AAI | |
| Shipping ISQ - USA | |
| Shipping ISQ - EMEA | |
| Gate 3/4 | |
| Limited Launch | |
| Production Order - ISQ | |
| Shipping ISQ - USA | |
| Shipping ISQ - EMEA | |
| | |
| Validation | |
| Gate 4 | |
| Gate 4.1 | |

D151001 Adjustable Collar - Project Plan Draft
Printed: 4/15/2016

CONFIDENTIAL

CALCO 001712

# EXHIBIT 41

| | |
|---|---|
| **From:** | Chris Webster <cwebster@ossur.com> |
| **Sent:** | Monday, May 2, 2016 8:34 AM |
| **To:** | Wayne Calco (calco.wayne@me.com) |
| **Cc:** | Paola Vargas; Jon Covach; Jason Taylor; Duane Romo; Shane Fedon; Mark HarmanPowell |
| **Subject:** | Adjustable Collar design team |

Hello,

This is an invite to a daily, recurring meeting as we sprint towards releasing tools for Prototype 1 on May 20th..... 3 weeks from now.

Attendance of every meeting is not mandatory but everyone is encouraged to attend when possible to provide input as part of **TEAM COLLAR**.

Part of the intention of these meetings is to keep track of daily design milestones and a chance for input and discussion from all aspects of the team that we need to succeed: design / styling / usability / DFM / assembly considerations / etc.

Thanks,
Chris

CALCO 002137

# EXHIBIT 42

| | |
|---|---|
| **From:** | Chris Webster <cwebster@ossur.com> |
| **Sent:** | Wednesday, May 4, 2016 9:10 AM |
| **To:** | Wayne Calco (calco.wayne@me.com); Paola Vargas; Mark HarmanPowell; Jason Taylor |
| **Subject:** | RE: Adjustable Collar |

I forgot to add that we should create some ID and branding suggestions on these approaches.  If we used this minimalist hinge we would be getting rid of the injection molded plastic side attachment, which had a large plastic face for branding, and instead just using a strip of loop that would attach to psa hook as on the current Miami J.





Chris Webster
Engineer III, R&D

Össur Americas, Inc.
27051 Towne Center
Foothill Ranch, CA 92610

Tel.     (949) 382-3845
Mobile  (949) 413-4600
VoIP     102 3845
E-mail   cwebster@ossur.com
www.ossur.com

CALCO 000513

Email-disclaimer





**From:** Chris Webster
**Sent:** Wednesday, May 04, 2016 9:01 AM
**To:** Wayne Calco (calco.wayne@me.com) <calco.wayne@me.com>; Paola Vargas <pvargas@ossur.com>; Mark HarmanPowell <MPowell@ossur.com>; Jason Taylor <jataylor@ossur.com>
**Subject:** Adjustable Collar

Hi, I was just thinking that since the repeatable fit is not a requirement and adds complexity and risk we should, at least in parallel, consider a minimalist hinge stack up and a front to back attachment design which is only hook and loop, as used currently on Miami J.  Two simple ideas:






Chris Webster
Engineer III, R&D

Össur Americas, Inc.
27051 Towne Center
Foothill Ranch, CA 92610

Tel.     (949) 382-3845

CALCO 000514

Mobile  (949) 413-4600
VoIP       102 3845
E-mail    cwebster@ossur.com
www.ossur.com
Email-disclaimer





CALCO 000515

# EXHIBIT 43

**From:**          Wayne Calco <calco.wayne@me.com>
**Sent:**          Wednesday, May 18, 2016 11:21 PM
**To:**            Shane Fedon
**Subject:**       Re: Touch base

HI Shane,

You are very welcome!  The design needs a lot of work but we  will get there. Thanks for fixing the issue with payments
too!  Its all good Shane, I will see you in the morning. It is great to be on the team and to participate in the meetings and
design refinements moving forward.


Best regards,

Wayne


On May 18, 2016, at 7:07 PM, Shane Fedon <sfedon@ossur.com> wrote:
>
> Wayne,
> Thanks for getting the work done and over to Chris.  I think we can still work on the back in terms of really buttoning
up design.... But over all, fantastic job!
>
> I wanted to reach out to say thank you for the hard work!  I also wanted to say that things should be all worked out in
pay.  I spoke with Sara from finance said you should now be all set to receive payment by the 5th of every month.  I
thought that's what you said you needed!!
>
> I'm excited to start working on the design of Proto two.  Let's talk tomorrow on that and the focus during the meeting!
>
> Talk to you tomorrow.  So you know,  I want to continue to work on the design every day until we have frozen the
design! I'll need you to continue to support the team by being active as a team member during these design meetings.
I'd also hope you can not miss any, though I understand you have other work going on, participation in person is what I
really need to emphasis with you.  I'm proud of your participation over the past few weeks.  Though we have closed the
design for prototype 1.....  We aren't close to being done yet!!
>
> All my best,
>
> Shane Fedon
> Ossur | Director of R&D
> Sent from my iPhone

CALCO 002130

# EXHIBIT 44

| | |
|---|---|
| **From:** | Shane Fedon <sfedon@ossur.com> |
| **Sent:** | Wednesday, June 1, 2016 11:50 AM |
| **To:** | Chris Webster |
| **Cc:** | Paola Vargas; Wayne Calco (calco.wayne@me.com); Jason Taylor; Mark HarmanPowell |
| **Subject:** | Re: Miami Adjustable discussion |
| **Attachments:** | ATT99073.jpg; ATT14104.jpg; ATT04808.jpg; ATT81476.jpg; ATT85979.jpg |

Hey guys!
This sounds like a positive plan!
I'm looking forward to seeing the end result. I think this is the right thing to do to ensure that the current customers see that we are enhancing the product and keeping the positive design aspects intact to maintain brand equity!!!!

I'm really looking forward to hearing Paola's thoughts on tomorrow's final 'back panel' design!!

Shane Fedon
Ossur | Director of R&D
Sent from my iPhone

On Jun 1, 2016, at 11:37 AM, Chris Webster <cwebster@ossur.com> wrote:

**Meeting Minutes and Outcome**

**Positives of Advanced Back: (from Paola and J Thorne)**
Overmold is comfortable
Flat shape is easy to don
Two tone is easy to read
Relook at COGS of overmold, considering market size and . strong enough feature to have flex edge?
Back should look different than current Advanced Back

**Meeting outcome:**
New Design based off of Miami J Advanced Back to be finalized by end of day Thursday. Wayne working on design, in collaboration with Mark.
We will meet again at 2pm tomorrow to Review so that CAD work can proceed.
Existing back panel to be put on hold in machine shop

Chris Webster
Engineer III, R&D

<Picture (Device Independent Bitmap) 1.jpg>

Össur Americas, Inc.
27051 Towne Center
Foothill Ranch, CA 92610

Tel.    (949) 382-3845
Mobile  (949) 413-4600
VoIP       102 3845
E-mail     cwebster@ossur.com

CALCO 002115

www.ossur.com
Email-disclaimer



<Picture (Device Independent Bitmap)

2.jpg> <Picture (Device Independent Bitmap)

3.jpg> <Picture (Device Independent Bitmap) 4.jpg>

<Picture (Device Independent Bitmap) 5.jpg>


-----Original Appointment-----
**From:** Chris Webster
**Sent:** Tuesday, May 31, 2016 4:49 PM
**To:** Chris Webster; Paola Vargas; Wayne Calco (calco.wayne@me.com); Jason Taylor; Mark HarmanPowell
**Cc:** Shane Fedon
**Subject:** Miami Adjustable discussion
**When:** Wednesday, June 01, 2016 10:30 AM-11:00 AM (UTC-08:00) Pacific Time (US & Canada).
**Where:** FR MR 1010754 TC Joshua Tree


Meeting to make decision on design of the Back Panel.

Paola, we need your input for this! ☺

CALCO 002116

# EXHIBIT 45

| | |
|---|---|
| **From:** | Jason Taylor <jataylor@ossur.com> |
| **Sent:** | Tuesday, June 7, 2016 8:11 PM |
| **To:** | Wayne Calco |
| **Subject:** | Re: Adjustable Collar - Weekly Status |

This meeting is the recurring weekly I'm running with my 2 week dashboard notes.  This is for the core team, including you.  You probably are seeing the modification I made today for The June 21 occurrence...I rescheduled as I will be out of the office.

Best regards,
Jason Taylor

On Jun 7, 2016, at 5:28 PM, Wayne Calco <calco.wayne@me.com> wrote:

> Jason,
> For some reason this email did not show up for me till 4:05 pm.
> Did this meeting take place?
> Wayne
>
> Confidential
>
> On Jun 7, 2016, at 4:05 PM, Jason Taylor <jataylor@ossur.com> wrote:
>
> .......................................................................................................................
>
> ## → Join Skype Meeting
>
> This is an online meeting for Skype for Business, the professional
> meetings and communications app formerly known as Lync.
>
> ## Join by phone
> X1010754
> .......................................................................................................................
>
> **2-Week Dashboard Meeting**
>
> • Review project tasks with each department and assign tasks for the following week.
>
> • Assess project risks, delays
>
> Meeting notes on Plaza: D151001 Adjustable Collar - 2 Week Dashboard Meeting Notes
>
> <mime-attachment.ics>

CALCO 001699

-833-

**2-Week Dashboard Meeting**

- Review project tasks with each department and assign tasks for the following week.

- Assess project risks, delays

**Meeting notes on Plaza:** D151001 Adjustable Collar - 2 Week Dashboard Meeting Notes

<mime-attachment.ics>

CALCO 001698

# EXHIBIT 46



CALCO 002627

# EXHIBIT 47

| | |
|---|---|
| **From:** | Chris Webster <cwebster@ossur.com> |
| **Sent:** | Monday, August 1, 2016 1:09 PM |
| **To:** | Chris Webster; Christian Jaramillo; Jason Taylor; Mark HarmanPowell; Paola Vargas; Shane Fedon; Zach Hills; Guðni Ingimarsson; Jason Thorne; Zak Klutts; Wayne Calco; Henry Hsu; Jon Covach; Martin Ayala; Mike Cangelosi |
| **Subject:** | RE: Adjustable Collar Team |

Meeting moved to 4 today


Chris Webster
R&D Engineer III
Sent from mobile.

CALCO 002005

# EXHIBIT 48

| From: | Chris Webster <cwebster@ossur.com> |
|---|---|
| Sent: | Wednesday, August 3, 2016 6:15 PM |
| To: | Wayne Calco |
| Subject: | RE: Design Review |

Hey, it's moved to 10am!



Chris Webster
Engineer III, R&D

Össur Americas, Inc.
27051 Towne Center
Foothill Ranch, CA 92610

Tel.     (949) 382-3845
Mobile  (949) 413-4600
VoIP     102 3845
E-mail   cwebster@ossur.com
www.ossur.com
Email-disclaimer



From: Wayne Calco [mailto:calco.wayne@me.com]
Sent: Wednesday, August 03, 2016 6:14 PM
To: Chris Webster <cwebster@ossur.com>
Subject: Re: Design Review

Chris,
When is the meeting?

I'm confused! Friday at ?????

Wayne

Confidential

On Aug 3, 2016, at 5:24 PM, Chris Webster <cwebster@ossur.com> wrote:

Updating time for Martin to attend.

<Picture
(Device

Chris Webster
Engineer III, R&D

Össur Americas, Inc.
27051 Towne Center

CALCO 000394

**-840-**

Independent Foothill Ranch, CA 92610
Bitmap)
1.jpg>
Tel.   (949) 382-3845
Mobile   (949) 413-4600
VoIP      102 3845
E-
mail      cwebster@ossur.com
www.ossur.com
Email-disclaimer



<Picture (Device
Independent Bitmap)
2.jpg>       <Picture (Device
Independent Bitmap)
3.jpg>       <Picture (Device
Independent Bitmap) 4.jpg>


-----Original Appointment-----
**From:** Chris Webster
**Sent:** Wednesday, August 03, 2016 8:02 AM
**To:** Chris Webster; Jason Taylor; Shane Fedon; Henry Hsu; Jon Covach; Mark HarmanPowell; Zach Hills;
Wayne Calco (calco.wayne@me.com); Christian Jaramillo; Martin Ayala
**Subject:** Design Review
**When:** Friday, August 05, 2016 10:00 AM-12:00 PM (UTC-08:00) Pacific Time (US & Canada).
**Where:** FR MR 1010754 TC Joshua Tree


Adjustable Collar **Proto 2**:  Component-level and system-level design review.

Overall objective:  Are we ready to go to tooling?

Blocking out 2 hours so that if needed we have time to thoroughly discuss each component and critical
features.

Regards,
Chris

CALCO 000395

# EXHIBIT 49

| From: | Chris Webster <cwebster@ossur.com> |
|---|---|
| Sent: | Friday, August 5, 2016 5:11 PM |
| To: | Annie Li; Mark HarmanPowell; Shane Fedon; Wayne Calco (calco.wayne@me.com); Jason Taylor; Jon Covach; Henry Hsu; Zach Hills |
| Subject: | Adjustable Collar - Friday Meeting minutes |

Thanks everybody for showing up and sharing your thoughts! I will send out an invite for a meeting on Monday where we can dive into hinge and see how it can be further refined and also discuss options for larger changes. Wayne will review the competitive claims. The meeting will begin at our standard 2:30 and go from there.

Some meeting minutes from today, Friday's Adjustable Collar discussion:

- Color version from Annie by end of next week (12th)
  - o Color samples coming back from RTP in two weeks... translucent, pearlescent
- Tool budget? – Jason to give info to Jon
- Monday meeting with Zach / henry on test method
  - o Discussion on test method/ protocol
- Jon to help look for materials
  - o Zeitel p66 toughened... $2.60?
- Chris to create STEP files to send to Jon to begin quotation / timeline estimate for production of Proto2 tooling
- System design meeting
  - o Monday 2:30 – looks at claims of competitor braces
  - o Brainstorm how to elevate and refine current design
- Creep studies – astms from shane
  - o Design of the spring
- Polyone – consult for material recommendation... Jon?
  - o Need to give them minimum set requirements



Chris Webster
Engineer III, R&D

Össur Americas, Inc.
27051 Towne Center
Foothill Ranch, CA 92610

Tel.      (949) 382-3845
Mobile  (949) 413-4600
VoIP     102 3845
E-mail   cwebster@ossur.com
www.ossur.com
Email-disclaimer



CALCO 001996

# EXHIBIT 50



CALCO 002638

# EXHIBIT 51



CALCO 002656

# EXHIBIT 52

| From: | Duane Romo <dromo@ossur.com> |
|---|---|
| Sent: | Monday, February 8, 2016 4:22 PM |
| To: | Wayne Calco |
| Cc: | Jason Taylor; Chris Webster |
| Subject: | Front / Back Attachment |

HI Wayne,

We printed the attachment parts from Robert and tried it with a ribbon. I do like the front/back ribbon attachment concept and think we do need it reproducible too.
I do however feel we should revisit the front/back attachment to develop something that makes the circumference more secure once snapped together but the design could still allow the quick release to be removed and unsnapped allowing the strap to slide to a new position if adjustment is required.
Lets chat tomorrow.

Kind Regards



Duane Romo, CPO
Director, Functional Healing
27051 Towne Centre Drive
Foothill Ranch, CA 92610
Tel: +1 949 382 3901
E-mail: dromo@ossur.com
www.ossur.com
Email-disclaimer



CALCO 001338

**-849-**

# EXHIBIT 53

| | |
|---|---|
| **From:** | Wayne Calco <calco.wayne@me.com> |
| **Sent:** | Tuesday, April 5, 2016 11:26 AM |
| **To:** | Tatjana Latinovic |
| **Cc:** | IP Administrator; Duane Romo; Chris Webster; Jason Taylor |
| **Subject:** | Rotating strap mount on back panel for collar IP |

CALCO 001023



CALCO 001024

On Apr 4, 2016, at 3:07 PM, Tatjana Latinovic <tlatinovic@ossur.com> wrote:

Hi Wayne,

I hope that you are doing well. I am arranging a meeting with IP lawyers Justin and Tim tomorrow afternoon and I heard that you will be in the offices. It would be great if you could join us for the review of IP related to the adjustable collar project. We have already filed the first provisional application so the purpose of the review tomorrow would be to see if there have been any developments since the filing.

I am looking forward to seeing you.

Best regards, Tatjana

Kind regards

<image001.gif> Tatjana Latinovic
Intellectual Property Director, R&D
Össur Head Office

Tel: +354 5151311
Mobile: + 354 6641034
Fax: + 354 515 1367
E-mail: tlatinovic@ossur.com
www.ossur.com
Email-disclaimer

<image002.gif><image003.gif><image004.gif>

CALCO 001025

# EXHIBIT 54

| | |
|---|---|
| **From:** | Wayne Calco <calco.wayne@me.com> |
| **Sent:** | Tuesday, April 5, 2016 12:21 PM |
| **To:** | Tatjana Latinovic |
| **Cc:** | IP Administrator; Duane Romo; Chris Webster; Jason Taylor |
| **Subject:** | Back panel strap attachment concept |

CALCO 001019



CALCO 001020



CALCO 001021

On Apr 4, 2016, at 3:07 PM, Tatjana Latinovic <tlatinovic@ossur.com> wrote:

Hi Wayne,

I hope that you are doing well. I am arranging a meeting with IP lawyers Justin and Tim tomorrow afternoon and I heard that you will be in the offices. It would be great if you could join us for the review of IP related to the adjustable collar project. We have already filed the first provisional application so the purpose of the review tomorrow would be to see if there have been any developments since the filing.

I am looking forward to seeing you.

Best regards, Tatjana

Kind regards

<image001.gif> Tatjana Latinovic
Intellectual Property Director, R&D
Össur Head Office

Tel: +354 5151311
Mobile: + 354 6641034
Fax: + 354 515 1367
E-mail: tlatinovic@ossur.com
www.ossur.com
Email-disclaimer

<image002.gif><image003.gif><image004.gif>

CALCO 001022

# EXHIBIT 55

| **From:** | Chris Webster <cwebster@ossur.com> |
|---|---|
| **Sent:** | Sunday, April 17, 2016 1:28 PM |
| **To:** | Wayne Calco (calco.wayne@me.com) |
| **Cc:** | Jason Taylor |
| **Subject:** | 3d back piece |

Hi Wayne,

I managed to create a nice "blank" of the Miami J Advanced Back.

Let's discuss strategy for this piece. I wish we could rush a mold for this and then we could experiment with a bunch of different hole cut outs. That's probably what we need to do. I don't see any other way of truly gaining confidence on the back....





Chris Webster
Engineer III, R&D

Össur Americas, Inc.
27051 Towne Center
Foothill Ranch, CA 92610

CALCO 000587

# EXHIBIT 56

| | |
|---|---|
| **From:** | Jason Taylor <jataylor@ossur.com> |
| **Sent:** | Friday, June 3, 2016 4:04 PM |
| **To:** | Wayne Calco |
| **Cc:** | Chris Webster; Mark HarmanPowell; Shane Fedon |
| **Subject:** | Re: iconic back |

This is in the right direction, and I'm confident we can finalize this today.  Please continue to work with Mark and Chris to include some key features we discussed in the office today.

Best regards,
Jason Taylor

On Jun 3, 2016, at 3:35 PM, Wayne Calco <calco.wayne@me.com> wrote:

> Chris,
>
> Here is my new favorite. It is based on all of our meetings, but express thanks to Mark for asking me do create something "iconic that could be applied to other products".  This is a double embossed hole pattern with the shaded areas open to see pad material or the pad can have matching holes too! It is gorgeous!
>
> See you at 4 today for additional collaboration and discussion.  If you double click the .pdf it will present with normal line weights...
>
> Wayne
>>
>
>
>
> <iconic back.igs>
>
> <iconic back.dxf>
>
> <iconic back.pdf>

CALCO 001700

# EXHIBIT 57

| | |
|---|---|
| **From:** | Wayne Calco <calco.wayne@me.com> |
| **Sent:** | Wednesday, September 28, 2016 2:53 PM |
| **To:** | Chris Webster |
| **Subject:** | Chin adjust tab |
| **Attachments:** | IMG_4235.JPG; Untitled.txt |

CALCO 000728



CALCO 000729

# EXHIBIT 58

| | |
|---|---|
| **From:** | Wayne Calco <calco.wayne@me.com> |
| **Sent:** | Wednesday, September 28, 2016 3:01 PM |
| **To:** | Chris Webster |
| **Subject:** | Tab |
| **Attachments:** | IMG_4239.JPG; Untitled.txt |

CALCO 000719



CALCO 000720

-868-

Sent from my iPhone

CALCO 000721

# EXHIBIT 59

| | |
|---|---|
| **From:** | Wayne Calco <calco.wayne@me.com> |
| **Sent:** | Wednesday, September 28, 2016 2:55 PM |
| **To:** | Chris Webster |
| **Subject:** | Sternum adjust |
| **Attachments:** | IMG_4236.JPG; Untitled.txt |

1

CALCO 000725



CALCO 000726

Sent from my iPhone

CALCO 000727

# EXHIBIT 60

| From: | Wayne Calco <calco.wayne@me.com> |
|---|---|
| Sent: | Wednesday, September 28, 2016 3:16 PM |
| To: | Chris Webster |
| Subject: | Tabs |
| Attachments: | IMG_4250.JPG; Untitled.txt |

CALCO 000713



CALCO 000714

Sent from my iPhone

CALCO 000715

# EXHIBIT 61

From: **Chris Webster** cwebster@ossur.com
Subject: wayne's notes
Date: December 9, 2016 at 5:00 PM
To: Henry Hsu hhsu@ossur.com, Jared Olivo jolivo@ossur.com, Paola Vargas pvargas@ossur.com, Jason Taylor jataylor@ossur.com
Cc: Shane Fedon sfedon@ossur.com, Wayne Calco (calco.wayne@me.com) calco.wayne@me.com

Input from wayne on latest design:

- Are we certain Marketing really only wants the 74, because the 72 is cheaper.
  - R&D note: due to complaints about trache opening from ossur academy on proto3 we are lowering sternal area and will be meeting L0174 by default. Probably won't be able to have a 0172.
- Vista uses 9" from top position chin tray to bottom of thoracic extension.
  - Standard uses 7.5 (to the flex tabs)

Back panel:
- Back panel for eclipse tested superior to maimi j and the vista in lateral support. Check
- If overmolding, PP or rigid plastic needs to provide bulk of support, overmolding is just extra… decorative and comfort enhancement
- Strap must have something that extends past cheek tip to make an obvious pull point

Front:
- Grab point could be more like horizontal tongue. Don't want to grab under the mandible like current design

Sternal body (poly carb)
- In addition to lowering sternal body, make it wider. Could cut into the volume under the cheeks to make it wider there and reduce perception of bulk

Counterforce
- Two features, left and right, rather than below. Not necessarily for two fingers but to give option of accessing counterforce from left or right

Button
- Enlarge a little bit and bring to the surface, maybe make it oval

Large segment of business is obese people – front and back require ability to flex outwards. Currenly working well in this respect.

Vista collar has 1" gap between front and back panels on 98% patient. 18.5" neck size



Chris Webster
Engineer III, R&D

Ossur Americas, Inc.
27051 Towne Center
Foothill Ranch, CA 92610

Tel.      (949) 382-3845
Mobile  (949) 413-4600
VoIP     102 3845
E-mail   cwebster@ossur.com
www.ossur.com
Email-disclaimer



# EXHIBIT 62

Relativity                                    https://www.myrelativity.com/Relativity/CustomPages/ba469480-7be5-...

| | |
|---|---|
| **From:** | Chris Webster <cwebster@ossur.com> |
| **Sent:** | Friday, December 9, 2016 4:11 PM |
| **To:** | Wayne Calco (calco.wayne@me.com) |
| **Subject:** | FW: Collar notes |
| **Attachments:** | Document2.docx |



Chris Webster
Engineer III, R&D

Össur Americas, Inc.
27051 Towne Center
Foothill Ranch, CA 92610

Tel.    (949) 382-3845
Mobile (949) 413-4600
VoIP    102 3845
E-mail  cwebster@ossur.com
www.ossur.com
Email-disclaimer



**From:** Chris Webster
**Sent:** Thursday, December 08, 2016 1:32 PM
**To:** Chris Webster <cwebster@ossur.com>; Henry Hsu <hhsu@ossur.com>; Jared Olivo <jolivo@ossur.com>; Shane Fedon <sfedon@ossur.com>; Jason Taylor <jataylor@ossur.com>; Mark HarmanPowell <MPowell@ossur.com>
**Subject:** Collar notes

R&D Design discussion, post Össur acadamey feedback

-another note: low frictional ridges for rivet in mandible slots

CALCO 000360

1 of 2                                                            5/19/24, 2:26 PM

Relativity                                                        https://www.myrelativity.com/Relativity/CustomPages/ba469480-7be5-...

Strapping mechanism:
- Collar too difficult to don with "fold over" strapping mechanism, loosens as you bring it posterior. Could have some sort of lock ladder system if you stick to this mechanism

  o Use "pull forward" Requires double side loop straps and

  o possibly repositionable piece of hook

- Pull forward is the way competition / current collars all operate

  o Yes

- Look at post-op brace (new), how the straps lock on to hook only when you need them to

  o Will not use single hook to single hook. Will continue to use Velcro.

- Using new fold-over Velcro mechanism, find way to prevent patients from opening the wrong Velcro

  o Clear indication of touch points – accomplished via color, fabric loop pull tab, overmolding on edge

  o Improve intuitiveness of reproducible docking location – raise distal edges of "cheek" feature

  o Matching color of strap end to hook area on cheek?

Tracheal opening:
- Too small, hand mechanism comes down too far below the chin tray

  o Can maybe reduce mandible height in center, but need to improve ergonomic grip geometry.

  o Lower the sternal upper surface

    ▪ Define lowest possible point based on Vista TX and Miami J distal lenght

- Extend the sternal piece to make sure you get the L0174 billing code

  o Anterior portion to be as long as current Miami J front

Collar front / height mechanism:
- Collar front is bulky / thick

  o Polycarb body could more tightly house adjustment mechanism

- Button is difficult to push with no leverage

  o Need counterforce surface!

  o Raise button height closer to surface

CALCO 000361

- o  Enlarge size of button
- o  Tune the button springrate if necessary, do the above things first

Branding:
- Miami Logo needs to be obvious
  - o  Branding on straps would have to be loop
  - o  Branding on front sternal area might be easier

Comfort / Immobilization:
- Most comfortable / immobilized when wearing our collar front with Aspen multi-post back
  - o  Complete redesign of back, inspired by Miami J back and Vista Back
- Thickness of overlap at lateral aspect
  - o  Back panel less width
  - o  Reduce posterior reach of polycarb rigid component on front
  - o  Increase curvature of mold
  - o  Thin walls of ldpe of subframe on rear edges
  - o  Ramp feature on make back panel walk over edge of front subframe edges
  - o  Living hinges / bend points to allow easy circumferential flex on both sub frame and mandible
  - o

*Other topics:*
- Consider color scheme for all Miami J / Adjustable line
  - o  Cool gray 1 or 2 or 3
    - ▪  Need color chips of cool grey to show to marketing

- Look into changing liner color for DJ only

- IFU / Fitting: slide collar back, scoop collar front, attach straps, adjust height mechanism, re-adjust straps
  - o  Add 20degrees to chin tray angle to inherently bake in the scoop

- **Fitting -** Need to define the fitting steps in the IFU carefully.  Aspen applies straps first, then adjusts the height
  - • Adjusting straps as the last step is fine as long as the chin tray has proper landing on patient mandible.

- It is difficult to pull back on the straps when patient is supine
  - • Changing to pull forward

- Markings on strap may help with L/R symmetry
  - o  Add lines on strap for symmetry
  - o  It seems that it is easier to tighten one at a time.
    - • Straps must have low friction , low resistance to slide for easy strap adjustment

CALCO 000362

- Need to add a counter force feature for the ht. adj. button.
  - Needs certain amount of internal system friction

- Preference to snug up the straps...forward works much better
  - Yes

- In the field:  Compare to the Vista process...transition with the least amount of re-training
  - Keep process as similar whereve possible.
  - How to target sternal notch with something on design

- Like the extra overhang of the liner along the clavicle.
  - Ok

- Trimming straps is OK
  - ok

- Not able to secure the strap while adjusting.  When you initially pull the strap, you cannot maintain the tension while securing it down on to the hook/loop (it slips a bit).
  - Pulling forward

- The lateral extensions of the front assembly do not curl well without holding them, especially on small neck diameter patients
  - See above

- Miami J - IFU says to "snug-up" while closing the straps.  Do we want this on the Adjustable Collar too?
  - Need to compare to Vista IFU.  Initial placement on cheeks, then tighten, then additional snug up one side at a time.

- Trache opening is not as big.
  - Possibly shift the sternum cover down 10mm
    - 20mm
  - Possibly raise the thumb grab feature up ??mm
    - Redesign grip.  Probably need existing height for left to right torsional strength

- Need to define the angle of the front assembly during fit (tuck the lateral extensions up under the ears, not sag onto the traps).
  - Adjusting the angle

- Assembly stack-up is too thick.  Is a concern in the market
  - ID to improve perception of thickness

- Assembly stack-up may be preventing a secure fit on the back.
  - Back redesign

- Back - eliminate the overlap of the extensions over the laterals
  - Not eliminating, making more accomodating

- Use the straps to pull the back component forward (IFU)
  - yes

- Mix of the Adjustable collar front and the 4post style Aspen back was a very good fit overall.
  - New back design

- Need to discuss - Strap should say MIAMI
  - Branding on strap if possible

- Adjustment Button - access is a bit too narrow/deep.  It was a bit limiting.
  - See above

- ID - need to further discuss the colors for both the new adjustable and the sized Miami J.  Maybe we need to consider a "transition color scheme" utilizing a Cool Grey 1
  - See above.

CALCO 000364

# EXHIBIT 63

*OVER CENTER SNAP IN BALL/JOINT HOLDS STERNUM PLATE/PAD TO UPPER
STRUCTURE OF COLLAR, MOVES ON A SINGLE AXIS, NO OMNIDIRECTIONAL
MOVEMENT



BALL SNAPS INTO JOINT,
CONNECTS STERNUM PLATE
TO MAIN COLLAR BODY

*FRONT VIEW

SINGLE AXIS
BALL JOINT
R4

*SIDE VIEW

WAYNE CALCO, DESIGNER

# EXHIBIT 64

*2PART BALL/JOINT HOLDS STERNUM PLATE/PAD TO UPPER
STRUCTURE OF COLLAR, MOVES ON A SINGLE AXIS,



*TOP VIEW

BALL FITS INTO 2 PART JOINT,
CONNECTS STERNUM PLATE
TO MAIN COLLAR BODY

*FRONT VIEW

*SIDE VIEW

SINGLE AXIS
BALL JOINT
R3

WAYNE CALCO, DESIGNER

# EXHIBIT 65



Dictionary of
**Mechanical
Engineering**
Fourth Edition

**G.H.F. Nayler**



SLREF
TJ
9
N28
1996

# Dictionary of Mechanical Engineering

## Fourth Edition

**G.H.F. Nayler**
MSc, CEng, MIMechE, MRAeS

Society of Automotive Engineers, Inc.
Warrendale, Pa.

Butterworth-Heinemann
Oxford    Boston    Johannesburg
Melbourne    New Delhi    Singapore



First published by George Newnes Ltd, 1967
Second edition 1975
  reprinted 1978, 1981
Third edition 1985

Copyright © 1967, 1975, 1985, 1996 G.H.F. Nayler

Printed and bound in the United States of America.

Butterworth-Heinemann
Linacre House, Jordan Hill, Oxford OX2 8DP

A division of Reed Educational and Professional Publishing Ltd.
A member of the Reed Elsevier plc group

**British Library Cataloguing in Publication Data**
A catalogue record for this book is available from the British Library

Butterworth-Heinemann ISBN 0 7506 3009 4

All rights reserved. No part of this publication may be reproduced in any material form (including photo-copying or storing in any medium by electronic means and whether or not transiently or incidentally to some other use of this publication) without the written permission of the copyright holder except in accordance with the provisions of the Copyright Designs and Patents Act 1988 or under the terms of a license issued by the Copyright Licensing Agency Ltd, 90 Tottenham Court Road, London, England WIP 9HE. Applications for the copyright holder's written permission to reproduce any part of this publication should be addressed to the publishers.

Society of Automotive Engineers, Inc.
400 Commonwealth Drive, Warrendale, PA 15096-0001
Phone: (412) 776-4841     Fax: (412) 776-5760

**Library of Congress Cataloging-in-Publication Data**

Nayler, G. H. F.
    Dictionary of mechanical engineering / G.H.F. Nayler. -- 4th ed.
      p.   cm.
    ISBN 1-56091-754-7 (hardcover)
      1. Mechanical engineering--Dictionaries.  I. Title.
    TJ9.N28  1996
    621'.03--dc20                                    95-52297
                                                        CIP

SAE ISBN 1-56091-754-7

Permission to photocopy for internal or personal use, or the internal or personal use of specific clients, is granted by SAE for libraries and other users registered with the Copyright Clearance Center (CCC), provided that the base fee of $.50 per page is paid directly to CCC, 222 Rose-wood Dr., Danvers, MA 01923. Special requests should be addressed to the SAE Publications Group. 1-56091-754-7/96 $.50.

SAE Order No. R-156

**baler** A machine for compressing loose bulky material and securing it in a convenient form for transport, such as hay or cotton. See also **combine baler**.

**ball-and-disc integrator** See *integrator*.

**ball-and-socket joint** A joint in which a spherical end is placed within a socket that has been recessed to fit it, thus permitting free motion within a given cone or cutout in the socket. It is the same as "ball joint."

**ball-bearing** A bearing on a shaft composed of a number of hardened-steel balls rolling between an inner race forced on to the shaft and an outer race carried in a housing. The balls are equally spaced by a light metal cage and run in shallow grooves called ball-tracks. The cage or ball retainer is crimped or riveted into place after the balls have been inserted (see *Figure B.2*). An alternative method utilizes a filing slot in the races which allows assembly with a greater number of balls but reduces the thrust load carrying capacity of the bearing; that is, the load in the axial direction. A self-aligning ball-bearing has the balls running in a spherical housing which enables the inner and outer races to be at an angle to each other as shown in *Figure B.3*.



Figure B.2. *Ball-bearing, single-row: (a) radial or journal, (b) thrust.*

Figure B.3. *Ball-bearing, double-row self-aligning-radial.*

**ball bush** An outer cylindrical sleeve running on balls along a shaft, each row of balls taking the load in turn and then recirculating as shown in *Figure B.4*.

**ball catch** A spring-controlled ball, projecting through a smaller hole, which engages with a hole in a striking plate, as for a door fastening.

**ballcock** A self-regulating valve which, through a linkage system, turns the flow of water (or a liquid) on and off by the falling and the rising of a partly submerged sphere, usually a hollow ball.

23

# TAB F

1  GEORGE B. PIGGOTT (SBN 68227)
   a member of GEORGE B. PIGGOTT,
2  A PROFESSIONAL CORPORATION
   2603 Main Street, Penthouse
3  Irvine, California 92614
   Tel:   (949) 261-0500
4  Fax:   (949) 261-1085
   Email: george@piggottlaw.com
5
   Attorney for Plaintiff Wayne Calco
6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  WAYNE CALCO, an individual,          **Case No. 8:22-cv-01971-CJC-KES**

12                          Plaintiff,

13          vs.                          **DECLARATION OF GEORGE B.
                                          PIGGOTT IN OPPOSITION TO**
14  ÖSSUR AMERICAS, INC., a California    **DEFENDANTS' MOTION FOR**
    corporation; ÖSSUR hf, an Icelandic  **PARTIAL SUMMARY JUDGMENT**
15  company; and DOES 1 through 10,
    inclusive,
16                                        Date:  July 11, 2024
17                          Defendants.   Time: 10:00 a. m.
                                          Place: Courtroom 9D
18

19
                                          Complaint Filed: October 26, 2022
20                                        Trial Date: April 9, 2024

21

22

23

24

25

26

27

28
                              1
           DECLARATION OF GEORGE B. PIGGOTT IN OPPOSITION TO
          DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

I, George B. Piggott, declare that:

1.      I am an attorney duly licensed to practice law in the  courts of the State of California and I am also admitted to practice law before this court.  I am the principal of George B. Piggott, A Professional Corporation, and my firm represents Plaintiff Wayne Calco in this action.

2.      I originally filed a complaint in Orange County Superior Court for Mr. Calco's claims. A copy of the complaint is attached to Ossur's Request for Judicial Notice ("RJN") as Exhibit A. I  filed the complaint in Orange County Superior Court after reviewing the law on subject matter jurisdiction concerning Mr. Calco's claims. I concluded, wrongly as I subsequently learned, that the state court had jurisdiction over Mr. Calco's claims notwithstanding the significant patent issues that were involved. Ossur successfully demurred to the complaint on the grounds that the federal courts had exclusive jurisdiction over all of Mr. Calco's claims except his claim for recovery of the unpaid advanced royalty payment. The state court issued a reasoned opinion with its ruling  on November 19, 2021, which is attached as Exhibit B to the RJN.

3.      Following the court's ruling on the demurrer, I worked out a stipulation and order with Ossur's attorneys to stay the state court action pending the conclusion of this action. The stipulation and order were entered on January 18, 2022. A true and correct copy of the stipulation and order is attached hereto as Exhibit 66. The court is requested to take judicial notice of the stipulation and order. The state court action remains stayed as of this date.

4.      I monitored the prosecution activity on the docket of the United States Patent and Trademark Office ("PTO") concerning patent applications that eventually issued as what is referred to in the moving papers in Ossur's MS as the '374 Patent and '633 Patent. The applications are both significant with respect to Calco's claims because the '374 Patent contains claims that Calco asserts cover the Miami JS sternal relief dial and the '633 Patent contains claims that cover the "grip" which Calco asserts is his invention. A true and correct copy of the Documents & transaction history for the '633

1   Patent is attached hereto as Exhibit 67, which I obtained from the PTO website page for

2   the '633 Patent The history reflects that the examiner issued a final rejection with

3   respect to the application for the '633 Patent on September 28, 2021.  On November 19,

4   2021, Ossur submitted several documents in connection with the prosecution of the

5   patent, including an amendment and a request for continued examination, which are

6   reflected in the Documents & transaction history for the '633 Patent that is attached

7   hereto as Exhibit 67. Because the allowance of the claim for the "grip" would be

8   grounds for an additional claim against Ossur, as well as a federal jurisdiction, and the

9   allowance of claims in the application for the '374 Patent would also give rise to an

10  additional claim against Ossur, it was decided to defer filing a new action in federal

11  court pending further developments in the prosecution of the patent applications. A

12  notice of allowance of the '633 Patent issued on May 27, 2022 and a notice of allowance

13  of the '374 Patent followed on June 24, 2022, true and correct copies of which are

14  attached hereto as Exhibits 68 and 69, respectively, which I obtained from the PTO

15  website pages for the patents. However, until the patents actually issued, no claims

16  pertaining to them could be alleged. The filing of the complaint in this action was

17  therefore deferred pending the issuance of the '374 Patent and '633 Patent. I also

18  continued to monitor the prosecution activity to determine if continuation applications

19  might be filed in either prosecution prior to the issuance of the patents, which could

20  potentially introduce further issues. I determined that continuation applications had been

21  filed in each matter but I was unable to view the transaction history on the docket. I

22  requested that Ossur's counsel provide me with copies of the continuation applications,

23  but he refused.

24       5.     The state court held a status conference in  the stayed action on October 27,

25  2022. I filed a status conference statement in the action which explained why I had not

26  yet filed a complaint in federal court. A true and correct copy of the status conference

27  statement is attached hereto as Exhibit 70. The court is requested to take judicial notice

28  of the status conference statement, which summarizes the above.

6. I ultimately decided to proceed with the filing of this action on October 26, 2022 despite the open questions about the continuation applications that were still pending. I have since determined that those continuation applications have no bearing on the issues in this matter.

7. The state court complaint filed on May 24, 2021, that is attached as Exhibit A to the RJN alleges in paragraph 19 that:

> "Plaintiff is informed and believes and thereon alleges that Defendant ÖSSUR is falsely claiming in its advertising and product literature that the Miami JS's Sternum Adjustment and Repeatable Fit Tab features are patented, when in fact they are not. These false representations show that Defendant ÖSSUR knows that these features are patentable and should be patented; these false representations also demonstrate ÖSSUR's capacity to commit fraud and breach its obligations under the Agreement."

8. This allegation was based on discovery of false statements in an online brochure for the Miami J Select cervical collar ("Miami JS") on Ossur's website. Attached hereto as Exhibit 71 is true and correct copy of the online brochure that I subsequently downloaded from Ossur's website on December 13, 2021, which contains the false statements appearing on the page bearing Bates No. CALCO 002745 that:

> "Easy to don and doff with patented Reproducible Fit option" and
> "Simplified comfort adjustments with integrated and patented Sternal-Relief Dial."

9. I continued to monitor Ossur's website concerning the Miami JS and discovered that Ossur was continuing to make the same claims in its online brochure. The same statements appeared in Ossur's online brochure that I downloaded from Ossur's website on August 11, 2023 at the page bearing Bates No. CALCO 0021766. A true and correct copy of the brochure I downloaded on August 11, 2023, is attached hereto as Exhibit 72.

10. On November 28, 2023, the day before I took the deposition of Tatjana

4

1  Latinovic in this matter, I checked Ossur's website for the Miami JS again, and I

2  downloaded the online brochure, a true and correct copy of which is attached hereto as

3  Exhibit 73. The same statements in the brochure concerning the Reproducible Fit option

4  and Sternal-Relief Dial appear on the page with the legend at the top reading

5  "SPECIFICATION" except that the word "patented" has been changed to refer to

6  "proprietary". No explanation has been given by Ossur as to why it knowingly

7  continued to assert that neither the Sternal-Relief Dial or the Reproducible Fit option

8  were patented when neither were, and why it continued to assert in this case that the

9  Sternal-Relief Dial is not patented when it knowingly continued to advertise in its online

10  brochure after issuance of the '374 Patent that the Sternal-Relief was patented. I

11  downloaded the online brochure from Ossur's website again on May 27, 2024, a copy of

12  which is attached hereto as Exhibit 74. The same statements referring to "proprietary"

13  that are discussed above continue to appear in the brochure.

14      11.    Attached hereto collectively as Exhibit 75 is a true and correct copy of the

15  face page and pages 106 to 110 and 118 and 119 of the transcript of the deposition of

16  Tatjana Latinovic taken in this matter on November 29, 2023, which I attended, and

17  Exhibits 31, 32 and 33 to the deposition. The online brochures attached hereto as

18  Exhibits 71, 72, and 73 were marked as Exhibits 31, 32 and 33 to the Latinovic

19  deposition.

20      12.    Attached hereto as Exhibit 76 is a true and correct copy of a press release

21  by Ossur, dated May 1, 2019, that I located on the Ossur website and downloaded on

22  December 12, 2021. The press release concerns the introduction of the Miami JS as well

23  as another Ossur product.

24      13.    Attached hereto as Exhibit 77 is a true and correct copy of "PLAINTIFF'S

25  RESPONSES TO DEFENDANTS' SPECIAL INTERROGATORIES (SET ONE), that

26  is dated, verified and was served on October 30, 2023. The responses to special

27  interrogatory Nos. 4, 13, 16, 25, and 51 state that the adjustment mechanism described

28  in Claim 1, like the adjustment mechanism described in Claims 12 and 13, makes the

sternum pad movable to the relative support of the cervical collar. Calco objected to Ossur's interrogatories concerning coverage contentions on the grounds that called for expert opinion and that the information could be obtained through expert discovery. Ossur did not contest Calco's objection.

14    Attached hereto as Exhibit 78 is a true and correct copy of Calco's expert designation served on January 9, 2024. The report by Larry K, Roberts that is attached to the designation sets forth Calco's claims contentions, including his contentions with respect to Claim 1.

`    15.    In order to simplify and limit the patent coverage issues in this matter, Calco elected to not pursue his claims for relief based on the coverage of Claims 12 and 13 of the '374 Patent, and to confine his claims for relief to the coverage of Claim 1. Calco therefore withdrew his contentions concerning Claims 12 and 13. Ossur's counsel asserted this was "gamesmanship". I responded to his accusation by email on February 25, 2024. A true and correct copy of the email thread that includes my response to Ossur's counsel is attached hereto as Exhibit 79.

16.    Attached hereto collectively as Exhibit 80 is a true and correct copy of the face page of Volume 1 and pages 114 through 120 of the transcript of the deposition of Wayne Calco taken in this matter on November 29, 2023, which I attended.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This Declaration was executed this ___ day of June, 2024 at Irvine, California.


_____
George B. Piggott

# EXHIBIT 66

Electronically Filed by Superior Court of California, County of Orange, 01/18/2022 08:30:00 AM.
30-2021-01202543-CU-BC-CXC - ROA # 120 - DAVID H. YAMASAKI, Clerk of the Court By Gus Hernandez, Deputy Clerk.

GEORGE B. PIGGOTT (SBN 68227)
LAW OFFICES OF GEORGE B. PIGGOTT,
A Professional Corporation
2603 Main Street, Penthouse
Irvine, California 92614-6232
Tel: (949) 261-0500
Fax: (949) 261-1085
Email: george@piggottlaw.com

Attorney for Plaintiff Wayne Calco

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE

## CIVIL COMPLEX CENTER

| | |
|---|---|
| WAYNE CALCO, an individual;<br><br>                        Plaintiff,<br><br>     vs.<br><br>ÖSSUR AMERICAS, INC., a California<br>corporation; ÖSSUR hf, an Icelandic company;<br>and DOES 1 through 20, inclusive,<br><br>                       Defendants. | Case No. 30-2021-01202543-CU-BC-CJC<br><br>ASSIGNED TO: JUDGE WILLIAM CLASTER,<br>CX-104<br><br>STIPULATION FOR STAY OF ACTION<br>AND ORDER THEREON |

## RECITALS

1.     Defendants ÖSSUR AMERICAS, INC. and ÖSSUR hf (collectively "Defendants") filed a demurrer to the First, Second, Third and Fourth Causes of Action alleged in the First Amended Complaint ("FAC") of Plaintiff WAYNE CALCO ("Plaintiff");

2.     A hearing was held on the demurrer on November 19, 2021 before the Hon. William Claster in Department CX-104 of the above-entitled court. The Court sustained the demurrer to the Second, Third and Fourth Causes of Action on the grounds that they are subject to the exclusive jurisdiction of the federal courts because they claim future royalties under the contract between the parties that arise under patent law. The Court overruled the demurrer to the First Cause of Action even though it also includes a claim for future royalties because the First Cause of Action includes a claim

1  for royalties for the alleged completion of "Gate 2.1" under the contract that does not arise under patent

2  law and a demurrer does not lie to a portion of a cause of action. The Court ruled that it only had

3  jurisdiction to consider the Gate 2.1 claim.

4        3.    The Court granted Plaintiff leave to plead claims that do not arise under patent law.

5  Plaintiff did not file an amended pleading and intends to file an action in federal district court ("the

6  Federal District Court Action") alleging substantially the same claims as are alleged in the Plaintiff's

7  First Amended Complaint in this action.

8        4.    Plaintiff and Defendants wish to stay this action on the terms set forth below pending a

9  determination of whether the federal district court will accept and retain jurisdiction of the Federal

10  District Court Action to be filed by Plaintiff.

11  **STIPULATION**

12      NOW, THEREFORE, Plaintiff and Defendants hereby stipulate as follows:

13        A.    This action shall be stayed in all respects unless and until the Federal District Court

14  Action is dismissed by the federal court for lack of subject matter jurisdiction. Notwithstanding the

15  stay, Plaintiff may dismiss this action at any time.

16        B.    The stay of this action shall terminate and further proceedings shall commence in this

17  action in the event that the Federal District Court Action is dismissed by the federal court for lack

18  subject matter jurisdiction.

19        C.    Plaintiff shall dismiss this action with prejudice within ten (10) court days after the date

20  on which a final judgment is entered on the merits in the Federal District Court Action. The Defendants

21  waive costs of suit incurred herein upon dismissal of this action pursuant to the foregoing provision.

22        D.    The order of the Court on this stipulation shall be subject to modification by the Court

23  upon the application of Plaintiff and/or Defendants pursuant to noticed motion to the extent such

24  modification does not conflict with the provisions of this stipulation.

25  Dated: January ___, 2022           LAW OFFICES OF GEORGE B. PIGGOTT,

26                               A PROFESSIONAL CORPORATION

27

28                       By: _____
                         GEORGE B. PIGGOTT

2
STIPULATION FOR STAY OF ACTION AND ORDER THEREON

Attorney for Plaintiff WAYNE CALCO

Dated: January __, 2022

CALL & JENSEN
A Professional Corporation
Scott R. Hatch
Joshua G. Simon

By:_____
    JOSHUA G. SIMON
    Attorneys for Defendants, ÖSSUR AMERICAS, INC. and
    OSSUR hf

## ORDER

Pursuant to the foregoing Stipulation, and good cause appearing therefor:

**IT IS HEREBY ORDERED AS FOLLOWS:**

1.    This action shall be stayed in all respects unless and until the Federal District Court Action is dismissed by the federal court for lack of subject matter jurisdiction. Notwithstanding the stay, Plaintiff may dismiss this action at any time.

2.    The stay of this action shall terminate and further proceedings shall commence in this action in the event that the Federal District Court Action is dismissed by the federal court for lack of subject matter jurisdiction.

3.    Plaintiff shall dismiss this action with prejudice within ten (10) court days after the date on which a final judgment is entered on the merits in the Federal District Court Action. The Defendants waive costs of suit incurred herein upon dismissal of this action pursuant to the foregoing provision.

4.    This Order shall be subject to modification by the Court upon the application of Plaintiff and/or Defendants pursuant to noticed motion to the extent such modification does not conflict with the provisions of the foregoing stipulation.

5.    The 01/20/2022 Status Conference is continued to July 20, 2022 at 8:30 a.m.

Dated: January 18, 2022

_____
JUDGE OF THE SUPERIOR COURT

3
STIPULATION FOR STAY OF ACTION AND ORDER THEREON

# EXHIBIT 67

An official website of the United States government
Here's how you know ⌄

Back to home

⊠ Pay maintenance fees    🛒 Order certified copies    ◎ Global Dossier    ⬇ Download    🖶 Print

## 15/696,885 | 19793.517: CERVICAL COLLAR  [PUBLIC VIEW]

| Application # | Confirmation # | Attorney Docket # | Patent # |
|---|---|---|---|
| 15/696,885 | 1059 | 19793.517 | 11,452,633 ↗ |
| | | | Download PDF ⬇ |
| | | | Issued - 09/27/2022 |

| Filing or 371 (c) date | Status |
|---|---|
| 09/06/2017 | Patented Case 09/07/2022 |

≡ Show/hide menu

## Documents & transaction history

Documents | Transactions

Showing 1 to 140 of 140 entries

| Mail room date ↑↓ | Doc code ↑↓ | Doc description ↑↓ | Pages ↑↓ | Quick download | File size (KB) | ☐ ⓘ |
|---|---|---|---|---|---|---|
| 09/07/2022 | ISSUE.NTF | Issue Notification | 1 | | 60 | |
| 08/23/2022 | 1449 | List of References cited by applicant and considered by examiner | 1 | | 60 | |
| 08/19/2022 | IFEE | Issue Fee Payment (PTO-85B) | 2 | | 120 | |
| 08/19/2022 | WFEE | Fee Worksheet (SB06) | 2 | | 120 | |
| 08/19/2022 | N417 | Electronic Filing System Acknowledgment Receipt | 2 | | 120 | |
| 05/27/2022 | NOA | Notice of Allowance and Fees Due (PTOL-85) | 15 | | 23 / 33 / 900 | |
| 05/27/2022 | EXIN | Examiner Interview Summary Record (PTOL-413) | 1 | | 60 | |
| 05/27/2022 | 892 | List of references cited by examiner | 1 | | 60 | |
| 05/27/2022 | IIFW | Issue Information including classification, examiner, name, claim, renumbering, etc. | 3 | | 180 | |
| 05/27/2022 | FWCLM | Index of Claims | 1 | | 60 | |
| 05/27/2022 | SRFW | Search information including classification, databases and other search related notes | 2 | | 120 | |
| 05/27/2022 | 1449 | List of References cited by applicant and considered by examiner | 4 | | 240 | |

1/7

| Mail room date | Doc code | Doc description | Pages | Quick download | File size (KB) |
|---|---|---|---|---|---|
| 05/27/2022 | SRNT | Examiner's search strategy and results | 12 | | 720 |
| 05/27/2022 | BIB | Bibliographic Data Sheet | 1 | | 60 |
| 11/23/2021 | EXIN | Examiner Interview Summary Record (PTOL-413) | 3 | | 180 |
| 11/23/2021 | NPL | Non Patent Literature | 7 | | 420 |
| 11/19/2021 | RCEX | Request for Continued Examination (RCE) | 3 | | 180 |
| 11/19/2021 | WFEE | Fee Worksheet (SB06) | 2 | | 120 |
| 11/19/2021 | N417 | Electronic Filing System Acknowledgment Receipt | 2 | | 120 |
| 11/19/2021 | AMSB | Amendment Submitted/Entered with Filing of Continued Prosecution Application (CPA)/Request for Continued Examination(RCE) | 1 | | 60 |
| 11/19/2021 | CLM | Claims | 9 | | 25 / 540 |
| 11/19/2021 | REM | Applicant Arguments/Remarks Made in an Amendment | 10 | | 28 / 600 |
| 11/19/2021 | WFEE | Fee Worksheet (SB06) | 1 | | 60 |
| 09/28/2021 | CTFR | Final Rejection | 43 | | 334 / 281 / 139 / 2580 |
| 09/28/2021 | 892 | List of references cited by examiner | 1 | | 60 |
| 09/28/2021 | FWCLM | Index of Claims | 1 | | 60 |
| 09/28/2021 | SRFW | Search information including classification, databases and other search related notes | 2 | | 120 |
| 09/28/2021 | SRNT | Examiner's search strategy and results | 11 | | 660 |
| 07/21/2021 | EXIN | Examiner Interview Summary Record (PTOL-413) | 2 | | 120 |
| 07/21/2021 | NPL | Non Patent Literature | 7 | | 420 |
| 06/24/2021 | WFEE | Fee Worksheet (SB06) | 1 | | 60 |
| 06/24/2021 | WFEE | Fee Worksheet (SB06) | 2 | | 120 |
| 06/24/2021 | N417 | Electronic Filing System Acknowledgment Receipt | 2 | | 120 |
| 06/24/2021 | XT/ | Extension of Time | 2 | | 120 |
| 06/24/2021 | A... | Amendment/Request for Reconsideration-After Non-Final Rejection | 1 | | 60 |
| 06/24/2021 | CLM | Claims | 9 | | 25 / 540 |
| 06/24/2021 | REM | Applicant Arguments/Remarks Made in an Amendment | 8 | | 26 / 480 |

**-910-**

| Mail room date ↑↓ | Doc code ↑↓ | Doc description ↑↓ | Pages ↑↓ | | Quick download | File size (KB) | ⓘ |
|---|---|---|---|---|---|---|---|
| 03/01/2021 | IDS | Information Disclosure Statement (IDS) Form (SB08) | 4 | | | 25 / 240 | |
| 03/01/2021 | FOR | Foreign Reference | 30 | | | 1800 | |
| 03/01/2021 | FOR | Foreign Reference | 9 | | | 540 | |
| 03/01/2021 | NPL | Non Patent Literature | 18 | | | 1080 | |
| 03/01/2021 | WFEE | Fee Worksheet (SB06) | 2 | | | 120 | |
| 03/01/2021 | N417 | Electronic Filing System Acknowledgment Receipt | 3 | | | 180 | |
| 02/01/2021 | CTNF | Non-Final Rejection | 30 | | | 266 / 223 / 87 / 1800 | |
| 02/01/2021 | 892 | List of references cited by examiner | 1 | | | 60 | |
| 02/01/2021 | FWCLM | Index of Claims | 1 | | | 60 | |
| 02/01/2021 | SRFW | Search information including classification, databases and other search related notes | 2 | | | 120 | |
| 02/01/2021 | SRNT | Examiner's search strategy and results | 9 | | | 540 | |
| 11/24/2020 | SRNT | Examiner's search strategy and results | 2 | | | 120 | |
| 10/14/2020 | SCORE | Placeholder sheet indicating presence of supplemental content in Supplemental Complex Repository for Examiners(SCORE) | 1 | | | 60 | |
| 10/14/2020 | RCEX | Request for Continued Examination (RCE) | 3 | | | 180 | |
| 10/14/2020 | DRW | Drawings-only black and white line drawings | 4 | | | 240 | |
| 10/14/2020 | REM | Applicant Arguments/Remarks Made in an Amendment | 4 | | | 6 / 240 | |
| 10/14/2020 | WFEE | Fee Worksheet (SB06) | 2 | | | 120 | |
| 10/14/2020 | N417 | Electronic Filing System Acknowledgment Receipt | 3 | | | 180 | |
| 10/14/2020 | XT/ | Extension of Time | 2 | | | 120 | |
| 10/14/2020 | AMSB | Amendment Submitted/Entered with Filing of Continued Prosecution Application (CPA)/Request for Continued Examination(RCE) | 2 | | | 120 | |
| 10/14/2020 | SPEC | Specification | 2 | | | 9 / 120 | |
| 10/14/2020 | CLM | Claims | 7 | | | 19 / 420 | |
| 10/14/2020 | REM | Applicant Arguments/Remarks Made in an Amendment | 9 | | | 26 / 540 | |
| 10/14/2020 | WFEE | Fee Worksheet (SB06) | 1 | | | 60 | |

**-911-**

| Mail room date ↑↓ | Doc code ↑↓ | Doc description ↑↓ | Pages ↑↓ | Quick download | File size (KB) ⓘ |
|---|---|---|---|---|---|
| 06/19/2020 | CTFR | Final Rejection | 28 | | 496 / 565 / 89 / 1680 |
| 06/19/2020 | 892 | List of references cited by examiner | 1 | | 60 |
| 06/19/2020 | FWCLM | Index of Claims | 1 | | 60 |
| 06/19/2020 | SRFW | Search information including classification, databases and other search related notes | 2 | | 120 |
| 06/19/2020 | SRNT | Examiner's search strategy and results | 12 | | 720 |
| 05/21/2020 | SRNT | Examiner's search strategy and results | 2 | | 120 |
| 04/15/2020 | N417 | Electronic Filing System Acknowledgment Receipt | 2 | | 120 |
| 04/15/2020 | A... | Amendment/Request for Reconsideration-After Non-Final Rejection | 1 | | 60 |
| 04/15/2020 | CLM | Claims | 7 | | 19 / 420 |
| 04/15/2020 | REM | Applicant Arguments/Remarks Made in an Amendment | 7 | | 16 / 420 |
| 04/15/2020 | WFEE | Fee Worksheet (SB06) | 1 | | 60 |
| 01/15/2020 | CTNF | Non-Final Rejection | 22 | | 481 / 575 / 75 / 1320 |
| 01/15/2020 | 892 | List of references cited by examiner | 1 | | 60 |
| 01/15/2020 | SRFW | Search information including classification, databases and other search related notes | 2 | | 120 |
| 01/15/2020 | FWCLM | Index of Claims | 1 | | 60 |
| 01/15/2020 | SRNT | Examiner's search strategy and results | 9 | | 540 |
| 01/15/2020 | 1449 | List of References cited by applicant and considered by examiner | 5 | | 300 |
| 01/15/2020 | 1449 | List of References cited by applicant and considered by examiner | 25 | | 1500 |
| 01/15/2020 | BIB | Bibliographic Data Sheet | 1 | | 60 |
| 01/15/2020 | 1449 | List of References cited by applicant and considered by examiner | 4 | | 240 |
| 01/15/2020 | 1449 | List of References cited by applicant and considered by examiner | 4 | | 240 |
| 04/12/2019 | IDS | Information Disclosure Statement (IDS) Form (SB08) | 5 | | 38 / 300 |
| 04/12/2019 | N417 | Electronic Filing System Acknowledgment Receipt | 2 | | 120 |
| 07/05/2018 | IDS | Information Disclosure Statement (IDS) Form (SB08) | 4 | | 21 / 240 |

4/7

**-912-**

| Mail room date ↑↓ | Doc code ↑↓ | Doc description ↑↓ | Pages ↑↓ | Quick download | File size (KB) | ⓘ |
|---|---|---|---|---|---|---|
| 07/05/2018 | N417 | Electronic Filing System Acknowledgment Receipt | 2 | | 120 | |
| 03/22/2018 | NTC.PUB | Notice of Publication | 1 | | 60 | |
| 01/09/2018 | IDS | Information Disclosure Statement (IDS) Form (SB08) | 4 | | 20 / 240 | |
| 01/09/2018 | REF.OTHER | Other reference-Patent/Application/Search Documents | 11 | | 660 | |
| 01/09/2018 | N417 | Electronic Filing System Acknowledgment Receipt | 2 | | 120 | |
| 09/15/2017 | WFEE | Fee Worksheet (SB06) | 1 | | 60 | |
| 09/15/2017 | APP.FILE.REC | Filing Receipt | 3 | | 180 | |
| 09/07/2017 | OATH | Oath or Declaration filed | 10 | | 600 | |
| 09/06/2017 | PA.. | Power of Attorney | 2 | | 120 | |
| 09/06/2017 | IDS | Information Disclosure Statement (IDS) Form (SB08) | 25 | | 313 / 1500 | |
| 09/06/2017 | FOR | Foreign Reference | 21 | | 1260 | |
| 09/06/2017 | FOR | Foreign Reference | 23 | | 1380 | |
| 09/06/2017 | FOR | Foreign Reference | 8 | | 480 | |
| 09/06/2017 | FOR | Foreign Reference | 20 | | 1200 | |
| 09/06/2017 | FOR | Foreign Reference | 70 | | 4200 | |
| 09/06/2017 | FOR | Foreign Reference | 27 | | 1620 | |
| 09/06/2017 | FOR | Foreign Reference | 21 | | 1260 | |
| 09/06/2017 | FOR | Foreign Reference | 26 | | 1560 | |
| 09/06/2017 | FOR | Foreign Reference | 28 | | 1680 | |
| 09/06/2017 | FOR | Foreign Reference | 26 | | 1560 | |
| 09/06/2017 | FOR | Foreign Reference | 17 | | 1020 | |
| 09/06/2017 | FOR | Foreign Reference | 21 | | 1260 | |
| 09/06/2017 | FOR | Foreign Reference | 17 | | 1020 | |
| 09/06/2017 | FOR | Foreign Reference | 39 | | 2340 | |
| 09/06/2017 | OATH | Oath or Declaration filed | 8 | | 480 | |
| 09/06/2017 | FOR | Foreign Reference | 7 | | 420 | |
| 09/06/2017 | FOR | Foreign Reference | 12 | | 720 | |
| 09/06/2017 | FOR | Foreign Reference | 21 | | 1260 | |
| 09/06/2017 | FOR | Foreign Reference | 24 | | 1440 | |
| 09/06/2017 | FOR | Foreign Reference | 28 | | 1680 | |
| 09/06/2017 | FOR | Foreign Reference | 34 | | 2040 | |

| Mail room date ↑↓ | Doc code ↑↓ | Doc description ↑↓ | Pages ↑↓ | Quick download | File size (KB) | ⓘ |
|---|---|---|---|---|---|---|
| 09/06/2017 | FOR | Foreign Reference | 74 | | 4440 | |
| 09/06/2017 | NPL | Non Patent Literature | 6 | | 360 | |
| 09/06/2017 | NPL | Non Patent Literature | 8 | | 480 | |
| 09/06/2017 | NPL | Non Patent Literature | 1 | | 60 | |
| 09/06/2017 | NPL | Non Patent Literature | 2 | | 120 | |
| 09/06/2017 | NPL | Non Patent Literature | 7 | | 420 | |
| 09/06/2017 | NPL | Non Patent Literature | 16 | | 960 | |
| 09/06/2017 | NPL | Non Patent Literature | 1 | | 60 | |
| 09/06/2017 | NPL | Non Patent Literature | 1 | | 60 | |
| 09/06/2017 | NPL | Non Patent Literature | 7 | | 420 | |
| 09/06/2017 | NPL | Non Patent Literature | 2 | | 120 | |
| 09/06/2017 | NPL | Non Patent Literature | 4 | | 240 | |
| 09/06/2017 | NPL | Non Patent Literature | 16 | | 960 | |
| 09/06/2017 | NPL | Non Patent Literature | 1 | | 60 | |
| 09/06/2017 | NPL | Non Patent Literature | 1 | | 60 | |
| 09/06/2017 | NPL | Non Patent Literature | 6 | | 360 | |
| 09/06/2017 | NPL | Non Patent Literature | 2 | | 120 | |
| 09/06/2017 | ADS | Application Data Sheet | 9 | | 540 | |
| 09/06/2017 | WFEE | Fee Worksheet (SB06) | 2 | | 120 | |
| 09/06/2017 | N417 | Electronic Filing System Acknowledgment Receipt | 8 | | 480 | |
| 09/06/2017 | SPEC | Specification | 29 | | 190 / 1740 | |
| 09/06/2017 | CLM | Claims | 5 | | 13 / 300 | |
| 09/06/2017 | ABST | Abstract | 1 | | 2 / 60 | |
| 09/06/2017 | DRW | Drawings-only black and white line drawings | 18 | | 1080 | |

Show 1,000 entries

First  Previous  1  Next  Last

### Receive updates from the USPTO

Enter your email to subscribe or update your preferences

your@email.com          Subscribe

About the USPTO  ·  Search for patents  ·  Search for trademarks

US Department of Commerce
Accessibility
Privacy Policy
Financial and Performance Data

6/7

Vulnerability Disclosure Policy

Freedom of Information Act

Inspector General

NoFEAR Act

USA.gov

Follow us

-915-

# EXHIBIT 68

 UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

## NOTICE OF ALLOWANCE AND FEE(S) DUE

22913      7590      05/27/2022
Workman Nydegger
60 East South Temple
Suite 1000
Salt Lake City, UT 84111

| EXAMINER |
| --- |
| HAN, ROBIN |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 3786 | |

DATE MAILED: 05/27/2022

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 15/696,885 | 09/06/2017 | Henry HSU | 19793.517 | 1059 |

TITLE OF INVENTION: CERVICAL COLLAR

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | UNDISCOUNTED | $1200 | $0.00 | $0.00 | $1200 | 08/29/2022 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

By mail, send to:    Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

By fax, send to:    (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

22913          7590          05/27/2022
Workman Nydegger
60 East South Temple
Suite 1000
Salt Lake City, UT 84111

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

_____ (Typed or printed name)
_____ (Signature)
_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/696,885 | 09/06/2017 | Henry HSU | 19793.517 | 1059 |

TITLE OF INVENTION: CERVICAL COLLAR

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1200 | $0.00 | $0.00 | $1200 | 08/29/2022 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| HAN, ROBIN | 3786 | 602-018000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/AIA/122 or PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/AIA/47 or PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____
2 _____
3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted:    ☐ Issue Fee    ☐ Publication Fee (if required)    ☐ Advance Order - # of Copies _____

4b. Method of Payment: (Please first reapply any previously paid fee shown above)

☐ Electronic Payment via EFS-Web    ☐ Enclosed check    ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____    Date _____

Typed or printed name _____    Registration No. _____

Page 2 of 3
PTOL-85 Part B (08-18) Approved for use through 01/31/2020    OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE



# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/696,885 | 09/06/2017 | Henry HSU | 19793.517 | 1059 |

| | | | EXAMINER | |
|---|---|---|---|---|
| 22913    7590    05/27/2022 | | | HAN, ROBIN | |

Workman Nydegger
60 East South Temple
Suite 1000
Salt Lake City, UT 84111

| ART UNIT | PAPER NUMBER |
|---|---|
| 3786 | |

DATE MAILED: 05/27/2022

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b) (2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:
1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No. 15/696,885 | Applicant(s) HSU et al. |
|---|---|---|
| | Examiner ROBIN HAN | Art Unit 3786 | AIA (FITF) Status Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to <u>11/19/2021</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are <u>21-32</u>. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
     a) ☐ All   b) ☐ Some*   c) ☐ None of the:
       1. ☐ Certified copies of the priority documents have been received.
       2. ☐ Certified copies of the priority documents have been received in Application No. _____.
       3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

     * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of
     Paper No./Mail Date _____.
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☑ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____.
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____.
4. ☑ Interview Summary (PTO-413), Paper No./Mail Date. _____.

5. ☑ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____.

| /ROBIN HAN/ Examiner, Art Unit 3786 | /ERIN DEERY/ Primary Examiner, Art Unit 3754 |
|---|---|

U.S. Patent and Trademark Office
PTOL-37 (Rev. 08-13)        **Notice of Allowability**        Part of Paper No./Mail Date 20220518

Application/Control Number: 15/696,885                                    Page 2
Art Unit: 3786

*Notice of Pre-AIA or AIA Status*

1.      The present application, filed on or after March 16, 2013, is being examined under the

first inventor to file provisions of the AIA.

**EXAMINER'S AMENDMENT**

2.      An examiner's amendment to the record appears below. Should the changes and/or

additions be unacceptable to applicant, an amendment may be filed as provided by 37 CFR

1.312. To ensure consideration of such an amendment, it MUST be submitted no later than the

payment of the issue fee.

3.      Authorization for this examiner's amendment was given in an interview with Justin

Cassell on 05/18/2022.

4.      The application has been amended as follows:

5.      Claim 21. (Currently Amended) A cervical collar having an anterior component and a

posterior component securable to the anterior component with at least one strap, the anterior

component defining a central axis, the anterior component forming a frontal opening, and the

anterior component comprising:

a main support defining first and second frontal projections extending over a top segment of

the frontal opening, the first and second frontal projections extend laterally and anteriorly

toward the central axis such that the first and second frontal projections are arranged to jut

horizontally and ~~generally~~ parallel to a user's mandible, the first and second frontal projections

being arranged to receive the at least one strap and having a rigid construction so the first and

second frontal projections do not yield or bend when the at least one strap is secured thereto,

the main support defining a lower portion extending continuously and obliquely downwardly

Application/Control Number: 15/696,885                                          Page 3
Art Unit: 3786

from and between the first and second frontal projections relative to and along the central axis,

the lower portion having an inner periphery forming an entirety of a segment of the frontal

opening below the first and second frontal projections and commencing at first and second

recessed portions along the inner periphery and extending posteriorly by being formed by the

first and second frontal projections, the main support further forming first and second flanks

extending from the first and second frontal projections ~~generally~~ perpendicularly relative to and

laterally away from the central axis toward the posterior component;

an intermediate support defining a front portion centered about and having opposed sides

extending ~~generally~~ perpendicularly from the central axis toward the posterior component, the

front portion having an inner periphery joining with an inner periphery of the first and second

frontal projections to enclose the frontal opening with the lower portion of the main support by

extending between the first and second frontal projections over the frontal opening, the

intermediate support forming first and second flanks extending ~~generally~~ perpendicularly to

and away from the central axis from the opposed sides of the front portion along an inner

surface of the first and second flanks of the main support, each of the first and second flanks of

the intermediate support having first end portions at locations remote from the central axis and

pivotally attached to first end portions of the first and second flanks of the main support at first

and second pivot points, respectively, remote from the central axis;

wherein the intermediate support defines first and second slots proximate the first and second

frontal projections of the main support on the opposed sides of the front portion of the

intermediate support, respectively, the main support defines first and second slots at second

end portions of the first and second flanks adjacent the first and second frontal projections and

Application/Control Number: 15/696,885                                      Page 4
Art Unit: 3786

proximate to the central axis, respectively, the first and second slots of the intermediate

support extending in a first direction relative to the central axis, and the first and second slots

of the main support extending in a second direction relative to the central axis different from

the first direction;

an adjustment mechanism including first and second traction elements each having a first end

portion forming a boss coupling to and extending through the first and second slots of the main

support and intermediate support, respectively, and defining first and second sliding

connections, the first and second traction elements each having a second end portion

extending downwardly from the first end portion and relative to the central axis,

the second end portion of the first and second traction elements forming a series of teeth, the

adjustment mechanism further defining a lock element having upper and lower portions each

of which forms a series of teeth for engaging the series of teeth of the first and second traction

elements, the lock element having an actuator located along the central axis and protruding

through an opening formed by the lower portion of the main support, wherein the lock element

is monolithic;

a connector defining an opening for receiving the actuator, and curved channels for receiving

first and second arms and through which the first and second traction elements are guided and

slidingly engage the upper and lower portions of the lock element, respectively, the connector

also defining peripheral surfaces to the curved channels to direct the first and second traction

elements upwardly toward the first and second slots, the connector being monolithic and

located within the main support and forming a cavity into which the lock element is located;

Application/Control Number: 15/696,885                                    Page 5
Art Unit: 3786

wherein the lock element forms the first and second arms having first and second end portions

and extending curvingly away from opposed first and second sides from a center section of the

lock element toward a rear portion of the connector such that the first and second end portions

of the first and second arms, respectively, bias against the rear portion of the connector and

the center section of the lock element biasing a front portion of the connector, and

wherein the lock element is movable in a first direction toward the rear portion of the

connector under a spring bias to disengage the series of teeth of the upper and lower portions

of the lock element from the series of teeth of the first and second traction elements,

respectively, thereby enabling the intermediate portion to pivot at the first and second pivot

points relative to the main support;

wherein upon release of the actuator, the lock element engages the first and second traction

elements and the actuator is urged to the second direction toward the front portion of the

connector opposite the first direction thereby preventing pivoting of the intermediate support

relative to the main support.

6.      Claim 31. (Currently Amended) A cervical collar having an anterior component and a

posterior component securable to the anterior component with at least one strap, the anterior

component defining a central axis, the anterior component forming a frontal opening, and the

anterior component comprising:

a main support defining first and second frontal projections extending over a top segment of

the frontal opening, the first and second frontal projections extend laterally and anteriorly

toward the central axis such that the first and second frontal projections are arranged to jut

horizontally and ~~generally~~ parallel to a user's mandible, the first and second frontal projections

Application/Control Number: 15/696,885                                      Page 6
Art Unit: 3786

being arranged to receive the at least one strap and having a rigid construction so the first and

second frontal projections do not yield or bend when the at least one strap is secured thereto,

the main support defining a lower portion extending continuously and obliquely downwardly

from and between the first and second frontal projections relative to and along the central axis,

the lower portion having an inner periphery forming an entirety of a segment of the frontal

opening below the first and second frontal projections and commencing at first and second

recessed portions along the inner periphery and extending posteriorly by being formed by the

first and second frontal projections, the main support further forming first and second flanks

extending from the first and second frontal projections ~~generally~~ perpendicularly relative to and

laterally away from the central axis toward the posterior component;

an intermediate support defining a front portion centered about and having opposed sides

extending ~~generally~~ perpendicularly from the central axis toward the posterior component, the

front portion having an inner periphery joining with an inner periphery of the first and second

frontal projections to enclose the frontal opening with the lower portion of the main support by

extending between the first and second frontal projections over the frontal opening, the

intermediate support forming first and second flanks extending ~~generally~~ perpendicularly to

and away from the central axis from the opposed sides of the front portion along an inner

surface of the first and second flanks of the main support, each of the first and second flanks of

the intermediate support having first end portions at locations remote from the central axis and

pivotally attached to first end portions of the first and second flanks of the main support at first

and second pivot points, respectively, remote from the central axis;

Application/Control Number: 15/696,885                                    Page 7
Art Unit: 3786

wherein the intermediate support defines first and second slots proximate the first and second

frontal projections of the main support on the opposed sides of the front portion of the

intermediate support, the main support defines first and second slots at second end portions of

the first and second flanks adjacent the first and second frontal projections and proximate to

the central axis, the first and second slots of the intermediate support extending in a first

direction relative to the central axis, and the first and second slots of the main support

extending in a second direction relative to the central axis different from the first direction;

an upper support carried by the intermediate support and abutting an outer periphery of the

intermediate support opposite an inner periphery of the intermediate support so as to adjust

therewith relative to the main support, the upper support being located above the inner

periphery of the intermediate support and connected centrally to the intermediate support

along the central axis of the anterior component; wherein the intermediate support defines a

central tab extending outwardly away from the outer periphery of the intermediate support

along the central axis upon which a center portion of the upper support is suspended relative to

the intermediate support at said central tab;

a connector defining an opening for receiving an actuator, and curved channels for receiving

first and second arms and through which first and second traction elements are guided and

slidingly engage upper and lower portions of a lock element, respectively, the connector also

defining peripheral surfaces to the curved channels to direct the first and second traction

elements upwardly toward the first and second slots, the connector being monolithic and

located within the main support and forming a cavity into which the lock element is located;

wherein each of the upper and lower portions of the lock element forms a series of teeth;

Application/Control Number: 15/696,885                                    Page 8
Art Unit: 3786

wherein the first traction element forms a series of teeth along a lower end portion to slidingly

engage the upper portion of the lock element and the second traction element forms a series of

teeth along an upper end portion to slidingly engage the lower portion of the lock element;

wherein the lock element is monolithic and forms the first and second arms having first and

second end portions and extending curvingly away from opposed first and second sides from a

center section of the lock element toward a rear portion of the connector such that the first

and second end portions of the first and second arms, respectively, bias against the rear portion

of the connector and the center section of the lock element biasing a front portion of the

connector;

wherein the lock element is movable in a first direction toward the rear portion of the

connector under a spring bias to disengage the series of teeth of the upper and lower portions

of the lock element from the series of teeth of the first and second traction elements,

respectively, thereby enabling the intermediate portion to pivot at the first and second pivot

points relative to the main support;

wherein upon release of the actuator, the lock element engages the first and second traction

elements and the actuator is urged to the second direction toward the front portion of the

connector opposite the first direction thereby preventing pivoting of the intermediate support

relative to the main support.

***Allowable Subject Matter***

7.        Claims 21-32 are allowed.

Application/Control Number: 15/696,885                                    Page 9
Art Unit: 3786

**REASONS FOR ALLOWANCE**

8.      The following is an examiner's statement of reasons for allowance: The closest prior art

drawn to Modglin (US 2014/0107551 A1) (referred to as Modglin '551) in view of

THORSTEINSDOTTIR (2013/0310722 A1) further in view of Modglin (US 2013/0060179 A1)

(referred to as Modglin '179) fails to show or make obvious the claimed combinations of

elements particularly the limitations set forth in independent claims 21 and 31, and its

dependent claims 22-30 and 32 which recite features not taught or suggested by the prior art

drawn to Modglin '551 in view of THORSTEINSDOTTIR further in view of Modglin '179.

9.      Modglin '551 in view of THORSTEINSDOTTIR further in view of Modglin '179 fails to

disclose or fairly suggest wherein the lock element is monolithic; a connector defining curved

channels for receiving first and second arms and through which the first and second traction

elements are guided and slidingly engage the upper and lower portions of the lock element,

respectively, the connector also defining peripheral surfaces to the curved channels to direct

the first and second traction elements upwardly toward the first and second slots, wherein the

lock element forms the first and second arms having first and second end portions and

extending curvingly away from opposed first and second sides from a center section of the lock

element, in combination with the other elements of the apparatus recited in the claims.

10.     Accordingly, a prima facie case of obviousness or an anticipation rejection cannot be

established with respect to the claimed subject matter as set forth in claims 21 and 31.

11.     Claims 22-30 and 32 are allowed insofar as they depend from the allowed base claims

21 and 31.

Application/Control Number: 15/696,885                                      Page 10
Art Unit: 3786

Any comments considered necessary by applicant must be submitted no later than the

payment of the issue fee and, to avoid processing delays, should preferably accompany the

issue fee.  Such submissions should be clearly labeled "Comments on Statement of Reasons for

Allowance."

### *Conclusion*

12.     Any inquiry concerning this communication or earlier communications from the

examiner should be directed to ROBIN HAN whose telephone number is (408)918-7579. The

examiner can normally be reached Monday - Thursday, 7-5 PM PST.

Examiner interviews are available via telephone, in-person, and video conferencing

using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is

encouraged to use the USPTO Automated Interview Request (AIR) at

http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Alireza Nia can be reached on (571)270-3076. The fax phone number for the

organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be

obtained from Patent Center. Unpublished application information in Patent Center is available

to registered users. To file and manage patent submissions in Patent Center, visit:

https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-center for

more information about Patent Center and https://www.uspto.gov/patents/docx for

information about filing in DOCX format. For additional questions, contact the Electronic

Application/Control Number: 15/696,885                                    Page 11
Art Unit: 3786

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO

Customer Service Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/ROBIN HAN/
Examiner, Art Unit 3786

/ERIN DEERY/
Primary Examiner, Art Unit 3754

# EXHIBIT 69

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | | |
|---|---|---|---|
| 22913     7590 | 06/24/2022 | | |

Workman Nydegger
60 East South Temple
Suite 1000
Salt Lake City, UT 84111

| EXAMINER |
|---|
| HAWTHORNE, OPHELIA ALTHEA |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3786 | |

DATE MAILED: 06/24/2022

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/686,582 | 11/18/2019 | Wayne CALCO | 19793.488.1.1 | 4587 |

TITLE OF INVENTION: CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1200 | $0.00 | $0.00 | $1200 | 09/26/2022 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

By mail, send to:  Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

By fax, send to:    (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

22913        7590        06/24/2022
Workman Nydegger
60 East South Temple
Suite 1000
Salt Lake City, UT 84111

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

_____ (Typed or printed name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/686,582 | 11/18/2019 | Wayne CALCO | 19793.488.1.1 | 4587 |

TITLE OF INVENTION: CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1200 | $0.00 | $0.00 | $1200 | 09/26/2022 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| HAWTHORNE, OPHELIA ALTHEA | 3786 | 602-018000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

❏ Change of correspondence address (or Change of Correspondence Address form PTO/AIA/122 or PTO/SB/122) attached.

❏ "Fee Address" indication (or "Fee Address" Indication form PTO/AIA/47 or PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ❏ Individual ❏ Corporation or other private group entity ❏ Government

4a. Fees submitted:  ❏ Issue Fee   ❏ Publication Fee (if required)   ❏ Advance Order - # of Copies _____

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

❏ Electronic Payment via EFS-Web    ❏ Enclosed check    ❏ Non-electronic payment by credit card (Attach form PTO-2038)

❏ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

5. **Change in Entity Status** (from status indicated above)

❏ Applicant certifying micro entity status. See 37 CFR 1.29

❏ Applicant asserting small entity status. See 37 CFR 1.27

❏ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____    Date _____

Typed or printed name _____    Registration No. _____

PTOL-85 Part B (08-18) Approved for use through 01/31/2020    OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/686,582 | 11/18/2019 | Wayne CALCO | 19793.488.1.1 | 4587 |

22913    7590    06/24/2022
Workman Nydegger
60 East South Temple
Suite 1000
Salt Lake City, UT 84111

| EXAMINER |
|---|
| HAWTHORNE, OPHELIA ALTHEA |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3786 | |

DATE MAILED: 06/24/2022

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

Page 3 of 3

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b) (2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No.<br>16/686,582 | Applicant(s)<br>CALCO et al. | |
|---|---|---|---|
| | Examiner<br>OPHELIA A HAWTHORNE | Art Unit<br>3786 | AIA (FITF) Status<br>Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to <u>Amendment/Request for Reconsideration-After Non-Final Rejection filed 05/20/2022</u>.
   - ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are <u>1-7,9-12 and 14-17</u> . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information , please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All      b) ☐ Some*      c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: _____.

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
   **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   - ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

   **Identifying indicia** such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____.
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____.
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____.
5. ☑ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____.

/OPHELIA A HAWTHORNE/
Primary Examiner, Art Unit 3786

Application/Control Number: 16/686,582                                    Page 2
Art Unit: 3786

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

The present application, filed on or after March 16, 2013, is being examined under the

first inventor to file provisions of the AIA.

### *Allowable Subject Matter*

1.       Claims 1-7, 9-12 and 14-17 are allowed.

### *Reasons for Allowance*

The following is an examiner's statement of reasons for allowance: Applicant's

arguments, see pages 1-3, filed 05/20/2022, with respect to the rejection(s) of claim(s) 1-2, 4-7,

9-12 and 16-17 under 35 U.S.C. 102 and claims 3, 8 and 19-20 under 35 U.S.C. 103 have been

fully considered and are persuasive. Therefore, the rejection has been withdrawn and the claims

are allowed for the reasons as set forth in Non-final rejection mailed on 02/17/2022 and in

addition to Applicant's arguments filed 05/20/2022. Accordingly, a prima facie case of

obviousness rejection cannot be established with respect to the claimed subject matter as set forth

in claims 1-7, 9-12 and 14-17.

Any comments considered necessary by applicant must be submitted no later than the

payment of the issue fee and, to avoid processing delays, should preferably accompany the issue

fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for

Allowance."

Application/Control Number: 16/686,582                                    Page 3
Art Unit: 3786

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to OPHELIA ALTHEA HAWTHORNE whose telephone number is

(571)270-3860. The examiner can normally be reached M-F 8:00 AM-5:00 PM, EST.

Examiner interviews are available via telephone, in-person, and video conferencing using

a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is

encouraged to use the USPTO Automated Interview Request (AIR) at

http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Alireza Nia can be reached on 5712703076. The fax phone number for the

organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be

obtained from Patent Center. Unpublished application information in Patent Center is available

to registered users. To file and manage patent submissions in Patent Center, visit:

https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-center for more

information about Patent Center and https://www.uspto.gov/patents/docx for information about

filing in DOCX format. For additional questions, contact the Electronic Business Center (EBC)

at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service

Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/OPHELIA A HAWTHORNE/
Primary Examiner, Art Unit 3786

# EXHIBIT 70

Electronically Filed by Superior Court of California, County of Orange, 10/26/2022 11:33:00 AM.
30-2021-01202543-CU-BC-CXC - ROA # 134 - DAVID H. YAMASAKI, Clerk of the Court By E. efilinguser, Deputy Clerk.

1   GEORGE B. PIGGOTT (SBN 68227)
    LAW OFFICES OF GEORGE B. PIGGOTT,
2   A Professional Corporation
    2603 Main Street, Penthouse
3   Irvine, California 92614-6232
    Tel: (949) 261-0500
4   Fax: (949) 261-1085
    Email: george@piggottlaw.com
5

6   Attorney for Plaintiff Wayne Calco

7

8                SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE

9                          CIVIL COMPLEX CENTER

10

11  WAYNE CALCO, an individual;
                                    Plaintiff,   **Case No. 30-2021-01202543-CU-BC-CJC**
12                   vs.

13  ÖSSUR AMERICAS, INC., a California           **ASSIGNED TO: JUDGE WILLIAM CLASTER,**
    corporation; ÖSSUR hf, an Icelandic company;             **CX-104**
14  and DOES 1 through 20, inclusive,

15                                  Defendants.   **PLAINTIFF'S STATUS CONFERENCE**
                                                 **STATEMENT**
16

17

18                                               **Date: October 27, 2022**
                                                 **Time: 8:30 a.m.**
19                                               **Dept.: CX-104**

20

21

22

23

24

25

26

27

28

                                     1
                    PLAINTIFF'S STATUS CONFERENCE STATEMENT

1    Plaintiff, Wayne Calco ("Plaintiff"), submits the following Status Conference Statement:

2    Plaintiff's counsel prepared a joint status conference statement for submittal to the Court and

3  sent it to Defendants' counsel yesterday with a request that Defendants' counsel add a separate section

4  stating Defendants' position. Plaintiff's counsel deferred preparing a joint statement pending the filing

5  of the federal complaint, which Plaintiff intended to report in the joint statement. Defendants' counsel

6  advised Plaintiff's counsel this morning that he was unable to obtain authority from his client on short

7  notice to comply with Plaintiff's request. Plaintiff is therefore filing this separate statement and

8  assumes that Defendants will do the same.

9                                **PLAINTIFF'S STATEMENT**

10    Plaintiff deferred filing his complaint in the United States District Court pending the issuance

11  of two patents that are relevant to his claims. The purpose in doing so was to determine that the

12  prosecution with respect to those patents was complete to ensure that the facts alleged in the complaint

13  were likewise complete. One of those patents issued on September 27, 2022 (US Patent 11/452,633)

14  ("the 633 Patent") and the other patent issued on October 25, 2022 (US Patent 11/478,374) ("the 374

15  Patent"). Until the issuance of those patents, the Defendants could pursue further patent claims by filing

16  continuation applications. Once the patents issued, no continuation applications could be filed. The

17  documents and transaction history for the 633 Patent and the 374 Patent on the U.S. Patent and

18  Trademark Office ("USPTO") website does not reveal any continuation applications being filed for

19  either of those patents. Pending the issuance of the 374 Patent on October 25, 2022, Plaintiff had

20  completed the preparation of his federal complaint for filing when he was alerted that another link on

21  the USPTO website reveals that continuation applications were filed for the 633 Patent and the 374

22  Patent on August 23, 2022 and September 22, 2022, respectively. However, the continuation

23  applications are not publicly available for viewing.

24    Plaintiff's counsel made a request to Defendants' counsel to provide him with copies of the

25  continuation applications. Defendants' counsel refused, stating that there was a process to obtain the

26  information and Plaintiff should use it. Defendant's counsel was presumably referring to formal

27  discovery and/or the Rule 26 disclosures required under Rule 26 of the Federal Rules of Civil

28  Procedure.

2

PLAINTIFF'S STATUS CONFERENCE STATEMENT

1    It should be noted that Plaintiff's counsel emailed and mailed a letter to Defendants' counsel on

2  August 19, 2022 stating, *inter alia*, that unless Defendants conceded that one or more of the claims in

3  the application for the 374 Patent that subsequently issued covered the Sternal-Relief Dial that is the

4  subject of Plaintiff's claims, the Defendants were obligated to pursue additional patent claim coverage

5  for the Sternal Relief Dial by filing a continuation application before issuance of the patent. The letter

6  further stated that the Defendants were in any event obligated to pursue patent claim coverage for the

7  Reproducible Fit option that is also a subject of Plaintiff's claims by filing a continuation application

8  for that coverage. A copy of the August 19, 2022 letter by Plaintiff's counsel is attached hereto as

9  Exhibit 1.

10   In response to the letter attached hereto as Exhibit 1, counsel for the Defendants mailed a letter

11  to Plaintiff's counsel, dated September 30, 2022, a copy of which is attached hereto as Exhibit 2. That

12  letter makes no mention of the continuation applications that were filed on August 23, 2022 and

13  September 22, 2022.

14   Plaintiff is in the process of revising his federal complaint to reflect the most recent events,

15  including the filing of the continuation applications, their unavailability for viewing, and Defendants'

16  refusal to provide copies. Plaintiff requests that the status conference be continued and the stay of this

17  action remain in place pending the filing of Plaintiff's federal complaint and further proceedings in the

18  United States District Court.

19

20  Dated: October 26, 2022          LAW OFFICES OF GEORGE B. PIGGOTT,
                                      A PROFESSIONAL CORPORATION
21

22                                   _____

23                                   By: GEORGE B. PIGGOTT
                                     Attorney for Plaintiff WAYNE CALCO
24

25

26

27

28

**EXHIBIT 1**

LAW OFFICES OF
**GEORGE B. PIGGOTT**
A PROFESSIONAL CORPORATION
2603 MAIN STREET, PENTHOUSE
IRVINE, CALIFORNIA 92614-6232
TELEPHONE (949) 261-0500
FACSIMILE (949) 261-1085
E-MAIL: george@piggottlaw.com

August 19, 2022

Joshua Simon, Esq.                                    Via Email and U.S. Mail
Call & Jensen
610 Newport Center Drive, Suite 700
Newport Beach, CA 92660

Re: Wayne Calco v. Ossur Americas, Inc. and Ossur hf

Dear Joshua:

As you know, Wayne Calco contends that Ossur Americas, Inc. and Ossur hf and their affiliates ("Ossur'") are required to pursue in good faith patent claims for the cervical collar features that are used in Ossur's Miami J Select cervical collar ("Miami JS") that are based on concepts he created. These features include what are referred to in Ossur's online brochure for the Miami JS as the "patented Sternal-Relief Dial" and the "patented Reproducible Fit option." Ossur amended and canceled claims for its continuation application No. 16/686,582 that were allowed as amended by the United States Patent and Trademark Office. The Notice of Allowance and Fee(s) Due was issued on June 24, 2022. Additional claim coverage, including broader claims, can be sought by Ossur, which must be done through a new continuation application for such claims.

Unless Ossur concedes that one or more of the allowed claims cover the Sternal-Relief Dial for the Miami JS, such additional claim coverage must be sought for that feature to ensure that Ossur satisfies its obligations and duties to Mr. Calco. It is also the customary and prudent business practice for product manufacturers such as Ossur to seek such protection for their products. Indeed, Ossur advised Mr. Calco that its practice was to always seek broad claim protection for its products. Pursuing such additional claim coverage is also consistent with the standard of practice applicable to Ossur's patent counsel.

No claims were sought in the continuation application for the feature in the Miami JS that Ossur refers to in its online brochure as the "Reproducible Fit option". Claim coverage can and must be sought by Ossur for the "Reproducible Fit option" used in the Miami JS by means of a new continuation application for such claims, including but not limited to, a claim or claims for a cervical collar that includes both the Sternal-Relief Dial and the Reproducible Fit option.

Joshua Simon, Esq.
Call & Jensen
August 19, 2022
Page 2

     A new continuation application as described above must be filed before the issuance of the patent for continuation application No. 16/686,582. Demand is hereby made that Ossur file such a continuation application and do so prior to the issuance of the patent for application No. 16/686,582. Ossur's failure to do so will constitute a breach of its obligations and duties to Mr. Calco as well as poor business practice and will also fall below the standard of practice applicable to its patent counsel.

     Let me know if you or your clients have any questions.

Very truly yours,

GEORGE B. PIGGOTT

GBP:php

**EXHIBIT 2**



LAWYERS

610 NEWPORT CENTER DRIVE, SUITE 700
NEWPORT BEACH, CALIFORNIA 92660
TELEPHONE: 949.717.3000
FACSIMILE: 949.717.3100

CALLJENSEN.COM

September 30, 2022

OUR FILE NUMBER
OSS02-02

George B. Piggott
Law Offices of George B. Piggott
2603 Main Street, Penthouse
Irvine, CA  92614-6232

      Re:   <u>Wayne Calco v. Ossur Americas, Inc. and Ossur hf</u>

Dear George:

      Thank you for your letter of August 19, 2022, reminding Össur about the ability to obtain additional claim coverage stemming from US patent application 16/686,582.

      When considering a continuation application, Össur considers the subject matter that fits most closely with its commercial aims and the probability of success for patentability. While Össur may seek broad claims, it also must balance the sufficiency of disclosure in the original application to sustain reasonably a set of patentable claims having value to Össur and the associated costs.

                         Very truly yours,

                         Joshua G. Simon
                         For Call & Jensen
                         A Professional Corporation

JGS:cv

LITIGATION  •  REAL ESTATE  •  EMPLOYMENT  •  INTELLECTUAL PROPERTY  •  CLASS ACTIONS

## PROOF OF SERVICE

I am employed in the County of Orange, State of California.  I am over the age of eighteen (18) years and not a party to the within action; my business address is 2603 Main Street, Penthouse, Irvine, California 92614.

On October 26, 2022, I served the foregoing document described as **PLAINTIFF'S STATUS CONFERENCE STATEMENT** to be served on the parties interested in said action, by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

Scott R. Hatch, Esq.
Joshua G. Simon, Esq.
CALL & JENSEN
610 Newport Center Drive, Suite 700
Newport Beach, CA 92660
Email: shatch@calljensen.com
        jsimon@calljensen.com

[  ] **BY MAIL**

I caused [  ] the original [ X ] a true copy of above-described document to be placed in a sealed envelope addressed to the addressee(s) on the attached service list. I am readily familiar with the firm's practice of collecting and processing of the mail.  Under that practice it would be deposited with United States Postal Service on that same day with postage thereon fully prepaid at Irvine, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing affidavit.

[ X ] **BY ELECTRONIC SERVICE**

I caused the above-described document to be served electronically to the email address of the addressee(s) on the attached service list.

[X] STATE    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on October 26, 2022, at Irvine, California.

/s/ George B. Piggott

# EXHIBIT 71

PDAC Updates – Impacted Prosthetics Products VIEW HERE

                                       🔍

# Miami J® Select

Spine / Miami J® Select







CALCO 002735

12/13/21, 10:18 AM                          Miami J® Select Cervical Collar | Ossur.com

The Miami J Select cervical collar by Össur offers the widest range of height
adjustability in the market with a single, universal design that replicates the comfort,

immobilization and quality you expect from a Miami J product. Featuring a patented,
first-to-market locking mechanism to encourage patient compliance and anti-
microbial Sorbatex padding, Miami J Select is designed to support successful patient
outcomes.

REQUEST MORE INFORMATION

Overview        Specification        Support        Downloads

# Comfort to Compliance

Adjustability, comfort, and compliance from the brand you trust. Perfected with continuous
input from trauma managers & practitioners and decades of experience in design, the Miami
J Select offers a universal cervical collar that doesn't compromise immobilization or comfort.

                    

 **High Comfort, Low**        **Immobilization**

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select                    2/15

CALCO 002736

12/13/21, 10:18 AM                          Miami J® Select Cervical Collar | Ossur.com

## Pressure

Replicating the clinically proven comfort
and low tissue interface pressure of the
Miami J†

Tamper-resistance and proven 3-plane
immobilization†



## Cost-Savings

Sorbatex, with 3X the durability, outlasts
other padding†



CALCO 002737

Miami J® Select Cervical Collar | Ossur.com

**Blue is You ™ – intuitive blue Patient Touch Points and multi-colored Sorbatex padding – send patients home with confidence.**



https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select    4/15

CALCO 002738

# 7 precise fitting sizes with opportunity to fine-tune.



CALCO 002739

**One-piece, anatomically inspired collar back with Flex Edge ® designed to reduce occipital pressure.**

ta on file at Össur

CALCO 002740

# Features That Work

01:43



CALCO 002741

12/13/21, 10:18 AM                          Miami J® Select Cervical Collar | Ossur.com

# Miami J Select Competency Course

The Miami J Select Competency Course is available to healthcare professionals 24/7.
Instruction includes sizing, adjustability, locking the height in place, fitting, adjustments,
cleaning, and skin care. Accessory products such as the Occian Back and the JTO are also
included.



https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select                          8/15

CALCO 002742

Login to start course

# More Össur Spinal Solutions

Explore neck and back support technologies that you can trust including the Miami J®, Miami Jr® pediatric solutions, and the Miami LSO™ & Miami TLSO™.

CALCO 002743

Explore ›

# Specification

## Specification                                            ⌄

### Product description

The Miami J Select cervical collar by Össur offers the widest range of height adjustability in the market with a single, universal design that replicates the comfort, immobilization and quality you expect from a Miami J product

Featuring a patented, first-to-market locking mechanism to encourage patient compliance and anti-microbial Sorbatex padding, Miami J Select is designed to support successful patient outcomes

### Key features

- Easy height adjustability with a tamper-proof locking mechanism – 'Left to Lock'.

 Anti-microbial & biocompatible Sorbatex™ padding prevents bacterial build-up.

CALCO 002744

- Universal design that doesn't compromise immobilization or comfort.

- 7 precise fitting sizes with opportunity to fine-tune.

- Miami J® inspired chin tray.

- One-piece, anatomically inspired collar back with Flex Edge® designed to reduce occipital pressure.

- Easy to don and doff with patented Reproducible Fit option.

- Intuitive blue Patient Touch-Points to send patients home with confidence – Blue is You™.

- Simplified comfort adjustments with integrated and patented Sternal-Relief Dial.

- Large tracheal opening – improved function for ICU patients.

- Easy to clean and replace multi-colored padding.

- X-ray and CT lucent, MR-safe.

- Compatible with Occian™ Back & Miami JTO® accessories.

## Indications

Conditions requiring gross immobilization of the cervical spine

This may include: – C-Spine precaution for trauma patients – Immobilization for pre and post c-spine surgery

## General information        Available sizes

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select

11/15

CALCO 002745

Universal

# Support

## Videos

01:05



CALCO 002746

**USER INSTRUCTIONS**          **CLINICIAN FITTING INSTRUCTIONS**

# Downloads

## Downloads

📄 Miami J Select

📄 Miami J Select

📄 Miami J Select

Explore More Documents

# Discover more bracing & supports products

 SPINE

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select

13/15

CALCO 002747

**Miami LSO™**



CALCO 002748

**COMPANY**

About Össur

News

Careers at Össur

Compliance

Company Background

**SUPPORT**

Customer Service

Event Calendar

Contact Us

Resource Center

Find a Bracing Practitioner

Find Upper Limb Practitioner

**COMMUNITY**

Team Össur

Ambassadors

Philanthropic Partnerships

Life Without Limitations

Join the #ÖssurFamily

Subscribe ↗



**FOLLOW US**

Facebook ↗

CALCO 002749

# EXHIBIT 72

# Miami J® Select



The Miami J Select cervical collar by Össur offers the widest range of height adjustability in the market with a single, universal design that replicates the comfort, immobilization and quality you expect from a Miami J product. Featuring a patented, first-to-market locking mechanism to encourage patient compliance and anti-microbial Sorbatex padding, Miami J Select is designed to support successful patient outcomes.



CALCO 002759

REQUEST MORE INFORMATION

# Comfort to Compliance

Adjustability, comfort, and compliance from the brand you trust. Perfected with continuous input from trauma managers & practitioners and decades of experience in design, the Miami J Select offers a universal cervical collar that doesn't compromise immobilization or comfort.







### High Comfort, Low Pressure

Replicating the clinically proven comfort and low tissue interface pressure of the Miami J†

### Immobilization

Tamper-resistance and proven 3-plane immobilization†

### Cost-Savings

Sorbatex, with 3X the durability, outlasts other padding†



https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select/#specificationContentAnchor

2/10

CALCO 002760



8/11/23, 2:05 PM                    Miami J® Select Cervical Collar | Ossur.com

**Blue is You ™ – intuitive blue Patient Touch Points and multi-colored Sorbatex padding – send patients home with confidence.**



https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select#specificationContentAnchor                3/10

CALCO 002761



**7 precise fitting sizes with opportunity to fine-tune.**



CALCO 002762

**One-piece, anatomically inspired collar back with Flex Edge ® designed to reduce occipital pressure.**

*† Data on file at Össur*

**Features That Work**

OtxB

ÖSSUR.

Overview    Specification    Support    Downloads

CALCO 002763



## Miami J Select Competency Course

The Miami J Select Competency Course is available to healthcare professionals 24/7. Instruction includes sizing, adjustability, locking the height in place, fitting, adjustments, cleaning, and skin care. Accessory products such as the Occian Back and the JTO are also included.

Login to start course >




CALCO 002764

8/11/23, 2:05 PM    Miami J® Select Cervical Collar | Ossur.com



## More Össur Spinal Solutions

Explore neck and back support technologies that you can trust including the Miami J®, Miami Jr® pediatric solutions, and the Miami LSO™ & Miami TLSO™.

Explore ›

# Specification

∧

⌄ Specification

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select#specificationContentAnchor    7/10

CALCO 002765

**Product description**

The Miami J Select cervical collar by Össur offers the widest range of height adjustability in the market with a single, universal design that replicates the comfort, immobilization and quality you expect from a Miami J product. Featuring a patented, first-to-market locking mechanism to encourage patient compliance and anti-microbial Sorbatex padding, Miami J Select is designed to support successful patient outcomes.

**Key features**

- Easy height adjustability with a tamper-proof locking mechanism – 'Left to Lock'.

- Anti-microbial & biocompatible Sorbatex™ padding prevents bacterial build-up.

- Universal design that doesn't compromise immobilization or comfort.

- 7 precise fitting sizes with opportunity to fine-tune.

- Miami J® inspired chin tray.

- One-piece, anatomically inspired collar back with Flex Edge® designed to reduce occipital pressure.

- Easy to don and doff with patented Reproducible Fit option.

- Intuitive blue Patient Touch-Points to send patients home with confidence – Blue is You™.

- Simplified comfort adjustments with integrated and patented Sternal-Relief Dial.

- Large tracheal opening – improved function for ICU patients.

- Easy to clean and replace multi-colored padding.

- X-ray and CT lucent, MR-safe.

- Compatible with Occian™ Back & Miami JTO® accessories.

**Indications**    Conditions requiring gross immobilization of the cervical spine

This may include: – C-Spine precaution for trauma patients – immobilization for pre and post c-spine surgery

**General information**    Available sizes

Universal

# Support    ^

CALCO 002766

# EXHIBIT 73

# Miami J® Select





The Miami J Select cervical collar by Össur offers the widest range of height adjustability in the market with a single, universal design that replicates the comfort, immobilization and quality you expect from a Miami J product. Featuring a proprietary, first-to-market locking mechanism to encourage patient compliance and anti-microbial Sorbatex padding, Miami J Select is designed to support successful p    outcomes.



https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select#specificationContentAnchor

Miami J® Select Cervical Collar | Ossur.com

REQUEST MORE INFORMATION

# Comfort to Compliance

Adjustability, comfort, and compliance from the brand you trust. Perfected with continuous input from trauma managers & practitioners and decades of experience in design, the Miami J Select offers a universal cervical collar that doesn't compromise immobilization or comfort.







### High Comfort, Low Pressure

Replicating the clinically proven comfort and low tissue interface pressure of the Miami J†

### Immobilization

Tamper-resistance and proven 3-plane immobilization†

### Cost-Savings

Sorbatex, with 3X the durability, outlasts other padding†

11/28/23, 11:26 PM                     Miami J® Select Cervical Collar | Ossur.com



**Blue is You** ™ – **intuitive blue Patient Touch Points and multi-colored Sorbatex padding – send patients home with confidence.**

11/28/23, 11:26 PM
Miami J® Select Cervical Collar | Ossur.com



**7 precise fitting sizes with opportunity to fine-tune.**

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select#specificationContentAnchor

4/12

Miami J® Select Cervical Collar | Ossur.com



**One-piece, anatomically inspired collar back with Flex Edge ® designed to reduce occipital pressure.**

*† Data on file at Össur*

Miami J® Select Cervical Collar | Ossur.com

## Features That Work

01x43

11/28/23, 11:28 PM                                    Miami J® Select Cervical Collar | Ossur.com



## Miami J Select Competency Course

The Miami J Select Competency Course is available to healthcare professionals 24/7. Instruction includes sizing, adjustability, locking the height in place, fitting, adjustments, cleaning, and skin care. Accessory products such as the Occian Back and the JTO are also included.

Login to start course >

11/28/23, 11:28 PM
Miami J® Select Cervical Collar | Ossur.com



## More Össur Spinal Solutions

Explore neck and back support technologies that you can trust including the Miami J®, Miami Jr® pediatric solutions, and the Miami LSO™ & Miami TLSO™.

Explore >

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select/#specificationContentAnchor

8/12

11/28/23, 11:28 PM                                Miami J® Select Cervical Collar | Ossur.com

# Specification

## ˅ Specification

### Product description

The Miami J Select cervical collar by Össur offers the widest range of height adjustability in the market with a single, universal design that replicates the comfort, immobilization and quality you expect from a Miami J product. Featuring a proprietary, first-to-market locking mechanism to encourage patient compliance and anti-microbial Sorbatex padding, Miami J Select is designed to support successful patient outcomes.

### Key features

- Easy height adjustability with a tamper-proof locking mechanism – 'Left to Lock'.
- Anti-microbial & biocompatible Sorbatex padding prevents bacterial build-up.
- Universal design that doesn't compromise immobilization or comfort.
- 7 precise fitting sizes with opportunity to fine-tune.
- Miami J® inspired chin tray.
- One-piece, anatomically inspired collar back with Flex Edge® designed to reduce occipital pressure.
- Easy to don and doff with proprietary Reproducible Fit option.
- Intuitive blue Patient Touch-Points to send patients home with confidence – Blue is You™.
- Simplified comfort adjustments with integrated and proprietary Sternal-Relief Dial.
- Large tracheal opening – Improved function for ICU patients.
- Easy to clean and replace multi-colored padding.
- X-ray and CT lucent, MR-safe.
- Compatible with Occian™ Back & Miami JTO® accessories.

### Indications

Conditions requiring gross immobilization of the cervical spine

This may include: – C-Spine precaution for trauma patients – Immobilization for pre and post c-spine surgery

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-l-select#specificationContentAnchor

11/28/23, 11:28 PM

**General information**

**Available sizes**

Universal

Miami J® Select Cervical Collar | Ossur.com

# Support

0:06 / 14.28



**CLINICIAN FITTING TUTORIAL**



**TROUBLESHOOTING TIPS**

**USER FITTI**

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select#specificationContentAnchor

10/12

# Downloads

## Downloads

📄 Miami J Select                                              Instructions
                                                                 for use
📄 Miami J Select Catalog Page                                   Catalog
📄 Miami J Select                                               User Guide

Explore More Documents

## Discover more bracing & supports products

SPINE

11/28/23, 11:26 PM

Miami J® Select Cervical Collar | Ossur.com




**COMPANY**
About Össur
News
Careers at Össur
Compliance
Company Background

**SUPPORT**
Customer Service
Event Calendar
Contact Us
Resource Center
Find an Unloader Clinician
Find Upper Limb Practitioner
Upper Limb Training
Product Expected Lifetime

**COMMUNITY**
Team Össur
Ambassadors
Philanthropic Partnerships
Life Without Limitations
Join the #ÖssurFamily
Subscribe

**FOLLOW US**
Facebook
Instagram
LinkedIn
Twitter
Youtube

Privacy Policy

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select#specificationContentAnchor          12/12

**-987-**

# EXHIBIT 74

5/27/24, 2:05 PM                          Miami J® Select Cervical Collar | Ossur.com

**ÖSSUR.**  

# Miami J® Select



The Miami J Select cervical collar by Össur offers the widest range of height adjustability in the market with a single, universal design that replicates the comfort, immobilization and quality you expect from a Miami J product. Featuring a proprietary, first-to-market locking mechanism to encourage patient compliance and anti-microbial Sorbatex padding, Miami J Select is designed to support successful patient outcomes.



5/27/24, 2:05 PM                          Miami J® Select Cervical Collar | Ossur.com

REQUEST MORE INFORMATION

Overview     Specification     Support     Downloads

# Comfort to Compliance

Adjustability, comfort, and compliance from the brand you trust. Perfected with continuous input from trauma managers & practitioners and decades of experience in design, the Miami J Select offers a universal cervical collar that doesn't compromise immobilization or comfort.







### High Comfort, Low Pressure

Replicating the clinically proven comfort and low tissue interface pressure of the Miami J†

### Immobilization

Tamper-resistance and proven 3-plane immobilization†

### Cost-Savings

Sorbatex, with 3X the durability, outlasts other padding†

-990-



**Blue is You ™ – intuitive blue Patient Touch Points and multi-colored Sorbatex padding – send patients home with confidence.**



**7 precise fitting sizes with opportunity to fine-tune.**

-992-



**One-piece, anatomically inspired collar back with Flex Edge ® designed to reduce occipital pressure.**

*† Data on file at Össur*

## Features That Work

0:00 / 1:42

**-994-**



## Miami J Select Competency Course

The Miami J Select Competency Course is available to healthcare professionals 24/7. Instruction includes sizing, adjustability, locking the height in place, fitting, adjustments, cleaning, and skin care. Accessory products such as the Occian Back and the JTO are also included.

Login to start course  >



## More Össur Spinal Solutions

Explore neck and back support technologies that you can trust including the Miami J®, Miami Jr® pediatric solutions, and the Miami LSO™ & Miami TLSO™.

**Explore**  ›

**-996-**

Miami J® Select Cervical Collar | Ossur.com

# Specification

## ⌄ Specification

### Product description

The Miami J Select cervical collar by Össur offers the widest range of height adjustability in the market with a single, universal design that replicates the comfort, immobilization and quality you expect from a Miami J product. Featuring a proprietary, first-to-market locking mechanism to encourage patient compliance and anti-microbial Sorbatex padding, Miami J Select is designed to support successful patient outcomes.

### Key features

- Easy height adjustability with a tamper-proof locking mechanism – 'Left to Lock'.

- Anti-microbial & biocompatible Sorbatex padding prevents bacterial build-up.

- Universal design that doesn't compromise immobilization or comfort.

- 7 precise fitting sizes with opportunity to fine-tune.

- Miami J® inspired chin tray.

- One-piece, anatomically inspired collar back with Flex Edge™ designed to reduce occipital pressure.

- Easy to don and doff with proprietary Reproducible Fit option.

- Intuitive blue Patient Touch-Points to send patients home with confidence – Blue is You™.

- Simplified comfort adjustments with integrated and proprietary Sternal-Relief Dial.

- Large tracheal opening – improved function for ICU patients.

- Easy to clean and replace multi-colored padding.

- X-ray and CT lucent, MR-safe.

- Compatible with Occian™ Back & Miami JTO® accessories.

### Indications

Conditions requiring gross immobilization of the cervical spine

-997-

This may include: – C-Spine precaution for trauma patients – Immobilization for pre and post c-spine surgery

**General information**

**Available sizes**

Universal

# Support

0:00 / 14:25

CLINICIAN FITTING TUTORIAL          TROUBLESHOOTING TIPS          USER FITTI

5/27/24, 2:05 PM                                    Miami J® Select Cervical Collar | Ossur.com

# Downloads

**Downloads**

📄 **Miami J Select**                                                     Instructions
                                                                          for use

📄 **Miami J Select Catalog Page**                                        Catalog

📄 **Miami J Select**                                                     User Guide

Explore More Documents

## Discover more bracing & supports products

**SPINE**



-999-



**COMPANY**

About Össur

News

Careers at Össur

Compliance

Company Background

**SUPPORT**

Customer Service

Event Calendar

Contact Us

Resource Center

Find an Unloader Clinician

Find Upper Limb Practitioner

Upper Limb Training

Product Expected Lifetime

**COMMUNITY**

Team Össur

Ambassadors

Philanthropic Partnerships

Life Without Limitations

Join the #ÖssurFamily

Subscribe ⬈

**FOLLOW US**

Facebook ⬈

Instagram ⬈

Linkedin ⬈

X ⬈

Youtube ⬈

**-1000-**

# EXHIBIT 75

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WAYNE CALCO, AN INDIVIDUAL,
          Plaintiff,

    vs.                                    Case No.
                                           8:22-CV-01971-CJC-KES
OSSUR AMERICAS, INC., A
CALIFORNIA CORPORATION; OSSUR
HF, AN ICELANDIC COMPANY; AND
DOES 1 THROUGH 10, INCLUSIVE,
          Defendants.
_____

**CERTIFIED COPY**

VIDEOCONFERENCE DEPOSITION OF TATJANA LATINOVIC

PURSUANT TO FRCP RULE 30(B)(6)

Wednesday, November 29, 2023

7:28 a.m.

Witness Located in Reykjavik, Iceland

REPORTED BY:

Jessica Sanicola

CSR No. 12421

 

WAYNE CALCO vs OSSUR AMERICAS, INC.                          Page 106
Tatjana Latinovic, 11/29/2023

1    objection before, but --

2            MR. SIMON:  Have you ever handed a document

3    to a witness and -- during a deposition and then taken

4    it away?

5            MR. PIGGOTT:  No, I'm screen sharing it is

6    what I'm doing.  That's the method I've been using.

7    And until now, we've been in this deposition for

8    hours, you haven't said anything to the contrary.  So

9    I really --

10           MR. SIMON:  Well, it's not my job to teach

11   you the new rules with regard to remote depositions.

12   But yeah, you can proceed as you like.

13           MR. PIGGOTT:  Well, I'm going to proceed as I

14   have been for the moment.  Let's go to Exhibit -- I'm

15   going to screen share with you what we've marked as

16   Exhibit 31.

17           (Exhibit 31 marked)

18   BY MR. PIGGOTT:

19       Q.  This is taken off of a -- the Ossur website.

20   The date is December 13th, 2021, and this is the

21   information appearing on the website concerning the

22   Miami J Select Cervical Collar.

23           Are you familiar with this presentation of

24   information on Ossur's website, Ms. Latinovic?

25           MR. SIMON:  Vague and ambiguous, assumes




-1003-

WAYNE CALCO vs OSSUR AMERICAS, INC.                          Page 107
Tatjana Latinovic, 11/29/2023

1    facts.

2    BY MR. PIGGOTT:

3        Q.  I'm going to scroll through the entire

4    document for you.

5            MR. SIMON:  Same objection regarding the

6    exhibit.

7    BY MR. PIGGOTT:

8        Q.  And I'm going to a section called

9    "Specification," and there's a heading, "Key

10   Features."  And there's several bullet points, and I'm

11   looking at the bullet point, "Easy to don and doff

12   with patented reproducible fit option."

13           Do you see that?

14       A.  Yes, I do.

15       Q.  Do you -- are you aware of a patent for the

16   reproducible fit option on the Miami J Select Cervical

17   Collar?

18       A.  No, I am not.

19       Q.  Is this statement not true?

20           MR. SIMON:  Vague and ambiguous.

21           THE WITNESS:  Which part of statement?

22   BY MR. PIGGOTT:

23       Q.  The statement, "Easy to don and doff with

24   patented reproducible fit option."

25           Is the statement "patented reproducible fit



AdvancedONE LEGAL is now LEXITAS™

WAYNE CALCO vs OSSUR AMERICAS, INC.                          Page 108
Tatjana Latinovic, 11/29/2023

1    option," is that true, it's patented?

2              MR. SIMON:  Vague and ambiguous, calls for

3    speculation.

4              THE WITNESS:  Not to my knowledge, it's not.

5    BY MR. PIGGOTT:

6         Q.  So is this a false statement that the

7    reproducible fit option is patented?

8              MR. SIMON:  Vague and ambiguous, outside the

9    scope of what she's been designated to testify to,

10   irrelevant.

11   BY MR. PIGGOTT:

12        Q.  You can answer, Ms. Latinovic.

13        A.  What was the question?

14        Q.  Yeah, is that a false statement, the

15   "patented reproducible fit option"?

16             MR. SIMON:  Vague and ambiguous, lacks

17   foundation, and outside the scope of the designation.

18             THE WITNESS:  "Reproducible fit option" is

19   not patented.

20   BY MR. PIGGOTT:

21        Q.  All right.  And then there's another bullet

22   point down here, "Simplified comfort adjustments with

23   integrated and patented sternal relief dial."

24             As of December 31, 2021, was the sternal

25   relief dial patented?

  AdvancedONE LEGAL is now LEXITAS™

WAYNE CALCO vs OSSUR AMERICAS, INC.                          Page 109
Tatjana Latinovic, 11/29/2023

1          MR. SIMON:  Vague and ambiguous, lacks

2    foundation, calls for speculation.

3          THE WITNESS:  Not to my knowledge, it was not

4    patented.

5    BY MR. PIGGOTT:

6          Q.  Is it patented today?

7          A.  No.

8          Q.  I'm showing you a document we marked as

9    Exhibit 32.

10          (Exhibit 32 marked)

11    BY MR. PIGGOTT:

12          Q.  This is from the Ossur website, August 11,

13    2023, Miami J Select Cervical Collar.  The same basic

14    presentation, and I'm going to scroll down again to

15    "Specification, Key Features."  There's a bullet point

16    again, "Easy to don and doff with patented

17    reproducible fit option," and another bullet point,

18    "Simplified comfort adjustments with integrated and

19    patented sternal relief dial."

20          Do you know why Ossur continued to represent

21    on its website that the reproducible fit option was

22    patented and the sternal relief dial was patented as

23    of August 2023?

24          MR. SIMON:  Objection; vague and ambiguous,

25    calls for speculation.



WAYNE CALCO vs OSSUR AMERICAS, INC.                    Page 110
Tatjana Latinovic, 11/29/2023

```
 1              THE WITNESS:  No, I do not know that.
 2   BY MR. PIGGOTT:
 3        Q.  Do you know if anybody at Ossur had been
 4   notified that it was representing on its website that
 5   the reproducible fit option was patented and the
 6   sternal relief dial was patented when they had not
 7   been patented?
 8              MR. SIMON:  If you can answer that question
 9   without revealing attorney/client communications, you
10   may do so Tatjana.  Otherwise, I instruct you not to
11   answer.
12              THE WITNESS:  At that time when the -- when
13   the printout of this presentation, I don't.
14   BY MR. PIGGOTT:
15        Q.  Okay.  I'm sorry, I didn't follow your
16   answer.  "At that time" something.
17        A.  Are you asking me if we knew -- what did you
18   ask me?  Can you repeat, please?
19        Q.  Yeah.  Was Ossur notified at some point that
20   it was making these claims when no patents had been
21   issued for the reproducible fit option and the sternal
22   relief dial?
23        A.  I don't know, sir.
24        Q.  Did you participate --
25              MR. SIMON:  So I'm -- I'm going to object to
```

 

WAYNE CALCO vs OSSUR AMERICAS, INC.                          Page 118
Tatjana Latinovic, 11/29/2023

1          MR. PIGGOTT:  Okay.  I'm sending you

2    Exhibit 33 through the chat box, and I'm also going to

3    screen share it.

4              (Exhibit 33 marked)

5    BY MR. PIGGOTT:

6          Q.  This is, Ms. Latinovic, from the website

7    taken November 28 of 2023, yesterday.  This is the

8    Miami J Select.  And I'm going to scroll down to the

9    "Specifications" section and "Key Features" section

10   looking at the bullet point, "Easy to don and doff

11   with proprietary reproducible fit option."

12         Do you see that?

13         A.  Yes, I do.

14         Q.  And was that done at your direction?

15         MR. SIMON:  Vague and ambiguous, lacks

16   foundation.

17         THE WITNESS:  My instruction was to remove

18   "patented."

19   BY MR. PIGGOTT:

20         Q.  Okay.  Did you instruct somebody to put

21   "proprietary"?

22         A.  No, I did not.

23         Q.  And I note the bullet point, "Simplified

24   comfort adjustments with integrated and proprietary

25   sternal relief dial," did you instruct somebody to put

 

AdvancedONE LEGAL is now LEXITAS

WAYNE CALCO vs OSSUR AMERICAS, INC.                          Page 119
Tatjana Latinovic, 11/29/2023

1    "proprietary" there?

2        A.  No, I did not.

3        Q.  Have you told the person that you directed to

4    remove "patented" that they were not supposed to put

5    "proprietary"?

6            MR. SIMON:  Vague and ambiguous, assumes

7    facts.

8            THE WITNESS:  I only remember asking to

9    remove "patented."

10   BY MR. PIGGOTT:

11       Q.  Okay.  And who did you ask to remove

12   patented?

13       A.  Oh, someone in marketing department.

14       Q.  And who is that someone?

15       A.  I don't recall.

16       Q.  Did you discuss with that person using

17   "proprietary" instead of "patented"?

18       A.  No.

19       Q.  Is Ossur going to change this again to remove

20   the reference to "proprietary"?

21           MR. SIMON:  Vague and ambiguous, calls for

22   speculation, outside the scope.

23           THE WITNESS:  We will be auditing our

24   material in general.

25   BY MR. PIGGOTT:




WAYNE CALCO vs OSSUR AMERICAS, INC.                              Page 150
Tatjana Latinovic, 11/29/2023

1    STATE OF CALIFORNIA   )
                          )
2    COUNTY OF ORANGE      )

3

4         I, Jessica Sanicola, a Certified Shorthand

5    Reporter, do hereby certify:

6         That prior to being examined, the witness in

7    the foregoing proceedings was by me duly sworn to

8    testify to the truth, the whole truth, and nothing but

9    the truth;

10        That said proceedings were taken before me at

11   the time and place therein set forth and were taken

12   down by me in shorthand and thereafter transcribed

13   into typewriting under my direction and supervision;

14        I further certify that I am neither counsel

15   for, nor related to, any party to said proceedings,

16   not in anywise interested in the outcome thereof.

17        In witness whereof, I have hereunto

18   subscribed my name.

19

20   Dated:  Thursday, December 7, 2023

21   

22   _____

23   Jessica Sanicola
     CSR No. 12421

24

25



**-1010-**

12/13/21, 10:18 AM                          Miami J® Select Cervical Collar | Ossur.com

**PDAC Updates – Impacted Prosthetics Products** VIEW HERE

**ÖSSUR.**  🔍

# Miami J® Select

Spine / Miami J® Select







CALCO 002735

12/13/21, 10:18 AM                          Miami J® Select Cervical Collar | Ossur.com

The Miami J Select cervical collar by Össur offers the widest range of height adjustability in the market with a single, universal design that replicates the comfort,

immobilization and quality you expect from a Miami J product. Featuring a patented, first-to-market locking mechanism to encourage patient compliance and anti-microbial Sorbatex padding, Miami J Select is designed to support successful patient outcomes.

REQUEST MORE INFORMATION

Overview        Specification        Support        Downloads

# Comfort to Compliance

Adjustability, comfort, and compliance from the brand you trust. Perfected with continuous input from trauma managers & practitioners and decades of experience in design, the Miami J Select offers a universal cervical collar that doesn't compromise immobilization or comfort.





 **High Comfort, Low**                **Immobilization**

CALCO 002736

**-1012-**

## Pressure

Replicating the clinically proven comfort and low tissue interface pressure of the Miami J†

Tamper-resistance and proven 3-plane immobilization†



## Cost-Savings

Sorbatex, with 3X the durability, outlasts other padding†



CALCO 002737

-1013-

**Blue is You ™ – intuitive blue Patient Touch Points and multi-colored Sorbatex padding – send patients home with confidence.**



CALCO 002738

-1014-

Miami J® Select Cervical Collar | Ossur.com

# 7 precise fitting sizes with opportunity to fine-tune.



CALCO 002739

**One-piece, anatomically inspired collar back with Flex Edge ® designed to reduce occipital pressure.**

 ta on file at Össur

CALCO 002740

-1016-

# Features That Work

01:43



CALCO 002741

# Miami J Select Competency Course

The Miami J Select Competency Course is available to healthcare professionals 24/7. Instruction includes sizing, adjustability, locking the height in place, fitting, adjustments, cleaning, and skin care. Accessory products such as the Occian Back and the JTO are also included.



Login to start course  >

CALCO 002742

Login to start course

# More Össur Spinal Solutions

Explore neck and back support technologies that you can trust including the Miami J®,

Miami Jr® pediatric solutions, and the Miami LSO™ & Miami TLSO™.

CALCO 002743

Explore  >

# Specification

## Specification                                                    ⌄

### Product description

The Miami J Select cervical collar by Össur offers the widest range of height adjustability in the market with a single, universal design that replicates the comfort, immobilization and quality you expect from a Miami J product

Featuring a patented, first-to-market locking mechanism to encourage patient compliance and anti-microbial Sorbatex padding, Miami J Select is designed to support successful patient outcomes

### Key features

- Easy height adjustability with a tamper-proof locking mechanism – 'Left to Lock'.


Anti-microbial & biocompatible Sorbatex™ padding prevents bacterial build-up.

CALCO 002744

- Universal design that doesn't compromise immobilization or comfort.

- 7 precise fitting sizes with opportunity to fine-tune.

- Miami J® inspired chin tray.

- One-piece, anatomically inspired collar back with Flex Edge® designed to reduce occipital pressure.

- Easy to don and doff with patented Reproducible Fit option.

- Intuitive blue Patient Touch-Points to send patients home with confidence – Blue is You™.

- Simplified comfort adjustments with integrated and patented Sternal-Relief Dial.

- Large tracheal opening – improved function for ICU patients.

- Easy to clean and replace multi-colored padding.

- X-ray and CT lucent, MR-safe.

- Compatible with Occian™ Back & Miami JTO® accessories.

## Indications

Conditions requiring gross immobilization of the cervical spine

This may include: – C-Spine precaution for trauma patients – Immobilization for pre and post c-spine surgery

## General information        Available sizes

CALCO 002745

12/13/21, 10:18 AM                              Miami J® Select Cervical Collar | Ossur.com

Universal

# Support

## Videos

01:05



12/13/21, 10:18 AM                     Miami J® Select Cervical Collar | Ossur.com

**USER INSTRUCTIONS**          **CLINICIAN FITTING
INSTRUCTIONS**

# Downloads

## Downloads

📄 Miami J Select

📄 Miami J Select

📄 Miami J Select



Explore More Documents

# Discover more bracing & supports products


SPINE

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select                    13/15

CALCO 002747



**Miami LSO™**





CALCO 002748

12/13/21, 10:18 AM                    Miami J® Select Cervical Collar | Ossur.com

**COMPANY**

About Össur

News

Careers at Össur

Compliance

Company Background

**SUPPORT**

Customer Service

Event Calendar

Contact Us

Resource Center

Find a Bracing Practitioner

Find Upper Limb Practitioner

**COMMUNITY**

Team Össur

Ambassadors

Philanthropic Partnerships

Life Without Limitations

Join the #ÖssurFamily

Subscribe ⧉

**FOLLOW US**



Facebook ⧉

CALCO 002749

-1025-

# Miami J® Select





The Miami J Select cervical collar by Össur offers the widest range of height adjustability in the market with a single, universal design that replicates the comfort, immobilization and quality you expect from a Miami J product. Featuring a patented, first-to-market locking mechanism to encourage patient compliance and anti-microbial Sorbatex padding, Miami J Select is designed to support successful patient outcomes.



CALCO 002759

-1026-

8/11/23, 2:05 PM                                    Miami J® Select Cervical Collar | Ossur.com

REQUEST MORE INFORMATION

# Comfort to Compliance

Adjustability, comfort, and compliance from the brand you trust. Perfected with continuous input from trauma managers & practitioners and decades of experience in design, the Miami J Select offers a universal cervical collar that doesn't compromise immobilization or comfort.

                

### High Comfort, Low Pressure

Replicating the clinically proven comfort and low tissue interface pressure of the Miami J†

### Immobilization

Tamper-resistance and proven 3-plane immobilization†

### Cost-Savings

Sorbatex, with 3X the durability, outlasts other padding†



https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select#specificationContentAnchor                    2/10

CALCO 002760



**Blue is You ™ – intuitive blue Patient Touch Points and multi-colored Sorbatex padding – send patients home with confidence.**



CALCO 002761



**7 precise fitting sizes with opportunity to fine-tune.**



CALCO 002762

**One-piece, anatomically inspired collar back with Flex Edge ® designed to reduce occipital pressure.**

*† Data on file at Össur*

**Features That Work**

01:43

ÖSSUR.

Overview    Specification    Support    Downloads

CALCO 002763



### Miami J Select Competency Course

The Miami J Select Competency Course is available to healthcare professionals 24/7. Instruction includes sizing, adjustability, locking the height in place, fitting, adjustments, cleaning, and skin care. Accessory products such as the Occian Back and the JTO are also included.

Login to start course  ›




CALCO 002764

8/11/23, 2:05 PM                          Miami J® Select Cervical Collar | Ossur.com



### More Össur Spinal Solutions

Explore neck and back support technologies that you can trust including the Miami J®, Miami Jr® pediatric solutions, and the Miami LSO™ &
Miami TLSO™.

Explore  〉

# Specification

⌃

⌄ Specification

CALCO 002765

-1032-

## Product description

The Miami J Select cervical collar by Össur offers the widest range of height adjustability in the market with a single, universal design that replicates the comfort, immobilization and quality you expect from a Miami J product. Featuring a patented, first-to-market locking mechanism to encourage patient compliance and anti-microbial Sorbatex padding, Miami J Select is designed to support successful patient outcomes.

## Key features

- Easy height adjustability with a tamper-proof locking mechanism – 'Left to Lock'.

- Anti-microbial & biocompatible Sorbatex™ padding prevents bacterial build-up.

- Universal design that doesn't compromise immobilization or comfort.

- 7 precise fitting sizes with opportunity to fine-tune.

- Miami J® inspired chin tray.

- One-piece, anatomically inspired collar back with Flex Edge® designed to reduce occipital pressure.

- Easy to don and doff with patented Reproducible Fit option.

- Intuitive blue Patient Touch-Points to send patients home with confidence – Blue is You™.

- Simplified comfort adjustments with integrated and patented Sternal-Relief Dial.

- Large tracheal opening – improved function for ICU patients.

- Easy to clean and replace multi-colored padding.

- X-ray and CT lucent, MR-safe.

- Compatible with Occian™ Back & Miami JTO® accessories.

## Indications

Conditions requiring gross immobilization of the cervical spine

This may include: – C-Spine precaution for trauma patients – Immobilization for pre and post c-spine surgery

## General information

**Available sizes**

Universal

# Support

∧

CALCO 002766

11/28/23, 11:26 PM

Miami J® Select Cervical Collar | Ossur.com

# Miami J® Select





The Miami J Select cervical collar by Össur offers the widest range of height adjustability in the market with a single, universal design that replicates the comfort, immobilization and quality you expect from a Miami J product. Featuring a proprietary, first-to-market locking mechanism to encourage patient compliance and anti-microbial Sorbatex padding, Miami J Select is designed to support successful p outcomes.



11/28/23, 11:26 PM                        Miami J® Select Cervical Collar | Ossur.com

REQUEST MORE INFORMATION

# Comfort to Compliance

Adjustability, comfort, and compliance from the brand you trust. Perfected with continuous input from trauma managers & practitioners and decades of experience in design, the Miami J Select offers a universal cervical collar that doesn't compromise immobilization or comfort.



### High Comfort, Low Pressure

Replicating the clinically proven comfort and low tissue interface pressure of the Miami J†



### Immobilization

Tamper-resistance and proven 3-plane immobilization†



### Cost-Savings

Sorbatex, with 3X the durability, outlasts other padding†



**Blue is You ™ – intuitive blue Patient Touch Points and multi-colored Sorbatex padding – send patients home with confidence.**



**7 precise fitting sizes with opportunity to fine-tune.**

11/28/23, 11:26 PM                    Miami J® Select Cervical Collar | Ossur.com



**ÖSSUR.**

Overview    Specification    Support    Downloads



**One-piece, anatomically inspired collar back with Flex Edge ® designed to reduce occipital pressure.**

† Data on file at Össur

# Features That Work

01:43

11/28/23, 11:26 PM

Miami J® Select Cervical Collar | Ossur.com



## Miami J Select Competency Course

The Miami J Select Competency Course is available to healthcare professionals 24/7. Instruction includes sizing, adjustability, locking the height in place, fitting, adjustments, cleaning, and skin care. Accessory products such as the Occian Back and the JTO are also included.

Login to start course  ›





## More Össur Spinal Solutions

Explore neck and back support technologies that you can trust including the Miami J®, Miami Jr® pediatric solutions, and the Miami LSO™ & Miami TLSO™.

Explore >

11/28/23, 11:26 PM

Miami J® Select Cervical Collar | Ossur.com

# Specification

∨ **Specification**

**Product description**

The Miami J Select cervical collar by Össur offers the widest range of height adjustability in the market with a single, universal design that replicates the comfort, immobilization and quality you expect from a Miami J product. Featuring a proprietary, first-to-market locking mechanism to encourage patient compliance and anti-microbial Sorbatex padding, Miami J Select is designed to support successful patient outcomes.

**Key features**

- Easy height adjustability with a tamper-proof locking mechanism – 'Left to Lock'.

- Anti-microbial & biocompatible Sorbatex padding prevents bacterial build-up.

- Universal design that doesn't compromise immobilization or comfort.

- 7 precise fitting sizes with opportunity to fine-tune.

- Miami J® inspired chin tray.

- One-piece, anatomically inspired collar back with Flex Edge® designed to reduce occipital pressure.

- Easy to don and doff with proprietary Reproducible Fit option.

- Intuitive blue Patient Touch-Points to send patients home with confidence – Blue is You™.

- Simplified comfort adjustments with integrated and proprietary Sternal-Relief Dial.

- Large tracheal opening – improved function for ICU patients.

- Easy to clean and replace multi-colored padding.

- X-ray and CT lucent, MR-safe.

- Compatible with Occian™ Back & Miami JTO® accessories.

**Indications**

Conditions requiring gross immobilization of the cervical spine

This may include: – C-Spine precaution for trauma patients – Immobilization for pre and post c-spine surgery

∧

https://www.ossur.com/en-us/bracing-and-supports/spine/miami-j-select#specificationContentAnchor

11/28/23, 11:26 PM                                          Miami J® Select Cervical Collar | Ossur.com

**General information**

**Available sizes**

Universal

# Support









**CLINICIAN FITTING TUTORIAL**          **TROUBLESHOOTING TIPS**          **USER FITTI**

11/28/23, 11:26 PM                              Miami J® Select Cervical Collar | Ossur.com

# Downloads

**Downloads**

📄 Miami J Select                                                    Instructions
                                                                      for use
📄 Miami J Select Catalog Page                                        Catalog

📄 Miami J Select                                                    User Guide

Explore More Documents

## Discover more bracing & supports products

**SPINE**

Miami J® Select Cervical Collar | Ossur.com




**COMPANY**

About Össur

News

Careers at Össur

Compliance

Company Background


**SUPPORT**

Customer Service

Event Calendar

Contact Us

Resource Center

Find an Unloader Clinician

Find Upper Limb Practitioner

Upper Limb Training

Product Expected Lifetime


**COMMUNITY**

Team Össur

Ambassadors

Philanthropic Partnerships

Life Without Limitations

Join the #ÖssurFamily

Subscribe


**FOLLOW US**

Facebook

Instagram

Linkedin

Twitter

Youtube


Privacy Policy

# EXHIBIT 76

PDAC Updates – Impacted Prosthetics Products VIEW HERE

**ÖSSUR.**                                                        Q

# New additions to Miami line of orthopaedic technologies



**ÖSSUR**

**05-01-2019**

New Miami J® Select Cervical Collar designed to enhance fitting efficiency, improve patient compliance.

## Miami® TLSO Provides Advanced Compression and Immobilization for Thoracic and Lumbar Spinal Areas

FOOTHILL RANCH, CA., May 01, 2019 – Össur is introducing two new products to its signature Miami brand line of advanced orthopaedic supports: the Miami J® Select Cervical Collar for people who require gross immobilization of the cervical spine, including trauma victims and cervical spine surgery patients, and the Miami® TLSO advanced spinal compression support system for patients requiring gross spinal immobilization up to T7.



https://www.ossur.com/en-us/about-ossur/newsroom/new-additions-to-miami-line-of-orthopaedic-technologies                    1/6

CALCO 002729

12/12/21, 5:03 PM                                    New additions to Miami line of orthopedic technologies. Ossur.com



"At Össur, we are dedicated to continually innovating on behalf of patients, and we are honored to be extending the Miami J's legacy with the newest addition to our portfolio of leading bracing and support technologies."

JASON THORNE, VICE PRESIDENT OF GLOBAL MARKETING

Drawing upon Össur's decades of biomechanical design expertise and input from clinical experts, the new Miami J Select Cervical Collar features an universal intuitive design intended to provide optimal comfort and compliance for patients without compromising on requirements immobilization, fit or performance. It is intended to provide optimal immobilization and comfort while minimizing pressure points and skin breakdown in key areas of contact, including

https://www.ossur.com/en-us/about-ossur/newsroom/new-additions-to-miami-line-of-orthopaedic-technologies                                              2/6

CALCO 002730

the chin, occiput, trapezius and clavicle. Its patented design features the widest available range of height adjustability and first-to-market locking mechanism as well as Flex-Edge® technology on the back of the collar specifically designed to reduce occipital pressure. Together, these features encourage patient compliance by ensuring users do not tamper with clinically prescribed levels of collar height, particularly during post-op and rehab periods.

A proprietary, integrated Sternal-Relief Dial enables adjustments when a patient is chewing or sitting for added comfort. Blue is YouTM intuitive blue touch points on the Sternal-Relief Dial and straps simplify patient education and product use. In addition, clinicians may specify optional Reproducible Fit Tabs, which can make it easier for the patient to don or doff the Miami J Select according to physician instructions.

The Miami J Select also features proprietary anti-microbial Sorbatex™ padding, which helps limit excessive moisture and has been shown to inhibit microbial growth by over 99%1. Sorbatex has also demonstrated superior durability and quick-dry properties, drying over 30% faster than traditional cotton/foam padding2. The Miami J Select also features a large tracheal opening to accommodate the needs of ICU patients who may need tracheotomies, while simultaneously reducing the need for a separate tracheal extension piece.

During field tests, the Miami J Select was validated as providing easy height adjustability and donning and doffing3 through evaluations performed by trauma program managers, nurses and educators. In a biomechanical study on 22 healthy participants that compared Miami J Select to industry-leading universal and sized collar designs, subjects reported comfort and tissue-interface pressure (TIP) at the occiput, mandible and sternum that was comparable4 to Össur's classic, clinically proven Miami J5. . In addition, the Miami J Select was found to replicate immobilization of the cervical spine compared to the same collars, in all planes of movement6.

The Miami J Select is reimbursable in the U.S., with PDAC approval for both the brace (L0174) as replacement padding as needed (L0999), and is now available throughout the U.S.

## Miami TLSO: Intuitive, Modal Design for Optimal Patient Comfort and Immobilization



CALCO 002731

Össur's new Miami TLSO brace is an easy-to-use, fully assembled support that provides gross immobilization of the thoracic and lumbar spine for a variety of patients, including those needing post-surgical immobilization, spinal support up to T7, or recovering from spinal stenosis, herniated disc, and degenerative spinal fractures. It is also indicated for patients with spondylolisthesis or spondylolysis.

The low profile, lightweight Miami TLSO is made of a durable, ventilated fabric and features Össur's Blue is You™ intuitive patient touch points and soft, comfortable shoulder straps. Its anatomically contoured design is intended to immobilize the spine while maximizing patient comfort, with high strength, ventilated rigid panels that can be heat molded, grounded or trimmed to suit the patient's anatomy as needed.

The brace, designed to accommodate patients ranging in height from 5'1" to 6'5" and waist circumferences from 26-70 inches with belt extension option, requires minimal preparation and is designed to provide optimal patient comfort, whether applied in over-the-shoulder or underarm configurations. Donning and doffing are further simplified with conveniently located quick-release buckles.

The Miami TLSO brace is reimbursable in the U.S. and is now available throughout the country.

The comprehensive Össur Miami family covers the full spine spectrum from cervical spine to sacrum, built upon decades of experience in design and continuous input from clinical experts. Össur Spinal Solutions provide intended spine-immobilization with the best possible comfort and compliance, and simplified adjustability without compromising immobilization, fit or performance.

1. *Under ISO 20743 testing*
2. *Data on file at Össur*
3. *Society of Trauma Nurses TraumaCon (March 2018). Clinical Opinion Leader Survey*
4. *Data on file at Össur*
5. *Tescher AN et al. (2016). Comparison of Cervical Range-of-Motion Restriction and Craniofacial Tissue-Interface Pressure With 2 Adjustable and 2 Standard Cervical Collars. Spine, 41(6): E304-12*



*Data on file at Össur*

CALCO 002732

12/12/21, 5:03 PM                    New additions to Miami line of orthopedic technologies. Ossur.com

**COMPANY**

About Össur

News

Careers at Össur

Compliance

Company Background

**SUPPORT**

Customer Service

Event Calendar

Contact Us

Resource Center

Find a Bracing Practitioner

Find Upper Limb Practitioner

**COMMUNITY**

Team Össur

Ambassadors

Philanthropic Partnerships

Life Without Limitations

Join the #ÖssurFamily

Subscribe

**FOLLOW US**

Facebook

Instagram

Linkedin

Twitter



https://www.ossur.com/en-us/about-ossur/newsroom/new-additions-to-miami-line-of-orthopaedic-technologies                    5/6

CALCO 002733

12/12/21, 5:03 PM

New additions to Miami line of orthopedic technologies. Ossur.com

Youtube

© 2021 Össur

Privacy Policy



https://www.ossur.com/en-us/about-ossur/newsroom/new-additions-to-miami-line-of-orthopaedic-technologies

6/6

CALCO 002734

# EXHIBIT 77

1   GEORGE B. PIGGOTT (SBN 68227)
    a member of GEORGE B. PIGGOTT,
2   A PROFESSIONAL CORPORATION
    2603 Main Street, Penthouse
3   Irvine, California 92614
    Tel:    (949) 261-0500
4   Fax:    (949) 261-1085
    Email: george@piggottlaw.com
5
    Attorney for Plaintiff Wayne Calco
6

7

8                      UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT OF CALIFORNIA

10

11  WAYNE CALCO, an individual,            Case No. 8:22-cv-01971-CJC-KES
12                          Plaintiff,
                vs.                        PLAINTIFF'S RESPONSES TO
13                                         DEFENDANTS' SPECIAL
    ÖSSUR AMERICAS, INC., a California     INTERROGATORIES (SET ONE)
14  corporation; ÖSSUR hf, an Icelandic company;
    and DOES 1 through 10, inclusive,
15
16                          Defendants.

17

18                                         Complaint Filed: October 26, 2022
                                           Trial Date: None Set
19

20

21

22

23

24

25

26

27

28
                                  1
        PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)

| | |
|---|---|
| **PROPOUNDING PARTIES:** | Defendants ÖSSUR AMERICAS, INC. and OSSUR hf |
| **RESPONDING PARTY:** | Plaintiff WAYNE CALCO |
| **SET NO.:** | ONE |

### PRELIMINARY STATEMENT

The responses below represent the current knowledge and information of Plaintiff Wayne Calco ("Responding Party"). Responding Party has not completed his investigation of the facts and evidence relating to this matter, and has not completed discovery and preparation for trial. Responding Party's responses to Defendant's Special Interrogatories herein below may therefore be incomplete, and there is also the possibility that information that Responding Party subsequently obtains and/or discovers will alter his responses herein below. Responding Party reserves the right to supplement or modify his responses herein below based on any such information which is subsequently discovered, but he is not assuming any responsibility to do so that he does not otherwise have under applicable law or rules, if any. Responding Party further reserves the right to introduce as evidence in this matter any information which he may discover subsequent to this response. Except for explicit admissions contained herein, Responding Party makes no admissions of any nature or kind whatsoever which might otherwise be implied or inferred from the responses or objections set forth herein or the absence of objections. This Preliminary Statement is incorporated by this reference into each of the responses below.

Defendants Ossur Americas, Inc. and Ossur hf are sometimes referred to hereinafter collectively as the "Defendants."

### GENERAL OBJECTIONS

Responding Party objects to each of the Special Interrogatories to the extent any or all of the Special Interrogatories seek information which is protected from disclosure pursuant to the attorney-client communication privilege, the attorney work product doctrine (including, but not limited to, expert information and opinions and communications by or to experts), and/or other applicable privileges or protection. The foregoing objections and qualifications are incorporated by reference in the responses below to the individual Special Interrogatories to the extent applicable to the specific responses as though fully set forth therein. The fact that Responding Party does not assert the foregoing

2

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1  objections and qualification in his responses below to an individual Special Interrogatory shall not be

2  deemed a waiver of the protection afforded by the applicable privileges or protection

3  **SPECIAL INTERROGATORY NO. 1:**

4      State each and every fact known to YOU upon which YOU base YOUR

5  contention, set forth in YOUR FAC (*See* FAC at ¶ 29.) that ÖSSUR failed to pay a royalty to

6  YOU for sales of the Miami J Select.

7  **RESPONSE TO SPECIAL INTERROGATORY NO. 1:**

8      Responding Party objects to this Request as being vague and ambiguous and further objects to

9  this Request to the extent it calls for information which is privileged and protected from discovery by

10  the attorney-client communication privilege, the attorney work product doctrine (including, but not

11  limited to, expert information and opinions and communications by or to experts), and/or other

12  applicable privileges or protection. Subject to and without waiver of the foregoing objections,

13  Responding Party responds as follows: The requirements set forth in the AGREEMENT for payment of

14  the future royalty to Plaintiff have been satisfied, and alternatively as set forth more specifically below,

15  Defendants have breached their obligations under the AGREEMENT such that Plaintiff is entitled to a

16  future royalty; sales of the Miami J Select have occurred; and Defendants have failed to pay to Plaintiff

17  the future royalty specified in the AGREEMENT based on those sales. More specifically, and without

18  limiting the generality of the foregoing or the allegations of the First Amended Complaint, which are

19  incorporated in full herein, the sternum adjustment that is incorporated in the Miami J Select, referred

20  to by Defendants in their sales literature as the "sternal relief dial", is based on a concept created by

21  Plaintiff prior to entering into the AGREEMENT as evidenced by written records; the sternum

22  adjustment is protected and covered by one or more valid issued claims contained in the '374 Patent

23  that is owned or controlled by Defendants and names Plaintiff as a co-inventor; Defendants are

24  estopped to assert that those claims do not cover the Miami J Select or that the sternal relief dial is not

25  patentable by stating in their sales literature that the sternal relief dial is patented; and Defendants have

26  been selling the Miami J Select since at least 2019. Defendants have also failed to pay Plaintiff the

27  future royalty specified in the AGREEMENT that would be due for sales of the Miami J Select if

28  Defendants had pursued patent claims for the sternal relief dial in good faith, including other claims

3

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1   and/or broader claims for the sternal relief dial than those contained in the '374 Patent, which would

2   have issued and would be valid to protect and cover the Miami J Select. In addition, the repeatable fit

3   tabs that are incorporated in the Miami J Select, referred to by Defendants in their sales literature as the

4   "reproducible fit option", are based on a concept created by Plaintiff prior to entering into the

5   AGREEMENT as evidenced by written records; Defendants have failed to pursue any patent claims for

6   the reproducible fit option; if Defendants had pursued patent claims for the reproducible fit option in

7   good faith naming Plaintiff as an inventor or co-inventor, such claims would have issued and would be

8   valid to protect and cover the Miami J Select. Defendants; and Defendants are estopped to assert that

9   the reproducible fit option is not patented or patentable because Defendants have been stating in their

10  sales literature that the reproducible fit option is patented

11  **SPECIAL INTERROGATORY NO. 4:**

12      State each and every fact known to YOU upon which YOU base YOUR

13  contention that the structure in the Miami J Select performs the claimed function of Claim 12 of

14  the '374 Patent.

15  **RESPONSE TO SPECIAL INTERROGATORY NO. 4:**

16      Responding Party objects to this Request as being vague and ambiguous as to what is meant by

17  "the structure in the Miami J Select" and further objects to this Request to the extent it calls for

18  information which is privileged and protected from discovery by the attorney-client communication

19  privilege, the attorney work product doctrine (including, but not limited to, expert information and

20  opinions and communications by or to experts), and/or other applicable privileges or protection. With

21  respect specifically to facts known to experts, as well as opinions held by experts, such information is

22  privileged from discovery by means of contention interrogatory and is only discoverable through the

23  procedure set for in Rule 26(b(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424, 428-429

24  (N.D. Cal. 1989). Subject to and without waiver of the foregoing objections, Responding Party

25  responds as follows: The sternum adjustment used in the Miami J Select, which Defendants refer to as

26  the "sternal relief dial", and the "adjustment mechanism" described in Claim 12 of the '374 Patent,

27  each make the sternum pad movable relative to the lower support of the cervical collar.

28      In addition, the adjustment mechanism described in Claim 1 of the '374 Patent also makes the

4

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1   sternum pad movable relative to the lower support of the cervical collar.

2   **SPECIAL INTERROGATORY NO. 7:**

3       State each and every fact known to YOU upon which YOU base YOU

4   contention that the material in the Miami J Select performs the claimed function of Claim 12 of

5   the '374 Patent.

6   **RESPONSE TO SPECIAL INTERROGATORY NO. 7:**

7       Responding Party objects to this Request as being vague and ambiguous as to what is meant by

8   "the material in the Miami J Select" and further objects to this Request to the extent it calls for

9   information which is privileged and protected from discovery by the attorney-client communication

10  privilege, the attorney work product doctrine (including, but not limited to, expert information and

11  opinions and communications by or to experts), and/or other applicable privileges or protection.

12  Subject to and without waiver of the foregoing objections, Responding Party responds as follows:

13  With respect specifically to facts known to experts, as well as opinions held by experts, such

14  information is privileged from discovery by means of contention interrogatory and is only discoverable

15  through the procedure set for in Rule 26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424,

16  428-429 (N.D. Cal. 1989). Subject to and without waiver of the foregoing objections, Responding

17  Party responds as follows: The sternum adjustment used in the Miami J Select, which Defendants

18  refers to as the "sternal relief dial", and the "adjustment mechanism" described in Claim 12 of the '374

19  Patent, each make the sternum pad movable relative to the lower support of the cervical collar.

20      In addition, the adjustment mechanism described in Claim 1 of the '374 Patent makes the

21  sternum pad movable relative to the lower support of the cervical collar.

22  **SPECIAL INTERROGATORY NO. 10:**

23      State each and every fact known to YOU upon which YOU base YOUR

24  contention that the structure in the Miami J Select performs the claimed function of Claim 13 of

25  the '374 Patent.

26  **RESPONSE TO SPECIAL INTERROGATORY NO. 10:**

27      Responding Party objects to this Request as being vague and ambiguous as to what is meant by

28  "the structure in the Miami J Select" and further objects to this Request to the extent it calls for

5

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1  information which is privileged and protected from discovery by the attorney-client communication

2  privilege, the attorney work product doctrine (including, but not limited to, expert information and

3  opinions and communications by or to experts), and/or other applicable privileges or protection.

4  Subject to and without waiver of the foregoing objections, Responding Party responds as follows:

5  With respect specifically to facts known to experts, as well as opinions held by experts, such

6  information is privileged from discovery by means of contention interrogatory and is only discoverable

7  through the procedure set for in Rule 26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424,

8  428-429 (N.D. Cal. 1989). Subject to and without waiver of the foregoing objections, Responding

9  Party responds as follows: Claim 13 of the '374 Patent is a dependent claim of Claim 12. The sternum

10 adjustment used in the Miami J Select, which Defendants refer to as the "sternal relief dial", and the

11 "adjustment mechanism" described in Claim 12 of the '374 Patent, each make the sternum pad

12 movable relative to the lower support of the cervical collar.

13        In addition, the adjustment mechanism described in Claim 1 of the '374 Patent makes the

14 sternum pad movable relative to the lower support of the cervical collar.

15 **SPECIAL INTERROGATORY NO. 13:**

16        State each and every fact known to YOU upon which YOU base YOUR

17 contention that the material in the Miami J Select performs the claimed function of Claim 13 of

18 the '374 Patent.

19 **RESPONSE TO SPECIAL INTERROGATORY NO. 13:**

20        Responding Party objects to this Request as being vague and ambiguous as to what is meant by

21 "the material in the Miami J Select" and further objects to this Request to the extent it calls for

22 information which is privileged and protected from discovery by the attorney-client communication

23 privilege, the attorney work product doctrine (including, but not limited to, expert information and

24 opinions and communications by or to experts), and/or other applicable privileges or protection.

25 Subject to and without waiver of the foregoing objections, Responding Party responds as follows:

26 With respect specifically to facts known to experts, as well as opinions held by experts, such

27 information is privileged from discovery by means of contention interrogatory and is only discoverable

28 through the procedure set for in Rule 26(b)(4)(A) of the FRCP. *Roberts v. Heim*, 130 F.R.D. 424, 428-

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

429 (N.D. Cal. 1989). Subject to and without waiver of the foregoing objections, Responding Party responds as follows: Claim 13 of the '374 Patent is a dependent claim of Claim 12. The sternum adjustment used in the Miami J Select, which Defendants refers to as the "sternal relief dial", and the "adjustment mechanism" described in Claim 12 of the '374 Patent, each make the sternum pad movable relative to the lower support of the cervical collar.

In addition, the adjustment mechanism described in Claim 1 of the '374 Patent also makes the sternum pad movable relative to the lower support of the cervical collar.

**SPECIAL INTERROGATORY NO. 16:**

State each and every fact known to YOU upon which YOU base YOUR contention that the Sternal-Relief Dial of the Miami J Select performs the claimed function of Claim 12 of the '374 Patent.

**RESPONSE TO SPECIAL INTERROGATORY NO. 16:**

Responding Party objects to this Request as being vague and ambiguous and further objects to this Request to the extent it calls for information which is privileged and protected from discovery by the attorney-client communication privilege, the attorney work product doctrine (including, but not limited to, expert information and opinions and communications by or to experts), and/or other applicable privileges or protection. With respect specifically to facts known to experts, as well as opinions held by experts, such information is privileged from discovery by means of contention interrogatory and is only discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). Subject to and without waiver of the foregoing objections, Responding Party responds as follows: The sternum adjustment used in the Miami J Select, which Defendants refer to as the "sternal relief dial", and the "adjustment mechanism" described in Claim 12 of the '374 Patent, each make the sternum pad movable relative to the lower support of the cervical collar.

In addition, the adjustment mechanism described in Claim 1 of the '374 Patent makes the sternum pad movable relative to the lower support of the cervical collar.

**SPECIAL INTERROGATORY NO. 19:**

State each and every fact known to YOU upon which YOU base YOUR

7

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1  contention that the Sternal-Relief Dial of the Miami J Select is the same structure of

2  Claim 12 of the '374 Patent.

3  **RESPONSE TO SPECIAL INTERROGATORY NO. 19:**

4      Responding Party objects to this Request as being vague and ambiguous as to what is meant by

5  "the same structure of Claim 12" and further objects to this Request to the extent it calls for

6  information which is privileged and protected from discovery by the attorney-client communication

7  privilege, the attorney work product doctrine (including, but not limited to, expert information and

8  opinions and communications by or to experts), and/or other applicable privileges or protection. With

9  respect specifically to facts known to experts, as well as opinions held by experts, such information is

10 privileged from discovery by means of contention interrogatory and is only discoverable through the

11 procedure set for in Rule 26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424, 428-429

12 (N.D. Cal. 1989). The information requested calls for expert opinion and Responding Party therefore

13 objects to providing that information by means of answering this interrogatory.

14 **SPECIAL INTERROGATORY NO. 22:**

15     State each and every fact known to YOU upon which YOU base YOUR

16 contention that the Sternal-Relief Dial of the Miami J Select produces the same result as Claim 12 of

17 the '374 Patent.

18 **RESPONSE TO SPECIAL INTERROGATORY NO. 22:**

19     Responding Party objects to this Request as being vague and ambiguous and further objects to

20 this Request to the extent it calls for information which is privileged and protected from discovery by

21 the attorney-client communication privilege, the attorney work product doctrine (including, but not

22 limited to, expert information and opinions and communications by or to experts), and/or other

23 applicable privileges or protection. With respect specifically to facts known to experts, as well as

24 opinions held by experts, such information is privileged from discovery by means of contention

25 interrogatory and is only discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP.

26 See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). Subject to and without waiver of the

27 foregoing objections, Responding Party responds as follows: The sternum adjustment used in the

28 Miami J Select, which Defendants refer to as the "sternal relief dial", and the "adjustment mechanism"

8

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1   described in Claim 12 of the '374 Patent, each make the cervical collar more comfortable for the user

2   to wear by enabling the user to relax or tighten the pressure of the sternum support pad on the sternum.

3   **SPECIAL INTERROGATORY NO. 25:**

4       State each and every fact known to YOU upon which YOU base YOUR

5   contention that the Sternal-Relief Dial of the Miami J Select performs the claimed

6   function of Claim 13 of the '374 Patent.

7   **RESPONSE TO SPECIAL INTERROGATORY NO. 25:**

8       Responding Party objects to this Request as being vague and ambiguous and further objects to

9   this Request to the extent it calls for information which is privileged and protected from discovery by

10  the attorney-client communication privilege, the attorney work product doctrine (including, but not

11  limited to, expert information and opinions and communications by or to experts), and/or other

12  applicable privileges or protection. With respect specifically to facts known to experts, as well as

13  opinions held by experts, such information is privileged from discovery by means of contention

14  interrogatory and is only discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP.

15  See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). Subject to and without waiver of the

16  foregoing objections, Responding Party responds as follows: Claim 13 of the '374 Patent is a

17  dependent claim of Claim 12. The sternum adjustment used in the Miami J Select, which Defendants

18  refers to as the "sternal relief dial", and the "adjustment mechanism" described in Claim 12 of the '374

19  Patent, each make the sternum pad movable relative to the lower support of the cervical collar.

20      In addition, the adjustment mechanism described in Claim 1 of the '374 Patent makes the

21  sternum pad movable relative to the lower support of the cervical collar.

22  **SPECIAL INTERROGATORY NO. 28:**

23      State each and every fact known to YOU upon which YOU base YOUR

24  contention that the Sternal-Relief dial of the Miami J Select is the same structure of Claim 13 of

25  the '374 Patent.

26  **RESPONSE TO SPECIAL INTERROGATORY NO. 28:**

27      Responding Party objects to this Request as being vague and ambiguous as to what is meant by

28  "the same structure of Claim 13" and further objects to this Request to the extent it calls for

9

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1 information which is privileged and protected from discovery by the attorney-client communication

2 privilege, the attorney work product doctrine (including, but not limited to, expert information and

3 opinions and communications by or to experts), and/or other applicable privileges or protection. With

4 respect specifically to facts known to experts, as well as opinions held by experts, such information is

5 privileged from discovery by means of contention interrogatory and is only discoverable through the

6 procedure set for in Rule 26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424, 428-429

7 (N.D. Cal. 1989). The information requested calls for expert opinion and Plaintiff therefore objects to

8 providing that information by means of answering this interrogatory.

9 **SPECIAL INTERROGATORY NO. 31:**

10    State each and every fact known to YOU upon which YOU base YOUR

11 contention that the Sternal-Relief dial of the Miami J Select produces the same result as Claim 13 of

12 the '374 Patent.

13 **RESPONSE TO SPECIAL INTERROGATORY NO. 31:**

14    Responding Party objects to this Request as being vague and ambiguous and further objects to

15 this Request to the extent it calls for information which is privileged and protected from discovery by

16 the attorney-client communication privilege, the attorney work product doctrine (including, but not

17 limited to, expert information and opinions and communications by or to experts), and/or other

18 applicable privileges or protection. With respect specifically to facts known to experts, as well as

19 opinions held by experts, such information is privileged from discovery by means of contention

20 interrogatory and is only discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP.

21 See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). Subject to and without waiver of the

22 foregoing objections, Responding Party responds as follows: Claim 13 of the '374 Patent is a

23 dependent claim of Claim 12 of the '374 Patent. The sternum adjustment used in the Miami J Select,

24 which Defendants refer to as the "sternal relief dial", and the "adjustment mechanism" described in

25 Claim 12 of the '374 Patent, each make the cervical collar more comfortable for the user to wear by

26 enabling the user to relax or tighten the pressure of the sternum support pad on the sternum.

27 **SPECIAL INTERROGATORY NO. 34:**

28    State each and every fact known to YOU upon which YOU base YOUR

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1  contention that the '374 Patent covers the Sternal-Relief Dial of the Miami J Select.

2  **RESPONSE TO SPECIAL INTERROGATORY NO. 34:**

3  Responding Party objects to this Request as being vague and ambiguous and further objects to

4  this Request to the extent it calls for information which is privileged and protected from discovery by

5  the attorney-client communication privilege, the attorney work product doctrine (including, but not

6  limited to, expert information and opinions and communications by or to experts), and/or other

7  applicable privileges or protection. With respect specifically to facts known to experts, as well as

8  opinions held by experts, such information is privileged from discovery by means of contention

9  interrogatory and is only discoverable through the procedure set for in Rule 26(b(4)(A) of the FRCP.

10  See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). The information requested calls for

11  expert opinion and Plaintiff therefore objects to providing that information by means of answering this

12  interrogatory.

13  **SPECIAL INTERROGATORY NO. 37:**

14  State each and every fact known to YOU upon which YOU base YOUR

15  contention that the '374 Patent covers the Sternal-Relief Dial of the Miami J Select.

16  **RESPONSE TO SPECIAL INTERROGATORY NO. 37:**

17  Responding Party objects to this Request as being vague and ambiguous and further objects to

18  this Request to the extent it calls for information which is privileged and protected from discovery by

19  the attorney-client communication privilege, the attorney work product doctrine (including, but not

20  limited to, expert information and opinions and communications by or to experts), and/or other

21  applicable privileges or protection. With respect specifically to facts known to experts, as well as

22  opinions held by experts, such information is privileged from discovery by means of contention

23  interrogatory and is only discoverable through the procedure set for in Rule 26(b(4)(A) of the FRCP.

24  See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). The information requested calls for

25  expert opinion and Plaintiff therefore objects to providing that information by means of answering this

26  interrogatory.

27  **SPECIAL INTERROGATORY NO. 40:**

28  State each and every fact known to YOU upon which YOU base YOUR

11

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1  contention that the Miami J Select uses the Sternum Adjustment.

2  **RESPONSE TO SPECIAL INTERROGATORY NO. 40:**

3      Responding Party objects to this Request as being vague and ambiguous and further objects to

4  this Request to the extent it calls for information which is privileged and protected from discovery by

5  the attorney-client communication privilege, the attorney work product doctrine (including, but not

6  limited to, expert information and opinions and communications by or to experts), and/or other

7  applicable privileges or protection. Subject to and without waiver of the foregoing objections,

8  Responding Party responds as follows: The feature used in the Miami J Select which the Defendants

9  refer to as the "sternal relief dial", is based on the concept created by Responding Party that he refers to

10  as the "sternum adjustment", which is a mechanism that makes the cervical collar more comfortable for

11  the user to wear by enabling the user to relax or tighten the pressure of the sternum support pad on the

12  sternum by either allowing a forward flexing and angle change of the support pad or restricting that

13  movement.

14  **SPECIAL INTERROGATORY NO. 43:**

15      State each and every fact known to YOU upon which YOU base YOUR

16  contention that the Sternum Adjustment and the Sternal-Relief Dial of the Miami J

17  Select are substantially similar.

18  **RESPONSE TO SPECIAL INTERROGATORY NO. 43:**

19      Responding Party objects to this Request as being vague and ambiguous and further objects to

20  this Request to the extent it calls for information which is privileged and protected from discovery by

21  the attorney-client communication privilege, the attorney work product doctrine (including, but not

22  limited to, expert information and opinions and communications by or to experts), and/or other

23  applicable privileges or protection. With respect specifically to facts known to experts, as well as

24  opinions held by experts, such information is privileged from discovery by means of contention

25  interrogatory and is only discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP.

26  See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). With respect specifically to facts

27  known to experts, as well as opinions held by experts, such information is privileged from discovery by

28  means of contention interrogatory and is only discoverable through the procedure set for in Rule

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1  26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). The

2  information requested calls for expert opinion and Plaintiff therefore objects to providing that

3  information by means of answering this interrogatory.

4  **SPECIAL INTERROGATORY NO. 46:**

5     State each and every fact known to YOU upon which YOU base YOUR

6  Contention that the Sternal-Relief Dial has the same structure as the Sternum Adjustment.

7  **RESPONSE TO SPECIAL INTERROGATORY NO. 46:**

8     Responding Party objects to this Request as being vague and ambiguous as to what is meant by

9  "the same structure as the Sternum Adjustment" and further objects to this Request to the extent it calls

10  for information which is privileged and protected from discovery by the attorney-client communication

11  privilege, the attorney work product doctrine (including, but not limited to, expert information and

12  opinions and communications by or to experts), and/or other applicable privileges or protection. With

13  respect specifically to facts known to experts, as well as opinions held by experts, such information is

14  privileged from discovery by means of contention interrogatory and is only discoverable through the

15  procedure set for in Rule 26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424, 428-429

16  (N.D. Cal. 1989). With respect specifically to facts known to experts, as well as opinions held by

17  experts, such information is privileged from discovery by means of contention interrogatory and is only

18  discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130

19  F.R.D. 424, 428-429 (N.D. Cal. 1989). The information requested calls for expert opinion and Plaintiff

20  therefore objects to providing that information by means of answering this interrogatory.

21  **SPECIAL INTERROGATORY NO. 49:**

22     State each and every fact known to YOU upon which YOU base YOUR

23  contention that the Sternal-Relief Dial of the Miami J Select has the same function as

24  the Sternum Adjustment.

25  **RESPONSE TO SPECIAL INTERROGATORY NO. 49:**

26     Responding Party objects to this Request as being vague and ambiguous and further objects to

27  this Request to the extent it calls for information which is privileged and protected from discovery by

28  the attorney-client communication privilege, the attorney work product doctrine (including, but not

13
**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

limited to, expert information and opinions and communications by or to experts), and/or other

applicable privileges or protection. With respect specifically to facts known to experts, as well as

opinions held by experts, such information is privileged from discovery by means of contention

interrogatory and is only discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP.

See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989), Subject to and without waiver of the

foregoing objections, Responding Party responds as follows: The feature used in the Miami J Select

which the Defendants refer to as the "sternal relief dial" and the concept created by Plaintiff that he

refers to as the "sternum adjustment", each make the sternum pad movable relative to the lower support

of the cervical collar.

In addition, the adjustment mechanism described in Claim 1 of the '374 Patent makes the sternum

pad movable relative to the lower support of the cervical collar.

**SPECIAL INTERROGATORY NO. 52**:

State each and every fact known to YOU upon which YOU base YOUR

contention that the Sternal-Relief Dial of the Miami J Select produces the same result as the Sternum

Adjustment.

**RESPONSE TO SPECIAL INTERROGATORY NO. 52:**

Responding Party objects to this Request as being vague and ambiguous and further objects to

this Request to the extent it calls for information which is privileged and protected from discovery by

the attorney-client communication privilege, the attorney work product doctrine (including, but not

limited to, expert information and opinions and communications by or to experts), and/or other

applicable privileges or protection. Subject to and without waiver of the foregoing objections,

Responding Party responds as follows: The feature used in the Miami J Select which the Defendants

refer to as the "sternal relief dial", is based on the concept created by Responding Party that he refers to

as the "sternum adjustment", which is a mechanism makes the cervical collar more comfortable for the

user to wear by enabling the user to relax or tighten the pressure of the sternum support pad on the

sternum.

**SPECIAL INTERROGATORY NO. 55:**

State each and every fact known to YOU upon which YOU base YOUR

14

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1  contention that the repeatable fit option of the Miami J Select has the same structure as the Repeatable

2  Fit Tabs.

3  **RESPONSE TO SPECIAL INTERROGATORY NO. 55:**

4      Responding Party objects to this Request as being vague and ambiguous as to what is meant by

5  "the same structure as the Repeatable Fit Tabs" and further objects to this Request to the extent it calls

6  for information which is privileged and protected from discovery by the attorney-client communication

7  privilege, the attorney work product doctrine (including, but not limited to, expert information and

8  opinions and communications by or to experts), and/or other applicable privileges or protection. With

9  respect specifically to facts known to experts, as well as opinions held by experts, such information is

10  privileged from discovery by means of contention interrogatory and is only discoverable through the

11  procedure set for in Rule 26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424, 428-429

12  (N.D. Cal. 1989). With respect specifically to facts known to experts, as well as opinions held by

13  experts, such information is privileged from discovery by means of contention interrogatory and is only

14  discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130

15  F.R.D. 424, 428-429 (N.D. Cal. 1989) The information requested calls for expert opinion and Plaintiff

16  therefore objects to providing that information by means of answering this interrogatory.

17  **SPECIAL INTERROGATORY NO. 58:**

18      State each and every fact known to YOU upon which YOU base YOUR

19  contention that the repeatable fit option of the Miami J Select has the same function as the Repeatable

20  Fit Tabs.

21  **RESPONSE TO SPECIAL INTERROGATORY NO. 58:**

22      Responding Party objects to this Request as being vague and ambiguous and further objects to

23  this Request to the extent it calls for information which is privileged and protected from discovery by

24  the attorney-client communication privilege, the attorney work product doctrine (including, but not

25  limited to, expert information and opinions and communications by or to experts), and/or other

26  applicable privileges or protection. With respect specifically to facts known to experts, as well as

27  opinions held by experts, such information is privileged from discovery by means of contention

28  interrogatory and is only discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP.

15

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1   See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). With respect specifically to facts

2   known to experts, as well as opinions held by experts, such information is privileged from discovery by

3   means of contention interrogatory and is only discoverable through the procedure set for in Rule

4   26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). Subject to

5   and without waiver of the foregoing objections, Responding Party responds as follows: The Repeatable

6   Fit Tabs used in the Miami J Select, which Defendants refer to as the "Reproducible Fit Option, each

7   enable the user of the cervical collar to size the collar to themselves once; retain that size for future use;

8   and remove and replace the collar to the size that the user originally created using the feature.

9   **SPECIAL INTERROGATORY NO. 61:**

10       State each and every fact known to YOU upon which YOU base YOUR

11   contention that the repeatable fit option of the Miami J Select produces the same result as the

12   Repeatable Fit Tabs.

13   **RESPONSE TO SPECIAL INTERROGATORY NO. 61:**

14       Responding Party objects to this Request as being vague and ambiguous and further objects to

15   this Request to the extent it calls for information which is privileged and protected from discovery by

16   the attorney-client communication privilege, the attorney work product doctrine (including, but not

17   limited to, expert information and opinions and communications by or to experts), and/or other

18   applicable privileges or protection. With respect specifically to facts known to experts, as well as

19   opinions held by experts, such information is privileged from discovery by means of contention

20   interrogatory and is only discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP.

21   See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). With respect specifically to facts

22   known to experts, as well as opinions held by experts, such information is privileged from discovery by

23   means of contention interrogatory and is only discoverable through the procedure set for in Rule

24   26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). Subject to

25   and without waiver of the foregoing objections, Responding Party responds as follows: The feature in

26   the Miami J Select which the Defendants refer to as the "Reproducible Fit Option" and the concept which

27   Plaintiff refers to as the "Repeatable Fit Option" each enable the user of the cervical collar to size the

28   collar to themselves only once.

16
**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

**SPECIAL INTERROGATORY NO. 64:**

State each and every fact known to YOU upon which YOU base YOUR contention that the '374 Patent covers the Miami J Select.

**RESPONSE TO SPECIAL INTERROGATORY NO. 64:**

Responding Party objects to this Request as being vague and ambiguous and further objects to this Request to the extent it calls for information which is privileged and protected from discovery by the attorney-client communication privilege, the attorney work product doctrine (including, but not limited to, expert information and opinions and communications by or to experts), and/or other applicable privileges or protection. With respect specifically to facts known to experts, as well as opinions held by experts, such information is privileged from discovery by means of contention interrogatory and is only discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). With respect specifically to facts known to experts, as well as opinions held by experts, such information is privileged from discovery by means of contention interrogatory and is only discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP. See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). The information requested calls for expert opinion and Plaintiff therefore objects to providing that information by means of answering this interrogatory.

**SPECIAL INTERROGATORY NO. 67:**

State each and every fact known to YOU upon which YOU base YOUR contention that the '559 Patent covers the Miami J Select.

**RESPONSE TO SPECIAL INTERROGATORY NO. 67:**

Responding Party objects to this Request as being vague and ambiguous and further objects to this Request to the extent it calls for information which is privileged and protected from discovery by the attorney-client communication privilege, the attorney work product doctrine (including, but not limited to, expert information and opinions and communications by or to experts), and/or other applicable privileges or protection. Subject to and without waiver of the foregoing objections, Responding Party responds as follows: Responding Party does not contend that the '559 Patent covers the Miami J Select. Plaintiff is therefore unable to answer this interrogatory.

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

**SPECIAL INTERROGATORY NO. 70:**

State each and every fact known to YOU upon which YOU base YOUR contention that there is a structure in the Miami J Select that performs the claimed function of the Sternum Adjustment in the '559 Patent

**RESPONSE TO SPECIAL INTERROGATORY NO. 70:**

Responding Party objects to this Request as being vague and ambiguous as to what is meant by "a structure in the Miami J Select" and further objects to this Request to the extent it calls for information which is privileged and protected from discovery by the attorney-client communication privilege, the attorney work product doctrine (including, but not limited to, expert information and opinions and communications by or to experts), and/or other applicable privileges or protection. Subject to and without waiver of the foregoing objections, Responding Party responds as follows: The '559 Patent does not claim the Sternum Adjustment. Responding Party is therefore unable to answer this interrogatory.

**SPECIAL INTERROGATORY NO. 73:**

State each and every fact known to YOU upon which YOU base YOUR contention that there is material in the Miami J Select that performs the claimed function of the Sternum Adjustment in the '559 Patent.

**RESPONSE TO SPECIAL INTERROGATORY NO. 73:**

Responding Party objects to this Request as being vague and ambiguous as to what is meant by "material in the Miami J Select" and further objects to this Request to the extent it calls for information which is privileged and protected from discovery by the attorney-client communication privilege, the attorney work product doctrine (including, but not limited to, expert information and opinions and communications by or to experts), and/or other applicable privileges or protection. Subject to and without waiver of the foregoing objections, Responding Party responds as follows: The '559 Patent does not claim the Sternum Adjustment. Responding Party is therefore unable to answer this interrogatory.

**SPECIAL INTERROGATORY NO. 76:**

State each and every fact known to YOU upon which YOU base YOUR

18
**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1  contention that there is a structure in the Miami J Select that performs the claimed function of

2  the Sternum Adjustment in the '559 Patent.

3  **RESPONSE TO SPECIAL INTERROGATORY NO. 76:**

4          Responding Party objects to this Request as being vague and ambiguous as to what is

5  meant by "a structure in the Miami J Select" and further objects to this Request to the extent it calls for

6  information which is privileged and protected from discovery by the attorney-client communication

7  privilege, the attorney work product doctrine (including, but not limited to, expert information and

8  opinions and communications by or to experts), and/or other applicable privileges or protection.

9  Subject to and without waiver of the foregoing objections, Responding Party responds as follows:

10  The '559 Patent does not claim the Sternum Adjustment. Responding Party is therefore unable to answer

11  this interrogatory.

12  **SPECIAL INTERROGATORY NO. 79:**

13      State each and every fact known to YOU upon which YOU base YOUR

14  contention that the Sternum Adjustment in the '559 Patent and the Sternal-Relief Dial of the Miami J

15  Select are substantially similar.

16  **RESPONSE TO SPECIAL INTERROGATORY NO. 79:**

17          Responding Party objects to this Request as being vague and ambiguous as to what is

18  meant by "a structure in the Miami J Select" and further objects to this Request to the extent it calls for

19  information which is privileged and protected from discovery by the attorney-client communication

20  privilege, the attorney work product doctrine (including, but not limited to, expert information and

21  opinions and communications by or to experts), and/or other applicable privileges or protection.

22  Subject to and without waiver of the foregoing objections, Responding Party responds as follows:

23  The '559 Patent does not claim the Sternum Adjustment. Responding Party is therefore unable to answer

24  this interrogatory.

25  **SPECIAL INTERROGATORY NO. 88:**

26      State each and every fact known to YOU upon which YOU base YOUR

27  contention that Claim 5 of the '633 Patent is substantially similar to Claim 18 of the

28  '885 Patent Application.

19

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

**RESPONSE TO SPECIAL INTERROGATORY NO. 88:**

Responding Party objects to this Request as being vague and ambiguous and further objects to this Request to the extent it calls for information which is privileged and protected from discovery by the attorney-client communication privilege, the attorney work product doctrine (including, but not limited to, expert information and opinions and communications by or to experts), and/or other applicable privileges or protection. Subject to and without waiver of the foregoing objections, Responding Party responds as follows: Responding Party does not contend that Claim 5 of the '633 Patent is substantially similar to Claim 18 of the '885 Patent Application. Plaintiff is therefore unable to answer this interrogatory.

**SPECIAL INTERROGATORY NO. 91:**

State each and every fact known to YOU upon which YOU base YOUR contention that Claim 5 of the '633 Patent is substantially similar to Claim 25 of the '885 Patent Application.

**RESPONSE TO SPECIAL INTERROGATORY NO. 91**

Claim 25 of the '885 Application is the same as Claim 5 in the '633 Patent that issued on the '885 Application.

**SPECIAL INTRROGATORY NO. 94:**

State each and every fact known to YOU upon which YOU base YOUR contention that YOU contributed to the conception of Claim 5 of the '633 Patent.

**RESPONSE TO SPECIAL INTERROGATORY NO. 94:**

Responding Party objects to this Request as being vague and ambiguous and further objects to this Request to the extent it calls for information which is privileged and protected from discovery by the attorney-client communication privilege, the attorney work product doctrine (including, but not limited to, expert information and opinions and communications by or to experts), and/or other applicable privileges or protection. Subject to and without waiver of the foregoing objections, Responding Party responds as follows: The grip is a solid tab-like structure that is an obvious touch point built into and protruding from the center of the front portion of the intermediate support of the Miami J Select. The user of the Miami J Select or their clinician places a finger and/or thumb on the

20

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1  grip and moves their finger and/or thumb to smoothly and neatly adjust the height of the chin support

2  instead of grabbing the chin support assembly to adjust its height.  In a meeting that Plaintiff had on

3  September 28, 2016 with Chris Webster, who worked on the design team for the Miami J Select with

4  Responding Party and is a named as a co-inventor on the 633 Patent, Responding Party explained to

5  Webster the concept and need for the grip and drew by hand sketches of the grip. Webster was not

6  previously aware of this device and its function and expressed to Responding Party his understanding

7  of the concept and its need on the Miami J Select. Responding Party took a picture of the sketches of

8  the grip that he made for Webster in their meeting and emailed the pictures to Webster during the

9  meeting. Responding Party conceived the subject matter of at least Claim 5 and/or he contributed to the

10 conception of at least Claim 5 and also Claim 1 and he collaborated with one or more other persons to

11 produce the inventions through aggregate efforts.

12 **SPECIAL INTERROGATORY NO. 97:**

13     State each and every fact known to YOU upon which YOU base YOUR

14 contention that YOU are an inventor of the '633 Patent.

15 **RESPONSE TO SPECIAL INTERROGATORY NO. 97:**

16     Responding Party objects to this Request as being vague and ambiguous and further objects to

17 this Request to the extent it calls for information which is privileged and protected from discovery by

18 the attorney-client communication privilege, the attorney work product doctrine (including, but not

19 limited to, expert information and opinions and communications by or to experts), and/or other

20 applicable privileges or protection. Subject to and without waiver of the foregoing objections,

21 Responding Party responds as follows: The grip is a solid tab-like structure that is an obvious touch

22 point built into and protruding from the center of the front portion of the intermediate support of the

23 Miami J Select. The user of the Miami J Select or their clinician places a finger and/or thumb on the

24 grip and moves their finger and/or thumb to smoothly and neatly adjust the height of the chin support

25 instead of grabbing the chin support assembly to adjust its height.  In a meeting that Plaintiff had on

26 September 28, 2016 with Chris Webster, who worked on the design team for the Miami J Select with

27 Responding Party and is a named as a co-inventor on the 633 Patent, Responding Party explained to

28 Webster the concept and need for the grip and drew by hand sketches of the grip. Webster was not

21

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1 previously aware of this device and its function and expressed to Responding Party his understanding

2 of the concept and its need on the Miami J Select. Responding Party took a picture of the sketches of

3 the grip that he made for Webster in their meeting and emailed the pictures to Webster during the

4 meeting. Responding Party conceived the subject matter of at least Claim 5 and/or he contributed to the

5 conception of at least Claim 5 and also Claim 1 and he collaborated with one or more other persons to

6 produce the inventions through aggregate efforts.

7 **SPECIAL INTERROGATORY NO. 100:**

8 State each and every fact known to YOU upon which YOU base YOUR

9 contention that Claim 5 of the '633 Patent is not obvious.

10 **RESPONSE TO SPECIAL INTERROGATORY NO. 100:**

11 Responding Party objects to this Request as being vague and ambiguous and further objects to

12 this Request to the extent it calls for information which is privileged and protected from discovery by

13 the attorney-client communication privilege, the attorney work product doctrine (including, but not

14 limited to, expert information and opinions and communications by or to experts), and/or other

15 applicable privileges or protection. With respect specifically to facts known to experts, as well as

16 opinions held by experts, such information is privileged from discovery by means of contention

17 interrogatory and is only discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP.

18 See *Roberts v. Heim*, 130 F.R.D. 424 (1989). The information requested calls for expert opinion and

19 Plaintiff therefore objects to providing that information by means of answering this interrogatory.

20 **SPECIAL INTERROGATORY NO. 103:**

21 State each and every fact known to YOU upon which YOU base YOUR

22 contention that Claim 5 of the '633 Patent is novel.

23 **RESPONSE TO SPECIAL INTERROGATORY NO. 103:**

24 Responding Party objects to this Request as being vague and ambiguous and further objects to this

25 Request to the extent it calls for information which is privileged and protected from discovery by the

26 attorney-client communication privilege, the attorney work product doctrine (including, but not limited

27 to, expert information and opinions and communications by or to experts), and/or other applicable

28 privileges or protection. With respect specifically to facts known to experts, as well as opinions held by

22

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1  experts, such information is privileged from discovery by means of contention interrogatory and is only

2  discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP. *Roberts v. Heim*, 130

3  F.R.D. 424, 428-429 (N.D. Cal. 1989). The information requested calls for expert opinion and Plaintiff

4  therefore objects to providing that information by means of answering this interrogatory.

5  **SPECIAL INTERROGATORY NO. 106:**

6      State each and every fact known to YOU upon which YOU base YOUR

7  contention that Claim 5 of the '633 Patent was not known in the prior art.

8  **RESPONSE TO SPECIAL INTERROGATORY NO. 106:**

9      Responding Party objects to this Request as being vague and ambiguous and further objects to

10  this Request to the extent it calls for information which is privileged and protected from discovery by

11  the attorney-client communication privilege, the attorney work product doctrine (including, but not

12  limited to, expert information and opinions and communications by or to experts), and/or other

13  applicable privileges or protection. With respect specifically to facts known to experts, as well as

14  opinions held by experts, such information is privileged from discovery by means of contention

15  interrogatory and is only discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP.

16  See *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). The information requested calls for

17  expert opinion and Plaintiff therefore objects to providing that information by means of answering this

18  interrogatory.

19  **SPECIAL INTERROGATORY NO. 109:**

20      State each and every fact known to YOU upon which YOU base YOUR

21  contention that YOU contributed to the conception of Claim 1 of the '633 Patent.

22  **RESPONSE TO SPECIAL INTERROGATORY NO. 109:**

23      Responding Party objects to this Request as being vague and ambiguous and further objects to

24  this Request to the extent it calls for information which is privileged and protected from discovery by

25  the attorney-client communication privilege, the attorney work product doctrine (including, but not

26  limited to, expert information and opinions and communications by or to experts), and/or other

27  applicable privileges or protection. Subject to and without waiver of the foregoing objections,

28  Responding Party responds as follows: Responding Party collaborated with Defendants' representatives

23

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1    on the development and design of the height adjustment mechanism for the chin support that is claimed

2    in Claim 1 of the '633 Patent and contributed to the design of the height adjustment mechanism that is

3    claimed in Claim 1.

4    **SPECIAL INTERROGATORY NO. 112:**

5    State each and every fact known to YOU upon which YOU base YOUR

6    contention that YOU are entitled to a second royalty under the AGREEMENT.

7    **RESPONSE TO SPECIAL INTERROGATORY NO. 112:**

8    Responding Party objects to this Request as being vague and ambiguous and further objects to

9    this Request to the extent it calls for information which is privileged and protected from discovery by

10   the attorney-client communication privilege, the attorney work product doctrine (including, but not

11   limited to, expert information and opinions and communications by or to experts), and/or other

12   applicable privileges or protection. Responding Party assumes that the reference to "second royalty" is

13   to the second advanced royalty payment of $20,000.00 that is provided for in the AGREEMENT.

14   Based on that assumption, and subject to and without waiver of the foregoing objections, Responding

15   Party responds as follows: Responding Party was to receive two advanced royalty payments under the

16   AGREEMENT., regardless of whether or not the future royalty was ultimately due to Responding

17   Party. The first advanced payment was payable upon signing of the AGREEMENT and was paid to

18   Responding Party. The second advanced payment was $20,000, which was due upon successful

19   completion of the product development phase called "Gate 2.1" in the AGREEMENT. Defendants

20   unilaterally postponed the "Gate 2.1" phase for product design review that was the trigger for the

21   payment to Responding Party of the second advanced royalty of $20,000 multiple times. Although

22   some of Gate 2.1 occurred in the interim, the completion of Gate 2.1 phase was ultimately combined to

23   occur with the Gate 3.0 phase for product design freeze, when all specifications were to be finalized for

24   the Miami JS. The completion of Gate 2.1 and Gate 3.0 was necessary for the development of the

25   Miami J Select pursuant to Defendants' product development and life cycle process and the Miami J

26   Select could not have been completed without it. The completion of Gate 2.1 and Gate 3.0 therefore

27   had to occur and did occur on a date unknown to Responding Party sometime after the term of the

28   AGREEMENT expired and Responding Party's services terminated on January 31, 2017.

24

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

**SPECIAL INTERROGATORY NO. 115:**

State each and every fact known to YOU upon which YOU base YOUR contention that the AGREEMENT does not afford ÖSSUR sole and complete discretionary authority with respect to pursuing patents related to YOUR inventive concepts.

**RESPONSE TO SPECIAL INTERROGATORY NO. 115:**

Responding Party objects to this Request as being vague and ambiguous and further objects to this Request to the extent it calls for information which is privileged and protected from discovery by the attorney-client communication privilege, the attorney work product doctrine (including, but not limited to, expert information and opinions and communications by or to experts), and/or other applicable privileges or protection. Subject to and without waiver of the foregoing objections, Responding Party responds as follows: The AGREEMENT gives Defendants "full and sole" discretionary authority with regard to patenting or seeking patents with regard to any "Subject Intellectual Property", which is defined in the Agreement to mean "any intellectual property developed by Consultant for the Company *pursuant to* this Agreement". Thus, Defendants' discretion is limited to inventions developed by Responding Party *after* the Agreement was made. The AGREEMENT does not give Defendants any discretion with respect to patenting intellectual property created by Responding Party *prior to entering into the AGREEMENT.* Because Responding Party's right to a royalty is based upon concepts he created *prior to entering into the Agreement,* Defendants do not have discretion to not pursue patents for Responding Party's inventions; it must do so in good faith.

Where one party to a contract is vested with a discretionary power affecting the rights of another, the implied covenant requires that power be exercised in good faith. *Carma Developers (Cal.) Inc. v. Marathon Development California, Inc.*, 2 Cal.4th 342, 372 (1992) ("Carma"); *Locke v. Warner Bros., Inc.*, 57 Cal.App.4th 354, 363 (1997) (citing *Perdue v. Crocker National Bank*, 38 Cal.3d 913, 923 (1985)). Although the implied covenant does not operate to prohibit "a party from doing that which is *expressly* permitted by an agreement" (*Carma,* 2 Cal.4th at 374) (emphasis added)), that is not the situation here. Under the express terms of the AGREEMENT. Defendants

25

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1   have the discretion whether or not to pursue patent protection for any of Responding Party's

2   designs created pursuant to the AGREEMENT and Defendants have the discretion whether or not

3   to make or sell patented products. However, nothing in the AGREEMENT gives Defendants the

4   right to sell products incorporating Responding Party's designs that he created before entering into

5   the AGREEMENT without seeking patent protection. Because Defendants are engaging in conduct

6   which is not expressly allowed (*i.e.*, selling products with Responding Party's concepts without

7   seeking patent protection in good faith), its discretion with respect to patenting Responding Party's

8   inventions is limited by the implied covenant and Defendants are required to pursue patent

9   protection in good faith in order to effectuate the intent of the parties. *See also, Best Buy Stores,*

10   *L.P. v. Manteca Lifestyle Center, LLC*, 859 F.Supp.2d 1138 (E.D. Cal. 2012) (lease provision

11   interpreted to give developer discretion when to build, not the right not to build at all, and implied

12   covenant required developer to build in good faith).

13         If Defendants did not have the obligation to act in good faith, they could use and profit from

14   Responding Party's inventions, but refuse to seek patents and/or not name him as an inventor, so as

15   to deprive Responding Party of the future royalty provided for in the AGREEMENT. In effect,

16   Defendants would have no real obligation to Responding Party with respect to its use of

17   Responding Party's inventions, rendering the AGREEMENT illusory and unenforceable. The

18   implied covenant must be applied to avoid that result. *Bleecher v. Conte*, 29 Cal.3d 345, 350-52

19   (1981); *Larwin-Southern California, Inc. v. JGB Investment Co.*, 101 Cal.App.3d 626, 637 (1979).

20   **SPECIAL INTERROGATORY NO. 118:**

21         State each and every fact known to YOU upon which YOU base YOUR

22   contention that the  Miami J Select is a Patented Product as defined by the AGREEMENT entitling

23   YOU to future royalty payments.

24   **RESPONSE TO SPECIAL INTERROGATORY NO. 118:**

25         Responding Party objects to this Request as being vague and ambiguous and further objects to

26   this Request to the extent it calls for information which is privileged and protected from discovery by

27   the attorney-client communication privilege, the attorney work product doctrine (including, but not

28   limited to, expert information and opinions and communications by or to experts), and/or other

26

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1  applicable privileges or protection. With respect specifically to facts known to experts, as well as

2  opinions held by experts, such information is privileged from discovery by means of contention

3  interrogatory and is only discoverable through the procedure set for in Rule 26(b)(4)(A) of the FRCP.

4  *Roberts v. Heim*, 130 F.R.D. 424, 428-429 (N.D. Cal. 1989). Subject to and without waiver of the

5  foregoing objections, Responding Party responds as follows: Th sternum adjustment that is

6  incorporated in the Miami J Select, referred to by Defendants in their sales literature as the "sternal

7  relief dial", is based on a concept created by Plaintiff prior to entering into the AGREEMENT as

8  evidenced by written records; the sternum adjustment is protected and covered by at least Claims 1, 12

9  and 13 of the '374 Patent that is owned or controlled by Defendants and names Plaintiff as a co-

10  inventor; Defendants are estopped to assert that those claims do not cover the Miami J Select or that the

11  sternal relief dial is not patentable by stating in their sales literature that the sternal relief dial is

12  patented; and Defendants have been selling the Miami J Select since at least 2019.

13  **SPECIAL INTERROGATORY NO. 121:**

14  State each and every fact known to YOU upon which YOU base YOUR

15  contention that the AGREEMENT obligates ÖSSUR to pursue patents for YOUR

16  inventive concepts.

17  **RESPONSE TO SPECIAL INTERROGATORY NO. 121:**

18  Responding Party objects to this Request as being vague and ambiguous and further objects to

19  this Request to the extent it calls for information which is privileged and protected from discovery by

20  the attorney-client communication privilege, the attorney work product doctrine (including, but not

21  limited to, expert information and opinions and communications by or to experts), and/or other

22  applicable privileges or protection. Subject to and without waiver of the foregoing objections,

23  Responding Party responds as follows: California law implies in every contract a covenant of good

24  faith and fair dealing which requires each of the parties not to do anything that will deprive the other

25  parties of the benefits of the contract. This covenant not only imposes the duty to refrain from doing

26  anything which would render performance of the contract impossible, but also the duty to do

27  everything that the contract presupposes each party will do to accomplish its purpose. *Lueras v. BAC*

28  *Home Loans Servicing, LP*, 221 Cal.App 4th 49, 76 (2013). The implied duty of good faith and fair

27

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1  dealing aims to effectuate the contractual intentions of the parties. *Cates Construction, Inc. v. Talbot*
2  *Partners*, 21 Cal.4th 28, 43 (1999).

3  **SPECIAL INTERROGATORY NO. 124:**

4      State each and every fact known to YOU upon which YOU base YOUR
5  contention that YOU have sought patent protection for YOUR alleged Sternum
6  Adjustment concept.

7  **RESPONSE TO SPECIAL INTERROGATORY NO. 124:**

8  Responding Party objects to this Request as being vague and ambiguous and further objects to this
9  Request to the extent it calls for information which is privileged and protected from discovery by the
10  attorney-client communication privilege, the attorney work product doctrine (including, but not limited
11  to, expert information and opinions and communications by or to experts), and/or other applicable
12  privileges or protection. Subject to and without waiver of the foregoing objections, Responding Party
13  responds as follows: Responding Party has not sought patent protection for his Sternum Adjustment
14  concept.

15  **SPECIAL INTERROGATORY NO. 127:**

16      State each and every fact known to YOU upon which YOU base YOUR
17  contention that YOU have sought patent protection for YOUR alleged Repeatable Fit
18  Tabs concept.

19  **RESPONSE TO SPECIAL INTERROGATORY NO. 127:**

20      Responding Party objects to this Request as being vague and ambiguous and further objects to
21  this Request to the extent it calls for information which is privileged and protected from discovery by
22  the attorney-client communication privilege, the attorney work product doctrine (including, but not
23  limited to, expert information and opinions and communications by or to experts), and/or other
24  applicable privileges or protection. Subject to and without waiver of the foregoing objections,
25  Responding Party responds as follows: Responding Party has not sought patent protection for his
26  Repeatable Fit Tabs concept.

27  **SPECIAL INTERROGATORY NO. 130:**

28      State each and every fact known to YOU upon which YOU base YOUR

1  contention that YOU worked on product development for the Miami J Select.

2  **RESPONSE TO SPECIAL INTERROGATORY NO. 130:**

3  Responding Party objects to this Request as being vague and ambiguous and further objects to

4  this Request to the extent it calls for information which is privileged and protected from discovery by

5  the attorney-client communication privilege, the attorney work product doctrine (including, but not

6  limited to, expert information and opinions and communications by or to experts), and/or other

7  applicable privileges or protection. Subject to and without waiver of the foregoing objections,

8  Responding Party responds as follows: Responding Party contributed his concepts for a height

9  adjustment, the sternum adjustment and the repeatable fit tabs for the Miami J Select and worked on

10  the product development for the Miami J Select pursuant to the Agreement. The services he performed

11  pursuant to the Agreement were for the product development of the Miami J Select.

12  **SPECIAL INTERROGATORY NO. 133:**

13  State each and every fact known to YOU upon which YOU base YOUR

14  contention that the completion of Gate 2.1 for the Miami J Select occurred before the expiration of

15  the AGREEMENT.

16  **RESPONSE TO SPECIAL INTERROGATORY NO. 133:**

17  Responding Party objects to this Request as being vague and ambiguous and further objects to

18  this Request to the extent it calls for information which is privileged and protected from discovery by

19  the attorney-client communication privilege, the attorney work product doctrine (including, but not

20  limited to, expert information and opinions and communications by or to experts), and/or other

21  applicable privileges or protection. Subject to and without waiver of the foregoing objections,

22  Responding Party responds as follows: Responding Party does not contend that the completion of Gate

23  2.1 for the Miami J Select occurred before the expiration of the Agreement. Responding Party is

24  therefore unable to respond to this interrogatory.

25  **SPECIAL INTERROGATORY NO. 171:**

26  State each and every fact known to YOU upon which YOU base YOUR

27  contention, set forth in YOUR FAC (*See* FAC at ¶46), that YOU were fraudulently

28  induced by ÖSSUR to enter into the AGREEMENT.

29

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1    **RESPONSE TO SPECIAL INTERROGATORY NO. 171:**

2        Responding Party objects to this Request as being vague and ambiguous and further objects to

3    this Request to the extent it calls for information which is privileged and protected from discovery by

4    the attorney-client communication privilege, the attorney work product doctrine (including, but not

5    limited to, expert information and opinions and communications by or to experts), and/or other

6    applicable privileges or protection. Subject to and without waiver of the foregoing objections,

7    Responding Party responds as follows:  Responding Party was fraudulently induced by Defendants to

8    enter into the Agreement and to provide his inventions to Defendants in reliance on (i) Defendants'

9    promises and representations in the negotiations preceding the execution of the Agreement that it

10   would diligently seek patent protection for all of Responding Party's inventions that it used in its

11   cervical collar, naming him as an inventor or co-inventor, and that it would pay to him the Royalty, and

12   (ii) Defendants' express promises and representations in the Agreement. Responding Party negotiated

13   the terms of the Agreement with Duane Romo of Defendants in or about September and October of

14   2015, who made the foregoing representations to Responding Party that preceded the execution of the

15   Agreement, and Mr. Romo executed the Agreement on behalf of Defendants. In negotiating the

16   Agreement with Mr. Romo, Responding Party agreed to accept a lower consultancy fee in

17   consideration for a higher royalty rate than Defendants had originally proposed. Responding Party had

18   also initially demanded a royalty at a higher percentage rate if a patent issued as well as a royalty at a

19   lower percentage rate if a patent did not issue. Through Mr. Romo, Defendants insisted that a royalty

20   would only be paid if a patent issued naming Responding Paty as an inventor. Responding Party

21   relented to Defendants' demand due to Mr. Romo's assurance to him that Defendants would diligently

22   seek patent protection for all of Responding Party's inventions that it used in its cervical collar and that

23   it would name him as an inventor or co-inventor, and Responding Party's ignorance of Defendants'

24   intent not to seek patent claims for the inventions that Responding Party created. Responding Party did

25   not discover Defendants' true intentions to not pay him the Royalty and to not diligently seek patent

26   protection of his inventions until after he had provided his inventions to Defendants and discovered

27   that the Miami JS includes features that are based on his Sternum Adjustment and Repeatable Fit Tabs

28   concepts and other facts, from which  Responding Party concluded that Defendants' insistence that it

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1    would pay the Royalty to him only if a patent issued naming Responding Party as an inventor was

2    because Defendants did not intend to ever pay Responding Party the Royalty.

3          Defendants' fraudulent intent is further evidenced by the fact that Shane Fedon criticized

4    Responding Party's Agreement with Defendants to him while he was performing his services under the

5    Agreement, and in particular, Shane Fedon complained to Responding Party about his right to receive a

6    royalty in addition to consultancy fees. At the time of Shane Fedon's complaint, Responding Party

7    thought his complaint was motivated by professional envy and jealousy. However, after Responding

8    Party's discovery that the Miami JS includes features that are based on Responding Party's Sternum

9    Adjustment and Repeatable Fit Tabs concepts, in combination with his discovery of other facts,

10   including, but not limited to the facts alleged above and below, Responding Party concluded that Shane

11   Fedon's complaint revealed Defendants' fraudulent intent. Moreover, Defendants failed to name

12   Responding Party as an inventor as it was required to do by law in the 633 Patent, as well as two

13   applications for design patents that issued, despite his contributions with respect to certain features that

14   are the subject of claims in the 633 Patent and the design patents. Defendants failed to do so because of

15   its fraudulent and bad faith intent to avoid any possible claim by Responding Party that he was entitled

16   to a Royalty as a co-inventor of any such patent claims.

17         In addition, Defendants' fraudulent intent is evidenced by its following actions:

18             (i) failing to pursue patent claims for the Sternum Adjustment and Repeatable

19   Fit Tabs concepts in the non-provisional application filed on February 24, 2017 which issued as the

20   559 Patent, and failing to do so despite the fact such concepts are patentable and ÖSSUR's patent

21   lawyers told Responding Party those concepts were patentable and the provisional application included

22   claims for the Sternum Adjustment and Repeatable Fit Tabs;

23             (ii) waiting until February 24, 2017 to file the non-provisional application, after the

24   term of the Agreement had expired and Defendants had obtained all the services it needed from

25   Responding Party to produce the Miami JS with his concepts for the Sternum Adjustment and

26   Repeatable Fit Tabs;

27             (iii) withdrawing that portion of its 885 Application that included a claim for the

28   Sternum Adjustment;

31

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1    (iv) failing to name Responding Party as a co-inventor in the 885 Application, despite

2    the fact that Responding Party conceived the subject matter of at least one claim in the 885 Application

3    when it included Claim 18, and he conceived and/or he contributed to the conception of the subject

4    matter of at least Claim 25 in the 885 Application and collaborated with one or more other persons to

5    produce that invention through aggregate efforts;

6    (v) belatedly filing the continuation application for the 559 Patent to add claims

7    for the Sternum Adjustment, while wrongfully denying that those claims cover the Miami JS and that

8    the Miami JS is using the Sternum Adjustment; and

9    (vi) failing to pursue other and broader patent claims for the Sternum

10   Adjustment in the continuation application for the 559 Patent that issued as the 374 Patent that would

11   cover the Miami JS;

12   (vii) failing to pursue other and broader claims for the Sternum Adjustment in

13   another continuation application that would cover the Miami JS;

14   (viii) failing to pursue any patent claims for the Repeatable Fit Tabs, unless

15   such claims are included in a continuation application for the '633 Patent or the '374 Patent that is

16   unknow to Responding Party; and

17   (ix) using the Sternum Adjustment and Repeatable Fit Tabs in the Miami JS and

18   representing in Defendants' online advertising and product literature that those features are patented.

19   **SPECIAL INTERROGATORY NO. 174:**

20   State each and every fact known to YOU upon which YOU base YOUR

21   contention that ÖSSUR made false statements or representations to YOU prior to YOU

22   entering into the AGREEMENT set forth in YOUR FAC (*See* FAC at ¶46), that

23   allegedly induced YOU to enter into the AGREEMENT.

24   **RESPONSE TO SPECIAL INTERROGATORY NO. 174:**

25   Responding Party objects to this Request as being vague and ambiguous and further objects to

26   this Request to the extent it calls for information which is privileged and protected from discovery by

27   the attorney-client communication privilege, the attorney work product doctrine (including, but not

28   limited to, expert information and opinions and communications by or to experts), and/or other

32

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1  applicable privileges or protection. Subject to and without waiver of the foregoing objections,

2  Responding Party responds as follows:  Responding Party was fraudulently induced by Defendants to

3  enter into the Agreement and to provide his inventions to Defendants in reliance on (i) Defendants'

4  promises and representations in the negotiations preceding the execution of the Agreement that it

5  would diligently seek patent protection for all of Responding Party's inventions that it used in its

6  cervical collar, naming him as an inventor or co-inventor, and that it would pay to him the Royalty, and

7  (ii) Defendants' express promises and representations in the Agreement. Responding Party negotiated

8  the terms of the Agreement with Duane Romo of Defendants in or about September and October of

9  2015, who made the foregoing representations to Responding Party that preceded the execution of the

10  Agreement, and Mr. Romo executed the Agreement on behalf of Defendants. In negotiating the

11  Agreement with Mr. Romo, Responding Party agreed to accept a lower consultancy fee in

12  consideration for a higher royalty rate than Defendants had originally proposed. Responding Party had

13  also initially demanded a royalty at a higher percentage rate if a patent issued as well as a royalty at a

14  lower percentage rate if a patent did not issue. Through Mr. Romo, Defendants insisted that a royalty

15  would only be paid if a patent issued naming Responding Paty as an inventor. Responding Party

16  relented to Defendants' demand due to Mr. Romo's assurance to him that Defendants would diligently

17  seek patent protection for all of Responding Party's inventions that it used in its cervical collar and that

18  it would name him as an inventor or co-inventor, and Responding Party's ignorance of Defendants'

19  intent not to seek patent claims for the inventions that Responding Party created. Responding Party did

20  not discover Defendants' true intentions to not pay him the Royalty and to not diligently seek patent

21  protection of his inventions until after he had provided his inventions to Defendants and discovered

22  that the Miami JS includes features that are based on his Sternum Adjustment and Repeatable Fit Tabs

23  concepts and other facts, from which  Responding Party concluded that Defendants' insistence that it

24  would pay the Royalty to him only if a patent issued naming Responding Party as an inventor was

25  because Defendants did not intend to ever pay Responding Party the Royalty.

26       Defendants' fraudulent intent is further evidenced by the fact that Shane Fedon criticized

27  Responding Party's Agreement with Defendants to him while he was performing his services under the

28  Agreement, and in particular, Shane Fedon complained to Responding Party about his right to receive a

33

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1   royalty in addition to consultancy fees. At the time of Shane Fedon's complaint, Responding Party

2   thought his complaint was motivated by professional envy and jealousy. However, after Responding

3   Party's discovery that the Miami JS includes features that are based on Responding Party's Sternum

4   Adjustment and Repeatable Fit Tabs concepts, in combination with his discovery of other facts,

5   including, but not limited to the facts alleged above and below, Responding Party concluded that Shane

6   Fedon's complaint revealed Defendants' fraudulent intent. Moreover, Defendants failed to name

7   Responding Party as an inventor as it was required to do by law in the 633 Patent, as well as two

8   applications for design patents that issued, despite his contributions with respect to certain features that

9   are the subject of claims in the 633 Patent and the design patents. Defendants failed to do so because of

10  its fraudulent and bad faith intent to avoid any possible claim by Responding Party that he was entitled

11  to a Royalty as a co-inventor of any such patent claims.

12      In addition, Defendants' fraudulent intent is evidenced by its following actions:

13          (i) failing to pursue patent claims for the Sternum Adjustment and Repeatable

14  Fit Tabs concepts in the non-provisional application filed on February 24, 2017 which issued as the

15  559 Patent, and failing to do so despite the fact such concepts are patentable and ÖSSUR's patent

16  lawyers told Responding Party those concepts were patentable and the provisional application included

17  claims for the Sternum Adjustment and Repeatable Fit Tabs;

18          (ii)  waiting until February 24, 2017 to file the non-provisional application, after the

19  term of the Agreement had expired and Defendants had obtained all the services it needed from

20  Responding Party to produce the Miami JS with his concepts for the Sternum Adjustment and

21  Repeatable Fit Tabs;

22          (iii) withdrawing that portion of its 885 Application that included a claim for the

23  Sternum Adjustment;

24          (iv) failing to name Responding Party as a co-inventor in the 885 Application, despite

25  the fact that Responding Party conceived the subject matter of at least one claim in the 885 Application

26  when it included Claim 18, and he conceived and/or he contributed to the conception of the subject

27  matter of at least Claim 25 in the 885 Application and collaborated with one or more other persons to

28  produce that invention through aggregate efforts;

34
**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)**

1         (v) belatedly filing the continuation application for the 559 Patent to add claims

2 for the Sternum Adjustment, while wrongfully denying that those claims cover the Miami JS and that

3 the Miami JS is using the Sternum Adjustment; and

4         (vi) failing to pursue other and broader patent claims for the Sternum

5 Adjustment in the continuation application for the 559 Patent that issued as the 374 Patent that would

6 cover the Miami JS;

7         (vii) failing to pursue other and broader claims for the Sternum Adjustment in

8 another continuation application that would cover the Miami JS;

9         (viii) failing to pursue any patent claims for the Repeatable Fit Tabs, unless

10 such claims are included in a continuation application for the '633 Patent or the '374 Patent that is

11 unknow to Responding Party; and

12         (ix) using the Sternum Adjustment and Repeatable Fit Tabs in the Miami JS and

13 representing in Defendants' online advertising and product literature that those features are patented.

14 **SPECIAL INTERROGATORY NO. 177:**

15      State each and every fact known to YOU upon which YOU base YOUR

16 contention, set forth in YOUR FAC (*See* FAC at ¶¶ 59-60), that ÖSSUR intentionally

17 omitted information from the PTO.

18 **RESPONSE TO SPECIAL INTERROGATORY NO. 177:**

19      Responding Party objects to this Request as being vague and ambiguous and further objects to

20 this Request to the extent it calls for information which is privileged and protected from discovery by

21 the attorney-client communication privilege, the attorney work product doctrine (including, but not

22 limited to, expert information and opinions and communications by or to experts), and/or other

23 applicable privileges or protection. Subject to and without waiver of the foregoing objections,

24 Responding Party responds as follows Defendants intentionally failed to name Responding Party as a

25 ///

26 ///

27 ///

28 ///

1   co-inventor in the application for the '633 Patent; Defendants failed inform the PTO that Responding

2   Party was an inventor of the '633 Patent; and Defendants failed to advise the PTO of the facts that

3   made Responding Party an inventor of the '633 Patent.

4

5   Dated: October 30, 2023

6                                                    _____
                                                     GEORGE B. PIGGOTT (68227)
7                                                    a member of George B. Piggott, A Professional
                                                     Corporation
8                                                    Attorney for Plaintiff WAYNE CALCO

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**VERIFICATION**</u>

I, Wayne Calco, have read the foregoing **PLAINTIFF'S RESPONSES TO DEFENDANTS'**

**SPECIAL INTERROGATORIES (SET ONE)** and know its contents. I am a party to this action. The

matters stated in the foregoing document are true of my own knowledge, except to those matters that are

stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California and the United States

of America that the foregoing is true and correct, and that this Verification was executed on October 30,

2023, at Anaheim, California.

Wayne Calco

VERIFICATION

1

## PROOF OF SERVICE

2

3    I am employed in the County of Orange, State of California.  I am over the age of eighteen (18) years and not a party to the within action; my business address is 2603 Main Street, Penthouse, Irvine, California 92614.

4

5    On October 30, 2023, I served the foregoing document described as: **PLAINTIFF'S RESPONSES TO DEFENDANTS' SPECIAL INTERROGATORIES (SET ONE)** on the parties interested in said action, as follows:

6

7    Scott R. Hatch, Esq.
Joshua G. Simon, Esq.

8    Rebecca Makitalo, Esq.
CALL & JENSEN

9    610 Newport Center Drive, Suite 700
Newport Beach, CA 92660

10   Email: shatch@calljensen.com

11           jsimon@calljensen.com
           rmakitalo@calljensen.com

12

13   **[ X ] BY MAIL**

14       I caused [   ] the original [ X ] a true copy of above-described document to be placed in a sealed envelope addressed to the addressee(s) listed above. I am readily familiar with the firm's practice of collecting and processing of the mail.  Under that practice it would be deposited with

15   United States Postal Service on that same day with postage thereon fully prepaid at Irvine, California in the ordinary course of business.  I am aware that on motion of the party served,

16   service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing affidavit.

17

18   **[ X ] BY ELECTRONIC SERVICE**

19       I caused a PDF copy of the above-described document to be served by e-mail to the email address of the addressee(s) listed above.

20

21       I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed on

22   October 30, 2023. at Irvine, California.

23

24                                   George B. Piggott

25

26

27

28

PROOF OF SERVICE

# EXHIBIT 78

1  GEORGE B. PIGGOTT (SBN 68227)
   a member of GEORGE B. PIGGOTT,
2  A PROFESSIONAL CORPORATION
   2603 Main Street, Penthouse
3  Irvine, California 92614
   Tel:   (949) 261-0500
4  Fax:   (949) 261-1085
   Email: george@piggottlaw.com
5
   Attorney for Plaintiff Wayne Calco
6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11 WAYNE CALCO, an individual,           Case No. **8:22-cv-01971-CJC-KES)**

12                         Plaintiff,

13          vs.                          **PLAINTIFF WAYNE CALCO'S**
                                         **EXPERT DISCLOSURE PURSUANT**
14 ÖSSUR AMERICAS, INC., a California    **TO F.R.C.P. 26(a)(2)(B)**
   corporation; ÖSSUR hf, an Icelandic
15 company; and DOES 1 through 10,
   inclusive,
16

17                       Defendants.

18

19                                       Complaint Filed:   October 26, 2022
                                         Trial Date:        April 9, 2024
20

21

22

23

24

25

26

27

28

   PLAINTIFF WAYNE CALCO'S  EXPERT DISCLOSURE PURSUANT TO F.R.C.P. 26(a)(2)(B)

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

Pursuant to the Federal Rules of Civil Procedure 26(a)(2)(B) and the Local Rules of this Court, Plaintiff WAYNE CALCO ("CALCO") hereby submits the following list of prospective witnesses who may be called by CALCO's counsel to testify as to their expert opinion at the time of trial.

CALCO reserves the right to retain and call any and all other expert witnesses which need may arise after the deposition testimony of various experts involved herein have been obtained, should the same become necessary.

Further, CALCO reserves the right to call any and all parties or their employees or in-house expert witnesses in this matter, or read the deposition of any and all said witnesses who have testified, or call at the time of trial to testify, any and all of said employee-witnesses who have thus far testified by way of deposition and elicit from said witness, in addition to their percipient knowledge, any and all expert opinion and testimony for which they may be competent to give.

CALCO reserves the right to call any, and all experts designated by any party in this case. Subject to the aforementioned, CALCO hereby designates the following expert witnesses, who may be called by CALCO at the time of trial:

**Retained Experts:**

1.  **Larry K. Roberts, Esq.**

    24 Corporate Plaza, Second Floor

    Newport Beach, CA 92660

    (949) 640-6200

2.  **James Christopoulos, J.D., M.A.**

    Economics Consulting Group

    555 Anton Boulevard, Suite 150

    Costa Mesa, CA 92626

    (714) 442-8561

1
PLAINTIFF WAYNE CALCO'S  EXPERT DISCLOSURE PURSUANT TO F.R.C.P. 26(a)(2)(B)

1   Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure attached

2   hereto as Exhibit "A" is a true and accurate copy of the expert report by Larry K.

3   Roberts containing his statement of all opinions that the witness will express and the

4   basis for them, his qualifications, and fee schedule.

5   Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure attached

6   hereto as Exhibit "B" is a true and accurate copy of the expert report of Mr.

7   Christopolous containing his statement of all opinions that the witness will express and

8   the basis for them, his qualifications including a list of all publications, fee schedule,

9   and list of prior cases in which the witness testified as an expert at trial or by deposition.

10   In addition to the foregoing, CALCO reserves the right to call further expert

11   witnesses in rebuttal or by way of impeachment made necessary by their presentation of

12   the various parties' cases. CALCO also reserves the right to supplement this designation

13   at a later time.

14   CALCO reserves the right to call further expert witnesses at the time of trial. If

15   other expert witnesses are intended to be called, proper notification will be given to all

16   parties with the opportunity for deposition of said expert. In the event that any additional

17   analyses are obtained by any other party prior to trial, CALCO reserves the right to call

18   as an expert witness the professional performing the analysis.

19   CALCO retains the right to amend, modify or supplement this disclosure and

20   specifically reserves the right to withdraw any of the foregoing expert witnesses at any

21   time prior to their being called to testify at trial. CALCO expressly reserves the right to

22   file a supplemental list of witnesses. CALCO shall, or may, later designate individuals

23   as experts in this matter, including, but not limited to, individuals who are experts in the

24   subject areas described above, and any subject areas described by other parties to this

25   litigation. CALCO will designate such witnesses' names, addresses, qualifications and

26   the general substance of their testimony as soon as the same are ascertained so as to

27   allow complete discovery of all opinions and documentation.

28

2

PLAINTIFF WAYNE CALCO'S  EXPERT DISCLOSURE PURSUANT TO F.R.C.P. 26(a)(2)(B)

1

2

Dated: January 10, 2024                          /s/George B. Piggott
                                                 GEORGE B. PIGGOTT (68227)
3                                                a member of George B. Piggott, A Professional
                                                 Corporation
4                                                Attorney for Plaintiff WAYNE CALCO

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A

GEORGE B. PIGGOTT (SBN 68227)
a member of GEORGE B. PIGGOTT,
A PROFESSIONAL CORPORATION
2603 Main Street, Penthouse
Irvine, California 92614
Tel:    (949) 261-0500
Fax:    (949) 261-1085
Email: george@piggottlaw.com

Attorney for Plaintiff Wayne Calco

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WAYNE CALCO, an individual,<br><br>                                        Plaintiff,<br><br>         vs.<br><br>ÖSSUR AMERICAS, INC., a California corporation; ÖSSUR hf, an Icelandic company; and DOES 1 through 10, inclusive,<br><br>                                        Defendants. | Case No. **8:22-cv-01971-CJC-KES**<br><br>**RULE 26 REPORT OF PLAINTIFF'S PATENT EXPERT, LARRY K. ROBERTS; EXHIBITS IN SUPPORT THEREOF** |

1  **QUALIFICATIONS**

2      I am Larry K. Roberts, an attorney licensed to practice in California since 1976. My bar

3  number is 73297. I am also a USPTO-registered patent attorney, registration number 28464. I

4  have been a registered patent attorney since 1977. My office is presently at 24 Corporate Plaza

5  Drive, Second Floor, Newport Beach, CA 92660. My office telephone number is 949-640-6200.

6  I received a BS degree in Electrical Engineering from the University of Illinois in 1971, and an

7  MS degree in Engineering from UCLA in 1975. I received a JD degree from Loyola University

8  of Los Angeles in 1976.

9      I have been in private law practice since 1976, specializing in patent and trademark

10  matters. In the course of my work, I have prepared hundreds of patent applications. I have

11  prepared several patent applications for Wayne Calco, including one which issued as US Patent

12  9,132,027, entitled "Adjustable Cervical Collar."

13  **SCOPE OF ASSIGNMENT**

14      I have been retained by the Law Offices of George B. Piggott, A Professional

15  Corporation and I am being compensated at a rate of $375 per hour.

16      I expect to testify on the subject of claim coverage of US 11478374 (the '374 Patent) in

17  regard to the Ossur Miami JS cervical collar, on the subject of the Ossur prosecution of the '374

18  Patent, and whether the '374 Patent specification supports additional claims which cover the

19  Ossur Miami JS cervical collar.

20      This analysis is based on information available at the date of this report. I reserve the

21  right to supplement this report upon the receipt of additional information.

22  **OPINIONS:**

23  Based on my analysis of the information provided to date, it is my opinion that:

24      1. At least Claims 1, 12 and 13 of the '374 Patent cover the Miami JS cervical collar.

25      2. All original claims of the application which issued as the '374 patent were patentable

26         over the art cited by the USPTO examiner, and Ossur erred in not traversing the

27         examiner's rejection.

28

3. Additional patentable claims could have been, and could still be asserted, based on the '374 patent specification, which cover the Miami JS cervical collar, but Ossur has not sought such additional patent coverage.

**INFORMATION PROVIDED**

In preparing this report, I reviewed:

- The PTO file history of the '374 patent, as well as the parent application 15/422,029 which issued as US Patent 10,512,559.

- Exemplars of the Miami JS cervical collar.

- The results of a patentability search conducted with respect to claims I drafted based on the specification of the '374 patent.

- The Ossur website regarding the Miami JS cervical collar and documents cited therein, including the "Instructions for Use – Miami J Select".

- Certain discovery responses provided by Ossur, including the response to plaintiff's special interrogatory 1.

**ANALYSIS & BASIS OF OPINIONS**

**Opinion 1:**

At least Claims 1, 12 and 13 of the '374 Patent cover the Miami JS cervical collar. Attached as Exhibit 1 is a claim chart which analyzes how Claims 1, 12 and 13 of the '374 Patent cover the Sternal Relief Dial in the Miami JS. To the extent that any of the elements or limitations of the claims do not literally cover the Miami JS, they satisfy the doctrine of equivalents because they perform substantially the same function, in substantially the same way, to achieve substantially the same result as the elements or limitations in the patent claim. [*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. 722 (2002); *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997)].

It is apparently unchallenged that the Miami JS includes an anterior component arranged for connecting to a posterior component, and that the anterior component comprises a main support, a lower support hingedly connected to the main support, and a sternum pad. These features are common to both independent Claims 1 and 12.

3
RULE 26 REPORT OF PLAINTIFF'S PATENT EXPERT, LARRY K. ROBERTS; AND EXHIBITS IN SUPPORT THEREOF

Both Claims 1 and 12 also include the feature of "an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support." This feature is clearly present in the Miami JS collar. In a discovery response, Ossur stated that the "the Miami J Select merely has a rotatable dial that can lock the sternum pad relative to the lower support or can be turned clockwise or counterclockwise, to release the locking and permit the sternum pad to flex relative to the lower support…" This response appears to reflect an admission that this feature of Claims 1 and 12 is also found in the Miami JS.

Claim 1 further recites that the adjustment mechanism includes the feature that the sternum pad is mounted to a ball joint. There is little discussion of the function of the ball joint 142 in the '374 description, merely that the extension element 144 carries the ball joint 142 at an end thereof. FIGS. 20 and 21 show a dotted line marked 142, and the sternal pad 138. The only indication of the structure of the ball joint is the dotted line. FIG. 21 shows the sternal pad 138 in both solid line and in dashed lines, with the bottom-most dashed representation indicating that the sternal pad 138 is tilted so as not parallel to the lower support 20. This appears, in my view, to show that the ball joint, whose construction is not otherwise illustrated, allows the orientation of the sternal pad 138 to flex relative to the lower support.

Instead of a "ball joint" the Miami JS uses a living hinge to allow the sternum pad to flex relative to the lower support. A living hinge is the equivalent of the "ball joint" in this application.

**Opinion 2:**

The '374 patent application (application number16686582) received a first office action from the US Patent and Trademark Office (PTO) on 2/17/22. A true and correct copy of the office action is attached hereto as Exhibit 2. Of the 20 claims filed with the application, claims 1-12, 16-17 and 19-20 were rejected, and claims 13-15 and 18 were objected to. Claims 1-2, 4-7, 9-12 and 16-17 were rejected under Section 102 as being anticipated by Martin (US 20160008158), meaning that the Examiner considered Martin to disclose each element of these rejected claims. Claims 3 and 8 and 19-20 were rejected under Section 103 as being

unpatentable over Martin in view of Suarez (20130281899), on ground that the differences between the claimed subject matter and these references would have been obvious to a person of ordinary skill in the art. Claims 13-15 and 18 were indicated as allowable if rewritten in independent form.

The original claim 1 of the '582 application was directed to a cervical collar, with an anterior component arranged for connecting to a posterior component. The anterior component comprising a main support, a lower support hingedly connected to the main support, a sternum pad, and "an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support." Original application Claim 1 clearly covered the Miami JS collar.

Ossur responded to the office action by an amendment filed May 20, 2022. A true and correct copy of Ossur's response is attached hereto as Exhibit 3. Rather than argue that the original claims were patentable over the cited Martin reference, Ossur simply amended the claims so that the subject matter of Claim 13 was incorporated in amended claim 1, and Claim 14 was amended to independent form including the features of claim 1. Claims 19 and 20 were canceled.

Rather than accept the examiner's interpretation of Martin, in my opinion, Ossur should have argued that the original claims were patentable over Martin and Suarez. This approach would have been successful in removing the Section 102 and 103 rejections of the original claims.

The examiner's interpretation of Martin to disclose "an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support" was incorrect. Martin discloses an adjustment mechanism including knob 108 and element 122 which fixes the position of the lower support 114 relative to the main support 104. Martin does not provide for adjustment of the sternum pad (132, 200) relative to the lower support 114. Independent claims 19 and 20 include a more specifically defined adjustment mechanism, even more clearly distinguished from Martin. Suarez also does not disclose an adjustment mechanism for adjusting the sternum pad relative to the main

RULE 26 REPORT OF PLAINTIFF'S PATENT EXPERT, LARRY K. ROBERTS; AND EXHIBITS IN SUPPORT THEREOF

1    support.

2    　　The appropriate response to the office action of 2-17-22 was to argue the incorrectness of

3    the examiner's interpretation of Martin and Suarez, without amending Claims 1 and 19. Claims

4    13 and 14 should have been amended to independent form to capture the allowable subject

5    matter of these claims.  This argument would have removed the rejection of the claims under 35

6    USC 102/103, in my opinion.

7    **Opinion 3:**

8    　　Additional patentable claims could have been, and could still be asserted, based on the

9    '374 patent specification, which cover the Miami JS cervical collar and its adjustable height and

10   sternum adjustment features, but Ossur has apparently not sought such additional patent

11   coverage.

12   　　I have drafted a set of proposed patent claims supported by the disclosure of the '374

13   patent and its parent and grandparent applications, which provide additional claim coverage of

14   the sternum adjustment feature in combination with the mechanism for locking the position of

15   the collar's lower support relative to the main support. A copy of the proposed claim set is

16   attached as Exhibit 4.

17   　　Among the features of the proposed claim set are (i) an adjustment mechanism located on

18   the lowermost portion of the lower support for adjusting pressures of the lower pad relative to

19   the user's sternum region, (ii) a lock mechanism arranged for locking movement of the lower

20   support relative to the main support to lock the lower support in the adjusted position, the lock

21   mechanism comprising an actuator for adjusting the lock mechanism from locked to unlocked

22   conditions, the actuator located on the lower support, the actuator configured to control

23   engagement of a lock element to the locked condition and to control disengagement of the lock

24   element while in the unlocked condition, the lock mechanism further including a bias element

25   arranged to return the lock element to the locked condition by release of the actuator; and (iii)

26   wherein the adjustment mechanism operates independently of the lock mechanism so that

27   adjustment of pressures of the lower pad relative to the user's sternum region does not affect the

28   adjusted position of the lower support relative to the main support.

RULE 26 REPORT OF PLAINTIFF'S PATENT EXPERT, LARRY K. ROBERTS; AND EXHIBITS IN SUPPORT THEREOF

1    It is my opinion, based on review of prior references cited in the PTO prosecution of the

2    '374 patent and the prior art results of a patentability search conducted by a patent search firm,

3    that the proposed claims are patentable over the known prior art.

4    The patentability search identified a number of additional references, beyond the

5    references cited in the '374 patent prosecution. These references are the following:

| | |
|---|---|
| US9414956 | Garth Geoffrey et al. |
| US20100185130 | Rizo Patron Martin Eduardo |
| WO2015/025319 | Kantor Ehud |
| WO2014/033464 | Torlei Karina et al. |
| KR10-2009-0063297 | Lee, Sang Ho |
| KR10-2009-0063296 | Lee, Sang Ho |
| KR10-1371166 | Sun, Dong Youn |
| KR10-1205438 | Ryu, Sil Gun |
| CN204766078 | Zhou Wenguan et al. |
| CN204521095 | Li Binglei |
| CN105326596 | Zhang Ying et al. |
| CN105287081 | Xiao Liangxing et al. |
| CN105287080 | Zhang Ying et al. |

In my view, none of these references, alone or in combination, teach or suggest the cervical

collar as defined in these proposed claims. Particularly, the combination of features (i), (ii) and

(iii) above are not described or suggested by the references. The proposed claims would provide

additional significant patent protection to Ossur relative to the Miami JS, significantly

strengthening Ossur's patent position in relation to competitors attempting to provide competing

products.

Executed this 10th day of January 2024 at Newport Beach, California.

*Larry K. Roberts*

Larry K. Roberts

RULE 26 REPORT OF PLAINTIFF'S PATENT EXPERT, LARRY K. ROBERTS; AND EXHIBITS IN SUPPORT THEREOF

EXHIBIT 1

| Assignee: | OSSUR ICELAND EHF, ICELAND |
|---|---|
| Title: | Cervical collar having height adjustment |
| Filing Date: | 2019-11-18 |
| Publication Date: | 2022-10-25 |
| Inventor: | CALCO WAYNE et al. |
| Earliest Priority: | 2016-02-25 |

Claims:

| 1 | A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising: | **Features of Miami JS collar (as depicted in Miami J Select Instructions for Use ("Instructions"), and photos of the product.** |
|---|---|---|

1

| a main support; | Item c, chin support, in drawing on page 3 of the Instructions |
|---|---|
| a lower support hingedly connected to the main support; | The lower support is in two structures fixed together, and marked by the manuscript notation on the Instruction page 3 drawing. On the Miami JS collar, the lower support includes a first structure made of a rigid white plastic material, and the second structure is made of a semi-rigid gray plastic material.  The lower support is hingedly connected to the chin support structure to provide height adjustment controlled by height adjustment button g. |
| a sternum pad; and | The Miami JS has a sternum pad, marked as i in the Instruction drawing. This is a soft padding. |

2

| | |
|---|---|
| an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support; | **The Miami JS includes an adjustment mechanism including Sternum Relief Knob h shown in the Instruction page 3, and is mounted on the lowermost portion of the lower support, on the second structure of the lower support. The sternum padding is attached by hook and loop fasteners to the bottom of the lower support. The lowermost portion of the lower support is connected by a living hinge (marked by manuscript notation on the Instruction drawing). The Knob h is rotatable to a horizontal position to allow the lowermost portion of the lower support to flex relative to rest of the lower support, allowing the sternum pad to move relative to the lower support, so that pressure exerted by the sternum support and the patient's sternum is reduced or relaxed.** |
| wherein the sternum pad is mounted to a ball joint and the adjustment mechanism has an adjustment dial and an extension element arranged for adjustably extending relative to the lower support. | **The ball joint of Claim 1 provides flexibility to the mounting of the sternum pad. In the Miami JS, the sternum pad is "mounted' or connected to the lowermost portion of the lower support, and the living hinge provides flexibility to the mounting of the sternum pad. The living hinge is a ball joint, or the equivalent of a ball joint.**<br><br>**The Miami JS includes Sternum Relief Knob h. A boss extending from the dial extends through an opening in the lowermost portion in the lower support, barb-like features at the end of the boss cooperate with the opening and a recess in the opening to allow the boss and dial to rotate between the horizontal and the vertical position.**<br><br>**The Knob h includes an elongated portion (the extension element), which adjustably extends relative to the portion of the lower support above the living hinge.** |

3

| | | |
|---|---|---|
| 2 | The cervical collar of claim 1, wherein the adjustment mechanism includes an extension element variably extendable from the adjustment mechanism. | |
| 3 | The cervical collar of claim 2, wherein the adjustment mechanism includes a dial for adjusting a distance the extension element extends from the adjustment mechanism. | |
| 4 | The cervical collar of claim 2, wherein the adjustment mechanism includes a housing arranged for receiving the extension element in a contracted configuration. | |
| 5 | The cervical collar of claim 1, wherein the main support carries an upper support connected to inside the main support and oriented to face a mandible of a user. | |
| 6 | The cervical collar of claim 5, wherein the upper support is maintained in a stationary relationship with the main support. | |
| 7 | The cervical collar of claim 5, wherein the upper support is rigid. | |
| 8 | The cervical collar of claim 1, wherein the adjustment mechanism is located at a lowermost portion of the lower support. | |
| 9 | The cervical collar of claim 8, wherein the adjustment mechanism is located centrally at the lowermost portion of the lower support. | |
| 10 | The cervical collar of claim 1, wherein the main support carries a lock mechanism for locking rotation of the lower support relative to the main support. | |
| 11 | The cervical collar of claim 1, wherein the main support has a generally arcuate configuration adapted to extend about the mandible of a user, and the lower support has a generally arcuate configuration contoured for being adapted for securing against a sternum of the user. | |
| 12 | A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising: | **Features of Miami JS collar (as depicted in Miami J Select Instructions for Use ("Instructions"), and photos of the product.** |
| | a main support; | **Item c, chin support, in drawing on page 3 of the Instructions** |

4

| | |
|---|---|
| a lower support hingedly connected to the main support; | The lower support is in two structures fixed together, and marked by the manuscript notation on the Instruction page 3 drawing. On the Miami JS collar, the lower support includes a first structure made of a rigid white plastic material, and the second structure is made of a semi-rigid gray plastic material.  The lower support is hingedly connected to the chin support structure to provide height adjustment controlled by height adjustment button g. |
| a sternum pad; and | The Miami JS has a sternum pad, marked as i in the Instruction drawing. This is a soft padding. |
| an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support; | The Miami JS includes an adjustment mechanism including Sternum Relief Knob h shown in the Instruction page 3, and is mounted on the lowermost portion of the lower support, on the second structure of the lower support.<br><br>The sternum padding is attached by hook and loop fasteners to the bottom of the lower support.  The lowermost portion of the lower support is connected by a living hinge (marked by manuscript notation on the Instruction drawing).<br><br>The Knob h is rotatable to a horizontal position to allow the lowermost portion of the lower support to flex relative to rest of the lower support, allowing the sternum pad to move relative to the lower support, so that pressure exerted by the sternum support and the patient's sternum is reduced or relaxed. |

5

| | | |
|---|---|---|
| | wherein the adjustment mechanism includes a housing arranged for receiving an extension element in a contracted configuration resulting in a reduced or substantially minimized distance between the lower support and the sternum pad, the extension element having a screw thread, and the housing defining corresponding threads permitting slidable movement between the extension element and the screw thread according to adjustment of a dial associated with the extension element. | The lowermost portion of the lower support has an opening formed therein, forming the housing. The Knob h its elongated portion has a protruding boss, with two thread-like projections with barb-like features. These projections form a screw thread, or are the equivalent of a screw thread.<br><br>The boss is received into the opening of the lowermost portion of the lower support. The opening in the lower portion includes an area of reduced thickness surrounding the opening, forming a thread or thread-like corresponding thread feature, or which is the equivalent of the "corresponding threads." The thread or thread-like feature of the opening (i. e. the housing) permits sliding movement of the Knob, boss and projections within the housing. The projections on the boss are slidable relative to the thread feature on the housing, allowing the Knob to rotate relative to the housing. By turning the Knob and the elongated portion, there is sliding movement between the Knob elongated portion and the screw thread formed at the opening See photos of the dial and opening.<br><br>The Knob is in a contracted configuration when in the horizontal position, which results in a reduced or substantially minimized position between the sternum pad and the lower support with the lowermost position flexed upwardly. |
| 13 | The cervical collar of claim 12, wherein the housing defines a recess from which at least a portion of the dial extends. | The bottom portion of the base 242 of the lower support has an opening formed therein. The bottom portion with the opening forms the housing. The dial extends from the recess and opening. |
| 14 | A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising: | |

6

| | | |
|---|---|---|
| | a main support; | |
| | a lower support hingedly connected to the main support; | |
| | a sternum pad; and | |
| | an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support; | |
| | further comprising a lock mechanism for locking rotation of the lower support relative to the main support, the lock mechanism coupled to a slidelock arranged for operatively engaging end portions of the main support and lower support for locking and unlocking rotation of the lower support relative to the main support; | |
| | wherein the slidelock slides over an outer surface of the main support to cooperate with the main support to arrest or prevent rotation of the lower support relative to the main support. | |
| 15 | The cervical collar of claim 14, wherein the slidelock defines a central rack of teeth arranged to correspond to and operatively engage elements forming part of the lock mechanism for enabling linear translation of the slidelock relative to the main support. | |

7



LOWER SUPPORT

LIVING HINGE







3

# ENGLISH

**SYMBOLS**

 **MD**    Medical Device

**MR**    Magnetic Resonance (MR) safe

**Product overview (Fig. 1):**
a. Front
b. Height Indicator Marks
c. Chin Support — *UPPER SUPPORT*
d. Hook Landing Area
e. Tracheal Opening
f. Patient Compliance Lockout
g. Height Adjustment Button
h. Sternum Relief Knob
i. Sternum Contact — *STERNUM PAD*
j. Back Panel
k. Repeatable Fit Tabs (sold separately)
l. Strap

**INTENDED USE**

The device is intended to provide gross immobilization to the cervical spine

X-ray and CT lucent.

The device must be fitted and adjusted by a healthcare professional.

*Indications for use*

Conditions requiring gross immobilization of the cervical spine. This may include:
- C-Spine precaution for trauma patients
- Immobilization for pre and post c-spine surgery
- Other conditions requiring gross immobilization of the mid-cervical spine

*Contraindications*
- Patients with a compromised airway or known spinal deformities such as ankylosing spondylitis.
- Patients with penetrating trauma injuries.

**Warnings and Cautions:**

**Warning:** If an unstable fracture is suspected or unknown, with or without a sustained trauma, ensure additional spinal precautions are implemented to immobilize the spine.

**Warning:** Use of a cervical collar may increase intracranial pressure (ICP) through jugular venous compression.

**Warning:** Use of a cervical collar may increase complexity of airway management.

**Warning:** Cervical spine immobilization, including use of a cervical collar, has been associated with:
- Impaired respiratory effort and forced expiratory volume
- Pneumonia
- Aspiration
- Worsening of existing cervical spine injury
- Severe neurological deterioration in patients with ankylosing spondylitis

6





EXHIBIT 2

 Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Pᴀᴛᴇɴᴛ ᴀɴᴅ Tʀᴀᴅᴇᴍᴀʀᴋ Oғғɪᴄᴇ



UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/686,582 | 11/18/2019 | Wayne CALCO | 19793.488.1.1 | 4587 |

22913          7590          02/17/2022
Workman Nydegger
60 East South Temple
Suite 1000
Salt Lake City, UT 84111

| EXAMINER |
|---|
| HAWTHORNE, OPHELIA ALTHEA |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3786 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 02/17/2022 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

docketing@wnlaw.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No.<br>16/686,582 | Applicant(s)<br>CALCO et al. | |
|---|---|---|---|
| | Examiner<br>OPHELIA A HAWTHORNE | Art Unit<br>3786 | AIA (FITF) Status<br>Yes |

| *-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --* |
|---|

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☑ Responsive to communication(s) filed on <u>18 November 2019</u>.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on ____.

2a)☐ This action is **FINAL.**    2b)☑ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on ____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s) <u>1-20</u> is/are pending in the application.
  5a) Of the above claim(s) ____ is/are withdrawn from consideration.

6) ☐ Claim(s) ____ is/are allowed.

7) ☑ Claim(s) <u>1-12,16-17 and 19-20</u> is/are rejected.

8) ☑ Claim(s) <u>13-15 and 18</u> is/are objected to.

9) ☐ Claim(s) ____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☑ The specification is objected to by the Examiner.

11)☑ The drawing(s) filed on <u>18 November 2019</u> is/are:  a)☐ accepted or  b)☑ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
    a)☐ All  b)☐ Some**  c)☐ None of the:
      1.☐ Certified copies of the priority documents have been received.
      2.☐ Certified copies of the priority documents have been received in Application No. ____.
      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

| 1) ☑ Notice of References Cited (PTO-892) | 3) ☐ Interview Summary (PTO-413) |
|---|---|
| | Paper No(s)/Mail Date _____. |
| 2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)<br>Paper No(s)/Mail Date _____. | 4) ☐ Other: _____. |

U.S. Patent and Trademark Office
PTOL-326 (Rev. 11-13)          Office Action Summary          Part of Paper No./Mail Date 20220202

Application/Control Number: 16/686,582                                                Page 2
Art Unit: 3786

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

The present application, filed on or after March 16, 2013, is being examined under the

first inventor to file provisions of the AIA.


### *Specification*

The specification is objected to as failing to provide proper antecedent basis for the

claimed subject matter.  See 37 CFR 1.75(d)(1) and MPEP § 608.01(o).  Correction of the

following is required: in claim 8 the limitation "the main support is **only** connected to the lower

support at end portions of each of the main support and lower support" is not found to have

proper antecedent basis for this claimed subject matter in the original filed disclosure.


### *Claim Interpretation*

The following is a quotation of 35 U.S.C. 112(f):

> (f) Element in Claim for a Combination. – An element in a claim for a combination may be expressed
> as a means or step for performing a specified function without the recital of structure, material, or acts
> in support thereof, and such claim shall be construed to cover the corresponding structure, material, or
> acts described in the specification and equivalents thereof.

The following is a quotation of pre-AIA 35 U.S.C. 112, sixth paragraph:

> An element in a claim for a combination may be expressed as a means or step for performing a
> specified function without the recital of structure, material, or acts in support thereof, and such claim
> shall be construed to cover the corresponding structure, material, or acts described in the specification
> and equivalents thereof.

The claims in this application are given their broadest reasonable interpretation using the

plain meaning of the claim language in light of the specification as it would be understood by

one of ordinary skill in the art.  The broadest reasonable interpretation of a claim element (also

Application/Control Number: 16/686,582                                    Page 3
Art Unit: 3786

commonly referred to as a claim limitation) is limited by the description in the specification

when 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, is invoked.

As explained in MPEP § 2181, subsection I, claim limitations that meet the following

three-prong test will be interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth

paragraph:

(A)      the claim limitation uses the term "means" or "step" or a term used as a substitute for

        "means" that is a generic placeholder (also called a nonce term or a non-structural term

        having no specific structural meaning) for performing the claimed function;

(B)      the term "means" or "step" or the generic placeholder is modified by functional

        language, typically, but not always linked by the transition word "for" (e.g., "means for")

        or another linking word or phrase, such as "configured to" or "so that"; and

(C)      the term "means" or "step" or the generic placeholder is not modified by sufficient

        structure, material, or acts for performing the claimed function.

Use of the word "means" (or "step") in a claim with functional language creates a

rebuttable presumption that the claim limitation is to be treated in accordance with 35 U.S.C.

112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph. The presumption that the claim limitation is

interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, is rebutted when

the claim limitation recites sufficient structure, material, or acts to entirely perform the recited

function.

Absence of the word "means" (or "step") in a claim creates a rebuttable presumption that

the claim limitation is not to be treated in accordance with 35 U.S.C. 112(f) or pre-AIA 35

U.S.C. 112, sixth paragraph. The presumption that the claim limitation is not interpreted under

35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, is rebutted when the claim

Application/Control Number: 16/686,582                                    Page 4
Art Unit: 3786

limitation recites function without reciting sufficient structure, material or acts to entirely

perform the recited function.

Claim limitations in this application that use the word "means" (or "step") are being

interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, except as

otherwise indicated in an Office action. Conversely, claim limitations in this application that do

not use the word "means" (or "step") are not being interpreted under 35 U.S.C. 112(f) or pre-

AIA 35 U.S.C. 112, sixth paragraph, except as otherwise indicated in an Office action.

This application includes one or more claim limitations that do not use the word "means,"

but are nonetheless being interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth

paragraph, because the claim limitation(s) uses a generic placeholder that is coupled with

functional language without reciting sufficient structure to perform the recited function and the

generic placeholder is not preceded by a structural modifier.  Such claim limitation(s) is/are: an

adjustment mechanism as set forth in claims 1-6,13-14 and 19-20; a locking mechanism as set

forth in claims 7 and 16.

Because this/these claim limitation(s) is/are being interpreted under 35 U.S.C. 112(f) or

pre-AIA 35 U.S.C. 112, sixth paragraph, it/they is/are being interpreted to cover the

corresponding structure described in the specification as performing the claimed function, and

equivalents thereof.

Note: there are a variation of "the adjustment mechanisms" disclosed in Applicant's

specification.

As per paragraph [0141] of the specification, the adjustment mechanism 24 has an

adjustment dial and an extension element 144 arranged for adjustably extending relative to the

lower support 20. The extension element 144 carries the ball joint 142 at an end thereof. The

Application/Control Number: 16/686,582                                    Page 5
Art Unit: 3786

adjustment mechanism 24 includes a dial 138 for adjusting the length of the extension element

144 between the lower support 20 and the sternal pad 136. As per paragraph [0142] FIGS. 22A

and 22B show a variation of the adjustment mechanism 24 including a housing 145 arranged for

receiving the extension element 144 in a contracted configuration resulting in a reduced or

substantially minimized distance between the lower support and the sternal pad. The extension

element 145 has a screw thread 147, and the housing 145 defines corresponding threads

permitting slidable movement between the extension element 145 and the screw thread 147

according to adjustment of the dial 138.

   As per paragraph [0094] The lock mechanism 22 includes an actuator or dial 30 for

adjusting the lock mechanism 22 from locked to unlocked conditions and [0113] FIG. 11 depicts

an embodiment of an elongate element or slidelock 240 useable in the hinge connection of the

collar 200. The slidelock 240 defines a central rack 242 of teeth arranged to correspond and

operatively engage elements forming part of the lock mechanism for enabling linear translation

of the slidelock 240 relative to the main support, such as in the embodiment of FIGS. 3A-4. The

elements of the lock mechanism may be similar to the pinion of FIG. 4, or may be a linear rack

of teeth, or any other suitable feature or mechanism for engaging the central rack 242.

   If applicant does not intend to have this/these limitation(s) interpreted under 35 U.S.C.

112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, applicant may:  (1) amend the claim

limitation(s) to avoid it/them being interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112,

sixth paragraph (e.g., by reciting sufficient structure to perform the claimed function); or (2)

present a sufficient showing that the claim limitation(s) recite(s) sufficient structure to perform

the claimed function so as to avoid it/them being interpreted under 35 U.S.C. 112(f) or pre-AIA

35 U.S.C. 112, sixth paragraph.

Application/Control Number: 16/686,582                                        Page 6
Art Unit: 3786

### *Claim Rejections - 35 USC § 112*

1.      The following is a quotation of 35 U.S.C. 112(a):
(a) IN GENERAL.—The specification shall contain a written description of the invention, and of
the manner and process of making and using it, in such full, clear, concise, and exact terms as to
enable any person skilled in the art to which it pertains, or with which it is most nearly
connected, to make and use the same, and shall set forth the best mode contemplated by the
inventor or joint inventor of carrying out the invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), first paragraph:
The specification shall contain a written description of the invention, and of the manner and
process of making and using it, in such full, clear, concise, and exact terms as to enable any
person skilled in the art to which it pertains, or with which it is most nearly connected, to make
and use the same and shall set forth the best mode contemplated by the inventor of carrying out
his invention.

2.      Claim 8 is rejected under 35 U.S.C. 112(a) or 35 U.S.C. 112 (pre-AIA), first paragraph,

as failing to comply with the written description requirement. The claim(s) contains subject

matter which was not described in the specification in such a way as to reasonably convey to one

skilled in the relevant art that the inventor or a joint inventor, or for pre-AIA the inventor(s), at

the time the application was filed, had possession of the claimed invention. The added material

which is not supported by the original disclosure is as follows: " wherein the main support is

only connected to the lower support at end portions of each of the main support and lower

support ". The original filed disclosure does not provide evidence that Applicant possessed these

claim limitations at the time the application was filed.

        An objective standard for determining compliance with the written description

requirement is, "does the description clearly allow persons of ordinary skill in the art to

recognize that he or she invented what is claimed." *In reGosteli*, 872 F.2d 1008, 1012, 10

USPQ2d 1614, 1618 (Fed. Cir. 1989). Under *Vas-Cath, Inc.v. Mahurkar*, 935 F.2d 1555, 1563-

64, 19 USPQ2d 1111, 1117 (Fed. Cir. 1991), to satisfy the written description requirement, an

applicant must convey with reasonable clarity to those skilled in the art that, as of the filing date

Application/Control Number: 16/686,582                                    Page 7
Art Unit: 3786

sought, he or she was in possession of the invention, and that the invention, in that context, is

whatever is now claimed. The test for sufficiency of support in a parent application is whether

the disclosure of the application relied upon "reasonably conveys to the artisan that the inventor

had possession at that time of the later claimed subject matter." *Ralston Purina Co.v.Far-Mar-*

*Co., Inc.*, 772 F.2d 1570, 1575, 227 USPQ 177, 179 (Fed. Cir. 1985) (quoting *In reKaslow*, 707

F.2d 1366, 1375, 217 USPQ 1089, 1096 (Fed. Cir. 1983)).


### Claim Rejections - 35 USC § 102

In the event the determination of the status of the application as subject to AIA 35 U.S.C.

102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the

statutory basis for the rejection will not be considered a new ground of rejection if the prior art

relied upon, and the rationale supporting the rejection, would be the same under either status.

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (a)(1) the claimed invention was patented, described in a printed publication, or in public use, on sale,
> or otherwise available to the public before the effective filing date of the claimed invention.

3.     **Claim(s) 1-2, 4-7, 9-12 and 16-17 are rejected under 35 U.S.C. 102(a)(1) as being**

**anticipated by Martin et al. *U.S. Publication No*. (20160008158 A1).**

With respect to claim 1, Martin et al. discloses a cervical collar (100, figs.1-8B) having

an anterior or front component arranged for connecting to a posterior or back component, the

anterior component comprising:

a main support or chin support (104);

Application/Control Number: 16/686,582                                    Page 8
Art Unit: 3786

a lower support (114) hingedly or pivotal connected via (pivotal connection 118) and

[0042] to the main support (138, fig.1D);

a sternum pad (114, fig.1C); and

an adjustment mechanism (108, fig.2) and [0045] and [0052] located on the lower

support and the sternum pad is connected thereto such that the sternum pad is movable relative to

the lower support.

With respect to claim 2, Martin et al. discloses the adjustment mechanism (108) is located

at a lowermost portion of the lower support (as shown in fig.3).

With respect to claim 4, Martin et al. discloses the adjustment mechanism (108) includes

an extension element or height adjustment member (122) variably extendable from the

adjustment mechanism (108). The extension element or height adjustment member extends

through height adjustment aperture (120) and [0047]. **The height adjustment aperture 120 may**

**be an opening through a side portion 116 that permits a height adjustment member 122 to**

**externally extend through the main collar body 102 and translate through the height adjustment**

**aperture 120 relative to the main collar body 102 [0047].**

With respect to claim 5, Martin et al. discloses the adjustment mechanism includes a dial

(108) for adjusting a distance the extension element or height adjustment member (122) extends

from the adjustment mechanism. The extension element or height adjustment member extends

through height adjustment aperture (120) and [0047]. The extension element or height

adjustment member extends through height adjustment aperture (120) and [0047] and extends

from the adjustment member (108).

With respect to claim 6, Martin et al. discloses the adjustment mechanism (108) includes

a housing (shown in the reproduced image of fig.3 below) arranged for receiving the extension

Application/Control Number: 16/686,582                                    Page 9
Art Unit: 3786

element or height adjustment member (122) in a contracted configuration [0055, The height
adjustment aperture 120 may comprise openings through the main collar body 102 on the side
portions 116. In the embodiments shown, the main collar body 102 comprises two height
adjustment apertures 120, but in other embodiments, one or more than two apertures may be
formed according to the needs of the designer. Height adjustment apertures 120 may beneficially
be formed adjacent to or within the portions of the internal surface 134 having ridges 142. This
may allow the movement of the height adjustment member 122 inward or (contracted) and
outward in the height adjustment aperture 120 to more directly affect the position of the ridges
142 relative to ridges 144 on the chin support member 104 than ridges positioned farther from
the aperture 120].



FIG. 3

Application/Control Number: 16/686,582                                    Page 10
Art Unit: 3786

     With respect to claim 7, Martin et al. discloses the main support (104) carries a lock mechanism (108) for locking rotation of the lower support relative to the main support [0048, in conjunction with the pivotal connections 118, the chin support member or main support 104 may thus tilt or rotate along a path defined by travel of the height adjustment members 122 along the height adjustment apertures 120. The height adjustment members 122 may be prevented from withdrawal through the height adjustment apertures 120 by interference with the locking members 108 and/or by tabs extending radially from the end of the members 122. See, e.g., tabs 550 in FIG. 5.

     With respect to claim 9, Martin et al. discloses the main support carries an upper support (200, fig.3) connected to inside the main support and oriented to face a mandible of a user [0059, padding 200 is attached to main support or chin support 104 shown in fig.2, as such, when assembled and worn supports the mandible of the user].

     With respect to claim 10, Martin et al. discloses the upper support is maintained in a stationary relationship with the main support (shown in fig.3 when assembled and donned to the anatomy of the user).

     With respect to claim 11, Martin et al. discloses the upper support (200) is rigid (the support impart some degree of rigidity).

     With respect to claim 12, Martin et al. discloses the main support (138, fig.2) has a generally arcuate configuration adapted to extend about the mandible of a user (as shown in fig.3), and the lower support (114) has a generally arcuate configuration contoured for being adapted for securing against a sternum of the user (as shown in fig.3).

     With respect to claim 16, Martin et al. discloses a lock mechanism or ridges for locking rotation of the lower support (114) relative to the main support or chin support (104), the lock

Application/Control Number: 16/686,582                                    Page 11
Art Unit: 3786

mechanism coupled to a slidelock arranged for operatively engaging end portions of the main

support and lower support for locking and unlocking rotation of the lower support relative to the

main support (abstract, as the locking member is moved between locked and unlocked positions,

ridges on a main collar body and on a chin support member may be interlocked or allowed to

slide over each other from one desired position to another) and [0039, ridges may be provided on

opposing surfaces of the chin support member and the main collar body that interlock in a

plurality of positions corresponding to various heights of the front of the chin support member.

These ridges may be made either relatively slidable or relatively immobilized upon movement of

a tensioning member or locking member].

        With respect to claim 17, Martin et al. discloses the slidelock defines a central rack of

teeth (142 and 144, an example is shown in fig.4A) arranged to correspond to and operatively

engage elements forming part of the lock mechanism for enabling linear translation of the

slidelock relative to the main support [0050].

With respect to claim 18. The cervical collar of claim 16, wherein the slidelock slides over an

outer surface of the main support to cooperate with the main support to arrest or prevent rotation

of the lower support relative to the main support.


### *Claim Rejections - 35 USC § 103*

        In the event the determination of the status of the application as subject to AIA 35 U.S.C.

102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the

statutory basis for the rejection will not be considered a new ground of rejection if the prior art

relied upon, and the rationale supporting the rejection, would be the same under either status.

Application/Control Number: 16/686,582                                          Page 12
Art Unit: 3786

The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness

rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not
> identically disclosed as set forth in section 102, if the differences between the claimed invention and the
> prior art are such that the claimed invention as a whole would have been obvious before the effective
> filing date of the claimed invention to a person having ordinary skill in the art to which the claimed
> invention pertains. Patentability shall not be negated by the manner in which the invention was made.

**4.    Claims 3 and 8 are rejected under 35 U.S.C. 103 as being unpatentable over Martin**

**et al. as applied to claims 1 and 2 above, and further in view of Suarez et al.** *U.S.*

*Publication No.* **(20130281899 A1).**

With respect to claim 3, Martin et al. substantially discloses the invention as claimed

except the adjustment mechanism is located centrally at the lowermost portion of the lower

support.

Suarez et al., however, teaches in an analogous art, a cervical collar (shown in figs.1-2)

comprising a lower support (20) comprising adjustment mechanism or dial (60, figs.1-2) is

located centrally (shown in figs.1-2) at the lowermost portion of the lower support (20).

In view of the teachings of Suarez et al., it would have been obvious to one of ordinary

skill in the art before the effective filing date of the invention to modify the cervical collar of

Martin et al. by positioning the adjustment mechanism is located centrally at the lowermost

portion of the lower support for adjusting to and away from a sternum of a user for improving

comfort and fit of the cervical collar.

With respect to claim 8, the combination of Martin et al./Suarez et al. substantially

discloses the invention as claimed.  Suarez et al. further teaches the main support is only

connected to the lower support at end portions of each of the main support and lower support (as

shown in fig.1).

Application/Control Number: 16/686,582                                      Page 13
Art Unit: 3786

5.      **Claims 19-20 are rejected under 35 U.S.C. 103 as being unpatentable over Martin et**

**al.** *U.S. Publication No.* **(20160008158 A1) in view of Suarez et al.** *U.S. Publication No.*

**(20130281899 A1).**

With respect to claim 19, Martin et al. discloses a cervical collar (100, figs.1-8B) having

an anterior or front component arranged for connecting to a posterior or back component, the

anterior component comprising:

a main support or chin support (104);

a lower support (114) hingedly or pivotal connected via (pivotal connection 118) and

[0042] to the main support (138, fig.1D);

a sternum pad (114, fig.1C); and

an adjustment mechanism (108, fig.2) and [0045] and [0052] located on the lower support the

sternum pad (114) being connected to the adjustment mechanism such that the sternum pad is

movable relative to the lower support [0043, The height of the chin support member 104 may be

referred to as the relative distance between a front portion 124 of the chin support member 104

and a front portion 114 of the main collar body 102. A lower height is a smaller distance between

the front portions 114, 124, and a higher or taller height is a larger distance between them];

the adjustment mechanism (108) including an extension element or height adjustment

member (122) variably extendable from the adjustment mechanism (108) and securing to the

sternum pad; The extension element or height adjustment member extends through height

adjustment aperture (120) and [0047].  The height adjustment aperture 120 may be an opening

through a side portion 116 that permits a height adjustment member 122 to externally extend

through the main collar body 102 and translate through the height adjustment aperture 120

relative to the main collar body 102 [0047]; and a housing (shown in the reproduced image of

Application/Control Number: 16/686,582                                    Page 14
Art Unit: 3786

fig.3 below) arranged for receiving the extension element or height adjustment member (122) in

a contracted configuration [0055, The height adjustment aperture 120 may comprise openings

through the main collar body 102 on the side portions 116. In the embodiments shown, the main

collar body 102 comprises two height adjustment apertures 120, but in other embodiments, one

or more than two apertures may be formed according to the needs of the designer. Height

adjustment apertures 120 may beneficially be formed adjacent to or within the portions of the

internal surface 134 having ridges 142. This may allow the movement of the height adjustment

member 122 inward or (contracted) and outward in the height adjustment aperture 120 to more

directly affect the position of the ridges 142 relative to ridges 144 on the chin support member

104 than ridges positioned farther from the aperture 120].

     Martin et al. substantially discloses the invention as claimed except the adjustment

mechanism is located centrally at the lowermost portion of the lower support.

     Suarez et al., however, teaches in an analogous art, a cervical collar (shown in figs.1-2)

comprising a lower support (20) comprising adjustment mechanism or dial (60, figs.1-2) is

located centrally (shown in figs.1-2) at the lowermost portion of the lower support (20).

     In view of the teachings of Suarez et al., it would have been obvious to one of ordinary

skill in the art before the effective filing date of the invention to modify the cervical collar of

Martin et al. by positioning the adjustment mechanism is located centrally at the lowermost

portion of the lower support for adjusting to and away from a sternum of a user for improving

comfort and fit of the cervical collar.

Application/Control Number: 16/686,582                          Page 15
Art Unit: 3786



**FIG. 3**

With respect to claim 20, Martin et al. discloses a cervical collar (100, figs.1-8B) having

an anterior or front component arranged for connecting to a posterior or back component, the

anterior component comprising:

a rigid main support or chin support (104) and [0044, chin support comprises a generally

rigid material such as a polymer or composite material];

a lower support (114) hingedly or pivotal connected via (pivotal connection 118) and

[0042] to the main support (138, fig.1D);

a lock mechanism or dial (108) mounted to the rigid main support and arranged for

locking rotation of the lower support (114) relative to the rigid main support or chin support

(104) at the end portions thereof [0048, in conjunction with the pivotal connections 118, the chin

Application/Control Number: 16/686,582                                    Page 16
Art Unit: 3786

support member or main support 104 may thus tilt or rotate along a path defined by travel of the

height adjustment members 122 along the height adjustment apertures 120. The height

adjustment members 122 may be prevented from withdrawal through the height adjustment

apertures 120 by interference with the locking members 108 and/or by tabs extending radially

from the end of the members 122. See, e.g., tabs 550 in FIG. 5.

      a sternum pad (114, fig.1C); and

an adjustment mechanism (108, fig.2) and [0045] and [0052] located on the lower support the

sternum pad (114) being connected to the adjustment mechanism such that the sternum pad is

movable relative to the lower support [0043, The height of the chin support member 104 may be

referred to as the relative distance between a front portion 124 of the chin support member 104

and a front portion 114 of the main collar body 102. A lower height is a smaller distance between

the front portions 114, 124, and a higher or taller height is a larger distance between them];

      the adjustment mechanism (108) including an extension element or height adjustment

member (122) variably extendable from the adjustment mechanism (108) and securing to the

sternum pad; The extension element or height adjustment member extends through height

adjustment aperture (120) and [0047]. The height adjustment aperture 120 may be an opening

through a side portion 116 that permits a height adjustment member 122 to externally extend

through the main collar body 102 and translate through the height adjustment aperture 120

relative to the main collar body 102 [0047]; and a housing (shown in the reproduced image of

fig.3 below) arranged for receiving the extension element or height adjustment member (122) in

a contracted configuration [0055, The height adjustment aperture 120 may comprise openings

through the main collar body 102 on the side portions 116. In the embodiments shown, the main

collar body 102 comprises two height adjustment apertures 120, but in other embodiments, one

Application/Control Number: 16/686,582                                    Page 17
Art Unit: 3786

or more than two apertures may be formed according to the needs of the designer. Height

adjustment apertures 120 may beneficially be formed adjacent to or within the portions of the

internal surface 134 having ridges 142. This may allow the movement of the height adjustment

member 122 inward or (contracted) and outward in the height adjustment aperture 120 to more

directly affect the position of the ridges 142 relative to ridges 144 on the chin support member

104 than ridges positioned farther from the aperture 120].

　　　　Martin et al. substantially discloses the invention as claimed except the adjustment

mechanism is located centrally at the lowermost portion of the lower support.

　　　　Suarez et al., however, teaches in an analogous art, a cervical collar (shown in figs.1-2)

comprising a lower support (20) comprising adjustment mechanism or dial (60, figs.1-2) is

located centrally (shown in figs.1-2) at the lowermost portion of the lower support (20).

　　　　In view of the teachings of Suarez et al., it would have been obvious to one of ordinary

skill in the art before the effective filing date of the invention to modify the cervical collar of

Martin et al. by positioning the adjustment mechanism is located centrally at the lowermost

portion of the lower support for adjusting to and away from a sternum of a user for improving

comfort and fit of the cervical collar.

Application/Control Number: 16/686,582                           Page 18
Art Unit: 3786



**FIG. 3**

### *Allowable Subject Matter*

6.     Claims 13-15 are objected to as being dependent upon a rejected base claim, but would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims.

### *Reasons for Allowance*

The following is an examiner's statement of reasons for allowance:

The closest prior art of record fails to show or make obvious the claimed combinations of elements particularly the limitations as set forth in dependent claims and 13-15 which recite features not taught or suggested by the prior art of record.

Application/Control Number: 16/686,582                                      Page 19
Art Unit: 3786

The prior art of record fails to disclose or fairly suggest the sternum pad is mounted to a

ball joint and the adjustment mechanism has an adjustment dial and an extension element

arranged for adjustably extending relative to the lower support and wherein the adjustment

mechanism includes a housing arranged for receiving an extension element in a contracted

configuration resulting in a reduced or substantially minimized distance between the lower

support and the sternum pad, the extension element having a screw thread, and the housing

defining corresponding threads permitting slidable movement between the extension element and

the screw thread according to adjustment of a dial associated with the extension element, in

combination with the other elements (or steps) of the apparatus and method recited in the

claims.

Accordingly, a prima facie case of obviousness or an anticipation rejection cannot be

established with respect to the claimed subject matter as set forth in claims 13-14.

7.      Claim 15 is allowed insofar as they depend from the allowed base claim 14.


*Conclusion*

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to OPHELIA ALTHEA HAWTHORNE whose telephone number is

(571)270-3860. The examiner can normally be reached M-F 8:00 AM-5:00 PM, EST.

Examiner interviews are available via telephone, in-person, and video conferencing using

a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is

encouraged to use the USPTO Automated Interview Request (AIR) at

http://www.uspto.gov/interviewpractice.

Application/Control Number: 16/686,582                                    Page 20
Art Unit: 3786

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Alireza Nia can be reached on 5712703076. The fax phone number for the

organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be

obtained from Patent Center. Unpublished application information in Patent Center is available

to registered users. To file and manage patent submissions in Patent Center, visit:

https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-center for more

information about Patent Center and https://www.uspto.gov/patents/docx for information about

filing in DOCX format. For additional questions, contact the Electronic Business Center (EBC)

at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service

Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/OPHELIA A HAWTHORNE/
Primary Examiner, Art Unit 3786

| *Notice of References Cited* | Application/Control No. 16/686,582 | Applicant(s)/Patent Under Reexamination CALCO et al. | |
|---|---|---|---|
| | Examiner OPHELIA A HAWTHORNE | Art Unit 3786 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| * | A | US-20160008158-A1 | 01-2016 | Martin; Michael L. | A61F5/055 | 602/18 |
| * | B | US-20130281899-A1 | 10-2013 | Suarez; Daniel | A61F5/055 | 602/18 |
| | C | | | | | |
| | D | | | | | |
| | E | | | | | |
| | F | | | | | |
| | G | | | | | |
| | H | | | | | |
| | I | | | | | |
| | J | | | | | |
| | K | | | | | |
| | L | | | | | |
| | M | | | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | CPC Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    **Notice of References Cited**            Part of Paper No. *20220202*

| *Index of Claims* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 16/686,582 | CALCO et al. |
| | Examiner | Art Unit |
| | OPHELIA A HAWTHORNE | 3786 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| CLAIMS | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ Claims renumbered in the same order as presented by applicant | | | | | ☐ CPA | ☐ T.D. | | ☐ R.1.47 | | |

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 16/686,582 | CALCO et al. |
| | **Examiner** | **Art Unit** |
| | OPHELIA A HAWTHORNE | 3786 |

| CPC - Searched* | | |
|---|---|---|
| **Symbol** | **Date** | **Examiner** |
| (A61F5/055 OR A61F5/05883 OR A61F2250/0004 OR A61F5/3707 OR A61F5/05891 OR A61F2007/0011) | 02/02/2022 | OH |
| A61F5/055 | 02/02/2022 | OH |
| A61F5/05883 | 02/02/2022 | OH |
| A61F5/012 | 02/02/2022 | OH |
| A42B3/0473 | 02/02/2022 | OH |
| A61F13/12 | 02/02/2022 | OH |
| A61F5/028 | 02/02/2022 | OH |
| A61F5/3707 | 02/02/2022 | OH |
| A61F13/128 | 02/02/2022 | OH |
| A61F5/05816 | 02/02/2022 | OH |
| | | |

| CPC Combination Sets - Searched* | | |
|---|---|---|
| **Symbol** | **Date** | **Examiner** |
| | | |

| US Classification - Searched* | | | |
|---|---|---|---|
| **Class** | **Subclass** | **Date** | **Examiner** |
| | | | |

* See search history printout included with this form or the SEARCH NOTES box below to determine the scope of the search.

| /O.A.H/ Primary Examiner, Art Unit 3786 | |
|---|---|
| | |

U.S. Patent and Trademark Office

Part of Paper No.: 20220202

| Search Notes | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 16/686,582 | CALCO et al. |
| | Examiner | Art Unit |
| | OPHELIA A HAWTHORNE | 3786 |

| Search Notes | | |
|---|---|---|
| Search Notes | Date | Examiner |
| SEARCHED CPC SYMBOLS | 02/02/2022 | OH |
| CURSORY SEARCH | 02/02/2022 | OH |
| CONSIDER IDS | 02/02/2022 | OH |
| INVENTOR NAME SEARCH | 02/02/2022 | OH |

| Interference Search | | | |
|---|---|---|---|
| US Class/CPC Symbol | US Subclass/CPC Group | Date | Examiner |
| | | | |

| /O.A.H/ Primary Examiner, Art Unit 3786 | |
|---|---|
| | |

16/686,582 – GAU: 3786

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | 16686582 | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | 3786 | |
| Examiner Name | /OPHELIA A HAWTHORNE/ | |
| Attorney Docket Number | 19793.488.1.1 | |

**U.S.PATENTS**  | Remove |

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 10675173 | B2 | 2020-06-09 | THORSTEINSDOTTIR et al. | Equivalent to CN105120808 |

If you wish to add additional U.S. Patent citation information please click the Add button. | Add |

**U.S.PATENT APPLICATION PUBLICATIONS** | Remove |

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20130310722 | A1 | 2013-11-21 | THORSTEINSDOTTIR et al. | Equivalent to CN105120808 |
| | 2 | 20160008158 | A1 | 2016-01-14 | MARTIN et al. | Cited in the Chinese Office Action |
| | 3 | 20170252198 | A1 | 2017-09-07 | THORSTEINSDOTTIR et al. | Equivalent to CN105120808 |
| | 4 | 20200281754 | A1 | 2020-09-10 | THORSTEINSDOTTIR et al. | Equivalent to CN105120808 |

If you wish to add additional U.S. Published Application citation information please click the Add button. | Add |

**FOREIGN PATENT DOCUMENTS** | Remove |

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | Application Number | | 16686582 | | |
| | | | | Filing Date | | 2019-11-18 | | |
| | | | | First Named Inventor | | Wayne CALCO | | |
| | | | | Art Unit | | 3786 | | |
| | | | | Examiner Name | | | | |
| | | | | Attorney Docket Number | | 19793.488.1.1 | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 204655220 | CN | U | 2015-09-23 | HENGSHUI TIANJIAN MEDICAL APPLIANCES CO., LTD | Cited in the Chinese Office Action | ✕ |
| | 2 | 105120808 | CN | A | 2015-12-02 | OSSUR HF | Cited in the Chinese Office Action | ☒ |

If you wish to add additional Foreign Patent Document citation information please click the Add button | Add |

| NON-PATENT LITERATURE DOCUMENTS | | | Remove |
|---|---|---|---|

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|
| | 1 | Office Action from corresponding CN Application No. 201780057654.X, October 29, 2020. | ✕ |

If you wish to add additional non-patent literature document citation information please click the Add button | Add |

| **EXAMINER SIGNATURE** | | | |
|---|---|---|---|
| Examiner Signature | /OPHELIA A HAWTHORNE/ | Date Considered | 02/12/2022 |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 16686582 |
|---|---|---|
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | 3786 |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Justin J. Cassell/ | Date (YYYY-MM-DD) | 2021-03-01 |
|---|---|---|---|
| Name/Print | Justin J. Cassell | Registration Number | 46205 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.18        ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that:  (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent.  If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a).  Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906.  Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive.  Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151.  Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.1.18        ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

## BIB DATA SHEET

**CONFIRMATION NO. 4587**

| SERIAL NUMBER | FILING or 371(c) DATE | CLASS | GROUP ART UNIT | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 16/686,582 | 11/18/2019 **RULE** | 602 | 3786 | 19793.488.1.1 |

**APPLICANTS**
Ossur Iceland ehf, Reykjavik, ICELAND;

**INVENTORS**
Wayne CALCO, Foothill Ranch, CA;
Christopher Callicott WEBSTER, Foothill Ranch, CA;
Harry Duane ROMO, Foothill Ranch, CA;

**** CONTINUING DATA ************************
This application is a CON of 15/442,029 02/24/2017 PAT 10512559
    which claims benefit of 62/299,766 02/25/2016

**** FOREIGN APPLICATIONS ************************

**** IF REQUIRED, FOREIGN FILING LICENSE GRANTED ****
12/05/2019

| | STATE OR COUNTRY | SHEETS DRAWINGS | TOTAL CLAIMS | INDEPENDENT CLAIMS |
|---|---|---|---|---|
| Foreign Priority claimed ☐ Yes ☑ No | | | | |
| 35 USC 119(a-d) conditions met ☐ Yes ☑ No | ☐ Met after Allowance OAH | | | |
| Verified and Acknowledged  /OPHELIA ALTHEA HAWTHORNE/  Examiner's Signature  Initials | | | | |
| | CA | 20 | 20 | 2 |

**ADDRESS**
Workman Nydegger
60 East South Temple
Suite 1000
Salt Lake City, UT 84111
UNITED STATES

**TITLE**
CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT

| FILING FEE RECEIVED 1720 | FEES: Authority has been given in Paper No._____ to charge/credit DEPOSIT ACCOUNT No._____ for following: | ☐ All Fees |
|---|---|---|
| | | ☐ 1.16 Fees (Filing) |
| | | ☐ 1.17 Fees (Processing Ext. of time) |
| | | ☐ 1.18 Fees (Issue) |
| | | ☐ Other |
| | | ☐ Credit |

BIB (Rev. 05/07).

16/686,582 — GAU: 3786

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-10)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | /OPHELIA A HAWTHORNE/ |
| | Attorney Docket Number | 19793.488.1.1 |

| U.S.PATENTS | | | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code¹ | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 2801630 | | 1957-08-06 | MOORE | |
| | 2 | 2818063 | | 1957-12-31 | SMITH et al. | |
| | 3 | 2820455 | | 1958-01-21 | HALL | |
| | 4 | 2911970 | | 1959-11-10 | BARTELS | |
| | 5 | 3024784 | | 1962-03-13 | MONFARDINI | |
| | 6 | 3042027 | | 1962-07-03 | MONFARDINI | |
| | 7 | 3285243 | | 1966-11-15 | YELLIN | Cited in EP Search Report |
| | 8 | 3285244 | | 1966-11-15 | COTTRELL | |

EFS Web 2.1.17      ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT (Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | 9 | 3306284 | 1967-02-28 | McKINLEY | |
|---|---|---|---|---|---|
| | 10 | 3320950 | 1967-05-23 | MCELVENNY | |
| | 11 | 3504667 | 1970-04-07 | McFARLANE | |
| | 12 | 3512523 | 1970-05-19 | BARNETT | |
| | 13 | 3756226 | 1973-09-04 | CALABRESE et al. | |
| | 14 | 3916885 | 1975-11-04 | GAYLORD, JR. | |
| | 15 | 4173973 | 1979-11-13 | HENDRICKS | |
| | 16 | 4205667 | 1980-06-03 | GAYLORD, JR. | |
| | 17 | 4325363 | 1982-04-20 | BERKELEY | |
| | 18 | 4401111 | 1983-08-30 | BLACKSTONE | |
| | 19 | 4413619 | 1983-11-08 | GARTH | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | | | | | |
|---|---|---|---|---|---|
| | 20 | 4520801 | 1985-06-04 | LERMAN | |
| | 21 | 4538597 | 1985-09-03 | LERMAN | Cited in EP Search Report |
| | 22 | 4562833 | 1986-01-07 | PUJALS, JR. | |
| | 23 | 4677969 | 1987-07-07 | CALABRESE | |
| | 24 | 4708129 | 1987-11-24 | PUJALS, JR. | |
| | 25 | 4712540 | 1987-12-15 | TUCKER et al. | |
| | 26 | 4745922 | 1988-05-24 | TAYLOR | |
| | 27 | 4854306 | 1989-08-08 | PUJALS, JR. | |
| | 28 | 4886052 | 1989-12-12 | CALABRESE | |
| | 29 | 4940043 | 1990-07-10 | BURNS et al. | |
| | 30 | 4987891 | 1991-01-29 | GAYLORD, JR., et al. | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT (Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | 31 | 5005563 | 1991-04-09 | VEALE | |
|---|---|---|---|---|---|
| | 32 | 5038759 | 1991-08-13 | MORGENSTERN | |
| | 33 | 5058572 | 1991-10-22 | SCHMID et al. | |
| | 34 | 5097824 | 1992-03-24 | GARTH | |
| | 35 | 5156588 | 1992-10-20 | MARCUNE et al. | |
| | 36 | 5180361 | 1993-01-19 | MOORE et al. | |
| | 37 | 5215517 | 1993-06-01 | STEVENSON et al. | |
| | 38 | 5230698 | 1993-07-27 | GARTH | |
| | 39 | 5275581 | 1994-01-04 | BENDER | |
| | 40 | 5302170 | 1994-04-12 | TWEARDY | |
| | 41 | RE34714 | 1994-08-30 | BURNS et al. | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | | | | | |
|---|---|---|---|---|---|
| | 42 | 5346461 | 1994-09-13 | HEINZ et al. | Equivalent to WO 94/09728 |
| | 43 | 5366438 | 1994-11-22 | MARTIN, SR. | |
| | 44 | 5385535 | 1995-01-31 | McGUINNESS | |
| | 45 | 5433696 | 1995-07-18 | OSTI | |
| | 46 | 5437612 | 1995-08-01 | MOORE et al. | |
| | 47 | 5437617 | 1995-08-01 | HEINZ et al. | Equivalent to WO 94/09728 |
| | 48 | 5445602 | 1995-08-29 | GRIM et al. | |
| | 49 | D368527 | 1996-04-02 | BROOKE | |
| | 50 | D369660 | 1996-05-07 | MYOGA | |
| | 51 | 5520619 | 1996-05-28 | MARTIN | Equivalent to WO 95/22304 |
| | 52 | RE35290 | 1996-07-02 | DRUSKOCZI | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | | | | | |
|---|---|---|---|---|---|
| 53 | 5588957 | 1996-12-31 | MARTIN, SR. | |
| 54 | 5593382 | 1997-01-14 | RUDY, JR. et al. | |
| 55 | 5622529 | 1997-04-22 | CALABRESE | |
| 56 | 5624387 | 1997-04-29 | McGUINNESS | |
| 57 | D379232 | 1997-05-13 | BROOKE | |
| 58 | 5632722 | 1997-05-27 | TWEARDY et al. | Cited in Specification |
| 59 | 5688229 | 1997-11-18 | BAUER | |
| 60 | 5716335 | 1998-02-10 | IGLESIAS et al. | |
| 61 | 5728054 | 1998-03-17 | MARTIN | Equivalent to WO 95/22304 |
| 62 | D393718 | 1998-04-21 | TRAUT et al. | |
| 63 | 5785670 | 1998-07-28 | HIEBERT | |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | 64 | 5788658 | 1998-08-04 | ISLAVA | |
|---|---|---|---|---|---|
| | 65 | 5795315 | 1998-08-18 | TRAUT et al. | |
| | 66 | 5797713 | 1998-08-25 | TWEARDY et al. | |
| | 67 | 5797863 | 1998-08-25 | KOHNKE | |
| | 68 | RE35940 | 1998-10-27 | HEINZ et al. | Equivalent to WO 94/09728 |
| | 69 | 5865773 | 1999-02-02 | KOLEDIN | |
| | 70 | 5904662 | 1999-05-18 | MYOGA | |
| | 71 | 5934599 | 1999-08-10 | HAMMERSLAG | Equivalent to JP 2007-330808 Cited in Specification |
| | 72 | 5964722 | 1999-10-12 | GORALNIK et al. | |
| | 73 | 5976098 | 1999-11-02 | SEREBOFF | |
| | 74 | 5993403 | 1999-11-03 | MARTIN | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 -- GAU: 3786

| | | | | |
|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | | | |
| | Filing Date | 2019-11-18 | | |
| | First Named Inventor | Wayne CALCO | | |
| | Art Unit | | | |
| | Examiner Name | | | |
| | Attorney Docket Number | 19793.488.1.1 | | |

| | | | | |
|---|---|---|---|---|
| 75 | 6027467 | 2000-02-22 | NAKAMURA et al. | |
| 76 | 6036664 | 2000-03-14 | MARTIN, SR. et al. | Equivalent to WO 96/40018 |
| 77 | 6045523 | 2000-04-04 | DONALDSON | |
| 78 | D422710 | 2000-04-11 | MAYNARD | |
| 79 | 6050965 | 2000-04-18 | PILLAI | |
| 80 | 6056711 | 2000-05-02 | DOMAMSKI et al. | |
| 81 | 6058517 | 2000-05-09 | HARTUNIAN | |
| 82 | 6071255 | 2000-06-06 | CALABRESE | |
| 83 | 6071256 | 2000-06-06 | LAM | |
| 84 | RE36745 | 2000-06-20 | RUDY, JR. et al. | |
| 85 | 6090058 | 2000-07-18 | TRAUT et al. | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

| | | | | | | |
|---|---|---|---|---|---|---|
| | | **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | | | |

| Application Number | |
|---|---|
| Filing Date | 2019-11-18 |
| First Named Inventor | Wayne CALCO |
| Art Unit | |
| Examiner Name | |
| Attorney Docket Number | 19793.488.1.1 |

| | | | | | |
|---|---|---|---|---|---|
| 86 | 6165146 | | 2000-12-26 | GIEBELER | |
| 87 | 6183501 | B1 | 2001-02-06 | LATHAM | |
| 88 | 6202953 | B1 | 2001-03-20 | HAMMERSLAG | Equivalent to JP 2007-330808 Cited in Specification |
| 89 | 6245033 | B1 | 2001-06-12 | MARTIN | |
| 90 | 6254560 | B1 | 2001-07-03 | TWEARDY et al. | Cited in Specification |
| 91 | 6308345 | B1 | 2001-10-30 | WILLIAMS, JR. | |
| 92 | 6423020 | B1 | 2002-07-23 | KOLEDIN | |
| 93 | 6458090 | B1 | 2002-10-01 | WALPIN | |
| 94 | 6494854 | B1 | 2002-12-17 | VISNESS et al. | |
| 95 | D475139 | S | 2003-05-27 | MYOGA | |
| 96 | 6663581 | B1 | 2003-12-16 | CALABRESE | |

EFS Web 2.1.17    ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 97 | 6663630 | B2 | 2003-12-16 | FARLEY et al. | |
| | 98 | 6726643 | B1 | 2004-04-27 | MARTIN | |
| | 99 | 6740055 | B2 | 2004-05-25 | DOMINGUEZ | |
| | 100 | 6770046 | B2 | 2004-08-03 | HANSEN | |
| | 101 | 6872188 | B2 | 2005-03-29 | CAILLE et al. | |
| | 102 | 6913584 | B2 | 2005-07-05 | RUDY, JR. et al. | |
| | 103 | 6921376 | B2 | 2005-07-26 | TWEARDY et al. | Cited in Specification |
| | 104 | 6926686 | B2 | 2005-08-09 | CHEATHAM | |
| | 105 | 7018351 | B1 | 2006-03-28 | IGLESIAS et al. | |
| | 106 | 7041073 | B1 | 2006-05-09 | PATRON | |
| | 107 | 7070573 | B2 | 2006-07-04 | AXELSSON | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

| | 108 | 7090652 | B2 | 2006-08-15 | SANTELLI, JR. | |
| | 109 | 7090653 | B2 | 2006-08-15 | MOELLER | |
| | 110 | 7128724 | B2 | 2006-10-31 | MARSH | |
| | 111 | 7141031 | B2 | 2006-11-28 | GARTH et al. | |
| | 112 | 7198610 | B2 | 2007-04-03 | INGIMUNDARSON et al. | Cited in Specification |
| | 113 | D542919 | S | 2007-05-15 | LEATT | |
| | 114 | 7258677 | B2 | 2007-08-21 | RUDY, JR. et al. | |
| | 115 | 7291121 | B2 | 2007-11-06 | RUDY, JR. et al. | |
| | 116 | 7297127 | B2 | 2007-11-20 | LEE et al. | |
| | 117 | 7311686 | B1 | 2007-12-25 | IGLESIAS et al. | |
| | 118 | 7371221 | B1 | 2008-05-13 | BAKER | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

<table>
<tr><td rowspan="5"><strong>INFORMATION DISCLOSURE STATEMENT BY APPLICANT</strong><br>( Not for submission under 37 CFR 1.99)</td><td>Application Number</td><td></td></tr>
<tr><td>Filing Date</td><td>2019-11-18</td></tr>
<tr><td>First Named Inventor</td><td>Wayne CALCO</td></tr>
<tr><td>Art Unit</td><td></td></tr>
<tr><td>Examiner Name</td><td></td></tr>
<tr><td></td><td>Attorney Docket Number</td><td>19793.488.1.1</td></tr>
</table>

| | | | | | | |
|---|---|---|---|---|---|---|
| | 119 | 7371222 | B2 | 2008-05-13 | HEINZ et al. | |
| | 120 | 7399288 | B2 | 2008-07-15 | CHAO | |
| | 121 | D616555 | S | 2010-05-25 | THORGILSDOTTIR et al. | |
| | 122 | D616996 | S | 2010-06-01 | THORGILSDOTTIR et al. | |
| | 123 | D616997 | S | 2010-06-01 | THORGILSDOTTIR et al. | |
| | 124 | 7815585 | B2 | 2010-10-19 | VOLLBRECHT | |
| | 125 | 7896827 | B2 | 2011-03-01 | INGIMUNDARSON et al. | |
| | 126 | 7981068 | B2 | 2011-07-19 | THORGILSDOTTIR et al. | Cited in Specification |
| | 127 | 8038636 | B2 | 2011-10-18 | THORGILSDOTTIR et al. | Cited in Specification |
| | 128 | 5060637 | | 1991-10-29 | SCHMID et al. | |
| | 129 | 3050052 | | 1962-08-21 | S. GRASSL | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | 130 | 4827915 | | 1989-05-09 | GORSEN | |
|---|---|---|---|---|---|---|
| | 131 | 9713546 | B2 | 2017-07-25 | THORSTEINSDOTTIR et al. | |

If you wish to add additional U.S. Patent citation information please click the Add button.  [Add]

### U.S.PATENT APPLICATION PUBLICATIONS   [Remove]

| Examiner Initial* | Cite No | Publication Number | Kind Code¹ | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20020138028 | A1 | 2002-09-26 | RUDY, JR. et al. | |
| | 2 | 20020156408 | A1 | 2002-10-24 | CHEATHAM | |
| | 3 | 20020156409 | A1 | 2002-10-24 | LEE et al. | |
| | 4 | 20020169401 | A1 | 2002-11-14 | WALPIN | |
| | 5 | 20020173737 | A1 | 2002-11-21 | MIYAJI et al. | |
| | 6 | 20030055367 | A1 | 2003-03-20 | DOMINGUEZ | |
| | 7 | 20030060744 | A1 | 2003-03-27 | CAILLE et al. | |

16/686,582 - GAU: 3786

| | INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|---|

| Application Number | |
|---|---|
| Filing Date | 2019-11-18 |
| First Named Inventor | Wayne CALCO |
| Art Unit | |
| Examiner Name | |
| Attorney Docket Number | 19793.488.1.1 |

| | 8 | 20030181838 | A1 | 2003-09-25 | GARTH | |
|---|---|---|---|---|---|---|
| | 9 | 20040039318 | A1 | 2004-02-26 | SANTELLI, JR. | |
| | 10 | 20050101896 | A1 | 2005-05-12 | CALABRESE | |
| | 11 | 20070027418 | A1 | 2007-02-01 | CALCO et al. | |
| | 12 | 20070073203 | A1 | 2007-03-29 | MOENNING et al. | |
| | 13 | 20070270728 | A1 | 2007-11-22 | CHAO | |
| | 14 | 20090247918 | A1 | 2009-10-01 | PATRON | |
| | 15 | 20100137768 | A1 | 2010-06-03 | THORGILSDOTTIR et al. | |
| | 16 | 20100268139 | A1 | 2010-10-21 | GARTH | |
| | 17 | 20110066094 | A1 | 2011-03-17 | THORGILSDOTTIR et al. | |
| | 18 | 20180078400 | A1 | 2018-03-22 | HSU et al. | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

| | 19 | 20180078401 | A1 | 2018-03-22 | HSU et al. | |
|---|---|---|---|---|---|---|

If you wish to add additional U.S. Published Application citation information please click the Add button. [Add]

**FOREIGN PATENT DOCUMENTS**    [Remove]

| Examiner Initial* | Cite No | Foreign Document Number³ | Country Code²ⁱ | Kind Code⁴ | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T⁵ |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 165 157 | GB | A | 1986-04-09 | CHARLES GRIENER and COMPANY INC. | | |
| | 2 | 94/09728 | WO | A1 | 1994-05-11 | BIO CYBERNETICS INTERNATIONAL | | |
| | 3 | 95/22304 | WO | A1 | 1995-08-24 | AMBU INC. | | |
| | 4 | 96/40018 | WO | A1 | 1996-12-19 | AMBU INC | | |
| | 5 | 2 814 362 | FR | A1 | 2002-03-29 | PASCO BRUNO | | ☒ |
| | 6 | 100 57 286 | DE | A1 | 2002-05-29 | OPED AG STEINHAUSEN | | ☒ |
| | 7 | 2007-330808 | JP | A | 2007-12-27 | HAMMERSLAG | | ☒ |
| | 8 | 2 453 996 | GB | A | 2009-04-29 | LYSGEAR LIMITED | | ☐ |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

| | 9 | 1646071 | CN | A | 2005-07-27 | CALABRESE | | ☒ |
|---|---|---|---|---|---|---|---|---|
| | 10 | 201150587 | CN | Y | 2008-11-19 | HOU | | ☒ |

If you wish to add additional Foreign Patent Document citation information please click the Add button [Add]

## NON-PATENT LITERATURE DOCUMENTS [Remove]

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T⁵ |
|---|---|---|---|
| | 1 | Levangie et al., "Joint Structure and Function: A Comprehensive Analysis", Fourth Edition,Chapter 4: The Vertebral Column, 2005 F.A. Davis Company, Philadelphia, PA, pp. 161-164. | |
| | 2 | HSU et al., "AAOS Atlas of Orthoses and Assistive Devices, Mosby, Elsevier Fourth Edition, 2008, Philadelphia, PA, pg. 117-122. | |
| | 3 | Product Information Sheet, Philadelphia Tracheotomy Collar, obtained from www.ossur.com, prior to August 6, 2010, 1 page. | |
| | 4 | Product Information Sheet, Platazote Sheets, WBC Industries, obtained from www.wbcindustries.com prior to August 6, 2010, 2 pages. | |

If you wish to add additional non-patent literature document citation information please click the Add button [Add]

## EXAMINER SIGNATURE

| Examiner Signature | /OPHELIA A HAWTHORNE/ | Date Considered | 02/12/2022 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

¹ See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  ² Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  ³ For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.
⁴ Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  ⁵ Applicant is to place a check mark here if English language translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH.  /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

### CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

✕ A certification statement is not submitted herewith.

### SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Justin J. Cassell/ | Date (YYYY-MM-DD) | 2019-11-18 |
|---|---|---|---|
| Name/Print | Justin J. Cassell/ | Registration Number | 46,205 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.      The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.      A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.      A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.      A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.      A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.      A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.      A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.      A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.      A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (03-15)
Approved for use through 07/31/2016. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | /OPHELIA A HAWTHORNE/ | |
| Attorney Docket Number | 19793.488.1.1 | |

| U.S.PATENTS | | | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code1 | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 2088207 | | 1937-07-27 | H.A. KAISER | |
| | 2 | 2102069 | | 1937-12-14 | P.W. HANICKE | |
| | 3 | 2791999 | | 1954-05-14 | C. BUSTAMANTE | |
| | 4 | 2735424 | | 1953-02-21 | M.J. BENJAMIN | |
| | 5 | 2801630 | | 1957-08-06 | A.R. MOORE | |
| | 6 | 2806471 | | 1957-11-17 | A.H. BREESE | |
| | 7 | D188302 | | 1960-06-28 | MONFARDINI | |
| | 8 | 3027894 | | 1962-04-03 | A.R. MOORE | |

EFS Web 2.1.17          ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | 9 | 3060930 | | 1962-10-30 | S. GRASSL | |
|---|---|---|---|---|---|---|
| | 10 | 3075521 | | 1963-01-29 | S. GRASSL | |
| | 11 | 3135256 | | 1964-06-02 | E.J. GRUBER | |
| | 12 | 3177869 | | 1965-04-13 | W.L. BARTELS | |
| | 13 | D203018 | | 1965-11-23 | HELFERICH | |
| | 14 | 3313297 | | 1967-04-11 | L.T APPLEGATE et al. | |
| | 15 | 3916884 | | 1975-11-04 | ATTENBURROW | |
| | 16 | 4099523 | | 1978-07-11 | LOWREY | |
| | 17 | 4582051 | | 1986-04-15 | GREENE et al. | |
| | 18 | 4643174 | | 1987-02-17 | HORIUCHI | |
| | 19 | 4955368 | | 1990-09-11 | HEIMANN | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| | | | | | |
|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | Application Number | | | |
| | | Filing Date | 2019-11-18 | | |
| | | First Named Inventor | Wayne CALCO | | |
| | | Art Unit | | | |
| | | Examiner Name | | | |
| | | Attorney Docket Number | 19793.488.1.1 | | |

| | | | | | |
|---|---|---|---|---|---|
| | 20 | 5201702 | | 1993-04-13 | MARS |
| | 21 | 5632722 | | 1997-05-27 | TWEARDY et al. |
| | 22 | 6045522 | | 2000-04-04 | GROBER |
| | 23 | RE36745 | | 2000-06-20 | RUDY, JR. et al. |
| | 24 | 6289558 | B1 | 2001-11-18 | HAMMERSLAG | Cited in Specification |
| | 25 | 6315746 | B1 | 2001-11-13 | GARTH et al. |
| | 26 | 6632722 | B2 | 2003-10-14 | FUJIWARA et al. | Cited in Specification |
| | 27 | 6733469 | B2 | 2004-05-11 | MIYAJI et al. |
| | 28 | 7442176 | B2 | 2008-10-28 | COJBASIC |
| | 29 | 7674234 | B2 | 2010-03-09 | CALCO et al. |
| | 30 | 7846117 | B2 | 2010-12-07 | LEATT et al. |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| | | | | | | | |
|---|---|---|---|---|---|---|---|

<table>
<tr><td rowspan="6"><strong>INFORMATION DISCLOSURE STATEMENT BY APPLICANT</strong><br>( Not for submission under 37 CFR 1.99)</td><td>Application Number</td><td></td></tr>
<tr><td>Filing Date</td><td>2019-11-18</td></tr>
<tr><td>First Named Inventor</td><td>Wayne CALCO</td></tr>
<tr><td>Art Unit</td><td></td></tr>
<tr><td>Examiner Name</td><td></td></tr>
<tr><td>Attorney Docket  Number</td><td>19793.488.1.1</td></tr>
</table>

| | | | | | |
|---|---|---|---|---|---|
| | 31 | 7878995 | B2 | 2011-02-01 | HARTY | |
| | 32 | 7992261 | B2 | 2011-08-09 | HAMMERSLAG et al. | Cited in Specification |
| | 33 | 8038635 | B2 | 2011-10-18 | DELLANNO | |
| | 34 | D647623 | S | 2011-10-25 | THORGILSDOTTIR et al. | |
| | 35 | 8216167 | B2 | 2012-07-10 | GARTH et al. | |
| | 36 | 8257292 | B2 | 2012-09-04 | LINARES | |
| | 37 | D666302 | S | 2012-08-28 | JOSEPH | |
| | 38 | 8545423 | B2 | 2013-08-01 | PATRON | |
| | 39 | 8679044 | B2 | 2014-03-25 | THORGILSDOTTIR et al. | Cited in Specification |
| | 40 | 8932243 | B2 | 2015-01-13 | CALABRESE | |
| | 41 | 9132027 | B2 | 2015-09-15 | CALCO | |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

| If you wish to add additional U.S. Patent citation information please click the Add button. | | | | | Add |
| | | | | | Remove |

### U.S.PATENT APPLICATION PUBLICATIONS

| Examiner Initial* | Cite No | Publication Number | Kind Code¹ | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20070027418 | A1 | 2007-02-01 | CALCO et al. | |
| | 2 | 20100298748 | A1 | 2010-11-25 | ROSENFELD et al. | |
| | 3 | 20120053499 | A1 | 2012-03-01 | DONALDSON et al. | |
| | 4 | 20120130295 | A1 | 2012-05-24 | HAIDER | |
| | 5 | 20120165712 | A1 | 2012-06-28 | CALABRESE | |
| | 6 | 20130060179 | A1 | 2013-03-07 | MODGLIN | |
| | 7 | 20130281900 | A1 | 2013-10-24 | SUAREZ et al. | |
| | 8 | 20140012172 | A1 | 2014-01-09 | CALCO | |
| | 9 | 20110224591 | A1 | 2011-09-15 | THORGILSDOTTIR et al. | Equivalent to CN102227196 |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Application Number | | | | |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | Filing Date | 2019-11-18 | | | |
| | | First Named Inventor | Wayne CALCO | | | |
| | | Art Unit | | | | |
| | | Examiner Name | | | | |
| | | Attorney Docket Number | 19793.488.1.1 | | | |

| | 10 | 20140107551 | A1 | 2014-04-17 | MODGLIN | |
|---|---|---|---|---|---|---|
| | 11 | 20140323938 | A1 | 2014-10-30 | SUAREZ et al. | |
| | 12 | 20130310722 | A1 | 2013-11-21 | THORSTEINSDOTTIR et al. | Cited in Specification |
| | 13 | 20160287424 | A1 | 2016-10-06 | WEBSTER et al. | Cited in Specification |

If you wish to add additional U.S. Published Application citation information please click the Add button. | Add |

| FOREIGN PATENT DOCUMENTS | | Remove |

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2]i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | 19547115 | DE | A1 | 1997-06-19 | FERD. HAUBER GMBH & CO KG | | ☒ |
| | 2 | 9843568 | WO | A1 | 1998-10-08 | FEINGOLD | | ☐ |
| | 3 | 19849302 | DE | A1 | 2000-04-20 | LAZIK | | ☒ |
| | 4 | 1738724 | EP | A1 | 2007-01-03 | BARCELONA ORTHOPEDIC NECKLACE S.L | | ☐ |
| | 5 | 201602923 | CN | U | 2010-10-13 | HIGH CHEN INDUSTRIAL CO., LTD | | ☒ |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | | |
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

| | 6 | 202015274 | CN | U | 2011-10-26 | LAI ZHIJIA | | ☒ |
|---|---|---|---|---|---|---|---|---|
| | 7 | 2014102340 | WO | A1 | 2014-07-03 | CERVRITE AB | | ☐ |
| | 8 | 2933343 | CN | Y | 2007-08-15 | ZHAO JIACHANG | | ☒ |
| | 9 | 102227196 | CN | A | 2011-10-26 | OSSUR HF | | ☒ |

If you wish to add additional Foreign Patent Document citation information please click the Add button [Add]

[Remove]

**NON-PATENT LITERATURE DOCUMENTS**

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|
| | 1 | "Range-of-Motion Restriction and Craniofacial Tissue-Interface Pressure From Four Cervical Collars", The Journal of Trauma Injury, Infection, and Critical Care, Vol. 63, No. 5, November 2007, Pages 1120-1126. | |
| | 2 | "Ossur Is Immobilization", www.ossur.com, 2008, Pages 1-16. | |
| | 3 | "Miami J Patient Care Handbook", www.ossur.com, 2010, Pages 1-16. | |
| | 4 | Jacobson et al. "Improving Practice Efforts to Reduce Occipital Pressure Ulcers", Journal of Nursing Care Quality, Vol. 23, No. 3, 2008, Pages 283-288. | |
| | 5 | Bell et al. "Assessing Range of Motion to Evaluate the Adverse Effects of Ill-Fitting Cervical Orthoses", The Spine Journal, Vol. 9, 2009, Pages, 225-231. | |

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

| | 6 | Karason et al. "Evaluation of Clinical Efficacy and Safety of Cervical Trauma Collars: Differences in Immobilization, Effect on Jugular Venous Pressure and Patient Comfort", Scandinavian Journal of Trauma, Resuscitation and Emergency Medicine, 2014, Pages 1-7. | |

| If you wish to add additional non-patent literature document citation information please click the Add button | Add |
|---|---|

**EXAMINER SIGNATURE**

| Examiner Signature | /OPHELIA A HAWTHORNE/ | Date Considered | 02/12/2022 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

### CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

✕ A certification statement is not submitted herewith.

### SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Justin J. Cassell/ | Date (YYYY-MM-DD) | 2019-11-18 |
| Name/Print | Justin J. Cassell | Registration Number | 46205 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.17    ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.1.17    ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (03-15)
Approved for use through 07/31/2016. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | /OPHELIA A HAWTHORNE/ | |
| Attorney Docket Number | 19793.488.1.1 | |

**U.S.PATENTS** — Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code1 | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | D278747 | S | 1985-05-07 | PEACH, JR | |
| | 2 | 4628913 | | 1986-12-16 | LERMAN | |
| | 3 | 4732144 | | 1988-03-22 | CUNANAN | |
| | 4 | D314623 | S | 1991-02-12 | CALABRESE et al. | |
| | 5 | D552742 | S | 2007-10-09 | LEATT | |
| | 6 | D609815 | S | 2010-02-09 | PATTERSON | |
| | 7 | D617907 | S | 2010-06-15 | WALLER | |
| | 8 | D631167 | S | 2011-01-18 | LEATT et al. | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket  Number | 19793.488.1.1 | |

| | 9 | D643978 | S | 2011-08-23 | ABAJO ALONSO et al. | |
|---|---|---|---|---|---|---|
| | 10 | D644331 | S | 2011-08-30 | SANDHU | |
| | 11 | D644332 | S | 2011-08-30 | SANDHU | |
| | 12 | D647624 | S | 2011-10-25 | THORGILSDOTTIR et al. | |
| | 13 | D659842 | S | 2012-05-15 | DONALDSON et al. | |
| | 14 | D662597 | S | 2012-06-26 | CHANG | |
| | 15 | D692568 | S | 2013-10-29 | CHIANG et al. | |
| | 16 | D693014 | S | 2013-11-05 | CHIANG et al. | |
| | 17 | D767825 | S | 2016-09-27 | GEORGESON et al. | |
| | 18 | 4702233 | | 1987-10-27 | OMICIOLI | |
| | 19 | 5632722 | | 1997-05-27 | TWEARDY et al. | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| | | | | | |
|---|---|---|---|---|---|
| | **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | | | |
| | | Filing Date | | | |
| | | First Named Inventor | Wayne CALCO | | |
| | | Art Unit | | | |
| | | Examiner Name | | | |
| | | Attorney Docket Number | 19793.488.1.1 | | |

| | 20 | 8864693 | B2 | 2014-10-21 | SUAREZ et al. | |
|---|---|---|---|---|---|---|
| | 21 | 9668906 | B2 | 2017-06-06 | THORGILSDOTTIR et al. | |

If you wish to add additional U.S. Patent citation information please click the Add button. | Add |

**U.S.PATENT APPLICATION PUBLICATIONS** | Remove |

| Examiner Initial* | Cite No | Publication Number | Kind Code¹ | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20110034844 | A1 | 2011-02-10 | THORGILSDOTTIR et al. | |
| | 2 | 20130281899 | A1 | 2013-10-24 | SUAREZ et al. | Cited in the Partial International Search Report |
| | 3 | 20150216708 | A1 | 2015-08-06 | GARTH et al. | Cited in the Partial International Search Report |

If you wish to add additional U.S. Published Application citation information please click the Add button. | Add |

**FOREIGN PATENT DOCUMENTS** | Remove |

| Examiner Initial* | Cite No | Foreign Document Number³ | Country Code²i | Kind Code⁴ | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T⁵ |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2653139 | EP | A1 | 2013-10-23 | OPTEC USA, INC | | |
| | 2 | 2886088 | EP | A1 | 2015-06-24 | DEROYAL INDUSTRIES, INC | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button | Add |

**NON-PATENT LITERATURE DOCUMENTS** | Remove |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|
| | 1 | International Search Report from PCT Application No. PCT/US2017/019391, May 18, 2017. | |
| | 2 | Partial International Search Report from PCT Application No. PCT/US2017/050206, December 5, 2017. | |
| | 3 | Product Brochure, "Capital Collar Enhanced," DeRoyal, 2014, 2 Pages. | |
| | 4 | Product Brochure, "Instructions for Use Eclipse Cervical Collar," VQ OrthoCare, 2015, 2 Pages. | |
| | 5 | Product Brochure, "Miami J Advanced By OSSUR," www.ossur.com, 2012, 4 Pages. | |
| | 6 | Product Brochure, "Miami J Cervical Collar," www.ossur.com, 1 Page. | |
| | 7 | Product Brochure, "Proglide Cervical Collar," OPTEC, www.optecusa.com, 1 Page. | |
| | 8 | Product Brochure, "Vista Upper Spine," Aspen Medical Products, 2015, 6 Pages. | |

| If you wish to add additional non-patent literature document citation information please click the Add button | Add |
|---|---|

| EXAMINER SIGNATURE | | | |
|---|---|---|---|
| Examiner Signature | /OPHELIA A HAWTHORNE/ | Date Considered | 02/12/2022 |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

EFS Web 2.1.17    ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| | | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | Application Number | |
| | Filing Date | |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

✕ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Justin J. Cassell/ | Date (YYYY-MM-DD) | |
|---|---|---|---|
| Name/Print | Justin J. Cassell | Registration Number | 46205 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.17    ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| L1 | 227 | ("10675173" \| "20130310722" \| "20160008158" \| "20170252198" \| "20200281754" \| "20020138028" \| "20020156408" \| "20020156409" \| "20020169401" \| "20020173737" \| "20030055367" \| "20030060744" \| "20030181838" \| "20040039318" \| "20050101896" \| "20070027418" \| "20070073203" \| "20070270728" \| "20090247918" \| "20100137768" \| "20100268139" \| "20100298748" \| "20110034844" \| "20110066094" \| "20110224591" \| "20120053499" \| "20120130295" \| "20120165712" \| "20130060179" \| "20130281899" \| "20130281900" \| "20140012172" \| "20140107551" \| "20140323938" \| "20150216708" \| "20160287424" \| "20180078400" \| "20180078401" \| "2088207" \| "2102069" \| "2735424" \| "2791999" \| "2801630" \| "2806471" \| "2818063" \| "2820455" \| "2911970" \| "3024784" \| "3027894" \| "3042027" \| "3050052" \| "3060930" \| "3075521" \| "3135256" \| "3177869" \| "3285243" \| "3285244" \| "3306284" \| "3313297" \| "3320950" \| "3504667" \| "3512523" \| "3756226" \| "3916884" \| "3916885" \| "4099523" \| "4173973" \| "4205667" \| "4325363" \| "4401111" \| "4413619" \| "4520801" \| "4538597" \| "4562833" \| "4582051" \| "4628913" \| "4643174" \| "4677969" \| "4702233" \| "4708129" \| "4712540" \| "4732144" \| "4745922" \| "4827915" \| "4854306" \| "4886052" \| "4940043" \| "4955368" \| "4987891" \| "5005563" \| "5038759" \| "5058572" \| "5060637" \| "5097824" \| "5156588" \| "5180361" \| "5201702" \| "5215517" \| "5230698" \| "5275581" \| "5302170" \| "5346461" \| "5366438" \| "5385535" \| "5433696" \| "5437612" \| "5437617" \| "5445602" \| "5520619" \| "5588957" \| "5593382" \| "5622529" \| "5624387" \| "5632722" \| "5688229" \| "5716335" \| "5728054" \| "5785670" \| "5788658" \| | US-PGPUB; USPAT | ADJ | ON | 2022/02/12 12:45 |

EXHIBIT 3

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | |
|---|---|
| Application No.: | 16/686,582 |
| Filing Date: | November 18, 2019 |
| First Inventor: | Wayne CALCO |
| Attorney No.: | 19793.488.1.1 |
| Examiner: | Ophelia Althea HAWTHORNE |
| Art Unit: | 3786 |
| For: | CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT |

<u>REPLY TO OFFICE ACTION</u>

Commissioner for Patents
P.O. Box 145
Alexandria, VA 22313-145

<u>INTRODUCTORY COMMENTS</u>

This reply is responsive to the outstanding Office Action of February 17, 2022. As a result of the following amendments and remarks, reconsideration of the application is respectfully requested.

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

2/9

<u>AMENDMENT</u>

Please amend the application in accordance with the following particulars.

<u>In the Claims</u>

The claims are amended as shown on the following page(s) under the heading LIST OF
CURRENT CLAIMS.  The list shows the status of all claims presently in the application
and is intended to supersede all prior versions of the claims in the application.  Any
cancellation of claims is made without prejudice or disclaimer.

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

3/9

LIST OF CURRENT CLAIMS

1. (Currently Amended) A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising:

a main support;

a lower support hingedly connected to the main support;

a sternum pad; and

an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support;

wherein the sternum pad is mounted to a ball joint and the adjustment mechanism has an adjustment dial and an extension element arranged for adjustably extending relative to the lower support.

2. (Original) The cervical collar of claim 1, wherein the adjustment mechanism is located at a lowermost portion of the lower support.

3. (Original) The cervical collar of claim 2, wherein the adjustment mechanism is located centrally at the lowermost portion of the lower support.

4. (Original) The cervical collar of claim 1, wherein the adjustment mechanism includes an extension element variably extendable from the adjustment mechanism.

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

4/9

5. (Original) The cervical collar of claim 4, wherein the adjustment mechanism includes a dial for adjusting a distance the extension element extends from the adjustment mechanism.

6. (Original) The cervical collar of claim 4, wherein the adjustment mechanism includes a housing arranged for receiving the extension element in a contracted configuration.

7. (Original) The cervical collar of claim 1, wherein the main support carries a lock mechanism for locking rotation of the lower support relative to the main support.

8. (Canceled)

9. (Original) The cervical collar of claim 1, wherein the main support carries an upper support connected to inside the main support and oriented to face a mandible of a user.

10. (Original) The cervical collar of claim 9, wherein the upper support is maintained in a stationary relationship with the main support.

11. (Original) The cervical collar of claim 9, wherein the upper support is rigid.

12. (Original) The cervical collar of claim 1, wherein the main support has a generally arcuate configuration adapted to extend about the mandible of a user, and the lower support has a generally arcuate configuration contoured for being adapted for securing against a sternum of the user.

13. (Canceled)

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

5/9

14. (Currently Amended) ~~The cervical collar of claim 1,~~ A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising:

a main support;

a lower support hingedly connected to the main support;

a sternum pad; and

an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support;

wherein the adjustment mechanism includes a housing arranged for receiving an extension element in a contracted configuration resulting in a reduced or substantially minimized distance between the lower support and the sternum pad, the extension element having a screw thread, and the housing defining corresponding threads permitting slidable movement between the extension element and the screw thread according to adjustment of a dial associated with the extension element.

15. (Original) The cervical collar of claim 14, wherein the housing defines a recess from which at least a portion of the dial extends.

16. (Currently Amended) A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising:

a main support;

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

6/9

a lower support hingedly connected to the main support;

a sternum pad; and

an adjustment mechanism located on the lower support and the sternum pad is connected
thereto such that the sternum pad is movable relative to the lower support;

~~The cervical collar of claim 1,~~ further comprising a lock mechanism for locking rotation
of the lower support relative to the main support, the lock mechanism coupled to a
slidelock arranged for operatively engaging end portions of the main support and lower
support for locking and unlocking rotation of the lower support relative to the main
support;

wherein the slidelock slides over an outer surface of the main support to cooperate with
the main support to arrest or prevent rotation of the lower support relative to the main
support.

17. (Original) The cervical collar of claim 16, wherein the slidelock defines a central rack
of teeth arranged to correspond to and operatively engage elements forming part of the
lock mechanism for enabling linear translation of the slidelock relative to the main
support.

18. (Canceled)

19. (Canceled)

20. (Canceled)

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

7/9

REMARKS

Reconsideration of the pending application is respectfully requested in view of these observations.

Amendment to the Claims

Claim 1 is amended with the allowable subject matter of claim 13. Claim 1 and the claims dependent on claim 1 are therefore in condition for allowance. Claims 8 and 13 are canceled.

Claim 14, identified as reciting allowable subject matter, is placed in independent form including the limitations of claim 1. Claims 14 and 15 are in condition for allowance.

Claim 16 is placed in independent form including the limitations of claim 1 and the allowable subject matter of claim 18. Claim 18 is canceled. Claims 16 and 17 are in condition for allowance.

Claim 18 was not rejected by the prior art, and is considered to recite allowable subject matter.

Claims 19 and 20 are canceled without prejudice or disclaimer to expedite the allowance of the pending application.

Entry of the amendment to the claims is kindly requested.

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

8/9

Specification

The objection to the specification is moot given the amendment to claim 8.

Claim Rejections – 35 U.S.C. § 112

Withdrawal of the rejection of claim 8 under 35 U.S.C. § 112(b) is kindly requested in view of the cancelation of claim 8.

Claim Rejections – 35 U.S.C. § 102

*Rejection of claims 1, 2, 4-7, 9-12, 16 and 17 under 35 U.S.C. § 102 as anticipated by US 2016/0008158 (Martin)*

Reconsideration of this rejection is kindly requested in view of the amendment to claim 1, which is placed in condition for allowance.

Withdrawal of the rejection is kindly requested.

Claim Rejections – 35 U.S.C. § 103

*Rejection of claims 3 and 8 under 35 U.S.C. § 103 as unpatentable over US 2016/0008158 (Martin) in view of US 2013/0281899 (Suarez)*

*Rejection of claims 19 and 20 under 35 U.S.C. § 103 as unpatentable over US 2016/0008158 (Martin) in view of US 2013/0281899 (Suarez)*

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

9/9

Reconsideration of the rejection of claim 3 is kindly requested in view of the amendment
to claim 1, which is placed in condition for allowance.

Claims 19 and 20 are canceled.

Withdrawal of the rejection is kindly requested.

Conclusion

The application is in condition for allowance because of the amendment to the claims and
the preceding remarks.

If any issues remain that may be resolved by a telephone or facsimile communication
with the Applicant's attorney, the Examiner is invited to contact the undersigned at the
numbers shown below.

Respectfully submitted,

/Justin J. Cassell/

JUSTIN J. CASSELL
Attorney for Applicant
Registration No.: 46,205

WORKMAN NYDEGGER
60 East South Temple, Suite 1000
Salt Lake City, UT 84111
Phone: (801) 533-9800

Date: May 20, 2022

EXHIBIT 4

Suggested Claims for Continuation Application

1

CLAIMS

What is claimed is:

1.  A cervical collar, comprising:

a posterior component;

an anterior component arranged for connecting to the posterior component;

the anterior component including:

a main support;

a lower support hingedly connected to the main support and arranged for movement relative to the main support to fit the main support to a user's chin structure to an adjusted position during a fitting procedure;

a lower pad attached to a lowermost portion of the lower support and arranged to contact a user's sternum region when the cervical collar is fitted on the user;

an adjustment mechanism located centrally on the lowermost portion of the lower support for adjusting pressures of the lower pad relative to the user's sternum region, the adjustment mechanism having an adjustment member arranged for rotary movement relative to the lowermost portion for rotating a member extending through an opening in the lowermost portion of the lower support;

a lock mechanism arranged for locking movement of the lower support relative to the main support to lock the lower support in the adjusted position, the lock mechanism comprising an actuator for adjusting the lock mechanism from locked to unlocked conditions, the actuator centrally located on the lower support, the actuator configured to control engagement of a lock element with a rack segment to the locked condition and to control disengagement

Suggested Claims for Continuation Application

2

of the lock element with the rack segment while in the unlocked condition, the lock mechanism further including a spring element arranged to return the lock element to the locked condition by release of the actuator;

and wherein the adjustment mechanism operates independently of the lock mechanism so that rotational positions of the adjustment member do not affect the adjusted position of the lower support relative to the main support.

2. The cervical collar of claim 1, wherein the main support carries an upper support connected to inside the main support and oriented to face a mandible of a user.

3. The cervical collar of claim 2, wherein the upper support is maintained in a stationary relationship with the main support.

4. The cervical collar of claim 1, wherein the main support has a generally arcuate configuration adapted to extend about the mandible of a user, and the lower support has a generally arcuate configuration contoured for being adapted for securing against the user's sternum.

5. The cervical collar of claim 1, wherein the lock element includes a shaft portion and a pinion portion for engagement with the rack segment.

6. The cervical collar of claim 1, wherein the lock mechanism is configured for incremental height adjustment of the lower support relative to the main support so the adjusted position is locked at a desired height setting.

7. The cervical collar of Claim 1, further comprising a connector for connecting the anterior component to the posterior component, the

Suggested Claims for Continuation Application

3

connector comprising a base element having a strap guide about which a strap extending from the posterior component extends.

8.  A cervical collar, comprising:

a posterior component;

an anterior component arranged for connecting to the posterior component;

the anterior component including:

 a main support;

a lower support hingedly connected to the main support and arranged for movement relative to the main support to fit the main support to a user's chin structure to an adjusted position during a fitting procedure;

a lower pad attached to a lowermost portion of the lower support and arranged to contact a user's sternum region when the cervical collar is fitted on the user; and

an adjustment mechanism located ~~centrally~~ on the lowermost portion of the lower support for adjusting pressures of the lower pad relative to the user's sternum region;

a lock mechanism arranged for locking movement of the lower support relative to the main support to lock the lower support in the adjusted position, the lock mechanism comprising an actuator for adjusting the lock mechanism from locked to unlocked conditions, the actuator ~~centrally~~ located on the lower support, the actuator configured to control engagement of a lock element to the locked condition and to control disengagement of the lock element while in the unlocked condition, the lock mechanism further including a bias element arranged to return the lock element to the locked condition by release of the actuator;

and wherein the adjustment mechanism operates independently of the lock mechanism so that adjustment of pressures of the lower pad relative to the user's sternum region does not affect the adjusted position

Suggested Claims for Continuation Application

4

of the lower support relative to the main support.

EXHIBIT B



WAYNE CALCO

v.

OSSUR AMERICAS INC.

Case No. 8:22-cv-01971-CJC (KESx)

Economic Loss Report*

Prepared January 10, 2024

*in compliance with Federal Rule 26 (a)(2)(B)

555 Anton Boulevard, Suite 150, Costa Mesa, California 92626 | Tel: 714-442-8561 | Fax: 714-586-5940
E-mail: expert@econconsulting.com | www.econconsulting.com

**A.    Statement of Opinions**

I have been retained by the Law Office of George B. Piggott to provide expert testimony and this report regarding the present and future values of Mr. Wayne Calco's past and future economic losses.  As relates to my retention, Mr. Calco is seeking royalty payments for his inventions pursuant to the Services Agreement with Ossur Americas, Inc. The tables and summary presented in Exhibit A were prepared to provide the calculations, totals, and opinions related to said losses.

*Methodology.*

Losses are calculated using Ossur's actual Global "Total Invoiced Sales" and "Total Net Sales" data for the First Quarter 2018 through the Third Quarter 2023 (9/27/23). Upon discussion with Chris Burdell, MS, a cervical collar industry sales professional, it is assumed that Ossur's Miami JS sales would parallel the growth of Aspen's "Vista" collar, which achieved 80% market share in its 13th year of sales. Based on sales numbers and market share percentages provided by Mr. Burdell, the cervical collar market is calculated to be $30,000,000. Five loss scenarios are calculated. Growth and Discount Rates are applied to each scenario.

At Mr. Piggott's request, Scenarios 1 and 2 assume that Ossur's Miami JS global sales would continue to increase until Global Total Invoiced Sales achieves a 50% market share in its 13th year of sales, or 2031. A 18.8% growth rate is applied to Ossur's 2023 annualized Global Total Invoiced Sales until it equals 50% market share. Thereafter, sales growth is assumed to slow to an industry standard 7% annual rate.

Scenarios 3 and 4 assume that Ossur's Miami JS global sales would continue to increase until Global Total Invoiced Sales achieves an 80% market share in the 13th year of sales, or 2031. A 26.0% growth rate is applied to Ossur's 2023 annualized Global Total Invoiced Sales until it equals 80% market share. Thereafter, sales growth is assumed to slow to an industry standard 7% annual rate.

At Mr. Piggott's request, Scenario 5 assumes that Mr. Calco's royalties would commence on the trial date and losses are calculated using Ossur's 2023 annualized Global Total Invoiced Sales and a 7% annual growth rate.

Losses in Scenarios 1 and 3 are calculated for the life of the patent, until March 23, 2038. Losses in Scenarios 2, 4 and 5 are calculated for 20 years commencing on the trial date, April 9, 2024. For all scenarios it is assumed that Net Sales and Invoiced Sales will maintain the same proportional relationship, at 62% of Invoiced Sales, for the duration of the calculations.

The present value of future economic losses is the amount of money necessary today, when properly invested, to pay the lost stream of future income.  The present value accounts for both the growth rate, or inflation of future sales and income, and the discount rate, or interest received from the invested money. Growth rates are as stated above. Discounting future streams of income requires a secure and prudent investment, such as the 30-year U.S. Treasury bond used in these calculations. Present value future economic losses are then calculated by applying both the appropriate growth rate and discount rate in each scenario.

*Conclusion.*

Based on my education, training, and experience, I have calculated the present value of Mr. Calco's past and future economic losses as follows, Scenario 1: $3,853,158; Scenario 2: $5,445,659; Scenario 3: $5,665,168; and Scenario 4: $8,392,272. For the complete statement of my opinions, along with the calculations and tables that support these conclusions, please see the

2

calculations and tables titled "Summary of Economic Damages Claimed by Wayne Calco" attached herein as Exhibit A.

**B.    Data or Other Information Considered.**

The following is a list of documents I received and considered in forming the above opinions:

1. Plaintiff's First Amended Complaint
2. Services Agreement between Ossur Americas Inc and Wayne Calco
3. Deposition of Timothy Paul Knust-Graichen, dated November 30, 2023
4. Ossur's Global Sales Data
5. Resume of Chris Burdell

The following is a list of additional documents, sources, and information considered in forming the above opinions:

1. 2022 Ossur Consolidated Financial Statements *(https://media.ossur.com/image/upload/documents/corporate/annual_report/2022_%C3%96ssur_Financial_Statements.pdf)*
2. 2022 Ossur Annual Report *(https://annual-report.ossur.com/)*
3. Ossur Financial Performance *(https://annual-report.ossur.com/2022/financial-performance#fiveyearoverview)*
4. Consumer Price Index (*www.bls.gov*)
5. Daily Treasury Yields (*www.treasury.gov*)
6. Economic Report of the President, 2023 (*www.whitehouse.gov*)

**C.    Summary and Support of Opinion.**

Please see the calculations and tables titled "Summary of Economic Damages Claimed by Wayne Calco" attached herein as Exhibit A.

**D.    Witness Qualifications.**

Please see C.V. attached herein as Exhibit B.

**E.    Testimony List.**

Please see Testimony List attached herein as Exhibit C.

**F.    Statement of Compensation.**

All billable hours will be invoiced at $400.00 per hour, except for testimonies, which will be invoiced at $500.00 per hour.  There is a two-hour minimum payment for all testimonies.  A non-refundable retainer fee of $1,800.00 was requested prior to commencement of work.  Please see Fee Schedule attached herein as Exhibit D.

I reserve the right to update and/or revise this report pending receipt of new and/or additional information, including other expert reports.

Sincerely,

James Christopoulos

3

# Exhibit A



# Summary of Economic Damages Claimed by Wayne Calco

**Prepared January 10, 2024**

| | 50% Market Share | | 80% Market Share | |
|---|---|---|---|---|
| | Scenario 1 2019-2038 | Scenario 2 2024-2044 | Scenario 3 2019-2038 | Scenario 4 2024-2044 |
| Past Losses | | | | |
| Royalties | $ 301,528 | $ - | $ 303,344 | $ - |
| **Total Past Loss** | **$ 301,528** | **$ -** | **$ 303,344** | **$ -** |
| Future Losses | | | | |
| Royalties | $ 3,551,629 | $ 5,445,659 | $ 5,361,824 | $ 8,392,272 |
| **Total Future Loss** | **$ 3,551,629** | **$ 5,445,659** | **$ 5,361,824** | **$ 8,392,272** |
| | | | | |
| **Total Past and Future Loss** | **$ 3,853,158** | **$ 5,445,659** | **$ 5,665,168** | **$ 8,392,272** |

*Wayne Calco v. Ossur Americas Inc [1515]*

Page A-1

**Scenario 1: Varied Sales Growth For 20 Years Starting in 2019 - 50% Market Share**

| | | |
|---|---|---|
| Basis: | $3,769,692 | Ossur's 2023 Annualized Global Total Invoiced Sales |
| Initial Growth Rate: | 18.8% | Calculated Rate to Achieve 50% Market Share in 2031 |
| Final Growth Rate: | 7.0% | Post Market Share Attainment Growth Rate (Src: Chris Burdell) |
| Discount Rate: | 4.2% | 30 Yr Bond, Daily Treasury Par Yield Curve Rate as of 1/9/24 (Src: treasury.gov) |

| Year | Patent Years | Ann Sales Growth | Invoiced Sales | Net Sales/ Inv Sales | Net Sales | 4% Royalty | Discount Rate | Present Value | Cumulative Loss |
|---|---|---|---|---|---|---|---|---|---|
| 2019 | 1 | | $656,162 | 63.7% | $418,084 | $16,723 | | $16,723 | $16,723 |
| 2020 | 2 | 118.1% | $1,431,399 | 65.0% | $930,504 | $37,220 | | $37,220 | $53,944 |
| 2021 | 3 | 58.4% | $2,267,589 | 57.0% | $1,291,567 | $51,663 | | $51,663 | $105,606 |
| 2022 | 4 | 25.6% | $2,848,255 | 59.3% | $1,688,594 | $67,544 | | $67,544 | $173,150 |
| 2023 | 5 | 32.4% | $3,769,692 | 65.2% | $2,459,021 | $98,361 | | $98,361 | $271,511 |
| 2024 | 6* | 18.8% | $1,209,603 | 62.0% | $750,432 | $30,017 | | $30,017 | $301,528 |
| **Total Past Loss** | | | | | | **$301,528** | | **$301,528** | |
| | | | | | | | | | |
| 2024 | 6* | 18.8% | $3,270,408 | 62.0% | $2,028,945 | $81,158 | 4.2% | $79,513 | $381,041 |
| 2025 | 7 | 18.8% | $5,324,173 | 62.0% | $3,303,092 | $132,124 | 4.2% | $124,252 | $505,293 |
| 2026 | 8 | 18.8% | $6,327,401 | 62.0% | $3,925,489 | $157,020 | 4.2% | $141,740 | $647,033 |
| 2027 | 9 | 18.8% | $7,519,666 | 62.0% | $4,665,165 | $186,607 | 4.2% | $161,689 | $808,723 |
| 2028 | 10 | 18.8% | $8,936,588 | 62.0% | $5,544,216 | $221,769 | 4.2% | $184,447 | $993,169 |
| 2029 | 11 | 18.8% | $10,620,499 | 62.0% | $6,588,906 | $263,556 | 4.2% | $210,407 | $1,203,576 |
| 2030 | 12 | 18.8% | $12,621,707 | 62.0% | $7,830,446 | $313,218 | 4.2% | $240,020 | $1,443,597 |
| 2031 | 13 | 18.8% | $15,000,000 | 62.0% | $9,305,928 | $372,237 | 4.2% | $273,802 | $1,717,399 |
| 2032 | 14 | 7.0% | $16,050,000 | 62.0% | $9,957,343 | $398,294 | 4.2% | $281,214 | $1,998,612 |
| 2033 | 15 | 7.0% | $17,173,500 | 62.0% | $10,654,357 | $426,174 | 4.2% | $288,826 | $2,287,438 |
| 2034 | 16 | 7.0% | $18,375,645 | 62.0% | $11,400,162 | $456,006 | 4.2% | $296,644 | $2,584,082 |
| 2035 | 17 | 7.0% | $19,661,940 | 62.0% | $12,198,173 | $487,927 | 4.2% | $304,674 | $2,888,756 |
| 2036 | 18 | 7.0% | $21,038,276 | 62.0% | $13,052,045 | $522,082 | 4.2% | $312,921 | $3,201,676 |
| 2037 | 19 | 7.0% | $22,510,955 | 62.0% | $13,965,689 | $558,628 | 4.2% | $321,391 | $3,523,067 |
| 2038 | 20 | 7.0% | $24,086,722 | 62.0% | $14,943,287 | $597,731 | 4.2% | $330,090 | $3,853,158 |
| **Total Future Loss** | | | | | | **$5,174,530** | | **$3,551,629** | |
| | | | | | | | | | |
| **Total Past and Future Loss** | | | | | | **$5,476,058** | | **$3,853,158** | |

**Scenario 2: Varied Sales Growth For 20 Years Starting on Trial Date - Market Share**

| Basis: | $3,769,692 | Ossur's 2023 Annualized Global Total Invoiced Sales |
|---|---|---|
| Initial Growth Rate: | 18.8% | Calculated Rate to Achieve 50% Market Share in 2031 |
| Final Growth Rate: | 7.0% | Post Market Share Attainment Growth Rate (Src: Chris Burdell) |
| Discount Rate: | 4.2% | 30 Yr Bond, Daily Treasury Par Yield Curve Rate as of 1/9/24 (Src: treasury.gov) |

| Year | Patent Years | Ann Sales Growth | Invoiced Sales | Net Sales/ Inv Sales | Net Sales | 4% Royalty | Discount Rate | Present Value | Cumulative Loss |
|---|---|---|---|---|---|---|---|---|---|
| 2024 | 0.7 | 18.8% | $3,270,408 | 62.0% | $2,028,945 | $81,158 | 4.2% | $79,513 | $79,513 |
| 2025 | 1.7 | 18.8% | $5,324,173 | 62.0% | $3,303,092 | $132,124 | 4.2% | $124,252 | $203,765 |
| 2026 | 2.7 | 18.8% | $6,327,401 | 62.0% | $3,925,489 | $157,020 | 4.2% | $141,740 | $345,505 |
| 2027 | 3.7 | 18.8% | $7,519,666 | 62.0% | $4,665,165 | $186,607 | 4.2% | $161,689 | $507,195 |
| 2028 | 4.7 | 18.8% | $8,936,588 | 62.0% | $5,544,216 | $221,769 | 4.2% | $184,447 | $691,641 |
| 2029 | 5.7 | 18.8% | $10,620,499 | 62.0% | $6,588,906 | $263,556 | 4.2% | $210,407 | $902,048 |
| 2030 | 6.7 | 18.8% | $12,621,707 | 62.0% | $7,830,446 | $313,218 | 4.2% | $240,020 | $1,142,068 |
| 2031 | 7.7 | 18.8% | $15,000,000 | 62.0% | $9,305,928 | $372,237 | 4.2% | $273,802 | $1,415,871 |
| 2032 | 8.7 | 7.0% | $16,050,000 | 62.0% | $9,957,343 | $398,294 | 4.2% | $281,214 | $1,697,084 |
| 2033 | 9.7 | 7.0% | $17,173,500 | 62.0% | $10,654,357 | $426,174 | 4.2% | $288,826 | $1,985,910 |
| 2034 | 10.7 | 7.0% | $18,375,645 | 62.0% | $11,400,162 | $456,006 | 4.2% | $296,644 | $2,282,554 |
| 2035 | 11.7 | 7.0% | $19,661,940 | 62.0% | $12,198,173 | $487,927 | 4.2% | $304,674 | $2,587,227 |
| 2036 | 12.7 | 7.0% | $21,038,276 | 62.0% | $13,052,045 | $522,082 | 4.2% | $312,921 | $2,900,148 |
| 2037 | 13.7 | 7.0% | $22,510,955 | 62.0% | $13,965,689 | $558,628 | 4.2% | $321,391 | $3,221,539 |
| 2038 | 14.7 | 7.0% | $24,086,722 | 62.0% | $14,943,287 | $597,731 | 4.2% | $330,090 | $3,551,629 |
| 2039 | 15.7 | 7.0% | $25,772,793 | 62.0% | $15,989,317 | $639,573 | 4.2% | $339,026 | $3,890,655 |
| 2040 | 16.7 | 7.0% | $27,576,888 | 62.0% | $17,108,569 | $684,343 | 4.2% | $348,202 | $4,238,857 |
| 2041 | 17.7 | 7.0% | $29,507,270 | 62.0% | $18,306,169 | $732,247 | 4.2% | $357,628 | $4,596,485 |
| 2042 | 18.7 | 7.0% | $31,572,779 | 62.0% | $19,587,601 | $783,504 | 4.2% | $367,308 | $4,963,794 |
| 2043 | 19.7 | 7.0% | $33,782,874 | 62.0% | $20,958,733 | $838,349 | 4.2% | $377,251 | $5,341,044 |
| 2044 | 20.0 | 7.0% | $9,759,872 | 62.0% | $6,054,978 | $242,199 | 4.2% | $104,615 | $5,445,659 |
| **Total Future Loss** | | | | | | **$9,094,744** | | **$5,445,659** | |

**Scenario 3: Varied Sales Growth For 20 Years Starting in 2019 - 80% Market Share**

| Basis: | $3,769,692 | Ossur's 2023 Annualized Global Total Invoiced Sales |
|---|---|---|
| Initial Growth Rate: | 26.0% | Calculated Rate to Achieve 80% Market Share in 2031 (Src: Chris Burdell) |
| Final Growth Rate: | 7.0% | Post Market Share Attainment Growth Rate (Src: Chris Burdell) |
| Discount Rate: | 4.2% | 30 Yr Bond, Daily Treasury Par Yield Curve Rate as of 1/9/24 (Src: treasury.gov) |

| Year | Patent Years | Ann Sales Growth | Invoiced Sales | Net Sales/ Inv Sales | Net Sales | 4% Royalty | Discount Rate | Present Value | Cumulative Loss |
|---|---|---|---|---|---|---|---|---|---|
| 2019 | 1 | | $656,162 | 63.7% | $418,084 | $16,723 | | $16,723 | $16,723 |
| 2020 | 2 | 118.1% | $1,431,399 | 65.0% | $930,504 | $37,220 | | $37,220 | $53,944 |
| 2021 | 3 | 58.4% | $2,267,589 | 57.0% | $1,291,567 | $51,663 | | $51,663 | $105,606 |
| 2022 | 4 | 25.6% | $2,848,255 | 59.3% | $1,688,594 | $67,544 | | $67,544 | $173,150 |
| 2023 | 5 | 32.4% | $3,769,692 | 65.2% | $2,459,021 | $98,361 | | $98,361 | $271,511 |
| 2024 | 6* | 26.0% | $1,282,797 | 62.0% | $795,841 | $31,834 | | $31,834 | $303,344 |
| **Total Past Loss** | | | | | | **$303,344** | | **$303,344** | |
| | | | | | | | | | |
| 2024 | 6* | 26.0% | $3,468,302 | 62.0% | $2,151,718 | $86,069 | 4.2% | $84,324 | $387,669 |
| 2025 | 7 | 26.0% | $5,988,006 | 62.0% | $3,714,930 | $148,597 | 4.2% | $139,744 | $527,413 |
| 2026 | 8 | 26.0% | $7,546,931 | 62.0% | $4,682,080 | $187,283 | 4.2% | $169,059 | $696,472 |
| 2027 | 9 | 26.0% | $9,511,709 | 62.0% | $5,901,018 | $236,041 | 4.2% | $204,523 | $900,995 |
| 2028 | 10 | 26.0% | $11,988,000 | 62.0% | $7,437,297 | $297,492 | 4.2% | $247,426 | $1,148,421 |
| 2029 | 11 | 26.0% | $15,108,971 | 62.0% | $9,373,533 | $374,941 | 4.2% | $299,329 | $1,447,750 |
| 2030 | 12 | 26.0% | $19,042,461 | 62.0% | $11,813,851 | $472,554 | 4.2% | $362,121 | $1,809,871 |
| 2031 | 13 | 26.0% | $24,000,000 | 62.0% | $14,889,485 | $595,579 | 4.2% | $438,084 | $2,247,954 |
| 2032 | 14 | 7.0% | $25,680,000 | 62.0% | $15,931,749 | $637,270 | 4.2% | $449,942 | $2,697,896 |
| 2033 | 15 | 7.0% | $27,477,600 | 62.0% | $17,046,971 | $681,879 | 4.2% | $462,121 | $3,160,018 |
| 2034 | 16 | 7.0% | $29,401,032 | 62.0% | $18,240,259 | $729,610 | 4.2% | $474,630 | $3,634,648 |
| 2035 | 17 | 7.0% | $31,459,104 | 62.0% | $19,517,077 | $780,683 | 4.2% | $487,478 | $4,122,125 |
| 2036 | 18 | 7.0% | $33,661,242 | 62.0% | $20,883,273 | $835,331 | 4.2% | $500,673 | $4,622,798 |
| 2037 | 19 | 7.0% | $36,017,528 | 62.0% | $22,345,102 | $893,804 | 4.2% | $514,225 | $5,137,024 |
| 2038 | 20 | 7.0% | $38,538,755 | 62.0% | $23,909,259 | $956,370 | 4.2% | $528,145 | $5,665,168 |
| **Total Future Loss** | | | | | | **$7,913,504** | | **$5,361,824** | |
| | | | | | | | | | |
| **Total Past and Future Loss** | | | | | | **$8,216,849** | | **$5,665,168** | |

**Scenario 4: Varied Sales Growth For 20 Years Starting on Trial Date - 80% Market Share**

| Basis: | $3,769,692 | Ossur's 2023 Annualized Global Total Invoiced Sales |
|---|---|---|
| Initial Growth Rate: | 26.0% | Calculated Rate to Achieve 80% Market Share in 2031 (Src: Chris Burdell) |
| Final Growth Rate: | 7.0% | Post Market Share Attainment Growth Rate (Src: Chris Burdell) |
| Discount Rate: | 4.2% | 30 Yr Bond, Daily Treasury Par Yield Curve Rate as of 1/9/24 (Src: treasury.gov) |

| Year | Patent Years | Ann Sales Growth | Invoiced Sales | Net Sales/ Inv Sales | Net Sales | 4% Royalty | Discount Rate | Present Value | Cumulative Loss |
|---|---|---|---|---|---|---|---|---|---|
| 2024 | 0.7 | 26.0% | $3,468,302 | 62.0% | $2,151,718 | $86,069 | 4.2% | $84,324 | $84,324 |
| 2025 | 1.7 | 26.0% | $5,988,006 | 62.0% | $3,714,930 | $148,597 | 4.2% | $139,744 | $224,069 |
| 2026 | 2.7 | 26.0% | $7,546,931 | 62.0% | $4,682,080 | $187,283 | 4.2% | $169,059 | $393,128 |
| 2027 | 3.7 | 26.0% | $9,511,709 | 62.0% | $5,901,018 | $236,041 | 4.2% | $204,523 | $597,650 |
| 2028 | 4.7 | 26.0% | $11,988,000 | 62.0% | $7,437,297 | $297,492 | 4.2% | $247,426 | $845,076 |
| 2029 | 5.7 | 26.0% | $15,108,971 | 62.0% | $9,373,533 | $374,941 | 4.2% | $299,329 | $1,144,406 |
| 2030 | 6.7 | 26.0% | $19,042,461 | 62.0% | $11,813,851 | $472,554 | 4.2% | $362,121 | $1,506,526 |
| 2031 | 7.7 | 26.0% | $24,000,000 | 62.0% | $14,889,485 | $595,579 | 4.2% | $438,084 | $1,944,610 |
| 2032 | 8.7 | 7.0% | $25,680,000 | 62.0% | $15,931,749 | $637,270 | 4.2% | $449,942 | $2,394,552 |
| 2033 | 9.7 | 7.0% | $27,477,600 | 62.0% | $17,046,971 | $681,879 | 4.2% | $462,121 | $2,856,673 |
| 2034 | 10.7 | 7.0% | $29,401,032 | 62.0% | $18,240,259 | $729,610 | 4.2% | $474,630 | $3,331,303 |
| 2035 | 11.7 | 7.0% | $31,459,104 | 62.0% | $19,517,077 | $780,683 | 4.2% | $487,478 | $3,818,781 |
| 2036 | 12.7 | 7.0% | $33,661,242 | 62.0% | $20,883,273 | $835,331 | 4.2% | $500,673 | $4,319,454 |
| 2037 | 13.7 | 7.0% | $36,017,528 | 62.0% | $22,345,102 | $893,804 | 4.2% | $514,225 | $4,833,679 |
| 2038 | 14.7 | 7.0% | $38,538,755 | 62.0% | $23,909,259 | $956,370 | 4.2% | $528,145 | $5,361,824 |
| 2039 | 15.7 | 7.0% | $41,236,468 | 62.0% | $25,582,907 | $1,023,316 | 4.2% | $542,441 | $5,904,265 |
| 2040 | 16.7 | 7.0% | $44,123,021 | 62.0% | $27,373,710 | $1,094,948 | 4.2% | $557,124 | $6,461,389 |
| 2041 | 17.7 | 7.0% | $47,211,633 | 62.0% | $29,289,870 | $1,171,595 | 4.2% | $572,204 | $7,033,593 |
| 2042 | 18.7 | 7.0% | $50,516,447 | 62.0% | $31,340,161 | $1,253,606 | 4.2% | $587,693 | $7,621,287 |
| 2043 | 19.7 | 7.0% | $54,052,598 | 62.0% | $33,533,972 | $1,341,359 | 4.2% | $603,601 | $8,224,888 |
| 2044 | 20.0 | 7.0% | $15,615,796 | 62.0% | $9,687,965 | $387,519 | 4.2% | $167,384 | $8,392,272 |
| **Total Future Loss** | | | | | | **$14,185,847** | | **$8,392,272** | |

## Scenario 5: Constant 7% Sales Growth For 20 Years Starting on Trial Date

Basis: $3,769,692 Ossur's 2023 Annualized Global Total Invoiced Sales
Growth Rate: 7.0%
Discount Rate: 4.2% 30 Yr Bond, Daily Treasury Par Yield Curve Rate as of 1/9/24

| Year | Patent Years | Ann Sales Growth | Invoiced Sales | Net Sales/ Inv Sales | Net Sales | 4% Royalty | Discount Rate | Present Value | Cumulative Loss |
|---|---|---|---|---|---|---|---|---|---|
| 2024 | 1 | 7.0% | $4,033,570 | 62.0% | $2,502,408 | $100,096 | 4.2% | $98,068 | $98,068 |
| 2025 | 2 | 7.0% | $4,315,920 | 62.0% | $2,677,576 | $107,103 | 4.2% | $100,722 | $198,790 |
| 2026 | 3 | 7.0% | $4,618,035 | 62.0% | $2,865,006 | $114,600 | 4.2% | $103,449 | $302,239 |
| 2027 | 4 | 7.0% | $4,941,297 | 62.0% | $3,065,557 | $122,622 | 4.2% | $106,249 | $408,487 |
| 2028 | 5 | 7.0% | $5,287,188 | 62.0% | $3,280,146 | $131,206 | 4.2% | $109,125 | $517,612 |
| 2029 | 6 | 7.0% | $5,657,291 | 62.0% | $3,509,756 | $140,390 | 4.2% | $112,079 | $629,691 |
| 2030 | 7 | 7.0% | $6,053,301 | 62.0% | $3,755,439 | $150,218 | 4.2% | $115,112 | $744,803 |
| 2031 | 8 | 7.0% | $6,477,032 | 62.0% | $4,018,320 | $160,733 | 4.2% | $118,228 | $863,032 |
| 2032 | 9 | 7.0% | $6,930,425 | 62.0% | $4,299,602 | $171,984 | 4.2% | $121,429 | $984,460 |
| 2033 | 10 | 7.0% | $7,415,554 | 62.0% | $4,600,574 | $184,023 | 4.2% | $124,716 | $1,109,176 |
| 2034 | 11 | 7.0% | $7,934,643 | 62.0% | $4,922,614 | $196,905 | 4.2% | $128,091 | $1,237,267 |
| 2035 | 12 | 7.0% | $8,490,068 | 62.0% | $5,267,197 | $210,688 | 4.2% | $131,559 | $1,368,826 |
| 2036 | 13 | 7.0% | $9,084,373 | 62.0% | $5,635,901 | $225,436 | 4.2% | $135,120 | $1,503,946 |
| 2037 | 14 | 7.0% | $9,720,279 | 62.0% | $6,030,414 | $241,217 | 4.2% | $138,777 | $1,642,723 |
| 2038 | 15 | 7.0% | $10,400,699 | 62.0% | $6,452,543 | $258,102 | 4.2% | $142,534 | $1,785,257 |
| 2039 | 16 | 7.0% | $11,128,747 | 62.0% | $6,904,221 | $276,169 | 4.2% | $146,392 | $1,931,649 |
| 2040 | 17 | 7.0% | $11,907,760 | 62.0% | $7,387,517 | $295,501 | 4.2% | $150,355 | $2,082,003 |
| 2041 | 18 | 7.0% | $12,741,303 | 62.0% | $7,904,643 | $316,186 | 4.2% | $154,424 | $2,236,428 |
| 2042 | 19 | 7.0% | $13,633,194 | 62.0% | $8,457,968 | $338,319 | 4.2% | $158,605 | $2,395,032 |
| 2043 | 20 | 7.0% | $14,587,518 | 62.0% | $9,050,026 | $362,001 | 4.2% | $162,898 | $2,557,930 |
| **Total Future Loss** | | | | | | **$4,103,497** | | **$2,557,930** | |

**Ossur: Sales Data**

| Year | Invoiced Sales | Annual Incr % | Net Sales | Annual Incr % | Net Sales/ Inv Sales |
|---|---|---|---|---|---|
| 2007 | | | | | |
| 2008 | | | | | |
| 2009 | | | | | |
| 2010 | | | | | |
| 2011 | | | | | |
| 2012 | | | | | |
| 2013 | | | | | |
| 2014 | | | | | |
| 2015 | | | | | |
| 2016 | | | | | |
| 2017 | | | | | |
| 2018 | 17,229 | | 5,239 | | 30.4% |
| 2019 | 656,162 | 3708.4% | 418,084 | 7879.5% | 63.7% |
| 2020 | 1,431,399 | 118.1% | 930,504 | 122.6% | 65.0% |
| 2021 | 2,267,589 | 58.4% | 1,291,567 | 38.8% | 57.0% |
| 2022 | 2,848,255 | 25.6% | 1,688,594 | 30.7% | 59.3% |
| 2023* | 3,769,692 | 32.4% | 2,459,021 | 45.6% | 65.2% |
| Average | | | | | 62.0% |

**Aspen: Sales & Market Share Data**
*Src: Chris Burdell*

| | Aspen Sales | Annual Incr % | Aspen Market Share | Annual Incr % |
|---|---|---|---|---|
| 2007 | Introduced | | | |
| 2013 | | | 48.0% | |
| 2014 | | | 52.0% | 8.3% |
| 2015 | 16,668,669 | | 55.0% | 5.8% |
| 2016 | 17,843,945 | 7.1% | 61.0% | 10.9% |
| 2017 | 20,233,883 | 13.4% | 66.0% | 8.2% |
| 2018 | 22,049,830 | 9.0% | | 10.1% |
| 2019 | 23,032,681 | 4.5% | 80.0% | 10.1% |
| Average | | 8.5% | | 8.9% |

| Quarter | Invoiced Sales | Q-Q % ∂ | Net Sales | Q-Q % ∂ |
|---|---|---|---|---|
| 2018-Q2 | 0 | | -1,769 | |
| 2018-Q3 | 3,996 | | 385 | |
| 2018-Q4 | 13,233 | | 6,624 | |
| 2019-Q1 | 31,767 | | 9,527 | |
| 2019-Q2 | 122,816 | | 70,179 | |
| 2019-Q3 | 201,229 | 4935.5% | 125,966 | 32595.3% |
| 2019-Q4 | 300,351 | 2169.7% | 212,412 | 3106.9% |
| 2020-Q1 | 370,445 | 1066.1% | 243,033 | 2450.9% |
| 2020-Q2 | 254,005 | 106.8% | 163,523 | 133.0% |
| 2020-Q3 | 360,386 | 79.1% | 226,829 | 80.1% |
| 2020-Q4 | 446,563 | 48.7% | 297,119 | 39.9% |
| 2021-Q1 | 442,206 | 19.4% | 250,154 | 2.9% |
| 2021-Q2 | 540,178 | 112.7% | 280,456 | 71.5% |
| 2021-Q3 | 620,748 | 72.2% | 364,383 | 60.6% |
| 2021-Q4 | 664,456 | 48.8% | 396,574 | 33.5% |
| 2022-Q1 | 614,461 | 39.0% | 375,805 | 50.2% |
| 2022-Q2 | 661,620 | 22.5% | 387,328 | 38.1% |
| 2022-Q3 | 763,155 | 22.9% | 452,587 | 24.2% |
| 2022-Q4 | 809,018 | 21.8% | 472,874 | 19.2% |
| 2023-Q1 | 796,749 | 29.7% | 486,145 | 29.4% |
| 2023-Q2 | 985,576 | 49.0% | 619,133 | 59.8% |
| 2023-Q3 | 993,985 | 30.2% | 705,747 | 55.9% |
| Average 20-Q4 - 23-Q3 | | 43.1% | | 40.4% |

# Exhibit B



# JAMES CHRISTOPOULOS J.D., M.A.

## Experience

CHRISTOPOULOS ECONOMICS CONSULTING GROUP     August 2008 – Present
Principal

JAMES CHRISTOPOULOS, ECONOMIST     March 2006 – August 2008
Principal

VAVOULIS & WEINER, LLC     March 2004 – February 2006
Economic Consultant

VAVOULIS & ASSOCIATES, INC.     October 1996 – March 2004
Economic Consultant

## Education

Master of Arts, Economics: California State University, Fullerton, May 2001.
Juris Doctor: John Marshall School of Law, Chicago, Illinois, June 1995.
Bachelor of Arts, History: University of California, Los Angeles, March 1991.

## Publications

- M.A. Thesis: "Using Occupational Attainment Probabilities to Estimate Future Earnings for A Minor Child", CSUF Library, May 2001.
- "Personal and Indivisible Consumption and Support Factors", with Gerald Martin, Ph.D., Determining Economic Damages, (Chapter 5, Section 535), 2003, 2004.

## Professional Memberships

American Academy of Economic and Financial Experts
National Association of Forensic Economics
The State Bar of California

555 Anton Boulevard, Suite 150, Costa Mesa, California 92626 | Tel: 714-442-8561 | Fax: 714-586-5940
E-mail: expert@econconsulting.com | www.econconsulting.com

-1211-

# Exhibit C



**CHRISTOPOULOS**
Economics Consulting Group

*James Christopoulos, J.D., M.A. - Testimony List*

| Case Name & Number | Date | Testimony Provided | Π / Δ | Client Attorney & Firm |
|---|---|---|---|---|
| Omar Galicia v. Manna Dev Grp, LLC dba Panera Bread [1459]; 37-2018-00006474-CU-WT-CTL | 06/18/19 | Deposition | Π | Armond Jackson<br>Jackson Law, P.C. |
| Mohamed Youssef v. LA Community College District [1443]; BC620171 | 09/03/19 | Trial | Π | Nabil Chelico, Bassma Zebib<br>Law Office of Nabil Chelico |
| James Buller v. Hensel Phelps Construction Company [1464]; 37-2017-00002228-CU-PO-CTL | 09/23/19 | Deposition | Π | Maxwell C. Agha<br>Bankers Hill Law Firm |
| Alexandra Stanley v. Kite Pharma, Inc.;Kite a Gilead Company [1466]; JAMS-1220060309 | 10/23/19 | Deposition | Π | Michael J. Gorbaty<br>Murtaugh Treglia Stern & Deily LLP |
| James Buller v. Hensel Phelps Construction Company [1464]; 37-2017-00002228-CU-PO-CTL | 10/24/19 | Trial | Π | Maxwell C. Agha / Byron Abron<br>Bankers Hill Law Firm / Alder Law |
| Alexandra Stanley v. Kite Pharma, Inc.; Kite a Gilead Company [1466]; JAMS-1220060309 | 11/13/19 | Arbitration | Π | Michael J. Gorbaty<br>Murtaugh Treglia Stern & Deily LLP |
| George Harris; Tap'd Out v. Abel Rojas [1448]; EC067088 | 01/14/20 | Trial | Π | Christopher J. Perry<br>The Perry Law Firm |
| Alan Gaines v. KIPP LA Schools [1465]; BC694089 | 02/24/20 | Deposition | Π | Armond Jackson<br>Jackson Law, P.C. |
| Brandi Boyd v. Dr. George Bucciero [1479]; 17L9422 | 10/20/20 | Deposition | Π | Michael J Baron<br>Goldstein, Fluxgold & Baron |
| Veronica Aguilera Garcia v. Zero Waste Solutions, Inc. [1481]; 2:20-cv-00803 | 12/15/20 | Deposition | Δ | Sarah Nash<br>Piliero Mazza |
| Anton Rosandic v. Memorialcare Health System [1485]; 30-2017-00927673 | 05/17/21 | Deposition | Π | Anton Rosandic<br>Anton Rosandic, In Pro Per |
| Cynthia LeFave, et al. v. Huntington Shorecliffs, et al [1484]; 30-2018-01000538-CU-BC-CJC | 05/31/22 | Trial | Π | Eric Strongin, Daniel Libbey<br>Strongin Burger LLP |
| Yuka Tamura v. Estelle Campbell; Studios at Walnut, LLC [1495]; BC695119 | 06/13/22 | Deposition | Π | Eric Strongin, Daniel Libbey<br>Strongin Burger LLP |
| Estate of Gregory Carter v. Rush, et al [1496]; 18 L 937 | 06/24/22 | Deposition | Π | Michael J Baron<br>Goldstein, Fluxgold & Baron |
| Prizer v. County of Orange [1493]; 30-2019-01069010-CU-PA-CJC | 07/29/22 | Deposition | Π | Eric Strongin, Daniel Libbey<br>Strongin Burger LLP |
| Huynh v. Nexgrill, The Home Depot [1502]; | 01/12/23 | Deposition | Π | Eric Strongin, Daniel Libbey<br>Strongin Burger LLP |
| Prizer v. County of Orange [1493]; 30-2019-01069010-CU-PA-CJC | 02/14/23 | Trial | Π | Eric Strongin, Daniel Libbey<br>Strongin Burger LLP |
| Estate of Gregory Carter v. Rush, et al [1496]; 18 L 937 | 02/22/23 | Trial | Π | Michael J Baron<br>Goldstein, Fluxgold & Baron |
| William Carter v. Loyola Medicine Home Care [1503]; 19 L 14261 | 07/14/23 | Deposition | Π | Michael J Baron<br>Goldstein, Fluxgold & Baron |
| Nancy Schlotthauer v. County of San Bernardino [1494]; CIVDS2000751 | 09/06/23 | Trial | Δ | Sharon Medellin<br>Alvarez-Glasman & Colvin |
| Mindy Lendino v. Modern Institute of Surgery; Ryan Stanton, MD [1507]; 20STCV07911 | 09/21/23 | Deposition | Π | Reuben Nathan; Ross Cornell<br>Nathan & Associates |

| *Summary of Appearances* | Last 4 Years | Total |
|---|---|---|
| Arbitration | 1 | 4 |
| Deposition | 13 | 45 |
| Trial | 7 | 23 |
| Total | 21 | 72 |

*1 of 1*

# Exhibit D



# FEE SCHEDULE

RETAINER                                                    $1,800.00
> Non-refundable retainer fee to be applied to future invoices related to specified case.

CASE PREPARATION                                    $400.00/HOUR
> Document Review, Telephone Conferences, Preliminary Calculation, Research, etc.

TESTIMONY                                              $500.00/HOUR
> State and Federal Court, Arbitration, Mediation, and Deposition. Two Hour Minimum.

Tax ID No.: 38-3754270

Retention on all matters is subject to a conflict check and considered effective upon receipt of the retainer fee by our office. Services will be rendered at our standard hourly rates, prevailing at the time services are rendered. Current rates are as stated above. We will bill in increments of 0.1 hours, even if the actual time for services rendered is less.

Effective January 1, 2020.

---

555 Anton Boulevard, Suite 150, Costa Mesa, California 92626 | Tel: 714-442-8561 | Fax: 714-586-5940
E-mail: expert@econconsulting.com | www.econconsulting.com

**-1215-**

1

## **<u>PROOF OF SERVICE</u>**

2

I am employed in the County of Orange, State of California.  I am over the age of
eighteen (18) years and not a party to the within action; my business address is 2603 Main
Street, Penthouse, Irvine, California  92614.

3

4

On January 10, 2024, I served the foregoing document described as **PLAINTIFF
WAYNE CALCO'S  EXPERT DISCLOSURE PURSUANT TO F.R.C.P. 26(a)(2)(B)** to
be served on the parties interested in said action, by placing a true copy thereof, enclosed in a
sealed envelope, addressed as follows:

5

6

7

Scott R. Hatch, Esq.
Joshua G. Simon, Esq.
Rebecca I. Makitalo, Esq.
CALL & JENSEN
610 Newport Center Drive, Suite 700
Newport Beach, CA 92660
Email: shatch@calljensen.com
        jsimon@calljensen.com
        rmakitalo@calljensen.com

8

9

10

11

12

13

[  ] **BY MAIL**

14

I caused [   ] the original [ X ] a true copy of above-described document to be placed in a
sealed envelope addressed to the addressee(s) on the attached service list. I am readily familiar
with the firm's practice of collecting and processing of the mail.  Under that practice it would
be deposited with United States Postal Service on that same day with postage thereon fully
prepaid at Irvine, California in the ordinary course of business.  I am aware that on motion of
the party served, service is presumed invalid if postal cancellation date or postage meter date is
more than one day after date of deposit for mailing affidavit.

15

16

17

18

**[ X ] BY ELECTRONIC SERVICE**

19

I caused the above-described document to be served electronically to the email address
of the addressee(s) on the attached service list.

20

21

**[X]** STATE     I declare under penalty of perjury under the laws of the State of California
that the above is true and correct.

22

23

Executed on January 10, 2024, at Irvine, California.

24

25

/s/ George B. Piggott

26

27

28

4
PLAINTIFF WAYNE CALCO'S  EXPERT DISCLOSURE PURSUANT TO F.R.CIV.P. 26(a)(2)(B)

# EXHIBIT 79

**George Piggott**

| | |
|---|---|
| **From:** | George Piggott <george@piggottlaw.com> |
| **Sent:** | Sunday, February 25, 2024 4:28 PM |
| **To:** | 'Joshua Simon' |
| **Cc:** | 'Rebecca Makitalo'; 'Scott Hatch'; 'DeeAnn Bocko' |
| **Subject:** | RE: Wayne Calco v. Ossur Americas, Inc., et. al./USCD Case No. 8:22-cv-01971 CJC KES |

Josh

In order to simplify and limit the coverage issues, Plaintiff has elected to not pursue his claims for relief based on the coverage of Claims 12 and 13 in the '374 Patent; and to confine his claims for relief to the coverage of Claim 1. Simplifying and limiting the issues is good advocacy, not gamesmanship. I also want to make clear that Plaintiff is not modifying or withdrawing his responses to any of your clients' requests for admission. There is no merit to your threatened sanctions motion.

George B. Piggott
Law Offices of George B. Piggott
A Professional Corporation
2603 Main Street, Penthouse
Irvine, CA 92614
Office: (949) 261-0500
Fax: (949) 261-1085
Email: george@piggottlaw.com

NOTE: The information contained in this email may
contain attorney-client privileged and/or confidential information
intended only for the use of the individual or entity named above. If
the reader of this message is not the intended recipient, or the
employee or agent responsible to deliver it to the intended recipient,
you are hereby notified that any dissemination, distribution or copying
of this communication is strictly prohibited.

**From:** Joshua Simon <jsimon@calljensen.com>
**Sent:** Saturday, February 24, 2024 5:02 PM
**To:** George Piggott <george@piggottlaw.com>
**Cc:** Rebecca Makitalo <rmakitalo@calljensen.com>; Scott Hatch <shatch@calljensen.com>; 'DeeAnn Bocko' <deeann@bocko.com>
**Subject:** RE: Wayne Calco v. Ossur Americas, Inc., et. al./USCD Case No. 8:22-cv-01971 CJC KES

George,

They are not threats. They are realities. You alleged in your FAC that Claims 12 and 13 cover the '374 Patent and those were the only claims you specifically alleged; your client confirmed and verified that in response to written discovery; your expert then proffered infringement contentions supporting your allegation that Claims 12 and 13 cover the '374 Patent, we then hired an expert to rebut the unreasonable position taken by your client and your expert, and then you waited until the eve of our filing the partial MSJ to "withdraw" your contentions. This is pure gamesmanship to which

1

there are and will be consequences . Thus, there is much merit to our anticipated request for cost of proof sanctions against you and your client.

What has no merit is your estoppel argument, which is not only legally untenable but also not supported by admissible evidence (because you conducted no discovery on it), and even if you were able to make the argument at trial, it is not tied to any claim and does not, even in the best case, get you to a patent that names your client as inventor.

Össur reserves all rights with respect to any belatedly withdrawn arguments and claims.

With respect to the stipulation, I cannot agree to it because the proposed dismissal is being made without prejudice. This means that if we prevail at trial, you could refile your unjust enrichment claim. That is not something my client will agree to.

Best,

Josh

**JOSHUA G. SIMON**
SHAREHOLDER
CALL & JENSEN, APC
610 Newport Center Drive, Suite 700
Newport Beach, CA 92660
(949) 717-3000
jsimon@calljensen.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

**From:** George Piggott <george@piggottlaw.com>
**Sent:** Saturday, February 24, 2024 4:33 PM
**To:** Joshua Simon <jsimon@calljensen.com>
**Cc:** Rebecca Makitalo <rmakitalo@calljensen.com>; Scott Hatch <shatch@calljensen.com>; 'DeeAnn Bocko' <deeann@bocko.com>
**Subject:** RE: Wayne Calco v. Ossur Americas, Inc., et. al./USCD Case No. 8:22-cv-01971 CJC KES

Josh

Your threats have no merit whatsoever. I also wish to remind you that your clients asserted in their responses to our requests for admission that the sternal relief dial was not patented and denied that Claims 12 and 13 of the '374 Patent cover the sternal relief dial when they have claimed to the entire world since at least May of 2020 that the sternal relief dial is patented. Despite your clients being estopped from denying that the '374 Patent and Claims 12 and 13 cover the sternal relief dial, we are withdrawing Claims 12 and 13 from our contentions in order to simplify and limit the coverage issues to those concerning Claim 1 of the '374 Patent.

Also in a further effort to simplify and limit the issues, I am attaching a proposed stipulation for the dismissal without prejudice of the sixth claim for relief for unjust enrichment. Please advise me if it is acceptable.

George B. Piggott
Law Offices of George B. Piggott
A Professional Corporation
2603 Main Street, Penthouse

2

**-1219-**

Irvine, CA 92614
Office: (949) 261-0500
Fax: (949) 261-1085
Email: george@piggottlaw.com


NOTE: The information contained in this email may
contain attorney-client privileged and/or confidential information
intended only for the use of the individual or entity named above. If
the reader of this message is not the intended recipient, or the
employee or agent responsible to deliver it to the intended recipient,
you are hereby notified that any dissemination, distribution or copying
of this communication is strictly prohibited.

**From:** Joshua Simon <jsimon@calljensen.com>
**Sent:** Saturday, February 24, 2024 3:48 AM
**To:** George Piggott <george@piggottlaw.com>
**Cc:** Rebecca Makitalo <rmakitalo@calljensen.com>; Scott Hatch <shatch@calljensen.com>
**Subject:** RE: Wayne Calco v. Ossur Americas, Inc., et. al./USCD Case No. 8:22-cv-01971 CJC KES

George,

You have VERIFIED discovery responses, both in response to special interrogatories and requests for admission, regarding your client's contentions related to Claims 12 and 13, and we have expended costs and fees to rebut those contentions. Ordinarily, a party must seek leave to amend its infringement contentions.

You say the proper place to handle it is in the pretrial order, but this relates directly to our partial MSJ, and we are under an obligation to attempt to resolve issues raised in the partial MSJ. You have known for months that your client's contentions regarding claims 12 and 13 are subjects of our MSJ, and yet you have waited until this late hour to inform us by email of this change (simultaneously pushing us to serve you with the brief before Monday).

Moreover, my clients reserve their right to seek their costs and fees incurred in addressing your client's contentions related to Claims 12 and 13 and to question Mr. Roberts about his opinions regarding Claims 12 and 13, including his infringement claim chart, as such questions will go to his credibility.

Lastly, I have yet to see a dismissal and/or stipulation from you regarding your unjust enrichment claim. Without a dismissal of that claim, we have to include our arguments regarding unjust enrichment in our MSJ papers.

Josh

**JOSHUA G. SIMON**
SHAREHOLDER
CALL & JENSEN, APC
610 Newport Center Drive, Suite 700
Newport Beach, CA 92660
(949) 717-3000
jsimon@calljensen.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

3

# EXHIBIT 80

```
 1              UNITED STATES DISTRICT COURT

 2                 CENTRAL OF CALIFORNIA

 3

 4    WAYNE CALCO, an individual,   )
                                    )
 5               Plaintiff,         )
                                    )
 6    vs.                           )    Case No.:
                                    )    8:22-cv-01971
 7    OSSUR AMERICAS, INC., a       )    CJC-KES
      California corporation;       )
 8    Ossur hf, an Icelandic        )    VOLUME I
      company; and DOES 1 through   )
 9    10, inclusive,                )
                                    )
10               Defendants.        )
      _____)

11

12

13      REMOTE VIDEOTAPED DEPOSITION OF WAYNE CALCO

14                 NOVEMBER 29TH, 2023

15                  IRVINE, CALIFORNIA

16

17

18

19

20

21

22

23

24    JOB NO.:        J10596224
      REPORTED BY:    MARIE WILSON
25                    CSR NO. 13480
```



800.211.DEPO (3376)
EsquireSolutions.com

WAYNE CALCO VOL. I                                    November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                               2

```
 1
 2
 3                   2:12 p.m.
 4                   November 29th, 2023
 5
 6          REMOTE VIDEOTAPED DEPOSITION OF
 7   WAYNE CALCO, taken on behalf of Defendants.
 8   The Witness was located in Irvine, California.
 9   The deposition was stenographically recorded
10   by Marie Wilson, Certified Shorthand Reporter,
11   No. 13480.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



WAYNE CALCO VOL. I                                        November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                                114

1    some other drawings and I think Duane saw this

2    stuff maybe -- maybe ahead of Tatjana.

3        Q.    So you had -- these were the formal

4    submissions that you provided to Ossur?

5        A.    Uh-huh, that's right.                             05:25

6        Q.    And these were the formal submissions you

7    provided to Ossur for the purposes of proving your

8    conception of -- concepts before the agreement was

9    signed; correct?

10       A.    Yes.                                              05:25

11       Q.    And this -- these drawings were the formal

12   submission to Ossur to prove your creation of the

13   concept of sternum adjustments -- sorry, scrap

14   that.  Sorry.

15       Okay.  And now did you -- are you aware of          05:26

16   any other formal submissions that you submitted to

17   Ossur that concerned your conception of sternum pad

18   adjustments before the agreement was signed?

19       MR. PIGGOTT:  I'm going to object.  We've

20   been talking about formal.  I should have objected       05:26

21   vague and ambiguous.  What do you mean by formal?

22   CAD drawing?

23       MR. SIMON:  He used "formal," so I'm using

24   his terms.

25       MR. PIGGOTT:  Okay.  Did you use "formal"?           05:26



800.211.DEPO (3376)
EsquireSolutions.com

1    I don't remember.

2          THE WITNESS:  I don't remember.

3          MR. SIMON:  He did.

4    Q.    But go ahead.

5    A.    Well, these are CAD drawings they                05:26

6    represent an iteration on the concept to show them,

7    "Okay, here is one way we can do it."

8    Q.    And you were aware that the contract

9    required you to prove the concepts that you

10   conceived of before the agreement with written          05:27

11   records; correct?

12         MR. PIGGOTT:  Could you repeat that or the

13   court reporter, could you read that?  It's getting

14   late.

15         (The question was read back as follows:           05:27

16         "Q. And you were aware that the

17         contract required you to prove the

18         concepts that you conceived of before

19         the agreement with written records;

20         correct?")                                         05:27

21         MR. PIGGOTT:  I don't quite understand

22   that.

23         MR. SIMON:  I'm sorry you don't

24   understand.  Let's see if the witness does.

25         MR. PIGGOTT:  Yeah, vague and ambiguous.           05:27



WAYNE CALCO VOL. I                                    November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                                116

1           THE WITNESS:  Could you maybe rephrase

2    that?

3           MR. SIMON:   Sure.

4      Q.   Why did you submit Ossur these drawings

5    here?                                                    05:27

6      A.   To show an iteration of all of the

7    concepts I was submitting.

8      Q.   And did you -- did you provide any other

9    written records to Ossur at this time to show the

10   concepts that you had conceived of before signing      05:28

11   the agreement?

12          MR. PIGGOTT:  Hold on, the concepts, we've

13   been talking about sternum adjustment.  You're

14   now -- all concepts?

15          MR. SIMON:  Fair enough.                         05:28

16     Q.   Let's stick strictly to sternum

17   adjustment.  Are you aware of any other written

18   records that you provided to Ossur at this time to

19   show your proof of concept with respect to sternum

20   adjustment?                                             05:28

21          MR. PIGGOTT:  I'm going to object to that

22   question.  Proof of concept, that's a different

23   term than you used before.

24          THE WITNESS:  Yeah, I didn't use proof of

25   concept.                                                05:29



WAYNE CALCO VOL. I                          November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                      117

1            MR. SIMON:  I believe you did but okay.

2        Q.   So let's go back to that other question

3    since you seem to change it after your counsel

4    testifies about it.  This is my deposition.  Please

5    stop testifying.  Why did you submit these --         05:29

6            MR. PIGGOTT:  He is the witness.

7    BY MR. SIMON:

8        Q.   Why did you submit these drawings to Ossur

9    on November 24th, 2015?

10       A.   Because that was the deal.  I was going to    05:29

11   show them iterations of these concepts, all of

12   them.

13       Q.   What was the deal?

14       A.   That after we had a signed agreement, I

15   would submit the concepts.                             05:29

16       Q.   Okay.  So when it came to the sternum

17   adjustment concepts, are these the only documents

18   that you submitted to Ossur as part of the deal?

19           MR. PIGGOTT:  Exhibit 1?

20           MR. SIMON:  Correct.                           05:30

21           THE WITNESS:  Well, there are some

22   drawings that I know that Chris and I saw, but I

23   think for the purposes of -- these were the ones

24   that -- these drawings were the ones that Tatjana

25   thanked me for these three concepts and she was       05:30



WAYNE CALCO VOL. I                           November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                      118

1  sending them to Justin Cassell.

2  BY MR. SIMON:

3     Q.   Okay.  Did you submit any other drawings

4  for sternum-adjustment concept to Tatjana other

5  than these two?                                        05:30

6     A.   Again, maybe -- I think that's it, but

7  this is -- you know, this is not the definitive.

8     Q.   Mr. Calco, I'm not asking that.  I am

9  asking you about what you provided to Tatjana?

10    A.   I don't -- I think that is it.               05:31

11    Q.   Okay.  So this is -- what we see in

12 Exhibit 1 is all you provided to Tatjana Latinovic

13 with respect to your sternum-adjustment concept; is

14 that correct?

15    A.   I think so, yes.                             05:31

16    Q.   Now, with respect to sending it to Tatjana

17 as opposed to just the drawing that you come up

18 with with Duane, you understood that by submitting

19 this document to Tatjana, that it would go on to

20 Mr. Cassell for patent prosecution; is that          05:31

21 correct?

22    A.   Well, not for patent prosecution.  The

23 first step that Cassell was going to take was to,

24 kind of, vet these concepts and see if he believed

25 that these concepts could be subjects of successful  05:31

WAYNE CALCO VOL. I                                          November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                                    119

1    patents.

2         Q.    Okay.  So your understanding was

3    Ms. Tatjana Latinovic would forward these drawings

4    to Mr. Cassell to explore possible patent claims

5    for these drawings; is that correct?                    05:32

6         A.    I don't want to mislead, but the process

7    was that Chris and I were going to start developing

8    these concepts together, so this -- what you're

9    looking at is not including any input from Chris.

10   This is not including any -- any work on the          05:32

11   concept to make it more perfect for Ossur or for

12   their production methods.  This was just the little

13   starting point to say, "Okay, here are these three

14   concepts.  Chris and Wayne are going to develop

15   these concepts into custom things for Ossur."          05:32

16        And I think the things that Cassell would

17   have ultimately started filing patents on were

18   iterations of this.  Not exactly this.

19        Does that make sense?

20        Q.    Sure, if you say so.                         05:33

21        Let's ask you this, so these drawings here

22   do not contain any input from Mr. Webster; is that

23   right?

24        A.    That's right.

25        Q.    These drawings here do not contain any       05:33



800.211.DEPO (3376)
EsquireSolutions.com

WAYNE CALCO VOL. I                          November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                    120

1    input from Mr. Shu; is that correct?

2        A.    That's correct.

3        Q.    And so these drawings here only reflect

4    your iteration of the sternum-adjustment concept

5    that you came up with before the agreement was          05:33

6    signed; is that correct?

7        A.    Yes.

8        Q.    And you are not aware of any other

9    drawings that you submitted to Ms. Latinovic for

10   purposes of forwarding on to Mr. Cassell at this         05:34

11   time in November of 2015 to explore potential

12   patent prosecution; is that correct?

13       A.    Yeah.   Like I said, it was a little early

14   for patent prosecution.   It was just enough

15   information to determine whether he thought they         05:34

16   could get patents on the things around these.    This

17   concept.

18       Q.    So the purpose of forwarding this on to

19   Mr. -- Ms. Latinovic was twofold; first, to show

20   proof that you conceived of this mechanism, and,         05:34

21   second, for Mr. Cassell to explore possible patent

22   prosecution down the road"; correct?

23       A.    Well, I wouldn't say -- it's more the

24   concept, not the mechanism itself, because I was

25   aware that the mechanisms would evolve.                  05:35



WAYNE CALCO VOL. I                                      November 29, 2023
WAYNE CALCO vs OSSUR AMERICAS, INC.                              140

```
 1   STATE OF  CALIFORNIA        )
                                 )  ss.
 2   COUNTY OF SAN BERNARDINO    )

 3

 4          I, MARIE WILSON, CSR 13480, a Certified

 5   Shorthand Reporter in and for the State of

 6   California, County of San Bernardino, do hereby

 7   certify:

 8          That WAYNE CALCO, the witness named in the

 9   foregoing deposition, before the commencement of

10   the deposition, was duly administered an oath in

11   accordance with CCP 2094;

12          That said deposition was taken down in

13   stenograph writing by me and thereafter transcribed

14   into typewriting under my direction.

15          I further certify that I am neither

16   related to any party to said action, nor in any way

17   interested, financially or otherwise, in the

18   outcome thereof.

19

20          Dated this 6th day of December, 2023.

21
```



```
24          MARIE WILSON, CSR NO. 13480
```



800.211.DEPO (3376)
EsquireSolutions.com

# TAB G

1  GEORGE B. PIGGOTT (SBN 68227)
   a member of GEORGE B. PIGGOTT,
2  A PROFESSIONAL CORPORATION
   2603 Main Street, Penthouse
3  Irvine, California 92614
   Tel:   (949) 261-0500
4  Fax:   (949) 261-1085
   Email: george@piggottlaw.com
5
   Attorney for Plaintiff Wayne Calco
6

7

8              **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10

11  WAYNE CALCO, an individual,          **Case No. 8:22-cv-01971-CJC-KES**

12                          Plaintiff,
                                         **DECLARATION OF LARRY K.**
13        vs.                            **ROBERTS IN OPPOSITION TO**
                                         **DEFENDANTS' MOTION FOR**
14  ÖSSUR AMERICAS, INC., a California   **PARTIAL SUMMARY JUDGMENT**
    corporation; ÖSSUR hf, an Icelandic
15  company; and DOES 1 through 10,
    inclusive,                           Date: July 11, 2024
16                                       Time: 11:0 a.m.
                            Defendants.  Place: Courtroom 9D
17

18

19
                                          Complaint Filed: October 26, 2022
20                                        Trial Date: October 21, 2024

21

22

23

24

25

26

27

28
                              1

I, Larry K. Roberts, declare that:

1.    I am a practicing intellectual property lawyer, and have been since 1976. I hold a Bachelor of Science degree (electrical engineering) from the University of Illinois (1971), and a Master's degree in engineering from UCLA (1975).   The curricula for my bachelor of science degree required courses such as math, physics and chemistry before more specialized courses in the field of electrical engineering.  The required curricula at the time (1967) also required a semester course in mechanical drafting.  Following undergraduate school, I was employed by Hughes Aircraft Company from 1971 to 1973 as an engineer, a member of the technical staff. I worked on various projects, including commercial satellites and radar equipment for military aircraft.  My master's thesis formed part of the basis for a paper, "A Useful Equivalence for a Coaxial-Waveguide Junction, (Robert Eisenhart, Paul T. Greiling, Larry K. Roberts, Ralston S. Robertson), IEEE Transactions on Microwave theory and Techniques, 26(3): 172-174, April 1978.

2.    During my career as an intellectual property lawyer, and particularly for the last several decades, I have specialized in preparing and prosecuting patent applications in the US Patent and Trademark Office (PTO). I was registered to practice before the PTO in 1977.  Earlier in my career, I was also engaged in patent litigation involving patent infringement claims.  I have for the past several decades specialized in preparation and prosecution of patent applications.  Over the course of my career, I have prepared and prosecuted hundreds of patent applications in the PTO. I have also rendered opinions on patent claim scope and/or infringement. I cannot exactly quantify the number of times, but it is likely well over one hundred.

3.    Preparation of patent applications involves understanding the technology at issue, preparing a written description of the invention and typically one or more embodiments of the invention, and crafting claims which recite elements of the invention and define the subject matter sought to be protected.  Prosecuting the patent application in the PTO involves reviewing official actions ("office actions") analyzing the prior art cited by the patent examiner, and preparing a response to the office action.

Most initial office actions include one or more rejections based on prior art.    The response might include presenting an argument traversing the rejections, amending the claims to avoid prior art, or both.  Among the technologies for which I have prepared and prosecuted patent applications is a cervical collar invented by my client, Wayne Calco, which issued as US 9132027, a true and correct copy of which is attached hereto as Exhibit 1. In working with Mr. Calco to prepare and prosecute the application, I became very knowledgeable about the technology involved in that invention. Adjustable cervical collars include several parts, including parts constructed from molded plastic parts, plastic parts joined together by hinges including living hinges, padding attached to plastic parts by hook and loop fasteners, adjustment mechanisms, which may include toothed racks and pinion gears, straps and buckles.  These are all devices or components I have become very knowledgeable with in the course of my practice.

      4.    Among the technological areas my practice has entailed include the following with exemplary patents that I have prepared  and prosecuted:

- Plastic container and lid systems with living hinges (US8534492)
- Molded plastic parts (US 9526672; 7340817; 9982822; 8372235)
- Resuscitation systems (US 8277399)
- Wound scaling devices (e.g. US_9757053; 8939918)
- Sink support systems (8070110)
- Water control valves (8479771)
- Spa system devices (blowers, jets,  air blowers controllers)(e.g.US 9066634, 11522326, 8137082, 8097130)
- Bracket systems (7472876)
- Circuit board drilling systems (7198438)
- Latches (6418760)
- Golf clubs (5518240)
- Robotic end effectors (e.g., US 4789292)

- Torque limiting wrenches for plastic fittings (US9694481)
- Bicycle seats (10981614)

5.     Although I do not have actual design experience in the design of cervical collars, I qualify as a person of ordinary skill in this art, due not only to my training and experience as an engineer, but as one who has worked with inventors such as Mr. Calco to describe his inventions and to review printed references involved in the prosecution of patents such as Mr. Calco's, and I have developed an in-depth knowledge of the features of the cervical collar at issue in this case.

6.     Defendants Ossur Americas, Inc. and Ossur hf ("Ossur") assert that a person of ordinary skill in the art with respect to the claims in suit would hold a bachelor degree in mechanical engineering, mechanical engineering orthotics, or a comparable discipline, and at least 1-2 years of mechanical product development or design. The claims in the '374 Patent concern a simple, straightforward device that does not require expert testimony from a person of ordinary skill in the art, certainly not in mechanical engineering. Assuming such expert testimony were required, the applicable field of art would be industrial design. Mr. Calco is an industrial designer and he is a highly skilled expert in the art who holds four patents for adjustable cervical collars.

7.     Presently at issue is only Claim 1 of the '374 patent, which is Exhibit G to the Latinovic Declaration. I had previously provided my opinions concerning Claims 12 and 13 of the '374 Patent, as well as Claim 1, but I was instructed by Mr. Calco's counsel, George Piggott, who retained me as his expert, that the decision had been made to not pursue Claims 12 and 13 in order to simplify and limit the issues for this action to Claim 1.

8.     I note that the '374 patent includes the following specific statements regarding the scope of coverage and interpretation of the disclosure (5:56-63):

While the disclosure is susceptible to various modifications and alternative constructions, certain illustrative embodiments are in the drawings and are described below. It should be understood, however, there is no intention to limit

the disclosure to the embodiments disclosed, but on the contrary, the intention covers all modifications, alternative constructions, combinations, and equivalents falling within the spirit and scope of the disclosure.

It will be understood that, unless a term is defined in this disclosure to possess a described meaning, there is no intent to limit the meaning of such term, either expressly or indirectly, beyond its plain or ordinary meaning.

9.  It is apparently unchallenged that the Miami JS includes an anterior component arranged for connecting to a posterior component, and that the anterior component comprises a main support, a lower support hingedly connected to the main support, and a sternum pad.

10.    Claim 1 also includes the feature of "an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support."  Ossur states that during prosecution of the '374 patent, the examiner issued a nonfinal rejection of certain claims, and that the examiner noted that the term "adjustment mechanism" would be construed as "means plus function" limitation under 35 USC Section 122(f).  The examiner's construction could have been rebutted by Ossur, which controlled the prosecution of the application. The examiner noted at page 5 of the office action of February 17, 2023, that if Ossur did not intend to have these limitations interpreted under Section 112(f), it could amend the claim limitations to avoid it/them being interpreted under 35 USC 112(f) (e.g. by reciting sufficient structure to perform the claimed function); or present a sufficient showing that the claim limitation(s) recite(s) sufficient structure to perform the claimed function so as to avoid it/them being interpreted under 35 USC 112(f).

11.    Ossur could certainly have presented a sufficient showing that the claim limitation recited sufficient structure to perform the claimed function.  The claim limitation does not simply recite a mechanism such that the sternum pad is movable relative to the lower support. Rather it recites additional structural features, including that the mechanism is an "adjustment" mechanism "located on the lower support" and

5

"the sternum pad is connected thereto."  "If persons of ordinary skill in the art reading the specification understand the term to have a sufficiently definite meaning as the name for the structure that performs the function, even when the term covers a broad class of structures or identifies the structures by their function (e.g., "filters," "brakes," "clamp," "screwdriver," and "locks"), 35 U.S.C. 112(f) will not apply. Manual of Patent Examining Procedure (MPEP 2181(I)(A)," citing *inter alia* Greenberg v. Ethicon Endo-Surgery, Inc., 91 F.3d 1580, 1583 (Fed. Cir. 1996)

12.    As stated in MPEP 2181(I)(A), the term at issue is not required to denote a specific structure or a precise physical structure to avoid the application of 35 U.S.C. 112(f). See Watts, 232 F.3d at 880, 56 USPQ2d at 1838; Inventio AG v. Thyssenkrupp Elevator Americas Corp., 649 F.3d 1350, 99 USPQ2d 1112 (Fed. Cir. 2011) (holding that the claim terms "modernizing device" and "computing unit" when read in light of the specification connoted sufficient, definite structure to one of skill in the art to preclude application of 35 U.S.C. 112, sixth paragraph). A limitation will not invoke 35 U.S.C. 112(f) if there is a structural modifier that further describes the term "means" or the generic placeholder. For example, although a generic placeholder like "mechanism" standing alone may invoke 35 U.S.C. 112(f) when coupled with a function, it will not invoke 35 U.S.C. 112(f) when it is preceded by a structural modifier (e.g., "detent mechanism"). Greenberg, 91 F.3d at 1583, 39 USPQ2d at 1786 (holding that the term "detent mechanism" did not invoke 35 U.S.C. 112, sixth paragraph because the structural modifier "detent" denotes a type of structural device with a generally understood meaning in the mechanical arts). Similarly, here, the structural modifiers are "adjustment" mechanism and "the sternum pad is connected thereto", which should have been sufficient to rebut the examiner's invocation of Section 112(f).

13.    Assuming without conceding that Claim 1 is interpreted under the "means plus function" requirements of 35 USC 112(f), it is instructive to note the specification of the '374 Patent – with the patents and patent application incorporated therein – also include other structural features of interest to the present inquiry.  Indeed, various

6

"adjustment mechanisms" are described not only in the '374 patent, but in the cervical collar patents whose specifications were incorporated by reference in the '374 patent:

> US 8038636 describes a height adjustment mechanism and circumferential adjustment mechanisms (see, e.g. abstract)
>
> US 9713546 describes a height adjustment mechanism and a single strap or circumferential adjustment mechanism (See, e.g. abstract, 9:34-41)
>
> US 20160287424 describes a side adjustment mechanism (Paragraph 0081), and a height adjustment mechanism (Claim 6)

Thus, adjustment mechanisms for providing various adjustments to the fit of cervical collars were described in the '374 Patent and patent documents incorporated therein.

14.    Other features of the patents incorporated by reference in the '374 patent specification include flexible or living hinges attaching a sternum footplate to the collar lower support. US 6254560 discloses a cervical collar with a sternum brace 20 and a sternum footplate 24, and continuous padding 26 along the entire lower portion of the sternum brace including footplate 24:

> "Extension 22 includes a flexible hinge portion 22a by which padded movable footplate 24 is permitted to pivot and move toward and away from the sternum of the patient of the cervical collar. Hinge portion 22a should be sufficiently flexible to allow footplate 24 to rest comfortably on the sternum of the patient and inhibit decubitus but not so flexible that the necessary support or distribution of force and weight to the sternum is not provided." [US 6254560, 3:12-19]

15.  Instead of disputing the examiner's construction and invocation of Section 12(f), Ossur did not comment on the construction under Section 112(f) asserted by the examiner.   Moreover, even without the argument that Section 112(f) should not have been invoked, there was no requirement that Ossur take either course of action, i.e. dispute the construction or amend the claim.  The examiner's construction and invocation of Section 112(f) was not a rejection.  As discussed below, Ossur should have argued against the prior art rejections without amending Claim 1.

16.    The '374 patent describes several embodiments of the collar and the "adjustment mechanism":

"An adjustment mechanism 24 is located centrally along a lowermost portion of the lower support 20, and may be configured for adjustment relative to and away from a sternum of a user for improving comfort and fit of the cervical collar. (8:46-50)

"A lower or sternum pad 210 is attached to a lower or lowermost portion of the lower support 206. The lower support 206 may include an adjustment mechanism 208 for adjusting pressures and/or height of the lower pad 210 relative to the user's sternum." (12:7-12)

"As in the embodiment of FIGS. 2A and 2B, and referring specifically to FIGS. 20 and 21, the adjustment mechanism 24 is located centrally along a lowermost portion of the lower support 20. The adjustment mechanism 24 has a sternal pad 136 adjustable in location relative to the lower support 20. The sternal pad 136 is mounted to a ball joint 142." (16:50-56)

"FIGS. 22A and 22B show a variation of the adjustment mechanism 24 including a housing 145 arranged for receiving the extension element 144 in a contracted configuration resulting in a reduced or substantially minimized distance between the lower support and the sternal pad." (16:64 to 17:2)

17.    The claim limitation "adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support" should be construed according to its plain meaning without importing features from particular embodiments of the '374 patent. "Adjustment mechanism" is not limited to the specific embodiments disclosed in the '374 patent, but should be interpreted to literally cover an adjustment mechanism mounted as recited in the claim on the lower support and connected to the sternum pad.

18.    The "sternum pad" should be construed as the soft padding which prevents or minimizes decubitus over long periods of wear of the collar, as described in the '374

8

patent, as described at 6:63-65.  The limitation "movable relative to the lower support" should be construed as the soft padding movable relative to the lower support which is secured against the sternum region of the user. ("The lower support generally is contoured for being adapted for securing against a sternum region of the user." (9:45-47))

19.    Claim 1 further recites an "extension element arranged for adjustably extending relative to the lower support".  "Adjustably extending" connotes movement of the element.  According to the plain meaning of the term, the "extension element" is an element or structure which is movable to adjustably extend relative to the lower support.

20.    Claim 1 further recites that the adjustment mechanism includes the feature that the sternum pad is mounted to a ball joint.  There is little discussion of the function or structure of the ball joint 142 in the '374 description, merely that the extension element 144 carries the ball joint 142 at an end thereof.  FIGS. 20 and 21 show a dotted line marked 142, and the "sternal" pad 138.  The only indication of the structure of the ball joint is the dotted line.  FIG. 21 shows the "sternal" pad 138 in both solid line and in dashed lines, with the bottom-most dashed representation indicating that the sternal pad 138 is tilted with respect to the lower support 20.  This appears to show that the ball joint, whose construction is not otherwise illustrated, allows the orientation of the sternal pad 138 to flex relative to the lower support. The ball joint flexing motion depicted in FIG. 21 is movement within a plane coincident with the plane of FIG. 21.

21.    Thus, the term "ball joint" should be construed to mean a type of joint using a ball and socket capable of providing the type of freedom of movement depicted in FIG. 21 of the '374 patent, i.e. flexing movement of the sternal pad within a plane relative to the lower support.  This may involve the type of socket, although none is illustrated in FIG. 21 or described in the '374 patent.  Exemplary types of ball joints which provide this range of movement are described in Mr. Calco's declaration at paragraph 26, and illustrations of those ball joints that he prepared are attached to his declaration as Exhibits 36 and 37 along with a definition of ball and socket joint that is

9

1  attached as Exhibit 38. The '374 Patent describes a flexible hinge portion for connecting

2  a movable sternum footplate to a sternum brace of a cervical collar, as discussed above

3  regarding the incorporated disclosure of US 6254560. In my view, the flexible hinge

4  portion can be considered an equivalent to a ball joint as that element is illustrated in the

5  '374 Patent.  The living hinge performs the same function in the same way,  i.e.

6  providing the same range of motion of the sternal pad as depicted in FIG. 21 of the '374

7  patent. The same result is achieved, i.e. improving the comfort of the user by reducing

8  pressure on the sternum

9      22.    I also note that Claim 1 uses the term "sternum pad," not "sternal pad,"

10  which I interpret to distinguish between the soft sternum padding or pad as described to

11  avoid decubitus and the sternal pad 136 as illustrated and described in FIGS. 20 and 21

12  (16:53-55).

13      23.    Features of the Miami JS collar are depicted in the Miami J Select

14  Instructions for Use ("Instructions") attached as Exhibit 2, which I obtained from the

15  Ossur website. Exhibit 2 includes Fig. 1 and the Product Overview for Fig. 1 that are

16  part of the Instructions. The full Instructions are attached to the Latinovic Declaration as

17  Exhibit L.  Ossur has apparently not contested that the Miami JS includes the features

18  recited in Claim 1 of a main support and a lower support hingedly connected to the main

19  support. These features are shown in the Instructions. The main support is item C, chin

20  support in the drawing on page 3 of the instructions. The lower support of the Miami JS

21  collar is in two structures fixed together, and marked by the manuscript notation on the

22  Instruction page 3 drawing.  On the Miami JS collar, the lower support includes a first

23  structure made of a rigid white plastic material, and the second structure is made of a

24  semi-rigid gray plastic material.  The lower support is hingedly connected to the chin

25  support structure to provide height adjustment controlled by height adjustment button g.

26  The semi-rigid gray plastic material of the lower support includes a lowermost portion

27  connected by a living hinge to the lower support structure above the living hinge. we

28      24.    The Miami JS collar includes a sternum pad, marked as "i" in the

Instruction page 3 drawing. This is the soft padding, connected to the lower support by hook-and-loop fasteners. This soft padding extends under the second structure (gray plastic material) above and below the living hinge.

25. Claim 1 includes the feature "adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support". As construed, this feature is found in the Miami JS. The Miami JS includes an adjustment mechanism including Sternum Relief Knob h shown in the Instruction page 3, and is mounted on the lowermost portion of the lower support, on the second structure of the lower support. The sternum padding is attached by hook and loop fasteners to the bottom of the lower support. The lowermost portion of the lower support is connected by a flexible living hinge portion (marked by manuscript notation on the Instruction drawing) to the portion of the second structure above the living hinge. The Knob h is rotatable to a horizontal position to allow the lowermost portion of the lower support to flex relative to the rest of the lower support above the hinge, allowing the sternum pad to move relative to the lower support, so that pressure exerted by the sternum support on the patient's sternum is reduced or relaxed.

26. The Miami JS adjustment dial is mounted for rotation on an axis, and has a dial body which has a width dimension that is smaller than a length dimension. The adjustment dial acts to allow flexing of the lowermost portion when the adjustment dial is positioned in the horizontal position. In this horizontal position, the smaller dimension of the dial does not obstruct flexing movement of the lowermost portion about the living hinge through a range of motion. In this position, the lowermost portion of the lower support, to which the sternum pad is connected, is allowed to flex and is movable relative to the lower support above the hinge.

27. A boss extending from the dial extends through an opening in the lowermost portion in the lower support. Barb-like features at the end of the boss cooperate with the opening and a recess in the opening to allow the boss and dial to rotate about the boss axis between the horizontal and the vertical position.

28.    The Knob h includes an elongated portion (the extension element), which adjustably extends relative to the portion of the lower support above the living hinge as the dial is rotated from the horizontal position to the vertical position.  The dial body is constructed such that the width dimension W of the dial (dimension from the boss axis to the width edge) is smaller than the length dimension L (dimension from the boss axis to the longitudinal tip of the dial).  The dimensions, using a ruler, are about L= 1 inch and W = 9/16th inch. The dial body is elongated along its length dimension relative to its width dimension. The width dimension of the dial is such that the dial edge does not interfere with living hinge flexing of the lowermost portion of the lower support with the dial in the horizontal position.  Conversely, adjusting the dial to the vertical position, the elongated portion of the dial is extended upwardly so the tip is adjacent to the portion of the lower support above the living hinge, to present interference to flexing of the lowermost portion of the lower support upwardly, inhibiting movement of the sternum pad relative to the lower support structure above the living hinge.

29.    The elements of Claim 1 read on the Miami JS as follows:

- **a main support:**  The chin support.
- **a lower support hingedly connected to the main support:** The lower support is in two structures fixed together, and marked by the manuscript notation on the Instruction page 3 drawing. On the Miami JS collar, the lower support includes a first structure made of a rigid white plastic material, and the second structure is made of a semi-rigid gray plastic material.  The lower support is hingedly connected to the chin support structure to provide height adjustment controlled by height adjustment button g.
- **Sternum pad:**  The soft pad attached to the lower support along the lowermost portion of the lower support.
- **an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support:** The Miami JS "Sternal Relief Knob" is mounted in the

lowermost portion of the lower support, and forms part of an adjustment mechanism, together with the integrally formed boss captured within an opening in the lowermost portion and the living hinge connecting the lowermost part of the lower support to the portion of the lower support above the hinge. As construed, the sternum pad is movable relative to the portion of the lower support above the hinge due to the living hinge.

- **wherein the sternum pad is mounted to a ball joint and the adjustment mechanism has an adjustment dial and an extension element arranged for adjustably extending relative to the lower support.** The Miami JS utilizes a flexible or living hinge which connects the lowermost portion of the lower support to the portion of the lower support above the hinge, with the sternum pad mounted to the lowermost portion and extending past the living hinge to the portion of the lower support above the hinge. The adjustment mechanism includes an adjustment dial, the "Sternal Relief Knob." The adjustment mechanism includes an extension element formed by the elongated shape of the "Sternal Relief Knob" which is arranged for adjustably extending relative to the portion of the lower support above the living hinge, by the rotation of the knob from the horizontal to the vertical position. While the living hinge joint is not a ball-shaped structure, it does provide a similar range of motion to that depicted in FIG. 21 of the '374 patent, the flexing movement of the sternal pad within a single plane relative to the lower support.

**The living hinge equivalency to the ball joint in Claim 1:**

30.    If an accused product or process does not literally infringe a patented invention, the accused product or process may be found to infringe under the doctrine of equivalents. The essential objective inquiry is: "Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?" Warner-Jenkinson Co. v. Hilton Davis Chemical Co., 520 U.S. 17, 40, 41 USPQ2d 1865, 1875 (1997). In determining equivalence, "[a]n analysis of the role

1  played by each element in the context of the specific patent claim will thus inform the

2  inquiry as to whether a substitute element matches the function, way, and result of the

3  claimed element, or whether the substitute plays a role substantially different from the

4  claimed element." 520 U.S. at 40. Alternatively, assuming Claim 1 is subject to 35 USC

5  112(f), such a limitation must be construed "to cover the corresponding structure,

6  material, or acts described in the specification and equivalents thereof." (35 USC

7  112(f)).

8      31.    Accordingly, in my view the living hinge of the Miami JS collar is an

9  equivalent to the ball joint.  The living hinge provides a substantially equivalent range of

10 motion of the sternum pad as illustrated in the '374 patent; both the living hinge and the

11 ball joint allow a range of motion along an axis.  The living hinge matches the function

12 of the ball joint allowing movement of the sternum pad relative to the lower support in

13 substantially the same way as the ball joint to allow flexing of the sternum pad relative

14 to the user's sternum, providing increased comfort to the user. Moreover, flexible or

15 living hinges were described in the specification (US 6254560, see discussion above) to

16 perform the identical function carried out by the ball joint in FIG. 21 of the 374 Patent

17 and the living hinge in the Miami JS.  The living hinge performs the same function as

18 the ball joint as construed.

19     32.    With respect to Ossur's contention that the "sternal-relief dial" of the

20 Miami JS is not an implementation or embodiment of the concept illustrated in Calco's

21 8/25/2015 drawing, the concept illustrated in that document is for a mechanism to adjust

22 the cervical collar's fit and comfort by tightening or relaxing the pressure of the sternum

23 support pad and allowing a forward flexing and angle change of the support pad. The

24 particular embodiment of the concept illustrated in the 8/25/2015 drawing involves the

25 use of a ball joint with a screw style shaft. In the case of the Miami JS, the concept is

26 implemented by use of the living hinge to emulate the ball joint function, and the

27 rotatable dial with its elongation to engage or disengage the upper portion of the lower

28 support, to allow the sternum pad to flex relative to the patient's sternum. Ossur

mistakenly focuses on the particular implementation or embodiment shown by the Calco drawing, rather than on the concept illustrated by the document. The Miami JS "sternal relief dial" is another implementation of that concept.

33.    I also understand Ossur to be arguing that it has acted in good faith in its prosecution of patents with respect to the Miami JS. The Latinovic Declaration that was filed with Ossur's original motion for summary judgment states at paragraph 16 that "Ossur generally seeks broad patent protection even if Ossur decides not to manufacture, distribute, or sell products protected by its patents". [Dkt. 47-2, ¶16] Ossur did not in my opinion prosecute the '374 patent application (application number 16686582; "the 582 Application") in accordance with this policy. Ossur received a first office action from the US Patent and Trademark Office (PTO) on 2/17/22, a true and correct copy of which is attached hereto as Exhibit 3, which I obtained from the PTO website page for the application.

34.    I have discussed above the office action and the examiner's interpretation that the term "adjustment mechanism" would be construed as "means plus function" limitation under 35 USC Section 122(f). As pointed above, Ossur reasonably could have argued against this interpretation.

35.    Of the 20 claims filed with the application, claims 1-12, 16-17 and 19-20 were rejected, and claims 13-15 and 18 were objected to. Claims 1-2, 4-7, 9-12 and 16-17 were rejected under Section 102 as being anticipated by Martin (US 20160008158), meaning that the Examiner considered Martin to disclose each element of these rejected claims. Claims 3 and 8 and 19-20 were rejected under Section 103 as being unpatentable over Martin in view of Suarez (20130281899), on ground that the differences between the claimed subject matter and these references would have been obvious to a person of ordinary skill in the art. Claims 13-15 and 18 were indicated as allowable if rewritten in independent form.

36.    The original claim 1 of the '582 Application was directed to a cervical collar, and is recited below:

"A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising:

a main support;

a lower support hingedly connected to the main support;

a sternum pad; and

an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support."

As discussed in paragraphs 25 and 29 above, these elements read on the Miami JS collar and the original application Claim 1 therefore clearly covered the Miami JS.

37.    Ossur responded to the office action by an amendment filed May 20, 2022, a true and correct copy of which is attached hereto as Exhibit 4, which I obtained from the PTO website page for the application. Rather than argue that the original claims were patentable over the cited Martin reference, Ossur simply amended the claims so that the subject matter of Claim 13 was incorporated in amended claim 1, and Claim 14 was amended to independent form including the features of claim 1. Claims 19 and 20 were canceled.

38.    Adding features from a dependent claim inherently narrows the scope of an independent claim.  While even amended application Claim 1, i.e. Claim 1 of the '374 patent, covers the Miami JS as discussed above, the amendment did change the scope of the claim. Rather than accept the examiner's interpretation of Martin, in my opinion, Ossur should have argued that the original claims were patentable over Martin and Suarez.  This approach would have been successful in removing the Section 102 and 103 rejections of the original claims.

39.    I approach the analysis of the examiner's office action and Ossur's response from the viewpoint of an experienced patent attorney, having considerable experience in analyzing prior art references and comparing the prior art references to inventions described in patent applications. Most patent applications are met with at least one office action on the merits, typically including claim rejections based on prior

1    art.  My role as a patent attorney includes an analysis of the cited prior references in

2    relation to the claims at issue. My experience includes a broad gamut of technologies,

3    including mechanical devices.

4        40.    In the February 17, 2022 office action, the examiner stated:

5        With respect to claim 1, Martin et al. discloses a cervical collar (100, figs. 1-8B)

6        having an anterior or front component arranged for connecting to a posterior or

7        back component, the anterior component comprising:

8        a main support or chin support (104);

9        a lower support (114) hingedly or pivotal connected via (pivotal connection 118)

10       and [0042] to the main support (138, fig. 1D);

11       a sternum pad (114, fig. 1C); and

12       an adjustment mechanism (108) fig. 2) and [0045] and [0052] located on the

13       lower support and the sternum pad is connected thereto such that the sternum pad

14       is movable relative to the lower support.

15   A copy of the Martin et al. reference is attached as Exhibit 5.

16       41.    The examiner's interpretation of Martin to disclose "an adjustment

17   mechanism located on the lower support and the sternum pad is connected thereto such

18   that the sternum pad is movable relative to the lower support" was incorrect. In fact, the

19   structures identified as the lower support and the sternum pad are referred to by the same

20   reference number – 114.  The "sternum pad" and the lower support are integrally formed

21   as a one-piece structure, part of a structure called the "main collar body" 102 as evident

22   in Figs. 1A and 1C of Martin.   The main collar body 102 and chin support member 104

23   are made from a generally rigid material, such as a polymer or composite material. The

24   parts may also be partially flexible to improve comfort [0044].  Because the "sternum

25   pad" and "lower support" as identified by the examiner are formed as a unitary one-

26   piece structure from a generally rigid material, movement between the "sternum pad"

27   and "lower support" is not possible in the Martin reference.

28       42.    Martin discloses an adjustment mechanism including knob 108 and element

17

DECLARATION OF LARRY K. ROBERTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

122 which fixes the position of the main collar body 102 with lower support 114 relative to the main support 104. This is a height adjustment for adjusting the chin support 104 relative to the main collar body 102 and lower support 114. Martin does not provide for adjustment of the sternum pad identified by the examiner as reference 114 relative to the lower support 114 or main collar body 102. Suarez also does not disclose an adjustment mechanism for adjusting the sternum pad relative to the main support, and the examiner did not contend that it did.

43. If Ossur had been prosecuting the patent application in accordance with its general policy as stated in the original Latinovic Declaration, and indeed according to normal practice, the appropriate response to the office action of 2-17-22 would have been to argue the incorrectness of the examiner's interpretation of Martin and Suarez, without amending Claims 1 and 19. Claims 13 and 14 should have been amended to independent form to capture the allowable subject matter of these claims. This argument would in my opinion have removed the rejection of the claims under 35 USC 102/103 and resulted in further patent coverage for the Miami JS based on Calco's concept for the sternum adjustment.

44. Moreover, additional patentable claims could have been, and at least until very recently, could still be asserted by Ossur, based on the '374 patent specification, which cover the Miami JS cervical collar and its adjustable height and sternum adjustment features. According to the information publicly available on the U. S. Patent and Trademark Office website, Ossur has apparently not sought such additional patent coverage.

45. I have drafted a set of proposed patent claims supported by the disclosure of the '374 patent and its parent and grandparent applications, which provide additional claim coverage of the sternum adjustment feature in combination with the mechanism for locking the position of the collars lower support relative to the main support. A copy of the proposed claim set is attached as Exhibit 6.

46. Among the features of the proposed claim set are (i) an adjustment

mechanism located on the lowermost portion of the lower support for adjusting

pressures of the lower pad relative to the user's sternum region, (ii) a lock mechanism

arranged for locking movement of the lower support relative to the main support to lock

the lower support in the adjusted position, the lock mechanism comprising an actuator

for adjusting the lock mechanism from locked to unlocked conditions, the actuator

located on the lower support, the actuator configured to control engagement of a lock

element to the locked condition and to control disengagement of the lock element while

in the unlocked condition, the lock mechanism further including a bias element arranged

to return the lock element to the locked condition by release of the actuator; and (iii)

wherein the adjustment mechanism operates independently of the lock mechanism so

that adjustment of pressures of the lower pad relative to the user's sternum region does

not affect the adjusted position of the lower support relative to the main support.

47.    It is my opinion, based on review of prior references cited in the PTO

prosecution of the '374 patent and the prior art results of a patentability search

conducted by a patent search firm, that the proposed claims are patentable over the

known prior art.

48.    In his declaration dated June 2, 2024, Ossur's expert, Nathan Macdonald

("Macdonald"), makes numerous claims and arguments that are erroneous and/or

contrived and therefore require response to the extent necessary for this motion.

49.    At paragraphs 83 to 92, Macdonald argues that Calco's examples of ball

joints with a cutout that are attached as Exhibits 36 and 37 to Calco's declaration are not

ball joints. The central premise of Macdonald's argument is that a ball joint has conical

movement whereas a hinge joint moves in a single axis. However, he ignores that fact

that the movement of the ball joint depicted in Fig. 21 of the '374 Patent is in a single

plane or axis and not conical. Instead of addressing that fact, Macdonald calls the ball

joint shown in Exhibit 36 by a different name - a "disguised snap together hinge joint" –

and declares that it is not a ball joint because its movement is constrained to a single

axis, exactly as is the movement shown in Fig. 21. Exhibit 36 is consistent with Fig. 21;

1    Macdonald's argument is not.

2    50.    Macdonald concedes that Exhibit 37 of Calco's declaration shows a ball

3    joint but asserts that its movement is not limited to a single axis as Calco describes in his

4    declaration. As discussed in Calco's declaration, the ball joint shown in Exhibit 37 is

5    constrained to move in a single plane consistent with Fig. 21 of the '374 Patent and

6    would also as a practical matter move only in a single plane.

7    51.    In paragraph 109 of his declaration, Macdonald argues that the ball joints

8    illustrated in Exhibits 36 and 37 of Calco's declaration are not equivalent to the living

9    hinge in the Miami JS because the living hinge when bent or flexed exerts a "restorative

10   force" back towards its resting position, which a ball joint lacks. Macdonald's analysis

11   misses the point.  "Restorative force" is not a feature of Claim 1, which recites "an

12   adjustment mechanism located on the lower support and the sternum pad is connected

13   thereto such that the sternum pad **is movable** relative to the lower support" (emphasis

14   added).  The living hinge in the Miami JS is movable with the knob in the horizontal

15   position.

16   52.    In paragraphs 139 and 140 of his declaration, Macdonald argues that

17   Calco's sternum adjustment concept was the subject of prior art extending back at least

18   as early as 1954 in US 2,818,063, which shows a cervical collar in Fig. 1 ("the 1954

19   Collar") that looks much like a corset wrapped around a patient's neck. Macdonald

20   claims that the laces of the 1954 Collar constitute a sternum adjustment because the

21   laces can be loosened or tightened to adjust the fit of the collar. Macdonald argues that

22   because the concept of a sternum adjustment goes back to at least the 1954 Collar,

23   Calco's concept must therefore be considered as covering only a specific mechanism

24   and cannot constitute a generalized concept of a sternum adjustment.

25   53.    Preliminarily, it must be noted that US 2,818,063 was of record in the

26   application that issued as the '374 Patent, but the patent examiner did not apply or use

27   that patent in its rejections under Section 102 or 103. The reasons why the examiner did

28   not are manifest. With its straps, laces and buckles, the 1954 Collar has an entirely

20

DECLARATION OF LARRY K. ROBERTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1    different structure than a modern adjustable cervical collar as described in the '374

2    Patent. The structure of the 1954 Collar simply has no application to Calco's sternum

3    adjustment concept, to a cervical collar having "an adjustment mechanism located on the

4    lower support and the sternum pad is connected thereto such that the sternum pad is

5    movable relative to the lower support".   Nor does the 1954 Collar include a lower

6    support hingedly connected to the main support as in Claim 1, and as found in the

7    Miami JS. The 1954 Collar appears intended for a one-time fitting with the head held in

8    the position prescribed by the doctor at the time of fitting and not for adjustment like the

9    Miami JS and as described and claimed in the '374 Patent.  See, e.g., US 2,818,063 at

10   3:38-41 (describing the relative positions of the wings 26 and 28 are "preselected" by

11   proper tying of the typing tapes 32 and the straps 74) and 4:22-25 ("… if the attending

12   physician desires that the patient be allowed to move his head forwardly, the apron 22

13   [with the tying tapes 32] may be omitted.").

14        54.    Macdonald argues in paragraph 142 that Calco's concept for sternum pad

15   adjustment at most covers mechanisms that move the sternum pad closer to or farther

16   from the lower support, whereas the sternum pad in the Miami JS does not move closer

17   to or farther from the lower support. Macdonald ignores the construction of the Miami

18   JS, as explained in paragraphs 24 and 25 above. The lower support of the Miami JS

19   collar comprises two structures that are fixed together.  A first structure is made of a

20   rigid white plastic material, and the second structure is made of a semi-rigid gray plastic

21   material.  The semi-rigid gray plastic material of the lower support includes a lowermost

22   portion connected by a living hinge to the lower support structure above the living

23   hinge.5The sternum pad, i.e. the soft padding connected to the lower support by hook

24   and loop fasteners, moves with the semi-rigid gray plastic material that constitutes the

25   lowermost portion  of the lower support, and at the same time, with rotation of the

26   lowermost portion of the lower support,  it moves closer to or farther from the first

27   structure of the lower support consisting of the rigid while plastic material as well as the

28   portion of the second structure above the living hinge.. Therefore, contrary to

Macdonald's argument, the sternum pad adjustment of the Miami JS allows movement of the sternum pad closer to and farther from the lower support above the living hinge.

55.    Macdonald asserts in paragraphs 42, 43, 100 and 120 that the '374 Patent discloses a sternum pad that physically moves towards or away from the lower support via a lead screw. Claim 1 includes no such feature. Claim 1 recites an "adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support." The rotation of the sternum relief knob of the Miami JS to the horizontal position allows the sternum pad to be movable relative to the lower support as discussed in paragraph 26 above. Furthermore, as discussed in paragraph 15 above, the '374 Patent discloses a living hinge by incorporation of US 6254560.

56.    Macdonald argues in paragraphs 123 to 125 that there is no meaningful difference between the terms "sternum pad" and "sternal pad", which are used interchangeably in the '374 Patent. This is not correct. "Sternum pad" is described and defined in 6:63-65 of the '374 Patent as follows: "The sternum part **4** carries a sternum pad **9** to avoid decubitus over long 65  periods of wear of the collar", which is shown in Fig. 1. This is clearly referring to the soft material that makes contact with the patient and not to rigid material. "Sternal pad" is a separate structure described in 16:54-55 as: "The adjustment mechanism 24 has a sternal pad 136 adjustable in location relative to the lower support 20", which is shown in Figs. 20 and 21. The sternum pad and sternal pad are therefore distinct and different structures, and there is no sternal pad recited in Claim 1. Ossur did not use "sternum pad" and "sternal pad" interchangeably in the '374 patent.

57.    In paragraph 71, Macdonald argues that I am essentially creating a second structure that is described in the '374 Patent but is not present in the Miami JS, which he refers to as a "separate sternum support pad." As discussed in paragraphs 24 through 26 above, there are two structures that together comprise the lower support that are recited in Claim 1 and are present in the Miami JS.

1        58.   Macdonald argues in paragraphs 144 and 145 that Claim 1 as originally

2    filed would not read on the Miami JS if it had issued because the Miami JS has a

3    sternum pad that moves with the lower support, not relative to it, and the Miami JS

4    lacks an adjustment mechanism that would cause such relative motion to occur. I

5    reiterate what I explained in paragraphs 55 and 56 above. The sternum relief knob

6    of the Miami JS, which is the sternum pad adjustment mechanism, allows movement

7    of the sternum pad closer to and farther from the lower support above the living hinge.

8    This movement is relative to the lower support.

9        I declare under penalty of perjury under the laws of the United States of America

10   that the foregoing is true and correct. This Declaration was executed this 5th day of

11   June, 2024 at Newport Beach, California.

_Larry K Roberts_

Larry K. Roberts

23
DECLARATION OF LARRY K. ROBERTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# EXHIBIT 81



US009132027B2

(12) **United States Patent**　　　(10) **Patent No.:**　**US 9,132,027 B2**
Calco　　　　　　　　　　　　　　　(45) **Date of Patent:**　　Sep. 15, 2015

(54) **ADJUSTABLE CERVICAL COLLAR**

(71) Applicant: **Wayne A Calco**, Aliso Viejo, CA (US)

(72) Inventor: **Wayne A Calco**, Aliso Viejo, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 188 days.

(21) Appl. No.: **13/831,852**

(22) Filed: **Mar. 15, 2013**

(65)　　　　**Prior Publication Data**

US 2014/0012172 A1　　Jan. 9, 2014

**Related U.S. Application Data**

(60) Provisional application No. 61/668,727, filed on Jul. 6, 2012.

(51) **Int. Cl.**
　　*A61F 5/00*　　　　(2006.01)
　　*A61F 5/055*　　　(2006.01)
(52) **U.S. Cl.**
　　CPC ...................................... *A61F 5/055* (2013.01)
(58) **Field of Classification Search**
　　CPC ................. A63B 2210/50; A63B 2021/0612;
　　　　A63B 21/068; A63B 22/0023; A63B 22/0087;
　　　　　A63B 21/015; A63B 21/0611; A63B 21/154;
　　　　　　A63B 2208/0252; A63B 2210/58; A63B
　　　　　　22/0605; A63B 23/12; A63B 2022/0652;
　　　　　A61M 16/0057; A61M 16/06; A61M 16/0616;
　　　　　　A61M 16/0683; B61D 33/005
　　USPC .................... 602/17–19; 128/DIG. 23
　　See application file for complete search history.

(56)　　　　**References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2,088,207 A | * | 7/1937 | Kaiser | ........................... 297/392 |
| 2,791,999 A | | 9/1954 | Bustamante | |
| 4,643,174 A | * | 2/1987 | Horiuchi | ........................ 602/18 |

| | | | | |
|---|---|---|---|---|
| 4,886,052 A | * | 12/1989 | Calabrese | ........................ 602/18 |
| 5,180,361 A | | 1/1993 | Moore et al. | |
| 5,230,698 A | | 7/1993 | Garth | |
| 5,588,957 A | | 12/1996 | Martin, Sr. | |
| 6,090,058 A | * | 7/2000 | Traut et al. | |
| 7,128,724 B2 | | 10/2006 | Marsh | |
| 7,141,031 B2 | | 11/2006 | Garth et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

CN　　　202 015 274 U　　10/2011

OTHER PUBLICATIONS

Invitation to Pay Additional Fees, Communication of Partial Search Report, International Application PCT/US2013/049475, mailed Nov. 15, 2013.

(Continued)

*Primary Examiner* — Michael Brown
(74) *Attorney, Agent, or Firm* — Larry K. Roberts

(57)　　　　**ABSTRACT**

An embodiment of an adjustable cervical collar system includes a collar body and a chin support structure assembled together, about respective pivots at opposed ends, for pivotal movement about a pivot axis so that the angle subtended by the collar body and chin support structure can be adjusted. The collar body and chin support structure can be locked in a selected position by a locking mechanism. A release mechanism permits the wearer to release the locking mechanism using one hand, and the angular position of the chin support structure relative to the collar body is changed manually. When the release mechanism is released, the locking mechanism automatically locks the chin support in the new position. A neck strap is detachable from the chin support structure and the collar body, and its length is also adjustable.

**21 Claims, 22 Drawing Sheets**





**US 9,132,027 B2**

Page 2

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,371,222 | B2 | 5/2008 | Heinz et al. |
| 7,399,288 | B2 | 7/2008 | Chao |
| 7,674,234 | B2 | 3/2010 | Calco et al. |
| 7,846,117 | B2 | 12/2010 | Leatt et al. |
| 8,038,635 | B2 | 10/2011 | Dellanno |
| 8,038,636 | B2 | 10/2011 | Thorgilsdottir et al. |
| 8,216,167 | B2 | 7/2012 | Garth et al. |
| 2007/0027418 | A1 | 2/2007 | Calco et al. |

| | | | |
|---|---|---|---|
| 2012/0053499 | A1 | 3/2012 | Donaldson et al. |
| 2012/0130295 | A1 | 5/2012 | Haider |
| 2013/0060179 | A1 | 3/2013 | Modglin |

OTHER PUBLICATIONS

Notification of Transmittal of International Search Report and Written Opinion of International Searching Authority, International Application PCT/US2013/049475, mailed Jan. 21, 2014.

* cited by examiner





FIG. 1A



FIG. 1B



FIG. 1C



FIG. 1D

50



FIG. 1E



FIG. 1F



FIG. 2A



FIG. 2B



FIG. 2C



FIG. 2D



FIG. 3



FIG. 4B



FIG. 4A

**U.S. Patent**    Sep. 15, 2015    Sheet 13 of 22    US 9,132,027 B2



FIG. 4C



FIG. 5B

FIG. 5A



FIG. 6A



FIG. 6B



FIG. 7A



FIG. 7B



FIG. 7C



FIG. 7E

FIG. 7D



FIG. 7F





FIG. 8



FIG. 9B

FIG. 9A

US 9,132,027 B2

1

## ADJUSTABLE CERVICAL COLLAR

### CROSS-REFERENCE TO RELATED PATENT APPLICATIONS

This application claims priority to and the benefit of U.S. Provisional Patent Application No. 61/668,727, filed Jul. 6, 2012.

### BACKGROUND

Cervical collars are used to support a person's neck and head for various therapeutic, comfort and emergency uses. Some collars are adjustable, and ease of adjustment and fitting to a particular person is desirable.

### BRIEF DESCRIPTION OF THE DRAWINGS

Features and advantages of the disclosure will readily be appreciated by persons skilled in the art from the following detailed description when read in conjunction with the drawing wherein:

FIGS. 1A and 1B are respective isometric views of an exemplary embodiment of an adjustable cervical collar with one side of a neck strap detached from its right side connection, taken from an upper left and lower right orientation. FIG. 1C is a left side view of the collar, showing the neck strap detached from its left side connection. FIG. 1D is a bottom view of the collar as in FIG. 1C. FIG. 1E is a right side view of the collar as in FIG. 1A. FIG. 1F is a front view of the collar as in FIG. 1E.

FIG. 2A and 2B are isometric views of the cervical collar as in respective FIGS. 1A and 1B, with the neck strap removed, and the chin support housing partially removed. FIGS. 2C and 2D are views similar to FIGS. 2A and 2B, but showing an alternate embodiment of a spring feature.

FIG. 3 is an exploded isometric view of the cervical collar arrangement as illustrated in FIGS. 2C and 2D, and the connection between the neck strap and the pivot connection.

FIGS. 4A and 4B are respective front and back isometric views of one exemplary strap connection to the collar pivot. FIG. 4C is an exploded view of the strap connection of FIGS. 4A and 4B.

FIGS. 5A and 5B are respective front and left side diagrammatic views illustrating use of a cervical collar as illustrated in FIGS. 1A-4B on a person.

FIGS. 6A and 6B are respective isometric views of an alternate embodiment of a chin support structure, respectively taken from a lower and an upper orientation.

FIGS. 7A and 7B are respective isometric views of an alternate embodiment of a neck strap structure, taken along upper and lower orientations. FIG. 7C is a isometric view of a portion of the neck strap structure of FIG. 7A and 7B, in relation to a collar body and chin support structure, with the strap end positioned for insertion into a connector. FIGS. 7D and 7E show an alternate embodiment of a collar body structure. FIG. 7F shows a cervical collar system with foam pads attached.

FIGS. 8 illustrates an exemplary embodiment of a lock for preventing release of a release mechanism for an adjustable collar body system.

FIGS. 9A-9B illustrate another embodiment of a lock for preventing release of a release mechanism for an adjustable collar body system.

### DETAILED DESCRIPTION

In the following detailed description and in the several figures of the drawing, like elements are identified with like reference numerals. The figures may not be to scale, and relative feature sizes may be exaggerated for illustrative purposes.

An exemplary embodiment of an adjustable cervical collar system 50 is illustrated in FIGS. 1A-5B. The collar system includes a neck strap 60, a collar body 70, and a chin support structure 80. The collar body and chin support structure are assembled together, about respective pivots at each end, and arranged for pivotal movement about a pivot axis 52 so that the angle subtended by the collar body and chin support structure can be adjusted through an angular range, and the structures 70 and 80 locked in a selected position by a locking mechanism. The system includes a release mechanism permitting the wearer to easily release the locking mechanism, using one hand, and the angular position of the chin support structure relative to the collar body is changed manually. When the release mechanism is released, the locking mechanism automatically locks the chin support in the new position. The neck strap 60 is detachable from the chin support structure and the collar body, and its length is also adjustable.

FIG. 3 is an exploded view of features of an exemplary embodiment of the collar system, including the collar body 70 and the chin support structure 80.

In an exemplary embodiment, the collar body 70 is a unitary rigid one-piece structure, preferably fabricated by injection molding a plastic material, such as polypropylene, polyamide, polycarbonate or other suitable material which becomes rigid when cured or cooled. The collar body includes an arcuate portion 72, having end portions 72A and 72B. The end portions have peripheral portions 72A-2 and 72B-2 defining circular openings 72A-1 and 72B-1, respectively. The peripheral portions each have a series of locking teeth 72A-3 and 72B-3 formed on the exterior surfaces, and the teeth form part of the locking mechanism described above.

The chin support structure 80 includes a rigid lower housing structure 82 and a rigid upper housing structure 84, which are assembled together by threaded fasteners, or in other suitable ways, such as snap fit or adhesive. The housing structures 82 and 84 are respective unitary one-piece structures, which in an exemplary embodiment are fabricated by injection molding a plastic material, such as polypropylene, polyamide, polycarbonate or other suitable material which becomes rigid when cured or cooled. The exploded view of FIG. 3 shows the elements of an exemplary locking and release mechanism 100, which are fitted within the assembled housing structures.

FIGS. 2A-2B show the assembly 90 of the collar body 70 and chin support structure 80 in different states. In FIG. 2A, the upper housing structure 84 is not shown. In FIG. 2B, the lower housing structure 82 is not shown, and the upper housing structure is partially broken-away to reveal sliding member 104 and X-shaped spring 104B, with cable end 108A of cable 108 attached to the sliding member 104. The X-shaped spring applies a bias force tending to push the sliding member 104 and its teeth 104A into engagement with the collar body teeth 72B-3. A pulling force applied to the sliding member 104 can compress the spring 104B, to move the teeth 104A out of engagement with the collar body teeth 72B-3. Sliding member 102 operates in a similar manner.

FIGS. 2C-2D are similar to FIGS. 2A-2B, but illustrate an alternate embodiment of a spring to apply bias force on the sliding members 102, 104. The alternate embodiment includes 104B' which may be integrally formed as part of sliding member 104, from a plastic material, The spring 104B' is formed with serpentine elements, which may be

US 9,132,027 B2

3

compressed by a pulling force tending to pull the sliding member 104 away from the collar body teeth 72B-3.

The lower housing structure 82 includes respective connector end portions 84A, 84B, which are cooperatively configured with the end portions 72A, 72B of the collar body 70 such that the connector end portions 82A, 82B are fitted into the circular openings 72A-1 and 72B-1 and allow pivotal movement of the chin support structure about the pivot axis 52. In this exemplary embodiment, the connector end portions define circular bosses such as 84B-1 protruding within an outer shroud portion 84B-3. The circular boss, e.g. 84B-1, fits within the peripheral portion, e.g. 72B-2, of the end portion 72B, and acts as a bearing surface. A tab 84B-2 protrudes from the circular boss, and a pin, such as pin 84B-2A, protrudes from the tip of the tab in a transverse direction, and rides over a series of small openings 74B-8 formed in the peripheral portion of the collar body, so as to provide a visual indication of the angular position of the chin support structure relative to the collar body. The housing structure 82 is a rigid structure, and the distance between the connector end portions 84A, 84B is slightly longer than the distance between the end portions 72A, 72B of the collar body. The ends of the collar body may be spread partly apart, or the ends of the chin support pressed together slightly to allow the assembly of the connector end portions into the end portions of the collar body, and the natural tension of the juxtaposition of the chin support with the collar body will maintain the assembled condition.

The collar system 50 includes a releasable locking system 100 to lock the chin support structure 80 in a desired rotational position relative to the collar body 70. The locking system includes the lines of teeth 72A-3 and 72A-4 formed on the outer surfaces of the peripheral portions 72A-2 and 72B-2, which are engaged by teeth formed at the end of sliding members 102, 104 carried within the chin support housings 82 and 84 and constrained for some movement along an axis toward and away from the teeth on the collar body. The sliding members are biased toward the collar body teeth by spring members, so that the default or rest positions of the sliding members are in the locked or engagement positions with the collar body teeth. First ends 106A, 108A of flexible cables 106, 108 are attached to the respective sliding members 102, 104 to provide a means to pull the teeth of the sliding members against the spring bias force and out of engagement with the collar body teeth, to release the lock. The user may then rotate the chin support structure to a desired position relative to the collar body, with the locking system in the unlocked or released condition. Releasing tension on the cables 106, 108 allows the spring force (applied by springs such as 104B or 104B') to automatically pull the sliding members back to the locked condition at the desired position.

The releasable locking system 100 further includes a mechanism operable by the user to exert pulling force on the cable ends 106B, 108B. In an exemplary embodiment, this mechanism includes a wheel assembly of wheels 110, 112 mounted for rotation about center shaft 110B, with pins 110A protruding from the wheel assembly at opposed locations adjacent the wheel periphery. The cable ends 106B, 108B have eyelets which are connected onto respective ones of the pins 110A, and sandwiched between wheels 110, 112. By rotating the wheel assembly, opposed pulling forces are exerted on the cable ends and thereby on the sliding members 102, 104, pulling the teeth on the sliding members out of engagement with the collar body teeth and releasing the lock.

In an exemplary embodiment, the mechanism to exert pulling force on the cable ends further includes housing 112, back plate 116 and actuating arms 114A, 114B. The actuating arms

4

are mounted in the housing 112, each having a button portion 114A-1 and 114B-1 which protrude through openings 112A on opposite sides of the front of the housing 112. A spring 114A-2 on arm 114A provides a separating force tending to push the respective button portions away from each other. The actuating arms 114A, 114B have respective slot openings 114A-3, 114B-3 which are engaged by respective pins 110A of the wheel 110. The respective slot openings 114A-3, 114B-3 are offset to allow engagement with the pins disposed at opposed locations on the wheel periphery. The user can grip the buttons between two fingers and press the two buttons toward each other, and thus actuating the wheel assembly to exert pulling forces on the cables. When the user releases the buttons, the pulling force is released, and the locking mechanism is in a locked position. Other suitable mechanisms may also be employed to rotate the wheel assembly 110, 112.

The lower housing 82 includes channel features in which the sliding members are mounted. An opening such as 84A-4 in each shroud portion (such as 82A-3) of the housing 82 allows the toothed end of the sliding member to pass into engagement with the collar body teeth.

The spring members (such as 104B, 104B') may be fabricated of a material such as nylon. An exemplary suitable material for the cables 106, 108 is Delrin™ but other material may alternatively be employed. The cables may be attached to the sliding members by snap fit, adhesive, fasteners, or even by integral molding of the parts.

The neck strap 60 is attached at each end to the pivot connections of the collar body and chin support structure by a strap connector. An exemplary connector 120 is illustrated in FIGS. 3 and 4A-4C. The connector 120 includes a housing member 122 and a back plate 124 assembled to the housing member by threaded fasteners. The strap 60 in an exemplary embodiment is a unitary flexible or semi-rigid material, such as nylon or polyethylene.

The strap connector 120 provides the functions of adjusting the effective strap length and allowing easy connection and disconnection of the strap connector from the collar body and chin support structure. The connector 120 also allows for rotation of the connector about the connection to the collar body. Respective clip members 128A, 128B are mounted in the housing 122 and retained by the back plate, and each includes a button portion (128A-2, 128B-2) and a clip barb feature (128A-1, 128B-1). A spring member 126 is mounted in a protruding boss feature 124A of the back plate, and provides a bias force tending to push the barb features apart. The barb features 128A-1, 128B-1 are configured to pass through the opening in the connector ends of the collar body 70, and to clip over the interior surface such as 84A-5 of the lower housing structure 82, thus securing the connector 120 in place. The button portions 128A-2, 128B-2 protrude through slots 122B in the housing structure 122, and the user, by pressing the respective button portions together, urge the respective barb portions toward each other and out of engagement with the collar body and chin support structure, allowing the connector to be removed. Another feature is that the connectors 120 allow the neck strap to be removed from the collar body and chin support structure, without changing or affecting the effective strap length.

The adjustment of the effective strap length is provided by engagement of a brake feature 132, carried by connector 120, between back plate 124 and bracket structure 134, between ribs 64A of the strap end 64. As shown in FIG. 4C, for example, the brake feature has opposed pivot portions 132B which are configured to be captured in yoke portions 124B of the back plate 124. Tips or sidearm portions 132A of the brake feature 132 are positioned between the back plate 124 and

US 9,132,027 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

bracket structure 134. A sliding plate 130 can be pushed inwardly by the user to lift the brake feature 132 out of engagement with the ribs, allowing the strap to be moved within the connector housing to adjust its position. A spring 134A bears against the sliding plate to bias it to the locked position. The brake feature 132 is not affected by pressing the button portions 128A-2, 128B-2 together to release the connector from engagement with the collar body and chin support structure. Thus, the patient or medical staff does not have to adjust the strap each time the collar system is removed from the patient; the existing strap position is maintained.

FIGS. 5A and 5B diagrammatically depict an exemplary embodiment of the cervical collar system 50 in position on a person.

Other strap configurations may alternatively be employed, such as straps which connect to the collar body assembly by hook and loop fasteners, or by snaps.

Foam pads may be attached to the chin contacting surface of the chin support structure, and the chest contacting surface of the collar body (e.g. by hook and loop fasteners) to provide additional comfort for the collar wearer. Such pads may be open cell foam pads covered by a fabric layer of a moisture wicking type.

An alternate embodiment of a chin support structure 80' is illustrated in FIGS. 6A and 6B. In this embodiment, the lower housing structure 82' and the upper housing structure 84' are formed with slots to allow the extreme ends of the chin support structure to spread, to accommodate patients with very large necks, and also provide ventilation to a pad attached to the chin supporting surface 84' (e.g. by hook and loop fasteners) and facilitate wicking away moisture. However, the slots are arranged such that the chin support structure 80' remains rigid and provides rigid support to the patient's chin while wearing the collar. Such pads may be open cell foam pads covered by a fabric layer of a moisture wicking type. As with the embodiment of FIGS. 1A-5B, the lower and upper housings structures are unitary, one-piece structures, fabricated by injection molding of a thermoplastic material. The slots are spaced away from the center portion of the chin support structure 80'. The lower housing structure 82' has two sets of slots 160, 162 on each side of the center portion. The slots 162 are formed through a portion of outer curved surface 82B' and extend through a portion of curved interior surface 82A' of the lower housing structure 82', stopping short of the edge 82C'. The slots 162 are formed through interior curved surface 82A' and extend from edge 82C' to an intermediate position between edge 82C' and edge 82D'. Slots 160 and 162 are interleaved. In this embodiment, three each of the slots 160, 162 are formed in the lower housing structure 82' on each side of the center of the chin support structure 82'.

Slots 164 are formed in the upper housing structure 84', as shown in FIG. 6B on opposite sides of the center of the chin support structure, and are respectively aligned with the slots 162 formed in the lower housing structure 82'. The slots 160, 162 and 164 are arranged in a transverse relation to the pivot axis 52 (FIG. 1A) in this exemplary embodiment. In an exemplary embodiment, the slots are about 0.035 inches wide.

In all other respects, the chin support structure 80' is similar to structure 80 of FIGS. 1A-5B, and assembles to the collar body 70 a neck strap in similar fashion.

Pulling apart the extreme ends of the chin support structure 82' when assembled to the collar body 70 allows the extreme ends to be moved apart slightly without cracking or breaking the rigid plastic material of the chin support structure, to allow the collar system to accommodate very wide necks. However, the slots are arranged such that the chin support structure 82' rigidly supports the wearer's chin in vertical and horizontal

directions. In an exemplary embodiment, the chin support structure may accommodate up to about two inches of spread.

An alternate embodiment of a neck strap 60' for the cervical collar 50 is illustrated in FIGS. 7A-7C. Instead of being a single piece structure, the strap 60' is a multi-piece assembly, including a neck pad structure 60A' having a broad top portion 60A'-1 and a narrow lower portion 60A'-2, and two straps 60B' and 60C'. The straps each have a first end which attaches to the broad top portion of the neck pad structure by a pivotal connection 170, 172, and a second end which attaches to a strap connector 120 as with the embodiment of FIGS. 1A-5B.

The pivotal connections 170, 172 may be formed by respective boss structures 170A, 172A integrally formed at the end of the respective strap ends 60B'-1 and 60C'-1, each boss fitted through an opening (60A'-2 or 60A'-3) in the neck pad 60A' Each boss has barbs extending outwardly at distal ends, to capture the boss in place onto the neck pad. Rigid covers 170C and 170D fit over the strap ends 60B'-1 and 60C'-1, and each are secured in place on the neck pad by three spaced, barbed bosses protruding through slots formed in the neck pad. FIG. 7B shows boss 170C-1, for example. The covers provide additional protection against the strap end becoming disconnected from the neck pad, and also provide some frictional engagement against the strap end, tending to hold the strap in a position relative to the neck pad.

The neck pad 60' may be fabricated of a rigid or semi-rigid material, such as nylon or polyethylene. Vertical louvers 60D'-1 are formed in the central region of the neck pad to facilitate flexing or bending of the neck pad to accommodate the contour of the patient's neck region, and the louvers and holes in the neck pad provide ventilation allowing moisture such as perspiration to escape. The covers 170C, 170D are preferably a rigid material such as nylon. The straps are preferably formed of a semi-rigid material having some flexibility, such as nylon.

The opposed ends 60B'-2 and 60C'-2 of each strap are inserted into the corresponding strap connector 120 for the system 50, and drawn in to tighten the strap 60' as discussed above regarding the strap 60. FIG. 7C illustrates a portion of the neck pad and strap 60C' in position relative to collar body 70' assembled to chin support structure 80 or 80'. The distal end of the strap is positioned for entry into the connector 120, as described above regarding FIG. 4C. Collar body 70' (shown in FIG. 7D and 7E in further detail) has an extending tab end, such as tab end 72A' extending past the pivot connection with the chin support structure. Slots 72A'-1 are formed in the tab end to facilitate bending of the tab end. The tab ends 72A' and 72B' serve to bridge the gap between the side of the neck pad and the collar body, on patients with larger necks, and to underlay the strap and neck pad on patients with smaller necks, while providing additional circumferential support of the cervical collar structure about the patient's neck.

The pivotal connection of the strap ends to the neck pad structure allows each strap 60B' and 60C' to be pivoted with respect to the neck pad, e.g. by +/−45 degrees or so, and in this embodiment the range of movement is limited by the covers 170C, 170D. The pivotal connection provides another adjustment of the cervical collar on the patient, increasing the patient's comfort.

The alternate embodiment of the collar body 70' is provided with integrally formed spaced fins 72E'-1 to provide some ventilation to a pad attached to the undersurface or fins, e.g. by hook and loop dot fasteners. The fins hold the pad away from the solid surface 72D'-1 of the collar body, allowing moisture such as perspiration to escape from the pad and its moisture-wicking fabric cover.

US 9,132,027 B2

7

Pads can be attached to the chin support surface of the chin support structure, to the chest contacting surface of the collar body, and to the neck pad, as illustrated in FIG. 7F. Pad **210** attaches to the underside of the chin support **70'**, page **200** attaches to the upper surface of the chin support **80'**, and pad **220** attaches to the inner facing surface of the neck pad **60'**. The pads may be attached by hook and loop fasteners, or other attachment mechanisms.

Other embodiments of the adjustable collar system may include a means for preventing adjustment of the vertical position of the chin support structure after the position has been set or locked to a desired position. Two exemplary techniques are disclosed for providing a lock for the release mechanism. FIG. **8** illustrates an insert **230** configured for closing an open window **240** formed in the upper structure **84** of the chin support structure **80**. The insert **230** has a pin **232** which protrudes into the release mechanism between the arms **114A** and **114B**, and blocks or prevents the buttons **114A-1** and **114B-1** from being pressed together to rotate the wheel assembly **112**. The insert has a pair of locking barbs **234, 236** which will grip the sides of the window **240** to hold the insert in place. Thus, once the medical staff or patient has adjusted the angular position of the chin support **80'** relative to the collar body **70** to the proper, desired position, the insert **230** may be inserted in place to close window **240**, and block the release buttons from being pressed together to pull the sliding members out of engagement with the teeth on the collar body.

Another technique for preventing further adjustment of the collar body system is illustrated in FIGS. 9A and 9B. Here, a cover **250** is formed of a rigid plastic material, such as polycarbonate, and is formed to fit over the release buttons **114A-1** and **114B-1**, preventing access to pinch the buttons together. The cover is molded to the contour of the buttons and boss covering the buttons, and can be a snap fit to assemble to the chin support structure. Barbs or adhesive may be used to further secure the cover **250** in place.

Although the foregoing has been a description and illustration of specific embodiments of the invention, various modifications and changes thereto can be made by persons skilled in the art without departing from the scope and spirit of the invention.

What is claimed is:

1. An adjustable cervical collar system, comprising:
a collar body; and
a chin support structure;
wherein the collar body and chin support structure are assembled together, about respective first and second pivot connections at respective side portions of the collar body and the chin support structure, and arranged for pivotal movement about a pivot axis so that the angle subtended by the collar body and chin support structure can be adjusted through an angular range, and locked in a selected position by a locking mechanism;
a release mechanism permitting the wearer to easily release the locking mechanism, using one hand in a single action, and allowing the angular position of the chin support structure relative to the collar body to be changed manually by the wearer, and wherein when the release mechanism is released, the locking mechanism automatically locks the chin support in the new position; and
a neck strap structure comprising a neck pad portion and first and second strap portions;
a first end of each strap portion arranged to connect to the collar body; and

8

wherein second ends of the first and second strap portions are respectively attached to opposed sides of the neck pad portion by a pivot connection allowing the respective first and second strap portions to pivot relative to the neck pad portion through a range of motion to adjust the position of the neck pad relative to the collar body.

2. The system of claim 1,
wherein the neck strap structure is detachable from the assembly of chin support structure and the collar body, and its effective length is adjustable.

3. The system of claim 2, wherein each first end of the first and second strap portions is removably attached to a respective one of the first and second pivot connections by a respective strap connector.

4. The system of claim 3, wherein each strap connector is configured to allow adjustment of the effective strap length and easy connection and disconnection of the strap connector from the collar body and chin support structure, and also to allow rotation of the strap connector about the pivot connection to the collar body.

5. The system of claim 4, wherein each connector is configured to allow the neck strap to be removed from the collar body and chin support structure without changing the effective strap length, so that the effective strap length is maintained after removal and reattachment of the strap from the collar body and chin support structure.

6. The system of claim 1, wherein the collar body and the chin support structure are rigid structures fabricated from one or more rigid plastic materials.

7. The system of claim 1, further comprising a lock configured to prevent operation of the release mechanism after the angular position has been set to a desired position.

8. An adjustable cervical collar system, comprising:
a collar body; and
a chin support structure;
wherein the collar body and chin support structure are assembled together, about respective first and second pivot connections at respective side portions of the collar body and the chin support structure, and arranged for pivotal movement about a pivot axis so that the angle subtended by the collar body and chin support structure can be adjusted through an angular range, and locked in a selected position by a locking mechanism;
a release mechanism permitting the wearer to easily release the locking mechanism, using one hand in a single action, and allowing the angular position of the chin support structure relative to the collar body to be changed manually by the wearer, and wherein when the release mechanism is released, the locking mechanism automatically locks the chin support in the new position;
a neck strap; and
wherein the neck strap is detachable from the assembly of chin support structure and the collar body, and its effective length is adjustable;
wherein the neck strap has a first strap end portion and a second strap portion, and each end portion is removably attached to a respective one of the first and second pivot connections by a respective strap connector;
wherein each strap connector is configured to allow adjustment of the effective strap length and easy connection and disconnection of the strap connector from the collar body and chin support structure, and also to allow rotation of the strap connector about the pivot connection to the collar body; and
wherein each strap connector comprises:
a housing;
a back plate;

-1284-

US 9,132,027 B2

9

respective first and second clip members mounted in the housing and retained by the back plate, each clip member including a button portion and a clip barb feature;

a spring member mounted in a protruding boss feature of the back plate and providing a bias force tending to push the barb features apart;

the barb features of each strap connector configured to pass through an opening in a connector end of the collar body and to clip over an interior surface of the chin support structure, to secure the strap connector in place; and

wherein the button portions protrude through slots in the housing structure, and configured so that the user, by pressing the respective button portions together, urge the respective barb portions toward each other and out of engagement with the collar body and chin support structure, allowing the connector to be removed, while also allowing the connector to rotate through a range of motion relative to the collar body.

9. An adjustable cervical collar system, comprising:

a collar body; and

a chin support structure;

wherein the collar body and chin support structure are assembled together, about respective first and second pivot connections at respective side portions of the collar body and the chin support structure, and arranged for pivotal movement about a pivot axis so that the angle subtended by the collar body and chin support structure can be adjusted through an angular range, and locked in a selected position by a locking mechanism;

a release mechanism permitting the wearer to easily release the locking mechanism, using one hand in a single action, and allowing the angular position of the chin support structure relative to the collar body to be changed manually by the wearer, and wherein when the release mechanism is released, the locking mechanism automatically locks the chin support in the new position; and

a neck strap; and

wherein the neck strap is detachable from the assembly of chin support structure and the collar body, and its effective length is adjustable;

wherein the neck strap has a first strap end portion and a second strap portion, and each end portion is removably attached to a respective one of the first and second pivot connections by a respective strap connector structure;

wherein each strap connector structure is configured to allow adjustment of the effective strap length and easy connection and disconnection of the strap connector structure from the collar body and chin support structure, and also to allow rotation of the strap connector structure about the pivot connection to the collar body; and

wherein the strap end portions each have a series of ribs, and wherein adjustment of the effective strap length is provided by engagement of a brake feature carried by the connector structure between ribs of the strap end portion, and wherein the connector structure further includes a sliding plate which can be pushed inwardly by the user to allow the brake feature to lift out of engagement with the ribs, allowing the strap end portion to be moved within the connector structure to adjust its position.

10. An adjustable cervical collar system, comprising:

a collar body; and

a chin support structure;

wherein the collar body and chin support structure are assembled together, about respective first and second pivot connections at respective side portions of the collar

10

body and the chin support structure, and arranged for pivotal movement about a pivot axis so that the angle subtended by the collar body and chin support structure can be adjusted through an angular range, and locked in a selected position by a locking mechanism;

a release mechanism permitting the wearer to easily release the locking mechanism, using one hand in a single action, and allowing the angular position of the chin support structure relative to the collar body to be changed manually by the wearer, and wherein when the release mechanism is released, the locking mechanism automatically locks the chin support in the new position; and

wherein the locking mechanism comprises:

an arcuate series of collar body locking teeth formed on each side portion of the collar body, and

a sliding member carried by the chin support member on each side portion and having a set of slider member teeth facing the collar body locking teeth, the sliding member arranged for sliding movement between a locking position in which the slider member teeth are engaged with the collar body locking teeth, and an unlocked position in which the slider member teeth are out of engagement with the collar body locking teeth.

11. The system of claim 10, wherein the locking mechanism comprises a bias spring to apply bias force on each slider member to bias the slider member to the locking position.

12. The system of claim 11, wherein the release mechanism comprises:

respective connector members having respective first ends attached to the respective sliding members;

a mechanism to exert pulling force on the respective connector member to pull the sliding member against the bias force and out of engagement with the collar body locking teeth to release the locking mechanism.

13. The system of claim 12, wherein the mechanism to apply pulling force is carried by the chin support structure, and comprises:

a wheel assembly mounted for rotation about a center shaft, with pins protruding from the wheel assembly at opposed locations adjacent a wheel periphery;

attachment members for connecting ends of the connector members to respective ones of the pins;

actuating arms arranged to engage the wheel assembly at opposed locations and having button portions for contact by a user;

a spring structure arranged to bias the actuating arms apart;

the actuating arms arranged to apply a rotational forced to the wheel assembly when the button portions are pressed toward each other, rotating the wheel assembly and exerting opposed pulling forces on the connector members and thereby on the sliding members, pulling the slider member teeth out of engagement with the collar body locking teeth and releasing the lock mechanism.

14. An adjustable cervical collar system, comprising:

a collar body; and

a chin support structure;

wherein the collar body and the chin support structure are rigid structures fabricated from one or more rigid plastic materials;

wherein the collar body and chin support structure are assembled together, about respective first and second pivot connections at respective side portions of the collar body and the chin support structure, and arranged for pivotal movement about a pivot axis so that the angle subtended by the collar body and chin support structure

US 9,132,027 B2

11

can be adjusted through an angular range, and locked in a selected position by a locking mechanism;

a release mechanism permitting the wearer to easily release the locking mechanism, using one hand in a single action, and allowing the angular position of the chin support structure relative to the collar body to be changed manually by the wearer, and wherein when the release mechanism is released, the locking mechanism automatically locks the chin support in the new position; and

wherein the chin support structure is formed with a plurality slots to allow the side portions of the chin support structure to spread apart without damaging the chin support structure, the slots also configured to provide ventilation.

15. An adjustable cervical collar system, comprising

a rigid collar body structure having opposed side portions;

a rigid chin support structure having opposed side portions and a center portion arranged to support the wearer's chin;

a neck strap structure;

wherein the collar body and chin support structure are assembled together, about respective pivot connections adjacent end of corresponding side portions of the collar body and chin support structure, and arranged for pivotal movement about a pivot axis so that an angle subtended by the collar body and chin support structure is adjustable through an angular range;

a locking mechanism locking the chin support structure in a desired angular position within the angular range relative to the collar body;

a release mechanism actuated by a wearer of the collar system, configured to permit the wearer to easily release the locking mechanism, using one hand, to allow the angular position to be changed manually;

the locking mechanism including a series of collar body teeth carried on each side portion of the collar body and a sliding member carried for sliding movement on each side portion of the chin support structure and having a

12

sliding member teeth, each sliding member arranged for movement between a lock position in which the sliding member teeth engage the collar body teeth and prevent rotation of the chin support structure relative to the collar body, and a release position in which the sliding member teeth are out of engagement with the collar body teeth.

16. The system of claim 15, further comprising a spring member for biasing each sliding member to the lock position, such that when the release mechanism is not actuated, the sliding member is in the lock position.

17. The system of claim 15, wherein the neck strap is detachable from the assembly of the chin support structure and the collar body, and its effective length is adjustable.

18. The system of claim 15, wherein the collar body includes a surface region configured to contact the wearer's chest region, and the collar body includes is integrally formed spaced ventilation fins, configured so that distal edges of the fins space portions of the collar body away from the wearer's chest region.

19. The system of claim 15, wherein the collar body includes a tab end extending past the pivot connection with the chin support structure, to bridge a gap between neck pad and the collar body, on patients with larger necks, and to underlay the strap and neck pad on patients with smaller necks, while providing additional circumferential support of the cervical collar structure about the patient's neck.

20. The system of claim 15, wherein the neck strap structure is a multi-piece assembly, including a neck pad structure and first and second straps each having a first end which attaches to the neck pad structure by a pivotal connection, and a second end which attaches to a strap connector configured for connection to a respective pivot connection between the collar body and the chin support structure, the pivotal connection allowing the respective strap to pivot through a range of motion relative to the neck pad structure.

21. The system of claim 15, wherein the collar body and the chin support structure are rigid structures fabricated from one or more rigid plastic materials.

*    *    *    *    *

# EXHIBIT 82





*LOWER SUPPORT*

*LIVING HINGE*







3

## ENGLISH

**SYMBOLS**

MD  Medical Device

MR  Magnetic Resonance (MR) safe

Product overview (Fig. 1):
a. Front
b. Height Indicator Marks
c. Chin Support — *UPPER SUPPORT*
d. Hook Landing Area
e. Tracheal Opening
f. Patient Compliance Lockout
g. Height Adjustment Button
h. Sternum Relief Knob
i. Sternum Contact — *STERNUM PAD*
j. Back Panel
k. Repeatable Fit Tabs (sold separately)
l. Strap

### INTENDED USE

The device is intended to provide gross immobilization to the cervical spine
X-ray and CT lucent.
The device must be fitted and adjusted by a healthcare professional.

*Indications for use*
Conditions requiring gross immobilization of the cervical spine. This may include:
• C-Spine precaution for trauma patients
• Immobilization for pre and post c-spine surgery
• Other conditions requiring gross immobilization of the mid-cervical spine

*Contraindications*
• Patients with a compromised airway or known spinal deformities such as ankylosing spondylitis.
• Patients with penetrating trauma injuries.

Warnings and Cautions:
Warning: If an unstable fracture is suspected or unknown, with or without a sustained trauma, ensure additional spinal precautions are implemented to immobilize the spine.
Warning: Use of a cervical collar may increase intracranial pressure (ICP) through jugular venous compression.
Warning: Use of a cervical collar may increase complexity of airway management.
Warning: Cervical spine immobilization, including use of a cervical collar, has been associated with:
• Impaired respiratory effort and forced expiratory volume
• Pneumonia
• Aspiration
• Worsening of existing cervical spine injury
• Severe neurological deterioration in patients with ankylosing spondylitis

6

# EXHIBIT 83



### UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/686,582 | 11/18/2019 | Wayne CALCO | 19793.488.1.1 | 4587 |

| 22913            7590      02/17/2022 |
|---|
| Workman Nydegger |
| 60 East South Temple |
| Suite 1000 |
| Salt Lake City, UT 84111 |

| EXAMINER |
|---|
| HAWTHORNE, OPHELIA ALTHEA |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3786 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 02/17/2022 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

docketing@wnlaw.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No.<br>16/686,582 | Applicant(s)<br>CALCO et al. | |
|---|---|---|---|
| | Examiner<br>OPHELIA A HAWTHORNE | Art Unit<br>3786 | AIA (FITF) Status<br>Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☑ Responsive to communication(s) filed on <u>18 November 2019</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☐ This action is **FINAL.**   2b) ☑ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims\***

5) ☑ Claim(s)  <u>1-20</u>  is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☑ Claim(s) <u>1-12,16-17 and 19-20</u> is/are rejected.
8) ☑ Claim(s) <u>13-15 and 18</u> is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

\* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10) ☑ The specification is objected to by the Examiner.
11) ☑ The drawing(s) filed on <u>18 November 2019</u> is/are: a)☐ accepted or b)☑ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
    a)☐ All   b)☐ Some\*\*   c)☐ None of the:
    1.☐ Certified copies of the priority documents have been received.
    2.☐ Certified copies of the priority documents have been received in Application No. _____.
    3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
\*\* See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)
2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date _____.
3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date _____.
4) ☐ Other: _____.

U.S. Patent and Trademark Office

PTOL-326 (Rev. 11-13)         **Office Action Summary**         Part of Paper No./Mail Date 20220202

Application/Control Number: 16/686,582                                          Page 2
Art Unit: 3786

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

The present application, filed on or after March 16, 2013, is being examined under the

first inventor to file provisions of the AIA.

### *Specification*

The specification is objected to as failing to provide proper antecedent basis for the

claimed subject matter. See 37 CFR 1.75(d)(1) and MPEP § 608.01(o). Correction of the

following is required: in claim 8 the limitation "the main support is **only c**onnected to the lower

support at end portions of each of the main support and lower support" is not found to have

proper antecedent basis for this claimed subject matter in the original filed disclosure.

### *Claim Interpretation*

The following is a quotation of 35 U.S.C. 112(f):

> (f) Element in Claim for a Combination. – An element in a claim for a combination may be expressed
> as a means or step for performing a specified function without the recital of structure, material, or acts
> in support thereof, and such claim shall be construed to cover the corresponding structure, material, or
> acts described in the specification and equivalents thereof.

The following is a quotation of pre-AIA 35 U.S.C. 112, sixth paragraph:

> An element in a claim for a combination may be expressed as a means or step for performing a
> specified function without the recital of structure, material, or acts in support thereof, and such claim
> shall be construed to cover the corresponding structure, material, or acts described in the specification
> and equivalents thereof.

The claims in this application are given their broadest reasonable interpretation using the

plain meaning of the claim language in light of the specification as it would be understood by

one of ordinary skill in the art. The broadest reasonable interpretation of a claim element (also

Application/Control Number: 16/686,582                                          Page 3
Art Unit: 3786

commonly referred to as a claim limitation) is limited by the description in the specification

when 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, is invoked.

As explained in MPEP § 2181, subsection I, claim limitations that meet the following

three-prong test will be interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth

paragraph:

(A)    the claim limitation uses the term "means" or "step" or a term used as a substitute for

"means" that is a generic placeholder (also called a nonce term or a non-structural term

having no specific structural meaning) for performing the claimed function;

(B)    the term "means" or "step" or the generic placeholder is modified by functional

language, typically, but not always linked by the transition word "for" (e.g., "means for")

or another linking word or phrase, such as "configured to" or "so that"; and

(C)    the term "means" or "step" or the generic placeholder is not modified by sufficient

structure, material, or acts for performing the claimed function.

Use of the word "means" (or "step") in a claim with functional language creates a

rebuttable presumption that the claim limitation is to be treated in accordance with 35 U.S.C.

112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph. The presumption that the claim limitation is

interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, is rebutted when

the claim limitation recites sufficient structure, material, or acts to entirely perform the recited

function.

Absence of the word "means" (or "step") in a claim creates a rebuttable presumption that

the claim limitation is not to be treated in accordance with 35 U.S.C. 112(f) or pre-AIA 35

U.S.C. 112, sixth paragraph. The presumption that the claim limitation is not interpreted under

35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, is rebutted when the claim

Application/Control Number: 16/686,582                                    Page 4
Art Unit: 3786

limitation recites function without reciting sufficient structure, material or acts to entirely

perform the recited function.

Claim limitations in this application that use the word "means" (or "step") are being

interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, except as

otherwise indicated in an Office action. Conversely, claim limitations in this application that do

not use the word "means" (or "step") are not being interpreted under 35 U.S.C. 112(f) or pre-

AIA 35 U.S.C. 112, sixth paragraph, except as otherwise indicated in an Office action.

This application includes one or more claim limitations that do not use the word "means,"

but are nonetheless being interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth

paragraph, because the claim limitation(s) uses a generic placeholder that is coupled with

functional language without reciting sufficient structure to perform the recited function and the

generic placeholder is not preceded by a structural modifier.  Such claim limitation(s) is/are: an

adjustment mechanism as set forth in claims 1-6,13-14 and 19-20; a locking mechanism as set

forth in claims 7 and 16.

Because this/these claim limitation(s) is/are being interpreted under 35 U.S.C. 112(f) or

pre-AIA 35 U.S.C. 112, sixth paragraph, it/they is/are being interpreted to cover the

corresponding structure described in the specification as performing the claimed function, and

equivalents thereof.

Note: there are a variation of "the adjustment mechanisms" disclosed in Applicant's

specification.

As per paragraph [0141] of the specification, the adjustment mechanism 24 has an

adjustment dial and an extension element 144 arranged for adjustably extending relative to the

lower support 20. The extension element 144 carries the ball joint 142 at an end thereof. The

Application/Control Number: 16/686,582                                    Page 5
Art Unit: 3786

adjustment mechanism 24 includes a dial 138 for adjusting the length of the extension element

144 between the lower support 20 and the sternal pad 136. As per paragraph [0142] FIGS. 22A

and 22B show a variation of the adjustment mechanism 24 including a housing 145 arranged for

receiving the extension element 144 in a contracted configuration resulting in a reduced or

substantially minimized distance between the lower support and the sternal pad. The extension

element 145 has a screw thread 147, and the housing 145 defines corresponding threads

permitting slidable movement between the extension element 145 and the screw thread 147

according to adjustment of the dial 138.

    As per paragraph [0094] The lock mechanism 22 includes an actuator or dial 30 for

adjusting the lock mechanism 22 from locked to unlocked conditions and [0113] FIG. 11 depicts

an embodiment of an elongate element or slidelock 240 useable in the hinge connection of the

collar 200. The slidelock 240 defines a central rack 242 of teeth arranged to correspond and

operatively engage elements forming part of the lock mechanism for enabling linear translation

of the slidelock 240 relative to the main support, such as in the embodiment of FIGS. 3A-4. The

elements of the lock mechanism may be similar to the pinion of FIG. 4, or may be a linear rack

of teeth, or any other suitable feature or mechanism for engaging the central rack 242.

    If applicant does not intend to have this/these limitation(s) interpreted under 35 U.S.C.

112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph, applicant may:  (1) amend the claim

limitation(s) to avoid it/them being interpreted under 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112,

sixth paragraph (e.g., by reciting sufficient structure to perform the claimed function); or (2)

present a sufficient showing that the claim limitation(s) recite(s) sufficient structure to perform

the claimed function so as to avoid it/them being interpreted under 35 U.S.C. 112(f) or pre-AIA

35 U.S.C. 112, sixth paragraph.

Application/Control Number: 16/686,582                                          Page 6
Art Unit: 3786

### *Claim Rejections - 35 USC § 112*

1.      The following is a quotation of 35 U.S.C. 112(a):
(a) IN GENERAL.—The specification shall contain a written description of the invention, and of
the manner and process of making and using it, in such full, clear, concise, and exact terms as to
enable any person skilled in the art to which it pertains, or with which it is most nearly
connected, to make and use the same, and shall set forth the best mode contemplated by the
inventor or joint inventor of carrying out the invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), first paragraph:
The specification shall contain a written description of the invention, and of the manner and
process of making and using it, in such full, clear, concise, and exact terms as to enable any
person skilled in the art to which it pertains, or with which it is most nearly connected, to make
and use the same and shall set forth the best mode contemplated by the inventor of carrying out
his invention.

2.      Claim 8 is rejected under 35 U.S.C. 112(a) or 35 U.S.C. 112 (pre-AIA), first paragraph,

as failing to comply with the written description requirement. The claim(s) contains subject

matter which was not described in the specification in such a way as to reasonably convey to one

skilled in the relevant art that the inventor or a joint inventor, or for pre-AIA the inventor(s), at

the time the application was filed, had possession of the claimed invention. The added material

which is not supported by the original disclosure is as follows: " wherein the main support is

only connected to the lower support at end portions of each of the main support and lower

support ". The original filed disclosure does not provide evidence that Applicant possessed these

claim limitations at the time the application was filed.

        An objective standard for determining compliance with the written description

requirement is, "does the description clearly allow persons of ordinary skill in the art to

recognize that he or she invented what is claimed." *In reGosteli*, 872 F.2d 1008, 1012, 10

USPQ2d 1614, 1618 (Fed. Cir. 1989). Under *Vas-Cath, Inc.v. Mahurkar*, 935 F.2d 1555, 1563-

64, 19 USPQ2d 1111, 1117 (Fed. Cir. 1991), to satisfy the written description requirement, an

applicant must convey with reasonable clarity to those skilled in the art that, as of the filing date

Application/Control Number: 16/686,582                                    Page 7
Art Unit: 3786

sought, he or she was in possession of the invention, and that the invention, in that context, is

whatever is now claimed. The test for sufficiency of support in a parent application is whether

the disclosure of the application relied upon "reasonably conveys to the artisan that the inventor

had possession at that time of the later claimed subject matter." *Ralston Purina Co.v.Far-Mar-*

*Co., Inc.*, 772 F.2d 1570, 1575, 227 USPQ 177, 179 (Fed. Cir. 1985) (quoting *In reKaslow*, 707

F.2d 1366, 1375, 217 USPQ 1089, 1096 (Fed. Cir. 1983)).


### *Claim Rejections - 35 USC § 102*

In the event the determination of the status of the application as subject to AIA 35 U.S.C.

102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the

statutory basis for the rejection will not be considered a new ground of rejection if the prior art

relied upon, and the rationale supporting the rejection, would be the same under either status.

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (a)(1) the claimed invention was patented, described in a printed publication, or in public use, on sale,
> or otherwise available to the public before the effective filing date of the claimed invention.


3.      **Claim(s) 1-2, 4-7, 9-12 and 16-17 are rejected under 35 U.S.C. 102(a)(1) as being**

**anticipated by Martin et al. *U.S. Publication No*. (20160008158 A1).**

With respect to claim 1, Martin et al. discloses a cervical collar (100, figs.1-8B) having

an anterior or front component arranged for connecting to a posterior or back component, the

anterior component comprising:

a main support or chin support (104);

Application/Control Number: 16/686,582                                    Page 8
Art Unit: 3786

a lower support (114) hingedly or pivotal connected via (pivotal connection 118) and

[0042] to the main support (138, fig.1D);

a sternum pad (114, fig.1C); and

an adjustment mechanism (108, fig.2) and [0045] and [0052] located on the lower

support and the sternum pad is connected thereto such that the sternum pad is movable relative to

the lower support.

With respect to claim 2, Martin et al. discloses the adjustment mechanism (108) is located

at a lowermost portion of the lower support (as shown in fig.3).

With respect to claim 4, Martin et al. discloses the adjustment mechanism (108) includes

an extension element or height adjustment member (122) variably extendable from the

adjustment mechanism (108). The extension element or height adjustment member extends

through height adjustment aperture (120) and [0047]. The height adjustment aperture 120 may

be an opening through a side portion 116 that permits a height adjustment member 122 to

externally extend through the main collar body 102 and translate through the height adjustment

aperture 120 relative to the main collar body 102 [0047].

With respect to claim 5, Martin et al. discloses the adjustment mechanism includes a dial

(108) for adjusting a distance the extension element or height adjustment member (122) extends

from the adjustment mechanism. The extension element or height adjustment member extends

through height adjustment aperture (120) and [0047]. The extension element or height

adjustment member extends through height adjustment aperture (120) and [0047] and extends

from the adjustment member (108).

With respect to claim 6, Martin et al. discloses the adjustment mechanism (108) includes

a housing (shown in the reproduced image of fig.3 below) arranged for receiving the extension

Application/Control Number: 16/686,582                                    Page 9
Art Unit: 3786

element or height adjustment member (122) in a contracted configuration [0055, The height

adjustment aperture 120 may comprise openings through the main collar body 102 on the side

portions 116. In the embodiments shown, the main collar body 102 comprises two height

adjustment apertures 120, but in other embodiments, one or more than two apertures may be

formed according to the needs of the designer. Height adjustment apertures 120 may beneficially

be formed adjacent to or within the portions of the internal surface 134 having ridges 142. This

may allow the movement of the height adjustment member 122 inward or (contracted) and

outward in the height adjustment aperture 120 to more directly affect the position of the ridges

142 relative to ridges 144 on the chin support member 104 than ridges positioned farther from

the aperture 120].



FIG. 3

Application/Control Number: 16/686,582                                    Page 10
Art Unit: 3786

With respect to claim 7, Martin et al. discloses the main support (104) carries a lock
mechanism (108) for locking rotation of the lower support relative to the main support [0048, in
conjunction with the pivotal connections 118, the chin support member or main support 104 may
thus tilt or rotate along a path defined by travel of the height adjustment members 122 along the
height adjustment apertures 120. The height adjustment members 122 may be prevented from
withdrawal through the height adjustment apertures 120 by interference with the locking
members 108 and/or by tabs extending radially from the end of the members 122. See, e.g., tabs
550 in FIG. 5.

With respect to claim 9, Martin et al. discloses the main support carries an upper support
(200, fig.3) connected to inside the main support and oriented to face a mandible of a user [0059,
padding 200 is attached to main support or chin support 104 shown in fig.2, as such, when
assembled and worn supports the mandible of the user].

With respect to claim 10, Martin et al. discloses the upper support is maintained in a
stationary relationship with the main support (shown in fig.3 when assembled and donned to the
anatomy of the user).

With respect to claim 11, Martin et al. discloses the upper support (200) is rigid (the
support impart some degree of rigidity).

With respect to claim 12, Martin et al. discloses the main support (138, fig.2) has a
generally arcuate configuration adapted to extend about the mandible of a user (as shown in
fig.3), and the lower support (114) has a generally arcuate configuration contoured for being
adapted for securing against a sternum of the user (as shown in fig.3).

With respect to claim 16, Martin et al. discloses a lock mechanism or ridges for locking
rotation of the lower support (114) relative to the main support or chin support (104), the lock

Application/Control Number: 16/686,582                                              Page 11
Art Unit: 3786

mechanism coupled to a slidelock arranged for operatively engaging end portions of the main

support and lower support for locking and unlocking rotation of the lower support relative to the

main support (abstract, as the locking member is moved between locked and unlocked positions,

ridges on a main collar body and on a chin support member may be interlocked or allowed to

slide over each other from one desired position to another) and [0039, ridges may be provided on

opposing surfaces of the chin support member and the main collar body that interlock in a

plurality of positions corresponding to various heights of the front of the chin support member.

These ridges may be made either relatively slidable or relatively immobilized upon movement of

a tensioning member or locking member].

With respect to claim 17, Martin et al. discloses the slidelock defines a central rack of

teeth (142 and 144, an example is shown in fig.4A) arranged to correspond to and operatively

engage elements forming part of the lock mechanism for enabling linear translation of the

slidelock relative to the main support [0050].

With respect to claim 18. The cervical collar of claim 16, wherein the slidelock slides over an

outer surface of the main support to cooperate with the main support to arrest or prevent rotation

of the lower support relative to the main support.


### *Claim Rejections - 35 USC § 103*

In the event the determination of the status of the application as subject to AIA 35 U.S.C.

102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the

statutory basis for the rejection will not be considered a new ground of rejection if the prior art

relied upon, and the rationale supporting the rejection, would be the same under either status.

Application/Control Number: 16/686,582                                    Page 12
Art Unit: 3786

The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness

rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not
> identically disclosed as set forth in section 102, if the differences between the claimed invention and the
> prior art are such that the claimed invention as a whole would have been obvious before the effective
> filing date of the claimed invention to a person having ordinary skill in the art to which the claimed
> invention pertains. Patentability shall not be negated by the manner in which the invention was made.

4.    **Claims 3 and 8 are rejected under 35 U.S.C. 103 as being unpatentable over Martin**

**et al. as applied to claims 1 and 2 above, and further in view of Suarez et al.** *U.S.*

*Publication No.* **(20130281899 A1).**

With respect to claim 3, Martin et al. substantially discloses the invention as claimed

except the adjustment mechanism is located centrally at the lowermost portion of the lower

support.

Suarez et al., however, teaches in an analogous art, a cervical collar (shown in figs.1-2)

comprising a lower support (20) comprising adjustment mechanism or dial (60, figs.1-2) is

located centrally (shown in figs.1-2) at the lowermost portion of the lower support (20).

In view of the teachings of Suarez et al., it would have been obvious to one of ordinary

skill in the art before the effective filing date of the invention to modify the cervical collar of

Martin et al. by positioning the adjustment mechanism is located centrally at the lowermost

portion of the lower support for adjusting to and away from a sternum of a user for improving

comfort and fit of the cervical collar.

With respect to claim 8, the combination of Martin et al./Suarez et al. substantially

discloses the invention as claimed.  Suarez et al. further teaches the main support is only

connected to the lower support at end portions of each of the main support and lower support (as

shown in fig.1).

Application/Control Number: 16/686,582                                    Page 13
Art Unit: 3786

5.      **Claims 19-20 are rejected under 35 U.S.C. 103 as being unpatentable over Martin et**

**al.** *U.S. Publication No.* **(20160008158 A1) in view of Suarez et al.** *U.S. Publication No.*

**(20130281899 A1).**

With respect to claim 19, Martin et al. discloses a cervical collar (100, figs.1-8B) having

an anterior or front component arranged for connecting to a posterior or back component, the

anterior component comprising:

a main support or chin support (104);

a lower support (114) hingedly or pivotal connected via (pivotal connection 118) and

[0042] to the main support (138, fig.1D);

a sternum pad (114, fig.1C); and

an adjustment mechanism (108, fig.2) and [0045] and [0052] located on the lower support the

sternum pad (114) being connected to the adjustment mechanism such that the sternum pad is

movable relative to the lower support [0043, The height of the chin support member 104 may be

referred to as the relative distance between a front portion 124 of the chin support member 104

and a front portion 114 of the main collar body 102. A lower height is a smaller distance between

the front portions 114, 124, and a higher or taller height is a larger distance between them];

the adjustment mechanism (108) including an extension element or height adjustment

member (122) variably extendable from the adjustment mechanism (108) and securing to the

sternum pad; The extension element or height adjustment member extends through height

adjustment aperture (120) and [0047].  The height adjustment aperture 120 may be an opening

through a side portion 116 that permits a height adjustment member 122 to externally extend

through the main collar body 102 and translate through the height adjustment aperture 120

relative to the main collar body 102 [0047]; and a housing (shown in the reproduced image of

Application/Control Number: 16/686,582                                    Page 14
Art Unit: 3786

fig.3 below) arranged for receiving the extension element or height adjustment member (122) in

a contracted configuration [0055, The height adjustment aperture 120 may comprise openings

through the main collar body 102 on the side portions 116. In the embodiments shown, the main

collar body 102 comprises two height adjustment apertures 120, but in other embodiments, one

or more than two apertures may be formed according to the needs of the designer. Height

adjustment apertures 120 may beneficially be formed adjacent to or within the portions of the

internal surface 134 having ridges 142. This may allow the movement of the height adjustment

member 122 inward or (contracted) and outward in the height adjustment aperture 120 to more

directly affect the position of the ridges 142 relative to ridges 144 on the chin support member

104 than ridges positioned farther from the aperture 120].

   Martin et al. substantially discloses the invention as claimed except the adjustment

mechanism is located centrally at the lowermost portion of the lower support.

   Suarez et al., however, teaches in an analogous art, a cervical collar (shown in figs.1-2)

comprising a lower support (20) comprising adjustment mechanism or dial (60, figs.1-2) is

located centrally (shown in figs.1-2) at the lowermost portion of the lower support (20).

   In view of the teachings of Suarez et al., it would have been obvious to one of ordinary

skill in the art before the effective filing date of the invention to modify the cervical collar of

Martin et al. by positioning the adjustment mechanism is located centrally at the lowermost

portion of the lower support for adjusting to and away from a sternum of a user for improving

comfort and fit of the cervical collar.

Application/Control Number: 16/686,582                                    Page 15
Art Unit: 3786



**FIG. 3**

With respect to claim 20, Martin et al. discloses a cervical collar (100, figs.1-8B) having

an anterior or front component arranged for connecting to a posterior or back component, the

anterior component comprising:

a rigid main support or chin support (104) and [0044, chin support comprises a generally

rigid material such as a polymer or composite material];

a lower support (114) hingedly or pivotal connected via (pivotal connection 118) and

[0042] to the main support (138, fig.1D);

a lock mechanism or dial (108) mounted to the rigid main support and arranged for

locking rotation of the lower support (114) relative to the rigid main support or chin support

(104) at the end portions thereof [0048, in conjunction with the pivotal connections 118, the chin

Application/Control Number: 16/686,582                                                    Page 16
Art Unit: 3786

support member or main support 104 may thus tilt or rotate along a path defined by travel of the

height adjustment members 122 along the height adjustment apertures 120. The height

adjustment members 122 may be prevented from withdrawal through the height adjustment

apertures 120 by interference with the locking members 108 and/or by tabs extending radially

from the end of the members 122. See, e.g., tabs 550 in FIG. 5.

     a sternum pad (114, fig.1C); and

an adjustment mechanism (108, fig.2) and [0045] and [0052] located on the lower support the

sternum pad (114) being connected to the adjustment mechanism such that the sternum pad is

movable relative to the lower support [0043, The height of the chin support member 104 may be

referred to as the relative distance between a front portion 124 of the chin support member 104

and a front portion 114 of the main collar body 102. A lower height is a smaller distance between

the front portions 114, 124, and a higher or taller height is a larger distance between them];

     the adjustment mechanism (108) including an extension element or height adjustment

member (122) variably extendable from the adjustment mechanism (108) and securing to the

sternum pad; The extension element or height adjustment member extends through height

adjustment aperture (120) and [0047]. The height adjustment aperture 120 may be an opening

through a side portion 116 that permits a height adjustment member 122 to externally extend

through the main collar body 102 and translate through the height adjustment aperture 120

relative to the main collar body 102 [0047]; and a housing (shown in the reproduced image of

fig.3 below) arranged for receiving the extension element or height adjustment member (122) in

a contracted configuration [0055, The height adjustment aperture 120 may comprise openings

through the main collar body 102 on the side portions 116. In the embodiments shown, the main

collar body 102 comprises two height adjustment apertures 120, but in other embodiments, one

Application/Control Number: 16/686,582                                    Page 17
Art Unit: 3786

or more than two apertures may be formed according to the needs of the designer. Height

adjustment apertures 120 may beneficially be formed adjacent to or within the portions of the

internal surface 134 having ridges 142. This may allow the movement of the height adjustment

member 122 inward or (contracted) and outward in the height adjustment aperture 120 to more

directly affect the position of the ridges 142 relative to ridges 144 on the chin support member

104 than ridges positioned farther from the aperture 120].

Martin et al. substantially discloses the invention as claimed except the adjustment

mechanism is located centrally at the lowermost portion of the lower support.

Suarez et al., however, teaches in an analogous art, a cervical collar (shown in figs.1-2)

comprising a lower support (20) comprising adjustment mechanism or dial (60, figs.1-2) is

located centrally (shown in figs.1-2) at the lowermost portion of the lower support (20).

In view of the teachings of Suarez et al., it would have been obvious to one of ordinary

skill in the art before the effective filing date of the invention to modify the cervical collar of

Martin et al. by positioning the adjustment mechanism is located centrally at the lowermost

portion of the lower support for **adjusting to and away from a sternum of a user for improving**

**comfort and fit of the cervical collar.**

Application/Control Number: 16/686,582                                    Page 18
Art Unit: 3786



FIG. 3

### Allowable Subject Matter

6.      Claims 13-15 are objected to as being dependent upon a rejected base claim, but would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims.

### Reasons for Allowance

The following is an examiner's statement of reasons for allowance:

The closest prior art of record fails to show or make obvious the claimed combinations of elements particularly the limitations as set forth in dependent claims and 13-15 which recite features not taught or suggested by the prior art of record.

Application/Control Number: 16/686,582                                    Page 19
Art Unit: 3786

The prior art of record fails to disclose or fairly suggest the sternum pad is mounted to a ball joint and the adjustment mechanism has an adjustment dial and an extension element arranged for adjustably extending relative to the lower support and wherein the adjustment mechanism includes a housing arranged for receiving an extension element in a contracted configuration resulting in a reduced or substantially minimized distance between the lower support and the sternum pad, the extension element having a screw thread, and the housing defining corresponding threads permitting slidable movement between the extension element and the screw thread according to adjustment of a dial associated with the extension element, in combination with the other elements (or steps) of the apparatus and method recited in the claims.

Accordingly, a prima facie case of obviousness or an anticipation rejection cannot be established with respect to the claimed subject matter as set forth in claims 13-14.

7.    Claim 15 is allowed insofar as they depend from the allowed base claim 14.


*Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to OPHELIA ALTHEA HAWTHORNE whose telephone number is (571)270-3860. The examiner can normally be reached M-F 8:00 AM-5:00 PM, EST.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

Application/Control Number: 16/686,582                                           Page 20
Art Unit: 3786

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Alireza Nia can be reached on 5712703076. The fax phone number for the

organization where this application or proceeding is assigned is 571-273-8300.

    Information regarding the status of published or unpublished applications may be

obtained from Patent Center. Unpublished application information in Patent Center is available

to registered users. To file and manage patent submissions in Patent Center, visit:

https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-center for more

information about Patent Center and https://www.uspto.gov/patents/docx for information about

filing in DOCX format. For additional questions, contact the Electronic Business Center (EBC)

at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service

Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/OPHELIA A HAWTHORNE/
Primary Examiner, Art Unit 3786

| | | | | | | |
|---|---|---|---|---|---|---|
| *Notice of References Cited* | | | Application/Control No.<br>16/686,582 | | Applicant(s)/Patent Under<br>Reexamination<br>CALCO et al. | |
| | | | Examiner<br>OPHELIA A HAWTHORNE | | Art Unit<br>3786 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| * | A | US-20160008158-A1 | 01-2016 | Martin; Michael L. | A61F5/055 | 602/18 |
| * | B | US-20130281899-A1 | 10-2013 | Suarez; Daniel | A61F5/055 | 602/18 |
| | C | | | | | |
| | D | | | | | |
| | E | | | | | |
| | F | | | | | |
| | G | | | | | |
| | H | | | | | |
| | I | | | | | |
| | J | | | | | |
| | K | | | | | |
| | L | | | | | |
| | M | | | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | CPC Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    **Notice of References Cited**                    Part of Paper No. *20220202*

| Index of Claims | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 16/686,582 | CALCO et al. |
| | Examiner | Art Unit |
| | OPHELIA A HAWTHORNE | 3786 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| CLAIMS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ☐ Claims renumbered in the same order as presented by applicant | | | | ☐ CPA | ☐ T.D. | ☐ R.1.47 | | | |

| CLAIM | | DATE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Final | Original | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 16/686,582 | CALCO et al. |
| | Examiner | Art Unit |
| | OPHELIA A HAWTHORNE | 3786 |

**CPC - Searched\***

| Symbol | Date | Examiner |
|---|---|---|
| (A61F5/055 OR A61F5/05883 OR A61F2250/0004 OR A61F5/3707 OR A61F5/05891 OR A61F2007/0011) | 02/02/2022 | OH |
| A61F5/055 | 02/02/2022 | OH |
| A61F5/05883 | 02/02/2022 | OH |
| A61F5/012 | 02/02/2022 | OH |
| A42B3/0473 | 02/02/2022 | OH |
| A61F13/12 | 02/02/2022 | OH |
| A61F5/028 | 02/02/2022 | OH |
| A61F5/3707 | 02/02/2022 | OH |
| A61F13/128 | 02/02/2022 | OH |
| A61F5/05816 | 02/02/2022 | OH |
| | | |

**CPC Combination Sets - Searched\***

| Symbol | Date | Examiner |
|---|---|---|
| | | |

**US Classification - Searched\***

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

\* See search history printout included with this form or the SEARCH NOTES box below to determine the scope of the search.

| /O.A.H/ Primary Examiner, Art Unit 3786 | |
|---|---|
| | |

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 16/686,582 | CALCO et al. |
| | Examiner | Art Unit |
| | OPHELIA A HAWTHORNE | 3786 |

| Search Notes | | |
|---|---|---|
| Search Notes | Date | Examiner |
| SEARCHED CPC SYMBOLS | 02/02/2022 | OH |
| CURSORY SEARCH | 02/02/2022 | OH |
| CONSIDER IDS | 02/02/2022 | OH |
| INVENTOR NAME SEARCH | 02/02/2022 | OH |

| Interference Search | | | |
|---|---|---|---|
| US Class/CPC Symbol | US Subclass/CPC Group | Date | Examiner |
| | | | |

| /O.A.H/<br>Primary Examiner, Art Unit 3786 | |
|---|---|
| | |

U.S. Patent and Trademark Office

Part of Paper No.: 20220202

16/686,582 – GAU: 3786

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | 16686582 | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | 3786 | |
| Examiner Name | /OPHELIA A HAWTHORNE/ | |
| Attorney Docket Number | 19793.488.1.1 | |

**U.S.PATENTS** [Remove]

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 10675173 | B2 | 2020-06-09 | THORSTEINSDOTTIR et al. | Equivalent to CN105120808 |

If you wish to add additional U.S. Patent citation information please click the Add button. [Add]

**U.S.PATENT APPLICATION PUBLICATIONS** [Remove]

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20130310722 | A1 | 2013-11-21 | THORSTEINSDOTTIR et al. | Equivalent to CN105120808 |
| | 2 | 20160008158 | A1 | 2016-01-14 | MARTIN et al. | Cited in the Chinese Office Action |
| | 3 | 20170252198 | A1 | 2017-09-07 | THORSTEINSDOTTIR et al. | Equivalent to CN105120808 |
| | 4 | 20200281754 | A1 | 2020-09-10 | THORSTEINSDOTTIR et al. | Equivalent to CN105120808 |

If you wish to add additional U.S. Published Application citation information please click the Add button. [Add]

**FOREIGN PATENT DOCUMENTS** [Remove]

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2]i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | | Application Number | 16686582 | | | | |
| | | | Filing Date | 2019-11-18 | | | | |
| | | | First Named Inventor | Wayne CALCO | | | | |
| | | | Art Unit | 3786 | | | | |
| | | | Examiner Name | | | | | |
| | | | Attorney Docket Number | 19793.488.1.1 | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 204655220 | CN | U | 2015-09-23 | HENGSHUI TIANJIAN MEDICAL APPLIANCES CO., LTD | Cited in the Chinese Office Action | ☒ |
| | 2 | 105120808 | CN | A | 2015-12-02 | OSSUR HF | Cited in the Chinese Office Action | ☒ |

| If you wish to add additional Foreign Patent Document citation information please click the Add button | Add |
|---|---|

**NON-PATENT LITERATURE DOCUMENTS**    Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|
| | 1 | Office Action from corresponding CN Application No. 201780057654.X, October 29, 2020. | ☒ |

| If you wish to add additional non-patent literature document citation information please click the Add button | Add |
|---|---|

**EXAMINER SIGNATURE**

| Examiner Signature | /OPHELIA A HAWTHORNE/ | Date Considered | 02/12/2022 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 16686582 |
| --- | --- | --- |
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | 3786 |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Justin J. Cassell/ | Date (YYYY-MM-DD) | 2021-03-01 |
| --- | --- | --- | --- |
| Name/Print | Justin J. Cassell | Registration Number | 46205 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.18          ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.     The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.     A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.     A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.     A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.     A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.     A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.     A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.     A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.     A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.1.18                ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

Page 1 of 1



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

## BIB DATA SHEET

**CONFIRMATION NO. 4587**

| SERIAL NUMBER | FILING or 371(c) DATE | CLASS | GROUP ART UNIT | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 16/686,582 | 11/18/2019 | 602 | 3786 | 19793.488.1.1 |
| | **RULE** | | | |

**APPLICANTS**
  Ossur Iceland ehf, Reykjavik, ICELAND;

**INVENTORS**
  Wayne CALCO, Foothill Ranch, CA;
  Christopher Callicott WEBSTER, Foothill Ranch, CA;
  Harry Duane ROMO, Foothill Ranch, CA;

**\*\* CONTINUING DATA \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
  This application is a CON of 15/442,029 02/24/2017 PAT 10512559
    which claims benefit of 62/299,766 02/25/2016

**\*\* FOREIGN APPLICATIONS \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**\*\* IF REQUIRED, FOREIGN FILING LICENSE GRANTED \*\***
  12/05/2019

| Foreign Priority claimed ☐ Yes ☑ No | ☐ Met after Allowance | STATE OR COUNTRY | SHEETS DRAWINGS | TOTAL CLAIMS | INDEPENDENT CLAIMS |
|---|---|---|---|---|---|
| 35 USC 119(a-d) conditions met ☐ Yes ☑ No | OAH | | | | |
| Verified and Acknowledged  /OPHELIA ALTHEA HAWTHORNE/  Examiner's Signature | Initials | CA | 20 | 20 | 2 |

**ADDRESS**
  Workman Nydegger
  60 East South Temple
  Suite 1000
  Salt Lake City, UT 84111
  UNITED STATES

**TITLE**
  CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT

| FILING FEE RECEIVED 1720 | FEES: Authority has been given in Paper No._____ to charge/credit DEPOSIT ACCOUNT No._____ for following: | ☐ All Fees |
|---|---|---|
| | | ☐ 1.16 Fees (Filing) |
| | | ☐ 1.17 Fees (Processing Ext. of time) |
| | | ☐ 1.18 Fees (Issue) |
| | | ☐ Other _____ |
| | | ☐ Credit |

BIB (Rev. 05/07).

16/686,582 – GAU: 3786

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-10)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | /OPHELIA A HAWTHORNE/ | |
| Attorney Docket Number | 19793.488.1.1 | |

| U.S.PATENTS | | | | | | Remove |
|---|---|---|---|---|---|---|

| Examiner Initial* | Cite No | Patent Number | Kind Code¹ | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 2801630 | | 1957-08-06 | MOORE | |
| | 2 | 2818063 | | 1957-12-31 | SMITH et al. | |
| | 3 | 2820455 | | 1958-01-21 | HALL | |
| | 4 | 2911970 | | 1959-11-10 | BARTELS | |
| | 5 | 3024784 | | 1962-03-13 | MONFARDINI | |
| | 6 | 3042027 | | 1962-07-03 | MONFARDINI | |
| | 7 | 3285243 | | 1966-11-15 | YELLIN | Cited in EP Search Report |
| | 8 | 3285244 | | 1966-11-15 | COTTRELL | |

EFS Web 2.1.17    ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | | | | | |
|---|---|---|---|---|---|
| | 9 | 3306284 | 1967-02-28 | McKINLEY | |
| | 10 | 3320950 | 1967-05-23 | MCELVENNY | |
| | 11 | 3504667 | 1970-04-07 | McFARLANE | |
| | 12 | 3512523 | 1970-05-19 | BARNETT | |
| | 13 | 3756226 | 1973-09-04 | CALABRESE et al. | |
| | 14 | 3916885 | 1975-11-04 | GAYLORD, JR. | |
| | 15 | 4173973 | 1979-11-13 | HENDRICKS | |
| | 16 | 4205667 | 1980-06-03 | GAYLORD, JR. | |
| | 17 | 4325363 | 1982-04-20 | BERKELEY | |
| | 18 | 4401111 | 1983-08-30 | BLACKSTONE | |
| | 19 | 4413619 | 1983-11-08 | GARTH | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 — GAU: 3786

| | | | | | |
|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | | |
| | Filing Date | 2019-11-18 | |
| | First Named Inventor | Wayne CALCO | |
| | Art Unit | | |
| | Examiner Name | | |
| | Attorney Docket Number | 19793.488.1.1 | |

| | | | | | |
|---|---|---|---|---|---|
| | 20 | 4520801 | 1985-06-04 | LERMAN | |
| | 21 | 4538597 | 1985-09-03 | LERMAN | Cited in EP Search Report |
| | 22 | 4562833 | 1986-01-07 | PUJALS, JR. | |
| | 23 | 4677969 | 1987-07-07 | CALABRESE | |
| | 24 | 4708129 | 1987-11-24 | PUJALS, JR. | |
| | 25 | 4712540 | 1987-12-15 | TUCKER et al. | |
| | 26 | 4745922 | 1988-05-24 | TAYLOR | |
| | 27 | 4854306 | 1989-08-08 | PUJALS, JR. | |
| | 28 | 4886052 | 1989-12-12 | CALABRESE | |
| | 29 | 4940043 | 1990-07-10 | BURNS et al. | |
| | 30 | 4987891 | 1991-01-29 | GAYLORD, JR., et al. | |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| | | | | | |
|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | Application Number | | | |
| | | Filing Date | 2019-11-18 | | |
| | | First Named Inventor | Wayne CALCO | | |
| | | Art Unit | | | |
| | | Examiner Name | | | |
| | | Attorney Docket Number | 19793.488.1.1 | | |

| | | | | | |
|---|---|---|---|---|---|
| | 31 | 5005563 | 1991-04-09 | VEALE | |
| | 32 | 5038759 | 1991-08-13 | MORGENSTERN | |
| | 33 | 5058572 | 1991-10-22 | SCHMID et al. | |
| | 34 | 5097824 | 1992-03-24 | GARTH | |
| | 35 | 5156588 | 1992-10-20 | MARCUNE et al. | |
| | 36 | 5180361 | 1993-01-19 | MOORE et al. | |
| | 37 | 5215517 | 1993-06-01 | STEVENSON et al. | |
| | 38 | 5230698 | 1993-07-27 | GARTH | |
| | 39 | 5275581 | 1994-01-04 | BENDER | |
| | 40 | 5302170 | 1994-04-12 | TWEARDY | |
| | 41 | RE34714 | 1994-08-30 | BURNS et al. | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 — GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | | | | | |
|---|---|---|---|---|---|
| | 42 | 5346461 | 1994-09-13 | HEINZ et al. | Equivalent to WO 94/09728 |
| | 43 | 5366438 | 1994-11-22 | MARTIN, SR. | |
| | 44 | 5385535 | 1995-01-31 | McGUINNESS | |
| | 45 | 5433696 | 1995-07-18 | OSTI | |
| | 46 | 5437612 | 1995-08-01 | MOORE et al. | |
| | 47 | 5437617 | 1995-08-01 | HEINZ et al. | Equivalent to WO 94/09728 |
| | 48 | 5445602 | 1995-08-29 | GRIM et al. | |
| | 49 | D368527 | 1996-04-02 | BROOKE | |
| | 50 | D369660 | 1996-05-07 | MYOGA | |
| | 51 | 5520619 | 1996-05-28 | MARTIN | Equivalent to WO 95/22304 |
| | 52 | RE35290 | 1996-07-02 | DRUSKOCZI | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| | INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 |
| First Named Inventor | Wayne CALCO |
| Art Unit | |
| Examiner Name | |
| Attorney Docket Number | 19793.488.1.1 |

| | 53 | 5588957 | | 1996-12-31 | MARTIN, SR. | |
|---|---|---|---|---|---|---|
| | 54 | 5593382 | | 1997-01-14 | RUDY, JR. et al. | |
| | 55 | 5622529 | | 1997-04-22 | CALABRESE | |
| | 56 | 5624387 | | 1997-04-29 | McGUINNESS | |
| | 57 | D379232 | | 1997-05-13 | BROOKE | |
| | 58 | 5632722 | | 1997-05-27 | TWEARDY et al. | Cited in Specification |
| | 59 | 5688229 | | 1997-11-18 | BAUER | |
| | 60 | 5716335 | | 1998-02-10 | IGLESIAS et al. | |
| | 61 | 5728054 | | 1998-03-17 | MARTIN | Equivalent to WO 95/22304 |
| | 62 | D393718 | | 1998-04-21 | TRAUT et al. | |
| | 63 | 5785670 | | 1998-07-28 | HIEBERT | |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | | | | | |
|---|---|---|---|---|---|
| | 64 | 5788658 | 1998-08-04 | ISLAVA | |
| | 65 | 5795315 | 1998-08-18 | TRAUT et al. | |
| | 66 | 5797713 | 1998-08-25 | TWEARDY et al. | |
| | 67 | 5797863 | 1998-08-25 | KOHNKE | |
| | 68 | RE35940 | 1998-10-27 | HEINZ et al. | Equivalent to WO 94/09728 |
| | 69 | 5865773 | 1999-02-02 | KOLEDIN | |
| | 70 | 5904662 | 1999-05-18 | MYOGA | |
| | 71 | 5934599 | 1999-08-10 | HAMMERSLAG | Equivalent to JP 2007-330808 Cited in Specification |
| | 72 | 5964722 | 1999-10-12 | GORALNIK et al. | |
| | 73 | 5976098 | 1999-11-02 | SEREBOFF | |
| | 74 | 5993403 | 1999-11-03 | MARTIN | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 -- GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | | | | | |
|---|---|---|---|---|---|
| | 75 | 6027467 | 2000-02-22 | NAKAMURA et al. | |
| | 76 | 6036664 | 2000-03-14 | MARTIN, SR. et al. | Equivalent to WO 96/40018 |
| | 77 | 6045523 | 2000-04-04 | DONALDSON | |
| | 78 | D422710 | 2000-04-11 | MAYNARD | |
| | 79 | 6050965 | 2000-04-18 | PILLAI | |
| | 80 | 6056711 | 2000-05-02 | DOMAMSKI et al. | |
| | 81 | 6058517 | 2000-05-09 | HARTUNIAN | |
| | 82 | 6071255 | 2000-06-06 | CALABRESE | |
| | 83 | 6071256 | 2000-06-06 | LAM | |
| | 84 | RE36745 | 2000-06-20 | RUDY, JR. et al. | |
| | 85 | 6090058 | 2000-07-18 | TRAUT et al. | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| | | | | | | |
|---|---|---|---|---|---|---|
| | | **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | | | |
| | | | Filing Date | | 2019-11-18 | |
| | | | First Named Inventor | | Wayne CALCO | |
| | | | Art Unit | | | |
| | | | Examiner Name | | | |
| | | | Attorney Docket Number | | 19793.488.1.1 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 86 | 6165146 | | 2000-12-26 | GIEBELER | |
| | 87 | 6183501 | B1 | 2001-02-06 | LATHAM | |
| | 88 | 6202953 | B1 | 2001-03-20 | HAMMERSLAG | Equivalent to JP 2007-330808 Cited in Specification |
| | 89 | 6245033 | B1 | 2001-06-12 | MARTIN | |
| | 90 | 6254560 | B1 | 2001-07-03 | TWEARDY et al. | Cited in Specification |
| | 91 | 6308345 | B1 | 2001-10-30 | WILLIAMS, JR. | |
| | 92 | 6423020 | B1 | 2002-07-23 | KOLEDIN | |
| | 93 | 6458090 | B1 | 2002-10-01 | WALPIN | |
| | 94 | 6494854 | B1 | 2002-12-17 | VISNESS et al. | |
| | 95 | D475139 | S | 2003-05-27 | MYOGA | |
| | 96 | 6663581 | B1 | 2003-12-16 | CALABRESE | |

EFS Web 2.1.17       ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 97 | 6663630 | B2 | 2003-12-16 | FARLEY et al. | |
| | 98 | 6726643 | B1 | 2004-04-27 | MARTIN | |
| | 99 | 6740055 | B2 | 2004-05-25 | DOMINGUEZ | |
| | 100 | 6770046 | B2 | 2004-08-03 | HANSEN | |
| | 101 | 6872188 | B2 | 2005-03-29 | CAILLE et al. | |
| | 102 | 6913584 | B2 | 2005-07-05 | RUDY, JR. et al. | |
| | 103 | 6921376 | B2 | 2005-07-26 | TWEARDY et al. | Cited in Specification |
| | 104 | 6926686 | B2 | 2005-08-09 | CHEATHAM | |
| | 105 | 7018351 | B1 | 2006-03-28 | IGLESIAS et al. | |
| | 106 | 7041073 | B1 | 2006-05-09 | PATRON | |
| | 107 | 7070573 | B2 | 2006-07-04 | AXELSSON | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 108 | 7090652 | B2 | 2006-08-15 | SANTELLI, JR. | |
| | 109 | 7090653 | B2 | 2006-08-15 | MOELLER | |
| | 110 | 7128724 | B2 | 2006-10-31 | MARSH | |
| | 111 | 7141031 | B2 | 2006-11-28 | GARTH et al. | |
| | 112 | 7198610 | B2 | 2007-04-03 | INGIMUNDARSON et al. | Cited in Specification |
| | 113 | D542919 | S | 2007-05-15 | LEATT | |
| | 114 | 7258677 | B2 | 2007-08-21 | RUDY, JR. et al. | |
| | 115 | 7291121 | B2 | 2007-11-06 | RUDY, JR. et al. | |
| | 116 | 7297127 | B2 | 2007-11-20 | LEE et al. | |
| | 117 | 7311686 | B1 | 2007-12-25 | IGLESIAS et al. | |
| | 118 | 7371221 | B1 | 2008-05-13 | BAKER | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| | | | | | | |
|---|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | Application Number | | | | |
| | | Filing Date | | 2019-11-18 | | |
| | | First Named Inventor | | Wayne CALCO | | |
| | | Art Unit | | | | |
| | | Examiner Name | | | | |
| | | Attorney Docket Number | | 19793.488.1.1 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 119 | 7371222 | B2 | 2008-05-13 | HEINZ et al. | |
| | 120 | 7399288 | B2 | 2008-07-15 | CHAO | |
| | 121 | D616555 | S | 2010-05-25 | THORGILSDOTTIR et al. | |
| | 122 | D616996 | S | 2010-06-01 | THORGILSDOTTIR et al. | |
| | 123 | D616997 | S | 2010-06-01 | THORGILSDOTTIR et al. | |
| | 124 | 7815585 | B2 | 2010-10-19 | VOLLBRECHT | |
| | 125 | 7896827 | B2 | 2011-03-01 | INGIMUNDARSON et al. | |
| | 126 | 7981068 | B2 | 2011-07-19 | THORGILSDOTTIR et al. | Cited in Specification |
| | 127 | 8038636 | B2 | 2011-10-18 | THORGILSDOTTIR et al. | Cited in Specification |
| | 128 | 5060637 | | 1991-10-29 | SCHMID et al. | |
| | 129 | 3050052 | | 1962-08-21 | S. GRASSL | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

| | 130 | 4827915 | | 1989-05-09 | GORSEN | |
|---|---|---|---|---|---|---|
| | 131 | 9713546 | B2 | 2017-07-25 | THORSTEINSDOTTIR et al. | |

| If you wish to add additional U.S. Patent citation information please click the Add button. | Add |
|---|---|
| | Remove |

**U.S. PATENT APPLICATION PUBLICATIONS**

| Examiner Initial* | Cite No | Publication Number | Kind Code¹ | Publication Date | Name of Patentee or Applicant of cited Document | Pages, Columns, Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20020138028 | A1 | 2002-09-26 | RUDY, JR. et al. | |
| | 2 | 20020156408 | A1 | 2002-10-24 | CHEATHAM | |
| | 3 | 20020156409 | A1 | 2002-10-24 | LEE et al. | |
| | 4 | 20020169401 | A1 | 2002-11-14 | WALPIN | |
| | 5 | 20020173737 | A1 | 2002-11-21 | MIYAJI et al. | |
| | 6 | 20030055367 | A1 | 2003-03-20 | DOMINGUEZ | |
| | 7 | 20030060744 | A1 | 2003-03-27 | CAILLE et al. | |

EFS Web 2.1.17          ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | | | | | |
|---|---|---|---|---|---|
| 8 | 20030181838 | A1 | 2003-09-25 | GARTH | |
| 9 | 20040039318 | A1 | 2004-02-26 | SANTELLI, JR. | |
| 10 | 20050101896 | A1 | 2005-05-12 | CALABRESE | |
| 11 | 20070027418 | A1 | 2007-02-01 | CALCO et al. | |
| 12 | 20070073203 | A1 | 2007-03-29 | MOENNING et al. | |
| 13 | 20070270728 | A1 | 2007-11-22 | CHAO | |
| 14 | 20090247918 | A1 | 2009-10-01 | PATRON | |
| 15 | 20100137768 | A1 | 2010-06-03 | THORGILSDOTTIR et al. | |
| 16 | 20100268139 | A1 | 2010-10-21 | GARTH | |
| 17 | 20110066094 | A1 | 2011-03-17 | THORGILSDOTTIR et al. | |
| 18 | 20180078400 | A1 | 2018-03-22 | HSU et al. | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| | | | | | | |
|---|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | | | | | |
| | Filing Date | | 2019-11-18 | | | |
| | First Named Inventor | | Wayne CALCO | | | |
| | Art Unit | | | | | |
| | Examiner Name | | | | | |
| | Attorney Docket Number | | 19793.488.1.1 | | | |

| | 19 | 20180078401 | A1 | 2018-03-22 | HSU et al. | |
|---|---|---|---|---|---|---|

If you wish to add additional U.S. Published Application citation information please click the Add button. | Add |

**FOREIGN PATENT DOCUMENTS** | Remove |

| Examiner Initial* | Cite No | Foreign Document Number³ | Country Code²ⁱ | Kind Code⁴ | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T⁵ |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 165 157 | GB | A | 1986-04-09 | CHARLES GRIENER and COMPANY INC. | | |
| | 2 | 94/09728 | WO | A1 | 1994-05-11 | BIO CYBERNETICS INTERNATIONAL | | |
| | 3 | 95/22304 | WO | A1 | 1995-08-24 | AMBU INC. | | |
| | 4 | 96/40018 | WO | A1 | 1996-12-19 | AMBU INC | | |
| | 5 | 2 814 362 | FR | A1 | 2002-03-29 | PASCO BRUNO | | ☒ |
| | 6 | 100 57 286 | DE | A1 | 2002-05-29 | OPED AG STEINHAUSEN | | ☒ |
| | 7 | 2007-330808 | JP | A | 2007-12-27 | HAMMERSLAG | | ☒ |
| | 8 | 2 453 996 | GB | A | 2009-04-29 | LYSGEAR LIMITED | | ☐ |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

**-1334-**

16/686,582 – GAU: 3786

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | | | | | | |
| | Filing Date | | 2019-11-18 | | | | |
| | First Named Inventor | | Wayne CALCO | | | | |
| | Art Unit | | | | | | |
| | Examiner Name | | | | | | |
| | Attorney Docket Number | | 19793.488.1.1 | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 9 | 1646071 | CN | A | 2005-07-27 | CALABRESE | | ☒ |
| 10 | 201150587 | CN | Y | 2008-11-19 | HOU | | ☒ |

If you wish to add additional Foreign Patent Document citation information please click the Add button   **Add**

## NON-PATENT LITERATURE DOCUMENTS   **Remove**

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T⁵ |
|---|---|---|---|
| | 1 | Levangie et al., "Joint Structure and Function: A Comprehensive Analysis", Fourth Edition,Chapter 4: The Vertebral Column, 2005 F.A. Davis Company, Philadelphia, PA, pp. 161-164. | |
| | 2 | HSU et al., "AAOS Atlas of Orthoses and Assistive Devices, Mosby, Elsevier Fourth Edition, 2008, Philadelphia, PA, pg. 117-122. | |
| | 3 | Product Information Sheet, Philadelphia Tracheotomy Collar, obtained from www.ossur.com, prior to August 6, 2010, 1 page. | |
| | 4 | Product Information Sheet, Platazote Sheets, WBC Industries, obtained from www.wbcindustries.com prior to August 6, 2010, 2 pages. | |

If you wish to add additional non-patent literature document citation information please click the Add button   **Add**

## EXAMINER SIGNATURE

| Examiner Signature | /OPHELIA A HAWTHORNE/ | Date Considered | 02/12/2022 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

¹ See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. ² Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). ³ For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. ⁴ Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. ⁵ Applicant is to place a check mark here if English language translation is attached.

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
| --- | --- | --- |
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

✕ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Justin J. Cassell/ | Date (YYYY-MM-DD) | 2019-11-18 |
| --- | --- | --- | --- |
| Name/Print | Justin J. Cassell/ | Registration Number | 46,205 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent.  Accordingly, pursuant to the requirements of the Act, please be advised that:  (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent.  If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a).  Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906.  Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive.  Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151.  Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (03-15)
Approved for use through 07/31/2016. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | | 2019-11-18 |
| First Named Inventor | | Wayne CALCO |
| Art Unit | | |
| Examiner Name | | /OPHELIA A HAWTHORNE/ |
| Attorney Docket Number | | 19793.488.1.1 |

| U.S.PATENTS | | | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code¹ | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 2088207 | | 1937-07-27 | H.A. KAISER | |
| | 2 | 2102069 | | 1937-12-14 | P.W. HANICKE | |
| | 3 | 2791999 | | 1954-05-14 | C. BUSTAMANTE | |
| | 4 | 2735424 | | 1953-02-21 | M.J. BENJAMIN | |
| | 5 | 2801630 | | 1957-08-06 | A.R. MOORE | |
| | 6 | 2806471 | | 1957-11-17 | A.H. BREESE | |
| | 7 | D188302 | | 1960-06-28 | MONFARDINI | |
| | 8 | 3027894 | | 1962-04-03 | A.R. MOORE | |

EFS Web 2.1.17          ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | 9 | 3060930 | 1962-10-30 | S. GRASSL | |
|---|---|---|---|---|---|
| | 10 | 3075521 | 1963-01-29 | S. GRASSL | |
| | 11 | 3135256 | 1964-06-02 | E.J. GRUBER | |
| | 12 | 3177869 | 1965-04-13 | W.L. BARTELS | |
| | 13 | D203018 | 1965-11-23 | HELFERICH | |
| | 14 | 3313297 | 1967-04-11 | L.T APPLEGATE et al. | |
| | 15 | 3916884 | 1975-11-04 | ATTENBURROW | |
| | 16 | 4099523 | 1978-07-11 | LOWREY | |
| | 17 | 4582051 | 1986-04-15 | GREENE et al. | |
| | 18 | 4643174 | 1987-02-17 | HORIUCHI | |
| | 19 | 4955368 | 1990-09-11 | HEIMANN | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | | | | | |
|---|---|---|---|---|---|
| 20 | 5201702 | | 1993-04-13 | MARS | |
| 21 | 5632722 | | 1997-05-27 | TWEARDY et al. | |
| 22 | 6045522 | | 2000-04-04 | GROBER | |
| 23 | RE36745 | | 2000-06-20 | RUDY, JR. et al. | |
| 24 | 6289558 | B1 | 2001-11-18 | HAMMERSLAG | Cited in Specification |
| 25 | 6315746 | B1 | 2001-11-13 | GARTH et al. | |
| 26 | 6632722 | B2 | 2003-10-14 | FUJIWARA et al. | Cited in Specification |
| 27 | 6733469 | B2 | 2004-05-11 | MIYAJI et al. | |
| 28 | 7442176 | B2 | 2008-10-28 | COJBASIC | |
| 29 | 7674234 | B2 | 2010-03-09 | CALCO et al. | |
| 30 | 7846117 | B2 | 2010-12-07 | LEATT et al. | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

| | 31 | 7878995 | B2 | 2011-02-01 | HARTY | |
|---|---|---|---|---|---|---|
| | 32 | 7992261 | B2 | 2011-08-09 | HAMMERSLAG et al. | Cited in Specification |
| | 33 | 8038635 | B2 | 2011-10-18 | DELLANNO | |
| | 34 | D647623 | S | 2011-10-25 | THORGILSDOTTIR et al. | |
| | 35 | 8216167 | B2 | 2012-07-10 | GARTH et al. | |
| | 36 | 8257292 | B2 | 2012-09-04 | LINARES | |
| | 37 | D666302 | S | 2012-08-28 | JOSEPH | |
| | 38 | 8545423 | B2 | 2013-08-01 | PATRON | |
| | 39 | 8679044 | B2 | 2014-03-25 | THORGILSDOTTIR et al. | Cited in Specification |
| | 40 | 8932243 | B2 | 2015-01-13 | CALABRESE | |
| | 41 | 9132027 | B2 | 2015-09-15 | CALCO | |

EFS Web 2.1.17      ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
| --- | --- | --- |
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 19793.488.1.1 |

| If you wish to add additional U.S. Patent citation information please click the Add button. | | Add |
| --- | --- | --- |
| | | Remove |

### U.S.PATENT APPLICATION PUBLICATIONS

| Examiner Initial* | Cite No | Publication Number | Kind Code¹ | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| --- | --- | --- | --- | --- | --- | --- |
| | 1 | 20070027418 | A1 | 2007-02-01 | CALCO et al. | |
| | 2 | 20100298748 | A1 | 2010-11-25 | ROSENFELD et al. | |
| | 3 | 20120053499 | A1 | 2012-03-01 | DONALDSON et al. | |
| | 4 | 20120130295 | A1 | 2012-05-24 | HAIDER | |
| | 5 | 20120165712 | A1 | 2012-06-28 | CALABRESE | |
| | 6 | 20130060179 | A1 | 2013-03-07 | MODGLIN | |
| | 7 | 20130281900 | A1 | 2013-10-24 | SUAREZ et al. | |
| | 8 | 20140012172 | A1 | 2014-01-09 | CALCO | |
| | 9 | 20110224591 | A1 | 2011-09-15 | THORGILSDOTTIR et al. | Equivalent to CN102227196 |

EFS Web 2.1.17          ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2019-11-18 | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 19793.488.1.1 | |

| | 10 | 20140107551 | A1 | 2014-04-17 | MODGLIN | |
|---|---|---|---|---|---|---|
| | 11 | 20140323938 | A1 | 2014-10-30 | SUAREZ et al. | |
| | 12 | 20130310722 | A1 | 2013-11-21 | THORSTEINSDOTTIR et al. | Cited in Specification |
| | 13 | 20160287424 | A1 | 2016-10-06 | WEBSTER et al. | Cited in Specification |

If you wish to add additional U.S. Published Application citation information please click the Add button. | Add |

| FOREIGN PATENT DOCUMENTS | | | | | | | Remove |
|---|---|---|---|---|---|---|---|

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2]i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | 19547115 | DE | A1 | 1997-06-19 | FERD. HAUBER GMBH & CO KG | | ☒ |
| | 2 | 9843568 | WO | A1 | 1998-10-08 | FEINGOLD | | ☐ |
| | 3 | 19849302 | DE | A1 | 2000-04-20 | LAZIK | | ☒ |
| | 4 | 1738724 | EP | A1 | 2007-01-03 | BARCELONA ORTHOPEDIC NECKLACE S.L | | ☐ |
| | 5 | 201602923 | CN | U | 2010-10-13 | HIGH CHEN INDUSTRIAL CO., LTD | | ☒ |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

| | | | | | | |
|---|---|---|---|---|---|---|
| | Application Number | | | | | |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Filing Date | | 2019-11-18 | | | |
| | First Named Inventor | | Wayne CALCO | | | |
| | Art Unit | | | | | |
| | Examiner Name | | | | | |
| | Attorney Docket Number | | 19793.488.1.1 | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 6 | 202015274 | CN | U | 2011-10-26 | LAI ZHIJIA | | ☒ |
| | 7 | 2014102340 | WO | A1 | 2014-07-03 | CERVRITE AB | | ☐ |
| | 8 | 2933343 | CN | Y | 2007-08-15 | ZHAO JIACHANG | | ☒ |
| | 9 | 102227196 | CN | A | 2011-10-26 | OSSUR HF | | ☒ |

If you wish to add additional Foreign Patent Document citation information please click the Add button   [Add] [Remove]

**NON-PATENT LITERATURE DOCUMENTS**

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|
| | 1 | "Range-of-Motion Restriction and Craniofacial Tissue-Interface Pressure From Four Cervical Collars", The Journal of Trauma Injury, Infection, and Critical Care, Vol. 63, No. 5, November 2007, Pages 1120-1126. | |
| | 2 | "Ossur Is Immobilization", www.ossur.com, 2008, Pages 1-16. | |
| | 3 | "Miami J Patient Care Handbook", www.ossur.com, 2010, Pages 1-16. | |
| | 4 | Jacobson et al. "Improving Practice Efforts to Reduce Occipital Pressure Ulcers", Journal of Nursing Care Quality, Vol. 23, No. 3, 2008, Pages 283-288. | |
| | 5 | Bell et al. "Assessing Range of Motion to Evaluate the Adverse Effects of Ill-Fitting Cervical Orthoses", The Spine Journal, Vol. 9, 2009, Pages, 225-231. | |

EFS Web 2.1.17      ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

| | 6 | Karason et al. "Evaluation of Clinical Efficacy and Safety of Cervical Trauma Collars: Differences in Immobilization, Effect on Jugular Venous Pressure and Patient Comfort", Scandinavian Journal of Trauma, Resuscitation and Emergency Medicine, 2014, Pages 1-7. | |
|---|---|---|---|

| If you wish to add additional non-patent literature document citation information please click the Add button | Add |
|---|---|

### EXAMINER SIGNATURE

| Examiner Signature | /OPHELIA A HAWTHORNE/ | Date Considered | 02/12/2022 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT<br>( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2019-11-18 |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Justin J. Cassell/ | Date (YYYY-MM-DD) | 2019-11-18 |
|---|---|---|---|
| Name/Print | Justin J. Cassell | Registration Number | 46205 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.17    ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.1.17    ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (03-15)
Approved for use through 07/31/2016. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | | |
| First Named Inventor | Wayne CALCO | |
| Art Unit | | |
| Examiner Name | /OPHELIA A HAWTHORNE/ | |
| Attorney Docket Number | 19793.488.1.1 | |

| U.S.PATENTS | | | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code1 | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | D278747 | S | 1985-05-07 | PEACH, JR | |
| | 2 | 4628913 | | 1986-12-16 | LERMAN | |
| | 3 | 4732144 | | 1988-03-22 | CUNANAN | |
| | 4 | D314623 | S | 1991-02-12 | CALABRESE et al. | |
| | 5 | D552742 | S | 2007-10-09 | LEATT | |
| | 6 | D609815 | S | 2010-02-09 | PATTERSON | |
| | 7 | D617907 | S | 2010-06-15 | WALLER | |
| | 8 | D631167 | S | 2011-01-18 | LEATT et al. | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 - GAU: 3786

<table>
<tr><td rowspan="6">INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT<br>( Not for submission under 37 CFR 1.99)</td><td>Application Number</td><td></td></tr>
<tr><td>Filing Date</td><td></td></tr>
<tr><td>First Named Inventor</td><td>Wayne CALCO</td></tr>
<tr><td>Art Unit</td><td></td></tr>
<tr><td>Examiner Name</td><td></td></tr>
<tr><td>Attorney Docket  Number</td><td>19793.488.1.1</td></tr>
</table>

| | | | | | |
|---|---|---|---|---|---|
| | 9 | D643978 | S | 2011-08-23 | ABAJO ALONSO et al. | |
| | 10 | D644331 | S | 2011-08-30 | SANDHU | |
| | 11 | D644332 | S | 2011-08-30 | SANDHU | |
| | 12 | D647624 | S | 2011-10-25 | THORGILSDOTTIR et al. | |
| | 13 | D659842 | S | 2012-05-15 | DONALDSON et al. | |
| | 14 | D662597 | S | 2012-06-26 | CHANG | |
| | 15 | D692568 | S | 2013-10-29 | CHIANG et al. | |
| | 16 | D693014 | S | 2013-11-05 | CHIANG et al. | |
| | 17 | D767825 | S | 2016-09-27 | GEORGESON et al. | |
| | 18 | 4702233 | | 1987-10-27 | OMICIOLI | |
| | 19 | 5632722 | | 1997-05-27 | TWEARDY et al. | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|

| Application Number | |
|---|---|
| Filing Date | |
| First Named Inventor | Wayne CALCO |
| Art Unit | |
| Examiner Name | |
| Attorney Docket Number | 19793.488.1.1 |

| | 20 | 8864693 | B2 | 2014-10-21 | SUAREZ et al. | |
|---|---|---|---|---|---|---|
| | 21 | 9668906 | B2 | 2017-06-06 | THORGILSDOTTIR et al. | |

If you wish to add additional U.S. Patent citation information please click the Add button. [Add]

**U.S. PATENT APPLICATION PUBLICATIONS** [Remove]

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20110034844 | A1 | 2011-02-10 | THORGILSDOTTIR et al. | |
| | 2 | 20130281899 | A1 | 2013-10-24 | SUAREZ et al. | Cited in the Partial International Search Report |
| | 3 | 20150216708 | A1 | 2015-08-06 | GARTH et al. | Cited in the Partial International Search Report |

If you wish to add additional U.S. Published Application citation information please click the Add button. [Add]

**FOREIGN PATENT DOCUMENTS** [Remove]

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2]i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2653139 | EP | A1 | 2013-10-23 | OPTEC USA, INC | | |
| | 2 | 2886088 | EP | A1 | 2015-06-24 | DEROYAL INDUSTRIES, INC | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button [Add]

**NON-PATENT LITERATURE DOCUMENTS** [Remove]

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|
| | 1 | International Search Report from PCT Application No. PCT/US2017/019391, May 18, 2017. | |
| | 2 | Partial International Search Report from PCT Application No. PCT/US2017/050206, December 5, 2017. | |
| | 3 | Product Brochure, "Capital Collar Enhanced," DeRoyal, 2014, 2 Pages. | |
| | 4 | Product Brochure, "Instructions for Use Eclipse Cervical Collar," VQ OrthoCare, 2015, 2 Pages. | |
| | 5 | Product Brochure, "Miami J Advanced By OSSUR," www.ossur.com, 2012, 4 Pages. | |
| | 6 | Product Brochure, "Miami J Cervical Collar," www.ossur.com, 1 Page. | |
| | 7 | Product Brochure, "Proglide Cervical Collar," OPTEC, www.optecusa.com, 1 Page. | |
| | 8 | Product Brochure, "Vista Upper Spine," Aspen Medical Products, 2015, 6 Pages. | |

| If you wish to add additional non-patent literature document citation information please click the Add button | Add |
|---|---|

| EXAMINER SIGNATURE | | | |
|---|---|---|---|
| Examiner Signature | /OPHELIA A HAWTHORNE/ | Date Considered | 02/12/2022 |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

EFS Web 2.1.17        ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 — GAU: 3786

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

| | | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | |
| | Filing Date | |
| | First Named Inventor | Wayne CALCO |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 19793.488.1.1 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Justin J. Cassell/ | Date (YYYY-MM-DD) | |
|---|---|---|---|
| Name/Print | Justin J. Cassell | Registration Number | 46205 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.17    ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

16/686,582 – GAU: 3786

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /O.A.H/

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| L1 | 227 | ("10675173" \| "20130310722" \| "20160008158" \| "20170252198" \| "20200281754" \| "20020138028" \| "20020156408" \| "20020156409" \| "20020169401" \| "20020173737" \| "20030055367" \| "20030060744" \| "20030181838" \| "20040039318" \| "20050101896" \| "20070027418" \| "20070073203" \| "20070270728" \| "20090247918" \| "20100137768" \| "20100268139" \| "20100298748" \| "20110034844" \| "20110066094" \| "20110224591" \| "20120053499" \| "20120130295" \| "20120165712" \| "20130060179" \| "20130281899" \| "20130281900" \| "20140012172" \| "20140107551" \| "20140323938" \| "20150216708" \| "20160287424" \| "20180078400" \| "20180078401" \| "2088207" \| "2102069" \| "2735424" \| "2791999" \| "2801630" \| "2806471" \| "2818063" \| "2820455" \| "2911970" \| "3024784" \| "3027894" \| "3042027" \| "3050052" \| "3060930" \| "3075521" \| "3135256" \| "3177869" \| "3285243" \| "3285244" \| "3306284" \| "3313297" \| "3320950" \| "3504667" \| "3512523" \| "3756226" \| "3916884" \| "3916885" \| "4099523" \| "4173973" \| "4205667" \| "4325363" \| "4401111" \| "4413619" \| "4520801" \| "4538597" \| "4562833" \| "4582051" \| "4628913" \| "4643174" \| "4677969" \| "4702233" \| "4708129" \| "4712540" \| "4732144" \| "4745922" \| "4827915" \| "4854306" \| "4886052" \| "4940043" \| "4955368" \| "4987891" \| "5005563" \| "5038759" \| "5058572" \| "5060637" \| "5097824" \| "5156588" \| "5180361" \| "5201702" \| "5215517" \| "5230698" \| "5275581" \| "5302170" \| "5346461" \| "5366438" \| "5385535" \| "5433696" \| "5437612" \| "5437617" \| "5445602" \| "5520619" \| "5588957" \| "5593382" \| "5622529" \| "5624387" \| "5632722" \| "5688229" \| "5716335" \| "5728054" \| "5785670" \| "5788658" \| | US-PGPUB; USPAT | ADJ | ON | 2022/02/12 12:45 |

# EXHIBIT 84

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

| | |
|---|---|
| Application No.: | 16/686,582 |
| Filing Date: | November 18, 2019 |
| First Inventor: | Wayne CALCO |
| Attorney No.: | 19793.488.1.1 |
| Examiner: | Ophelia Althea HAWTHORNE |
| Art Unit: | 3786 |
| For: | CERVICAL COLLAR HAVING HEIGHT ADJUSTMENT |

REPLY TO OFFICE ACTION

Commissioner for Patents
P.O. Box 145
Alexandria, VA 22313-145

INTRODUCTORY COMMENTS

This reply is responsive to the outstanding Office Action of February 17, 2022. As a result of the following amendments and remarks, reconsideration of the application is respectfully requested.

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

2/9

<u>AMENDMENT</u>

Please amend the application in accordance with the following particulars.

<u>In the Claims</u>

The claims are amended as shown on the following page(s) under the heading LIST OF
CURRENT CLAIMS.  The list shows the status of all claims presently in the application
and is intended to supersede all prior versions of the claims in the application.  Any
cancellation of claims is made without prejudice or disclaimer.

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

3/9

LIST OF CURRENT CLAIMS

1. (Currently Amended) A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising:

a main support;

a lower support hingedly connected to the main support;

a sternum pad; and

an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support;

wherein the sternum pad is mounted to a ball joint and the adjustment mechanism has an adjustment dial and an extension element arranged for adjustably extending relative to the lower support.

2. (Original) The cervical collar of claim 1, wherein the adjustment mechanism is located at a lowermost portion of the lower support.

3. (Original) The cervical collar of claim 2, wherein the adjustment mechanism is located centrally at the lowermost portion of the lower support.

4. (Original) The cervical collar of claim 1, wherein the adjustment mechanism includes an extension element variably extendable from the adjustment mechanism.

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

4/9

5. (Original) The cervical collar of claim 4, wherein the adjustment mechanism includes a dial for adjusting a distance the extension element extends from the adjustment mechanism.

6. (Original) The cervical collar of claim 4, wherein the adjustment mechanism includes a housing arranged for receiving the extension element in a contracted configuration.

7. (Original) The cervical collar of claim 1, wherein the main support carries a lock mechanism for locking rotation of the lower support relative to the main support.

8. (Canceled)

9. (Original) The cervical collar of claim 1, wherein the main support carries an upper support connected to inside the main support and oriented to face a mandible of a user.

10. (Original) The cervical collar of claim 9, wherein the upper support is maintained in a stationary relationship with the main support.

11. (Original) The cervical collar of claim 9, wherein the upper support is rigid.

12. (Original) The cervical collar of claim 1, wherein the main support has a generally arcuate configuration adapted to extend about the mandible of a user, and the lower support has a generally arcuate configuration contoured for being adapted for securing against a sternum of the user.

13. (Canceled)

**-1360-**

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

5/9

14. (Currently Amended) ~~The cervical collar of claim 1,~~ A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising:

a main support;

a lower support hingedly connected to the main support;

a sternum pad; and

an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support;

wherein the adjustment mechanism includes a housing arranged for receiving an extension element in a contracted configuration resulting in a reduced or substantially minimized distance between the lower support and the sternum pad, the extension element having a screw thread, and the housing defining corresponding threads permitting slidable movement between the extension element and the screw thread according to adjustment of a dial associated with the extension element.

15. (Original) The cervical collar of claim 14, wherein the housing defines a recess from which at least a portion of the dial extends.

16. (Currently Amended) A cervical collar having an anterior component arranged for connecting to a posterior component, the anterior component comprising:

a main support;

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

6/9

a lower support hingedly connected to the main support;

a sternum pad; and

an adjustment mechanism located on the lower support and the sternum pad is connected thereto such that the sternum pad is movable relative to the lower support;

~~The cervical collar of claim 1,~~ further comprising a lock mechanism for locking rotation of the lower support relative to the main support, the lock mechanism coupled to a slidelock arranged for operatively engaging end portions of the main support and lower support for locking and unlocking rotation of the lower support relative to the main support;

wherein the slidelock slides over an outer surface of the main support to cooperate with the main support to arrest or prevent rotation of the lower support relative to the main support.

17. (Original) The cervical collar of claim 16, wherein the slidelock defines a central rack of teeth arranged to correspond to and operatively engage elements forming part of the lock mechanism for enabling linear translation of the slidelock relative to the main support.

18. (Canceled)

19. (Canceled)

20. (Canceled)

**-1362-**

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

7/9

REMARKS

Reconsideration of the pending application is respectfully requested in view of these observations.

Amendment to the Claims

Claim 1 is amended with the allowable subject matter of claim 13. Claim 1 and the claims dependent on claim 1 are therefore in condition for allowance. Claims 8 and 13 are canceled.

Claim 14, identified as reciting allowable subject matter, is placed in independent form including the limitations of claim 1. Claims 14 and 15 are in condition for allowance.

Claim 16 is placed in independent form including the limitations of claim 1 and the allowable subject matter of claim 18. Claim 18 is canceled. Claims 16 and 17 are in condition for allowance.

Claim 18 was not rejected by the prior art, and is considered to recite allowable subject matter.

Claims 19 and 20 are canceled without prejudice or disclaimer to expedite the allowance of the pending application.

Entry of the amendment to the claims is kindly requested.

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

8/9

Specification

The objection to the specification is moot given the amendment to claim 8.

Claim Rejections – 35 U.S.C. § 112

Withdrawal of the rejection of claim 8 under 35 U.S.C. § 112(b) is kindly requested in view of the cancelation of claim 8.

Claim Rejections – 35 U.S.C. § 102

*Rejection of claims 1, 2, 4-7, 9-12, 16 and 17 under 35 U.S.C. § 102 as anticipated by US 2016/0008158 (Martin)*

Reconsideration of this rejection is kindly requested in view of the amendment to claim 1, which is placed in condition for allowance.

Withdrawal of the rejection is kindly requested.

Claim Rejections – 35 U.S.C. § 103

*Rejection of claims 3 and 8 under 35 U.S.C. § 103 as unpatentable over US 2016/0008158 (Martin) in view of US 2013/0281899 (Suarez)*

*Rejection of claims 19 and 20 under 35 U.S.C. § 103 as unpatentable over US 2016/0008158 (Martin) in view of US 2013/0281899 (Suarez)*

Application No.: 16/686,582
Art Unit: 3786
Attorney Docket No.: 19793.488.1.1

9/9

Reconsideration of the rejection of claim 3 is kindly requested in view of the amendment to claim 1, which is placed in condition for allowance.

Claims 19 and 20 are canceled.

Withdrawal of the rejection is kindly requested.

Conclusion

The application is in condition for allowance because of the amendment to the claims and the preceding remarks.

If any issues remain that may be resolved by a telephone or facsimile communication with the Applicant's attorney, the Examiner is invited to contact the undersigned at the numbers shown below.

Respectfully submitted,

/Justin J. Cassell/

JUSTIN J. CASSELL
Attorney for Applicant
Registration No.: 46,205

WORKMAN NYDEGGER
60 East South Temple, Suite 1000
Salt Lake City, UT 84111
Phone: (801) 533-9800

Date: May 20, 2022

# EXHIBIT 85



US 20160008158A1

(19) **United States**

(12) **Patent Application Publication**    (10) Pub. No.: **US 2016/0008158 A1**
Martin et al.    (43) Pub. Date:    **Jan. 14, 2016**

(54) **CERVICAL COLLAR WITH HEIGHT ADJUSTMENT MECHANISM**

(71) Applicant: **Otto Bock HealthCare LP**, Minneapolis, MN (US)

(72) Inventors: **Michael L. Martin**, West Jordan, UT (US); **Kwok Tim Ng**, Fanling (HK)

(21) Appl. No.: **14/328,413**

(22) Filed: **Jul. 10, 2014**

**Publication Classification**

(51) **Int. Cl.**
*A61F 5/055* (2006.01)

(52) **U.S. Cl.**
CPC ......... *A61F 5/055* (2013.01); *A61F 2250/0004* (2013.01)

(57) **ABSTRACT**

A cervical collar provides height adjustment using a locking member disposed on a height adjustment member extending through a height adjustment aperture. As the locking member is moved between locked and unlocked positions, ridges on a main collar body and on a chin support member may be interlocked or allowed to slide over each other from one desired position to another, thereby providing a height adjustment mechanism for the cervical collar.





**FIG. 1A**



**FIG. 1B**



**FIG. 1C**



**FIG. 1D**



**FIG. 2**



**FIG. 3**



FIG. 4A



FIG. 4B



**FIG. 5**



FIG. 6A

FIG. 6B



**FIG. 7A**



**FIG. 7B**



**FIG. 8A**



**FIG. 8B**



**FIG. 9A**

**FIG. 9B**



**FIG. 10A**

**FIG. 10B**



FIG. 11A

FIG. 11B



FIG. 12A

FIG. 12B

1

## CERVICAL COLLAR WITH HEIGHT ADJUSTMENT MECHANISM

### BACKGROUND

[0001]    The following relates generally to orthopedic neck braces and specifically to cervical collars with height adjustment features.

[0002]    The human spine has seven vertebrae in the neck that are referred to as the cervical vertebrae. When a person suffers a traumatic head or neck injury, fractures of the cervical vertebrae, strains, sprains, and whiplash symptoms may injure a person's spinal cord and other sensitive structures in the neck. Cervical collars are a type of neck brace used to support and immobilize a patient's neck, to help realign the spinal cord, and to relieve pain. They do so by limiting the head from tilting through use of bracing supports positioned around the patient's neck and under the patient's chin. Cervical collars may be rigid, padded braces or relatively soft and flexible. Typically, more rigid braces are used when there is an elevated risk of damage to the spinal cord, and softer braces are used in applications such as therapeutic recovery, where the patient's neck is stronger or the vertebrae and muscles have mostly healed.

[0003]    A paramount concern in the use of cervical collars is the comfort of the patient. A cervical collar provides sustained support to the appropriate sides of the head and neck while minimizing the hindrance to the patient's mobility and ability to perform common tasks such as speaking or eating. Since patients come in all shapes and sizes, it is difficult for collars to do both jobs effectively. Too often, a cervical collar that is comfortable is not effective in medical treatment or a collar that provides proper support is restrictive and claustrophobic for the patient.

[0004]    Some cervical collars have been developed with mechanisms that allow the patient and medical personnel to adjust the shape and support of the collar in an effort to provide a custom fit for the wearer. While these apparatuses succeed in addressing some of the issues faced by patients and medical personnel, they are frequently expensive to produce and subsequently expensive for a patient in need. Additionally, the adjustment mechanisms can be complex and unreliable, leading to confusion of the patient in the use of the device or unwanted and undesirable movement of the brace and the patient's neck.

### SUMMARY

[0005]    According to at least one embodiment, a height-adjustable cervical collar is provided, comprising a main collar body having a collar front portion and collar side portions. The collar front portion may be configured to be positioned anterior to a neck and upper chest area of a wearer, and the collar side portions may be configured to be positioned to the lateral sides of the neck of the wearer. At least one of the collar side portions may comprise at least one height adjustment aperture. The collar may also comprise a chin support member coupled to the main collar body, wherein the chin support member may have a chin front portion and chin side portions configured to be at least partially positioned below the chin and lower jaw of a wearer. The chin support member may comprise a pair of pivotable connections coupling the chin side portions to the main side portions and a height adjustment member extending externally through the height adjustment aperture of the main collar body. The collar may

also comprise a locking member positioned around the height adjustment member external to the height adjustment aperture. This locking member may be adjustable relative to the height adjustment member between a first position and a second position, wherein in the first position, pivoting movement of the chin support member relative to the main collar body around the pair of pivotable connections is permitted, and wherein in the second position, pivoting movement of the chin support member relative to the main collar body is inhibited.

[0006]    In some cases, the locking member may prevent the height adjustment member from withdrawing through the height adjustment aperture. the height adjustment member may also snap-fit through the locking member. The locking member may also be rotatable around the height adjustment member between the first position and the second position. In some arrangements, the locking member may be rotatable from the first position to the second position in only one direction of rotation,

[0007]    When the locking member is in the first position, the height adjustment member may be at least partially withdrawable through the height adjustment aperture, and when the locking member is in the second position, the height adjustment member may not be withdrawable through the height adjustment aperture.

[0008]    The height adjustment member may further comprise a tab extending radially from the height adjustment member. The tab may be spaced from the locking member when the locking member is in the first position, and the tab may be in contact with the locking member when the locking member is in the second position. In another embodiment, the locking member may comprise a first surface and a second surface, wherein each of the first and second surfaces may be selectively rotatable into alignment with the at least one tab, the second surface being externally raised relative to the first surface. Additionally, the tab may be inwardly compressible toward a central axis of the height adjustment member.

[0009]    In another embodiment, the main collar body may further comprise a first ridged surface and the chin support member may further comprise a second ridged surface, wherein when the locking member is in the first position, the first and second ridged surfaces may be relatively slidable over each other, and when the locking member is in the second position, the first and second ridged surfaces may not be relatively slidable. The first and second ridged surfaces may not relatively slidable over each other between a plurality of adjusted positions,

[0010]    The collar may further comprise a back panel member coupled to the main side portions of the main collar body. Furthermore, the pair of pivotable connections may removably secure the main collar body and chin support member together. The chin support member and main collar body may be separable from each other upon relative rotation to a predetermined position.

[0011]    According to another aspect of the present disclosure, a method of manufacturing a height-adjustable cervical collar may be provided, comprising: providing a pivotal connection between a chin support member and a main collar body of a cervical collar; inserting a height adjustment member of the height adjustment member through a height adjustment aperture in the main collar body; and positioning a locking member around the height adjustment member such that the

2

locking member is movable relative to the height adjustment member between a first relative position and a second relative position.

[0012] The method may further comprise pivoting the pivotal connection while the locking member is in the first relative position and inhibiting rotation of the pivotal connection while the locking member is in the second relative position. Rotation may be inhibited by ridges on the chin support member and the main collar body being pressed into an interlocking position interfering with rotation at the pivotal connection.

[0013] Positioning the locking member around the height adjustment member may comprise snap-fitting the height adjustment member with the locking member. The locking member may be positioned around the height adjustment member in a manner permitting rotation of the locking member around the height adjustment member. Additionally, the method may further comprise attaching a back panel member to the main collar body.

[0014] In another aspect, a cervical collar may be provided comprising: a lower support member configured to at least partially overlie the upper chest of a wearer that has a first ridged surface; an upper support member pivotally connected to the lower support member, wherein the upper support member has a second ridged surface facing the first ridged surface; and a releasable tensioning member connected to the cervical collar. The tensioning member may have an unlocked position and a locked position, wherein the unlocked position allows relative movement of the first and second ridged surfaces, and the locked position prevents relative movement of the first and second ridged surfaces by applying tension driving the first and second ridged surfaces into contact.

[0015] The tensioning member may be attached to or integrated with at least one of the lower and upper support members. The tensioning member may be removable from the at least one of the lower and upper support members.

[0016] Furthermore, the tensioning member may be rotatable between the locked and unlocked positions. Movement of a surface of the tensioning member may drive the first and second ridged surfaces into contact. The first and second ridged surfaces may be lockable in a plurality of positions relative to each other. The plurality of relative positions may correspond with a plurality of positions of the chin of a wearer,

[0017] The foregoing and other features, utilities and advantages of the invention will be apparent from the following more particular description of a preferred embodiment of the invention as illustrated in the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

[0018] The accompanying drawings and figures illustrate a number of exemplary embodiments and are part of the specification. Together with the present description, these drawings demonstrate and explain various principles of this disclosure. A further understanding of the nature and advantages of the present invention may be realized by reference to the following drawings. In the appended figures, similar components or features may have the same reference label.

[0019] FIGS. 1A-1D are various views of an embodiment of a cervical collar according to the present disclosure.

[0020] FIG. 2 is an exploded view of the cervical collar of FIG. 1A,

[0021] FIG. 3 is a view of the cervical collar of FIG. 1A being worn by a patient.

[0022] FIG. 4A is a view of the inside of a main collar body of an embodiment of a cervical collar according to the present disclosure.

[0023] FIG. 4B is a view of the inside of a chin support member of an embodiment of a cervical collar according to the present disclosure.

[0024] FIG. 5 is a detail external view of a chin support member of an embodiment of a cervical collar according to the present disclosure.

[0025] FIG. 6A is a section view of the interaction between locked ridges on a main collar body and a chin support member and between a height adjustment member and a locked locking member of a cervical collar according to the present disclosure.

[0026] FIG. 6B is a section view of the interaction between unlocked ridges on a main collar body and a chin support member and between a height adjustment member and an unlocked locking member of a cervical collar according to the present disclosure.

[0027] FIGS. 7A-7B are respective exterior and interior views of an embodiment of a locking member.

[0028] FIGS. 8A-8B are respective exterior and interior views of another embodiment of a locking member.

[0029] FIG. 9A is a view of a locked chin support member, main collar body, and locking member in a lowered position.

[0030] FIG. 9B is a section view of the chin support member, main collar body, and locking member of FIG. 9A taken through a plane perpendicular to the longitudinal axis of the shaft of the height adjustment member of the chin support member.

[0031] FIG. 10A is a view of a partially unlocked chin support member, main collar body, and locking member.

[0032] FIG. 10B is a section view of the chin support member, main collar body, and locking member of FIG. 10A taken through a plane perpendicular to the longitudinal axis of the shaft of the height adjustment member of the chin support member.

[0033] FIG. 11A is a view of a fully unlocked chin support member, main collar body, and locking member.

[0034] FIG. 11B is a section view of the chin support member, main collar body, and locking member of FIG. 11A taken through a plane perpendicular to the longitudinal axis of the shaft of the height adjustment member of the chin support member.

[0035] FIG. 12A is a view of a locked chin support member, main collar body, and locking member in a raised position.

[0036] FIG. 12B is a section view of the chin support member, main collar body, and locking member of FIG. 12A taken through a plane perpendicular to the longitudinal axis of the shaft of the height adjustment member of the chin support member.

[0037] While the embodiments described herein are susceptible to various modifications and alternative forms, specific embodiments have been shown by way of example in the drawings and will be described in detail herein. However, the exemplary embodiments described herein are not intended to be limited to the particular forms disclosed. Rather, the instant disclosure covers all modifications, equivalents, and alternatives falling within the scope of the appended claims.

DETAILED DESCRIPTION

[0038] Embodiments of the present disclosure may improve comfort and adjustability of cervical collars while remaining simple in operation and low in cost. According to

3

one embodiment, a height-adjustable cervical collar may include a main collar body and a chin support member. The height of the front of the chin support member relative to the front of the main collar body may be pivotally adjusted around a pair of pivot points linking the sides of the main collar body and the chin support member. The chin support member may be secured in a desired position that provides a custom fit for a wearer and that provides the proper angle of orientation of the head relative to the neck and upper torso.

[0039]   Ridges may be provided on opposing surfaces of the chin support member and the main collar body that interlock in a plurality of positions corresponding to various heights of the front of the chin support member. These ridges may be made either relatively slidable or relatively immobilized upon movement of a tensioning member or locking member. The tensioning or locking member may provide a secure, durable lock for the cervical collar that is inexpensive and easy to operate even by the patient while wearing the collar.

[0040]   In one embodiment, the height adjustment of the cervical collar may be limited by movement of a height adjustment member traveling within the bounds of a height adjustment aperture. Typically, the height adjustment member extends from the chin support member externally through a height adjustment aperture in the main collar body. The tensioning or locking member may then snap-fit over the height adjustment member external to the height adjustment aperture in a manner preventing withdrawal of the member through the aperture. Thereafter, movement of the tensioning or locking member, such as, for example, rotational movement, may cause the opposing ridges on the main collar body and chin support member to interlock and prevent chin height adjustment.

[0041]   The present description provides examples, and is not limiting of the scope, applicability, or configuration set forth in the claims. Thus, it will be understood that changes may be made in the function and arrangement of elements discussed without departing from the spirit and scope of the disclosure, and various embodiments may omit, substitute, or add other procedures or components as appropriate. For instance, the methods described may be performed in an order different from that described, and various steps may be added, omitted, or combined. Also, features described with respect to certain embodiments may be combined in other embodiments.

[0042]   Referring now to the figures in detail, FIGS. 1A-1D show various views of an exemplary embodiment of a cervical collar 100 of the present disclosure. FIG. 1A is a perspective view, FIG. 1B is a front view, FIG. 1C is a side view, and FIG. 1D is a rear view. The cervical collar 100 may include a main collar body 102, a chin support member 104, and a back support member 106. The main collar body 102 and chin support member 104 may be linked using one or more locking members 108 and pivotal connections 118. The main collar body 102 and the back support member 106 may be linked using hook and loop fastener material, such as a hook and loop fastener strap 110 attached to the back support member 106 and a hook and loop fastener pad 112 attached to the main collar body 102.

[0043]   The cervical collar 100 may be worn around the neck of a patient. See, e.g., FIG. 3. The main collar body 102 may be positioned against the anterior upper chest or lower neck area of the wearer, the back support member 106 may be positioned to the rear of the neck, preferably to the rear of the cervical vertebrae of the neck, and strapped to the main collar

body using the hook and loop fastener material 110, 112. The chin support member 104 may be positioned at least partially within and above the main collar body 102, so as to support the chin, jaw, upper neck, and lower skull of the wearer. The chin support member 104 and main collar body 102 may define an open space 113 to be positioned at the tracheal area of the neck. This open space 113 may improve comfort, facilitate an open tracheal airway, and allow airflow to the skin of the neck. The height of the chin support member 104 may be referred to as the relative distance between a front portion 124 of the chin support member 104 and a front portion 114 of the main collar body 102. A lower height is a smaller distance between the front portions 114, 124, and a higher or taller height is a larger distance between them. The connections between the main collar body 102 and chin support member 104 may provide adjustable height between these front portions 114, 124, as described in further detail herein. Thus, using the pivotal connections 118 and the hook and loop fastener material 110, 112, the cervical collar 100 may provide a custom fit of the height of the chin support member 104 and of the distance between the main collar body 102 and the back support member 106, respectively.

[0044]   The main collar body 102, chin support member 104, back support member 106, and locking member 108 may beneficially comprise a generally rigid material, such as a polymer or composite material. Such materials may beneficially reduce the weight of the cervical collar 100 and decrease manufacturing costs. They may also be partially flexible to improve comfort when wearing the collar 100.

[0045]   The main collar body 102 may be referred to as a lower support member due to being positioned in the lower portion of the collar 100, the chin support member 104 may be referred to as an upper support member due to being positioned in an upper portion of the collar 100, and the locking member 108 may be referred to as a releasable tensioning member due to its function in tensioning the chin support member 104 and main collar body 102 together.

[0046]   The cervical collar 100 may further comprise padding on internal surfaces of the main collar body 102, chin support member 104, and back support member 106. The padding may be removably securable to the rigid components of the cervical collar 100 by hook and loop fastener pads on the rigid components and/or the padding. In other arrangements, the padding may be secured to the collar 100 by adhesives or straps (e.g., FIG. 3 and related description).

[0047]   The main collar body 102 may have a front portion 114 and side portions 116. The side portions 116 may be configured to extend around and provide support to the left and right sides of the neck (i.e., the lateral sides of the neck). The side portions 116 may include a pair of pivotal connections 118. In the embodiments of FIGS. 1A-1D, the pivotal connections 118 may be positioned at the back ends of the side portions 116 of the main collar body 102. In other cases, the pivotal connections 118 may be arranged farther toward the front portion 114 of the main collar body 102. The main collar body 102 may also comprise one or more height adjustment aperture 120 extending through one or more of the side portions 116. A height adjustment aperture 120 may be an opening through a side portion 116 that permits a height adjustment member 122 to externally extend through the main collar body 102 and translate through the height adjustment aperture 120 relative to the main collar body 102, as discussed in further detail elsewhere herein. A hook and loop

US 2016/0008158 A1

4

fastener pad **112** may also be positioned on a side portion **116**. The main collar body **102** may also comprise front flanges **132**.

[0048]   The chin support member **104** may link to the main collar body **102** at the pivotal connections **118** and via the height adjustment apertures **120**. The chin support member **104** may comprise a pair of height adjustment members **122** extending through the height adjustment apertures **120** and slidable within the height adjustment apertures **120**. In conjunction with the pivotal connections **118**, the chin support member **104** may thus tilt or rotate along a path defined by travel of the height adjustment members **122** along the height adjustment apertures **120**. The height adjustment members **122** may be prevented from withdrawal through the height adjustment apertures **120** by interference with the locking members **108** and/or by tabs extending radially from the end of the members **122**. See, e.g., tabs **550** in FIG. **5**. The side portions **126** of the chin support member **104** may comprise indicator lines or guides that indicate to the user of the cervical collar **100** the relative rotated positions of each side portion **126** relative to the adjacent side portion **116** of the main collar body **102**. Using the guide lines, a user may determine if each side is raised or lowered to the same distance, so the wearer's comfort may be improved due to the left and right sides of the head being supported at the same angle.

[0049]   In some cases, the side portions **126** of the chin support member **104** may be positioned external to the side portions **116** of the main collar body **102**. In these cases, the height adjustment aperture **120** may be formed in the chin support member **104** and the height adjustment member **122** may be formed on the main collar body **102**.

[0050]   The main collar body **102** may have an internal surface **134** and an external surface **136**. The internal surface **134** may comprise a plurality of inward-facing ridges **142**. See FIGS. **2** and **4A**. The chin support member **104** also may have an internal surface **138** and an external surface **140**. The external surface **140** may face the internal surface **134** of the main collar body **102**. The external surface **140** may also comprise a plurality of ridges **144** sized and positioned to interact with the plurality of ridges **142** on the main collar body **102**. See FIG. **5**. In the embodiment of FIGS. **1A**-**1D**, the ridges **142**, **144** are positioned adjacent to the height adjustment aperture **120** and height adjustment member **122**, but in other embodiments, the ridges may be configured elsewhere along the side portions **116** of the main collar body **102** and side portions **126** of the chin support member **104** where the ridges can interlock with each other when the height adjustment member **122** is drawn outward relative to the height adjustment aperture **120**. When pressure is not being applied by the height adjustment member **122** to drive the external surface **140** toward the internal surface **134**, the ridges **142**, **144** may slide over each other in a direction about perpendicular to the parallel lines formed by the ridges. Thus, the ridges **142**, **144** may be repositioned relative to each other, and if they are locked in place again in a new position, the chin support member **104** and main collar body **102** will also have new relatively pivoted positions. In this manner, the cervical collar **100** may be adjusted to support the neck at various raised or lowered positions.

[0051]   The back support member **106** may be positioned behind the neck of the wearer. The back support member **106** may include apertures **128** through which hook and loop fastener straps **110** may be attached. The back support member **106** may also include a back groove **130** positioned ver-

tically along a substantial portion of the height of the back support member **106**. The back groove **130** may improve comfort of the back support member **106** by providing a recess in which the surface of the neck adjacent to the spinous processes of the cervical vertebrae may be received. The back support member **106** may be curved to follow a predefined contour aligning the cervical vertebrae in a desired orientation to be held by the cervical collar **100** in general.

[0052]   The locking member **108** may be a releasable securing means for holding the orientation of the chin support member **104** relative to the main collar body **102**. Embodiments of the locking member **108** are described and shown in greater detail in FIGS. **7A**-**8B**. The locking member **108** may releasably drive the ridges **142**, **144** into contact with each other, thereby locking the height of the chin support member **104** at a desired position. In some embodiments, the ridges **142**, **144** may interlock in this position, meaning they have corresponding surfaces that fit together adjacent to each other. The locking member **108** may also be moved to a position where it does not drive the ridges **142**, **144** into contact such that the ridges **142**, **144** are relatively slidable or liftable over each other. In this position, the height of the chin support member **104** may be adjusted until the locking member **108** is moved to a position where the ridges **142**, **144** are driven back into contact with each other.

[0053]   A hook and loop fastener strap **110** and pad **112** may allow the back support member **106** to be adjusted in horizontal and vertical directions relative to the main collar body **102**. The straps **110** and pads **112** may also adjust the tightness of the cervical collar **100** around the wearer's neck. The use of hook and loop fastener material may easily allow small or large adjustments to the fit of the collar **100**, and may allow the collar **100** to be moved or removed by the wearer. Other connecting means may also be used, such as ratcheting plastic straps, interlocking parts, hooks extending between the side portions **116** and the back support member **106**, or another similar means apparent to those skilled in the art having the benefit of the present disclosure. A pad **112** on the main collar body **102** may be beneficially placed on the side portions **116** where at least a portion of the anterior end of the pad may be directed through the main collar body **102**. This anterior portion **146** may extend through the main collar body **102** and attach or adhere to the back of the pad **112**, as shown in FIG. **4A**. With the anterior portion **146** thus configured, the pad **112** may be reinforced against becoming pulled from the main collar body **102** when the front end of a strap **110** is pulled away from the main collar body **102**.

[0054]   The pivotal connections **118** may be positioned at the back ends of the side portions **116**, **125** of the main collar body **102** and chin support member **104**. The pivotal connections **118** may be removably securable or non-removable. For example, non-removable pivotal connections **118** may be rivets or another at least somewhat permanent connection means keeping the chin support member **104** and main collar body **102** connected but still allowing relative height adjustment of their front portions **114**, **124**. See, e.g., FIG. **3**. The pivotal connections **118** may be removably secured by structures such as a bolt and nut or by a rotation lock such as the elements shown in FIGS. **1A**-**1D**. Elements of an embodiment of a pivot lock are shown in detail in FIGS. **4A**-**4B** and described below.

[0055]   The height adjustment aperture **120** may comprise openings through the main collar body **102** on the side portions **116**. In the embodiments shown, the main collar body

US 2016/0008158 A1

Jan. 14, 2016

5

**102** comprises two height adjustment apertures **120**, but in other embodiments, one or more than two apertures may be formed according to the needs of the designer. Height adjustment apertures **120** may beneficially be formed adjacent to or within the portions of the internal surface **134** having ridges **142**. This may allow the movement of the height adjustment member **122** inward and outward in the height adjustment aperture **120** to more directly affect the position of the ridges **142** relative to ridges **144** on the chin support member **104** than ridges positioned farther from the aperture **120**, such as near the pivotal connections **118** or front portion **114**. In other words, relative movement of the ridges **142**, **144** may be more directly enacted by relative movement of the height adjustment member **122** in the aperture **120** when the ridges **142**, **144** are adjacent to the member **122** and aperture **120**. The shape of the height adjustment apertures **120** may beneficially follow the paths of motion of the height adjustment members **122** as they rotate around the pivotal connections **118** while extending through the main collar body **102**. The terminal ends of the apertures **120** may define the limits of adjustment of the height of the chin support member **104** to positions commonly used among patients. In some embodiments, the height adjustment apertures **120** may be holes, openings, passages, slots, or channels in the main collar body **102**.

[0056] Height adjustment members **122** may extend from the external surface **140** of the chin support member **104** through the height adjustment apertures **120** of the main collar body **102**. In other embodiments, the internal surface **138** of the chin support member **104** may be positioned external to the external surface **136** of the main collar body **102**, and the height adjustment members **122** may extend from the external surface **136** of the main collar body **102** through apertures that extend through the chin support member **104**. Height adjustment members are also discussed in detail in connection with FIGS. **2** and **5**, infra.

[0057] The front flanges **132** may provide flexible support for the main collar body **102** against the wearer's upper torso. Broad, curved flanges **132** may distribute pressure on the wearer's torso and improve comfort of the collar **100**. The front flanges **132** may also provide a design element to improve the cosmetic and aesthetic appeal of the collar **100**.

[0058] FIG. **2** is an exploded view of the cervical collar **100**. The interaction and relative positioning of many features of the embodiment described in connection with FIGS. **1A**-**1D** is shown in FIG. **2**. The exploded view shows ridges **144** on the chin support member **104** adjacent to the height adjustment member **122** extending from the external surface **140**. The ridges **144** may correspond with ridges **142** on the internal surface **134** of the main collar body **102** adjacent to the height adjustment apertures **120**. See also FIGS. **4A** and **6A**-**6B**. This view also shows exploded positions of padding **200** for the cervical collar **100**.

[0059] FIG. **3** shows an exemplary embodiment where the cervical collar **100** is worn by a patient **300**. The padding **200** may protect the skin of the patient **300** from chafing or scratches by the relatively rigid material used to make other parts of the cervical collar **100** that would contact the patient **300**. This view also shows an alternative embodiment of the pivotal connection **318** between the main collar body **102** and the chin support member **104**. In this embodiment, the pivotal connection **318** is a rivet or other similar permanent connection that permits pivotal movement between the parts **102**, **104** while securing them together without being removable simply by relative rotation of the parts **102**, **104**.

[0060] The foam padding **200** may protect the wearer **300** by dampening and cushioning relative movements between the cervical collar **100** and the wearer **300**. The padding **200** may improve comfort, especially when the collar **100** is worn over long periods of time. The padding **200** may comprise foam rubber, neoprene, or another comfortable, elastically-flexible synthetic or natural padding material. In conjunction with the hook and loop fastener material **110**, **112** and the height adjustment between the chin support member **104** and main collar body **102**, the padding **200** may provide an additional amount of comfort and customizability to the cervical collar **100**. For example, the thickness or material of the padding **200** may be changed to affect the rigidity of the foam or the distance between the internal surfaces of the collar **100** and the wearer's body.

[0061] FIGS. **4A**-**4B** show internal surfaces **134**, **138** of the main collar body **102** and chin support member **104**. FIG. **4A** shows ridges **142** extending from the internal surface **134** of the main collar body **102** around the height adjustment aperture **120**. The height adjustment aperture **120** may have an elongated shape to allow ridges **144** adjacent to a height adjustment member **122** to be seated in a range of positions relative to the aperture **120** as the chin support member **104** pivots about the pivotal connections **118**. The ridges **142** may correspondingly extend around the perimeter of the height adjustment aperture **120** so that ridges **144** adjacent to the height adjustment member **122** on the chin support member **104** may be seated in at least some of the ridges **142** of the main collar body **102** at a plurality of pivoted positions of the chin support member **104**. The ridges **142** may beneficially be formed and spaced so that the ridges **144** of the chin support member **104** may fit with the ridges **142** on the main collar body when the height adjustment member **122** is at the extreme ends of the elongated shape of the height adjustment aperture **120**. Thus, the entire length of the elongated shape may provide the range of motion of the height adjustment member **522**.

[0062] FIG. **4A** also illustrates a pivot stem **400** extending from the side portion **116** of the main collar body **102**. The pivot stem **400** may be configured to be inserted through a pivot opening **402** in a side portion **126** of the chin support member **104**, thereby forming the pivotal connection **118** between the main collar body **102** and chin support member **104**. The pivot stem **400** may comprise locking flanges **404** that extend radially outward from a central axis of the pivot stem **400**. The flanges **404** may have increased circumferential width at their outermost radial surfaces as compared to their width near the central axis of the pivot stem **400**. Thus, they may form the fan shapes shown in FIG. **4A**.

[0063] FIG. **4B** shows an internal surface **138** of a side portion **126** of a chin support member **104**. A pivot opening **402** is shown in the side portion **126** that may be configured to receive a pivot stem **400** of the main collar body **102**. To insert the pivot stem **400** through the pivot opening **402**, the pivot stem **400** and pivot opening **402** would need to be in a relative rotated position where flange keyways **410** of the pivot opening **402** align with and receive the locking flanges **404**. In this orientation, the pivot stem **400** may be moved through the pivot opening **402** and then be rotated so that the flanges **404** are internal to flange supports **408** extending inward from the internal surface **134** near the pivot opening **402**. With the flanges **404** positioned inward from the internal faces of the supports **408**, the pivot stem **400** may not be withdrawn through the opening **402** without reorientation of the flanges

**404** to fit back through the keyways **410**. The width of the flanges **404** and supports **408** may help ensure that the flanges **404** are not unintentionally withdrawn through the opening **402** over a wide range of relative pivoted angles of the main collar body **102** and the chin support member **104**. In some embodiments, these angles may include up to 90 degrees of relative rotation of the respective side portions **116**, **126** near the pivotal connections **118**. In some embodiments, the flange-and-keyway design may allow the chin support member and the main collar body to be separated from each other after assembly if they are rotated to a predetermined position (e.g., the position they are in when the stem **400** is inserted through the opening **402**).

[0064]    FIG. **5** shows a detailed view of a height adjustment member **522** extending from an external surface **540** of a chin support member **504**. The height adjustment member **522** may be an embodiment of a height adjustment member **122** described above. As shown in this figure, the height adjustment member **522** may have an elongated shape extending from the external surface **540**. In some embodiments, the external surface **540** may include a raised portion **546** separating the base of the height adjustment member **522** from the surrounding external surface **540** of the chin support member **504**. The raised portion **546** may reduce contact and friction between the chin support member **504** and a main collar body (e.g., main collar body **102**) by providing a surface separating the chin support member **504** and main collar body. Additionally, because the external surface **540** is curved in typical embodiments, the raised portion **546** may provide a flat surface against which the internal surface or ridges (e.g., ridges **142**) of the main collar body can slide and directly interface. Thus, the raised portion **546** may establish a limit of penetration of the height adjustment member **522** through a height adjustment aperture (e.g., height adjustment aperture **120**). Limiting the depth of penetration may beneficially prevent a locking member **108** from being too loose on the height adjustment member **522** to keep the ridges (e.g., ridges **142**, **144**) in contact when the locking member is in a locked position on the height adjustment member **522**. The raised portion **546** may also include ridges **544** that interlock with or slide over ridges on a main collar body as the collar **100** is locked or adjusted.

[0065]    The height adjustment member **522** may comprise a shaft **548** having a length X. Length X may extend from the raised surface **546** to the inner side of one or more tabs **550** radially extending from the shaft **548** at the end of the height adjustment member **522**. The tabs **550** may have a width Y. In some embodiments, the external end of the height adjustment member **522** may include a flexure slot **522** allowing the tabs **550** to elastically flex inward, thereby temporarily reducing width Y.

[0066]    The height adjustment member **522** may also comprise key ridges **554** on multiple sides of the shaft **548** and external end of the height adjustment member **522**. In embodiments where the flexure slot **552** is not present, key ridges **554** may not be split in the manner shown in FIG. **5**, but may instead be solid at the external end of the height adjustment member **522**. Key ridges **554** may be beneficial in keeping a locking member (e.g., locking member **108**) in a locked or unlocked position, as described in additional detail in connection with FIGS. **9A-12**B.

[0067]    The terminal end of the height adjustment member **522** may also comprise at least one indicator surface **555**. The indicator surface **555** may have symbols printed, embossed,

engraved, or molded onto it to help the user determine whether a locking member is in a locked position or an unlocked position. For example, when the locking member is in a locked position, an arrow (e.g., arrow indicator **822** of FIG. **8**A or indicator **722** of FIG. **7**A) or other symbol on the locking member may point toward a lock symbol on the indicator surface **555**, and when the locking member is in an unlocked position, the arrow may not point toward the lock symbol (or vice versa).

[0068]    The shaft **548** of the height adjustment member **522** may comprise at least four side surfaces, including at least two opposing permissive surfaces **556** and at least two restrictive surfaces **558** on other opposing surfaces. The permissive surfaces **556** may be generally positioned Closer to a central axis of the shaft **548** than the restrictive surfaces **558**. See, e.g., FIG. **9**B, which shows a cross-section of the shaft **548**. In one embodiment, the permissive surfaces **556** may be sloped (e.g., similar to sides of a diamond) relative to the central axis of the shaft **548**, and the restrictive surfaces **558** may be corners or peaks (e.g., similar to corners of a square) relative to the central axis and compared to the permissive surfaces **556**. With a locking member disposed around the shaft **548**, the locking member may turn at least more easily between locked and unlocked positions around the permissive surfaces **556** than around the restrictive surfaces **558**. This may beneficially control the amount of rotation of the locking member around the shaft **548**. It may also help guide the user in determining which direction he should turn the locking member to lock or unlock the brace. See also FIGS. **9A-12**B and their related descriptions below.

[0069]    FIGS. **6A-6**B show a section view illustrating the interaction of the ridges **142**, **144** relative to the positioning of a locking member **808**. This locking member **808** is also shown in FIGS. **8A-8**B. The locking member **808** may also be locking members **108** or **708**. See FIG. **7A-7**B. In FIG. **6**A, the locking member **808** is in a locked position. The ridges **142**, **144** are interlocked and are not slidable over each other because the height adjustment member **122** is fully inserted through the height adjustment aperture **120**, as indicated by length $H_1$. The height adjustment member **122** cannot be withdrawn through the height adjustment aperture **120** in this position because locked position supports **620** are against the inside surfaces of tabs (e.g., tabs **550** of FIG. **5**) at the end of the height adjustment member **122**. Thus, the main collar body **102** and chin support member **104** are not relatively pivotable at this height adjustment aperture **120**.

[0070]    In FIG. **6**B, the locking member **808** is in an unlocked position. The ridges **142**, **144** can be separated (as shown) and can slide over each other because the height adjustment member **122** is partially withdrawn through the height adjustment aperture **120**. The height adjustment member **122** now only has length $H_2$ extending out of the aperture **120**, which is less than length $H_1$. The locking member **808** has been rotated about 90 degrees between FIGS. **6**A and **6**B, as shown by the rotation of the external indicators **822**. See also FIGS. **9**A and **11**A. Thus, the locked position supports **620** are no longer positioned between the tabs of the height adjustment member **122** and the main collar body **102**. Instead, in this position, unlocked position supports **618** are allowing the tabs to move closer to the height adjustment aperture **120**, thereby providing slack between the ridges **142**, **144**. Additional details and embodiments of the locking member **808** are shown and described in connection with FIGS. **7A-8**B.

7

[0071]   FIGS. 7A-7B show views of an embodiment of a locking member 708 according to the present disclosure. The locking member 708 may be a locking member 108 described above. The locking member 708 may comprise an outer surface 710 and inner surface 712 generally forming a ring. The outer surface 710 may be ridged to improve grip in turning the locking member 708. The locking member 708 may also comprise an external surface 714 and internal surface 716. The external surface 714 may be configured to face externally from the cervical collar (e.g., away from the main collar body 102), and the internal surface 716 may be configured to face internally (e.g., toward the main collar body 102).

[0072]   A plurality of unlocked position supports 718 and locked position supports 720 are positioned within the inner surface 712. The position supports 718, 720 may be attached to the inner surface 712 near the internal surface 716 and extend toward the plane of the external surface 714 of the locking member 708. The unlocked position supports 718 may have external surfaces 726 at a first recessed level from the external surface 714, and the locked position supports 720 may have external surfaces 728 at a second recessed level from the external surface. The first recessed level may be farther from the external surface 714 (or closer to the internal surface 716) than the second recessed level.

[0073]   When a height adjustment member (e.g., height adjustment member 122 or 522) is inserted through the central opening 730 of the locking member 708, the internal sides of the tabs of the height adjustment member (e.g., tabs 550) may be disposed external to the external surfaces 726 or 728 of the position supports 718 or 720. If the tabs 550 are positioned external to the unlocked position supports 718, the height adjustment member 522 may move in and out relative to the locking member 708 and a height adjustment aperture (e.g., height adjustment aperture 120). An example of this configuration is shown in FIG. 6B. If the tabs 550 are positioned external to the locked position supports 720, the height adjustment member 522 is immobilized relative to the aperture 120 and locking member 708, as shown in FIG. 6A. In the unlocked configuration, the ridges (e.g., ridges 142, 144) are allowed to slide over each other because the height adjustment member 522 can move, but in the locked configuration, the ridges 142, 144 are pressed together and relatively immobile. Thus, by turning the locking member 708 so that the tabs 550 of the height adjustment member 522 are either external to the unlocked position supports 718 or external to the locked position supports 720, the user may selectively control whether the ridges 142, 144 are unlocked or locked. The lock position of the ridges 142, 144 also controls whether the chin support member and main collar body are relatively movable around the pivotal connections 118. Thus, the position of the locking member 108, 708 may control whether height adjustment of the collar 100 is locked or unlocked, and turning the locking member 108, 708 may allow the user to change whether height adjustment of the cervical collar is allowed.

[0074]   The ridges 142, 144 may be relatively movable over each other due to the internal surface 134 and external surface 140 being permitted to be drawn apart. When these surfaces 134, 140 are capable of being drawn apart, the height adjustment member 522 and height adjustment aperture 120 may be moved relative to each other. The locking member 108, 708 may also be movable relative to the height adjustment member 522 in this position. For example, if locking member 108, 708 is unlocked, the ridges 142, 144 may move relative to each other, but if they are pressed together in this position,

there will be space between the locking member 108, 708 and the tabs extending from the end of the height adjustment member 522. The space may be thus present because the tabs are external to the unlocked position supports 718 in the unlocked position rather than being external to the locked position supports 720, and the unlocked position supports 718 extend externally to a shorter distance than the locked position supports 720, thereby leaving space between the tabs and the locking member 108, 708.

[0075]   The external surface 714 may include an arrow or other symbol or indicator 722 adjacent to either the unlocked or locked position supports 718, 720. In some embodiments, the indicator 722 may be an arrow that points toward the indicator surface 555 of the height adjustment member 522, and the indicator surface 555 may have a symbol on it signifying whether the locking member 108, 708 is in a locked position or an unlocked position. For example, the indicator 722 may point toward a lock symbol on the indicator surface 555 when the locking member 708 is locked, but when the locking member 708 is unlocked, the indicator 722 may not be directed toward the lock symbol due to rotation of the locking member 708.

[0076]   Each of the position supports 718, 720 may comprise an overhanging tab 724 radially extending inward relative to the inner surface 712 of the locking member 708 and the rest of the length of the position supports 718, 720. The height adjustment member may be inserted through central opening 730 between the position supports 718, 720. The height adjustment member may be thus inserted by being introduced to the locking member from the internal side of the locking member 708 and then pushed through the position supports 718, 720. In some embodiments, the position supports 718,720 may be at least partially flexible and may flex toward the inner surface 712 as the height adjustment member is pressed through the locking member 708. The height adjustment member may have a width (e.g., width Y in FIG. 5) at its external end that is greater than a width of a central shaft (e.g., width of shaft 548). Thus, one or more position supports 718, 720 may flex outward as the height adjustment member is pressed through them, and after being pressed through to a sufficient depth, the position supports 718, 720 may flex back into the positions shown in FIGS. 7A-7B.

[0077]   Once the position supports 718, 720 move back to their rest positions, the locking member 708 may be secured to the shaft of the height adjustment member by interference of the extra width (e.g.,Y) and the width of the space between the position supports 718, 720. The ease of insertion of the height adjustment member through the locking member 708 may be improved by using overhanging tabs 724 on the position supports 718, 720 since the position members 718, 720 may be thinner toward the internal surface 716 of the locking member 708 (i.e., where they need to flex to accommodate the external end of the height adjustment member) yet may be wide enough to prevent the height adjustment member from freely withdrawing from the locking member 708 due to the overhanging tabs 724 extending inward nearer to the external surfaces 726, 728 (i.e., where they need to sit to restrict withdrawal of an inserted height adjustment member). In some embodiments, there may be a space between unlocked position supports 718 that may allow the tabs 550 to at least partially withdraw between them.

[0078]   The inner surface 712, unlocked position supports 718, and locked position supports 720 define the central opening 730 of the locking member 708. As shown in FIGS.

US 2016/0008158 A1

8

Jan. 14, 2016

7A-7B, the opening **730** may be non-circular. Thus, the inner surface **712** may be closer to the outer surface **710** of the locking member **708** along a first lateral axis as compared to a second lateral axis of the opening **730** (e.g., a second lateral axis perpendicular to the first lateral axis). In the pictured embodiment, the inner surface **712** is closer to the outer surface **710** at the long axis of the elliptical shape of the opening **730** adjacent to the unlocked position supports **718**, and the inner surface **712** is farther from the outer surface **710** at the short axis of the elliptical shape adjacent to the locked position supports **720**. Thus, when a distal end of the height adjustment member **522** (e.g., the end bearing the tabs **550**) may be inserted into the locking member **708**, the opening **730** may only allow the height adjustment member **522** to be inserted in one relative rotated orientation. If their rotated orientation is not matched, the tabs **550** may prevent the height adjustment member **522** from entering the opening **730**.

[0079]    After the height adjustment member **522** is partially inserted into the opening **730** from the side of the internal surface **716** of the locking member **708**, the overhanging tabs **724** may prevent further insertion due to their overhanging the opening **730** and thereby limiting the depth of insertion. The locked and unlocked position supports **718, 720** may therefore be elastically deformable or bendable at least outward toward the inner surface **712** of the locking member **708** so that the tabs **550** of the height adjustment member **522** can be snap-fit past the overhanging tabs **724** and extend to where the tabs **550** are external to the external supports **726, 728** of the supports **718, 720** and the shaft **548** is laterally adjacent to the overhanging tabs **724**. While in FIGS. 7A-7B the opening **730** is generally elliptical, it will be apparent to those having ordinary skill in the art that have the benefit of the present disclosure that other shapes of an opening **730** may be used to perform the functions of the generally elliptical shape shown. In some embodiments, the opening **730** may be circular or another shape allowing a height adjustment member **522** to be inserted in more than one orientation.

[0080]    The tabs **724** of the locked position supports **720** may comprise keyways **732**. The keyways **732** may be formed in one or more overhanging tabs **724** and may correspond in size and position with key ridges **554** on a height adjustment member **522** inserted through the locking member **708**. The keyways **732** may be used to prevent the height adjustment member **522** from being pressed or snap-fit past the overhanging tabs **724** unless the key ridges **554** align with and pass through the keyways **732** as the height adjustment member **522** passes the overhanging tabs **724**. The keyways **732** may also be used in embodiments where the opening **730** only allows a height adjustment member **522** to be inserted in one relative orientation.

[0081]    The keyways **732** may be sized and shaped to receive the key ridges **554** of the height adjustment member **522**. In FIGS. 7A-7B, the keyways **732** are generally semi-circular, and in FIG. **5** the key ridges **554** are generally triangular, yet the sizes and positions of the keyways **732** and key ridges **554** allow the key ridges **554** to pass through the keyways **732** when the height adjustment member **522** and locking member **708** are in the properly relatively rotated position. In some embodiments, the shape of the key ridges **554** may match the shape of the key ridges **554**, such as keyways having triangular cutout shape about the same size as triangular key ridges (see, e.g., keyways **832** of FIGS. 8A-8B), or

circular key ridges may be provided on the height adjustment member to match the circular keyways on the overhanging tabs.

[0082]    Keyways **732** and key ridges **554** may thus be used to force a specific relatively rotated orientation of the height adjustment member **522** and the locking member **708** when they are attached to each other. The keyways **732** and key ridges **554** may also force a specific orientation when a locking member **708** is removed from the height adjustment member **522**. In this scenario, the locking member **708** may need to be turned around the height adjustment member **522** so that the keyways **732** and key ridges **554** align, and then the unlocked position supports **718** must be drawn outward toward the inner surface **712** to allow the tabs **550** of the height adjustment member **522** to be withdrawn through the opening **730**. In at least these arrangements, the unlocked position supports **718** may be more flexible than the locked position supports **720**.

[0083]    In the embodiment of FIGS. 7A-7B, two unlocked position supports **718** are provided at each side of the opening **730** and one locked position support **720** is provided at each side of the opening **730**. In some embodiments, the pairs of unlocked position supports **718** may be merged into a single unlocked position support (see, e.g., unlocked position supports **818** of FIGS. 8A-8B), or the locked position supports **720** may be divided into more than one support each. In this manner, the designer may use the size and number of the position supports as a means for controlling the collective rigidity or flexibility of the position supports.

[0084]    FIGS. 8A-8B show another embodiment of a locking member **808** for use in locking a height adjustment member (e.g., height adjustment member **522**) relative to a height adjustment aperture (e.g., height adjustment aperture **120**). Similar to the locking member **708** of FIGS. 7A-7B, this locking member **808** includes outer and inner surfaces **810, 812** and external and internal surfaces **814, 816**. Unlocked position supports **818** having external surfaces **826** and locked position supports **820** having external surfaces **828** are within the inner surface **812**. The external surfaces **826** of the unlocked position supports **818** may extend farther from the internal surface **816** than the external surfaces **828** of the locked position supports **820**. An arrow or other indicator **822** may be positioned on the external surface **814**. Each of the position supports **818, 820** include overhanging tabs **824**. An opening **830** may be formed by the inner surface **812** and the position supports **818, 820**. The overhanging tabs **824** of the locked position supports **820** may have triangular keyways **832** shaped to receive key ridges (e.g., key ridges **554**) of a height adjustment member. The tabs **824** may also comprise locking surfaces **834**.

[0085]    As illustrated by this embodiment, the outer surface **810** of the locking member **808** may be non-circular. In this case, the non-circular shape may be referred to as being generally hexagonal. Other shapes will be apparent to those having ordinary skill in the art and the benefit of this disclosure. Flattened surfaces of the generally hexagonal shape may improve grip of the user and give him a better sense of the degrees through which the locking member **808** has been turned while the locking member is not visible (e.g., not visible due to being under the operator's chin).

[0086]    Ridges **836** may be formed on the outer surface **810** on each portion of the outer surface **810** or just on selected sides or surfaces. In FIGS. 8A-8B, the ridges **836** are only on two sides of the generally hexagonal shape. Placing the ridges

US 2016/0008158 A1

Jan. 14, 2016

9

836 on the sides of the outer surface 810 that are not adjacent to the indicators 822 may suggest to the user to turn the locking member 808 around a height adjustment member by holding the outer surface 810 at those two sides, thereby limiting obstruction of the indicators 822 by the user's hand.

[0087] Similar to the locking member 708 described above, the opening 830 may receive a height adjustment member 522, but in this embodiment there are only two unlocked position supports 818. Decreasing the number of unlocked position supports 818 may increase the resistance of each unlocked position support 818 against deformation, thereby increasing the difficulty of installing or removing the locking member 808 from the height adjustment member 522.

[0088] FIGS. 9A, 10A, 11A, and 12A show side views of a main collar body 102, chin support member 104, and locking member 808 in different relative positions. In FIG. 9A, the chin support member 104 is in a lowered position relative to the main collar body 102, and the locking member 808 is in a locked position, as indicated by the locking indicators 822 directed toward the tabs of the height adjustment member 522. In FIG. 10A, the locking member 808 is partially rotated; in FIG. 11A, the locking member 808 is rotated into an unlocked position; and in FIG. 12A, the locking member is locked again and the chin support member 104 is in a raised position relative to the main collar body 102.

[0089] FIGS. 9B, 10B, 11B, and 12B show cross-sectional views taken through the shaft 548 of the height adjustment member 522 of FIGS. 9A, 10A, 11A, and 12A and through the locked and unlocked position supports 820, 818 of the locking member 808. The cross-section is taken through the shaft 548 along the length X where the locked position supports 820 have tabs 824 adjacent to the shaft 548. As shown here, the locked position supports 820 of the locking member 808 may include locking surfaces 834 adjacent to the keyways 832 of the locked position supports 820. These locking surfaces 834 can also be seen in FIGS. 8A-8B, and corresponding locking surfaces 734 are in FIGS. 7A-7B.

[0090] With the height adjustment member 522 inserted through the locking member 808, as shown in FIG. 9B, at least one locking surface 834 may be in contact with a restrictive surface 558 of the shaft 548 of the height adjustment member 522, and key ridges 554 on the shaft 548 may be seated in keyways 832. Another locking surface 834 of the locked position support 820 may be facing a permissive surface 556 of the shaft 548. The contact between locking surfaces 834 and restrictive surfaces 558 may prevent the locking member 808 from rotating around the shaft 548 in a direction that further drives the locking surfaces 834 and restrictive surfaces 558 into each other. The locking member 808 may, however, be rotated in a direction driving a locking surface 834 toward a permissive surface 556, as shown in FIG. 10B, where the locking member 808 has been rotated counterclockwise about 45 degrees, and in FIG. 11B, where the locking member 808 has been rotated about 90 degrees counterclockwise.

[0091] To reach the position of FIG. 10B from the position of FIG. 9B, a force may applied to the locking member 808 to rotate it around the shaft 548. In response to the rotating force, the key ridges 554 may resist movement of the locking member 808 around the shaft 548 due to their seating in the keyways 832. Thus, rotation of the locking member 808 may require outward flexure of the locked position supports 820 toward the inner surface 812 in order to allow the key ridges 554 to rotate out of the keyways 832 into the position of FIG.

10B. The materials may also be deformable to allow this rotation. When rotating between the positions of FIGS. 10B and 11B, the locked position supports 820 may again flex outward so that the key ridges 554 may be seated in the keyways 832 as shown in FIG. 11B. After rotation from the position of FIG. 9B to the position of FIG. 11B, the locking surfaces 834 formerly adjacent to restrictive surfaces 558 in FIG. 9B are now facing the permissive surfaces 556 in FIG. 11B, and the locking surfaces 834 that were facing the permissive surfaces 556 in FIG. 9B are now facing restrictive surfaces 558 in FIG. 11B.

[0092] Once reaching the position of FIG. 11B, the locking member 808 may be in an unlocked position, and the chin support member 104 may be pivoted upward relative to the main collar body 102. The height adjustment member 522 may move through the height adjustment aperture, such as to the position shown in FIG. 12A. As shown in FIG. 12B, the locking member 808 may then be moved back into the locked position of FIG. 9B to keep the chin support member 104 from making any undesired movements.

[0093] The locking member 808 may be referred to as being in a "locked position" when the radially extending tabs 550 of the height adjustment member 522 are in a position external and adjacent to the locked position supports 820, and the locking member 808 may be referred to as being in an "unlocked position" when the tabs 550 are in a position external and adjacent to the unlocked position supports 818. The position of the locking member 808 may be considered locked in the locked position since the position of the tabs 550 in that position may drive the ridges of the main collar body 102 and the ridges of the chin support member 104 into each other, thereby locking or at least inhibiting relative movement of the main collar body 102 and the chin support member 104. Similarly, in the unlocked position, the ridges of the main collar body 102 and chin support member 104 are not locked or forced together, so when the chin support member 104 and main collar body 102 are relatively pivoted by the user, the ridges can move over each other.

[0094] In some embodiments, the locking member 808 may only rotate in one direction between the locked position and the unlocked position. For example, to unlock the locking member 808, it may in some cases only be rotated clockwise or counterclockwise, and the locking member 808 may stop rotating once reaching the unlocked position. It may stop rotating due to contact between a locking surface 834 and a restrictive surface 558. The locking member 808 may be rotated in the opposite direction to lock it again. In other embodiments, the locking member 808 may be rotated in one direction between the locked and unlocked positions, and if the locking member 808 continues to rotate it may be locked again. In some arrangements, the locking member 808 may move from a locked position to an unlocked position by being rotated in more than one direction, such as being unlocked no matter whether it is turned clockwise or counterclockwise.

[0095] The locking member 808 may be referred to as being in a "seated position" when the key ridges 554 of a height adjustment member 522 are seated in keyways 832 of a locking member 808. Thus, the locked position and the unlocked position of the locking member 808 may be seated positions between which the locking member 808 may be rotated.

[0096] The previous description of the disclosure is provided to enable a person skilled in the art to make or use the disclosure. Various modifications to the disclosure will be

US 2016/0008158 A1
Jan. 14, 2016

10

readily apparent to those skilled in the art, and the generic principles defined herein may be applied to other variations without departing from the spirit or scope of the disclosure. Throughout this disclosure the term "example" or "exemplary" indicates an example or instance and does not imply or require any preference for the noted example. Thus, the disclosure is not to be limited to the examples and designs described herein but is to be accorded the widest scope consistent with the principles and novel features disclosed herein.

What is claimed is:

**1**. A height-adjustable cervical collar, comprising:

a main collar body having a collar front portion and collar side portions, the collar front portion configured to be positioned anterior to a neck and upper chest area of a wearer, the collar side portions configured to be positioned to the lateral sides of the neck of the wearer, at least one of the collar side portions comprising at least one height adjustment aperture;

a chin support member coupled to the main collar body, the chin support member having a chin front portion and chin side portions configured to be at least partially positioned below the chin and lower jaw of a wearer, the chin support member comprising:

a pair of pivotable connections coupling the chin side portions to the main side portions;

a height adjustment member extending externally through the height adjustment aperture of the main collar body;

a locking member positioned around the height adjustment member external to the height adjustment aperture, the locking member being adjustable relative to the height adjustment member between a first position and a second position, wherein in the first position, pivoting movement of the chin support member relative to the main collar body around the pair of pivotable connections is permitted and in the second position, pivoting movement of the chin support member relative to the main collar body is inhibited.

**2**. The height-adjustable cervical collar of claim **1**, wherein the locking member prevents the height adjustment member from withdrawing through the height adjustment aperture.

**3**. The height-adjustable cervical collar of claim **2**, wherein the height adjustment member snap-fits through the locking member.

**4**. The height-adjustable cervical collar of claim **1**, wherein the locking member is rotatable around the height adjustment member between the first position and the second position.

**5**. The height-adjustable cervical collar of claim **4**, wherein the locking member is rotatable from the first position to the second position in only one direction of rotation.

**6**. The height-adjustable cervical collar of claim **1**, wherein when the locking member is in the first position, the height adjustment member is at least partially withdrawable through the height adjustment aperture, and when the locking member is in the second position, the height adjustment member is not withdrawable through the height adjustment aperture.

**7**. The height-adjustable cervical collar of claim **1** wherein the height adjustment member further comprises a tab extending radially from the height adjustment member.

**8**. The height-adjustable cervical collar of claim **7**, wherein the tab is spaced from the locking member when the locking member is in the first position and the tab is in contact with the locking member when the locking member is in the second position.

**9**. The height-adjustable cervical collar of claim **7**, wherein the locking member comprises a first surface and a second surface, each of the first and second surfaces being selectively rotatable into alignment with the at least one tab, the second surface being externally raised relative to the first surface.

**10**. The height-adjustable cervical collar of claim **7**, wherein the tab is inwardly compressible toward a central axis of the height adjustment member.

**11**. The height-adjustable cervical collar of claim **1**, wherein the main collar body further comprises a first ridged surface and the chin support member further comprises a second ridged surface;

wherein when the locking member is in the first position, the first and second ridged surfaces are relatively slidable over each other, and when the locking member is in the second position, the first and second ridged surfaces are not relatively slidable.

**12**. The height-adjustable cervical collar of claim **11**, wherein the first and second ridged surfaces are relatively slidable over each other between a plurality of adjusted positions.

**13**. The height-adjustable cervical collar of claim **1**, further comprising a back panel member coupled to the main side portions of the main collar body.

**14**. The height-adjustable cervical collar of claim **1**, wherein the pair of pivotable connections removably secure the main collar body and chin support member together.

**15**. The height-adjustable cervical collar of claim **14**, wherein the chin support member and main collar body are separable from each other upon relative rotation to a predetermined position.

**16**. A method of manufacturing a height-adjustable cervical collar, the method comprising:

providing a pivotal connection between a chin support member and a main collar body of a cervical collar;

inserting a height adjustment member of the chin support member through a height adjustment aperture in the main collar body;

positioning a locking member around the height adjustment member such that the locking member is movable relative to the height adjustment member between a first relative position and a second relative position.

**17**. The method of claim **16**, further comprising;

pivoting the pivotal connection while the locking member is in the first relative position;

inhibiting rotation of the pivotal connection while the locking member is in the second relative position.

**18**. The method of claim **17**, wherein rotation is inhibited by ridges on the chin support member and the main collar body being pressed into an interlocking position interfering with rotation at the pivotal connection.

**19**. The method of claim **16**, wherein positioning the locking member around the height adjustment member comprises snap-fitting the height adjustment member with the locking member.

**20**. The method of claim **16**, wherein the locking member is positioned around the height adjustment member in a manner permitting rotation of the locking member around the height adjustment member.

US 2016/0008158 A1                                           Jan. 14, 2016

11

**21**. The method of claim **16**, further comprising attaching a back panel member to the main collar body.

**22**. A cervical collar, comprising:

a lower support member configured to at least partially overlie the upper chest of a wearer, the lower support member having a first ridged surface;

an upper support member pivotally connected to the lower support member, the upper support member having a second ridged surface, the second ridged surface facing the first ridged surface;

a releasable tensioning member connected to the cervical collar, the tensioning member having an unlocked position and a locked position, the unlocked position allowing relative movement of the first and second ridged surfaces, the locked position preventing relative movement of the first and second ridged surfaces by applying tension driving the first and second ridged surfaces into contact.

**23**. The cervical collar of claim **22**, wherein the tensioning member is attached to or integrated with at least one of the lower and upper support members.

**24**. The cervical collar of claim **23**, wherein the tensioning member is removable from the at least one of the lower and upper support members.

**25**. The cervical collar of claim **22**, wherein the tensioning member is rotatable between the locked and unlocked positions.

**26**. The cervical collar of claim **22**, wherein movement of a surface of the tensioning member drives the first and second ridged surfaces into contact.

**27**. The cervical collar of claim **22**, wherein the first and second ridged surfaces are lockable in a plurality of positions relative to each other.

**28**. The cervical collar of claim **27**, wherein the plurality of relative positions corresponds with a plurality of positions of the chin of a wearer.

\*   \*   \*   \*   \*

# EXHIBIT 86

Suggested Claims for Continuation Application

1

CLAIMS

What is claimed is:

1. A cervical collar, comprising:

a posterior component;

an anterior component arranged for connecting to the posterior component;

the anterior component including:

a main support;

a lower support hingedly connected to the main support and arranged for movement relative to the main support to fit the main support to a user's chin structure to an adjusted position during a fitting procedure;

a lower pad attached to a lowermost portion of the lower support and arranged to contact a user's sternum region when the cervical collar is fitted on the user;

an adjustment mechanism located centrally on the lowermost portion of the lower support for adjusting pressures of the lower pad relative to the user's sternum region, the adjustment mechanism having an adjustment member arranged for rotary movement relative to the lowermost portion for rotating a member extending through an opening in the lowermost portion of the lower support;

a lock mechanism arranged for locking movement of the lower support relative to the main support to lock the lower support in the adjusted position, the lock mechanism comprising an actuator for adjusting the lock mechanism from locked to unlocked conditions, the actuator centrally located on the lower support, the actuator configured to control engagement of a lock element with a rack segment to the locked condition and to control disengagement

Suggested Claims for Continuation Application

2

of the lock element with the rack segment while in the unlocked condition, the lock mechanism further including a spring element arranged to return the lock element to the locked condition by release of the actuator;

and wherein the adjustment mechanism operates independently of the lock mechanism so that rotational positions of the adjustment member do not affect the adjusted position of the lower support relative to the main support.

2. The cervical collar of claim 1, wherein the main support carries an upper support connected to inside the main support and oriented to face a mandible of a user.

3. The cervical collar of claim 2, wherein the upper support is maintained in a stationary relationship with the main support.

4. The cervical collar of claim 1, wherein the main support has a generally arcuate configuration adapted to extend about the mandible of a user, and the lower support has a generally arcuate configuration contoured for being adapted for securing against the user's sternum.

5. The cervical collar of claim 1, wherein the lock element includes a shaft portion and a pinion portion for engagement with the rack segment.

6. The cervical collar of claim 1, wherein the lock mechanism is configured for incremental height adjustment of the lower support relative to the main support so the adjusted position is locked at a desired height setting.

7. The cervical collar of Claim 1, further comprising a connector for connecting the anterior component to the posterior component, the

3

connector comprising a base element having a strap guide about which a strap extending from the posterior component extends.

8.  A cervical collar, comprising:

a posterior component;

an anterior component arranged for connecting to the posterior component;

the anterior component including:

 a main support;

a lower support hingedly connected to the main support and arranged for movement relative to the main support to fit the main support to a user's chin structure to an adjusted position during a fitting procedure;

a lower pad attached to a lowermost portion of the lower support and arranged to contact a user's sternum region when the cervical collar is fitted on the user; and

an adjustment mechanism located ~~centrally~~ on the lowermost portion of the lower support for adjusting pressures of the lower pad relative to the user's sternum region;

a lock mechanism arranged for locking movement of the lower support relative to the main support to lock the lower support in the adjusted position, the lock mechanism comprising an actuator for adjusting the lock mechanism from locked to unlocked conditions, the actuator ~~centrally~~ located on the lower support, the actuator configured to control engagement of a lock element to the locked condition and to control disengagement of the lock element while in the unlocked condition, the lock mechanism further including a bias element arranged to return the lock element to the locked condition by release of the actuator;

and wherein the adjustment mechanism operates independently of the lock mechanism so that adjustment of pressures of the lower pad relative to the user's sternum region does not affect the adjusted position

Suggested Claims for Continuation Application

4

of the lower support relative to the main support.